**CASE NO. 15-10398-F**

---

**UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

---

**TERI LYNN HINKLE,**

**Plaintiff—Appellant**

**v.**

**MIDLAND CREDIT MANAGEMENT, INC.;**

**MIDLAND FUNDING LLC; AND**

**ENCORE CAPITAL GROUP INC.**

**Defendants—Appellees,**

---

# APPENDIX TO APPELLANT'S BRIEF

**VOLUME 4**

---

***Appeal from the United States District Court, Southern District of Georgia, Dublin Division***

Craig K. Perry
Attorney at Law
Nevada Bar No. 3786
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
(702) 228-4777
*Attorney for Plaintiff-Appellant Teri Hinkle*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERI LYNN HINKLE,

Plaintiff,

vs.

MIDLAND CREDIT MANAGEMENT, INC.,

Defendant.

CASE NUMBER: 3:13Cv-33

**TRANSCRIBED FROM ELECTRONIC RECORDING**

Augusta, Georgia
May 7, 2014

TRANSCRIPT OF MOTION TO COMPEL HEARING

Before the Honorable BRIAN K. EPPS

United States Magistrate Judge

APPEARANCES: (VIA TELECONFERENCE)

FOR THE PLAINTIFF:
TERI LYNN HINKLE, Pro Se

FOR THE DEFENDANT:
MATTHEW B. AMES
Balch & Bingham, LLP
30 Ivan Allen Jr., Blvd., NW
Suite 700
Atlanta, Georgia 30308
(404) 962-3531

ALSO PRESENT:
K. ANN BROUSSARD

TRANSCRIBED BY:
C. Joan Mobley
U.S. District Court Reporter, CCR, CVR-M
P.O. Box 1316
Brunswick, Georgia 31521
(912) 280-1348

***(P R O C E E D I N G S)***

***(Call to Order 3:04 p.m.)***

THE CLERK: The Court calls case number 3:13CV-33, *Teri Lynn Hinkle versus Midland Credit Management, Incorporated,* represented by Matthew Ames. We are here for a teleconference.

THE COURT: Good afternoon, Everyone.

MS. HINKLE: Good afternoon.

MS. BROUSSARD: Good afternoon, Your Honor.

MR. AMES: Good afternoon, Your Honor.

THE COURT: Mr. Ames, I appreciate the brief that you filed with the latest update on where things stand.

Ms. Hinkle, I guess that email that you sent to him on May 5th at 10:37 p.m. that outlines your current state of outstanding issues, the ones that remain?

MS. HINKLE: Yes, their email and my email in reply.

THE COURT: That's right. Your email dated May 5th at 10:37 p.m.

MS. HINKLE: Right.

THE COURT: So those are the outstanding issues left of all the ones that you had originally raised?

MS. HINKLE: Yes, sir.

THE COURT: Well, first of all, let me congratulate you guys on making significant progress on your own. Certainly we always like to see the parties working together to get things resolved, and there has been a lot of hard work, I am sure, to

get us to where we sit right now.

Ms. Hinkle, I have been looking at all your stuff very carefully, my clerk and I have, and so with the ones that you have outstanding now I think maybe the best way to start this is for me to just tell you my gut reaction to your email on both counts, and then, if you don't mind, let me hear your thoughts in response. Is that okay with you?

MS. HINKLE: All right. Thank you.

THE COURT: So with your first issue where you say that, look, these documents that are attached to the surreply brief, the latest brief filed by the Defense, attachments A-1 through D-1 or D-2, I think it is, I think what you are saying is, look, first of all, it was missing pages. And so then you gave me a second report of the same information so now we have all three pages and it is clear that pages 2 and 3 are blank, but now your concern has shifted because the reports contain more information now than they did in the original report; is that right?

MS. HINKLE: Partially. The information that is inserted that wasn't there before, first of all, makes them not identical to the first ones, but especially if you have it in front of you, the attachment C-1 and C-2.

THE COURT: Let me get to that.

All right.

MS. HINKLE: It's the best way to point out the

example.

On C-1 at the top, it shows there a balance and that's because while the other documents that they had given me prior to previously claimed that the account had been paid in full in 2008. Now I definitely did not do that but all of the documents show that it had a zero balance. On the new one, C-2, now it shows $880.80. Now interestingly, that amount of $880.80 is the exact amount they claim is owed on the other alleged account.

THE COURT: Well, Ms. Hinkle, first of all, I think it says $300.80.

MS. HINKLE: Yeah, I am sorry. Three hundred. You are right. I am looking at a distance.

THE COURT: I think this is a good example and one where I think I can help you a little bit and kind of explain what my role is.

My role is to make sure that if you have requested documents that are relevant to your lawsuit that I am here to make sure the Defendant gives you the documents that you requested.

What I am not here to do is talk about things like inconsistencies between one report they give you and another. And all you and I can do right now is speculate as to why the first report shows zero at the top and the second one shows $300.80.

So at this point, those kinds of issues don't really

go to the question of whether they are producing the documents that are responsive to the requests for production you sent them. What you are getting in now is to the kind of detail that you are only going to be able to explore in a deposition setting.

MS. HINKLE: All right. I understand that.

On that same document the request was to produce everything in their possession in regard to compliance with the FCRA, and it is definitely incomplete because it shows they stopped reporting to the credit reports in 2009. I didn't even know about this if it wasn't for the credit reports in 2011 and so the document --

THE COURT: That is what you think the document suggests but you don't know until you depose someone and say am I correct that this report shows the very last date that you reported this debt to a credit reporting agency? The answer presumably will be, yes, that's what it shows, but it might be something else and then you can ask the follow-up question of, well, then why is it this is still showing up on my credit report if the last report date is March of 2009. That is stuff that you and I can't talk about in the context of a motion to compel. All I can do at this stage is say what did you request and Defendant have you given them that. And it sounds like the answer is, yes; they have produced the documents that you have requested. Now you have to schedule a deposition and ask those

questions to determine whether there are inconsistencies and some evidence that you can use to support your case.

MS. HINKLE: All right. I had decided that this particular issue, Request Number 5, I would be unlikely to get any more than what I have gotten anyway.

THE COURT: Well in a deposition setting you might get a little further. You might say is this the be all and end all? Is there another report out there that will explain more? And it may be in that setting the knowledgeable designee from the company may say well you know what, come to think of it, there is another report. We didn't give you everything. Hold on a minute. Let me go get somebody to print that report for you but we can't speculate right now. All we can do is look at your request, ask the Defendants is this everything, and when they say yes, unless there is some burning evidence or specific indication that there is more they are not giving you that is really all we can do for now.

MS. HINKLE: All right. I accept that.

THE COURT: And it sounds like then with respect to this first issue of these reports now that you have seen pages 2 and 3, the blank pages, you are concerned about whether they have intentionally omitted anything in response to the request. You really don't have that concern anymore; is that right?

MS. HINKLE: Well, I am very familiar with data entry software. I don't know what software they are using. I have

personally never seen one that creates blank pages. It just creates a page as you need it when you reach the bottom of the page.

I am not objecting to that. I was objecting to being told the first time that they had given me everything that they had in response and in the second set things were so different and then there were also two letters that they had not produced the first time, so obviously my question would be what else didn't you produce this time.

THE COURT: Well, and like I said, you can point to some specific evidence that you've got, something that really strongly suggests they are playing games with you and they are not producing the full file that you have asked for then certainly I want to hear about that. But it sounds like right now you are pretty reasonably satisfied you have everything, and you have to take some depositions to see whether these other speculations of yours might actually have some substance to them. Is that a fair characterization of where we sit?

MS. HINKLE: I would say on that issue that it is. I may not need to based on what they did give me and the facts of the case.

THE COURT: Okay. Now, Ms. Hinkle, moving on to the second item that you have in your email, and I read these things carefully because I want to make sure that you have your day to explain what you think you are missing and certainly to the

extent that the Defendants are not giving you something I want to make sure they do.

But to be honest with you, when I read your second bullet point in this email I scratched my head because if you look back at the requests that you mention, 6 and 8, the essence of those requests is, hey, you say I owe you money. You give me proof of that. You show me where there is some contract out there where you have the right to claim that debt is yours. Where did you buy my debt from? What accounts did you buy that show I owe somebody money and you bought it from them, essentially? Is that a fair characterization of 6 and 8?

MS. HINKLE: Just a moment. I wanted to look at 6 and 8, and I was being interrupted very briefly.

THE COURT: I did not characterize that very well but that is the essence of it, I think.

MS. HINKLE: Okay. Let me look at how it was worded. I just had it.

THE COURT: I have a copy here. The first one, 6, do you have that with you now?

MS. HINKLE: Yes.

THE COURT: The first one, produce the contract obligating the Plaintiff to pay any alleged debt to you or any other entity for which you claim you are authorized to collect the debt.

The second, produce the sale agreement containing

essentially your personal identifiers connected with any alleged account purported to belong to the Plaintiff which you claim to have the legal right to collect.

So in both of those the common theme is there, what is your source? Well how in the world do you Midland claim that I owe you money? Where did you buy my debt from?

And it looked like the information they gave you in response gave you every piece of that puzzle you needed but then I read your stuff and you said well wait a minute. I am not even interested in that. That is not really what I am interested in. And I am thinking well, goodness. That is what the request asked for. So I couldn't understand what you were trying to get at there.

MS. HINKLE: I might should have worded it better. What I was getting at, it doesn't really matter to me where they got it because in the first place it wasn't mine so I don't care about that. What it relayed to or referred to was what did you do when you attempted to reinvestigate after I disputed. In their interrogatories they said they went back to the seller, then in response to this production they gave me the two bills of sale and they say that is all they did to investigate after I disputed. That is what this issue is. Then in the bills of sale it clearly says in both of them that the sale was made without warranty or recourse - one of them is in capital letters - and there is nothing else attached to it; no indication as to

what those sales were comprised of or even if they had anything to do with me, but when, generally, the phrase without recourse and without representations or warranty pretty much means don't come back to us if you have a problem; however, they say they did go back to them. The purchasing agreement will spell out specifically what possible reason they could have to expect that these two other previous buyers would have been able to give them anything more than they already had to verify or validate. That is why I asked for the purchasing agreements because it spells out exactly what they could expect to get from the seller beyond what they already got. If there was no expectation that they could get anything from the seller, then they would have known that that would not constitute a proper reinvestigation under the FCRA.

THE COURT: So forgive me for being somewhat dense, what documentation do you believe is out there that they have not produced that you want?

MS. HINKLE: On the reinvestigation under the (s)(2)(B) they are required to do a proper reinvestigation to ascertain the validity or verification of the debt that they are reporting on the credit report.

THE COURT: And so if they say if the credit report shows that you owe Midland $5.00 and you dispute that then Midland has to go back and say, oh, well, how in the world did we claim that she owes us $5.00? What is our documentation that

supports that, right?

MS. HINKLE: Well under the law they have to investigate it.

THE COURT: Exactly. They have to go back to their files and make sure they have evidence that you owe them that $5.00.

MS. HINKLE: Right. But information that does not match and is not correct that they purchased from another buyer just information they have in their own records as to what they purchased does not verify or validate that information. That is just parroting their own internal information. That doesn't prove that what they have is correct.

THE COURT: This is the way I look at it. I think where things stand is you say I dispute it. I don't owe you $5.00 Midland and then you say show me how I owe you $5.00, and so in response Midland comes back and says, look, you weren't a customer of ours. You were a customer of someone else's. You failed to pay them the $5.00 that you owed them and then we bought the debt from somebody else. Here is the contract where we bought the debt and here is the exhibit to the contract that shows the specific account we bought in regards to you and the $5.00 that you owe. And it appears that they gave you that contract where they bought the debt that included your account. Would you agree with that?

MS. HINKLE: No. This is not the contract. This is

the just a copy of a bill of sale.

THE COURT: So you are saying when they bought your account, when they bought the debt arising out of your account with someone else, GE or I think a sale account on the other, that there was more documentation that went along with the purchase agreement than what they are giving you so far?

MS. HINKLE: There was more connected to the bill of sale. There is the purchase agreement which spells out the terms of the purchase because I am not disputing an amount. I am disputing the existence.

THE COURT: Okay. So I guess at this point I would turn to Mr. Ames to enlighten us about whether there is more to this agreement and any arguments by the Defense that the rest of the agreement shouldn't be produced and is not relevant.

MR. AMES: I appreciate that, Your Honor.

In terms of the account purchase agreement or what is referred as the forward flow agreement in Ms. Hinkle's May 5th email, I think we have really four concerns. The first is a procedural matter, and I will confess I was not a participant in the conferrals that occurred between Ms. Hinkle on the one hand and Ms. Broussard on the other so if I misspeak I hope that someone will correct me, but as a procedural matter in terms of discharging the duty to confer in good faith, in my review of the emails and brief writing and everything that preceded today's call, this explanation of relevance that we just heard

is the first time that that theory has been communicated to Midland so we would just purely as a procedural matter express a concern that this has been sort of a changing theory of relevance that has been difficult for us to pin down.

In terms of the substance, the time line alone I think negates this notion that the account purchase agreement somehow bears relevance to what investigation the Midland entity and Encore may or may not have done subsequent to acquiring Ms. Hinkle's account. The time line is this: we acquire bundles of accounts all at once pursuant to this forward flow agreement. There is a bill of sale that accompanied each specific account, and that is the only piece of paper that identifies Ms. Hinkle specifically. And then if there is a dispute, which Ms. Hinkle contends there is, then we would investigate but we can't start investigating a dispute relating to an account that we own until we own the account so this notion that the agreement that gave us title to the debt in the first place somehow reflects actions that we took afterwards just as a matter of logic and the time line doesn't make sense to us.

In terms of the content, the account purchase agreement or this forward flow agreement that Ms. Hinkle described, that is sort of a master agreement between the seller on the one hand and Midland Funding on the other and that is the vehicle that enabled the transfer of many accounts, sometimes hundreds or even thousands of accounts, at once, and that just

describes general commercial terms that are highly sensitive and proprietary to us. The nature of the relationship between the buyer and the seller overarching the amount that we acquired this bundle of accounts for, you know, venue in the event of a dispute; dispute resolution mechanism, those kinds of things. The only document that bears on Ms. Hinkle's account specifically is the bill of sale that we gave to her. The overarching commercial terms that don't relate to her specifically have no logical bearing on what we did or did not do to discharge our obligations under the statute that she cites 1681(s)(2). So there is a timing issue in terms of the time line and there is a relevance issue.

I just mentioned the concern a moment ago that these are very sensitive business terms to us. I mean, what we pay to acquire debt goes to the heart of our business and has no rational relationship to any of the claims in the case but the dissemination of that data could be used for an improper purpose and it could be devastating to our business. We could be under bid on future deals if our competitors knew our method of doing business and what we paid. And I will add, parenthetically I understand that on numerous occasions we attempted to negotiate the terms of a protective order in this case and Ms. Hinkle refused to entertain that, so that gives us great concern that a document that doesn't appear to be relevant is something that is of such keen interest to her.

THE COURT: Let me ask you this, Mr. Ames. Would you be agreeable to producing the full agreement if I sign the protective order?

MR. AMES: I don't know that my client would be over joyed about that either.

THE COURT: The inquiry is not whether your client would be over joyed.

MR. AMES: I understand.

MS. HINKLE: Your Honor, may I clarify?

THE COURT: Yes, you may. If it is with respect to the protective order, I don't have much patience for you being difficult on that. Protective orders are standard fare in litigation. It serves a very important purpose in the competitive business environment that most defendants operate within and so I don't understand why you would give them grief on that. You can't on the one hand insist on knowing everything about your account and on the other hand not give them protection they need to produce the information.

MS. HINKLE: Okay. Partially that is what I want to clarify.

I have no objection to a specific protective order. My only objection was that they be specific with me as to what it was they wanted to protect.

Going back to what Mr. Ames said, this is in fact not a new issue. This is not a new wrinkle. I did explain the

(s)(2)(B) and their obligation to what would be in the purchase agreement that would clarify all of that.

THE COURT: Well let me ask you this, Ms. Hinkle. How does it relate? How is the overall purchase agreement going to shed any light on this investigation duty that they have once you dispute a debt?

MS. HINKLE: Okay. Let me explain that. Under the (s)(2)(B) it is only about that. It only refers to the investigation done after a dispute. Now when they gave me the bills of sale and it says without recourse or warranty then they gave me a piece of paper printed up with the information that they say they got from the other buyers. First of all, those documents show that the sale amount was the full amount of the debt, which obviously is incorrect. They couldn't make any money if that is what they were doing. But I really don't care what they paid for it. I don't need to see the amounts that they paid. What is important is the terms of the sale as far as Midland's expectation to be able to go back to the seller to verify the existence of any account. I am not disputing that they bought this information from these other sellers. I am disputing that the original accounts ever existed so that is where you have to start. They say they didn't do anything but go back to the sellers to reinvestigate. If the language in the purchase agreement clearly states that they don't have anything else, they can't provide anything else, there is nothing else to

be had and they knew that in advance, then going back to the seller and presenting that that satisfies the requirement under the (s)(2)(B) section of the FCRA is just not true.

THE COURT: Well, I don't know. You had me there for a minute and I was going along with you and then I started thinking well let's just say for a minute the contract says what you think which is that there is no right of recourse and we have given you all there is to have with respect to confirmation that each of these accounts exist that you are buying then the next question is, well, what else can Midland do, right? But I get your overall point.

Mr. Ames, it sounds like she has a pretty good point there that the purchase agreement would have to include some language regarding verification of these accounts and perhaps even what happens when someone disputes a debt.

MR. AMES: I have not seen the particular account purchase agreement that she references in her email so I could only speculate as to what it says. I know generally that it includes the overarching commercial terms of the sale and does not identify or mention any accounts specifically. I guess where we get tripped up is it seems pretty settled under Georgia law that to constitute a valid assignment it has to be writing and it has to clearly identify the assignor and the assignee, and we've got both of those elements here with the bill of sale. The irony of this is if we had done it the exact opposite way,

if we had produced only the account purchase agreement and not the bill of sale then there might be room for an argument that we haven't reasonably identified her debt or connected the dots that in any way show standing on our part to speak to collect but in this instance we have been precise and we have produced a bill of sale that satisfies Georgia law for an assignment of a chosen action and we, again, admit that any overarching commercial terms just don't bear on any investigation that we did or didn't do marked after the fact.

THE COURT: But surely it may affect it. It depends on what the agreement says it may. I can see where there is an argument of relevance here and it sounds like you are not familiar enough with those general terms and conditions to be able to really categorically say whether they are responsive or not. So I would err on the side of Ms. Hinkle on this and think that instead of just giving her an exhibit to the sale that talks specifically about her that the overall contract is arguably relevant but certainly to the extent that it needs to be redacted to protect trade secrets and the like I want you to have the protection of being able to do that and the protection of a protective order as well, and if Ms. Hinkle won't consent to one, just file with the Court a draft and I will be glad to sign it as long as it is like most of the ones we see around here.

MS. HINKLE: I offered to do that, Your Honor. And as

I said before, I have no problem with them redacting out things like amounts, agreements to buy. A forward flow usually means that they are agreeing to buy more accounts later on down the road with the same entity as opposed to an accounts purchase agreement. It may be one or both between the two accounts. I have no argument that they bought to assign to them a debt that belonged to somebody. My argument is it doesn't belong to me and the language is going to be in that agreement as to what their reasonable expectation of proving it did would have been. That is what would be in that agreement so I am perfectly amenable to a specific protective order in regard to this. I would ask, however, that you instruct them not to redact any of the language in regard to what was included in the sale as far as warranty, documentation, where they got it from, for instance, because I know --

THE COURT: Ms. Hinkle, I think you are getting a little ahead of yourself. You are not dealing with some Johnny-come-lately lawyer here. Mr. Ames is highly regarded, he certainly has a lot of experience, and you are starting to talk about a dispute that doesn't even exist. I mean, I think he understands that the general terms and conditions are ones that you are going to want to see. Those are the ones that you allege to be relevant so let's not get into that right now.

MS. HINKLE: All right.

THE COURT: I will say overall, Ms. Hinkle, I do think

that sometimes you approach these topics with this feeling like you are dealing with shysters on the other side or perhaps litigators who don't know what they're doing. I don't think that has been the case with either lawyer you dealt with so I think that you need to probably show them a little more respect and professionalism. Certainly when I litigated I made every effort to do that with my opposing counsel and I only accused them of not being forthcoming when I had direct evidence of that being the case. It is just what we do within the bar and I will expect you to do the same thing for them.

MS. HINKLE: All right.

THE COURT: All right. So we need to move on and talk about the timing of all this.

Ms. Hinkle, is there any outstanding discovery that you are going to want to conduct once you get this redacted protected full agreement in hand?

MS. HINKLE: Just one. I would request the opportunity to depose the person who signed the affidavit that was put in yesterday. I don't know if you got a chance to read it but it doesn't pertain to me at all. It is all about the Defendant's debt throughout the whole thing.

THE COURT: Ms. Hinkle, how in the world does that affidavit not relate to you?

MS. HINKLE: The language in it all refers to the Defendant's debt, the Defendant's account. I am the Plaintiff.

THE COURT: Hold on a second.

Well I think that is probably a typo; is that right, Mr. Ames?

MR. AMES: It is.

THE COURT: I think it is a fair inference that that is a typo. I understand you want to take his deposition. I think I would probably want to do the same so if you want to do that and maybe take one other deposition of the Defendants if that is all we are talking about, how much time do you think you need to do that, Ms. Hinkle?

MS. HINKLE: Just long enough for me to - I will have to do it in written deposition so just long enough for me to serve that on them and for them to reply.

THE COURT: You don't want to do that in a regular deposition? Written depositions to me are just terribly inefficient and time consuming and you can't do follow-up. I would not recommend that.

MS. HINKLE: My reason for that is that I am financially unable to do it any other way.

THE COURT: All right. You know what; I so don't like depositions in written requests. I have only seen them in a couple of instances since I have been on the bench. I didn't see them at all in my practice because we avoided them like the plague. I am not familiar with the timing mechanisms of that.

Mr. Ames, are you familiar enough with the timing

mechanisms to know what kind of time that means we need to give for that?

MR. AMES: No, Your Honor. I am scurrying for my rule book now and if you have encountered this once or twice that is one or two times more than I have over 15 years. I am aware that it is out there but I have never seen it done.

THE COURT: All right. Let's see.

MS. HINKLE: I should think just like other forms of discovery would it not require 30 days to give them to answer?

THE COURT: Like most things in the law I am pretty good at speculating and half the time I am right but the other half I am not so I have to take a look at the rule to see.

(BRIEF PAUSE)

MR. AMES: It looks like the general rule is under Federal Rule 31. I am reading very quickly. I am not seeing anything that directly speaks to a time limit but it might be because I am reading quickly, and I am looking to see if there is a local rule also.

(BRIEF PAUSE)

MR. AMES: There doesn't appear to be a local rule that addresses it so it is just the federal rule.

THE COURT: Hold on. Let me read this real fast. Sorry.

MR. AMES: Sure.

(BRIEF PAUSE)

THE COURT: Well there is a procedure in 31.5 for cross-examination questions and redirect questions but, Mr. Ames, I doubt you would want to submit any written cross-examination questions, right?

MR. AMES: That's right.

(BRIEF PAUSE)

THE COURT: All right. How quickly, Mr. Ames, do you think we can get that protective order together and produce that agreement?

MR. AMES: We will have a proposed protective order to Ms. Hinkle by no later than close of business Friday and hopefully sooner than then. I will need to get the agreement from my client and start reviewing it immediately and then upon entry of the protective order we will produce the document. I don't want to promise to produce anything tomorrow without talking to my clients.

THE COURT: Sure.

MR. AMES: Inside of, say, 7 days should be do-able.

THE COURT: Well let me ask you this, Mr. Ames. Is there any additional discovery that you are going to want to conduct?

MR. AMES: No, sir. We are eager to proceed on to the next stage of the case.

THE COURT: Okay. Well, Ms. Hinkle, if I give you 45 days from today's date to complete discovery do you think that

will be sufficient?

MS. HINKLE: Yes, sir. I would like to point out there are two of those agreements; they are different companies.

THE COURT: I think that is understood.

Now I want you to understand that there were lots of accounts that would have been purchased through these two agreements and you're not going to get information regarding other people's accounts, you understand that, right?

MS. HINKLE: No, I don't want that. I have no interest in that at all.

THE COURT: So are you are just getting the general terms and conditions that go along with the bill of sale?

MS. HINKLE: Yes.

THE COURT: Okay. All right.

So we will enter an order to that effect then that we are going to allow 45 days for the Plaintiff to conduct discovery, that the Defendant doesn't have any additional discovery to conduct, and we will look for that draft protective order to come in.

Ms. Hinkle, do you have any objection to Mr. Ames emailing you that draft protective order?

MS. HINKLE: No. I would appreciate it.

THE COURT: That is just going to move things along a lot faster if you will agree to do that.

And do you have a good email address that you can

 communicate to him now so we are all on the same page about where it goes?

MS. HINKLE: We have been communicating to my only email address.

THE COURT: Oh that is right. Y'all had some emails in here. Okay.

All right. Well I think that takes care of everything so we are going to deny in part and grant in part the motion to compel and grant it only with respect to this issue of the agreement.

And backing up just for a minute; Mr. Ames, do you have any cases where this has been litigated in the past in a similar context?

MR. AMES: I have asked that question and I am wary of not overstating it. Midland has cases all over the country and while my folks at our law firm who handle these are unaware of this agreement ever being required to be produced I did not want to overstate it by saying that Midland had never been ordered to produce it because if they have and our firm just wasn't involved or wasn't aware of it I don't want to unintentionally mislead the Court. But in our experience, it has never been an issue.

THE COURT: And I know I am backing up a little bit here. But the way I am thinking about this is that agreement somewhere in there probably has some representations and

warranties regarding the validity of the debts that are being purchased and/or it may touch on what happens when a debt on one of these accounts is disputed. What kind of information can be requested and provided. Am I just totally wrong about that?

MR. AMES: I just don't know, Your Honor.

MS. HINKLE: Your Honor, there is a recent case where Midland was ordered to produce the purchase agreement and that is ***Gold versus Midland*** out of Northern California. That order was on February 14th of this year.

THE COURT: Ms. Hinkle, that is excellent. That is excellent. Do you have a cite for that?

MS. HINKLE: I can send you the order. I will send it to your clerk.

THE COURT: And so that would give me a little more comfort if I knew I wasn't the first judge in the country to order production of that type of agreement. I just makes sense to me that there may be some provisions along those lines in there that would arguably be relevant to the litigation.

MS. HINKLE: I will give you case law on some others as well but that is the latest one.

THE COURT: Okay. Well make sure you copy Mr. Ames when you send that authority to Mrs. Cirillo.

And Mr. Ames, if you have any contra authority that you want to send, you can do it in the same manner.

MR. AMES: Okay. Well what if we do? I mean, if we

find cases that say it should not be required to be disclosed, the zealous advocate impulses in me are going to want to invite the Court to reconsider the issue and if that is not the signal that you are sending then I certainly don't want to file something that I shouldn't.

THE COURT: I am doing some of this off the cuff, right, and just listening to you guys talk about it and then do what my gut tells me and I am always uncomfortable with that. As I said earlier, my gut is only right about 50 percent of the time or maybe 51 percent, so if you want to instead of emailing Mrs. Cirillo some cites if you are more comfortable submitting a supplemental brief then I will give you through Friday to do that. Is that enough time?

MR. AMES: Yes, Your Honor.

THE COURT: Okay. And then from there we will enter a ruling shortly after that and hopefully get this thing back on track.

MR. AMES: We appreciate Your Honor's time and patience.

THE COURT: No, no problem. Glad to do it.

Ms. Hinkle, is there anything further from your perspective we need to talk about today?

MS. HINKLE: I don't believe so. I thank you very much.

THE COURT: Thank you.

Mr. Ames, any further from your perspective?

MR. AMES: Well one small point of clarification. On the extension of 45 days of additional discovery, is that going to be limited to the serving and responses to the deposition by written question?

THE COURT: No. In fact, if the Defendant thinks of something else that you believe needs to be done, I am not going to limit you guys at all. You have 45 days to do whatever else you think you need. And the 45 days won't run from today. It will run from whenever we get this order out ruling on these issues.

MR. AMES: Okay. I was a little more concerned about it going the other way which is that it is an opportunity for another 45 days of open ended questions about produce this agreement and that agreement when I think we have produced everything we could locate that pertains to her specifically but if it is open it's open. I just want to make sure I understand the Court's ruling.

THE COURT: I think Ms. Hinkle has had enough of this document discovery anyway. She is ready to get to the deposition and get this over with.

MS. HINKLE: And you are absolutely right. I really truly do not believe other than the purchasing sale agreements that there is anything that they could give me.

THE COURT: Now, Ms. Hinkle, I do want to tell you

that you do have 45 days but you really need to give some serious consideration to whether there are any other depositions you want to take because you are not going to get another bite at this. This is the last opportunity to conduct discovery in the case.

MS. HINKLE: Absolutely. I will do that order immediately after this conference and the other case law I need to get out of my records and I will send that to Mrs. Cirillo no later than the morning.

THE COURT: All right. Well thank you very much, everyone, for your efforts in narrowing this discovery dispute down to a very manageable core of issues. I wish you guys a good rest of the week.

MR. AMES: Okay.

MS. HINKLE: Thank you very much.

MR. AMES: Thank you, Your Honor.

THE COURT: Goodbye.

*(PROCEEDING CONCLUDES APPROXIMATELY 3:48 p.m.)*

---

**CERTIFICATION**

I certify that the foregoing, consisting of pages 1-29, is a true and correct copy of the transcript as transcribed by me to the best of my ability from the official electronic recording of the proceedings.

This the 20th day of May, 2014.

/s/ C. Joan Mobley

U.S. District Court Reporter

Southern District of Georgia

Plaintiff's Appendix Document No - 80

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION

## CLERK'S MINUTES - GENERAL

CASE NO. **3:13cv33** DATE **5/29/2014**

TITLE **Teri Lynn Hinkle v. Midland Credit Management, Inc.**

TIMES **9:05 - 9:11** TOTAL **6 minutes**

Honorable : **Brian K. Epps, United States Magistrate Judge** Courtroom Deputy : **Rebecca Cirillo**

Court Reporter : **FTR** Interpreter : **N/A**

| Attorney for Plaintiff | Attorney for Defendant(s) | Attorney for |
|---|---|---|
| **Pro Se** | **Matthew B. Ames** | |

PROCEEDINGS : **Teleconference**

☑ In Court
☐ In Chambers

Teleconference held.

Parties will submit a new draft protective order reflecting the proper procedure for filing documents under seal pursuant to the Local Rules.

This submission should be emailed to the Courtroom Deputy Clerk: rebecca_cirillo@gas.uscourts.gov

Plaintiff's Appendix Document No - 82

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.
2014 JUN 17 PM 1:37
CLERK C Adams
SO. DIST. OF GA.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERI LYNN HINKLE, )
Plaintiff, )
v. ) Case No. 3:13-cv-00033-DHB-BKE
MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING LLC, and ENCORE CAPITAL GROUP, INC., )
Defendants. )

**CONFIDENTIALITY AGREEMENT AND CONSENT PROTECTIVE ORDER**

Pursuant to Rule 26 of the Federal Rules of Civil Procedure, L.R. 79.7, and for good cause shown, Midland Credit Management, Inc. ("MCM"), Midland Funding LLC ("Midland Funding"), Encore Capital Group, Inc. ("Encore"), and Teri Lynn Hinkle ("Plaintiff") (collectively the "Parties") stipulate to the entry of the following protective order to preserve and maintain the confidentiality of personal, private, confidential, trade secrets, confidential research, training and development technology, and proprietary information that may be disclosed or obtained by the Parties to this case -- through testimony and/or the production of certain records by and between the Parties during the course of discovery. The Parties agree that good cause exists for this Protective Order for the purpose of preserving and maintaining the confidentiality of sensitive business and financial records or any other information that may be disclosed or obtained by the Parties through the production of certain confidential or proprietary Documents and to preserve the privacy rights of non-Parties to this Action. The Court specifically finds that good cause exists for this Protective Order.

1. As used herein, the following definitions apply:

(a) "Plaintiff" means Teri Lynn Hinkle, her attorneys, representatives, and any and all other persons who have acted for, or may act, on her behalf.

(b) "Defendants" means MCM, Midland Funding, and/or Encore and their attorneys, representatives, and any and all other persons who have acted for, or may act for, on their behalf.

(c) "Parties" means, collectively, Plaintiff and Defendants.

(d) "Action" means this suit, Civil Action No. 3:13-cv-00033, *Teri Hinkle v. Midland Credit Management, Inc., et. al*, pending in the United States District Court for the Southern District of Georgia, Dublin Division.

(e) "Document" means and includes, but is not limited to, all written, printed, typed, recorded, or graphic matter of every kind and description, both originals and copies and all attachments and appendices thereto. "Document" or "Documents" means and includes all matter within the foregoing description that is in the possession, control, or custody of Plaintiff or in the possession, control, or custody of any attorney for Plaintiff. The Midland Defendants reserve the right to amend this definition to include additional documents.

(f) "Confidential Information" or "CONFIDENTIAL" means any information or Documents (regardless whether in electronic or hard copy format) that is personal or private or confidential information, including trade secrets, relating to Defendants; or Defendant's employees, officers, directors, managers, or agents such as personal financial information, social security numbers, and general non-public business information;

(g) "TRADE SECRET" means any Confidential Information or Documents (regardless of whether in electronic or hard copy format) that shall include any legitimate confidential and proprietary business information, or such information or Documents not known to the general public, from which the disclosing party derives economic value and a competitive advantage in the marketplace from not being generally known to others, the disclosure of which could cause irreparable injury or damage to the disclosing party.

2. This Protective Order shall govern the disclosure and use of Confidential Information produced in connection with this Action. All information that is or has been produced or discovered in this Action, regardless of whether designated confidential, shall be

used solely for the prosecution or defense of this Action unless the information is available to the general public without a breach of the terms of this Protective Order. The measures designated by the Parties in this Protective Order are reasonable and will not prejudice anyone or unduly burden the Court.

3. This Protective Order is necessary to preserve the legitimate proprietary and privacy interests of sources of information and establishes a procedure for disclosing Confidential Information to the Parties in this Action, imposes obligations on persons receiving Confidential Information to protect it from unauthorized use or disclosure, and establishes a procedure for challenging confidentiality designations.

4. By entering into this Protective Order the Parties do not intend to waive any objections raised in response to discovery requests, nor does this Protective Order in any way obligate any party to produce any specific Document or records in the future that a party deems inappropriate for production.

5. This Protective Order is intended to preserve and maintain personal, private, confidential, trade secrets, confidential research, training and development, technology and proprietary business information not known to the general public, the disclosure of which could cause serious injury or damage to the Parties. This Protective Order is also intended to preserve and protect any confidential and proprietary business information that may be discovered or produced through the inspection of any party's electronic data regardless of where stored, including through the inspection of any personal or business computer by any party's expert. This Protective Order may also pertain to additional records of a proprietary nature that will be specifically designated by the disclosing party as they are determined by that party to fall within the protections of this Protective Order. This Protective Order is also intended to preserve

personal, private, and Confidential Information pertaining to Plaintiff and to individuals who are not Parties to this Action such as personal financial information, personal medical information, social security numbers, and other sensitive, personal, or private information.

6. Any Documents produced subject to the terms of this Protective Order shall be considered either "CONFIDENTIAL" or "TRADE SECRET" and shall be given confidential treatment as described below. All Documents produced subject to this Protective Order shall be designated or stamped "CONFIDENTIAL" or "TRADE SECRET."

7. Documents designated as "CONFIDENTIAL" shall be limited to any type or classification of financial information concerning Defendants or their respective operation that have not been released to the public; manuals, memoranda, instructions, and other Documents that discuss, describe, or set forth standards, criteria, guidelines, policies, or practices relating to the addition of interest to debts and/or the collection of debts; organizational charts of Defendants; insurance policies of Defendants; Documents setting forth Defendants' Document destruction and retention policies; account notes and/or call logs; and/or personal, private, and Confidential Information pertaining to Plaintiff and to individuals who are not Parties to this Action and as personal, financial information, personal medical information, social security numbers, and other sensitive, personal, or private information. Notwithstanding the foregoing, CONFIDENTIAL documents shall not include Documents exchanged produced by either Party prior to May 13, 2014.

8. Documents designated as "TRADE SECRET" for purposes of this Protective Order shall include any legitimate confidential, financial, and proprietary business information, and such other information or Documents not known to the general public, from which the disclosing part derives economic value and a competitive advantage in the marketplace from not

being generally known to others, the disclosure of which would cause serious injury or damage to the disclosing Party. Additional Documents may be later identified that shall be given similar protections pursuant to this Protective Order as specifically designated by and agreed to by the Parties during the course of this Action.

9. CONFIDENTIAL or TRADE SECRET Documents or information shall not be exhibited, disseminated, copied, or in any way communicated to anyone for any purpose whatsoever, other than in conjunction with the above-captioned Action. Except as provided for in this Protective Order, the Parties shall keep all Documents or information covered by the terms of this Protective Order from all persons as provided for by the terms of this agreement.

10. Neither the receiving party nor its representatives shall disclose Documents designated as Confidential or Trade Secret, other than to the following persons (hereinafter referred to as "Qualified Persons – Confidential"):

(a) Designated representatives of Defendants or designated counsel of record in this Action;

(b) Employees of Defendants' counsel acting at the direction of counsel, and assigned to and necessary to assist such counsel in the preparation or trial of this Action;

(c) Plaintiff or any of Plaintiff's designated counsel of record in this Action;

(d) All attorneys for the Parties in this Action, including in-house attorneys, and their assistants, associates, paralegals, clerks, stenographic personnel, those individuals specifically acting at the direction of counsel, and Defendants' human resources administrators and staff assigned to and necessary to assist such counsel in the preparation or trial of this Action;

(e) The Court (including any agent of the Court) and any court reporter used during depositions.

This Protective Order permits the Parties and their designated representatives to view Documents or information designated as CONFIDENTIAL or TRADE SECRET exclusively for purposes of this Action; however, the Parties and their designated representatives are precluded

from sharing and/or disclosing that information to anyone other than their designated counsel of record in this Action. Accordingly, the Parties and their designated representatives expressly agree to maintain the confidentiality associated with those Documents designated as CONFIDENTIAL or TRADE SECRET and agree that they will not disclose or otherwise share such information with anyone other than their designated counsel of record in this Action at any time either during the pendency of this Action or subsequent to the conclusion of the Action. To the extent CONFIDENTIAL or TRADE SECRET Documents are used as exhibits or attachments to any filing with the Court in the above-captioned Action, the party so using the CONFIDENTIAL or TRADE SECRET Documents will file the Documents with the Court under seal in accordance with Local Rule 79.7.

Specifically, if a Party desires to quote, attach as an exhibit, or otherwise include in any filing any CONFIDENTIAL or TRADE SECRET information disclosed by the opposite Party, the filing Party shall provide no less than seven days' notice to the disclosing Party prior to filing so that the disclosing Party may submit a motion to the Court seeking authorization for such CONFIDENTIAL or TRADE SECRET information to be filed under seal pursuant to L.R. 79.7(b).

11. Nothing in this Protective Order shall be construed as precluding a party from seeking additional protection from the Court against the disclosure or production of any other confidential information, including an order that such information not be disclosed or that it be disclosed only in a designated manner.

12. Nothing contained in this Protective Order precludes or limits a party from viewing its own CONFIDENTIAL or TRADE SECRET Documents.

13.    The use of CONFIDENTIAL or TRADE SECRET Documents or information at trial or hearing shall be addressed in any pre-trial or pre-hearing order or by a stipulation submitted by the Parties to comport with the Court's pre-trial or pre-hearing filing deadlines. However, notwithstanding the foregoing, if a Party desires to utilize at a trial or hearing any CONFIDENTIAL or TRADE SECRET information disclosed by the opposite Party, the filing Party shall provide reasonable notice to the disclosing Party prior to trial or hearing so that the disclosing Party may submit a motion to the Court seeking authorization for such CONFIDENTIAL or TRADE SECRET information to be filed under seal pursuant to L.R. 79.7(b).

14.    CONFIDENTIAL or TRADE SECRET Documents or information subject to this Protective Order shall not be made public by counsel for the receiving party or divulged to anyone other than the persons entitled to access such information under Paragraphs 9 and 10. Each person who has access to material that has been designated as CONFIDENTIAL or TRADE SECRET shall take all due precautions to prevent the unauthorized or inadvertent disclosure of such material.

15.    The agreement of the Parties to this Protective Order shall not be construed as an agreement or admission: (i) that any material or Document designated as confidential is, in fact, confidential; (ii) as to the correctness or truth of any allegation made or position taken relative to any matter designated as confidential; or (iii) with respect to the authenticity, competency, relevance, or materiality of any Document or thing designated as confidential.

16.    A party shall designate as other Confidential Information disclosed during any deposition in this matter as "CONFIDENTIAL" by notifying all other Parties either during the deposition or, in writing, within thirty (30) days of receipt of the transcript, of the specific pages

and lines of the transcript that contain Confidential Information. Each party shall attach a copy of such written notice to the face of the transcript and each copy thereof in its possession, custody, or control.

17. Nothing shall prevent disclosure beyond the terms of this Protective Order if any party expressly consents to such disclosure, either in writing or in the record of any proceeding in this Action, or if the Court, after notice to all affected Parties, orders such disclosure.

18. The provisions of the Protective Order shall survive and remain in full force and effect after the conclusion of this Action.

19. This Protective Order shall not prohibit disclosure of CONFIDENTIAL or TRADE SECRET Documents or information to the Court or Court personnel (including any Court for purposes of appellate review) at any time.

20. Upon written request by counsel for the disclosing party or person, the party having received any Documents or information subject to this Protective Order shall return these items at the close of Action, and will certify to the disclosing party that the receiving party has returned or destroyed all copies of the CONFIDENTIAL or TRADE SECRET Documents. The Party receiving CONFIDENTIAL or TRADE SECRET Documents shall not be permitted to retain a file copy after the conclusion of this Action.

21. The Parties, by their respective representatives, hereby agree and stipulate to each of the terms and conditions as set forth in the foregoing Protective Order.

APPROVED and SO ORDERED this 17th day of June, 2014.

Brian K. Epps
United States Magistrate Judge

Respectfully submitted this 12th day of June, 2014.

Balch & Bingham LLP LLP

Matthew B. Ames
Georgia Bar No.
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020

**Attorneys for Encore Capital Group, Inc., Midland Funding LLC, and Midland Credit Management, Inc.**

Teri Lynn Hinkle
322 Bethel Street
Eastman, GA 31023

**Pro Se Plaintiff**

Plaintiff's Appendix Document No - 83

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 JUL 16 AM 10:07

CLERK [signature]
SO. DIST. OF GA.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**DUBLIN DIVISION**

**Teri Lynn Hinkle**
***Plaintiff,***

**vs**

**MIDLAND CREDIT MANAGEMENT INC.**
**MIDLAND FUNDING, LLC.**
**ENCORE CAPITAL GROUP INC.**
***Defendants.***

**Case No. 3:13-CV-00033**

# PLAINTIFF'S MOTION TO COMPEL DEFENDANT MIDLAND CREDIT MANAGEMENT TO RESPOND TO REQUESTS FOR PRODUCTION AND MEMORANDUM IN SUPPORT

Plaintiff hereby motions the Court to compel Midland Credit Management Inc. to file an amended response to Plaintiff's outstanding discovery requests.

Plaintiff certifies pursuant to FRCP 26(c), 37(a)(1), and S.D. Ga. L.R. 26.5 that she has conferred in good faith with Defendants' counsel in an effort to resolve the outstanding discovery dispute outlined below without the necessity for the Court's involvement and assistance. Counsel has stated Defendants will oppose this motion. (*See* Exhibit 16(a),(b) attached). This motion is not made for purposes of delay, harassment or to unnecessarily increase the costs of litigation.

## A.  Introduction

1. Plaintiff is Teri Lynn Hinkle and defendant is Midland Credit Management Inc., (MCM).

2. Plaintiff sued defendant for violations of the Fair Debt Collection Practices Act, (FDCPA) and the Fair Credit Reporting Act, (FCRA).

3. On May 21, 2014 and May 23, 2014, plaintiff served discovery materials including Requests for Production on Defendant by USPS.

4. Plaintiff received responses to the discovery requests on June 25, 2014. The responses were largely non-responsive and incomplete. However, for the second time since discovery began in this case the Defendants produced documents it had previously stated did not exist or were not in its possession. Plaintiff will address this issue in further pleadings.

5. Plaintiff contacted Defendants' counsel on June 26, 2014 via email and stated with specificity what the deficiencies were and requested the Defendants amend their responses.

6. Plaintiff received amended responses via email on June 30, 2014 which included a generic document downloaded from the T-Mobile website and another page from Defendants' internal records labeled "Midland – Hinkle 00221" which was clearly a part of the record previously provided to Plaintiff but one which had been omitted. Plaintiff will address this issue in further pleadings.

7. In response to Plaintiff's Third Request for Production number 7 to Defendant, MCM responded with the following in responses received by Plaintiff on June 25, 2014:

   a. REQUEST 7: Produce **MCM's written request to the Seller** for the "Terms and Conditions" historically associated with the Purchased Account MCM alleges belongs to the Plaintiff. (emphasis added), (this request referred to a particular paragraph included in a document currently designated "Confidential" and subject to protective order and the reference was cited with the request)

   b. RESPONSE: Defendants direct Plaintiff to enclosed documents bates labeled Midland-Hinkle 000204-000218, which are the terms and conditions that were in effect prior to the account charge off date of 12/29/07, and **retrieved from the T-Mobile website by Defendants.** (emphasis added).

   c. Plaintiff clearly did not request the document provided and MCM did not address what was requested in their response.

8. Defendant's amended response to Request number 7, received on June 30, 2014 was as follows:

   a. This request **seeks "Terms and Conditions** historically associated with any" of the Plaintiff's accounts. Midland produced the T-Mobile terms and conditions that were in effect during the relevant time period, retrieved from T-Mobile's website. Midland does not have any additional documents that

are responsive to this request. A defendant cannot be compelled to produce records that do not exist. *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009). (emphasis added)

b. Again Plaintiff did not request "Terms and Conditions" but instead requested "MCM's Written Request To The Seller" when they asked for the terms and conditions and this response is yet another attempt to distract and misdirect from the actual document requested. Plaintiff expects a response directed at the actual request made. This question goes to the heart of their defense of the allegation made in connection with the FCRA§ 1861s-2(b) and therefore is a critical element for discovery and has not been objected to on any grounds.

9. Plaintiff contacted Defendants' counsel again via email with objections to the amended responses on July 1, 2014 and requested a second corrected response to Request for Production number 7. (*See* Exhibit 16(a),(b) attached)

10. Because MCM failed to fully respond to the discovery requests, Plaintiff requests the Court to compel MCM to provide the proper response to Request for Production number 7 in a timely manner so that the Plaintiff may have the requested information to evaluate before preparation of further pleadings.

**B. Argument and Brief in Support**

11. The court may compel responses to discovery if a party does not do any of the following: (1) answer questions submitted under Federal Rules of Civil Procedure 30 or 31; (2) make a designation under Rule 30(b)(6) or 31(a); (3) answer an

interrogatory submitted under Federal Rule of Civil Procedure 33; or (4) respond to a request for inspection submitted under Federal Rule of Civil Procedure 34. FRCP 37(a)(2)(B).

12. A party may seek production of any document, electronically stored information, or tangible thing within the scope of FRCP 26(b) – that is, anything relevant and not privileged. See FRCP 34(a)(1); *See Gile v. United Airlines, Inc.*, 95 F.3d 492 (7th Cir. 1996).

13. The requesting party must ask the court to compel production if the responding party objects to a request, does not respond to a request, or does not permit inspection as requested. See FRCP 37(a)(3)(B)(iv); *GFI Computer Indus. v. Fry*, 476 F.2d 1,3 (5th Cir. 1973).

14. The Court should grant Plaintiff's motion to compel for the following reasons:

   a. Defendant MCM did not respond properly to the specific item requested in Requests for Production number 7 of Plaintiff's third Requests for Production propounded upon them contrary to the requirements of Fed. R. Civ. P. 33(b)(2) and therefore can be compelled to answer under FRCP 37(a)(3)(B)(iii).

   b. Defendant MCM has stated in responses to interrogatories when asked to describe the procedures involved in their "reinvestigation" of the Plaintiff's disputes to the CRAs that they simply obtained the information from the

"sellers" they purchased the electronic data connected with the alleged accounts from.

c. Defendant MCM has provided nothing other than information which would have been included in the initial purchase to indicate they did in fact contact the "sellers" or make any requests for information from them subsequent to the Plaintiffs disputes with the CRAs.

d. Request for Production number 7 at issue in this motion was made pursuant to a procedure described to the Defendants by the sellers in the document referenced above in ¶ 7(a). Since the Plaintiff and this Court have nothing but the Defendant's statement in interrogatories that they obtained information from the sellers in compliance with their obligation under the FCRA to investigate Plaintiff's disputes, the request for the **written request to the sellers** would establish their statement to be fact. It would appear the Defendant MCM is attempting to avoid specifically addressing the request in regard to the document which **was** requested by pretending the Plaintiff instead requested another.

e. Defendant MCM appears to be deliberately misconstruing the clearly stated request to mean something different than it states although the request is in no way ambiguous or confusing.

15. Plaintiff states that the information requested by the Plaintiff is relevant and admissible at trial.

WHEREFORE, because plaintiff's requests are proper and because MCM has refused to comply with the rules, the Plaintiff requests the Court compel MCM to respond fully, adequately and expeditiously to Request for Production Number 7 referenced above.

DATED this 14th day of July, 2014

Respectfully Submitted,

Teri Lynn Hinkle

Plaintiff

# EXHIBIT 16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

Teri Lynn Hinkle
*Plaintiff,*

Case No 3:13-cv-00033

vs

MIDLAND CREDIT MANAGEMENT INC.
MIDLAND FUNDING LLC.
ENCORE CAPITAL GROUP INC.
*Defendants.*

## CERTIFICATION OF CONFERENCE

I, Teri Lynn Hinkle, Plaintiff in this case, hereby certify that at all relevant times and in regard to all Motions to Compel submitted by me to this Honorable Court, that I did confer in good faith with the Defendants prior to filing the motions pursuant to FRCP 37(a)(1), and S.D. Ga. L.R. 26.5.

Respectfully submitted this 14th day of July, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

**Teri Hinkle <queensongbird@gmail.com>** Jul 1 (10 days ago)

to Joshua

Dear Mr. Moore,

In response to the new responses emailed to me today I must point out the following. I have no idea where your clients got that I disputed the alleged T-Mobile acct. with the CRAs prior to July of 2012 because I didn't. I have the original dispute letters to the CRAs showing that I didn't. I obtained my credit report in May of 2011 and discovered the alleged GE acct they were reporting and there was nothing else pertaining to them in any of the three reports. I disputed that alleged acct. only on Sept. 6, 2011. I did not discover they were even reporting the alleged T-Mobile acct to the CRAs until June of 2012. On July 13, 2012 I disputed the second time with the CRAs and that time I disputed both trade lines they were reporting. So prior to July 13, 2012 there was no dispute with the CRAs by me on the alleged T-Mobile acct reported by your clients. Then on July 27, 2012 I sent a second demand for validation for both alleged accounts they were reporting. The first demand was sent Oct. 20, 2011 and was SPECIFICALLY in regard to the alleged GE account.

Your clients state that I did not respond to their letters asking me to prove my disputes but in fact I certainly did in a letter of Response and Intent to Sue sent certified mail #70112970000056529448 on July 27, 2012, which was received by them on July 30, 2012 at 8:08 am EST. I sent a copy of the letter and the certified mail receipt and screenshot of the USPS tracking page to Ms. Broussard shortly before your office took over this case.

As to your clients letter to me of April 30, 2013, that was the date of the filing of this suit. I responded to that as well on May 7, 2013 instructing them to refer to the civil suit already filed.

When your clients wrongly responded to my first demand for validation with a dunning letter listing a completely different account that wasn't mine I simply assumed they had mixed my dispute up with somebody else as it made no sense to me whatsoever. As I said I only knew at that time about the alleged GE account and my disputes of that one which they NEVER responded to.

So far your clients have sworn three times they had no further documents yet when I pushed the issue, twice they have magically produced documents that were not disclosed previously. Both times what they did produce contained obviously fabricated entries or assertions, (account balance belonging to a different file, contradictory dates and information etc.). This would indicate that in their apparent confusion they are manufacturing documentary evidence. I'm sure the jury will find all the fabricated material quite interesting.

As to the response to Number 7 of the Third Request for Production. This request was in reference to ¶4.6 of the Account Purchase Agreement which I included in the request. I DID NOT request a copy of the "Terms and Conditions". I specifically requested **"MCM's written request to the Seller"**, not the terms and conditions.

Please instruct your clients to correct that response immediately. I will be out of town from Thursday to Sunday of this week so will be unavailable.

Regards,

Teri Hinkle

**Teri Hinkle <queensongbird@gmail.com>** 10:26 AM (23 hours ago)

to Joshua, Matt, bcc: me

Joshua,

I hope you and yours had a pleasant holiday. Before I left over the holiday I responded to your clients' amended responses to requests for production by email to you. I stated the following:

*"As to the response to Number 7 of the Third Request for Production. This request was in reference to ¶4.6 of the Account Purchase Agreement which I included in the request. I DID NOT request a copy of the "Terms and Conditions". I specifically requested* ***"MCM's written request to the Seller"****, not the terms and conditions.*

*Please instruct your clients to correct that response immediately. I will be out of town from Thursday to Sunday of this week so will be unavailable."*

As of this morning I have not had a response to that email or any correction to the improper response to that particular response for production. If I don't receive a corrected response by the end of business day today I will have to file a motion to compel. Please advise as to whether you will object to that motion or not.

Regards,

Teri Hinkle

**Moore, Joshua M.** 11:14 AM (22 hours ago)

to me, Matt

Ms. Hinkle, it is our understanding that you are seeking production of any written communication between Midland and Debt Recovery Solutions, LLC regarding the T-Mobile debt. Midland has no documents that are responsive to your request. Midland would oppose a motion to compel documents because a defendant cannot be compelled to produce records that do not exist. *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009).

Regards,
Joshua

**Teri Hinkle <queensongbird@gmail.com>** 11:23 AM (22 hours ago)

to Joshua

Joshua,

Your understanding is correct, specifically the document requested in number 7, however Midland did not respond to the request by stating they had no such documents. Instead they responded by providing something not requested.

The response needs to be amended to reflect the proper statement if in fact Midland now says they do not have the document requested. Please have them correct this situation.

Regards,

Teri Hinkle

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**DUBLIN DIVISION**

Teri Lynn Hinkle
*Plaintiff,*

vs

MIDLAND CREDIT MANAGEMENT INC.
MIDLAND FUNDING LLC.
ENCORE CAPITAL GROUP INC.
*Defendants.*

Case No 3:13-cv-00033

**CERTIFICATE OF SERVICE**

I hereby certify that I presented the foregoing copies of **PLAINTIFF'S MOTION TO COMPEL DEFENDANT MIDLAND CREDIT MANAGEMENT TO RESPOND TO REQUEST FOR PRODUCTION AND MEMORANDUM IN SUPPORT,** to **Mathew B. Ames, and Joshua M. Moore, Balch & Bingham LLP,** Counsel for Defendants, **MIDLAND CREDIT MANAGEMENT, MIDLAND FUNDING LLC., AND ENCORE CAPITAL GROUP, INC.** via USPS on July 14, 2014.

Sent to:

Mathew B. Ames & Joshua M. Moore
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd. N.W.
Suite 700
Atlanta, Georgia 30308-3036

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

Case: 15-10398 Date Filed: 07/20/2015 Page: 58 of 185

Hinkle
322 Bethel St.
Eastman, GA
31023

U.S. POSTAGE
PAID
EASTMAN, GA
31023
JUL 14, 14
AMOUNT
$1.40
00082219-04
UNITED STATES POSTAL SERVICE
1000
30903

Clerk of U.S. Dist. Court
P.O. Box 1130
Augusta, GA
30903

Plaintiff's Appendix Document No - 84

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE,**<br><br>**Plaintiff,**<br><br>**V.**<br><br>**MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Civil Action**<br>**File No. 3:13-CV-00033** |

**DEFENDANT MIDLAND CREDIT MANAGEMENT, INC.'S RESPONSE TO MOTION TO COMPEL DEFENDANT MIDLAND CREDIT MANAGEMENT TO RESPOND TO REQUEST FOR PRODUCTION OF DOCUMENTS AND MEMORANDUM IN SUPPORT**

Defendant Midland Credit Management, Inc. ("Midland") opposes Plaintiff's *Motion to Compel Defendant Midland Credit Management to Respond to Request for Production of Documents and Memorandum in Support* ("Motion") because there is nothing to compel. Specifically, the Court should deny Plaintiff's Motion because Midland has produced all documents in its possession, custody or control that are responsive to the discovery request that is the subject of Plaintiff's Motion. Plaintiff's motion surmises that responsive documents are being withheld from production. But this unfounded accusation is wrong, as Midland has already explained – repeatedly – to Plaintiff. Plaintiff's Motion should be denied.

## I. Preliminary Statement

Plaintiff seeks to compel the production of documents that do not exist, as Plaintiff has already been told. Indeed, as will be explained below, even Plaintiff doubts the existence of the documents that are the subject of her Motion.

Plaintiff's motion to compel is limited to Midland's response to Request No. 7 of Plaintiff's Third Request for Production of Documents. That request seeks "'terms and conditions' historically associated with the Purchased Account [Midland] alleges belongs to Plaintiff [regarding the T-Mobile Debt acquired from Debt Recovery Solutions, LLC]." In response, Midland produced the terms and conditions in effect when Plaintiff opened her account with her original creditor, T-Mobile.

Apparently, this is not what Plaintiff wanted. Via email, Plaintiff later clarified that she seeks "production of any written communication between Midland and Debt Recovery Solutions, LLC regarding the T-Mobile Debt."[1]

---

[1] *See* July 10, 2014 email exchange, attached hereto as **Exhibit A**. In response to Plaintiff's follow-up request (for any written communication regarding the T-Mobile debt), Midland's counsel explained: "Midland has no documents that are responsive to your request. Midland would oppose a motion to compel documents because a defendant cannot be compelled to produce records that do not

Midland told Plaintiff no responsive documents exist. This should not have been a surprising revelation—during the May 7, 2014 hearing on a previous motion to compel filed by Plaintiff, Plaintiff conceded "**I really truly do not believe other than the purchasing sale agreements that there is anything that they could give me**."[2] Yet, Plaintiff still propounded two additional Requests for Production of Documents and has put Midland to the unnecessary trouble and expense of responding to this Motion. There is simply nothing else for the Court to order Midland to produce.

## II. Argument and Citation of Authority

Midland is not knowingly withholding any responsive documents. If the Court ordered the production of documents response to Plaintiff's Third Request for Production No. 7, Midland would have no additional documents to produce. It is well established that a defendant cannot be compelled to produce records that do not exist.[3] Plaintiff has come forward with no contrary evidence or case law.

exist. *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009)."

[2] *See* Motion to Compel Hearing Transcript at 28:22-24 (emphasis added), relevant pages attached hereto as **Exhibit B**.

[3] *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009).

Plaintiff seems to believe there are additional documents she has not received, but Plaintiff makes no effort to prove the documents exist (nor could she), that Defendants possess them, or that Defendants are withholding them.

To the extent that this is a "dispute" borne of misunderstanding, Midland respectfully submits that Plaintiff bears the blame for this.   First, despite the opportunity to do so, at no time has Plaintiff sought the deposition of a Midland representative to glean a better understanding of the types of records Midland maintains or what those records mean.   In fact, Plaintiff failed to conduct *any* depositions in this case.   Second, at no time has Plaintiff called Midland's counsel to seek clarification of the issue that is the subject of her Motion.

Plaintiff's Motion lacks support and should be denied.   Midland has produced all of the documents it possesses that are responsive to Request No. 7. In fact, in responding to Plaintiff's Third Requests, Midland went beyond what the Federal Rules typically require by providing a narrative response to aid Plaintiff's understanding of the existence and nature of the documents that do exist.   Plaintiff still remains unsatisfied.   But Midland has not shied away from producing anything in response to Request No. 7 or any other request in this case.

Respectfully submitted this 28th day of July, 2014.

BALCH & BINGHAM LLP

/s/Matthew B. Ames
MATTHEW B. AMES
Georgia Bar No. 015898
JOSHUA M. MOORE
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020

**Attorneys for Midland Funding LLC, Midland Credit Management, Inc., and Encore Capital Group, Inc.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DEFENDANT MIDLAND CREDIT MANAGEMENT, INC.'S RESPONSE TO MOTION TO COMPEL DEFENDANT MIDLAND CREDIT MANAGEMENT TO RESPOND TO REQUEST FOR PRODUCTION OF DOCUMENTS AND MEMORANDUM IN SUPPORT** has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 28th day of July, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

/s/Matthew B. Ames
Matthew B. Ames
Georgia Bar No. 015898

# Exhibit A

**Murray, Ashleigh**

**From:** Teri Hinkle <queensongbird@gmail.com>
**Sent:** Thursday, July 10, 2014 11:23 AM
**To:** Moore, Joshua M.
**Subject:** Re: Hinkle v Midland

Joshua,

Your understanding is correct, specifically the document requested in number 7, however Midland did not respond to the request by stating they had no such documents. Instead they responded by providing something not requested. The response needs to be amended to reflect the proper statement if in fact Midland now says they do not have the document requested. Please have them correct this situation.

Regards,

Teri Hinkle

On Thu, Jul 10, 2014 at 11:14 AM, Moore, Joshua M. <jmmoore@balch.com> wrote:

Ms. Hinkle, it is our understanding that you are seeking production of any written communication between Midland and Debt Recovery Solutions, LLC regarding the T-Mobile debt. Midland has no documents that are responsive to your request. Midland would oppose a motion to compel documents because a defendant cannot be compelled to produce records that do not exist. *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009).

Regards,
Joshua

Joshua Michael Moore, Attorney, Balch & Bingham LLP
30 Ivan Allen Jr. Boulevard, N.W. • Suite 700 • Atlanta, GA 30308-3036
t: (404) 962-3536 f:(866) 258-8981 e: jmmoore@balch.com
www.balch.com

**From:** Teri Hinkle [mailto:queensongbird@gmail.com]
**Sent:** Thursday, July 10, 2014 10:26 AM
**To:** Moore, Joshua M.
**Cc:** Ames, Matt
**Subject:** Hinkle v Midland

Joshua,

I hope you and yours had a pleasant holiday. Before I left over the holiday I responded to your clients' amended responses to requests for production by email to you. I stated the following:

*"As to the response to Number 7 of the Third Request for Production. This request was in reference to ¶4.6 of the Account Purchase Agreement which I included in the request. I DID NOT request a copy of the "Terms and Conditions". I specifically requested* ***"MCM's written request to the Seller"****, not the terms and conditions.*

*Please instruct your clients to correct that response immediately. I will be out of town from Thursday to Sunday of this week so will be unavailable."*

As of this morning I have not had a response to that email or any correction to the improper response to that particular response for production. If I don't receive a corrected response by the end of business day today I will have to file a motion to compel. Please advise as to whether you will object to that motion or not.

Regards,

Teri Hinkle

---

CONFIDENTIALITY: This email and any attachments may be confidential and/or privileged and are therefore protected against copying, use, disclosure or distribution. If you are not the intended recipient, please notify us immediately by replying to the sender and double deleting this copy and the reply from your system.

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| TERI LYNN HINKLE, | * | |
| | * | CASE NUMBER: |
| Plaintiff, | * | 3:13Cv-33 |
| vs. | * | |
| | * | |
| | * | **TRANSCRIBED FROM** |
| MIDLAND CREDIT MANAGEMENT, | * | **ELECTRONIC RECORDING** |
| INC., | * | |
| | * | Augusta, Georgia |
| Defendant. | * | May 7, 2014 |
| | * | |

TRANSCRIPT OF MOTION TO COMPEL HEARING

Before the Honorable BRIAN K. EPPS

United States Magistrate Judge

APPEARANCES: (VIA TELECONFERENCE)

FOR THE PLAINTIFF:
TERI LYNN HINKLE, Pro Se

FOR THE DEFENDANT:
MATTHEW B. AMES
Balch & Bingham, LLP
30 Ivan Allen Jr., Blvd., NW
Suite 700
Atlanta, Georgia 30308
(404) 962-3531

ALSO PRESENT:
K. ANN BROUSSARD

TRANSCRIBED BY:
C. Joan Mobley
U.S. District Court Reporter, CCR, CVR-M
P.O. Box 1316
Brunswick, Georgia 31521
(912) 280-1348

*(P R O C E E D I N G S)*

*(Call to Order 3:04 p.m.)*

THE CLERK: The Court calls case number 3:13CV-33, *Teri Lynn Hinkle versus Midland Credit Management, Incorporated,* represented by Matthew Ames. We are here for a teleconference.

THE COURT: Good afternoon, Everyone.

MS. HINKLE: Good afternoon.

MS. BROUSSARD: Good afternoon, Your Honor.

MR. AMES: Good afternoon, Your Honor.

THE COURT: Mr. Ames, I appreciate the brief that you filed with the latest update on where things stand.

Ms. Hinkle, I guess that email that you sent to him on May 5th at 10:37 p.m. that outlines your current state of outstanding issues, the ones that remain?

MS. HINKLE: Yes, their email and my email in reply.

THE COURT: That's right. Your email dated May 5th at 10:37 p.m.

MS. HINKLE: Right.

THE COURT: So those are the outstanding issues left of all the ones that you had originally raised?

MS. HINKLE: Yes, sir.

THE COURT: Well, first of all, let me congratulate you guys on making significant progress on your own. Certainly we always like to see the parties working together to get things resolved, and there has been a lot of hard work, I am sure, to

get us to where we sit right now.

Ms. Hinkle, I have been looking at all your stuff very carefully, my clerk and I have, and so with the ones that you have outstanding now I think maybe the best way to start this is for me to just tell you my gut reaction to your email on both counts, and then, if you don't mind, let me hear your thoughts in response. Is that okay with you?

MS. HINKLE: All right. Thank you.

THE COURT: So with your first issue where you say that, look, these documents that are attached to the surreply brief, the latest brief filed by the Defense, attachments A-1 through D-1 or D-2, I think it is, I think what you are saying is, look, first of all, it was missing pages. And so then you gave me a second report of the same information so now we have all three pages and it is clear that pages 2 and 3 are blank, but now your concern has shifted because the reports contain more information now than they did in the original report; is that right?

MS. HINKLE: Partially. The information that is inserted that wasn't there before, first of all, makes them not identical to the first ones, but especially if you have it in front of you, the attachment C-1 and C-2.

THE COURT: Let me get to that.

All right.

MS. HINKLE: It's the best way to point out the

example.

On C-1 at the top, it shows there a balance and that's because while the other documents that they had given me prior to previously claimed that the account had been paid in full in 2008. Now I definitely did not do that but all of the documents show that it had a zero balance. On the new one, C-2, now it shows $880.80. Now interestingly, that amount of $880.80 is the exact amount they claim is owed on the other alleged account.

THE COURT: Well, Ms. Hinkle, first of all, I think it says $300.80.

MS. HINKLE: Yeah, I am sorry. Three hundred. You are right. I am looking at a distance.

THE COURT: I think this is a good example and one where I think I can help you a little bit and kind of explain what my role is.

My role is to make sure that if you have requested documents that are relevant to your lawsuit that I am here to make sure the Defendant gives you the documents that you requested.

What I am not here to do is talk about things like inconsistencies between one report they give you and another. And all you and I can do right now is speculate as to why the first report shows zero at the top and the second one shows $300.80.

So at this point, those kinds of issues don't really

go to the question of whether they are producing the documents that are responsive to the requests for production you sent them. What you are getting in now is to the kind of detail that you are only going to be able to explore in a deposition setting.

MS. HINKLE: All right. I understand that.

On that same document the request was to produce everything in their possession in regard to compliance with the FCRA, and it is definitely incomplete because it shows they stopped reporting to the credit reports in 2009. I didn't even know about this if it wasn't for the credit reports in 2011 and so the document --

THE COURT: That is what you think the document suggests but you don't know until you depose someone and say am I correct that this report shows the very last date that you reported this debt to a credit reporting agency? The answer presumably will be, yes, that's what it shows, but it might be something else and then you can ask the follow-up question of, well, then why is it this is still showing up on my credit report if the last report date is March of 2009. That is stuff that you and I can't talk about in the context of a motion to compel. All I can do at this stage is say what did you request and Defendant have you given them that. And it sounds like the answer is, yes; they have produced the documents that you have requested. Now you have to schedule a deposition and ask those

questions to determine whether there are inconsistencies and some evidence that you can use to support your case.

MS. HINKLE: All right. I had decided that this particular issue, Request Number 5, I would be unlikely to get any more than what I have gotten anyway.

THE COURT: Well in a deposition setting you might get a little further. You might say is this the be all and end all? Is there another report out there that will explain more? And it may be in that setting the knowledgeable designee from the company may say well you know what, come to think of it, there is another report. We didn't give you everything. Hold on a minute. Let me go get somebody to print that report for you but we can't speculate right now. All we can do is look at your request, ask the Defendants is this everything, and when they say yes, unless there is some burning evidence or specific indication that there is more they are not giving you that is really all we can do for now.

MS. HINKLE: All right. I accept that.

THE COURT: And it sounds like then with respect to this first issue of these reports now that you have seen pages 2 and 3, the blank pages, you are concerned about whether they have intentionally omitted anything in response to the request. You really don't have that concern anymore; is that right?

MS. HINKLE: Well, I am very familiar with data entry software. I don't know what software they are using. I have

personally never seen one that creates blank pages. It just creates a page as you need it when you reach the bottom of the page.

I am not objecting to that. I was objecting to being told the first time that they had given me everything that they had in response and in the second set things were so different and then there were also two letters that they had not produced the first time, so obviously my question would be what else didn't you produce this time.

THE COURT: Well, and like I said, you can point to some specific evidence that you've got, something that really strongly suggests they are playing games with you and they are not producing the full file that you have asked for then certainly I want to hear about that. But it sounds like right now you are pretty reasonably satisfied you have everything, and you have to take some depositions to see whether these other speculations of yours might actually have some substance to them. Is that a fair characterization of where we sit?

MS. HINKLE: I would say on that issue that it is. I may not need to based on what they did give me and the facts of the case.

THE COURT: Okay. Now, Ms. Hinkle, moving on to the second item that you have in your email, and I read these things carefully because I want to make sure that you have your day to explain what you think you are missing and certainly to the

extent that the Defendants are not giving you something I want to make sure they do.

But to be honest with you, when I read your second bullet point in this email I scratched my head because if you look back at the requests that you mention, 6 and 8, the essence of those requests is, hey, you say I owe you money. You give me proof of that. You show me where there is some contract out there where you have the right to claim that debt is yours. Where did you buy my debt from? What accounts did you buy that show I owe somebody money and you bought it from them, essentially? Is that a fair characterization of 6 and 8?

MS. HINKLE: Just a moment. I wanted to look at 6 and 8, and I was being interrupted very briefly.

THE COURT: I did not characterize that very well but that is the essence of it, I think.

MS. HINKLE: Okay. Let me look at how it was worded. I just had it.

THE COURT: I have a copy here. The first one, 6, do you have that with you now?

MS. HINKLE: Yes.

THE COURT: The first one, produce the contract obligating the Plaintiff to pay any alleged debt to you or any other entity for which you claim you are authorized to collect the debt.

The second, produce the sale agreement containing

essentially your personal identifiers connected with any alleged account purported to belong to the Plaintiff which you claim to have the legal right to collect.

So in both of those the common theme is there, what is your source? Well how in the world do you Midland claim that I owe you money? Where did you buy my debt from?

And it looked like the information they gave you in response gave you every piece of that puzzle you needed but then I read your stuff and you said well wait a minute. I am not even interested in that. That is not really what I am interested in. And I am thinking well, goodness. That is what the request asked for. So I couldn't understand what you were trying to get at there.

MS. HINKLE: I might should have worded it better. What I was getting at, it doesn't really matter to me where they got it because in the first place it wasn't mine so I don't care about that. What it relayed to or referred to was what did you do when you attempted to reinvestigate after I disputed. In their interrogatories they said they went back to the seller, then in response to this production they gave me the two bills of sale and they say that is all they did to investigate after I disputed. That is what this issue is. Then in the bills of sale it clearly says in both of them that the sale was made without warranty or recourse - one of them is in capital letters - and there is nothing else attached to it; no indication as to

what those sales were comprised of or even if they had anything to do with me, but when, generally, the phrase without recourse and without representations or warranty pretty much means don't come back to us if you have a problem; however, they say they did go back to them. The purchasing agreement will spell out specifically what possible reason they could have to expect that these two other previous buyers would have been able to give them anything more than they already had to verify or validate. That is why I asked for the purchasing agreements because it spells out exactly what they could expect to get from the seller beyond what they already got. If there was no expectation that they could get anything from the seller, then they would have known that that would not constitute a proper reinvestigation under the FCRA.

THE COURT: So forgive me for being somewhat dense, what documentation do you believe is out there that they have not produced that you want?

MS. HINKLE: On the reinvestigation under the (s)(2)(B) they are required to do a proper reinvestigation to ascertain the validity or verification of the debt that they are reporting on the credit report.

THE COURT: And so if they say if the credit report shows that you owe Midland $5.00 and you dispute that then Midland has to go back and say, oh, well, how in the world did we claim that she owes us $5.00? What is our documentation that

supports that, right?

MS. HINKLE: Well under the law they have to investigate it.

THE COURT: Exactly. They have to go back to their files and make sure they have evidence that you owe them that $5.00.

MS. HINKLE: Right. But information that does not match and is not correct that they purchased from another buyer just information they have in their own records as to what they purchased does not verify or validate that information. That is just parroting their own internal information. That doesn't prove that what they have is correct.

THE COURT: This is the way I look at it. I think where things stand is you say I dispute it. I don't owe you $5.00 Midland and then you say show me how I owe you $5.00, and so in response Midland comes back and says, look, you weren't a customer of ours. You were a customer of someone else's. You failed to pay them the $5.00 that you owed them and then we bought the debt from somebody else. Here is the contract where we bought the debt and here is the exhibit to the contract that shows the specific account we bought in regards to you and the $5.00 that you owe. And it appears that they gave you that contract where they bought the debt that included your account. Would you agree with that?

MS. HINKLE: No. This is not the contract. This is

the just a copy of a bill of sale.

THE COURT: So you are saying when they bought your account, when they bought the debt arising out of your account with someone else, GE or I think a sale account on the other, that there was more documentation that went along with the purchase agreement than what they are giving you so far?

MS. HINKLE: There was more connected to the bill of sale. There is the purchase agreement which spells out the terms of the purchase because I am not disputing an amount. I am disputing the existence.

THE COURT: Okay. So I guess at this point I would turn to Mr. Ames to enlighten us about whether there is more to this agreement and any arguments by the Defense that the rest of the agreement shouldn't be produced and is not relevant.

MR. AMES: I appreciate that, Your Honor.

In terms of the account purchase agreement or what is referred as the forward flow agreement in Ms. Hinkle's May 5th email, I think we have really four concerns. The first is a procedural matter, and I will confess I was not a participant in the conferrals that occurred between Ms. Hinkle on the one hand and Ms. Broussard on the other so if I misspeak I hope that someone will correct me, but as a procedural matter in terms of discharging the duty to confer in good faith, in my review of the emails and brief writing and everything that preceded today's call, this explanation of relevance that we just heard

is the first time that that theory has been communicated to Midland so we would just purely as a procedural matter express a concern that this has been sort of a changing theory of relevance that has been difficult for us to pin down.

In terms of the substance, the time line alone I think negates this notion that the account purchase agreement somehow bears relevance to what investigation the Midland entity and Encore may or may not have done subsequent to acquiring Ms. Hinkle's account. The time line is this: we acquire bundles of accounts all at once pursuant to this forward flow agreement. There is a bill of sale that accompanied each specific account, and that is the only piece of paper that identifies Ms. Hinkle specifically. And then if there is a dispute, which Ms. Hinkle contends there is, then we would investigate but we can't start investigating a dispute relating to an account that we own until we own the account so this notion that the agreement that gave us title to the debt in the first place somehow reflects actions that we took afterwards just as a matter of logic and the time line doesn't make sense to us.

In terms of the content, the account purchase agreement or this forward flow agreement that Ms. Hinkle described, that is sort of a master agreement between the seller on the one hand and Midland Funding on the other and that is the vehicle that enabled the transfer of many accounts, sometimes hundreds or even thousands of accounts, at once, and that just

describes general commercial terms that are highly sensitive and proprietary to us. The nature of the relationship between the buyer and the seller overarching the amount that we acquired this bundle of accounts for, you know, venue in the event of a dispute; dispute resolution mechanism, those kinds of things. The only document that bears on Ms. Hinkle's account specifically is the bill of sale that we gave to her. The overarching commercial terms that don't relate to her specifically have no logical bearing on what we did or did not do to discharge our obligations under the statute that she cites 1681(s)(2). So there is a timing issue in terms of the time line and there is a relevance issue.

I just mentioned the concern a moment ago that these are very sensitive business terms to us. I mean, what we pay to acquire debt goes to the heart of our business and has no rational relationship to any of the claims in the case but the dissemination of that data could be used for an improper purpose and it could be devastating to our business. We could be under bid on future deals if our competitors knew our method of doing business and what we paid. And I will add, parenthetically I understand that on numerous occasions we attempted to negotiate the terms of a protective order in this case and Ms. Hinkle refused to entertain that, so that gives us great concern that a document that doesn't appear to be relevant is something that is of such keen interest to her.

THE COURT: Let me ask you this, Mr. Ames. Would you be agreeable to producing the full agreement if I sign the protective order?

MR. AMES: I don't know that my client would be over joyed about that either.

THE COURT: The inquiry is not whether your client would be over joyed.

MR. AMES: I understand.

MS. HINKLE: Your Honor, may I clarify?

THE COURT: Yes, you may. If it is with respect to the protective order, I don't have much patience for you being difficult on that. Protective orders are standard fare in litigation. It serves a very important purpose in the competitive business environment that most defendants operate within and so I don't understand why you would give them grief on that. You can't on the one hand insist on knowing everything about your account and on the other hand not give them protection they need to produce the information.

MS. HINKLE: Okay. Partially that is what I want to clarify.

I have no objection to a specific protective order. My only objection was that they be specific with me as to what it was they wanted to protect.

Going back to what Mr. Ames said, this is in fact not a new issue. This is not a new wrinkle. I did explain the

(2) failed to cease collection activities in response to her oral dispute of the T-Mobile Account in violation of § 1692g(b) (*id.* at ¶ 94);

(3) harassed her with telephone calls after she disputed the T-Mobile Account in violation of § 1692d(5) (*id.* at ¶ 95); and

(4) falsely represented the nature of the T-Mobile Account to the credit reporting agencies in violation of § 1692e (*id.* at ¶¶ 91, 93).

Each alleged basis for her FDCPA claim fails as a matter of law, however, and Midland is entitled to summary judgment on Count IV.

While Hinkle claims that Midland violated the FDCPA by failing to provide her with the requisite notice of the procedure for disputing the T-Mobile Account, the undisputed evidence shows otherwise. Because Hinkle failed to dispute the T-Mobile Account in writing within 30 days, as Midland advised her in its initial communication regarding the T-Mobile Account, it was not required to cease collection activities.

**A. Midland provided Hinkle with the validation notice required by § 1692g(a).**

"[T]he FDCPA sets forth a detailed procedure for disputing the validity of a debt, . . . and upon the making of a request for debt verification, all collection efforts must cease." *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002) (citing 15 U.S.C. § 1692g(a)). Here, "there is no question that [Midland's] letter to Plaintiff contained a proper validation notice" apprising Hinkle of the statutory procedure for disputing the debt and requesting verification:

Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid.

If you notify MCM, in writing, within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

Ex. 1-F; *Bleich*, 233 F. Supp. 2d at 500. "Where a debt collector has included appropriate language regarding the FDCPA debt validation procedure, the allegation that the debt is invalid, standing alone, cannot form the basis of a lawsuit alleging fraudulent or deceptive practices in connection with the collection of a debt." *Id.* at 501.[22] Accordingly, Midland is entitled to judgment as a matter of law on Hinkle's FDCPA claim to the extent it is based on the allegation that Midland violated § 1692g(a) by "fail[ing] . . . to provide the required 'Thirty Day Validation Notice' or disclosures to Plaintiff." (*See* Doc. 8, at ¶ 92).

**B. Hinkle failed to dispute the debt in writing within 30 days, and so Midland was not required under § 1692g(b) to cease collection activities.**

"There is also no question that Plaintiff chose to ignore the debt validation procedure" noted in Midland's initial communication to Hinkle on December 21,

[22] Indeed, "[t]o allow such lawsuits would discourage use of the detailed statutory procedure" under the FDCPA, which provides the consumer with an opportunity to dispute the debt, and a debt collector the chance to verify it. *Bleich*, 233 F. Supp. 2d at 501. If the law were otherwise, consumers such as Hinkle "would be encouraged to resort to litigation (and the prospect of an attorney's fee award) instead of being encouraged to communicate directly with the debt collector to expeditiously resolve their claim." *Id.* Thus, one "can only wonder why the plaintiff has chosen to impose the significant burden of litigation on both the defendant[s] and this court, instead of simply following [the] cost-effective procedures provided by the FDCPA specifically designed to facilitate the exchange of information between debt collectors and debtors." *Id.* (quoting *Lindbergh v. Transworld Systems, Inc.*, 846 F. Supp. 175, 179 (D. Conn. 1994)).

2011. *Bleich*, 233 F. Supp. at 500. Under § 1692g(b), "[i]f the consumer notifies the debt collector **in writing** within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt." 15 U.S.C. § 1692g(b) (emphasis added). Here, it is undisputed that while Hinkle orally disputed the T-Mobile Account on December 28, 2011,[23] she did not dispute the debt in writing until July 26, 2012, when she mailed Midland a package entitled "Notice of Intent to Sue."[24] But "[a]n oral notice of dispute of a debt's validity has different legal consequences than a written notice." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859,

[23] *See* (Doc. 8, at, at ¶ 20); Ex. 1-E, at Midland-Hinkle 00035 ("Verbal Dispute within 45 days" recorded on "12/28/2011").

[24] *See* (Doc. 8, at, at ¶ 31–32) ("On July 27, 2012 Hinkle sent a second Demand for Validation letter to MCM and Midland via USPS Certified mail."). While Hinkle's First Amended Complaint (Doc. 8, at ¶ 32) refers to her July 27, 2012 "Notice of Intent to Sue" as containing a "second Demand for Validation," the "first" such written demand pertained to the GE/Meijer Debt, for which she wrote requesting validation on October 20, 2011, over two months before Midland's initial communication with Hinkle regarding the T-Mobile Debt. *Compare* (Doc. 8, at ¶ 18) ("On October 20, 2011 Hinkle sent a 'Demand for Validation of Debt' letter by USPS Certified mail to MCM regarding the alleged account it was reporting."), *with* Ex. 1-F ("Midland Funding LLC recently purchased your T-MOBILE account and Midland Credit Management, Inc. ('MCM'), a debt collection company, is the servicer of this obligation.") (dated December 21, 2011), *and* Ex. 1-I, at Midland-Hinkle 000028 ("Pursuant to 15 U.S.C. § 1692 (g) (4) Validation of Debts, if you have evidence to validate your claim . . ., this is a demand that, within 30 days, you provide such verification/validation and supporting evidence . . . .") (dated July 26, 2012).

As such, it remains undisputed that Hinkle did not request in writing that Midland provide validation of the T-Mobile Debt until July 27, 2012, well outside the 30-day validation period that began to run on December 21, 2011, when Midland sent her an initial communication regarding the T-Mobile Debt, which included the validation notice required by § 1692g(a).

869-70 (S.D. Tex. 2011). "[I]f the consumer disputes the debt orally rather than in writing, the consumer loses the protections afforded by § 1692g(b); the debt collector is under no obligation to cease all collection efforts and obtain verification of the debt." *Id.* (citing *Withers v. Eveland,* 988 F. Supp. 942, 947 (E.D. Va. 1997)).[25] Therefore, Midland is also entitled to summary judgment on Count IV to the extent it is based on Hinkle's contention that Midland violated § 1692g(b) by failing to cease collection activities in response to her oral dispute of the T-Mobile Account.

**C. Hinkle has failed to raise a triable issue of fact as to whether Midland's collection calls violated § 1692d.**

For the same reason, Hinkle's claim also fails as a matter of law to the extent she contends that Midland violated § 1692d(5) by "harass[ing] her with numerous collection calls" despite "refusing to respond to Hinkle's demand for validation." (Doc. 8, at ¶ 95). Because Hinkle "dispute[d] the debt orally rather than in writing, . . . [Midland] [was] under no obligation to cease all collection efforts and obtain verification of the debt." *Osborn*, 821 F. Supp. at 869–70. While Hinkle primarily contends that her claim under § 1692d(5) is based on Midland's failure to cease

[25] *See also Bicking v. Law Offices of Rubenstein & Cogan,* 783 F.Supp.2d 841, 845 (E.D. Va. 2011) ("A debt collector's statutory duty to verify the debt does not arise unless and until the debtor disputes the debt in writing."); *Fasten v. Zager,* 49 F.Supp.2d 144, 148–49 (E.D.N.Y. 1999) ("Under Section 1692g(a)(4), verification is triggered only by the consumer writing a letter to the debt collector. Here, plaintiff's telephone call to defendant did not constitute such a request for verification.").

collection activities in response to her oral dispute,[26] she also has failed to put forth

any evidence sufficient to raise a genuine issue of material fact regarding whether

Midland's collection efforts were indeed harassing or abusive in violation of

§ 1692d.[27]

---

[26] Regarding the basis of her claim under § 1692d(5), Hinkle testified as follows:

Q.     So are you claiming that just calling you about a debt that you failed to
       pay is harassment?

A.     Again, you are assuming facts not in evidence.  This had nothing to
       with a debt I failed to pay.  They were calling me after I demanded debt
       validation.  They did not validate it.  That is a collection action and it's
       harassment.

Ex. 2, at 78:20–25; 79:1–2.

[27] Specifically, Midland's records show that Hinkle was only called seven (7) times
regarding the T-Mobile Debt.  *See* Ex. 1-E.  Hinkle's testimony was consistent with
Midland's records, as she testified only that she was called "about five or six times":

Q.     All right. Now, you also claim telephone harassment under 1692d(5)

. . . .

Q.     How many times did you speak with them on the phone?

A.     I only answered the phone when they called about five or six times.
       After that I refused to answer it.

Ex. 2, at 77:13–22.  Thus, Hinkle fails to raise a genuine issue of material fact as to whether
Midland violated § 1692d(5) by "[c]ausing a telephone to ring or engaging any person in
telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any
person at the called number." 15 U.S.C. § 1692d(5); *see Tucker v. CBE Group, Inc.*, 710
F.Supp.2d 1301 (M.D. Fla. 2010) (granting summary judgment to defendant debt collector,
finding that debt collector's 57 calls to plaintiff's home in an attempt to collect a debt from
his adult daughter did not violate § 1692d(5) where defendant made no more than seven calls
in a single day, and did not call back the same day after leaving a message); *Arteaga v. Asset
Acceptance, LLC*, 733 F. Supp. 2d 1218, 1229 (E.D. Cal. 2010) (finding that "[debt
collector's] conduct did not rise to the level of harassment under Section 1692d, and
[plaintiff] fail[ed] to raise a triable issue of fact as to whether the phone calls were initiated
with the intent to harass in violation of Section 1692d(5)" where the plaintiff "present[ed] no
evidence that [debt collector] called her immediately after she hung up, called multiple times
in a single day, called her place of employment, family, or friends, called at odd hours, or
called after she requested Asset to cease calling").

**D.      Midland made no false representations in violation of § 1692e because it properly flagged Hinkle's account as disputed in its communications with the CRAs.**

"In any event, the final, fatal blow to all of Plaintiff's arguments is the fact that Defendant in no way falsely represented the legal status of the debt." *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 161 (D. Me. 2011).  The remainder of Hinkle's FDCPA claim is premised on her allegations that Midland violated § 1692e(2) by "ma[king] a false representation to the three Consumer Reporting Agencies . . . as to the character, amount, or legal status of an alleged debt" (Doc. 8, at ¶ 93), and that Midland violated § 1692e(8) "by reporting an 'alleged' debt' . . . to a consumer reporting agency . . . in connection with the collection of a debt which they knew was incorrect" (Doc. 8, at ¶ 91).   However, "the FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must 'communicate' the disputed nature of the debt" in order to satisfy its obligations to adequately inform credit reporting agencies about the debt. *Poulin*, 760 F. Supp. 2d at 161 (citing *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 418 (8th Cir. 2008) ("[I]f a debt collector *elects* to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt.")).

Nevertheless, "Plaintiff insists that because Defendant was informed that the debt alleged . . . was invalid, its decision to 'credit report' this debt amounted to a

violation of various provisions of Section 1692e, which prohibits the false representation of the legal status of the debt and communicating information known to be false." *Id.* "While Plaintiff may wish this to be a true statement of the law, [s]he unfortunately can cite to no legal authority to support [t]his argument." *Id.* Midland was not required to cease reporting the debt to the credit reporting agencies simply because Hinkle disputed that the debt was ever owed. "In fact, numerous courts have held . . . that the FDCPA does not require a debt collector to independently investigate the merit of the debt . . .[,] and [t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161 citations omitted). Thus, "[t]he Act in no way gives consumers some sort of veto power over collection agencies." *Poulin*, 760 F. Supp. 2d at 161. Because "[t]he evidence before the Court firmly establishes that, in reporting the debt to the credit reporting agencies, [Midland] specifically flagged the debt as disputed,"[28] Midland is entitled to judgment as a matter of law on Count IV. *Poulin*, 760 F. Supp. 2d at 161.

[28] Ex. 1-G ("[W]e have requested that the three major consumer credit reporting agencies change the status of this account to 'Disputed.'"); Ex. 1-H (same).

## III. Midland is entitled to summary judgment on Hinkle's FCRA claims (Counts I-III) because the undisputed evidence shows that it obtained her credit report for the permissible purpose of collection and that its investigation was not willfully unreasonable.

In Counts I and II, Plaintiff alleges violations of the FCRA by MCM and Midland Funding, respectively.[29] Both counts are based on the same alleged conduct, namely that:

(1) Midland "obtain[ed] the consumer credit report of Hinkle with no permissible purpose" (Doc. 8, at ¶¶ 74, 88);

(2) Midland "willfully and knowingly report[ed] information . . . which it knew was false and inaccurate" to the CRAs (*id.* ¶¶ 75, 81); and

(3) Midland failed to conduct a reasonable investigation under 15 U.S.C. § 1681s-2(b) (*id.* ¶¶ 75, 81).

Both counts fail because:

(1) Obtaining a credit report for purposes of collection of an account is a permissible purpose under the FCRA, *see* 15 U.S.C. § 1681b(a)(3)(A);

(2) The FDCPA does not provide a private right of action for the mere inaccurate reporting of information; and

(3) While the FDCPA does provide a right of action for the failure to conduct a reasonable investigation of a dispute, the undisputed facts here demonstrate that Midland's investigation was reasonable.

### A. Midland obtained Hinkle's credit report in connection with its attempted collection of the Accounts, which is a permissible purpose under the FCRA.

The FCRA expressly provides that "[a] credit report may be provided 'in connection with a credit transaction involving the consumer on whom the

[29] In Count III, Plaintiff alleges Defendant Encore Capital Group, Inc. is—somehow—equally responsible for the violations alleged in Counts I and II.

information is to be furnished and involving the review or **collection** of an account of the consumer.'" *Flores v. I. C. Sys., Inc.*, No. 13-CV-21352, 2014 WL 1379046, at *3 (S.D. Fla. Apr. 8, 2014), *appeal dismissed* (May 13, 2014) (quoting 15 U.S.C. § 1681b(a)(3)(A)) (emphasis added; alterations omitted). "[T]his provision of [the] FCRA permits a debt collector to request a credit report if it uses the report to review an account." *Pinson v. Monarch Recovery Mgmt., Inc.*, No. 12-CV-80480, 2013 WL 961308, at *2 (S.D. Fla. Mar. 12, 2013) (citation omitted).

Here, Midland was undisputedly attempting to collect debts from Hinkle. (*See, e.g.*, Doc. 8, at ¶¶ 39) ("MCM, and Midland operate as a debt buying and collection enterprise."); (*id.* ¶ 92) ("Midland . . . in connection with the collection of a debt"); (*id.* ¶ 94) ("MCM and Midland . . . are still engaging in collection actions . . ."). "It is also undisputed that, as the assignee of that account, [Midland] was entitled under the FCRA to obtain plaintiff's credit report from consumer reporting agencies for the permissible purpose of review or collection of the assigned debt." *Ostrander v. Unifund Corp.*, No. 07-CV-86-JTC, 2008 WL 850329 (W.D.N.Y. Mar. 28, 2008).

Hinkle has offered no evidence whatsoever that Midland obtained her credit report for any purpose other than collection. "The fact that Plaintiff disputes [her] current obligation to pay . . . does not provide a basis for concluding that

Defendant[s] lacked a permissible purpose in obtaining Plaintiff's credit report." *Holloman v. Smith Debnam Narron Drake Saintssing & Myers, LLP*, No. 1:14CV31, 2014 WL 1225330, at *2 (M.D.N.C. Mar. 25, 2014), *report and recommendation adopted*, 2014 WL 1339976 (M.D.N.C. Apr. 3, 2014).

Therefore, to the extent that Hinkle's FCRA claims are based on her allegations that Midland obtained her credit report for an impermissible purpose, Midland is entitled to summary judgment in its favor.

**B. The FCRA does not provide a private right of action for inaccurate reporting.**

The FCRA codified the "[r]esponsibilities of furnishers of information to consumer reporting agencies"[30] at 15 U.S.C. § 1681s-2. Subsection 1681s-2(a) requires that furnishers provide CRAs with "accurate information," while subsection 1681s-2(b) imposes certain obligations upon a furnisher once it receives notice of a dispute from a CRA. *See New v. CitiFinancial Auto Credit, Inc.*, No. 1:10-CV-905-WKW, 2012 WL 2415532, at *3 (M.D. Ala. June 26, 2012).

The FCRA expressly excludes from the Act's civil enforcement provisions, 15 U.S.C. §§ 1681n & 1681o, "any violation of – subsection (a) of [§ 1681s-2], including any regulations issued thereunder." *See* 15 U.S.C. § 1681s-2(c)(1).

[30] "Furnishers" include "an[y] entity . . . which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies." *Carney v. Experian Info. Solutions, Inc.*, 57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999). Although Midland disputes that it provided any information to a credit bureau, accepting Plaintiff's allegations as true for purposes of this motion, Midland would be a furnisher of information.

Rather, the enforcement of § 1681s-2(a) is vested solely with state and federal regulators. *See* 15 U.S.C. § 1681s-2(d) ("The provisions of law described in paragraphs (1) through (3) of subsection (c) of this section . . . shall be enforced exclusively . . . by the Federal agencies and officials and the State officials identified in section 1681s of this title.").

Thus, the Eleventh Circuit has recognized that no private cause of action exists under § 1681s-2(a) for reporting false information:

> Green contends that Citizens Bank of Rhode Island ("Citizens") violated § 1681s–2(a) by tendering false information regarding his account. The FCRA, however, does not provide a private right of action to redress such a violation, and the district court was correct in so holding.

*Green v. RBS Nat. Bank*, 288 F. App'x 641, 642 (11th Cir. 2008); *see also New v. CitiFinancial Auto Credit, Inc.*, 2012 WL 2415532, at *3 ("The FCRA does not provide a private right of action to redress a furnisher of information's violation of its duty under § 1681s–2(a)."); *Bishop v. Holloway Credit Solutions, LLC*, No. 3:08-CV-995-TFM, 2009 WL 499390, at *4 (M.D. Ala. Feb. 27, 2009) ("The obligations included in § 1681s-2(a) do not give rise to a private cause of action."); *Knudson v. Wachovia Bank*, 513 F. Supp. 2d 1255, 1260-61 (M.D. Ala. 2007) ("There is no private right of action for violations of § 1681 s–2(a).") (citing *Yelder v. Credit Bureau of Montgomery*, 131 F. Supp. 2d 1275, 1283 (M.D. Ala.2001)).

Therefore, to the extent Plaintiff's FCRA claims are based upon furnishing inaccurate information to the CRAs, those counts must be dismissed because Congress did not provide consumers with a private right of action under the FCRA for the alleged furnishing of false or inaccurate information.

**C. Midland's investigation was reasonable given the information available, and Hinkle refused to provide additional information requested.**

On the other hand, Congress did provide private rights of action for violations of § 1681s-2(b), which requires furnishers to perform a reasonable investigation after receiving notice of a dispute from a CRA. In Counts I and II, Hinkle seeks to hold Midland liable for willful violations of the FCRA based on her allegations that Midland failed to conduct a reasonable investigation after receiving notice from the CRAs that the Accounts were disputed.

The undisputed facts simply cannot support a claim for willfulness, however, because "there is an absence of evidence to support" that MCM "consciously disregarded" the law. *Riley*, 194 F. Supp. 2d at 1243. Plaintiff must meet a high standard to survive summary judgment on a claim of willful violation of the FCRA:

> While the Eleventh Circuit has not specifically addressed the meaning of "willful" under the FCRA, the Ninth Circuit has held that "as used in the FCRA, 'willfully' entails a 'conscious disregard' of the law, which means 'either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the

> FCRA or in reckless disregard of whether the policy [or action] contravened those rights.'"

*King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1279 (N.D. Ga. 2006) (granting summary judgment on plaintiff's claim for willful violation of the FCRA) (citation omitted). In other words, "[t]o be found in willful noncompliance, a defendant must have 'knowingly and intentionally committed an act in conscious disregard for the rights of others.'" *Stevenson v. TRW, Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986) (describing cases finding willfulness where reports were "rife with innuendo, misstatement, and slander" or "contained statements about the plaintiff regarding her excessive drinking"), *cert. denied*, 483 U.S. 1022 (1987)); *see also Heupel v. Trans Union LLC*, 193 F. Supp. 2d 1234, 1241 (N.D. Ala. 2002) (granting summary judgment for defendant; "Courts have consistently disallowed punitive damages absent special and aggravating circumstances.").

Under this standard, "the failure to delete erroneous information after receipt of notice by the consumer and even the reinsertion of incorrect information after it had previously been deleted have been found to fall short of the knowing and intentional disregard standard." *Reed*, 321 F. Supp. 2d at 1116; *Thomas v. Gulf Coast Credit Servs., Inc.*, 214 F. Supp. 2d 1228, 1238 (M.D. Ala. 2002) (granting summary judgment on willfulness claim because "fail[ure] to produce immediate eradication of inaccurate information" is not a knowing and conscious disregard

for the plaintiff's rights). Rather, the evidence must show an "intention to thwart consciously [plaintiff's] right to have inaccurate information removed promptly from his report." *King*, 452 F. Supp. 2d at 1280 (citing *Stevenson*, 987 F.2d at 294.

The determinative question for liability is whether the furnisher of information "could have discovered an error in a particular report through a reasonable investigation." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991); *see also Chiang v. Verizon New England Inc.*, 595 F.3d 26, 29–30 (1st Cir. 2010) (same). Here, however, Hinkle relies on nothing more than her contention that the furnished information was inaccurate. But "[a]n FCRA plaintiff 'cannot rest on a showing of mere inaccuracy, shifting to the defendant the burden of proof on the reasonableness of procedures for ensuring accuracy.'" *Podell v. Citicorp Diners Club*, 914 F. Supp. 1025, 1032 (S.D.N.Y. 1996) (quoting *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984)). Rather, it is Plaintiff's burden to prove that MCM acted unreasonably under the circumstances. *Id.* Yet Plaintiff has introduced absolutely no evidence regarding the applicable standard of care or the reasonableness of Midland's investigation under the circumstances. In fact, Hinkle has steadfastly refused to offer any evidence at all regarding the unreasonableness of Midland's investigation,

apparently laboring under the mistaken view that the burden is on Midland to show that its investigation was reasonable.[31]

In any event, the undisputed evidence shows that Midland acted reasonably under the circumstances, yet Plaintiff failed to substantiate her dispute.  In July and August 2012, Midland received notice from two of the CRAs, Equifax and Experian, that Plaintiff disputed that the T-Mobile account was hers.[32]  Through its electronic systems, Midland verified that it was reporting the information it received about the account when it was purchased.[33]  As a matter of law, Midland was entitled to rely on the information it received from the original creditor, and

---

[31] For example, when she was asked about Midland's letter of July 21, 2012 (Midland-Hinkle 00078), wherein Midland requested "copies of any documentation you may have that supports your dispute," Hinkle testified as follows:

> Q.   And it reads in part: The purpose of this letter is to request your assistance so that we may reach a quick resolution to your dispute. So it looks like they were asking you for documentation regarding your dispute. Is that what you understood it to be?
>
> A.   I understood it to be them shifting the burden back on me and I'm not obligated under law to do that for them.

Ex. 2, at 106:15–23.  Hinkle likewise admitted that she lacked any evidence regarding the reasonableness of Midland's investigation of her dispute:

> Q.   But you don't know exactly what steps were taken in conducting any alleged investigation; is that correct?
>
> A.   They haven't disclosed that as yet, no. I was not there.

Ex. 2, at 76:16–20.

[32] Ex. 1, at ¶ 15.

[33] *Id.*

"[t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161.[34] Moreover, Midland requested information or documentation from Plaintiff during its investigation of her disputes, but Plaintiff declined to provide anything.[35]

Without receiving any documentation suggesting that the information Midland received from the original creditors was inaccurate, Midland could not have "**consciously** disregarded" Hinkle's rights under the law. *See Thomas*, 214 F. Supp. 2d at 1238 ("[F]ail[ure] to produce immediate eradication of inaccurate information" is not a knowing and conscious disregard for the plaintiff's rights). Consequently, MCM is entitled to summary judgment on Hinkle's claim for willful violations of the FCRA.

## CONCLUSION

For the reasons stated above, Midland is entitled to judgment as a matter of law on all of the claims asserted in Hinkle's First Amended Complaint. Accordingly, Midland respectfully requests that this Court enter summary judgment in its favor on all counts.

---

[34] *See also Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1174 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt."); *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996).

[35] Ex. 1-G; Ex. 1-H.

Respectfully submitted this the 28th day of July, 2014.

*/s/ Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898
Joshua M. Moore
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020

**Attorneys for Midland Funding LLC, Midland Credit Management, Inc., and Encore Capital Group, Inc.**

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 28th day of July, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

*/s/ Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.,**<br><br>**DEFENDANTS.** | ) | **CIVIL ACTION NO. 3:13-cv-00033-DHB-BKE** |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. On September 24, 2008, Midland acquired from AIS Services, LLC a debt originally owed to GE/Meijer (the "GE/Meijer Account").[1]

2. On October 1, 2008, Midland sent an initial collection letter to Hinkle regarding the GE/Meijer Account, which included a settlement offer promising that Midland would notify the three major CRAs that the debt was paid in full if it received payment of $237.49 by November 15, 2008.[2]

---

[1] *See* Affidavit of Angelique Ross, attached hereto as Exhibit 1, at ¶ 6; *see also* Ex. A to Affidavit of Angelique Ross (attachments to Exhibit 1 are hereinafter cited as Ex.1-A, and so on).

[2] Ex. 1-D.

3.      Twelve days later, Midland received a check in the amount of $237.49—the exact amount of the settlement offer—sent to its secure payment "lock box" at the remittance address identified on the settlement letter.[3]

4.      Thereafter, Midland ceased reporting the GE/Meijer Account to the CRAs as of March 16, 2009, and the account was reported as "paid in full."[4]

5.      On December 6, 2011, Midland acquired from Debt Recovery Solutions, LLC, a debt originally owed to T-Mobile (the "T-Mobile Account").[5]

6.      Midland sent an initial collection letter to Hinkle regarding the T-Mobile Account on December 21, 2011, advising her that Midland would "assume the debt to be valid" if she did not "notify [Midland] within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof."[6]

7.      On October 20, 2011—over three years after Midland had sent its initial communication to Hinkle regarding the GE/Meijer Account—Hinkle sent a "Demand for Validation of Debt" to Midland, claiming that she did not owe, and never owed, any money on the GE/Meijer Account.[7]

---

[3] Ex. 1 at ¶ 8; Ex. 1-C, at Midland-Hinkle 000047 and Midland-Hinkle 000221.
[4] Ex. 1-C, at Midland-Hinkle 000048.
[5] Ex. 1, at ¶ 7; *see also* Ex. 1-B.
[6] Ex. 1-F.
[7] (Doc. 8, at ¶ 17).

8. Shortly after sending her "Demand for Validation" of the GE/Meijer Account, Hinkle received Midland's initial communication concerning the T-Mobile Account on December 21, 2011.[8]

9. On December 28, 2011, Midland called Hinkle at her home in an attempt to reach a settlement of the T-Mobile Account.[9]

10. During the December 28, 2011 conversation, Hinkle verbally disputed that she owed any money on the T-Mobile Account.[10]

11. Upon receiving notice of Hinkle's dispute of the T-Mobile Account, Midland sent her letters dated February 5, 2012, and July 21, 2012, seeking her assistance "so that we may reach a quick resolution of your dispute."[11]

12. Each letter also stated that as part of Midland's "investigation of your dispute, it would be helpful to have a copy of any documentation you may have that supports your dispute," and provided four examples of supporting documentation.[12]

13. Hinkle, however, never provided any documentation to substantiate her dispute of the T-Mobile Account.[13]

---

[8] (Doc. 8, at ¶ 19); *see also* Ex. 1-F.
[9] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.
[10] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.
[11] Exs. 1-G, and 1-H.
[12] Exs. 1-G, and 1-H.
[13] Ex. 1-E.

14. Hinkle intentionally refused to respond to Midland's request for assistance in investigating her dispute, later testifying that she "understood [the letters] to be [Midland] shifting the burden back on me and I'm not obligated under law to do that [investigation] for them."[14]

15. Having received no response to its February 5 letter requesting Hinkle's assistance in investigating her dispute of the T-Mobile Account, Midland obtained a copy of her credit report on May 7, 2012.[15]

16. In July 2012, Midland received notice of a dispute from the credit bureaus. Midland verified it was furnishing the information provided by Debt Recovery Solutions, LLC and continued to report the T-Mobile Account as "disputed."[16]

17. After Hinkle received Midland's second letter requesting documentation regarding her dispute on July 21, Hinkle mailed to Midland a "Notice of Intent to Sue" and a "Demand for Validation of Debt" regarding the T-Mobile Account on July 26, 2012—over seven (7) months after Midland sent her its initial communication concerning the T-Mobile Account.[17]

---

[14] *See* Transcript of March 11, 2014 Deposition of Teri L. Hinkle at 106:15–23. A true and correct copy of the referenced transcript is attached hereto as Exhibit 2.
[15] (Doc. 8, at ¶ 25).
[16] *See* Ex. 1 at ¶ 15, *see also* Ex. I-E.
[17] (*See* Doc. 8, at, at ¶ 31–32); Ex. 1-I, at Midland-Hinkle 000028.

18. When Midland failed to pay the $18,000 settlement as demanded in her July 26 "Notice of Intent to Sue,"[18] Hinkle filed suit, alleging that Midland had violated the FDCPA and the FCRA by attempting to collect the Accounts and by falsely reporting the Accounts to the credit reporting agencies.

Respectfully submitted this 28th day of July, 2014.

Balch & Bingham LLP

/s/Matthew B. Ames
Matthew B. Ames
Georgia Bar No. 015898
Joshua M. Moore
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
**Attorneys for Midland Funding LLC, and Midland Credit Management, Inc.**

[18] Ex. 1-I, at Midland-Hinkle 000023.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 28thth day of July, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

/s/Matthew B. Ames
Matthew B. Ames
Georgia Bar No. 015898

absence of a third party challenging the protection of information, the Court serves as "the primary representative of the public interest in the judicial process," and must "review any request to seal the record (or part of it) [and] may not rubber stamp a stipulation to seal the record." Estate of Martin Luther King, Jr., Inc. v. CBS, Inc., 184 F. Supp. 2d 1353, 1363 (N.D. Ga. 2002).

Upon consideration of these guiding principles, Plaintiff shall file the entirety of her response to Defendants' motion for summary judgment under seal on September 9, 2014. The **CLERK SHALL MAINTAIN** the materials in a secure file pending a final ruling by the Court on the instant motion to seal. By September 12, 2014, Defendants shall file a brief, in accordance with the provisions of Loc. R. 79.7, explaining why information in Plaintiff's responsive brief and/or accompanying exhibits should be sealed rather than, for example, appropriately redacted.

To ensure Plaintiff receives this Order prior to the deadline for filing her summary judgment response, the **CLERK** is **DIRECTED** to serve a copy of this Order on Plaintiff electronically and by United States mail.

SO ORDERED this 3rd day of September, 2014, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

(s)(2)(B) and their obligation to what would be in the purchase agreement that would clarify all of that.

THE COURT: Well let me ask you this, Ms. Hinkle. How does it relate? How is the overall purchase agreement going to shed any light on this investigation duty that they have once you dispute a debt?

MS. HINKLE: Okay. Let me explain that. Under the (s)(2)(B) it is only about that. It only refers to the investigation done after a dispute. Now when they gave me the bills of sale and it says without recourse or warranty then they gave me a piece of paper printed up with the information that they say they got from the other buyers. First of all, those documents show that the sale amount was the full amount of the debt, which obviously is incorrect. They couldn't make any money if that is what they were doing. But I really don't care what they paid for it. I don't need to see the amounts that they paid. What is important is the terms of the sale as far as Midland's expectation to be able to go back to the seller to verify the existence of any account. I am not disputing that they bought this information from these other sellers. I am disputing that the original accounts ever existed so that is where you have to start. They say they didn't do anything but go back to the sellers to reinvestigate. If the language in the purchase agreement clearly states that they don't have anything else, they can't provide anything else, there is nothing else to

be had and they knew that in advance, then going back to the seller and presenting that that satisfies the requirement under the (s)(2)(B) section of the FCRA is just not true.

THE COURT: Well, I don't know. You had me there for a minute and I was going along with you and then I started thinking well let's just say for a minute the contract says what you think which is that there is no right of recourse and we have given you all there is to have with respect to confirmation that each of these accounts exist that you are buying then the next question is, well, what else can Midland do, right? But I get your overall point.

Mr. Ames, it sounds like she has a pretty good point there that the purchase agreement would have to include some language regarding verification of these accounts and perhaps even what happens when someone disputes a debt.

MR. AMES: I have not seen the particular account purchase agreement that she references in her email so I could only speculate as to what it says. I know generally that it includes the overarching commercial terms of the sale and does not identify or mention any accounts specifically. I guess where we get tripped up is it seems pretty settled under Georgia law that to constitute a valid assignment it has to be writing and it has to clearly identify the assignor and the assignee, and we've got both of those elements here with the bill of sale. The irony of this is if we had done it the exact opposite way,

if we had produced only the account purchase agreement and not the bill of sale then there might be room for an argument that we haven't reasonably identified her debt or connected the dots that in any way show standing on our part to speak to collect but in this instance we have been precise and we have produced a bill of sale that satisfies Georgia law for an assignment of a chosen action and we, again, admit that any overarching commercial terms just don't bear on any investigation that we did or didn't do marked after the fact.

THE COURT: But surely it may affect it. It depends on what the agreement says it may. I can see where there is an argument of relevance here and it sounds like you are not familiar enough with those general terms and conditions to be able to really categorically say whether they are responsive or not. So I would err on the side of Ms. Hinkle on this and think that instead of just giving her an exhibit to the sale that talks specifically about her that the overall contract is arguably relevant but certainly to the extent that it needs to be redacted to protect trade secrets and the like I want you to have the protection of being able to do that and the protection of a protective order as well, and if Ms. Hinkle won't consent to one, just file with the Court a draft and I will be glad to sign it as long as it is like most of the ones we see around here.

MS. HINKLE: I offered to do that, Your Honor. And as

I said before, I have no problem with them redacting out things like amounts, agreements to buy. A forward flow usually means that they are agreeing to buy more accounts later on down the road with the same entity as opposed to an accounts purchase agreement. It may be one or both between the two accounts. I have no argument that they bought to assign to them a debt that belonged to somebody. My argument is it doesn't belong to me and the language is going to be in that agreement as to what their reasonable expectation of proving it did would have been. That is what would be in that agreement so I am perfectly amenable to a specific protective order in regard to this. I would ask, however, that you instruct them not to redact any of the language in regard to what was included in the sale as far as warranty, documentation, where they got it from, for instance, because I know --

THE COURT: Ms. Hinkle, I think you are getting a little ahead of yourself. You are not dealing with some Johnny-come-lately lawyer here. Mr. Ames is highly regarded, he certainly has a lot of experience, and you are starting to talk about a dispute that doesn't even exist. I mean, I think he understands that the general terms and conditions are ones that you are going to want to see. Those are the ones that you allege to be relevant so let's not get into that right now.

MS. HINKLE: All right.

THE COURT: I will say overall, Ms. Hinkle, I do think

that sometimes you approach these topics with this feeling like you are dealing with shysters on the other side or perhaps litigators who don't know what they're doing. I don't think that has been the case with either lawyer you dealt with so I think that you need to probably show them a little more respect and professionalism. Certainly when I litigated I made every effort to do that with my opposing counsel and I only accused them of not being forthcoming when I had direct evidence of that being the case. It is just what we do within the bar and I will expect you to do the same thing for them.

MS. HINKLE: All right.

THE COURT: All right. So we need to move on and talk about the timing of all this.

Ms. Hinkle, is there any outstanding discovery that you are going to want to conduct once you get this redacted protected full agreement in hand?

MS. HINKLE: Just one. I would request the opportunity to depose the person who signed the affidavit that was put in yesterday. I don't know if you got a chance to read it but it doesn't pertain to me at all. It is all about the Defendant's debt throughout the whole thing.

THE COURT: Ms. Hinkle, how in the world does that affidavit not relate to you?

MS. HINKLE: The language in it all refers to the Defendant's debt, the Defendant's account. I am the Plaintiff.

THE COURT: Hold on a second.

Well I think that is probably a typo; is that right, Mr. Ames?

MR. AMES: It is.

THE COURT: I think it is a fair inference that that is a typo. I understand you want to take his deposition. I think I would probably want to do the same so if you want to do that and maybe take one other deposition of the Defendants if that is all we are talking about, how much time do you think you need to do that, Ms. Hinkle?

MS. HINKLE: Just long enough for me to - I will have to do it in written deposition so just long enough for me to serve that on them and for them to reply.

THE COURT: You don't want to do that in a regular deposition? Written depositions to me are just terribly inefficient and time consuming and you can't do follow-up. I would not recommend that.

MS. HINKLE: My reason for that is that I am financially unable to do it any other way.

THE COURT: All right. You know what; I so don't like depositions in written requests. I have only seen them in a couple of instances since I have been on the bench. I didn't see them at all in my practice because we avoided them like the plague. I am not familiar with the timing mechanisms of that.

Mr. Ames, are you familiar enough with the timing

mechanisms to know what kind of time that means we need to give for that?

MR. AMES: No, Your Honor. I am scurrying for my rule book now and if you have encountered this once or twice that is one or two times more than I have over 15 years. I am aware that it is out there but I have never seen it done.

THE COURT: All right. Let's see.

MS. HINKLE: I should think just like other forms of discovery would it not require 30 days to give them to answer?

THE COURT: Like most things in the law I am pretty good at speculating and half the time I am right but the other half I am not so I have to take a look at the rule to see.

(BRIEF PAUSE)

MR. AMES: It looks like the general rule is under Federal Rule 31. I am reading very quickly. I am not seeing anything that directly speaks to a time limit but it might be because I am reading quickly, and I am looking to see if there is a local rule also.

(BRIEF PAUSE)

MR. AMES: There doesn't appear to be a local rule that addresses it so it is just the federal rule.

THE COURT: Hold on. Let me read this real fast. Sorry.

MR. AMES: Sure.

(BRIEF PAUSE)

THE COURT: Well there is a procedure in 31.5 for cross-examination questions and redirect questions but, Mr. Ames, I doubt you would want to submit any written cross-examination questions, right?

MR. AMES: That's right.

(BRIEF PAUSE)

THE COURT: All right. How quickly, Mr. Ames, do you think we can get that protective order together and produce that agreement?

MR. AMES: We will have a proposed protective order to Ms. Hinkle by no later than close of business Friday and hopefully sooner than then. I will need to get the agreement from my client and start reviewing it immediately and then upon entry of the protective order we will produce the document. I don't want to promise to produce anything tomorrow without talking to my clients.

THE COURT: Sure.

MR. AMES: Inside of, say, 7 days should be do-able.

THE COURT: Well let me ask you this, Mr. Ames. Is there any additional discovery that you are going to want to conduct?

MR. AMES: No, sir. We are eager to proceed on to the next stage of the case.

THE COURT: Okay. Well, Ms. Hinkle, if I give you 45 days from today's date to complete discovery do you think that

 will be sufficient?

MS. HINKLE: Yes, sir. I would like to point out there are two of those agreements; they are different companies.

THE COURT: I think that is understood.

Now I want you to understand that there were lots of accounts that would have been purchased through these two agreements and you're not going to get information regarding other people's accounts, you understand that, right?

MS. HINKLE: No, I don't want that. I have no interest in that at all.

THE COURT: So are you are just getting the general terms and conditions that go along with the bill of sale?

MS. HINKLE: Yes.

THE COURT: Okay. All right.

So we will enter an order to that effect then that we are going to allow 45 days for the Plaintiff to conduct discovery, that the Defendant doesn't have any additional discovery to conduct, and we will look for that draft protective order to come in.

Ms. Hinkle, do you have any objection to Mr. Ames emailing you that draft protective order?

MS. HINKLE: No. I would appreciate it.

THE COURT: That is just going to move things along a lot faster if you will agree to do that.

And do you have a good email address that you can

communicate to him now so we are all on the same page about where it goes?

MS. HINKLE: We have been communicating to my only email address.

THE COURT: Oh that is right. Y'all had some emails in here. Okay.

All right. Well I think that takes care of everything so we are going to deny in part and grant in part the motion to compel and grant it only with respect to this issue of the agreement.

And backing up just for a minute; Mr. Ames, do you have any cases where this has been litigated in the past in a similar context?

MR. AMES: I have asked that question and I am wary of not overstating it. Midland has cases all over the country and while my folks at our law firm who handle these are unaware of this agreement ever being required to be produced I did not want to overstate it by saying that Midland had never been ordered to produce it because if they have and our firm just wasn't involved or wasn't aware of it I don't want to unintentionally mislead the Court. But in our experience, it has never been an issue.

THE COURT: And I know I am backing up a little bit here. But the way I am thinking about this is that agreement somewhere in there probably has some representations and

warranties regarding the validity of the debts that are being purchased and/or it may touch on what happens when a debt on one of these accounts is disputed. What kind of information can be requested and provided. Am I just totally wrong about that?

MR. AMES: I just don't know, Your Honor.

MS. HINKLE: Your Honor, there is a recent case where Midland was ordered to produce the purchase agreement and that is ***Gold versus Midland*** out of Northern California. That order was on February 14th of this year.

THE COURT: Ms. Hinkle, that is excellent. That is excellent. Do you have a cite for that?

MS. HINKLE: I can send you the order. I will send it to your clerk.

THE COURT: And so that would give me a little more comfort if I knew I wasn't the first judge in the country to order production of that type of agreement. I just makes sense to me that there may be some provisions along those lines in there that would arguably be relevant to the litigation.

MS. HINKLE: I will give you case law on some others as well but that is the latest one.

THE COURT: Okay. Well make sure you copy Mr. Ames when you send that authority to Mrs. Cirillo.

And Mr. Ames, if you have any contra authority that you want to send, you can do it in the same manner.

MR. AMES: Okay. Well what if we do? I mean, if we

find cases that say it should not be required to be disclosed, the zealous advocate impulses in me are going to want to invite the Court to reconsider the issue and if that is not the signal that you are sending then I certainly don't want to file something that I shouldn't.

THE COURT: I am doing some of this off the cuff, right, and just listening to you guys talk about it and then do what my gut tells me and I am always uncomfortable with that. As I said earlier, my gut is only right about 50 percent of the time or maybe 51 percent, so if you want to instead of emailing Mrs. Cirillo some cites if you are more comfortable submitting a supplemental brief then I will give you through Friday to do that. Is that enough time?

MR. AMES: Yes, Your Honor.

THE COURT: Okay. And then from there we will enter a ruling shortly after that and hopefully get this thing back on track.

MR. AMES: We appreciate Your Honor's time and patience.

THE COURT: No, no problem. Glad to do it.

Ms. Hinkle, is there anything further from your perspective we need to talk about today?

MS. HINKLE: I don't believe so. I thank you very much.

THE COURT: Thank you.

Mr. Ames, any further from your perspective?

MR. AMES: Well one small point of clarification. On the extension of 45 days of additional discovery, is that going to be limited to the serving and responses to the deposition by written question?

THE COURT: No. In fact, if the Defendant thinks of something else that you believe needs to be done, I am not going to limit you guys at all. You have 45 days to do whatever else you think you need. And the 45 days won't run from today. It will run from whenever we get this order out ruling on these issues.

MR. AMES: Okay. I was a little more concerned about it going the other way which is that it is an opportunity for another 45 days of open ended questions about produce this agreement and that agreement when I think we have produced everything we could locate that pertains to her specifically but if it is open it's open. I just want to make sure I understand the Court's ruling.

THE COURT: I think Ms. Hinkle has had enough of this document discovery anyway. She is ready to get to the deposition and get this over with.

MS. HINKLE: And you are absolutely right. I really truly do not believe other than the purchasing sale agreements that there is anything that they could give me.

THE COURT: Now, Ms. Hinkle, I do want to tell you

that you do have 45 days but you really need to give some serious consideration to whether there are any other depositions you want to take because you are not going to get another bite at this. This is the last opportunity to conduct discovery in the case.

MS. HINKLE: Absolutely. I will do that order immediately after this conference and the other case law I need to get out of my records and I will send that to Mrs. Cirillo no later than the morning.

THE COURT: All right. Well thank you very much, everyone, for your efforts in narrowing this discovery dispute down to a very manageable core of issues. I wish you guys a good rest of the week.

MR. AMES: Okay.

MS. HINKLE: Thank you very much.

MR. AMES: Thank you, Your Honor.

THE COURT: Goodbye.

*(PROCEEDING CONCLUDES APPROXIMATELY 3:48 p.m.)*

---

**CERTIFICATION**

I certify that the foregoing, consisting of pages 1-29, is a true and correct copy of the transcript as transcribed by me to the best of my ability from the official electronic recording of the proceedings.

This the 20th day of May, 2014.

/s/ C. Joan Mobley
U.S. District Court Reporter
Southern District of Georgia

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

FILED
OCT 16 2013
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

**IN RE: MIDLAND CREDIT MANAGEMENT, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION** MDL No. 2286

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO −10)**

On October 11, 2011, the Panel transferred 2 civil action(s) to the United States District Court for the Southern District of California for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. §1407. *See* 818 F.Supp.2d 1377 (J.P.M.L. 2011). Since that time, 11 additional action(s) have been transferred to the Southern District of California. With the consent of that court, all such actions have been assigned to the Honorable Michael M. Anello.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Southern District of California and assigned to Judge Anello.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. §1407 to the Southern District of California for the reasons stated in the order of October 11, 2011, and, with the consent of that court, assigned to the Honorable Michael M. Anello.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Southern District of California. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7−day period, the stay will be continued until further order of the Panel.

Inasmuch as no objection is pending at this time, the stay is lifted.

Oct 16, 2013

CLERK'S OFFICE
UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

Jeffery N. Lüthi
Clerk of the Panel

I hereby attest and certify on Oct 16, 2013 that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

Clerk, U.S. District Court
Southern District of California

By: s/ K. Johnson
Deputy

**IN RE: MIDLAND CREDIT MANAGEMENT, INC., TELEPHONE CONSUMER PROTECTION ACT LITIGATION**

MDL No. 2286

**SCHEDULE CTO–10 – TAG–ALONG ACTIONS**

| DIST | DIV. | C.A.NO. | CASE CAPTION |
|---|---|---|---|
| GEORGIA SOUTHERN | | | |
| GAS | 3 | 13–00033 | Hinkle v. Midland Credit Management Inc. et al |

Plaintiff's Appendix Document No - 85

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.**<br><br>**DEFENDANTS.** | ) | **CIVIL ACTION NO.**<br>3:13-cv-00033-DHB-BKE |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 56 and 56.1 of the Southern District of Georgia, Defendants Midland Credit Management, Inc., Midland Funding, LLC, Encore Capital Group, Inc. (collectively, "Midland") hereby respectfully move this Court for an order granting summary judgment in their favor on the claims asserted by Plaintiff Teri Lynn Hinkle ("Hinkle"). In support of this motion, Midland also submits the following Statement of Undisputed Facts and Memorandum of Law.

## INTRODUCTION

In her First Amended Complaint (Doc. 8), Hinkle claims that Midland violated various provisions of the Fair Debt Collection Practices Act ("FDCPA")

by attempting to collect on two accounts that she claims she did not owe. (*See* Doc. 8, at ¶¶ 90–103) (Count IV). She claims that Midland also violated various provisions of the Fair Credit Reporting Act ("FCRA") by improperly reporting the same two accounts to consumer reporting agencies ("CRAs"). (*See id.*, at ¶¶ 64–89) (Counts I–III).[1] The undisputed evidence, however, shows that both claims fail as a matter of law.

In Count IV, Hinkle alleges that Midland is liable under several provisions of the FDCPA for failing to provide her with the statutorily-required validation notices concerning both of the disputed accounts (Doc. 8, at ¶ 92); failing to cease collection activities after she disputed the accounts (*id.* at ¶ 94); harassing her with telephone calls after she disputed the accounts; (*id.* at ¶ 95); and making false representations regarding the accounts to the CRAs (*id.* at ¶¶ 91, 93). But according to the undisputed evidence, Midland did include the requisite validation notices in its initial communications with Hinkle concerning both accounts. Because Hinkle failed to dispute the accounts in writing within 30 days, as required under the FDCPA's statutory validation procedure, Midland was not obligated to cease its collection activities. Nor can Midland be liable for making any false representations to the CRAs in connection with the accounts, as the undisputed evidence shows that it appropriately flagged the accounts as "disputed."

[1] Plaintiff dismissed Count V of the Amended Complaint. *See* (Docs. 21, 23).

As for Counts I-III, Hinkle essentially alleges a single claim for purportedly willful violations of the FCRA.[2] In support of her FCRA claim, Hinkle alleges that Midland obtained her credit report without a permissible purpose (Doc. 8, at ¶¶ 74, 88); reported false information to the CRAs (*id.* ¶¶ 75, 81); and failed to conduct a reasonable investigation after receiving notice from the CRAs that she disputed the two accounts that Midland was attempting to collect (*id.* ¶¶ 75, 81). It is undisputed, however, that Midland obtained Hinkle's credit report only for the permissible purpose of attempting to collect on her two accounts; the FCRA provides no private right of action for the alleged furnishing of false information to the CRAs; and Hinkle has failed to raise a triable issue of fact regarding the reasonableness of Midland's investigations regarding the disputed accounts.

Accordingly, and for the reasons stated below, Midland is entitled to judgment as a matter of law on both the FDCPA and FCRA claims asserted in Hinkle's First Amended Complaint.

[2] In Counts I and II, the same claim is asserted against Midland Credit Management, Inc. and Midland Funding, respectively. In Count III, Plaintiff alleges Encore Capital Group, Inc. is vicariously liable for violations alleged against Midland Credit Management, Inc. and Midland Funding, LLC in Counts I and II.

## STATEMENT OF UNDISPUTED FACTS

On September 24, 2008, Midland acquired from AIS Services, LLC a debt originally owed to GE/Meijer (the "GE/Meijer Account").[3]  On October 1, 2008, Midland sent an initial collection letter to Hinkle regarding the GE/Meijer Account, which included a settlement offer promising that Midland would notify the three major CRAs that the debt was paid in full if it received payment of $237.49 by November 15, 2008.[4]  Twelve days later, Midland received a check in the amount of $237.49—the exact amount of the settlement offer—sent to its secure payment "lock box" at the remittance address identified on the settlement letter.[5]  Thereafter, Midland ceased reporting the GE/Meijer Account to the CRAs as of March 16, 2009, and the account was reported as "paid in full."[6]  On October 20, 2011—over three years after Midland had sent its initial communication to Hinkle regarding the GE/Meijer Account—Hinkle sent a "Demand for Validation of Debt" to Midland, claiming that she did not owe, and never owed, any money on the GE/Meijer Account.[7]

---

[3] *See* Affidavit of Angelique Ross, attached hereto as Exhibit 1, at ¶ 6; *see also* Ex. 1-A to Affidavit of Angelique Ross.

[4] Ex. 1-D.

[5] Ex. 1 at ¶ 8; Ex. 1-C, at Midland-Hinkle 000047 and Midland-Hinkle 000221.

[6] Ex. 1-C, at Midland-Hinkle 000048.

[7] (Doc. 8, at ¶ 17).

Separately, on December 6, 2011, Midland acquired from Debt Recovery Solutions, LLC, a debt originally owed to T-Mobile (the "T-Mobile Account").[8] Midland sent an initial collection letter to Hinkle regarding the T-Mobile Account on December 21, 2011, advising her that Midland would "assume the debt to be valid" if she did not "notify [Midland] within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof."[9]

It was shortly after sending her "Demand for Validation" of the GE/Meijer Account that Hinkle then received Midland's initial communication concerning the T-Mobile Account on December 21, 2011.[10]  On December 28, 2011, Midland called Hinkle at her home in an attempt to reach a settlement of the T-Mobile Account.[11]  During that conversation, however, Hinkle verbally disputed that she owed any money on the T-Mobile Account.[12]

Upon receiving notice of Hinkle's dispute of the T-Mobile Account, Midland sent her letters dated February 5, 2012, and July 21, 2012, seeking her assistance "so that we may reach a quick resolution of your dispute."[13]  Each letter

---

[8] Ex. 1, at ¶ 7; *see also* Ex. 1-B.

[9] Ex. 1-F.

[10] (Doc. 8, at ¶ 19); *see also* Ex. 1-F.

[11] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.

[12] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.

[13] Exs. 1-G, and 1-H.

also stated that as part of Midland's "investigation of your dispute, it would be helpful to have a copy of any documentation you may have that supports your dispute," and provided four examples of supporting documentation.[14] Hinkle, however, never provided any documentation to substantiate her dispute of the T-Mobile Account.[15]   Instead, Hinkle intentionally refused to respond to Midland's request for assistance in investigating her dispute, later testifying that she "understood [the letters] to be [Midland] shifting the burden back on me and I'm not obligated under law to do that [investigation] for them."[16]

Having received no response to its February 5 letter requesting Hinkle's assistance in investigating her dispute of the T-Mobile Account, Midland obtained a copy of her credit report on May 7, 2012.[17]   After Hinkle received Midland's second letter requesting documentation regarding her dispute on July 21, Hinkle mailed to Midland a "Notice of Intent to Sue" and a "Demand for Validation of Debt" regarding the T-Mobile Account on July 26, 2012—over seven (7) months after Midland sent her its initial communication concerning the T-Mobile Account.[18]   When Midland failed to pay the $18,000 settlement as demanded in her

---

[14] Exs. 1-G, and 1-H.

[15] Ex. 1-E.

[16] *See* Transcript of March 11, 2014 Deposition of Teri L. Hinkle at 106:15–23.   A true and correct copy of the referenced transcript is attached hereto as Exhibit 2.

[17] (Doc. 8, at ¶ 25).

[18] (*See* Doc. 8, at, at ¶ 31–32); Ex. 1-I, at Midland-Hinkle 000028.

July 26 "Notice of Intent to Sue,"[19] Hinkle filed suit, alleging that Midland had violated the FDCPA and the FCRA by attempting to collect the Accounts and by falsely reporting the Accounts to the credit reporting agencies.

## ARGUMENT AND CITATION OF AUTHORITY

Midland is entitled to judgment as a matter of law on both Hinkle's FDCPA and FCRA claims. First, to the extent Hinkle's FDCPA claim is based on any of her allegations concerning the GE/Meijer Account, that claim is barred by the one-year statute of limitations under the FDCPA. As for Hinkle's claims regarding the T-Mobile Account, they likewise fail as a matter of law. Contrary to her unsupported allegations, the undisputed evidence demonstrates that Midland did in fact include the requisite validation notice in its initial communication with Hinkle concerning the T-Mobile Account. Because she failed to dispute the accounts in writing within 30 days, as required under the FDCPA's statutory validation procedure, Midland was not obligated to cease its collection activities. Furthermore, the undisputed evidence also shows Midland appropriately flagged the accounts as "disputed" in its communications with the CRAs, thereby satisfying its obligations under the FDCPA.

Midland is also entitled to summary judgment on Hinkle's FCRA claims; (1) as it is undisputed that Midland obtained Hinkle's credit report only for the

[19] Ex. 1-I, at Midland-Hinkle 000023.

permissible purpose of its attempt to collect on the Accounts; (2) the FCRA provides no private right of action for the alleged furnishing of false information to the CRAs; and (3) Hinkle has put forth no evidence whatsoever regarding the alleged unreasonableness of Midland's investigations regarding her dispute of the T-Mobile Account.

**I. Hinkle's FDCPA claim (Count IV) is time-barred to the extent it is based on her allegations concerning the GE/Meijer Account.**

Claims under the FDCPA must be brought "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). Yet it is undisputed that the GE/Meijer Account was paid in full as of December 2008.[20] Consequently, any FDCPA claim based on the GE/Meijer Account is clearly time-barred.

**II. Hinkle's FDCPA claim (Count IV) fails as a matter of law because the undisputed evidence shows that Midland was not required to cease collection activities in response to Hinkle's oral dispute of the T-Mobile Account.**

Hinkle claims in Count IV that Midland:

(1) failed to provide her with the statutorily-required validation notices concerning both Debts[21] in violation of § 1692g(a) (Doc. 8, at ¶ 92);

---

[20] Ex. 1-C, at Midland-Hinkle 000047.

[21] Although Midland's initial communication to Hinkle regarding the GE/Meijer Debt plainly included the validation notice required under § 1692g(a) (*see* Ex. 1-D), as noted above, any FDCPA claim with respect to that debt is time-barred under the FDCPA's one-year statute of limitations. *See Narog v. Certegy Check Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011) ("A plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full, and after the debt collector acknowledged that the debt was paid in full. Under the FDCPA, that conduct is not taken in connection with the collection of a debt.") (citing *Winter v. I.C. System Inc.*, 543 F.Supp.2d 1210, 1213 (S.D. Cal. 2008)).

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE**<br><br>**Plaintiff,** | ) | **CIVIL ACTION NO.<br>3:13-cv-00033-DHB-BKE** |
| **MIDLAND FUNDING, LLC; and<br>MIDLAND CREDIT MANAGEMENT, INC.**<br><br>**Defendants.** | ) | |

**AFFIDAVIT OF ANGELIQUE ROSS, AS AUTHORIZED REPRESENTATIVE OF MIDLAND CREDIT MANAGEMENT, INC.**

STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

This date personally appeared before me, the undersigned authority at law and for this jurisdiction, Angelique Ross, an authorized representative of Midland Credit Management, Inc. ("MCM"), who being by me first duly sworn according to law states on oath:

1. My name is Angelique Ross. I am over the age of majority and competent to make this affidavit, and understand the obligation of an oath.

2. I am employed at MCM as Senior Group Manager.

3. MCM is a debt servicing company based in San Diego, California, whose principal business involves the collection of delinquent debts. MCM services debts owned by Midland Funding, LLC.

4. In my capacity at MCM, I am familiar with: (a) the management of consumer account information purchased from various creditors, including correspondence and transactions on the account; and (b) the reporting of consumer account information to major consumer reporting agencies.

5.      In connection with these duties, I routinely rely on records kept in the regular course of MCM's business either by myself or those under a duty to maintain these records. Based upon my position, personal knowledge, and such records of MCM, I am familiar with the facts contained herein.

6.      MCM was the servicer for two accounts of the Plaintiff, Teri Lynn Hinkle.  The first, designated as MCM Account No. 8528711764, was purchased from AIS Services, LLC by Midland Funding, LLC.  According to the information received from AIS Services, LLC, the debt involved credit extended to Plaintiff by GE Money/Meijer (the "GE/Meijer Account"). Attached as **Exhibit A** is a printout of the electronic document containing information about the GE/Meijer Account sold to Midland Funding, LLC.  The footnote of that document states "Data printed by Midland Credit Management, Inc. from electronic records provided by AIS Services, LLC pursuant to the Bill of Sale/Assignment of Accounts transferred on or about 9/24/2008 in connection with sale of accounts from AIS Services, LLC to Midland Funding, LLC."

7.      The second account, designated as MCM Account No. 8544300953, was purchased from Debt Recovery Solutions, LLC by Midland Funding, LLC.  According to information received from Debt Recovery Solutions, LLC, the debt involved credit extended to Plaintiff by T-Mobile (the "T-Mobile Account").  Attached as **Exhibit B** is a printout of the electronic document containing information about the T-Mobile Account sold to Midland Funding, LLC.  The footnote of that document states "Data printed by Midland Credit Management, Inc. from electronic records provided by AIS Services, LLC pursuant to the Bill of Sale/Assignment of Accounts transferred on or about 12/6/2011 in connection with sale of accounts from Debt Recovery Solutions to Midland Funding, LLC."

8. Attached as **Exhibit C** are MCM's account notes regarding the GE/Meijer Account. These notes are created contemporaneously with MCM's servicing of the account and are created, kept, and maintained in MCM's normal course of business. According to these notes, MCM sent Plaintiff an initial communication regarding the GE/Meijer Account on or about October 1, 2008. *See* **Ex. C** at MIDLAND-HINKLE-000047. That initial communication is a standard form letter that informs the consumer that Midland Funding, LLC has recently purchased the debt, that MCM will service the debt, that the consumer has certain dispute and validation rights under the Fair Debt Collection Practices Act, and that the consumer can settle the debt for a discount (in Plaintiff's case, 40%). *See id.* Attached as **Exhibit D** is a copy of that letter. In response to that letter, MCM received a payment in full of the discounted settlement amount. *See* **Ex. C** at MIDLAND-HINKLE-000047.

9. MCM provides consumer credit information to major credit bureaus (i.e. credit reporting agencies) on a monthly basis. MCM furnished information to the credit bureaus regarding the GE/Meijer Account on a monthly basis from November 2008 through March 2009. *See* **Ex. C** at MIDLAND-HINKLE-000048. For the first two months, MCM reported that the account was assigned to collections, and after receiving the payment, MCM reported that the account was paid in full. *See id.* MCM has not furnished any information to the credit bureaus regarding the GE/Meijer Account since March 2009.

10. Attached as **Exhibit E** are MCM's account notes regarding the T-Mobile Account. These notes are created contemporaneously with MCM's servicing of the account and are created, kept, and maintained in MCM's normal course of business. According to the notes, MCM sent Plaintiff an initial communication regarding the T-Mobile Account on December 21, 2011. *See* **Ex. E** at MIDLAND-HINKLE-000035. That letter is a standard form letter that

informs the consumer that Midland Funding, LLC has recently purchased the debt, that MCM will service the debt, that the consumer has certain dispute and validation rights under the Fair Debt Collection Practices Act, and that the consumer can settle the debt for a discount (in Plaintiff's case, 10%). Attached as **Exhibit F** is a copy of that letter.

11. The initial letter to Plaintiff regarding the T-Mobile Account explained:

> If you notify MCM, in writing, within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

**Ex. F** at MIDLAND-HINKLE-000108.

12. Correspondence received from consumers is documented in MCM's notes. MCM's notes for the T-Mobile Account demonstrate that it did not receive a written dispute from Plaintiff within thirty (30) days of the December 21, 2011 letter to Plaintiff. *See* **Ex. E** at MIDLAND-HINKLE-000035.

13. Plaintiff did, however, dispute the T-Mobile Account verbally by telephone on December 28, 2011. *See* **Ex. E** at MIDLAND-HINKLE-000035. By letter dated February 5, 2012, MCM requested that Plaintiff provide more information and documentation concerning her dispute. *See* **Exhibit G**. Plaintiff never responded to that request.

14. MCM furnished information to the credit bureaus regarding the T-Mobile Account on a monthly basis from February 2012 through March 2014. *See* **Ex. E** at MIDLAND-HINKLE-000112. Based on Plaintiff's December 28, 2011 verbal dispute, MCM noted each time that the debt was disputed, as shown by the "XF" compliance condition in MCM's notes. *See id.*

15. In July 2012, MCM received notice of a dispute from the credit bureaus. MCM verified that it was furnishing the information provided by Debt Recovery Solutions, LLC, and

continued to report the T-Mobile Account as "disputed." *See* **Ex. E** at MIDLAND-HINKLE-000033-34. In addition, on July 21, 2012, MCM sent Plaintiff a letter requesting additional documentation as part of its investigation. *See* **Exhibit H.** Plaintiff responded that she could not furnish MCM with any documentation because the account was not hers. *See* **Exhibit I.**

Further affiant sayeth not.

[signature] 7/28/14
Signature

Name: Angelique Ross
Authorized Representative of Midland Credit Management, Inc.

State of California )
) ss.
County of San Diego )

Subscribed and sworn to before me on this 28 day of July, 2014 by Angelique Ross, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

[signature]
Notary Public

My Commission Expires:

JAMIE M. GARCIA
Commission # 2006575
Notary Public - California
San Diego County
My Comm. Expires Feb 7, 2017

# Exhibit A

| Field | Field Data |
|---|---|
| AIS File Number | 5128074 |
| AIS Portfolio | S30029 |
| Original Account Number | Redacted 4729 |
| Original Creditor | GE MONEY / MEIJER |
| Contract Date | 4/10/2005 |
| Last Paid Date | 12/13/2005 |
| Last Paid Amount | $- |
| Charge off Date | 8/7/2006 |
| Sale Amount | $357.56 |
| Name | "HINKLE, TERRI" |
| SSN | Redacted |
| Address1 | Redacted |
| City | Redacted |
| State | Redacted |
| Zip | Redacted |
| HomePhone | Redacted |

Data printed by Midland Credit Management, Inc. from electronic records provided by AIS SERVICES, LLC pursuant to the Bill of Sale / Assignment of Accounts transferred on or about 9/24/2008 in connection with the sale of accounts from AIS SERVICES, LLC to Midland Funding, LLC.

# Exhibit B

| Field | Field Data |
|---|---|
| DRS# | Redacted 9415 |
| Name | TERI HINKLE |
| Street-1 | Redacted |
| Street-2 | Redacted |
| City | Redacted |
| State | Redacted |
| Zip | Redacted |
| SSN# | Redacted |
| Home# | Redacted |
| Sale Amount | 300.8 |
| Orig Bal$ | 300.8 |
| C/O Date | 2007/12/29 |
| Open Date | 03/04/2006 |
| Creditor | T-MOBILE |
| DOB | Redacted |

Data printed by Midland Credit Management, Inc. from electronic records provided by Debt Recovery Solutions LLC pursuant to the Bill of Sale / Assignment of Accounts transferred on or about 12/6/2011 in connection with the sale of accounts from Debt Recovery Solutions LLC to Midland Funding, LLC.

# Exhibit C

Customer Additional Data

Print

**Issuer Information**

**Purch. from APPLIED INCOME SCIENCES on 09/24/08, purch.bal.= $ 357.56 .**

| | | | | | |
|---|---|---|---|---|---|
| Original Account #: | **Redacted 4729** | Account Open Date: | **04/10/2005** | Issuer Last Payment Amount: | **.00** |
| Original Lender: | **GE/ MEIJER** | Issuer Last Payment Date: | **12/13/2005** | Issuer Interest Rate: | **.0000%** |
| Product Type: | **Credit Card** | Charge Off Date: | **08/07/2006** | Interest Status: | |
| Affinity | | Charge Off Balance: | **.00** | | |
| Desc 1: | | **GE MONEY** | | | |
| Desc 2: | | | | | |
| Desc 3: | | | | | |

| **Balance Information** | | **Payment Information** | | **General Information** | |
|---|---|---|---|---|---|
| TOTAL DUE NOW: | **.00** | MCM Last Payment: | **.00** | Date of Occurrence: | **01/12/2006** |
| Int + Fees: | **.00** | Last Payment Received: | **10/13/2008** | State Statute Expiration Date: | **10/13/2014** |
| Unpaid Balance: | **.00** | First Due: | | Days Left in Statute: | **1055** |
| MCM Interest Rate: | **5.000%** | Next Due: | | Last Worked Date: | **05/01/2013 by HCB** |
| Interest Method: | **Interest accrued from charge-off date** | Monthly Day Due: | **0** | Site: | **SAN DIEGO** |
| Interest Paid Through: | **12/21/2008** | Down Payment: | **.00** | Deceased Date: | |
| | | Monthly Payment: | **.00** | Investor: | **1597** |
| | | Settlement Amount: | **.00** | Open/Closed: | **O** |
| | | | | Days Delinquent: | **0** |
| | | | | Payments Delinquent: | **0** |
| | | | | Times Delinquent: | |

MIDLAND-HINKLE-000044

**Collection Detail for account # Redacted 1764** **GA Local: 08:50 AM (E)**

**No Value Account** **023-OK TO WORK-DISPUTE OUTSIDE VAL PER**

**026-VERBAL/WRTTEN CEASE-DESIST/REFUSE**

Payment Plan | Update Address | Verify Employer | Update Phone | Additional Data | Payment History

| Terri Hinkle | | GE/ MEIJER - Redacted 4729 | | Inv#: 1597 K Port#: 797 | |
|---|---|---|---|---|---|
| | Best#: | Last Wk: | 05/01/2013 | Purch Bal: | $357.56 |
| Redacted | Home: | Int Rate: | 5.00% | Int+Fees: | $40.55 |
| | Work: | Last Pd: | 10/13/2008 | Total Paid: | $398.11 |
| Redacted | Last Ltr: 12/24/2008 | Last Pd$: | $237.49 | | |
| SSN: Redacted | Ltr Dis%: 0.00% | Ltr Exp: | | Balance: | $.00 |
| Dte Birth: | SIF Amt: $.00 | Dte C/O: | 08/07/2006 | SOL Exp: | 10/13/2014 |

CC: D5R Name: ANDREW ASCH Xfr Site: SD Ext: X31244 Team: C954

| Comments | Status | CC | By | Followup | Amount | Entered | Time |
|---|---|---|---|---|---|---|---|
| LAWSUIT FILED AGAINST MCM, ET AL. ON 4/30/13 IN USDC SOUTHERN DIST OF GA DUBLIN DIV. CASE NO. 3:13-CV-00033-DHB-WLB | COMM | D5R | HCB | 05/01/2013 | 0.00 | 05/01/2013 | 15:16:53 |
| Account assigned from BU8 to D5R by MASHIRO | TRNF | D5R | HCB | | 0.00 | 05/01/2013 | 15:16:15 |
| Account assigned from STL to BU8 by CROBIN2 | TRNF | BU8 | ELF | | 0.00 | 05/01/2013 | 11:51:38 |
| REVIEWED CORRESPONDENCE FWRD'D TO COMPLIANCE, WILL ADD TO CU DEMANDS | COMM | STL | ELF | 05/01/2013 | 0.00 | 05/01/2013 | 11:51:34 |
| PER MULT CONSUMER RQSTD CND ON MULTIPLE, WILL CND ACCT | COMM | STL | GT9 | 04/24/2013 | 0.00 | 04/24/2013 | 08:42:04 |
| RCVD SIGND LTR FROM TERI LYNN HINKLE. PM ON 4/5/2013. RCVD IN CSS ON 4/10/2013. CU STS THIS IS A WAY OF COURTESY TO APPRAISE MCM, NOTES ON ALL THREE ENTITIES, FACT ACT, HAVE BEEN TRYING TO RESOLVE ISSUES FOR PAST | COMM | STL | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 15:35:28 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 18 MONTHS, IT IS BLATANTLYAPPARENT THATS THEY PREFER TO BE SUED,CU IS PREPARED TO RESPECT THAT PREFERENCE, AND PURSUE REMEDY, HAVE CONSIDERED PETITIONING THE COURT FOR CLASS STATUS. WILL FWD TO COMPLIANCE PER THREAT TO SUE. ATTACHED ORIGINAL COMPLAINT FOR VIOLATIONS OF THE FDCPA AND FCRA TO SUE. ADDRESS VERIFIED | | | | | | | |
| PER MULT ADDR UPDATED | COMM | STL | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:25:58 |
| Account moved to No Value | ARCV | STL | *** | 11/23/2011 | 0.00 | 11/23/2011 | 16:05:31 |
| Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 103-Claims true i dentity fraud, account fraudulently opened. Verify Name, address, SSN, Dates and Balance. Control# 99991276003041041 | COMM | STL | *** | | 0.00 | 10/04/2011 | 05:11:20 |
| Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 103-Claims true i dentity fraud, account fraudulently opened. Verify Name, address, SSN, Dates and Balance. Control# 99991270040593010 | COMM | STL | *** | | 0.00 | 09/28/2011 | 05:13:58 |
| Account dispute modified in E-OSCAR. Bureau: EXP. Dispute Type 103-Claims true i dentity fraud, account fraudulently opened. Verify Name, address, SSN, Dates and Balance. Control# 2857644133004 | COMM | STL | *** | | 0.00 | 09/27/2011 | 05:11:57 |
| Account dispute modified in E-OSCAR. Bureau: TUN. Dispute Type 112-Consumer stat es inaccurate information. Verify Name, address, SSN, Dates and Balance. Control # 24311390200706002N | COMM | STL | *** | | 0.00 | 09/15/2011 | 05:13:57 |
| Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 112-Consumer stat es inaccurate information. Verify Name, address, SSN, Dates and Balance. Control # 99991253019104028 | COMM | STL | *** | | 0.00 | 09/11/2011 | 05:04:42 |

MIDLAND-HINKLE-000046

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| SENT PAID-OFF ACCT WITH MCM STAT | LT21 | X10 | *** | | 0.00 | 12/23/2008 | 00:29:09 |
| SETTLED ACCOUNT-GOOD JOB! | STTL | X10 | AZJ | 12/23/2008 | 0.00 | 12/23/2008 | 00:17:57 |
| SETTLED ACCOUNT-GOOD JOB! | STTL | X10 | AZJ | 12/22/2008 | 0.00 | 12/22/2008 | 07:22:40 |
| HIGH AND DRY Redacted | COMM | X10 | | | 0.00 | 12/15/2008 | 07:55:41 |
| OT * LEFT MESSAGE Redacted | COMM | X10 | BOT | | 0.00 | 12/15/2008 | 08:00:28 |
| PLS STTL | RVEW | AZJ | BOT | 01/31/2009 | 0.00 | 12/15/2008 | 08:00:08 |
| LT LT1A ( 40% disc on bal/debt val ltr), Settlement offer of $237.49. Letter sent 10/01/2008, Offer Expires 11/15/2008. | SLTR | SMB | *** | 09/30/2008 | 0.00 | 09/30/2008 | 09:38:45 |

MIDLAND-HINKLE-000047

800 message(s)

Redacted 1764 - Terri Hinkle - $.00

Add Comm (Last 5)

Account number: Redacted 1764 Find

## Bureau Reports by Reporting Date

| Date | Comment Code | Stat | Compliance Condition | Status_Desc |
|---|---|---|---|---|
| 11/17/08 | | 93 | | Account assigned to internal or external collections |
| 12/15/08 | | 93 | | Account assigned to internal or external collections |
| 01/13/09 | | 62 | | Account paid in full, was a collection account. |
| 02/15/09 | | 62 | | Account paid in full, was a collection account. |
| 03/16/09 | | 62 | | Account paid in full, was a collection account. |

MIDLAND-HINKLE-000048

Payment History Next Due Date: Print

| N R | Tran Code/Fund | Collector Code | Post Date | Trans Amount | Prnc Amount | Interest Amount | Balance | Due Date |
|---|---|---|---|---|---|---|---|---|
| | 551 NC | X10 | 12/22/2008 | 160.62 | 159.10 | 1.52 | .00 | |
| | 101 LB | IN2 | 10/13/2008 | 237.49 | 198.46 | 39.03 | 159.10 | |
| | | | **Total:** | **398.11** | **357.56** | **40.55** | | |
| | | | **Cash:** | **237.49** | | | | |

mcm
midland credit management, inc.
800 message(s)

Redacted 1764 - Terri Hinkle - $.00

Add Comm (Last 5)

Account number: Redacted 1764 Find

## Letter History Inquiry

| Letter | Date | Type | Letter Description |
|---|---|---|---|
| LT21 | 12/24/2008 | Production | SENT PAID-OFF ACCT WITH MCM STAT |
| LT1A | 10/01/2008 | Production | SENT LETTER 1A |

mcm
midland credit management, inc.
1699 message(s)

Redacted 1764 - Terri Hinkle - $.00 ($300.80)
Add Comm (Last 5)

Account number: 8528711764 Find

## Payment History Details

| | | | | | |
|---|---|---|---|---|---|
| Transaction Amount: | 237.49 | Next Due: | | Funds: | LB |
| Principal Amount: | 198.46 | Balance: | 159.10 | Transaction Code: | 101 |
| Int + Fees: | 39.03 | Transaction Number: | 001 | Batch Sequence Number: | 00675 |
| | | Business Date: | 10/13/2008 | Check Number: | 2392 |
| Batch ID: | L101308 | Effective Date: | 10/13/2008 | NSF Amount: | .00 |
| Other Amount: | .00 | Reversal Flag: | | User Group: | 000 |
| Balance: | 159.10 | Reversal NSF: | | Unit: | 00 |
| Already Reversed: | | Investor Number: | 01597 | Pool: | 10380 |
| Collector: | INDIA OVERHEAD 2 IN2 | | | System Date: | 10/13/2008 |
| Reference Number: | | | | System Time: | 13:46:03 |
| User ID: | EEGNER | | | | |

Case: 15-10398 Date Filed: 07/20/2015 Page: 154 of 185
Payment History Detail~R2K-GUI: PROD r2014.06.01.01 Page 2 of 4

Midland - Hinkle 00222
http://r2k-prd.internal.mcmcg.com/r2k2prod/paymentHistory/paymentHistoryDetails.do?r... 6/27/2014

Case: 15-10398 Date Filed: 07/20/2015 Page: 155 of 185
Payment History Detail~R2K-GUI: PROD r2014.06.01.01 Page 3 of 4

Midland - Hinkle 00223
http://r2k-prd.internal.mcmcg.com/r2k2prod/paymentHistory/paymentHistoryDetails.do?r... 6/27/2014

Midland - Hinkle 00224

# Exhibit D



mcm Dept. 12421
PO Box 603
Oaks, PA 19456

## *Settlement Opportunity*

Contact Information: Tel (800) 825-8131

Hours of Operation: M-Th 6am - 7pm; Fri 6am - 5pm; Sat 6am - Noon PST
Current Owner: Midland Funding LLC
Original Creditor: GE/ MEIJER
MCM Account No.: Redacted 1764
Current Balance: $395.81
Payment Due Date: 11-15-2008

10-01-2008

2346-1

#BWNHLTH
#0000 0852 8711 7643#
TERRI HINKLE
Redacted
Redacted

Dear TERRI HINKLE,

Welcome! We have a great offer for our new customers.

Midland Funding LLC recently purchased your GE/ MEIJER account and Midland Credit Management, Inc. ("MCM"), a debt collection company, is the servicer of this obligation. As the new servicer of this account, we would like to find a positive resolution to your account.

Midland Credit Management, Inc. (MCM) is currently able to offer you a discount of ***40% off*** your Current Balance ***if we receive payment by 11-15-2008.***

What's In It For You? Once MCM receives your payment of $237.49, we will:
- Notify the credit bureaus that the debt is "Paid in Full". *
- Immediately stop all recovery activity on this account.

To accept this offer, simply detach the Acceptance Certificate below and enclose it with your $237.49 payment in the envelope provided. ***Please mail your payment no later than 11-08-2008*** in order to receive credit for the 40% off discount by the expiration date 11-15-2008.

If you prefer to speak with one of our Account Managers, please contact us at (800) 825-8131.

NOTICE: PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION

Midland Credit Management, Inc.
(800) 825-8131

*Please tear off and return lower portion with payment in envelope provided*

## *Acceptance Certificate*

TERRI HINKLE
Redacted
Redacted

MCM Account Number: Redacted 1764
Current Balance: $395.81
**Amount Due:** $237.49

Make Check Payable to: Midland Credit Management, Inc.

**Payment Due Date:** 11-15-2008

mcm
Midland Credit Management, Inc.
Department 8870
Los Angeles, CA 90084-8870

12 852871176 4 3 0023749 111508 8

**Important Disclosure Information**

**Please understand this is a communication from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.**

The records associated with the account purchased from GE/ MEIJER reflect that you are obligated on this account, which is in default with a Current Balance of $395.81. As the owner of this account, but subject to the rights described below, Midland Funding LLC is entitled to payment of this account. All communication regarding this account should be addressed to MCM and not the previous owner.

Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid.

If you notify MCM, in writing, within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

If you request, in writing, within thirty (30) days after receiving this notice, MCM will provide you with the name and address of the original creditor.

If an attorney represents you with regard to this debt, please refer this letter to your attorney. Likewise, if you are involved in an active bankruptcy case, or if this debt has been discharged in a bankruptcy case, please refer this letter to your bankruptcy attorney so that we may be notified.

Please remember, even if you make a payment within 30 days after receiving this notice, you still have the remainder of the 30 days to exercise the rights described above.

* No credit reporting will occur if the federal reporting period has expired.

---

Please send any correspondence relating to any credit reporting* of this account to:
MCM CREDIT REPORTING DEPARTMENT, 8875 Aero Drive, Suite 200, San Diego, CA 92123.
PLEASE RETAIN THIS ADDRESS FOR ANY ISSUES RELATING SOLELY TO THE CREDIT REPORTING OF YOUR ACCOUNT.

# Exhibit E

Customer Additional Data 

**Issuer Information**

**Purch. from DEBT RECOVERY SOLUTIONS LLC on 12/06/11, purch.bal.= $ 300.80 .**

| | | | | | |
|---|---|---|---|---|---|
| Original Account #: | Redacted **9415** | Account Open Date: | **03/04/2006** | Issuer Last Payment Amount: | **.00** |
| Original Lender: | **T-MOBILE** | Issuer Last Payment Date: | | Issuer Interest Rate: | **.0000%** |
| Product Type: | **Cellular** | Charge Off Date: | **12/29/2007** | Interest Status: | |
| Affinity | | Charge Off Balance: | **300.80** | | |

| **Balance Information** | | **Payment Information** | | **General Information** | |
|---|---|---|---|---|---|
| TOTAL DUE NOW: | **300.80** | MCM Last Payment: | **.00** | Date of Occurrence: | **06/02/2007** |
| Int + Fees: | **.00** | Last Payment Received: | | State Statute Expiration Date: | **06/02/2013** |
| Unpaid Balance: | **300.80** | First Due: | | Days Left in Statute: | **0031** |
| MCM Interest Rate: | **.000%** | Next Due: | | Last Worked Date: | **05/01/2013 by HCB** |
| Interest Method: | **No interest accrued** | Monthly Day Due: | **0** | Site: | **SAN DIEGO** |
| Interest Paid Through: | | Down Payment: | **.00** | Deceased Date: | |
| | | Monthly Payment: | **.00** | Investor: | **2488** |
| | | Settlement Amount: | **.00** | Open/Closed: | **O** |
| | | | | Days Delinquent: | **0** |
| | | | | Payments Delinquent: | **0** |
| | | | | Times Delinquent: | |

MIDLAND-HINKLE-000031

## Collection Detail for account # Redacted 0953 GA Local: 07:48 AM (E)

**Mini Miranda required on answer mach msg** **023-OK TO WORK-DISPUTE OUTSIDE VAL PER**

**026-VERBAL/WRTTEN CEASE-DESIST/REFUSE**

Payment Plan Update Address Verify Employer Update Phone Additional Data Payment History

| Teri Hinkle | | T-MOBILE - 445799415 | | Inv#: 2488 K Port#: 1394 | |
|---|---|---|---|---|---|
| | Best#: | | Last Wk: 05/01/2013 | Purch Bal: | $300.80 |
| Redacted | Home: | Redacted - Redacted | Int Rate: 0.00% | Int+Fees: | $.00 |
| | Work: | | Last Pd: | Total Paid: | $.00 |
| Redacted | Last Ltr: | 04/30/2013 | Last Pd$: $.00 | | |
| SSN: Redacted | Ltr Dis%: | 0.00% | Ltr Exp: | Balance: | $300.80 |
| Dte Birth: Redacted | SIF Amt: | $.00 | Dte C/O: 12/29/2007 | SOL Exp: | 06/02/2013 |

CC: D5R Name: ANDREW ASCH Xfr Site: SD Ext: X31244 Team: C954

| Comments | Status | CC | By | Followup | Amount | Entered | Time |
|---|---|---|---|---|---|---|---|
| Account assigned from BU8 to D5R by MASHIRO | TRNF | D5R | HCB | | 0.00 | 05/01/2013 | 15:17:38 |
| LAWSUIT FILED AGAINST MCM, ET AL. ON 4/30/13 IN USDC SOUTHERN DIST OF GA DUBLIN DIV. CASE NO. 3:13-CV-00033-DHB-WLB | COMM | BU8 | HCB | 05/01/2013 | 0.00 | 05/01/2013 | 15:17:36 |
| CR INFO NOT ABLE TO INVESTIGAT | QC01 | BU8 | GT9 | 04/30/2013 | 0.00 | 04/30/2013 | 08:19:49 |
| RCVD RESPONSE FROM COMPLIANCE, THIS ACCOUNT HAS BEEN NOTATED AND ADDED, OUTSIDE VALIDATION WITH NO MEDIA IN HOUSE, WILL SEND QC01B | COMM | BU8 | GT9 | 04/30/2013 | 0.00 | 04/30/2013 | 08:19:44 |
| REVIEWED CORRESPONDENCE FWRD'D TO COMPLIANCE INBOX 04/23/2013, WILL ADD TO CU DEMANDS | COMM | BU8 | ELF | 04/26/2013 | 0.00 | 04/26/2013 | 16:10:32 |
| CREATED ACCT IN CRS | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:25:18 |
| ****IN ADDITION FACT ACT | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:22:09 |

MIDLAND-HINKLE-000032

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ACCOUNT BECAUSE CONSUMER STS HAS BEEN TRYING TO RESOLVE THIS ISSUER WITH ALL THREE ENTITIES | | | | | | | |
| ****IN ADDITION ATTACHED COURT DOCUMENTS | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:18:10 |
| RCVD SIGND LTR FROM TERI LYNN HINKLE. PM ON 4/5/2013. RCVD IN CSS ON 4/10/2013. CU STS THIS IS A WAY OF COURTESY TO APPRAISE MCM, HAVE BEEN TRYING TO RESOLVE ISSUES FOR PAST 18 MONTHS, IT IS BLATANTLY APPARENT THATS THEY PREFER TO BE SUED,CU IS PREPARED TO RESPECT THAT PREFERENCE, AND PURSUE REMEDY, HAVE CONSIDERED PETITIONING THE COURT FOR CLASS STATUS. WILL FWD TO COMPLIANCE PER THREAT TO SUE. ADDRESS VERIFIED | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:17:25 |
| Account dispute modified in E-OSCAR. Bureau: EXP. Dispute Type 1-Not his/hers. V erify Name, address, SSN, Dates and Balance. Control# 2879775558001 | COMM | BU8 | *** | | 0.00 | 08/06/2012 | 12:05:35 |
| Account assigned from A8 to BU8 by CROBIN2 | TRNF | BU8 | ELF | | 0.00 | 08/01/2012 | 11:12:18 |
| RCVD CONSUMER DEMAND AS STATED BELOW | COMM | A8 | ELF | 08/01/2012 | 0.00 | 08/01/2012 | 11:08:03 |
| ENTERED IN CRS | COMM | A8 | GDO | 07/31/2012 | 0.00 | 07/31/2012 | 16:35:58 |
| RCVD SGND CERT LTR PM 7/27/2012, LTR RCVD 7/30/2012 FROM TERI LYNN HINKLE. CU STS IN RESPONSE TO QCPP THEY CANNOT FURNISH MCM ANYTHING, BECAUSE THEY DO NOT HAVE ACCOUNT. STS REQUESTED VAL IN 10/2011 BUT NEVER RECEIVED VAL. STS MCM IS RPTING FALSE INFO ON CRDT RPT. STS MCM CONTINUED COLLECTION AFTER RQSTED VAL AND TOLDOPERATORS TO CEASE CALLING. STS INTENDS TO FILE SUIT FOR VIOLATIONS FOR TOTAL OF $18,000, BUT RQSTS | COMM | A8 | GDO | 07/31/2012 | 0.00 | 07/31/2012 | 16:31:57 |

MIDLAND-HINKLE-000033

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| VAL. ACCOUNT OUTSIDE VAL, WILL FWD TO COMPLIANCE TO REVIEW. | | | | | | | |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 07/27/2012, Offer Expires 08/26/2012. | SLTR | A8 | *** | | 0.00 | 07/26/2012 | 14:26:05 |
| REQUEST TO PROVIDE PROOF | QCPP | A8 | *** | 07/20/2012 | 0.00 | 07/20/2012 | 21:13:58 |
| OK to work-Dispute outside validation period. Consumer needs to send proof. | COMM | A8 | *** | 08/03/2012 | 0.00 | 07/20/2012 | 19:42:41 |
| Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 1-Not his/hers. V erify Name, address, SSN, Dates and Balance. Control# 99992201016681057 | COMM | A8 | *** | | 0.00 | 07/20/2012 | 09:27:54 |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 06/15/2012, Offer Expires 07/15/2012. | SLTR | KTX | *** | | 0.00 | 06/14/2012 | 18:32:11 |
| Account moved by contacts load | TRNF | KTX | FTJ | | 0.00 | 06/04/2012 | 16:26:31 |
| SENT TO MCM LEGAL CC0130R | RVEW | L01 | *** | 05/22/2012 | 0.00 | 05/22/2012 | 22:53:59 |
| MM * NO MESSAGE LEFT Redacted | COMM | D5D | D5D | | 0.00 | 05/22/2012 | 13:25:21 |
| DIAL HOME * AFTER NO CONNECT Redacted | COMM | D5D | D5D | | 0.00 | 05/22/2012 | 13:25:02 |
| DIAL HOME * AFTER NO CONNECT Redacted | COMM | D5D | D5D | | 0.00 | 05/22/2012 | 13:24:50 |
| MM * NO MESSAGE LEFT Redacted | COMM | D5D | D5D | | 0.00 | 05/22/2012 | 13:21:53 |
| EE | COMM | D5D | D5D | 05/22/2012 | 0.00 | 05/22/2012 | 13:23:52 |
| MM * NO MESSAGE LEFT Redacted | COMM | D5D | D5D | | 0.00 | 05/19/2012 | 11:14:29 |
| MM * NO MESSAGE LEFT Redacted | COMM | D5D | D5D | | 0.00 | 05/19/2012 | 10:11:31 |
| MM * NO MESSAGE LEFT Redacted | COMM | D5D | D5D | | 0.00 | 05/19/2012 | 06:03:10 |
| FLUP | FLUP | D5D | D5D | 05/22/2012 | 0.00 | 05/19/2012 | 11:13:17 |
| PASSED ACCOUNT Redacted | COMM | D5D | D5D | | 0.00 | 05/18/2012 | 08:05:05 |
| RPC * OTHER Redacted | COMM | D5D | D5D | | 0.00 | 04/05/2012 | 09:50:37 |
| RPC DCC DONE....MMQA DOEN CONSUMER...SD DO NOT CAL ME ANYMORE ITS A VIOLATION HU | RPOT | D5D | D5D | 05/18/2012 | 0.00 | 04/05/2012 | 09:49:40 |
| Account assigned from IND to D5D | TRNF | D5D | D5D | | 0.00 | 04/05/2012 | 09:49:09 |

MIDLAND-HINKLE-000034

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| by BSINGH5 | | | | | | | |
| OT * NO MESSAGE LEFT Redacted | COMM | IND | E52 | | 0.00 | 04/04/2012 | 06:01:05 |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 04/05/2012, Offer Expires 05/05/2012. | SLTR | IND | *** | | 0.00 | 04/04/2012 | 18:51:25 |
| HUNG UP WHILE ON HOLD Redacted | COMM | IND | | | 0.00 | 04/03/2012 | 16:27:58 |
| OT * NO MESSAGE LEFT Redacted | COMM | IND | FFA | | 0.00 | 04/03/2012 | 10:02:53 |
| INVENTORY MGMT | TRNF | IND | FTJ | | 0.00 | 04/02/2012 | 18:43:45 |
| Acct not eligible for legal at this time | TRNF | SMB | FE1 | | 0.00 | 03/26/2012 | 17:27:14 |
| SENT TO MCM LEGAL CC0130R | RVEW | L01 | *** | 02/05/2012 | 0.00 | 02/05/2012 | 23:29:34 |
| PASSED ACCOUNT Redacted | COMM | E5G | E5G | | 0.00 | 02/05/2012 | 15:01:33 |
| EE | COMM | E5G | E5G | 02/05/2012 | 0.00 | 02/05/2012 | 15:00:58 |
| REQUEST TO PROVIDE PROOF | QCPP | E5G | *** | 02/04/2012 | 0.00 | 02/04/2012 | 22:13:24 |
| OK to work-Dispute outside validation period. Consumer needs to send proof. | COMM | E5G | *** | 02/18/2012 | 0.00 | 02/04/2012 | 20:48:01 |
| OT * NO MESSAGE LEFT Redacted | COMM | VDQ | E5G | | 0.00 | 12/28/2011 | 06:54:20 |
| Verbal Dispute within 45 days. | RVEW | VDQ | *** | 12/28/2011 | 0.00 | 12/28/2011 | 20:48:25 |
| FRAUD/ID THEFT - CONSUMER CLAIMS FRAUD. RPC DCC MM QA CONSUMER SAID THAT SHE DOESN'T OWE THAT BILL AND SHE HAS TOLD US ABOUT IT AND SHE'LL FILE A LAWSUIT AND HUNG UP. | RPOT | E5G | E5G | 12/29/2011 | 0.00 | 12/28/2011 | 06:53:47 |
| Account assigned from IND to E5G by ASHASHI | TRNF | E5G | E5G | | 0.00 | 12/28/2011 | 06:52:55 |
| OT * NO MESSAGE LEFT Redacted | COMM | IND | FDC | | 0.00 | 12/27/2011 | 16:41:45 |
| LT LT1A ( 10% disc on bal/debt val ltr), Settlement offer of $270.72. Letter sent 12/21/11, Offer Expires 02/04/12. | SLTR | IND | *** | 12/20/2011 | 0.00 | 12/20/2011 | 20:09:52 |
| Please do not make exceptions to the recommended discount/settlement strategy. This account has been selected as part of a Marketing/Operations test | COMM | IND | *** | | 0.00 | 12/20/2011 | 15:11:11 |
| Load to IND | COMM | IND | CXN | | 0.00 | 12/19/2011 | 16:14:29 |

MIDLAND-HINKLE-000035

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| KEEP ACCOUNT ACCESSIBLE TO OWNER - CC0130R | RVEW | PS4 | *** | 12/17/2011 | 0.00 | 12/17/2011 | 23:44:46 |

  800 message(s)

Redacted 0953 - Teri Hinkle - $300.80

Add Comm (Last 5)

Account number: Redacted 0953

## Bureau Reports by Reporting Date

| Date | Comment Code | Stat | Compliance Condition | Status_Desc |
|---|---|---|---|---|
| 02/19/12 | | 93 | XF | Account assigned to internal or external collections |
| 03/21/12 | | 93 | XF | Account assigned to internal or external collections |
| 04/19/12 | | 93 | XF | Account assigned to internal or external collections |
| 05/25/12 | | 93 | XF | Account assigned to internal or external collections |
| 06/18/12 | | 93 | XF | Account assigned to internal or external collections |
| 07/19/12 | | 93 | XF | Account assigned to internal or external collections |
| 08/17/12 | | 93 | XF | Account assigned to internal or external collections |
| 09/16/12 | | 93 | XF | Account assigned to internal or external collections |
| 10/17/12 | | 93 | XF | Account assigned to internal or external collections |
| 11/19/12 | | 93 | XF | Account assigned to internal or external collections |
| 12/18/12 | | 93 | XF | Account assigned to internal or external collections |
| 01/17/13 | | 93 | XF | Account assigned to internal or external collections |
| 02/19/13 | | 93 | XF | Account assigned to internal or external collections |
| 03/20/13 | | 93 | XF | Account assigned to internal or external collections |

MIDLAND-HINKLE-000037

mcm
midland credit management, inc.
800 message(s)

Redacted 0953 - Teri Hinkle - $300.80

Add Comm (Last 5)

Account number: Redacted 0953 Find

## Letter History Inquiry

| Letter | Date | Type | Letter Description |
|---|---|---|---|
| QC01 | 04/30/2013 | Production | CR INFO NOT ABLE TO INVESTIGAT |
| 5G70 | 07/27/2012 | Marketing | DISCOUNT LETTER |
| QCPP | 07/21/2012 | Production | REQUEST TO PROVIDE PROOF |
| 5G70 | 06/15/2012 | Marketing | DISCOUNT LETTER |
| 5G70 | 04/05/2012 | Marketing | DISCOUNT LETTER |
| QCPP | 02/05/2012 | Production | REQUEST TO PROVIDE PROOF |
| LT1A | 12/21/2011 | Production | SENT LETTER 1A |

MIDLAND-HINKLE-000038

# Exhibit F

Return Mail Only - No Correspondence
mcm Dept. 12421
PO Box 603
Oaks, PA 19456

## Settlement Opportunity

Contact Information: Tel (800) 265-8825

Hours of Operation: Sat-Th 5am - 2pm PST;
Current Owner: Midland Funding LLC
Original Creditor: T-MOBILE
Original Account No.: Redacted 9415

MCM Account No.: Redacted 0953
Current Balance: $300.80
Payment Due Date: 02-04-2012

12-21-2011

2345-1

#BWNHLTH
#0000 0854 4300 9536#
TERI HINKLE
Redacted
Redacted

Dear TERI HINKLE,

Welcome! We have a great offer for our new customers.

Midland Funding LLC recently purchased your T-MOBILE account and Midland Credit Management, Inc. ("MCM"), a debt collection company, is the servicer of this obligation. As the new servicer of this account, we would like to find a positive resolution to your account.

Midland Credit Management, Inc. (MCM) is currently able to offer you a discount of ***10% off*** your Current Balance ***if we receive payment by 02-04-2012.***

What's In It For You? Once MCM receives your payment of $270.72, we will:
- Notify the credit bureaus that the debt is "Paid in Full". *
- Immediately stop all recovery activity on this account.

To accept this offer, simply detach the Acceptance Certificate below and enclose it with your $270.72 payment in the envelope provided. ***Please mail your payment no later than 01-28-2012*** in order to receive credit for the 10% off discount by the expiration date 02-04-2012.

If you prefer to speak with one of our Account Managers, please contact us at (800) 265-8825.

**NOTICE: PLEASE SEE REVERSE SIDE FOR IMPORTANT INFORMATION**

Midland Credit Management, Inc.
(800) 265-8825

*Please tear off and return lower portion with payment in envelope provided*

## *Acceptance Certificate*

MCM Account Number: Redacted 0953
Current Balance: $300.80
**Amount Due:** $270.72

Make Check Payable to: Midland Credit Management, Inc.

**Payment Due Date:** 02-04-2012

For ease and convenience, make payments online and view additional offers at: **www.midlandcreditonline.com**

mcm
Midland Credit Management, Inc.
P.O. Box 60578
Los Angeles, CA 90060-0578

12 8544300953 6 0027072 020412 6

MIDLAND-HINKLE-000107

LT1A

**Important Disclosure Information**

**Please understand this is a communication from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose.**

Calls to and/or from this company may be monitored or recorded.

The records associated with the account purchased from T-MOBILE reflect that you are obligated on this account, which is in default. As of the date of this letter, you owe $300.80. The offer to settle this account for the discount(s) offered in this letter remains open until 02-04-2012. If the offer to settle this account is not accepted on or before 02-04-2012, the amount you owe may be greater because of interest, late charges, and other charges that may vary from day to day. To obtain an exact payoff amount, or for further information, please call one of our Account Managers at (800) 265-8825. As the owner of this account, but subject to the rights described below, Midland Funding LLC is entitled to payment of this account. All communication regarding this account should be addressed to MCM and not the previous owner.

Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid.

If you notify MCM, in writing, within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

If you request, in writing, within thirty (30) days after receiving this notice, MCM will provide you with the name and address of the original creditor.

If an attorney represents you with regard to this debt, please refer this letter to your attorney. Likewise, if you are involved in an active bankruptcy case, or if this debt has been discharged in a bankruptcy case, please refer this letter to your bankruptcy attorney so that we may be notified.

Please remember, even if you make a payment within 30 days after receiving this notice, you still have the remainder of the 30 days to exercise the rights described above.

*You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill the terms of your credit obligations.

-------------------------

Please send any correspondence relating to any credit reporting* of this account to:
MCM CREDIT REPORTING DEPARTMENT, 8875 Aero Drive, Suite 200, San Diego, CA 92123.
PLEASE RETAIN THIS ADDRESS FOR ANY ISSUES RELATING SOLELY TO THE CREDIT REPORTING OF YOUR ACCOUNT.

MAIL PAYMENTS TO: P.O. Box 60578, Los Angeles, CA 90060-0578

MAIL CORRESPONDENCE BUT NO PAYMENTS TO: MCM's business address at 8875 Aero Drive, Suite 200, San Diego, CA 92123

# Exhibit G

Return Mail Only - No Correspondence

mcm Dept 12421
PO Box 603
Oaks, PA 19456

Contact Information: Tel (800) 825-8131

Hours of Operation: M-Th 6am - 7pm; Fri-Sat 6am - 5pm PST

02-05-2012

Original Creditor: T-MOBILE
Original Account No.: Redacted9415

91395-1

#BWNHLTH
#0000 0854 4300 9536#
TERI HINKLE
Redacted
Redacted

MCM Account No.: Redacted 0953
Current Balance: $300.80

Dear TERI HINKLE,

The purpose of this letter is to request your assistance so that we may reach a quick resolution to your dispute.

As part of our investigation of your dispute, it would be helpful to have a copy of any documentation you may have that supports your dispute. In the interim, we have requested that the three major consumer credit reporting agencies change the status of this account to "Disputed."*

Examples of such documentation include the following:

1. **Paid in Full or Account Settled:** Proof of payment, for example: a) copy of front and back of payment instrument with copy of settlement offer or statement showing balance, b) copy of paid in full or settled in full letter, or c) other document showing balance has been fully satisfied.

2. **Fraud:** a) copy of police report, b) Federal Trade Commission fraud affidavit (which can be obtained at www.ftc.gov/idtheft), or c) notarized fraud affidavit.

3. **Balance Discrepancy:** a) copy of contract that states rates for timeframe of disputed service, (b) copy of bill that shows amount owed or rates, or (c) more detailed explanation of disputed charges.

4. **Death of Consumer Owing the Debt:** copy of the certified Death Certificate.

Please mail any documentation you may have to support your claim to:

Attention: Consumer Support Services.
P.O. Box 939069
San Diego, CA 92193

We can be reached at **(800) 825-8131** ext. **32980** should you have any further questions.

Sincerely,

Consumer Support Services

*Your credit report will not be updated if the federal reporting period has expired.

Please understand this communication is from a debt collector. This is an attempt to collect a debt. Any information will be used for that purpose.

Calls to and/or from this company may be monitored or recorded.

Las llamadas desde y hasta esta compañía podrán ser monitoreadas o grabadas.

**MAIL PAYMENTS TO**: P.O. Box 60578, Los Angeles, CA 90060-0578

**MAIL CORRESPONDENCE BUT NO PAYMENTS TO**: MCM's business address at 8875 Aero Drive, Suite 200, San Diego, CA 92123

Plaintiff's Appendix Document No - 87

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

TERI LYNN HINKLE,

Plaintiff,

v. CV 313-033

MIDLAND CREDIT MANAGEMENT, INC., et al.,

Defendants.

**ORDER**

Before the Court is *pro se* Plaintiff's third motion to compel, seeking an amended response from Defendant Midland Credit Management Inc. ("MCM") as to one of her requests for production. (Doc. no. 83.) Plaintiff requested production of the "written request to the Seller for the 'Terms and Conditions' historically associated with the Purchased Account MCM alleges belongs to the Plaintiff." (Id. at 3.) In its amended response, MCM represented it did not have any responsive documents to produce, but only after recasting the request as seeking the terms and conditions themselves and not the written request Plaintiff sought. (Id. at 3-4.) In a subsequent email to Plaintiff, defense counsel accurately summarized Plaintiff's request and stated that MCM has no responsive documents. (Id. at 11.) However, MCM has not amended its response accordingly, as Plaintiff requested. (Id. at 11-12.) If the documents requested for production do not exist, MCM should not merely say so in an email, but "is required to affirmatively state in its discovery responses that such records are missing or destroyed." Purdee v. Pilot Travel Centers, LLC, No. CV407-028, 2009 WL 430401, at *1 (S.D. Ga. Feb. 19, 2009); see also Cairns v. Chicago Exp., Inc., 25

F.R.D. 169, 170 (N.D. Ohio Mar. 29, 1960) (ruling that a party claiming that records sought did not exist should submit an affidavit so stating). Therefore, the Court **GRANTS** Plaintiff's motion and **ORDERS** MCM to file an amended response to the request for production at issue within seven days of the date of this Order.

SO ORDERED this 31st day of July, 2014, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

Plaintiff's Appendix Document No - 93

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE,**<br><br>**PLAINTIFF,**<br><br>**V.**<br><br>**MIDLAND CREDIT MANAGEMENT, INC. , MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.,**<br><br>**DEFENDANTS.** | ) | **CIVIL ACTION NO. 3:13-cv-00033-DHB-BKE** |

**DEFENDANT'S MOTION TO FILE UNDER SEAL**

Pursuant to the Confidentiality Agreement and Consent Protective Order [Doc. 80, ¶ 10] and Local Rule 79.7, Defendants Midland Credit Management, Inc. and Midland Funding, LLC (collectively, "Midland") hereby respectfully move this Court for an order directing Plaintiff to file under seal certain confidential and trade secret information belonging to Defendants.

Plaintiff has filed a Notice of Intent to Refer to Confidential Documents in her response to Defendant's Motion for Summary Judgment, which is due on September 9, 2014. Specifically, Plaintiff intends to "refer to the two Accounts Purchasing Agreements marked CONFIDENTIAL [sic], and file "un-redacted

paragraphs contained therein".[1]  The documents that Plaintiff intends to file are not just marked as confidential—each is designated as a "trade secret."  The Confidentiality and Consent Protective Order entered in this case defines trade secret in ¶ 1(g) as

> legitimate confidential and proprietary business information, or such information or documents not known to the general public, from which the disclosing party derives economic value and a competitive advantage in the marketplace from not being generally known to others, the disclosure of which could cause irreparable injury or damage to the disclosing party.

Plaintiff did not object to and has not challenged Midland's designation of the Account Purchase Agreements as Trade Secret.

The Court conditioned disclosure of Midland's Account Purchase Agreements upon entry of a confidentiality agreement and protective order.  By virtue of their trade secret status, the Account Purchase Agreements are highly confidential, commercially sensitive, and contain proprietary business information that, if disclosed, would put Midland at a competitive disadvantage.  Specifically, the terms and conditions under which Midland acquires accounts from third parties

---

[1] The parties entered into a Confidentiality Agreement and Consent Protective Order as a precondition to Midland's production of its  (1) Assignment of Accounts between Midland and AIS Services, LLC dated September 24, 2008 ; and the (2) Account Purchase Agreement between Midland and Debt Recovery

is a trade secret that Midland goes to great lengths to keep out of the hands of its competitors.  For this reason, Midland requests that the Court direct Plaintiff to file under seal (i) the Account Purchase Agreements under seal, and (ii) any pleadings containing quotations, characterizations or summaries of information contained in the Account Purchase Agreements. Midland respectfully requests information filed under seal remain sealed for a period of one year after the later of (i) the entry of final judgment or (ii) conclusion of a direct appeal, if any.

Respectfully submitted this 2nd day of September, 2014.

BALCH & BINGHAM LLP

*/s/Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898
Joshua M. Moore
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia  30308
Telephone:  (404) 261-6020

**Attorneys for Midland Funding
LLC, and Midland Credit
Management, Inc.**

---

Solutions, LLC dated December 6, 2011 (collectively, the "Account Purchase Agreements").

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **DEFENDANTS' MOTION TO FILE UNDER SEAL** has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 2nd day of September, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

*/s/Matthew B. Ames*
Matthew B. Ames

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION**

| | | |
|---|---|---|
| **TERI LYNN HINKLE,** <br><br> **PLAINTIFF,** <br><br> **V.** <br><br> **MIDLAND CREDIT MANAGEMENT, INC. , MIDLAND FUNDING, LLC, and ENCORE CAPITAL GROUP, INC.,** <br><br> **DEFENDANTS.** | ) | **CIVIL ACTION NO. 3:13-cv-00033-DHB-BKE** |

**ORDER**

Defendants' Motion to File Under Seal is hereby GRANTED. Plaintiff is DIRECTED Plaintiff to file under seal the Account Purchase Agreements, and any pleadings containing quotations, characterizations or summaries of information contained in the Account Purchase Agreements. Information filed under seal shall remain sealed for a period of one year after the later of (i) the entry of final judgment or (ii) conclusion of a direct appeal, if any.

So ORDERED this ____ day of September, 2014.

______________________________
Brian K. Epps
United States Magistrate Judge
Southern District of Georgia

Plaintiff's Appendix Document No - 94

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

TERI LYNN HINKLE,

Plaintiff,

v. ) CV 313-033

MIDLAND CREDIT MANAGEMENT, INC., et al.,

Defendants.

**ORDER**

Before the Court is Defendant's Motion to File Under Seal, which requests an order from the Court directing Plaintiff to file under seal certain confidential and trade secret information belonging to Defendants. (Doc. no. 93.) In accordance with a previously entered Confidentiality Agreement and Consent Protective Order (see doc. no. 82), Plaintiff notified Defendants of her intent to include information about two Accounts Purchasing Agreements in her response to the Defendants' motion for summary judgment that is due on Tuesday, September 9, 2014. (Id.) Because of the looming deadline, the Court enters this preliminary ruling without awaiting a response from Plaintiff.

Under Local Rule 79.7(d), "part[ies] seeking to have any matter placed under seal must rebut the presumption of the openness derived from the First Amendment by showing that closure is essential to preserve some higher interest and is narrowly tailored to serve that interest." As the Local Rules reflect, the filing of documents under seal is generally disfavored, because "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern, and the common-law right of access to

judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th Cir. 2007) (internal quotations and citations omitted). "The common law right of access may be overcome by a showing of good cause, which requires balancing the asserted right of access against the other party's interest in keeping the information confidential." Id. (citing Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001) (*per curiam*)). When balancing these interests,

> courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

Id. at 1246.

"[A] party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information," id., such as when the information could serve as "sources of business information that might harm a litigant's competitive standing." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978)). Courts have found that parties' interests in the terms of confidential agreements can outweigh the public right of access. See, e.g., Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co., No. 3:10-cv-891, 2010 WL 6790538, at *2 (M.D. Fla. Oct. 28, 2010); Mars, Inc. v. JCM Am. Corp., No. 05-3165, 2007 WL 496816, at *2-3 (D.N.J. Feb. 13, 2007) (finding that public disclosure of confidential business agreements would result in injury to the plaintiff because it would sacrifice the plaintiff's competitive negotiating position).

The parties' desire to seal court documents "is immaterial to the public right of access." Brown v. Advantage Eng'g, Inc., 960 F.2d 1013, 1016 (11th Cir. 1992). In the