CASE NO. 15-10398-F

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

TERI LYNN HINKLE,

Plaintiff—Appellant

v.

MIDLAND CREDIT MANAGEMENT, INC.;

MIDLAND FUNDING LLC; AND

ENCORE CAPITAL GROUP INC.

Defendants—Appellees,

APPENDIX TO APPELLANT'S BRIEF

VOLUME 5

*Appeal from the United States District Court, Southern District of Georgia,*
*Dublin Division*

Craig K. Perry
Attorney at Law
Nevada Bar No. 3786
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
(702) 228-4777
*Attorney for Plaintiff-Appellant Teri Hinkle*

Plaintiff's Appendix Document No - 97

FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 SEP -8  AM 9: 46

CLERK_____
SO.DIST. OF GA.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

|  |  |  |
|---|---|---|
| **Teri Lynn Hinkle** | ) | |
| *Plaintiff*, | ) | |
| | ) | **Case No. 3:13-CV-00033** |
| **vs** | ) | |
| | ) | |
| **MIDLAND CREDIT** | ) | |
| **MANAGEMENT INC.** | ) | |
| **MIDLAND FUNDING, LLC.** | ) | |
| **ENCORE CAPITAL GROUP INC.** | ) | |
| *Defendants*. | ) | |
| | ) | |

# SEALED AND IMPOUNDED

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

The Plaintiff asks the Court to deny Defendants' motion for summary judgment and states the following:

### A.  Introduction

1. On June 27, 2013 Plaintiff, Teri Lynn Hinkle filed her First Amended Complaint and sued the Defendants for violations of the FCRA, 15 U.S.C. § 1681*et al*, and the FDCPA 15 U.S.C. § 1692g(a), g(b),d(5) and 1692e. (*See* Doc. 8)

2. U.S. Marshal's Return of Service were filed for all Defendants on September 27, 2013 (*See* Docs.10-13)

3. Defendants filed an Answer to the Complaint on October 1, 2013 (*See* Doc. 14)

4. On July 28, 2014 Defendants filed a Motion for Summary Judgment. (*See* Doc. 85)

5. Summary Judgment is improper in this case because there are genuine issues of material fact on each element of Plaintiff's causes of action for violations of the FDCPA and the FCRA.

## STATEMENT OF FACTS

6. Plaintiff raised the issue several times in pleadings and noticed the Defendants by USPS Certified Mail, of their failure to comply with FRCP by not providing the Plaintiff with the required 26(a)(1) Initial Disclosures. They to date, have yet to provide those disclosures to the Plaintiff.

7. Defendants agreed to a deadline of November 11, 2013 for the Rule 26(a)(1) disclosures to be made as stated in their Rule 26(f) Report filed with this Court on November 5, 2013 but in fact never submitted the disclosures to the Plaintiff. (*See* Doc. 29)

8. When asked by interrogatory to identify each person known who has knowledge of the facts relevant to this case and to give a brief description thereof for each person they may call as a witness the Defendants objected to the request as overbroad and unduly burdensome etc. but stated without waiving objections the following: (*See* PlainApp., 00062 #3),

   a. "MCM identifies the following: John Moreno, Process Analyst, Midland Credit Management, Inc. Mr. Moreno may be contacted through counsel for MCM. MCM has not identified any individual that it intends to call as an expert witness, but will do so in accordance with the applicable scheduling order in this case."

9. The Defendants have never identified any other person as having any knowledge of facts relevant to this case by 26(a)(1) Disclosures, amended Disclosures, or any other method but instead rely on an affidavit by Angelique Ross in their Motion for Summary Judgment. (*See* Doc. 85 Ex.1)

10. The Defendants state in answers to interrogatories even though the responses were not responsive to the question(s) asked, that no individual person communicated with the

Plaintiff, and that all written communication was "system generated" and not generated by a live person. (*See* PlainApp., 00063 #5)

11. In their interrogatory responses they identify letters only in regard to the second account they allege was owed by the Plaintiff. After stating to the Court, (*See* Doc. 84-2 pg 28 line 12-18), as well as in discovery responses, that they had no more documents responsive to the Plaintiff's discovery requests, they suddenly come up with a letter they claim was sent to the Plaintiff in 2008, the same letter they had purported not to be in possession of when the Plaintiff demanded it in telephone conference with Defendants' Counsel. This is also the letter Defendants claim is the basis for their immunity by time bar on the Plaintiff's FDCPA claims. (*See* Doc 85 pg.4, ¶1) (*See* also Doc. 85 Ex.1-D)

12. Defendants state in their Motion at pg 17 ¶2 and pg 23 ¶1, that they are entitled to rely on records from the original creditor and that they are "assignees" of the original creditor yet they admit they bought the alleged accounts from two other debt buyers and state in responses to interrogatories that they "obtained and relied on the information from the sellers of the unpaid accounts." (*See* PlainApp.at 00066,67 #15)

13. Defendants made two purchases from debt buyers, AIS Services, LLC (AIS), and Debt Recovery Solutions (DRS), on Sept. 24, 2008 and Dec. 6, 2011 respectively. Both purchases were made "**without recourse or warranty**" as stated in the Bills of Sale. (*See* PlainApp., 00009,10)

14. At no time have the Defendants produced either for this Court or to the Plaintiff any documents from, or proof of communications with, any original creditor with whom either alleged debt could have originated.

15. Prior to December 2011 the Plaintiff never received any written communications from the Defendants. (*See* PlainApp.,00001, Affidavit)

16. Prior to December 27, 2011 the Plaintiff never received any telephone calls from the Defendants. (*See* Affidavit, PlainApp., 00001)

17. Prior to May 2011 the Plaintiff was not aware of the existence of Encore Capital Group or its subsidiaries Midland Funding, LLC and Midland Credit Management Inc. (*See* Affidavit, PlainApp., 00001)

18. The Defendants **did not** cease reporting the account allegedly purchased from AIS in 2008 even though they repeatedly state in their motion and it is sworn to in their affidavit that they did. Plaintiff did not become aware of that account until obtaining her credit reports in May 2011. After Plaintiff's dispute with the CRAs on Sept. 6, 2011 the Defendants "verified" with TransUnion and Experian and continued reporting. The Defendants furnished account information to the CRAs continuously from Nov. 17, 2008 to at least the end of Dec. of 2012 as shown on the Plaintiff's credit reports. (*See* Doc 58 Ex. 10a-q)

19. The Defendants' state at pg 4, ¶1 of their motion and in the accompanying document they cite as evidence, Ex. 1-C (000048), of Doc. 85 that they reported the alleged account only up to March 16 of 2009 which is in contradiction to the exhibits in Doc. 58.  Contrary to their affidavit at ¶9 they did not start furnishing the information to the CRAs until after they claim to have received payment in full in Oct. of 2008 (*See* PlainApp 00018)

20. Plaintiff sent a demand for validation of the first alleged account on Oct. 20, 2011 and never received a response regarding that account being disputed. Instead Plaintiff received a letter from the Defendants after Dec. 27, 2011 that was dated Dec. 21, 2011; regarding a different account the Plaintiff had no knowledge of. (*See* Affidavit, PlainApp., 00001)

21. MCM began calling the Plaintiff's home blocking their caller ID on Dec. 27, 2011. The Plaintiff stated to the Midland representative that she had no accounts with the company, would not pay them any money, that the call was in violation of the law and that she would sue if they did not cease calling. (*See* PlainApp., 00036)

22. MCM did not cease calling until after the Plaintiff stopped answering and then it began calling one of the Plaintiff's old land line phone numbers according to its own internal records provided in discovery. (*See* PlainApp., 00027,28)

23. The Defendants obtained the Plaintiff's credit reports on May 7, 2012 after the Plaintiff had disputed the first alleged account, had told them verbally she had no account, instructed them to cease harassment and had noticed them by formal validation demand and CRA dispute.

24. The Defendants state they obtained the credit reports with the permissible purpose of attempting to collect on two "accounts" in their Motion for Summary Judgment at pages 3, ¶1 and 16 ¶ III (A).

25. The Plaintiff discovered a second alleged account being reported by Midland Funding, LLC to the CRAs in June 2012 in addition to the first. Plaintiff disputed both accounts with the CRAs on July 13, 2012. Subsequently, MCM deleted the first account from TransUnion and all other entries were updated with the CRAs[1]

26. MCM responded to the Plaintiff's disputes with dunning letters, requests for her to prove the dispute and telephone calls to her home demanding payment. (*See* PlainApp., 00016-31)

27. Nowhere in the data claimed to have been purchased from Debt Recovery Solutions (DRS) for the alleged T-Mobile account is there a cell phone number indicated. The two telephone numbers indicated in the records are the Plaintiff's land line numbers no longer in service at

---

[1] *See* Doc 58 Ex. 10a-q

the time of first communication with the Plaintiff. (*See* Affidavit, PlainApp., 00001 and PlainApp., 00016-31).

## STANDARD OF REVIEW

28. Although summary judgment is proper in any case where there is no genuine issue of material fact, this is not a case in which the court should grant summary judgment. See FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S/Ct/ 2548, 2552 (1986).

29. A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76F.3d 1245, 1251 (1st Cir. 1996); see *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555. Only if defendants meet their burden is plaintiff required to respond by summary judgment proof to show a genuine issue of material fact. FRCP 56(e).

30. In determining whether there is a disputed issue of material fact that precludes summary judgment, the court must consider all evidence in the light most favorable to plaintiff as the non-movant. *Garcia v. Pueblo Country Club*, 229 F.3d 1233, 1236-37 (10th Cir. 2002).

## ARGUMENTS AND AUTHORITIES

31. For the Defendants to successfully argue for summary judgment they must show that there are no material fact issues as to any elements of the Plaintiff's causes of action. Defendants have made nothing more than conclusory statements regarding the causes of action brought by the Plaintiff, relied on unauthenticated information purchased from other debt buyers,

incomplete records and an untrustworthy affidavit from a person whose identity was not previously disclosed and has not been authenticated.

32. The Defendants state in their motion repeatedly that the Plaintiff's claims fail as a matter of law and that the evidence which they have proffered is undisputed. Plaintiff disputes their evidence, (*See* PlainApp. at 00000), and will show the Defendants have cherry picked information from records shared with the Plaintiff in discovery for the purpose of misleading the Court into rendering an unjust decision. The Defendants owe a duty of candor to the Court.

## As to 15 U.S.C. § 1692g(a), g(b),d(5) and 1692e:

33. The Defendants state that the Plaintiff's claims under the FDCPA are barred by statute of limitations based on a letter produced at the eleventh hour in response to Plaintiff's third requests for production, after having sworn not to have any further documents responsive to the Plaintiff's requests. (*Id.* ¶11) No evidence is submitted to show that the letter was sent with sufficient postage and was deposited in the mail. In any case Plaintiff did not receive it.[2] The long held "Mailbox Rule" of established evidentiary presumption can be and is in this case, being rebutted by the Plaintiff. The letter is therefore an issue of credibility which must be resolved by the trier of fact.[3]

34. The Plaintiff was forced to file three Motions to Compel, all of which were granted in order to obtain the Defendants' internal records, responses and relevant documents Bates Labeled Midland-Hinkle 000001 thru 000224. (*See* PlainApp., 00006-8 "Evidentiary Discrepancies".)

---

[2] *See* Affidavit PlainApp., 00001
[3] *Witt v. Roadway Express*, 136 F.3d 1424, 14-2930 (10th Cir. 1998) [("A rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service. Because the presumption is rebuttable, however, evidence denying receipt creates a credibility issue that must be resolved by the trier of fact.") (citations omitted)]; *see also S. Frederick Sansone*, 127 NLRB 1301, 1302 n.4 (1960)

35. The Defendants claimed the records produced in discovery were from an "active file" updated regularly, however the evidence belies that claim when entries in the record which are purported to be historical fact are not consistent with previous records. (*See* PlainApp., 00006-8 "Evidentiary Discrepancies".) Such discrepancies include but are not limited to:

   a. The alleged account the defendants claim was paid in full in 2008 suddenly shows a balance belonging to a different alleged account where it showed zero in the first printing;

   b. Record is missing four years of entries from 2009 to the time of filing this suit;

   c. Dates which, if kept in the regular course of business, should be consecutive are out of chronological order and revert back;

   d. Records produced after denying their existence but others missing which should be included;

   e. Records showing conflicting balances including interest not allowed by law;

   f. Telephone calls placed to a second number in MCM's attempts to harass the Plaintiff after being told to cease and desist.[4]

36. There are entries contained in the records produced in discovery that are outright fabrications because the event described would have been virtually impossible.

37. Each time MCM called the Plaintiff's current land line they blocked their caller ID.[5] Most people, including the Plaintiff, have far better things to do in their lives than to have to

---

[4] *Meadows v. Franklin Collection Serv., Inc.*, 2011 WL 479997 (11th Cir. Feb. 11, 2011). The court reversed the lower court's entry of summary judgment for the collector on the § 1692d(5) claim. "The statute itself recognizes *that answering the phone is not necessary for there to be harassment.* This makes good sense because a ringing telephone, even if screened and unanswered, can be harassing, especially if it rings on a consistent basis over a prolonged period of time and concerns debts that one does not owe."
*Atchoo v. Redline Recovery Servs.*, L.L.C., 2010 WL 1416738 (W.D.N.Y. Apr. 5, 2010). The court found that it was not necessary in a claim under § 1692d(5) for the consumer to allege that the defendant made a certain number of phone calls. Also, there is no requirement under *this section that the consumer answer the phone. Instead, it is* enough that the defendant merely causes the phone to ring continuously with the intent to annoy, abuse, or harass.

[5] *Knoll v. Intellirisk Mgmt.*, 2006 WL 2974190 (D. Minn. Oct. 16, 2006). Denied debt collector's motion to dismiss class action where debt collector used the false name, Jennifer Smith as the Caller ID finding a claim was stated under §§ 1692d, 1692e, 1692f.

tolerate repeated calls from an entity that has been told in no uncertain terms to stop and has

been notified in writing to communicate in writing only. To determine that behavior is

harassment or abuse ONLY if there are many incidences of it is to say that the FDCPA

should be narrowly construed and the debt collection industry should have free reign to abuse

the public at will via telecommunications. The FDCPA is a strict liability statute to protect

consumers and non-consumers who deal with the debt collection industry in various

circumstances such as the Plaintiff.[6]

38. The Defendants claim that the Plaintiff's claims in Count IV fail in FN #21 of their motion,

because the alleged account was paid in full in 2008. Plaintiff has no knowledge of any

payment, the alleged account or who may have paid it. This instant case is not about the

alleged debt or to whom it was owed. This case has to do with the Defendants' bad behavior

in their attempts to collect money from the Plaintiff in violation of federal law.  The Plaintiff

is entitled to remedy under the FDCPA and the FCRA. *See Montgomery v. Huntington Bank*

*& Silver Shadow Recovery Inc., 346 F.3d 693 (6th Cir. 2003).*[7]

39. Defendants' statements in their motion are troublesome at best when they contradict

themselves and fail to provide the complete record in regard to their assertions. First they

state they mailed an "offer of settlement"[8] on **October** 1, 2008 and received a check for the

exact amount requested **12** days later.[9] They state in their argument that the alleged account

---

[6] *Ruth v. Triumph P'ships*, 577 F.3d 790 (7th Cir. 2009), *Brown v. Card Serv. Ctr.*, 464 F.3d 450 (3rd Cir. 2006)
[7] "A non-debtor who was subjected to abusive collection tactics may not maintain an action for violations of § 1692c(c), since that section is limited to violations directed at a "consumer" as defined in the Act, but may maintain an action for violation of §§ 1692d and 1692e, which have no such limitation and therefore apply to anyone who is the victim of prescribed misconduct", *See* also; *Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998)* "[T]he FDCPA is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists"; *Ruth v Triumph P'ships, 577 F. 3d 790 (2nd Cir. 2009).* The FDCPA is a strict liability statute, and debt collectors, whose conduct falls short of its requirements are liable irrespective of their intentions.
[8] This letter shows a total balance that does not match other records See Doc.85 Ex.D, Record #000219 ($395.81)and Ex. C, Records #000045,49 ($398.11), #000221, ($396.59)
[9] See Doc 85, pg 4, ¶1

was "paid in full" as of **December** 2008.[10] Bates Record heretofore "Record", labeled

000049 shows two transactions, the first shown as a payment in **full settlement** and indicated

in Record 000044, as having been paid on **October 13, 2008**. There is another on **Dec. 22,**

**2008** for a balance owed in the amount of $160.62. Record 000045 shows that the total paid

was $398.11 and on Record 000047 two entries appear, "SETTLED ACCOUNT GOOD

JOB!" dated Dec. 22 and 23, 2008. (*See* PlainApp., 00016-31) The Defendants make no

mention of a second transaction for a balance owed in their motion but the existence of it is

inadvertently referred to when they state the **two different dates** for the alleged account

having been paid in full. If the first payment had been in response to an "offer of settlement"

with a promise to close the account and cease reporting to the CRAs as they claim and the

offer *was accepted and the money collected*, any further collection actions would have been

clearly illegal. The Defendants cannot have it both ways. Further, Plaintiff has provided

indisputable evidence that the Defendants did not cease reporting the alleged account at least

through 2012.[11] In addition, the information they did furnish to the CRAs was not consistent

in detail and the account was reported as an "**open account.**" There is only one reason for a

debt collector to report any information on any consumer account and that is to "collect."

Defendants admit they were doing when stating their permissible purpose for having

obtained the Plaintiff's credit reports was, "attempting to collect" on the "**accounts**", (plural,

indicating both accounts) at pages 3, ¶1and 16, ¶ III(A) of their motion. If the alleged account

had no balance owing, it had literally not existed since 2008. If the Defendants were not

reporting in the hopes of obtaining money from the Plaintiff, why report it in the first place

since they didn't report it at all until after it had been paid in full? What purpose other than

---

[10] See Doc. 85 pg 8, ¶2 (I)
[11] See Doc. 58 Ex. 10a-q

deliberate and willful harm to the Plaintiff could there be? The evidence shows that when the

Plaintiff disputed the entries as **"not hers"** to the CRAs the Defendants "verified" and

continued reporting, not once but **TWICE**.[12]

40. If the documents produced in discovery are indeed a part of an ongoing, regularly updated

file, it is beyond credibility that random pages suddenly show up only when the Defendants

need them to or that dates and entries do not match earlier printings.[13]

41. The Plaintiff never received ANY communication regarding the first account allegedly

purchased in 2008, before or after her disputes with the CRAs or her written Demand for

Validation. (*See* Affidavit, PlainApp., 00001) Each time the Defendants "verified" the

account causing re-insertion and continued reporting with the CRAs it was a unique, separate

and distinct action and any violations pursuant to those actions would have a unique and

separate statute of limitations under both the FDCPA and the FCRA.

42. At pg 7, ¶2 of the Defendants' motion they state:

a. "Furthermore, the undisputed evidence also shows Midland appropriately flagged the
accounts as "disputed" in its communications with the CRAs, thereby satisfying its
obligations under the FDCPA."

The requirement to "flag the accounts" as disputed does not afford the Defendants' the ability

to furnish information to the CRAs that it knows or should know is false and deceptive with

impunity. Plaintiff's allegations under the FDCPA pertain to using false and deceptive means

to collect and as the courts have held, the act of reporting debts to CRAs is an attempt to

collect a debt.[14] The requirement in regard to flagging an account as disputed is further

---

[12] *See* Doc. 58, Ex. 10a-q

[13] *See* PlainApp., 00006-8 "Evidentiary Discrepancies"

[14] **Edeh v. Midland Credit Mgmt., Inc.,** 2010 WL 3893604 (D. Minn. Sept 29, 2010). "The court has learned
through its work on countless FDCPA cases that threatening to report and reporting debts to CRAs is one of the
*most commonly-used arrows in the debt collector's quiver.* Consistent with the view of the FTC-and consistent with
the views expressed in Purnell, Quale, and Semper-the court finds that Midland was engaged in "collection of the

required under the FCRA rather than the FDCPA. Those obligations are clearly enumerated in the FTC's Notice to Furnishers.[15]

43. The Defendants state in their motion that Plaintiff's claims under the FDCPA in regard to the second alleged account fail because her first dispute was "verbal" when their collectors called her home. However, the telephone call to Plaintiff on December 27, 2011 was, in fact, the MCM's first direct communication with the Plaintiff after the alleged purchase of an account on December 6, 2011 from Debt Recovery Solutions, (DRS).[16] The first letter sent by MCM regarding that alleged account was dated December 21, 2011 but received after the Plaintiff issued her very clear verbal dispute on Dec. 27, 2011. (*See* PlainApp., 00028 and Affidavit, PlainApp., 00001)

44. The Defendants have made much of *Bleich v Revenue Maximization Grp., Inc.*, 233 F.Supp. 2d 496, 500 (E.D.N.Y. 2002) in their argument that Plaintiff's verbal dispute simply didn't count. However more recent decisions in the 2nd, 4th, and 9th Circuit Courts have upheld the clear and plain language of the statute supporting a consumer's right to dispute verbally.[17]

---

debt" in violation of § 1692g(b) when it reported Edeh's disputed debt to the CRAs before sending verification of that debt to Edeh."

[15] *See* PlainApp., 00037,38, **Notice To Furnishers Of Information: Obligations of Furnishers Under The FCRA,** under Duties After Notice of Dispute From Consumer, and  Duties After Notice of Dispute From Consumer,
[16] *See* PlainApp., 00010, "Bill of Sale"

[17] *Russell v. Absolute Collection Services,* No. 12-2357, 2014 WL 3973729 (4th Cir. Aug. 15, 2014). The debt collector argued that Section 1692g debt validation procedures required the debtor to dispute the debt in writing. The court disagreed, stating that such an interpretation "would thwart the statute's objective of curtailing abusive and deceptive collection practices and would contravene the FDCPA's express command that debt collectors be liable for violations of 'any provision' of the statute." *Clark v. Absolute Collection Service, Inc., U.S. Court of Appeals,* (4th Cir. No. 13-1151), http://www.ca4.uscourts.gov/Opinions/Published/131151.P.pdf ... *Hooks v. Forman, Holt, Eliades & Ravin, LLC ,* 2nd Cir. May 29, 2013, http://www.ballardspahr.com/~/media/files/alerts/2013-06-06-hooks.pdf ... In *Camacho v. Bridgeport Financial Inc.,* 430 F. 3d 1078 (9th Cir. 2005)... "a consumer need not send a writing to contest the debt under § 1692g(a)(3). (quoting *Russello v. United States,* 464 U.S. 16, 23 (1983) (alteration in Camacho)... "the statute provides for other protections in the event of a dispute, and those protections depend only on whether a debt was disputed, and not on whether there was a prior writing."

45. The Defendants, in their zeal to obtain summary judgment fail to disclose that the second Demand for Validation letter was in regard to **"any"** alleged accounts. Plaintiff clearly informed MCM by Certified Letter reflected in Record 000033, after she had already done so verbally, that she could not provide them with anything because she had nothing to give them and no knowledge of anything connected with the accounts. The Plaintiff followed the proper processes of dispute within the FDCPA and the FCRA at all relevant times. The Defendants' internal records show that they chose to ignore and adopted the attitude that they did not have *to validate, verify or cease to collect.*[18]

46. Plaintiff has established through evidence including her sworn affidavit and the Defendants' own statements in interrogatories and production of documents that there are genuine issues of material fact as well as issues of credibility, which must be reserved for the trier of fact, to violations of 15 U.S.C. § 169 g(a), g(b),d(5) and 1692e and Defendant's Motion for Summary Judgment on relevant claims should be denied.

## As to 15 U.S.C. § 1681et al:

47. The Defendants state in their motion that they had a permissible purpose for obtaining the Plaintiff's credit reports under 15 U.S.C. § 1681b(a)(3)(A)…(Doc. 85, pg 16, ¶3(1)). However, while many courts have failed to notice the fact that the section of the FCRA the Defendants claim provides **them** with a permissible purpose does not in fact pertain to them at all but solely *to the CRAs and* **their** "reason to believe". In a very clear and concise ruling the court provided common sense clarity on that irrefutable fact in *Cappetta v. GC Services Ltd. Partnership, 654 F.Supp. 2d (E.D. Va 2009:*

---

[18] *See* PlainApp., 00006-8, "Evidentiary Discrepancies"

a. "Congress clearly directs the relevant portion of the FCRA toward "credit reporting agencies." See § 1681b(a), Subject to subsection (c) of this section any *consumer reporting agency* may furnish a consumer report under the following circumstances and no other." Specifically, subsection (a) allows the credit reporting agency to provide a credit report to a person which *it has reason to believe*… (F) otherwise has a legitimate business need for the information § 1681a(3)(F). The statute requires that the credit reporting agency *(antecedent of the third person singular pronoun "it")* have "reason to believe" the "person" to which it provides a credit report "has a legitimate business need for the information." Without having such a belief, a credit reporting agency may be held liable." (*emphasis added*)

The plain language of the statute indicates Congress' intent in passing the legislation as written and must not be ignored.

48. The FTC, in 2011, updated their statement of interpretation of the FCRA in *"40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations"[19]* Under Section 604 – Permissible Purposes of Reports, the FTC makes the following interpretation statements:

a. Page 44, Section 3 (B) "Reports for Review or Collection of an Account"… **Debt Collection.** A collection agency, detective agency, private investigator, or attorney has a permissible "collection" purpose under this section to obtain a consumer report on a consumer for use in obtaining payment of that consumer's account **on behalf of a creditor**…..(*emphasis added*)

49. The Defendants are not **"creditors"**, as defined by the FCRA:

a. §603 Definitions; rules of construction [15 U.S.C. § 1681a] The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

---

[19] http://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations

The Defendants are debt collectors by their own definition, specifically "buyers". [20] Further, as "**buyers**" of defaulted account information from other entities, and in this case other buyers and not from creditors, they most certainly could not have been obtaining the Plaintiff's consumer credit report on **behalf of a creditor**. The Defendants are not "**assignees**" with an agreement to pay any other entity a portion of monies they collect, nor are they in a position to "**satisfy**" any obligation with an original creditor a consumer may have had. The Defendants have provided no proof of agency from a creditor which would afford them the status of assignee. Continued in the "Staff Report", *Id.*;

    b. **Page 47, Section 604(a)(3)(E)**, "allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information, as a **potential investor** or servicer, or current insurer, in connection with, an existing credit obligation." (*emphasis added*).

The Defendants, as potential investors in consideration of the two purchases they made in regard to this case, would have had a permissible purpose to obtain the Plaintiff's credit reports, **IF** they had done so prior to either one of the closing dates of those purchases. That is not the case here; the dates of the two purchases were Sept. 24, 2008 and Dec. 6, 2011 but the Plaintiff's credit report was not obtained by them until May 7, 2012, a full 6 months after the second purchase.

50. Defendants' own records shown in Record 000035 and language contained in their 2010 SEC. 10-K Report, appear to reveal the real reason for obtaining the Plaintiff's credit report.[21] *Trans Union Corp. v. F.T.C., C.A.D.C. 1996, 81 F.3d 228, 317 U.S.App. D.C. 133* holds that consumer reporting agency's use of consumer reports for **target marketing** would

---

[20] (*See* PlainApp., 00053)

[21] "Please do not make exceptions to the recommended/discount settlement strategy. This account has been selected as part of a Marketing/Operations test".. ". (No change to that directive was ever entered into the record.) *See* PlainApp., 00006-8, "Evidentiary Discrepancies" and PlainApp. At 00055)

not be legitimate business purpose under catch-all provision of FCRA, which spells out

purposes for which credit report may be furnished; to "legitimate business need," consumer

must have sought to initiate transaction. The Plaintiff in this case **did not** seek to initiate any

transaction.

51. The FTC, tasked with the enforcement of the FCRA can certainly be considered an expert

authority on the statute. By their interpretation the Defendants as "debt buyers" could only

ever have a permissible purpose for the acquisition of a consumer credit report **IF** it is in

connection with a decision to purchase an account from another entity but there must actually

be an "existing credit obligation." If they could show a "reason to believe" the credit

obligation actually exists and is authentic they are only authorized to obtain the credit report

once, PRIOR to purchase for evaluation and assessment purposes. The failure of the justice

system to take note of these details within the statute has contributed to a broken system and

an out of control debt buying industry.[22] By certifying best information and belief to the

CRAs, the Defendants' surreptitious acquisition of Plaintiff's credit reports derived from an

interest and priority well beyond the permissible scope of the FCRA.

52. A recent decision in the Middle District of Florida, (*See* PlainApp., 00056-60), reveals that at

least one district Court has recognized the clear and vital import of the FTC's interpretation

of the statute.

53. The Defendants exhibit a well and established pattern of considering compliance with the

law to be cost prohibitive and appear to view litigation brought by consumers to be a simple

---

[22] FTC, **"Structure and Practices of the Debt Buying Industry,"**
http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-
industry/debtbuyingreport.pdf. **"Dirty Debts Sold Dirt Cheap"**, Dalie Jimenez,
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2250784 , **"Junk Justice: A Statistical Analysis of 4,400
Lawsuits Filed By Debt Buyers, Peter Holland"**,, Midland Funding LLC, Midland Credit Management, among
the buyers having filed more than 1,000 cases per year during 2009 and 2010 in Maryland alone.
http://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=2443&context=fac_pubs

"*cost of doing business.*"[23] The Defendants routinely, as a collection strategy, file thousands

of cases in state courts across the nation using law firms willing to aid in the operation of a

litigation "factory" as stated in the recent filing by the Consumer Financial Protection Bureau

(CFPB), in the Northern District of Georgia which Plaintiff asks this Court to take Judicial

Notice of along with the Defendants uncorrected past behavior (*See* FNs #23, 33).[24]

54. The CFPB states in the complaint that the law firm they are suing filed more than 350,000

suits from 2009 through 2013 on behalf of banks and debt buyers such as Portfolio Recovery

Associates and **Midland Funding, LLC**, "The Collection Suits". The CFPB cites the

following in their complaint:

  a. "The firm filed most of the Georgia Collection Suits against consumers on behalf of
     debt buyers. Those buyers could not support their collection activities with basic
     documents, such as the original contracts underlying the alleged debts or the **chain of
     title evidencing that the debt buyer had standing to sue the consumer.** Defendants
     filed the Georgia Collection Suits **without investigating** or verifying support for the
     suits, including whether the facts alleged were true."[25] (*emphasis added*)
  b. "The firm routinely obtained and used affidavits in the Georgia Collection Suits in
     which the affiants represented that they had personal knowledge of the validity and
     ownership of debts. **Defendants knew or should have known that many of these
     affidavits were executed by persons who lacked personal knowledge of the facts.**"
     (*emphasis added*)
  c. "For affidavits received from its debt-buyer clients, the Firm's attorneys did not
     determine whether any underlying documentation for the debt was available, nor did
     they review the contracts governing the sale of accounts to determine whether those
     contracts **disclaimed any warranties regarding the accuracy or validity of the
     debts.**" (*emphasis added*)

---

[23] *State of Texas* v. *Midland Funding. LLC, et al.* http://www.msfraud.org/law/lounge/State-of-Texas-v-Midland-Funding-Encore-robosigning-2011.pdf *MARTHA VASALLE, et al., v MIDLAND FUNDING LLC*, et al, US Dist. Court, Northern District of Ohio, Western Division Case No. 3:11-cv-00096 http://www.ftc.gov/policy/advocacy/amicus-briefs/2011/06/martha-vassalle-et-al-v-midland-funding-llc-et-al. *West Virginia v. Midland Funding LLC, Midland Credit Management Inc.*, 2011… http://wvrecord.com/news/242479-debt-buying-company-shocked-by-mcgraws-lawsuit. *Swanson v. Midland Funding LLC*, Minnesota http://www.ag.state.mn.us/Consumer/PressRelease/121212DebtBuyers.asp

[24] http://files.consumerfinance.gov/f/201407_cfpb_complaint_hanna.pdf

[25] http://files.consumerfinance.gov/f/201407_cfpb_complaint_hanna.pdf page 8 ¶¶ 20, 23, pg 9 ¶24

55. Many of the allegations contained in the CFPB complaint regarding the buyers and their use of the law firm as a "litigation factory" are directly relevant to this instant action:

    a. The Midland defendants rely on an affidavit from an individual with "no first hand fact knowledge" of any records, documents, validity of ownership, and chain of title or even basic authenticity of accounts purchased from other entities. The affiant, Angelique Ross makes no mention in her affidavit of ever working for either of the purported original creditors, having had access to their files or making any effort at any time to do so. The Midland Defendants have a well-established practice and pattern of using false affidavits in hundreds of thousands of cases across the nation and have been sued by multiple individuals and government agencies and representatives for doing so. (*Id. FN #22*) Courts have held that testimony based on a computer screen is not sufficient.[26]

    b. The Midland Defendants state in their responses to discovery requests propounded by the Plaintiff that *Midland Funding, LLC* and *Encore Capital Group* **conducted no investigation after Plaintiff's multiple disputes** with the CRAs and that MCM simply relied on information from the sellers. (*Id.* ¶12)

    c. A close look at both "Bills of Sale" reveals the two alleged accounts purchased which they reported to the CRAs as belonging to the Plaintiff were purchased WITHOUT RECOURSE OR WARRANTY. The Defendants knew or certainly should have known that Plaintiff's disputes held merit.

---

[26] In ***Unifund CCR Partners v. Cavender,*** No. 2007-CC-3040, 14 Fla.L. Weekly Supp. 975b (Orange Cty. July 20, 2007), the court held that a debt buyer "assignment" that does not refer to specific accounts does not establish ownership by the plaintiff, nor is testimony based on a computer screen sufficient.

d. The Accounts Purchase Agreements for both purchases contain no added guarantees and state the accounts being sold and the information provided are from the "Sellers" own records, not records from any original creditor or other source. (*See* PlainApp., 00086-124)

e. In Requests for Production propounded on the Defendants, Plaintiff sought, documents showing any verification or validation of an attempt to investigate after her disputes with the CRAs, and a complete Chain of Title for each account. The Defendants merely responded by referring to documents previously produced which are comprised of nothing more than their own internal records which they admit were created by them from information obtained from the sellers at the time of the sales.[27]

f. The Agreement between Midland and DRS, (at pg 7, ¶3.2.3 <u>Communications</u>), states;

i. **"Without express written authorization from Seller, Purchaser shall not make direct contact with any of all of Seller's predecessor(s)-in interest for any reason with regard to any of the Accounts sold hereunder. This includes but is not limited to: Account inquiries, Obligor information, or Account Documents (including the issuance of any Subpoena Duces Tecum) with regard to any of the Accounts sold hereunder."**

The Defendants agreed to a contract fully cognizant of the fact that the terms and conditions therein prohibited them from doing a proper investigation and therefore they could not comply with the law requiring a proper investigation should a consumer file a dispute. The Defendants did not conduct a reasonable investigation by seeking information from any first hand competent entity such as an original creditor because they were voluntarily contractually prohibited from doing so and not because the law says they don't have to or that they have no such duty.

---

[27] *See* PlainApp., 00070-82

g.  Although the Midland/DRS Agreement does state at ¶4.6 <u>Terms and Conditions</u> that
Midland could have requested a "representative copy of the Terms and Conditions"
historically associated with any of the Purchased Accounts", the Defendants
*repeatedly attempted to avoid stating they did not contact the Seller* with any such
request when the Plaintiff requested a copy of the written request in discovery.
Plaintiff had to file her third Motion to Compel in order to get a proper answer which
was that they did not make any written attempt to request from the seller. Still,
Defendants simply stated they had; "no documents that are responsive to this
Request" with no explanation as to why they would not have evidence of having
exercised the remedy afforded by the contract with DRS or if they had in fact
disposed of it. (*See* PlainApp.00083-85) Their response clearly indicates that the
Defendants did not make any such request of the Seller. As there are NO ENTRIES
anywhere in the records produced in discovery and relied on by the Defendants in
their defense, reflecting any communication with the Seller after the Purchase in
regard to the Plaintiff's dispute, there is a clear indication by the evidence, or lack
thereof, that they did absolutely nothing which could be considered a "reasonable
investigation."

56. The purchaser of accounts sold subject to quitclaim language knows that there is an increased
probability that any given piece of information the purchaser has about those accounts will be
incorrect. *See* American Law Institute – American Bar Association Continuing Legal
Education, *Limited Liability Entities 2012 Update: Auriga v. Gatz*, VCU10728 ALI-AB A
667, Jan. 27, 2012 (implying that potential buyers of a property to be sold "as is" and "with
all faults" would conduct necessary due diligence before deciding whether to bid.)  That is

why permissible purpose for obtaining credit reports before purchase exists but the Defendants did not do that.

57. The word "investigation" itself connotes a careful inquiry, so the review has to be reasonable. In Johnson v. MBNA, 2004 WL 243404 (4th Cir. Va., the Court concluded MBNA's investigation was not;

    a. "the creditor had only a computer code to review (since no documents had been retained), it should have reported back that it could not conclusively verify that Johnson was a co-obligor." The Johnson case sets a standard for reinvestigations, and suggests that furnishers should not be verifying the validity of debts they have previously reported unless they have the documents to "conclusively" refute information submitted by disputing consumers.[28] As a general rule, whether an investigation is "reasonable" under the FCRA is a question of fact for the jury. *See Crabill v. Trans Union LLC,* 259 F.3d 662, 664 (7th Cir.2001).[29]

58. The Defendants quote the Plaintiff from her deposition as having said that she viewed their letter as an attempt to shift the burden of proof onto her and that she wasn't obligated to do that. This is an attempt to mislead as the quote is taken out of context and intent. Plaintiff was referring to the Defendants' obligations under the FCRA to conduct a reasonable investigation and the absence of any legal grounds for the Defendants to force the Plaintiff to fulfill that obligation for them:[30]

    a. *"A consumer's refusal to fill out a police report or fraud affidavit does not impact the furnishers' duty to conduct a reasonable investigation" See Boggio v. USAA*

---

[28] *Johnson v. MBNA Am. Bank, NA,* 357F.3d 426, 431 (4th Cir.2004). Whether an investigation is "**reasonable**" is a question of fact unless the reasonableness of the defendant's procedures is beyond question.

[29] See also, *Cunningham v Ocwen Financial,* et al. M.D. Tenn., No. 3:12-cv-0440
A Reporting Agency "must either modify, delete, or permanently block reporting of information that it finds... to be inaccurate or incomplete, or that cannot be verified after any reinvestigation." § 1681s-2(b)(1)(E)... "Plaintiff is entitled to pursue his claims that Litton and Ocwen did not conduct reasonable investigations-those that were "fairly searching ... something more than a merely cursory review" – under § 1681s-2(b)(1)(A).

[30] If a consumer disputes information with the CRA, both the CRA and the furnisher have a duty to reasonably investigate and verify that the information is accurate. 15 USC § 1681(a)(1)(A), 1681s-2(b).
https://casetext.com/case/boggio-v-usaa-fed-sav-bank#.UwENIrRTay4

*Federal Savs. Bank, 696 F.3d 611 (6t Cir. 2012), The text of § 1681s-2(b) does not permit furnishers to require independent confirmation of materials contained in a CRA notice of a dispute before conducting the required investigation.*

Plaintiff's statement was in connection with her disputes to the CRAs not in reference to her direct disputes with the Defendants as they would have this Court believe after doing nothing more than checking electronic records created in house.[31]

59. Plaintiff has made no allegations in her Amended Complaint as to §1681s-2(a). References to erroneous information having been reported after her disputes were statements of the subsequent consequences of the Defendants' failure to meet their obligations under §1681s-2(b). However the continuance of erroneous reporting does affect the statute of limitations under the FCRA.[32] Each subsequent reporting of false information also constitutes a unique, separate, and distinct FDCPA § 1692e violation with its own time clock on statute of limitation. Defendants voluminous arguments on § 1681s-2(a) from pages 18 to 20 of their motion and all cases cited thereto are nothing more than a self-serving diatribe designed to distract and mislead the Court as Plaintiff made no allegations under 15 U.S.C. § 1681s-2(a) in her Complaint.

60. The Defendants state at pages 20 through 21 of their motion, that their actions were not willful, cite cases holding to that theory and upon that premise conclude that the Plaintiff is

---

[31] *Dixon-Rollins v. Experian Information Solutions, Inc., et al* E.D. Penn., Sept. 23, 2010, No. 09-0646 Mem. Opinion, "It was not unreasonable for the jury to conclude that Trans Union willfully or recklessly violated the FCRA by doing nothing more than "parroting information" it received from ACCB. (citing *Cushman*, 115 F.3d at 225 ("[A] 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Campbell v Chase Manhattan Bank, USA, N.A.*, No. 02-3489, 2005 WL 1514221, at* 16 (D.N.J. June 27, 2005) **(parroting information received from original source may be considered a willful violation of the FCRA);**...Saenz v. Trans Union, LLC, 621 F. Supp. 2d 1074, 1083 (D. Or. 2007) (Trans Union must do more than parrot information received by original source);

[32] *As the court noted in Larson v Ford Credit, No. 06-cv-1811 JMR/FLN, 2007 WL 1875989 (D. Minn. 2007), "[t]he majority of courts considering the question have drawn upon defamation's traditional 'multiple-publications rule'. Under this rule, each publication of the same falsehood by the same defamer is a separate cause of action, thus starting the limitations clock anew." (citing Restatement (Second) of Torts § 577A(1). In the FCRA context, this means each transmission of erroneous credit information is a separate FCRA violation.*

not entitled to punitive damages under the FCRA. At all times pertinent hereto, Defendants'

actions, acting by and through its agents, servants and/or employees, were malicious,

intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights

of the Plaintiff herein.

61. The Defendants proffered much the same defense in the case of *Brim v. Midland Credit Management, Inc., 795 F. Supp.2d 1255 (2011)*[33] that are in large part analogous to the

instant case before this Court. Rather than accept the jury's verdict in Brim, MCM sought to

vacate the judgment or reduce the Plaintiff's award. The court refused, finding that a punitive

damages award of roughly six times the actual damages awarded was appropriate under

Supreme Court standards. Furthermore, it supported the ultimate objectives of deterrence and

punishment for credit report abuse. The court noted:

    a.   *"In the facts before this court, the degree of reprehensibility is great, as defendant has stood by a faulty system for years, insisting its procedures are reasonable, in the face of obvious evidence otherwise."*

    b.   *"Under the defendant's system, when a consumer disputes a debt, 95% of such disputes are checked by a computer merely making sure the disputed debt is the same as the information defendant has in its system already. Upon such review, defendant then asserts the debt is valid each and every time. As Plaintiff points out, defendant receives about 8,000 disputes per week and for 95% of those disputes, defendant checks its own records as a means of validating the debt, although the debts are all purchased, at discount, from various creditors who have been unable to collect on them. The jury determined defendant's conduct to be reprehensible. This court will not set that finding 1264\*1264 aside, as there is more than sufficient evidence to support such a finding."*

62. This instant case appears to be an instant replay of the Brim case, in that the Defendants

contend they have no obligation under the law to have done anything more than consult the

---

[33] Brim v. Midland Credit Management, Inc., CV-10-J-369-NE (N.D. Ala. Jan. 11, 2011) (summary judgment opinion), available at www.gpo.gov/fdsys/granule/USCOURTS-alnd-5_10-cv-00369/USCOURTS-alnd-5_10-cv-00369-0/content-detail.html.

same information they reported to the CRAs from their own records. Those records contain

nothing but hearsay information from other buyers without any authenticating evidence from

a qualified source as to its truth and validity. Just as in Brim and many other cases involving

the Midland Defendants, mere computer generated inquiries masquerade as human

intervention and cognitive investigation. The Defendants have no documentation from any

original creditor authenticating any accounts nor did they ever, as evidenced in their own

records and by the agreements under which both purchases were made, attempt to verify the

information contained in the spread sheets purchased.[34] The Defendants have failed to

demonstrate exactly what they did to meet the burden of a **"reasonable investigation"**,

which would be a question of ultimate material fact and therefore clearly a matter for the trier

of fact and a genuine issue before the Court. The accuracy and veracity of the Defendants'

alleged business records as well as their actions are very much open to question and are

issues of material fact before this Court.

63. The telephone calls placed to the Plaintiff's home were for the purpose of collection as stated

by the Midland representative and not for the purpose of discussing the Plaintiff's repeated

disputes with the CRAs or her formal disputes with the Defendants.

64. Both alleged accounts were purchased not from original creditors but pursuant to "as is"

contracts with "no warranty" as to accuracy, validity, or authenticity from other Debt Buyers.

Similar contracts between the Midland Defendants and sellers are readily available online as

are a number of others, [35] which firmly establishes that the contents of such contracts are

---

[34] This constitutes a decided lack of historical fact. The resolution of disputes over historical facts or the inferences to be drawn from them is a jury function. A dispute over historical facts or inferences, if genuine and material within the meaning of Rule 56, precludes summary judgment.
[35] Jefferson Capital/Midland Funding and Encore Capital Group: http://agreements.realdealdocs.com/Asset-Purchase-Agreement/ASSET-PURCHASE-AND-FORWARD-FLOW-AGREEMEN-228804/#doc_start , FIA Card Services/CACH, LLC Forward Flow Agreement:
https://s3.amazonaws.com/s3.documentcloud.org/documents/329733/fia-to-cach-forward-flow.txt, U.S.

already a matter of public record. Absolutely no supporting documents connected with the Plaintiff such as signed contracts, applications, card holder agreements, or billing statements were included in the sale. The Defendants show no effort whatsoever to seek any supporting documentation or information beyond the bare and contradictory information received in spreadsheets at the times of the sales. To the contrary, the only effort they made was to make a request to and expect the Plaintiff to instead prove a negative and somehow come up with proof that something she had no knowledge of did not exist. 15 U.S.C. § 1681s-2(b) does not place a duty of investigation on the consumer but does so squarely on the CRA and the furnisher.

65. There remains glaring genuine issues of material fact before the Court as to the "reasonableness" of the Defendants' actions in regard to their obligation of investigation under 15 U.S.C. § 1681S-2(b) and therefore the Defendants' Motion for Summary Judgment in regard to that section of the statute should be denied.

66. The Defendants make much of the time lapse between the Plaintiff's disputes with both the Defendants and the CRAs before filing this suit and at the same time complain that the Plaintiff could have avoided the whole thing by following the procedures for dispute enumerated by the statutes. Apparently numerous disputes both written and oral, letters of intent and demands for validation of the alleged accounts were not enough, let alone the 18 months the Plaintiff afforded the Defendants to resolve the disputes before engaging in litigation. The Defendants, in fact, did nothing to resolve the issue other than demand money from the Plaintiff and ask the Plaintiff to assist them in their statutorily required obligations

---

Bank/Livingston Financial - http://dalie.org/wp-content/uploads/2014/02/2009.01.30-USB-and-Livingston-Forward-Flow-amts-may-be-wrong-as-is-rep-of-compl-with-laws.pdf, Arrow Financial/CACH LLC, - http://debtbuyeragreements.com/wp-content/uploads/2014/03/Arrow-Financial-Services-LLC-to-CACH-LLC-11-09-2007.pdf

to investigate. The Plaintiff is at a loss as to what else she could have done short of standing on her head and is highly doubtful given the Defendants' responses to other consumers' well founded disputes such as Brim[36], that even if she had spent those 18 months standing on her head the outcome would have been any different.

67. Even a cursory search on the Internet will produce an exorbitant number of consumer complaints and statements about the Defendants in this case violating consumer protection statutes using egregious and harassing tactics to collect on bogus debts from paid off accounts, false credit cards and non-existent telecommunications accounts. Their actions include alleged cell phone accounts which do not exist including supposedly originated with Sprint, Verizon, SunCom, and **T-Mobile**. (*See* PlainApp., 00039-41)

68. To prevail on her claim of violations of the FCRA, the Plaintiff must prove the following elements as a matter of law: Defendant MCM obtained Plaintiff's credit report with no permissible purpose and that her claim was brought within the statute of limitations of the FCRA. That Defendants, MCM and Midland did not perform a reasonable investigation before verifying the alleged accounts they were reporting to the CRAs after Plaintiff filed disputes. That Defendant Encore is vicariously liable for the actions of both of its wholly owned subsidiaries in regard to these violations as a result of their direct oversight of their operations. Because there are genuine issues of material fact on elements of the violations of

---

[36] Midland never investigated the dispute except by conducting a cursory computer check against its own minimal records. The consumer's lawyer reports that Midland never had a single employee actually investigate any of the disputes, and it never contacted the seller about the alleged debt. Midland's position – which is not uncommon among, furnishers of information to the CRAs – was that it had no responsibility to do anything because its computer "investigated" the dispute when it reviewed the information in Midland's own internal system and compared it with the information supplied by the CRAs. Midland's other argument was that even if they had contacted the seller of the debt, the result would have been the same. The trial court upheld the jury's verdict, noting that, "...the defendant maintained throughout the trial that it had no obligation to determine the accuracy of the accounts it attempted to collect, even though it, in turn, reports them to credit reporting agencies."

the FCRA made by the Plaintiff, the Defendants Motion for Summary Judgment should be

denied.

## OBJECTIONS

69. The evidence submitted in support of Defendants' motion should not be considered by the

Court because it is not properly authenticated, is hearsay, is untrustworthy and refers to facts

not in evidence before the Court. The Court should strike the following summary judgment

proof:

    a. Defendants rely on an untrustworthy affidavit.

        i. Defendants provide and rely on the affidavit of Angelique Ross with no

           substantiated and authenticated evidence annexed thereto in support of statements

           made.

        ii. The affidavit refers to facts not in evidence before the Court and is hearsay.

        iii. Statements made in the affidavit have been shown to be patently false making the

           entire affidavit untrustworthy.

    b. Affiant, Angelique Ross states that she is "familiar" with records and facts as a

    "Senior Group Manager" at MCM yet there is nothing on the record establishing that

    she is in fact a custodian of records at present or at all times relevant to this case. Nor

    is there anything on the record that establishes that she is even employed by or

    authorized to speak on behalf of the three Defendants. The Affiant and her

    qualifications and any training alleged knowledge are not affirmatively identified.

    This draws into question Affiants' competence and authority to testify.[37] The Affiant

---

[37] Affidavits in support of a Motion for Summary Judgment must state that the statements made therein are made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated therein. *Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 233 (Tex.1962); Tex. R.Civ.P. 166-A(e). The affidavit must not merely state that the affiant is competent to testify to the matters stated therein; but rather there must be something in the affidavits to show affirmatively how

makes statements which have not been proven and are very much in dispute such as that the Midland accounts were debts owed by the Plaintiff. She reveals the information she relies on came not from a creditor but the sellers, (other buyers). She does not state that she ever worked for either of the two alleged original creditors or the sellers and therefore could have no first hand fact knowledge of the validity, authenticity, accuracy or origination of the information she relies on in making her statements. She admits the information in the records she claims to be "familiar" is not from any original creditors but from data printed by MCM off electronic records provided by the previous debt buyer sellers. The Affiant makes a statement in regard to the reporting of the alleged GE account which Plaintiff has already proven by irrefutable evidence to be blatantly false. (*See* Doc. 58 Ex. 10a-q). Further, the Affiant has proved herself to be an unqualified witness without first-hand knowledge when the Midland Defendants proffered her as an expert witness in an on-going case in the Northern District of California.[38]

70. Defendants failed to comply with FRCP 26 which requires both parties to submit to the other their 26(a)(1) disclosures within 14 days after the completion of the 26(f) conference and to update any disclosures or discovery responses as proscribed by the rule.

71. Defendants' Motion for Summary Judgment and all its attachments and exhibits should be stricken by sanction for failure to comply with FRCP 26 *See David v. Caterpillar, Inc.*, 324

---

the affiant is competent to testify. *Murfee v. Oquin,* 423 S.W.2d 172, 174 (Tex.Civ.App.-Amerillo 1967, writ ref'd n. r. e.).

[38] *Gold v. Midland Credit Management, Inc., et al.,* https://ecf.cand.uscourts.gov/cgi-bin/HistDocQry.pl?106800721649407-L_1_0-l... Doc. 65 pg 4-B, Ms. Ross stated she had "general knowledge", did not have "specific information" and was proven to be unqualified to testify to the matters the Defendants appointed her to attest to.

F.3d 851, 857 (7th Cir. 2003)[39] Plaintiff asks the Court to strike Defendants' Motion for

Summary Judgment in its entirety from the record but in the alternative, Plaintiff has

addressed the issues argued by the Defendants in their motion and shown there are issues of

material fact before this Court.

## SUMMARY JUDGMENT EVIDENCE

72. In support of her response, Plaintiff includes the following evidence in the attached appendix:

   a. Plaintiff's Appendix, 00001- The Affidavit of Teri Lynn Hinkle which establishes

      that dispute processes outlined in the FDCPA and FCRA were adhered to at all times,

      that Plaintiff had no communications with the Defendants prior to 2011, that

      purported facts contained in the Defendants' alleged business records are false and

      that the Plaintiff made numerous attempts to resolve the issues prior to litigation.

   b. Plaintiff's Appendix of Documents 00000 – 00124


## CONCLUSION

73. The Defendants have not met their burden to show that there are no material facts at issue for

   any element of the Plaintiff's Complaint. In determining whether genuine issues of material

   fact exist, "factual controversies are construed in the light most favorable to the non-movant,

   but only if both parties have introduced evidence showing that an actual controversy exists,"

   Lynch Props. 140 F.3d at 625. The Defendant has proffered nothing more than an

---

[39] *David v. Caterpillar, Inc.,* 324 F.3d 851, 857 (7th Cir. 2003), "This court has stated that 'the sanction of exclusion is automatic and mandatory unless the sanctioned party can show *that its violation of Rule 26(a) was either justified or harmless.*' However, we also have stated that '[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." See also *Westefer v. Snyder,* 422 F.3d 570, 584 n.21 (7th Cir.2005) and *Dugan v. Smerwick Sewerage Co.,* 142 F.3d 398, 407 (7th Cir. 1998)..."Unlike its [FRCP] 11counterpart, which now assigns to the discretion of the district court whether to impose sanctions for a violation of the rule, [FRCP] 26(g)(3) still *requires* that sanctions be imposed in the event of a violation." *Thibealt  v. Square D Co.,* 960 F.2[nd] 239, 245 (1st Cir. 1992). FRCP 26(e) does not require "that a court order must be in effect, and then violated, as a prerequisite for the imposition of sanctions.... The rule itself furnishes fair warning."

untrustworthy affidavit of alleged facts proven to be false and misleading; and business records created from unauthenticated, inaccurate and unsubstantiated information gleaned from electronic records purchased from two other third parties containing numerous contradictions, false entries and missing data. There is no reliable evidence to prove that the Defendants did not violate the FDCPA and the FCRA nor is there one iota of evidence presented to prove the Defendants performed any investigation after the Plaintiff's disputes with the CRAs much less one that could be considered "reasonable" under the statute. The Defendants have made nothing more than conclusory and misleading statements in their defense. "Summary Judgment will not lie if the dispute about a material fact is "genuine", that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986).

**WHEREFORE,** because the Defendants have failed to show there are no issues of material fact before the Court and the Plaintiff has shown there are substantial material issues, the Plaintiff respectfully requests the Court DENY the Defendants' Motion for Summary Judgment, strike the Defendants' affidavit, and allow Plaintiff's claims to move forward to trial on the merits.

DATED this 3rd day of September, 2014

Respectfully Submitted,

Teri Lynn Hinkle

## CERTIFICATE OF SERVICE

I hereby certify that I presented the foregoing copies of **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, to **Mathew B. Ames, and Joshua M. Moore, Balch & Bingham LLP**, Counsel for Defendants, **MIDLAND CREDIT MANAGEMENT, MIDLAND FUNDING LLC., AND ENCORE CAPITAL GROUP, INC.** via USPS on September 4, 2014.

Sent to:

Mathew B. Ames & Joshua M. Moore
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd. N.W.
Suite 700
Atlanta, Georgia 30308-3036

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023



# EXPRESS MAIL
## UNITED STATES POSTAL SERVICE

## Mailing Envelope
### For Domestic and International Use



U.S. POSTAGE
PAID
EASTMAN, GA
31023
SEP 05, 14
AMOUNT
**$19.15**
00082219-04

1007

**EXTREMELY URGENT**    *Please Rush To Addressee*

When used internationally
affix customs declarations
(PS Form 2976, or 2976A).

## Visit us at usps.com

E13527940BUS

EI3527940BUS

### EXPRESS MAIL
#### UNITED STATES POSTAL SERVICE

Addressee Copy
Label 11-B, March 2004

Post Office To Addressee

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code: 31023
Postage: $ 11.15

Date Accepted: 9 / 4 / 14

Time Accepted: 7:41 AM / PM

Flat Rate or Weight: 14 lbs. oz.

**FROM: (PLEASE PRINT)**
Hinkle
322 Bethel St
Eastman GA 31023

**TO: (PLEASE PRINT)**
Clerk of US District Court
PO Box 1130
Augusta GA

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811





Please
Recycle

EP13C

# Plaintiff's Appendix of Exhibits

# 00000 – 00124



# FACTS IN DISPUTE

**Referenced to the relevant paragraphs in Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment**

1. Plaintiff's disputes of both alleged debts the Defendants were attempting to collect were proper and timely under the law. (See ¶¶ 33, 44,

2. Plaintiff's disputes and subsequent allegations were within the statutes of limitation. (See ¶¶ 33, 63,

3. Plaintiff never received any direct communication of any kind from the Defendants prior to 2011. (See ¶¶ 11, 41, 42,

4. Defendants records produced in discovery were inconsistent, obviously altered or were created for the purpose of this litigation. (See ¶¶ 11, 35, 36,

5. Defendants violated the FDCPA by failing to validate after Plaintiff's multiple disputes and attempting to collect alleged debts by false and deceptive means. (See ¶¶ 38, 39, 63

6. Defendants violated the FCRA by obtaining Plaintiff's consumer credit report for an impermissible purpose. (See ¶¶ 47thru 52

7. Defendants violated the FCRA by failing to conduct a reasonable investigation after Plaintiff's multiple disputes with the three CRAs which resulted in continued and on-going violations. (See ¶¶ 55, 57, 58, 62, 64,

8. Defendants' actions relevant to the Plaintiff's Complaint were at all times willful. (See ¶¶60,

9. Plaintiff followed proper procedure under the law to resolve the disputes raised in her Complaint outside litigation. (See ¶¶ 45, 66

10. Defendants did NOT cease reporting the Midland account disputed by Plaintiff in 2011 in March of 2009 as they repeatedly claim. (See ¶¶18, 19,

11. Defendants telephone calls to Plaintiff after failing to respond to dispute were for the purpose of harassment. (See ¶¶ 37, 43,

12. Plaintiff's verbal dispute made on December 27, 2011 was valid and proper under the law. (See ¶¶ 37, 38, 44

13. Defendants at all times relevant to this case furnished false information to the major CRAs. (See ¶¶ 39, 42

PlainApp. 00000

## AFFIDAVIT

NOW COMES the Affiant, Teri Lynn Hinkle of Eastman, Georgia who is over the age of 21 years, competent to testify and declares as follows under penalty of perjury regarding Case No. 3:13-CV-00033; *Teri Lynn Hinkle v Midland Credit Management Inc., et al.*:

1.  That Affiant had never heard of Midland Credit Management Inc., Midland Funding LLC or Encore Capital Group until she discovered references to them in her consumer credit reports from the three major credit reporting agencies, Equifax, Experian and TransUnion in May of 2011.

2.  That Affiant discovered an alleged account not belonging to her, Midland account #852871****, being reported by Midland Credit Management Inc., (MCM), in all of the credit reports she obtained in May of 2011. (*See* Doc. 58 Ex. 10a-q)

3.  That Affiant had never seen any of her credit reports prior to May of 2011 and was fully unaware of any information that might have been contained in them prior to that date.

4.  That Affiant personally sent a formal letter of dispute on September 6, 2011 with sufficient postage affixed, via USPS Certified Mail to the three credit reporting agencies, Trans Union, Equifax and Experian (CRAs), disputing the single alleged account that MCM had placed in her credit reports. (*See* PlainApp. at 00046-48)

5.  That Affiant personally sent via USPS Certified Mail with sufficient postage affixed, a demand for VALIDATION of the alleged account she discovered in her credit reports to defendant Midland Credit Management Inc. on October 20, 2011. (*See* PlainApp. at 00042-45)

6.  That Affiant never personally received ANY direct communications of ANY type from the Midland Defendants prior to a phone call placed to her home by MCM on December

**PlainApp. 00001**

27, 2011 at 6:40 pm EST from 800-825-8131 with "Unknown" showing in the caller ID of Affiant's phone. (*See* PlainApp. at 00036)

7.  That Affiant answered the call from MCM on December 27, 2012 and the caller stated the call was an attempt to collect a debt. Affiant then told the caller she had no debt with their company, would not pay them, that the call was in violation of the law and she would sue if they did not cease calling her. Affiant did not use the terms "fraud" or "identity theft" in her communication with the Midland representative. Affiant made note of the date and time of the call immediately after hanging up. MCM made additional calls to the Affiant's home phone number in Georgia.

8.  That on or about December 29, 2011 Affiant received a dunning letter from MCM for a different alleged account than she had previously disputed. The alleged account, a T-Mobile account, Midland account #854430****, did not belong to the Affiant, and had not been present in her credit reports obtained in May of that year.

9.  That Affiant perceived the letter from MCM to have been in error because it was not in regard to the alleged account she had disputed with the company nor had their representative identified a specific alleged debt over the telephone in their conversation.

10. That Affiant obtained her credit reports a second time in June of 2012 and discovered that MCM was still reporting the alleged account disputed in September of 2011, Midland account #852871**** and Midland Funding LLC was reporting an alleged T-Mobile account, Midland account #8544430**** on the various reports.

11. That Affiant sent a second formal dispute on July 13, 2012 to the all of the CRAs disputing both alleged accounts the Midland Entities were reporting. (*See* PlainApp. at 00049-52)

## PlainApp. 00002

12. That Affiant sent a second letter demanding validation on July 27, 2012 on **any alleged account**, with sufficient postage affixed by USPS Certified mail to the Midland Entities. (*See* PlainApp. at 00011-15)

13. That Affiant to date has never received a response to her multiple disputes of Midland account #852871****.

14. That Affiant conducted an internet google search on the Midland Entities and discovered numerous complaint sites containing posts by people stating they had been harassed by them regarding bogus T-Mobile accounts. (*See* PlainApp. at 00039-41)

15. That Affiant having reached no resolution of her disputes sent a letter of *intent to sue* with sufficient postage affixed by USPS Certified mail on July 27, 2012 to the Midland entities at the address shown in her credit reports. (*See* PlainApp. at 00034-35)

16. That Affiant has never received validation for either alleged account being reported on her credit reports by Midland Credit Management and Midland Funding, LLC.

17. That the telephone numbers listed for the Affiant in the Midland records produced in discovery were both landlines and not cell phones.

18. That Affiant's telephone number 734-379-4368 had no telephone attached to it as it was simply a landline installed for the purpose of obtaining DSL service from AT&T.

19. That Affiant's telephone number 734-379-0753 was a Voice Over Internet Protocol (VOIP) account with VONAGE and used as her only home landline telephone and was not a cell phone.

20. That at no time did Affiant have voicemail, answering machine, or any other message service for either telephone number.

## PlainApp. 00003

21. That Affiant still does not use voicemail or any other type of messaging service on her telephone.

22. That during the month of December 2008 Affiant was not in Michigan but instead was in Georgia.

23. That Affiant has never given Midland Credit Management, Midland Funding, LLC or Encore Capital Group permission to call her or to obtain her credit reports.

24. That Affiant has never applied for credit, insurance or any other type of account with Midland Credit Management Inc., Midland Funding, LLC or Encore Capital Group nor has she received any loans, credit or insurance from them.

25. That the only cell phone Affiant owned during the relevant time to this lawsuit was a Virgin Mobile phone which she discontinued using after a few months and does not remember the number associated with it.

26. That Affiant did not demand payment of $18,000.00 from the Midland Defendants in her Letter of Intent to Sue and Demand for Validation sent to them on July 26, 2012. Affiant simply stated the amount of statutory damages the suit would involve at that point in time but stated she was and would remain willing to negotiate a resolution without litigation.(*See* PlainApp. at 00034-35)

27. That all relevant evidentiary documents to this Affidavit are attached as Plaintiff's Appendix.

PlainApp. 00004

## NOTARY'S VERIFICATION

STATE OF GEORGIA

COUNTY OF DODGE


On this day personally came before me the above-named Affiant, who proved her identity to my

satisfaction, and she acknowledged her signature on this Affidavit in my presence and stated that

she did so fully understanding that she was subject to the penalties of perjury.

### AFFIRMATION

I hereby affirm that I prepared and have read this Affidavit and that I believe the foregoing

statements in this Affidavit to be true and correct.  I hereby further affirm that the basis of these

beliefs is my own direct knowledge of the statements described herein.

Further the Affiant sayeth naught.

Signed in Eastman, Georgia

September 2, 2014

Teri Lynn Hinkle

Name of Notary: Lena R. Howell

Signature of Notary: Lena R Howell

Seal



PlainApp. 00005

# EVIDENTIARY DISCREPANCIES

(Based on documents provided by Defendants in the discovery process in Case No. 3:13-CV-00033, Hinkle v. Midland et al)

The Plaintiff filed three Motions to Compel to obtain the Defendants' internal records and relevant documents Bates Labeled Midland-Hinkle 000001 thru 000224:

    a.  First responses to Requests for Production - 000001-000106;

    b.  Amended responses are labeled 000107-000125;

    c.  Amended responses comprised of the Accounts Purchase Agreements 80 and 90 percent redacted, which were produced by order of this Court (*See* Doc. 76) - 000126-000164;

    d.  Amended Accounts Purchase Agreements - 000165-000203

    e.  Responses to 2nd and 3rd requests - 000204-000218;

    f.  Final amended response after order of this Court, (*See* Doc.87), are labeled 000219 – 000224.

1.  **Records 000048,49,50** show a balance owed of **ZERO**. Records 000118,000121 (the same document) shows a balance of $300.80 which is the **EXACT** balance shown on records 000031,32,37,38 and 000112,115 for the **OTHER** alleged account. (*See* PlainApp. at 00016-31)

2.  **Record   000048** shows 5 reporting dates starting 11/17/2008, ending 03/16/2009. Record 000118 (the same doc.) shows no update of reporting dates yet as is shown in Plaintiff's credit reports if the record had been "updated" it would show at least 26 entries as of the date of the filing of this action keeping in mind that the records do not reflect which of the three CRAs the reports were made to or if it was to one or all three. (*See* Doc. 58 Ex.10a-q and PlainApp. at 00016-00031)

3.  **Halfway down the page of Record 000054** after all entry dates are entered sequentially as they should be if the record is part of a regularly updated file, the dates suddenly jump from 10/12/2008 to 10/20/2008 and then **BACK** to 10/14/2008. All entry dates continue sequentially after that. It would appear that the entry date of 10/20/2008 was **"inserted"** into the record at a later time and was not a record created at the time of the occurrence and therefore does not

qualify as a regularly maintained business record. Instead it would indicate fabrication of records for the purpose of litigation. (*See* PlainApp. at 00016-31)

4.  **Records 000107, 000109 and 000110** were produced after Plaintiff's first Motion to Compel and after the Defendants stated there were no more documents relevant to the Plaintiff's requests. These are letters Plaintiff already possessed however this action demonstrates a lack of credibility in the Defendants' statements made both to the Plaintiff and to the Court.

5.  **Records 000219 and 000221** show balances owed which do not match other documents with balances shown for the same alleged account. (*See* PlainApp. at 00016-31) Record 000221 was not produced until the last possible moment after Plaintiff's challenge on the validity of previous documents and her third Request for production of them and is one the Defendants insisted multiple times they did not have.

6.  **Records 000121 and 000219;** Plaintiff was told by counsel for Defendants they did not have the two letters shown in 000121 supposedly sent in 2008 and were not required to keep copies yet suddenly when needed for purposes of defense the first one materializes but the second doesn't. **Records 000050 and 000121** Reveals a letter supposedly sent but not produced. Defendants claim that after sending the settlement letter dated October 1, 2008, that they received a payment from somebody 12 days later and then sent another letter….. **Record 000219** which was never produced. Both records should have been included in the first or second responses if they did in fact exist at that time. (*See* PlainApp. at 00016-31)

7.  **Records 000049, 000219,000221** show that the Defendants had applied interest and fees which they would not be legally entitled to collect without authorization set forth in the original account agreement(s) which they admittedly do not and never have had nor were there any attempts in evidence to procure such documents from an original source. This is but one detail of inaccuracy in the information furnished to the CRAs before and after disputes by the Plaintiff. (*See* 15 U.S.C. § 1692f and PlainApp. at 00016-31)

8.  **Record 000034 shows 7** telephone calls placed to Plaintiff's old land line after she stopped taking the Defendants' calls to her current land line. It is not within the realm of reasonableness to assume the Defendants intended to call anyone other than the Plaintiff at that number.

## PlainApp. 00007

9. **Record 000035,** on 12/20/2011 in an entry near bottom of the page... "Please do not make exceptions to the recommended/discount settlement strategy. This account has been selected as part of a Marketing/Operations test" (No change to that directive was ever entered into the record.) Also in that record is an entry which states that the Plaintiff claimed fraud which is untrue. (*See* Affidavit, PlainApp. At 00002 ¶7)

10. **Record 000035,** shows the first call Plaintiff answered from MCM with the wrong date 12/28/2008 at 06:53:47and a notation of "Fraud/ID Theft – Consumer Claims Fraud. The call did NOT take place on the 28[th] but did occur on the 27[th] of December at exactly 6:40 pm EST. and Plaintiff made **NO CLAIMS** of fraud or identity theft but did state emphatically she had no accounts with them, she would not pay them and instructed them to cease calling her and stated that she would sue if they didn't. (*See* Affidavit, PlainApp. At 00002 ¶7)

11. **Record 000032,** entry on 4/30/2013 – "RCVD Response from Compliance, this account has been notated and added, outside validation with NO MEDIA IN HOUSE" ... Entry on same date in same doc..."CR INFO NOT ABLE TO INVESTIGATE (*See* PlainApp. at 00016-31)


**FALSE INFORMATION IN RECORDS**

12. **Bates Record 000035** shows Plaintiff's telephone conversation with MCM representative to be Dec. 28, 2011. The conversation took place on Dec. 27, 2011 as Plaintiff made note of the time and date of the call immediately after hanging up. (*See* PlainApp.at 00028)

13. **Contradictory and false information** in the "on going" record is contained in Record 000047 with the following entries:
   g. "HIGH AND DRY 7343794368" on 12/15/2008 followed by;
   h. **"OT\* LEFT MESSAGE 7343794368"**
   Since there was no telephone connected to the line that number would have reached and the Plaintiff had no answering machine or voice mail connected to it either, the claim of having left a message is outside the realm of possibility. (*See* PlainApp., at 00003 Affidavit ¶¶18-20 ) Later entries in the record indicate the truth of the matter. On Record 000054 on 8 separate dates showing calls made to the same number the entry shows, **"NO DIAL TONE"**.

**PlainApp. 00008**

## EXHIBIT C

## BILL OF SALE

AIS Services, LLC, ("Seller"), for value received and pursuant to the terms and conditions of Accounts Purchase Agreement ("Agreement") dated as of September 24, 2008 between Seller and Midland Funding LLC ("Buyer"), does hereby sell, assign and convey to Buyer, its successor and assigns, all right title and interest of Seller in and to those Accounts described in the Agreement and listed on Exhibit "A" attached thereto, without recourse and without representations of, or warranty of, collectibility, or otherwise, except to the extent provided for within the Agreement. For the purpose of this Bill of Sale the Sale File date shall be September 22, 2008.

EXECUTED this 24 day of September, 2008

AIS Services, LLC
By:
Name: Dean Kavanagh
Title:   Vice President

PlainApp. 00009

MIDLAND-HINKLE-000002

## EXHIBIT A

### ASSIGNMENT AND BILL OF SALE

Debt Recovery Solutions LLC ("Seller") and Midland Funding, LLC ("Purchaser") have entered into an Account Purchase Agreement dated December 6, 2011 ("Agreement"), for the sale by Seller to Purchaser of the Purchased Accounts described in the Account Schedule delivered by Seller to Purchaser on the Closing Date for this Bill of Sale pursuant to the provisions of the Agreement. Such Purchased Accounts were purchased by Purchaser on December 6, 2011. To the extent not otherwise defined herein, all capitalized terms appearing in this Bill of Sale shall have the meanings defined for such terms in the Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller hereby sells, assigns, transfers, conveys and delivers to Purchaser all rights, title and interests in and to each and every one of the Purchased Accounts described in the Account Schedule.

To the best of Seller's knowledge and belief, all of the information contained in the Accounts Schedule and Seller's Accounts Information, is and shall be true, complete, accurate and not misleading in any material respect. Further, all of the information contained in Seller's Accounts Information (a) constitutes Seller's own business records regarding the Purchased Accounts; and (b) accurately reflects in all material respects the information about the Purchased Accounts in Seller's possession. All of Seller's Accounts Information has been kept in the regular course of Seller's business, and was made or compiled at or near the time of the event and recorded by (or from information transmitted by) a person (i) with knowledge of the data entered into and maintained in Seller's business records, or (ii) who caused the data to be entered into and maintained in Seller's business records. It is the regular practice of Seller's business to maintain and compile such data.

THIS BILL OF SALE IS EXECUTED WITHOUT RECOURSE OR WARRANTIES EXCEPT AS STATED AND PROVIDED FOR IN THE AGREEMENT.

IN WITNESS WHEREOF, Seller and Purchaser have signed, and Seller has delivered this Bill of Sale to Purchaser, effective as of December 6, 2011.

DEBT RECOVERY SOLUTIONS LLC

By: _____

Print
Name: Dwald Schwatz

Print
Title: Manager

MIDLAND FUNDING LLC

By: _____

Print
Name: _____

Print
Title: _____

J. Brandon Black
President

Approved by Legal

-17-

PlainApp. 00010

## NOTICE AND DEMAND

## TO VALIDATE DEBT CLAIM

MCM/MIDLAND FUNDING LLC.

ATTENTION CONSUMER SUPPORT SERVICES

P.O. BOX 939069

SAN DIEGO, CALIF. 92193

Sent by USPS Certified Mail # 70112970000056529448

RE: ANY ALLEGED ACCOUNT WITH Teri Lynn Hinkle, of 322 Bethel Street, Eastman, Georgia 31023

**This letter is not a refusal to pay, but a notice sent pursuant to the Fair Credit Reporting Act 15 U.S.C. §1681, that your claim is disputed and validation is requested.**

## ******* SILENCE IS ACQUIESCENCE *******

### NOTICE TO AGENT IS NOTICE TO PRINCIPAL

### NOTICE TO PRINCIPAL IS NOTICE TO AGENT

### APPLICABLE TO ALL SUCCESSORS AND ASSIGNS

### NOTICE AND DEMAND TO CEASE AND DESIST COLLECTION ACTIVITIES PRIOR TO VALIDATION OF PURPORTED DEBT

Pursuant to the truth in lending laws of the United States Code, Title 15 § 1601 et. seq. and/or and the Fair Debt Collection Practices Act laws of the United States Code § 1692 et. Seq.
This notice constitutes a timely written response to your notice via communication to Experian Credit Reporting Agency that you are attempting to collect an alleged debt and is not a dishonor of your alleged claim of debt.

This notice is my, required by law, demand to "cease and desist" collection activities of any type prior to validation of purported debt and you must validate the enclosed claim of an alleged debt. Failure to completely answer each and every question, thus constituting partial answers, will be construed to be, no answer. You must provide verification that an actual debt really exists by producing the following:

(1)   The name and address of the organization alleging a claim of a debt;

1

*On the 26th day of July 2012 Teri Lynn Hinkle of Eastman, Georgia sent this four page document to:*
MCM/MIDLAND FUNDING LLC, P.O. Box 939069, San Diego, California 92193

PlainApp. 000011

MIDLAND-HINKLE-000026

(2)   The name and address of the person or persons in that organization alleging a claim of a debt;

(3)   The name of the actual creditor even if that is myself;

(4)   The origin of the funds used to create this alleged claim of a debt

(5)   The actual records of the organization showing the time and place of the deposit and distribution of the funds used to create this alleged claim of debt.

(6)   The actual records of the organization showing that an actual loan was made from the organization's own funds that resulted in the enclosed alleged claim of a debt.

(7)   The actual records of the organization with a live signature on any and all document/instrument(s) used to allege the existence of a real loan of funds or debt from the organization to myself or anyone else by a similar name.

(8)   BE ADVISED that verification is defined (Black's Law Dictionary, 6th Edition) as follows: "Confirmation of correctness, truth, or authenticity, by affidavit, oath or deposition". Affidavit of truth of matter stated and object of verification is to assure good faith in averments or statements of party.

(9)   The actual records of the organization  showing that an honest disclosure of facts relating to the alleged loan was made by the organization in compliance with the truth in lending laws of the United States Code, Title 15 § 1601 et. seq. and Regulation Z.

(10)   The actual records of the organization showing that any and all document/instrument(s) containing my signature or the likeness of my signature were not negotiated or pledged by the organization against my credit to create the funds used for the appearance of a debt and resulting in this alleged claim of debt.

(11)   The person that prepares and swears to the validation of debt must describe: 1) your job description on a daily basis; 2) if you are the regular keeper of those books and records and are familiar with how they are kept and their contents; 3) how long have you been in your position; 4) when did you first come in contact with the alleged account/debt; 5) how frequently do you work with the files and information they are presenting to verify/validate the alleged debt; 6) are you the person/employee who regularly works with the alleged account/debt; and 7) do you have personal knowledge about the alleged debt and/or any alleged account.

(12)   What are the terms of assignment for this account?  Attach a facsimile of any records relating to such terms.

(13)   Have any insurance claims been made by any creditor or assignee regarding this account?

(14)   Has the purported balanced of this account been used in any tax deduction claim?

**TAKE NOTICE:** The person that prepares and swears to the validation of debt must also be the same person who will be available to answer interrogatories and be available for depositions.

2

On the 26th day of July 2012 Teri Lynn Hinkle of Eastman, Georgia sent this four page document to: MIDLAND FUNDING LLC, P.O. Box 939069, San Diego, California 92193

PlainApp. 00012

MIDLAND-HINKLE-000027

15 U.S.C. § 1692 (e) states that a "false, deceptive, and misleading representation, in connection with the collection of any debt," includes the false representation of the character or legal status of any debt and further makes a threat to take any action that cannot legally be taken is deceptive practice.

Pursuant to 15 U.S.C. § 1692 (g) (4) Validation of Debts, if you have evidence to validate your claim that the attached presentment does not constitute fraudulent misrepresentation and that one owes this alleged debt, this is a demand that, within 30 days, you provide such verification/validation and supporting evidence signed and certified under penalty of perjury to substantiate your claim. . Until the requirements of the Fair Debt Collection Practices Act have been complied with and your claim is verified/validated, you have no consent to continue any collection activities.

This is a constructive notice that, absent the validation of your claim within 30 days, you must "cease and desist" any and all collection activity and are prohibited from contacting me through the mail, by telephone, in person, at my home, or at my work. You are further prohibited from contacting any other third party. Each and every attempted contact, in violation of this act, will constitute harassment and defamation of character and will subject your agency and/or attorney and any and all agents in his/her individual capacities, who take part in such harassment, and defamation, to a liability for actual damages, as well as statutory damages of up to $1,000 for each and every violation, and a further liability for legal fees to be paid to any counsel which I may retain. Further, absent such validation of your claim, you are prohibited from filing any notice of lien and/or levy or judgment and are also barred from reporting any derogatory credit information to any credit reporting agency, regarding this disputed purported debt.

FURTHERMORE, pursuant to the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 (g) (8), as you are merely an "agency" acting on someone else's behalf, this is a demand that you provide the name of the original "principal", or "holder in due course", for whom you are attempting to collect this alleged debt.

PLEASE TAKE NOTICE that this is a criminal investigation of the business practices of the above named organization, its agents, officers, employees and attorney to determine violations of the United States criminal laws. Your enclosed claim of collection of a purported debt appears to be founded upon a false record in violation of U.S.C. Title 18 § 2071 and 2073 (falsifying records) and further; uttering and possessing false obligations and counterfeit securities based upon the falsified records in violation of U.S.C. Title 18 § 471, 472, 473 and/or 513, and further: using corrupt business practices to make and possess false records and claim of obligation, not substantiated by truthful facts in violation of the Federal Racketeer Influences and Corrupt Organization (RICO), U.S.C. Title 18 § 1961 et. seq. and further: using the U.S. Mail to present such fraud and false instruments amounting to Mail Fraud, criminal conduct falling under Title 18 U.S.C. § 1341 – Frauds and Swindles laws, and further sending mail with false and fictitious names, a criminal conduct falling under Title 18 U.S.C. § 1842 – Fictitious Names.

TAKE NOTICE

Debt Collector's failure in providing Respondent with the requisite verification, validating the above referenced alleged debt within the requirements of law as codified in the Fair Debt Collection Practices Act, Fair Credit Reporting Act and the corresponding laws of each state, signifies that Debt Collector tacitly agrees that:

3

On the 26th day of July 2012 Teri Lynn Hinkle of Eastman, Georgia sent this four page document to:
MIDLAND FUNDING LLC, P.O. Box 939069, San Diego, California 92193

PlainApp. 00015

MIDLAND-HINKLE-000028

a. Debt Collector has no lawful, bona fide, verified claim, re the above-referenced alleged account:

b. Debt Collector waives any and all claims against Respondent and

c. Debt Collector tacitly agrees that Debt Collector will compensate Respondent for all costs, fees and expenses incurred in defending against this and any and all continued collection attempts, re the above-referenced alleged account.

d. Failure of Debt Collector to properly and legally verify/validate alleged debt as required in this notice is a self executing irrevocable power of attorney authorizing Respondent/Alleged Debtor named herein to direct the permanent removal, on behalf of the alleged Creditor, of any and all references to said account in any and all credit reporting agency files of any type.

This response will constitute my effort to resolve this on-going debt claim between the parties involved. Until full disclosure is achieved, there can be no case, collection or action. *"No civil or criminal cause of action can arise lest, out of fraud, and there be a valid, honest contract."* See *Eads v. Marks* 249 P. 2d 257, 260.

4

Mark A
322 Bemoer
Eastman, Georgia
31023

MCM/MIDLAND Funding LLC
ATTN: Consumer Support Services
P.O. Box 939069
San Diego, California
92193

7011 2970 0000 5652 9448



**PlainApp. 00015**

MIDLAND-HINKLE-000030

Customer Additional Data

**Issuer Information**

**Purch. from APPLIED INCOME SCIENCES on 09/24/08, purch.bal.= $ 357.56 .**



| | | | |
|---|---|---|---|
| Original Account #: | ████████ | Account Open Date: 04/10/2005 | Issuer Last Payment Amount: .00 |
| Original Lender: | **GE/ MEIJER** | Issuer Last Payment Date: 12/13/2005 | Issuer Interest Rate: .0000% |
| Product Type: | **Credit Card** | Charge Off Date: 08/07/2006 | Interest Status: |
| Affinity | | Charge Off Balance: .00 | |
| Desc 1: | | **GE MONEY** | |
| Desc 2: | | | |
| Desc 3: | | | |

**Balance Information**       **Payment Information**       **General Information**

| Balance Information | | Payment Information | | General Information | |
|---|---|---|---|---|---|
| TOTAL DUE NOW: | .00 | MCM Last Payment: | .00 | Date of Occurrence: | 01/12/2006 |
| Int + Fees: | .00 | Last Payment Received: | 10/13/2008 | State Statute Expiration Date: | 10/13/2014 |
| Unpaid Balance: | .00 | First Due: | | Days Left in Statute: | 1055 |
| MCM Interest Rate: | 5.000% | Next Due: | | Last Worked Date: | 05/01/2013 by HCB |
| Interest Method: | **Interest accrued from charge-off date** | Monthly Day Due: | 0 | Site: | **SAN DIEGO** |
| Interest Paid Through: | 12/21/2008 | Down Payment: | .00 | Deceased Date: | |
| | | Monthly Payment: | .00 | Investor: | 1597 |
| | | Settlement Amount: | .00 | Open/Closed: | **O** |
| | | | | Days Delinquent: | 0 |
| | | | | Payments Delinquent: | 0 |
| | | | | Times Delinquent: | |

PlainApp. 00016

MIDLAND-HINKLE-000044

**Collection Detail for account # 8528711764**          GA Local:  08:50 AM  (E)

No Value Account                            023-OK TO WORK-DISPUTE OUTSIDE VAL
                                            PER

026-VERBAL/WRTTEN CEASE-DESIST/REFUSE

| Payment Plan | Update Address | Verify Employer Payment History | Update Phone | Additional Data | |
|---|---|---|---|---|---|
| Terri Hinkle | | GE/ MEIJER  - ▬▬▬ | | Inv#: 1597 | K Port#: 797 |
| | Best#: | Last Wk: | 05/01/2013 | Purch Bal: | $357.56 |
| ▬▬▬ | Home: | Int Rate: | 5.00% | Int+Fees: | $40.55 |
| | Work: | Last Pd: | 10/13/2008 | Total Paid: | $398.11 |
| ▬▬▬ | Last Ltr: | 12/24/2008 | Last Pd$: | $237.49 | |
| ▬▬▬ | Ltr Dis%: | 0.00% | Ltr Exp: | Balance: | $.00 |
| Dte Birth: | SIF Amt: | $.00 | Dte C/O: | 08/07/2006 | SOL Exp: | 10/13/2014 |

CC: D5R  Name:  ANDREW ASCH          ▨     Site: SD  Ext: X31244  Team: C954

| Comments | Status | CC | By | Followup | Amount | Entered | Time |
|---|---|---|---|---|---|---|---|
| LAWSUIT FILED AGAINST MCM, ET AL. ON 4/30/13 IN USDC SOUTHERN DIST OF GA DUBLIN DIV. CASE NO. 3:13-CV-00033-DHB-WLB | COMM | D5R | HCB | 05/01/2013 | 0.00 | 05/01/2013 | 15:16:53 |
| Account assigned from BU8 to D5R by MASHIRO | TRNF | D5R | HCB | | 0.00 | 05/01/2013 | 15:16:15 |
| Account assigned from STL to BU8 by CROBIN2 | TRNF | BU8 | ELF | | 0.00 | 05/01/2013 | 11:51:38 |
| REVIEWED CORRESPONDENCE FWRD'D TO COMPLIANCE, WILL ADD TO CU DEMANDS | COMM | STL | ELF | 05/01/2013 | 0.00 | 05/01/2013 | 11:51:34 |
| PER MULT CONSUMER RQSTD CND ON MULTIPLE, WILL CND ACCT | COMM | STL | GT9 | 04/24/2013 | 0.00 | 04/24/2013 | 08:42:04 |
| RCVD SIGND LTR FROM TERI LYNN HINKLE. PM ON 4/5/2013. RCVD IN CSS ON 4/10/2013. CU STS THIS IS A WAY OF COURTESY TO APPRAISE MCM, NOTES ON ALL THREE ENTITIES, FACT ACT, HAVE BEEN TRYING TO RESOLVE ISSUES FOR PAST | COMM | STL | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 15:35:28 |

PlainApp. 00017

MIDLAND-HINKLE-000045



❶ 800 message(s) ❶

8528711764 - Terri Hinkle - $.00
← ◄◄ ▓▓▓▓▓▓▓ (Last 5)

Account number:          8528711764          ▓▓▓

## Bureau Reports by Reporting Date

| Date | Comment Code | Stat | Compliance Condition | Status_Desc |
|------|--------------|------|----------------------|-------------|
| 11/17/08 | | 93 | | Account assigned to internal or external collections |
| 12/15/08 | | 93 | | Account assigned to internal or external collections |
| 01/13/09 | | 62 | | Account paid in full, was a collection account. |
| 02/15/09 | | 62 | | Account paid in full, was a collection account. |
| 03/16/09 | | 62 | | Account paid in full, was a collection account. |

PlainApp. 00018

MIDLAND-HINKLE-000048

http://phxr2k02.internal.mcmcg.com/r2k2prod/creditBureauReports/viewCreditBureauRepo...    5/2/2013



**8528711764 - Terri Hinkle - $.00 ($300.80)**         Account number:   8528711764      Find

1534 message(s)    ⬅ ⬅⬅   Add Comm    (Last 5)

## Bureau Reports by Reporting Date

| Date | Comment Code | Stat | Compliance Condition | Status_Desc |
|------|--------------|------|----------------------|-------------|
| 11/17/08 | | 93 | | Account assigned to internal or external collections |
| 12/15/08 | | 93 | | Account assigned to internal or external collections |
| 01/13/09 | | 62 | | Account paid in full, was a collection account. |
| 02/15/09 | | 62 | | Account paid in full, was a collection account. |
| 03/16/09 | | 62 | | Account paid in full, was a collection account. |

PlainApp. 00019

MIDLAND-HINKLE-000118

Payment History                    Next Due Date:

| N R | Tran Code/Fund | Collector Code | Post Date | Trans Amount | Prnc Amount | Interest Amount | Balance | Due Date |
|---|---|---|---|---|---|---|---|---|
| | 551 NC | X10 | 12/22/2008 | 160.62 | 159.10 | 1.52 | .00 | |
| | 101 LB | IN2 | 10/13/2008 | 237.49 | 198.46 | 39.03 | 159.10 | |
| | | | Total: | 398.11 | 357.56 | 40.55 | | |
| | | | Cash: | 237.49 | | | | |

PlainApp. 00020

MIDLAND-HINKLE-000049

Letter History Inquiry - R2K-GUI-PROD-2013-04-01-01  Case 3:13-cv-00033-DHB-BKE Document 97-2  Filed 09/08/14  Page 23 of 37  Page 57 of 3

Case: 15-10398    Date Filed: 07/20/2015    Page: 57 of 251

**mcm**
❶ 800 message(s) ❶    8528711764 - Terri Hinkle - $.00    ⇐ ⇐ ⇐ Auto Screen (Last 5)    Account number:    8528711764    [Find]

### Letter History Inquiry

| Letter Date | | Type | Letter Description |
|---|---|---|---|
| LT21 | 12/24/2008 | Production | SENT PAID-OFF ACCT WITH MCM STAT |
| LT1A | 10/01/2008 | Production | SENT LETTER 1A |

PlainApp. 00021

MIDLAND-HINKLE-000050

http://phxr2k02.internal.mcmcg.com/r2k2prod/letterHistory/viewLetterHistory1.do?r2k2Ac...    5/2/2013

**mcm**
*cited and committed, inc*
❶ 1534 message(s) ❶     ⬅ ⬅⬅     [ Add Comm. ]     (Last 5)

8528711764 - Terri Hinkle - $.00  ($300.80)     Account number:     8528711764     [Flag]

### Letter History Inquiry

| Letter | Date | Type | Letter Description |
|--------|------|------|--------------------|
| LT21 | 12/24/2008 | Production | SENT PAID-OFF ACCT WITH MCM STAT |
| LT1A | 10/01/2008 | Production | SENT LETTER 1A |

# PlainApp. 00022

MIDLAND-HINKLE-000121

Midland Credit Mgmt. Inc.
Comments List - No Value notes

| Account Number | Seq Que | Typ Sts | Entered Date | Entered Time | Ent By | Activity Date | Activity Time | Activity Amt | Letter | Close Date |
|---|---|---|---|---|---|---|---|---|---|---|



5/03/13   4:31:34
032091311764

Comments List - Midland Credit Mgmt, Inc.                                LISTCOMHD
                                                                         Page 1

| Account Number | Seq# | Que | Typ | Ste | Entered Date | Entered Time | Ent By | Activity Date | Activity Time | Activity Amt | Letter | Close Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 032091311764 | 1-001 | | CL | TRNF | 2008/09/26 | 13:65:06 | *** | | | | | 2008/10/20 |
| 032091311764 | 1-001 | | | Account Assigned by CVDJOOR | | | C92 | | | | | 2008/10/20 |
| 032091311764 | 2-001 | | IN2 | TRNF | 2008/10/01 | 12:14:22 | | | | | | 2008/10/20 |
| 032091311764 | 3-001 | | IN2 | Ineligible Account | | | | | | | | 2008/10/20 |
| 032091311764 | 4-001 | | D | COWN | 2008/10/05 | 5:25:46 | | | | | | 2008/10/05 |
| 032091311764 | 5-001 | | HO | DIALTONE 734379436B | | 6:04:20 | | | | | | 2008/10/07 |
| 032091311764 | 5-001 | | IN2 | COWN | 2008/10/07 | 6:04:20 | | | | | | 2008/10/07 |
| 032091311764 | 6-001 | | HO | DIALTONE 734379436B | | 5:45:15 | | | | | | 2008/10/09 |
| 032091311764 | 6-001 | | D | COWN | 2008/10/09 | | | | | | | 2008/10/09 |
| 032091311764 | 7-001 | | HO | DIALTONE 734379436B | | 10:12:17 | | | | | | 2008/10/11 |
| 032091311764 | 7-001 | | IN2 | COWN | 2008/10/11 | | | | | | | 2008/10/11 |
| 032091311764 | 8-001 | | HO | DIALTONE 734379436B | | 5:40:26 | | | | | | 2008/10/12 |
| 032091311764 | 8-001 | | D | COWN | 2008/10/12 | | | | | | | 2008/10/12 |
| 032091311764 | 9-001 | | IN2 | RVIN | 2008/10/13 | 13:46:03 | *** | 2008/10/14 | 8:00:00 | | | 2008/10/20 |
| 032091311764 | 9-001 | | CL | Payment has been received and no Monthly Payments have been setup. | | | | | | | | 2008/10/20 |
| 032091311764 | 10-001 | | D | COWN | 2008/10/14 | 6:19:09 | | | | | | 2008/10/14 |
| 032091311764 | 10-001 | | HO | DIALTONE 734379436B | | | | | | | | 2008/10/14 |
| 032091311764 | 11-001 | | CL | TRNF | 2008/10/20 | 23:34:08 | *** | | | | | 2008/12/15 |
| 032091311764 | 11-001 | | X03 | Account moved due to House Account process to X03 by GETWEEBPS | | | | | | | | 2008/12/15 |
| 032091311764 | 11-001 | | | House Closed UP, moved to X10 | | | | | | | | 2008/12/15 |
| 032091311764 | 12-001 | | X10 | TRNF | 2008/10/04 | 17:36:20 | C5Q | | | | | 2008/12/15 |
| 032091311764 | 13-001 | | D | COWN | 2008/10/05 | 18:30:15 | | | | | | 2008/11/05 |
| 032091311764 | 13-001 | | HO | DIALTONE 734379436B | | | | | | | | 2008/11/05 |
| 032091311764 | 14-001 | | D | COWN | 2008/12/02 | 14:52:30 | | | | | | 2008/12/02 |
| 032091311764 | 14-001 | | HO | DIALTONE 734379436B | | | | | | | | 2008/12/02 |
| 032091311764 | 15-001 | | D | COWN | 2009/12/08 | 11:26:27 | | | | | | 2008/12/08 |
| 032091311764 | 15-001 | | HO | DIALTONE 734379436B | | | | | | | | 2008/12/08 |

End of list.

PlainApp. 00024

MIDLAND-HINKLE-000054

Customer Additional Data

**Issuer Information**

**Purch. from DEBT RECOVERY SOLUTIONS LLC on 12/06/11, purch.bal.= $ 300.80 .**



| | | | |
|---|---|---|---|
| Original Account #: | ▮▮▮▮ | Account Open Date: 03/04/2006 | Issuer Last Payment Amount: .00 |
| Original Lender: | **T-MOBILE** | Issuer Last Payment Date: | Issuer Interest Rate: .0000% |
| Product Type: | **Cellular** | Charge Off Date: 12/29/2007 | Interest Status: |
| Affinity | | Charge Off Balance: 300.80 | |

| **Balance Information** | | **Payment Information** | | **General Information** | |
|---|---|---|---|---|---|
| TOTAL DUE NOW: | 300.80 | MCM Last Payment: | .00 | Date of Occurrence: | 06/02/2007 |
| Int + Fees: | .00 | Last Payment Received: | | State Statute Expiration Date: | 06/02/2013 |
| Unpaid Balance: | 300.80 | First Due: | | Days Left in Statute: | 0031 |
| MCM Interest Rate: | .000% | Next Due: | | Last Worked Date: | 05/01/2013 by HCB |
| Interest Method: | No interest accrued | Monthly Day Due: 0 | | Site: | SAN DIEGO |
| Interest Paid Through: | | Down Payment: | .00 | Deceased Date: | |
| | | Monthly Payment: | .00 | Investor: | 2488 |
| | | Settlement Amount: | .00 | Open/Closed: | O |
| | | | | Days Delinquent: | 0 |
| | | | | Payments Delinquent: | 0 |
| | | | | Times Delinquent: | |

# PlainApp. 00025

MIDLAND-HINKLE-000031

## Collection Detail for account # 8544300953        GA Local: 07:48 AM (E)

**Mini Miranda required on answer mach msg**    023-OK TO WORK-DISPUTE OUTSIDE VAL PER

**026-VERBAL/WRTTEN CEASE-DESIST/REFUSE**

| Payment Plan | Update Address | Verify Employer Payment History | Update Phone | Additional Data |
|---|---|---|---|---|
| **Teri Hinkle** | | T-MOBILE - 445799415 | | Inv#: 2488  K Port#: 1394 |
| | Best#: | Last Wk: | 05/01/2013 | Purch Bal: | $300.80 |
| ▬▬▬▬ | Home: | (478) 374-4132 | Int Rate: | 0.00% | Int+Fees: | $.00 |
| | Work: | Last Pd: | | Total Paid: | $.00 |
| ▬▬▬▬ | Last Ltr: | 04/30/2013 | Last Pd$: | $.00 | |
| ▬▬▬▬ | Ltr Dis%: | 0.00% | Ltr Exp: | | Balance: | $300.80 |
| Dte Birth: ▬▬▬ | SIF Amt: | $.00 | Dte C/O: | 12/29/2007 | SOL Exp: | 06/02/2013 |

CC: **D5R** Name: **ANDREW ASCH**    ▦    Site: **SD** Ext: **X31244** Team: **C954**

| Comments | Status | CC | By | Followup | Amount | Entered | Time |
|---|---|---|---|---|---|---|---|
| Account assigned from BU8 to D5R by MASHIRO | TRNF | D5R | HCB | | 0.00 | 05/01/2013 | 15:17:38 |
| LAWSUIT FILED AGAINST MCM, ET AL. ON 4/30/13 IN USDC SOUTHERN DIST OF GA DUBLIN DIV. CASE NO. 3:13-CV-00033-DHB-WLB | COMM | BU8 | HCB | 05/01/2013 | 0.00 | 05/01/2013 | 15:17:36 |
| CR INFO NOT ABLE TO INVESTIGAT | QC01 | BU8 | GT9 | 04/30/2013 | 0.00 | 04/30/2013 | 08:19:49 |
| RCVD RESPONSE FROM COMPLIANCE, THIS ACCOUNT HAS BEEN NOTATED AND ADDED, OUTSIDE VALIDATION WITH NO MEDIA IN HOUSE, WILL SEND QC01B | COMM | BU8 | GT9 | 04/30/2013 | 0.00 | 04/30/2013 | 08:19:44 |
| REVIEWED CORRESPONDENCE FWRD'D TO COMPLIANCE INBOX 04/23/2013, WILL ADD TO CU DEMANDS | COMM | BU8 | ELF | 04/26/2013 | 0.00 | 04/26/2013 | 16:10:32 |
| CREATED ACCT IN CRS | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:25:18 |
| ****IN ADDITION FACT ACT | COMM | BU8 | GT9 | 04/23/2013 | 0.00 | 04/23/2013 | 13:22:09 |

PlainApp. 00026

MIDLAND-HINKLE-000032

| | | | | | | |
|---|---|---|---|---|---|---|
| VAL. ACCOUNT OUTSIDE VAL, WILL FWD TO COMPLIANCE TO REVIEW. | | | | | | |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 07/27/2012, Offer Expires 08/26/2012. | SLTR | A8 | *** | | 0.00 | 07/26/2012 14:26:05 |
| REQUEST TO PROVIDE PROOF | QCPP | A8 | *** | 07/20/2012 | 0.00 | 07/20/2012 21:13:58 |
| OK to work-Dispute outside validation period. Consumer needs to send proof. | COMM | A8 | *** | 08/03/2012 | 0.00 | 07/20/2012 19:42:41 |
| Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 1-Not his/hers. V erify Name, address, SSN, Dates and Balance. Control# 99992201016681057 | COMM | A8 | *** | | 0.00 | 07/20/2012 09:27:54 |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 06/15/2012, Offer Expires 07/15/2012. | SLTR | KTX | *** | | 0.00 | 06/14/2012 18:32:11 |
| Account moved by contacts load | TRNF | KTX | FTJ | | 0.00 | 06/04/2012 16:26:31 |
| SENT TO MCM LEGAL CC0130R | RVEW | L01 | *** | 05/22/2012 | 0.00 | 05/22/2012 22:53:59 |
| MM * NO MESSAGE LEFT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/22/2012 13:25:21 |
| DIAL HOME * AFTER NO CONNECT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/22/2012 13:25:02 |
| DIAL HOME * AFTER NO CONNECT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/22/2012 13:24:50 |
| MM * NO MESSAGE LEFT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/22/2012 13:21:53 |
| EE | COMM | D5D | D5D | 05/22/2012 | 0.00 | 05/22/2012 13:23:52 |
| MM * NO MESSAGE LEFT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/19/2012 11:14:29 |
| MM * NO MESSAGE LEFT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/19/2012 10:11:31 |
| MM * NO MESSAGE LEFT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/19/2012 06:03:10 |
| FLUP | FLUP | D5D | D5D | 05/22/2012 | 0.00 | 05/19/2012 11:13:17 |
| PASSED ACCOUNT 7343790753 | COMM | D5D | D5D | | 0.00 | 05/18/2012 08:05:05 |
| RPC * OTHER 4783744132 | COMM | D5D | D5D | | 0.00 | 04/05/2012 09:50:37 |
| RPC DCC DONE....MMQA DOEN CONSUMER...SD DO NOT CAL ME ANYMORE ITS A VIOLATION HU | RPOT | D5D | D5D | 05/18/2012 | 0.00 | 04/05/2012 09:49:40 |
| Account assigned from IND to D5D | TRNF | D5D | D5D | | 0.00 | 04/05/2012 09:49:09 |

# PlainApp. 00027

MIDLAND-HINKLE-000034

by BSINGH5

| Description | Type | | | | Amount | Date | Time |
|---|---|---|---|---|---|---|---|
| OT * NO MESSAGE LEFT 4783744132 | COMM | IND | E52 | | 0.00 | 04/04/2012 | 06:01:05 |
| LT 5G70( 40% Discount), Settlement offer of $180.48. Letter sent 04/05/2012, Offer Expires 05/05/2012. | SLTR | IND | *** | | 0.00 | 04/04/2012 | 18:51:25 |
| HUNG UP WHILE ON HOLD 4783744132 | COMM | IND | | | 0.00 | 04/03/2012 | 16:27:58 |
| OT * NO MESSAGE LEFT 4783744132 | COMM | IND | FFA | | 0.00 | 04/03/2012 | 10:02:53 |
| INVENTORY MGMT | TRNF | IND | FTJ | | 0.00 | 04/02/2012 | 18:43:45 |
| Acct not eligible for legal at this time | TRNF | SMB | FE1 | | 0.00 | 03/26/2012 | 17:27:14 |
| SENT TO MCM LEGAL CC0130R | RVEW | L01 | *** | 02/05/2012 | 0.00 | 02/05/2012 | 23:29:34 |
| PASSED ACCOUNT 4783744132 | COMM | E5G | E5G | | 0.00 | 02/05/2012 | 15:01:33 |
| EE | COMM | E5G | E5G | 02/05/2012 | 0.00 | 02/05/2012 | 15:00:58 |
| REQUEST TO PROVIDE PROOF | QCPP | E5G | *** | 02/04/2012 | 0.00 | 02/04/2012 | 22:13:24 |
| OK to work-Dispute outside validation period. Consumer needs to send proof. | COMM | E5G | *** | 02/18/2012 | 0.00 | 02/04/2012 | 20:48:01 |
| OT * NO MESSAGE LEFT 4783744132 | COMM | VDQ | E5G | | 0.00 | 12/28/2011 | 06:54:20 |
| Verbal Dispute within 45 days. | RVEW | VDQ | *** | 12/28/2011 | 0.00 | 12/28/2011 | 20:48:25 |
| FRAUD/ID THEFT - CONSUMER CLAIMS FRAUD. RPC DCC MM QA CONSUMER SAID THAT SHE DOESN'T OWE THAT BILL AND SHE HAS TOLD US ABOUT IT AND SHE'LL FILE A LAWSUIT AND HUNG UP. | RPOT | E5G | E5G | 12/29/2011 | 0.00 | 12/28/2011 | 06:53:47 |
| Account assigned from IND to E5G by ASHASHI | TRNF | E5G | E5G | | 0.00 | 12/28/2011 | 06:52:55 |
| OT * NO MESSAGE LEFT 4783744132 | COMM | IND | FDC | | 0.00 | 12/27/2011 | 16:41:45 |
| LT LT1A ( 10% disc on bal/debt val ltr), Settlement offer of $270.72. Letter sent 12/21/11, Offer Expires 02/04/12. | SLTR | IND | *** | 12/20/2011 | 0.00 | 12/20/2011 | 20:09:52 |
| Please do not make exceptions to the recommended discount/settlement strategy. This account has been selected as part of a Marketing/Operations test | COMM | IND | *** | | 0.00 | 12/20/2011 | 15:11:11 |
| Load to IND | COMM | IND | CXN | | 0.00 | 12/19/2011 | 16:14:29 |

PlainApp. 00028

MIDLAND-HINKLE-000035

Case: 15-10398     Date Filed: 07/20/2015     Page: 65 of 251

**mcm** · · · · · · · · · · · ·     8544300953 - Teri Hinkle - $300.80 ($300.80)     Account number:     8544300953     Find

❶ 1534 message(s) ❶     ⇐ ⇐⇐     Add Comm...     (Last 5)

## Letter History Inquiry

| Letter | Date | Type | Letter Description |
|---|---|---|---|
| QC01 | 04/30/2013 | Production | CR INFO NOT ABLE TO INVESTIGAT |
| 5G70 | 07/27/2012 | Marketing | DISCOUNT LETTER |
| QCPP | 07/21/2012 | Production | REQUEST TO PROVIDE PROOF |
| 5G70 | 06/15/2012 | Marketing | DISCOUNT LETTER |
| 5G70 | 04/05/2012 | Marketing | DISCOUNT LETTER |
| QCPP | 02/05/2012 | Production | REQUEST TO PROVIDE PROOF |
| LT1A | 12/21/2011 | Production | SENT LETTER 1A |

## PlainApp. 00029

MIDLAND-HINKLE-000115

| Field | Field Data |
|---|---|
| AIS File Number | 5128074 |
| AIS Portfolio | S30029 |
| Original Account Number | 6005065003614729 |
| Original Creditor | GE MONEY / MEIJER |
| Contract Date | 4/10/2005 |
| Last Paid Date | 12/13/2005 |
| Last Paid Amount | $- |
| Charge off Date | 8/7/2006 |
| Sale Amount | $357.56 |
| Name | "HINKLE, TERRI" |
| SSN | ███████ |
| Address1 | 6080 PARK BLVD |
| City | SOUTH ROCKWOOD |
| State | MI |
| Zip | 48179-9724 |
| HomePhone | 7343790753 |

Data printed by Midland Credit Management, Inc. from electronic records provided by AIS SERVICES, LLC pursuant to the Bill of Sale / Assignment of Accounts transferred on or about 9/24/2008 in connection with the sale of accounts from AIS SERVICES, LLC to Midland Funding, LLC.

PlainApp. 00030

MIDLAND-HINKLE-000124

| Field | Field Data |
|---|---|
| DRS# | 310445799415 |
| Name | TERI HINKLE |
| Street-1 | 6080 PARK BV |
| Street-2 | 6080S |
| City | SOUTH ROCKWOO |
| State | MI |
| Zip | 48179 |
| SSN# | ███████ |
| Home# | 7343790753 |
| Sale Amount | 300.8 |
| Orig Bal$ | 300.8 |
| C/O Date | 2007/12/29 |
| Open Date | 03/04/2006 |
| Creditor | T-MOBILE |
| DOB | ███████ |

Data printed by Midland Credit Management, Inc. from electronic records provided by Debt Recovery Solutions LLC pursuant to the Bill of Sale / Assignment of Accounts transferred on or about 12/6/2011 in connection with the sale of accounts from Debt Recovery Solutions LLC to Midland Funding, LLC.

PlainApp. 00031

MIDLAND-HINKLE-000125

April 5, 2013

Mr. J. Brandon Black

Chief Executive Officer-Midland Credit Management

8875 Aero Drive, Suite 200

San Diego, California 92123

RE: Encore Capital Group Inc., Midland Funding LLC, Midland Credit Management Inc.


Dear Mr. Black,


This is by way of a courtesy to apprise you and your other corporate entities that the attached legal action will be filed in Federal District Court within ten days after your receipt of this letter.

As you can see by reading the attached draft complaint I have attempted to resolve these issues with all three entities multiple times over the course of the past 18 months to no avail.

There is a plethora of case law[1] on the record indicating the Encore family of companies' collective attitude of ignoring federal consumer statutes as an accepted cost of doing business in direct opposition to agreements to correct procedures and practices. It is blatantly apparent they prefer to be sued. I am fully prepared to respect that preference and pursue remedy through the Federal District Court for all violations of federal law and my rights.

I am more than confident a jury will recognize and award the damages I seek and I am equally comfortable in trusting to a jury of my peers the amount of actual and/or punitive damages due me in regard to these matters.

As indicated in the draft complaint I will consider petitioning the court for class status at the end of the discovery process. Given the massive number of BBB complaints, class action and individual suits filed against all three companies across the nation, I don't think there will be any problem identifying class members.

---

[1] Herkert v MRC Receivables Corp. 2009, Brimm v Midland 2011, Texas v Midland, MCM, Encore 2011, Snow v. Midland 2006, Seaworth v Meserli 2010, Edeh v MCM 2010 just to name a very few.

PlainApp. 00032

Until such time as the completion of the discovery process I will remain amenable to amicable settlement for the violations enumerated in the original complaint.


Respectfully,


*Teri L. Hinkle*

Teri Lynn Hinkle

322 Bethel Street

Eastman, Georgia 31023

478-374-4132

queensongbird@gmail.com


Sent by USPS Certified Mail Return Receipt Requested # 7011297000056529554


PlainApp. 00033

MIDLAND-HINKLE-000057

8544300953

July 26, 2012

Teri Lynn Hinkle

322 Bethel St.

Eastman, Georgia

31023

MCM Dept 12421

Attention Consumer Support Services

P.O. Box 939069

San Diego, CA 92193

## RESPONSE AND NOTICE OF INTENT TO SUE

Dear Sir/Madam,

In response to your attached correspondence, I cannot furnish you with ANYTHING as I do not have that alleged account. This is the second non-existent account I have both disputed with the credit reporting agencies but with you as well. I mailed a demand for your company to Validate any alleged account you could claim to have with me in October of 2011 which you chose to ignore. Since that time your company has reported false information on my credit report which constitutes a violation of the FDPCA 15 U.S.C. 1692e(2)(10), which carries a statutory damage of $1,000.00 per defendant per erroneous reporting.

Two months after I demanded validation your company began violating further by mailing dunning letters instead and calling my phone, all of which is prohibited without fulfilling my demand for validation. That is yet another FDCPA violation. Your operators were told in no uncertain terms to cease calling me but have not complied.

In addition your company has continued to report erroneous information on my credit reports for nine months with is a violation of the Fair Credit Reporting Act (FCRA) which carries a $1,000.00 per month per credit report, per alleged account you are reporting which has been both disputed and you have refused to validate.

I fully intend to file suit in Federal District Court, Southern Division of Georgia for all violations to date and will name both Midland Credit Management and Midland Funding LLC. as initial defendants in the complaint. Those violations with my court costs and without including other defendants which will be added, come to around $18,000.00 to date.

I am a reasonable woman but I have simply had enough abuse at the hands of your company and will tolerate no more. I have attached yet another demand for validation for ANY ALLEGED ACCOUNT you think you can prove not only belongs to me but you have the legal right to collect on. Barring that I will expect that either you contact me to negotiate a settlement of this

PlainApp. 00034

MIDLAND-HINKLE-000076

matter within thirty days of your receipt of this letter or I will assume that you wish for me to go forward with the suit and let a jury decide. I'm sure if you review Snow vs Midland Funding LLC, Texas you will realize that a jury often tends to have little tolerance for this type of harassment, much smaller in that case than in this one. This will be my last communication on this matter before filing the suit unless I hear from you that you wish to mitigate the matter outside litigation.


Respectfully,


Teri Lynn Hinkle

322 Bethel Street

Eastman, Georgia 31023

queensongbird@gmail.com


Mailed by USPS Certified #70112970000056529448


**PlainApp. 00035**

MIDLAND-HINKLE-000077

# CALL LOG

| DATE | TIME | COMPANY | CALLER ID | |
|---|---|---|---|---|
| 12/27/2011 | 6:40 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 12/28/2011 | 8:52 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/7/2012 | 6:34 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/8/2012 | 10:36 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/30/2012 | 6:37 PM | MIDLAND | Unknown | 1-800-825-8131 |
| | | | | |
| | | | | |
| | | | | |

PlainApp. 00036

*All furnishers subject to the Federal Trade Commission's jurisdiction must comply with all applicable regulations, including regulations promulgated after this notice was prescribed in 2004. Information about applicable regulations currently in effect can be found at the Commission's Web site, www.ftc.gov/credit. Furnishers who are not subject to the Commission's jurisdiction should consult with their regulators to find any relevant regulations.*

## NOTICE TO FURNISHERS OF INFORMATION:
## OBLIGATIONS OF FURNISHERS UNDER THE FCRA

The federal Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681-1681y, imposes responsibilities on all persons who furnish information to consumer reporting agencies (CRAs). These responsibilities are found in Section 623 of the FCRA, 15 U.S.C. 1681s-2. State law may impose additional requirements on furnishers. All furnishers of information to CRAs should become familiar with the applicable laws and may want to consult with their counsel to ensure that they are in compliance. The text of the FCRA is set forth in full at the Website of the Federal Trade Commission (FTC): www.ftc.gov/credit. A list of the sections of the FCRA crossreferenced to the U.S. Code is at the end of this document.

Section 623 imposes the following duties upon furnishers:

### ACCURACY GUIDELINES
The banking and credit union regulators and the FTC will promulgate guidelines and regulations dealing with the accuracy of information provided to CRAs by furnishers. The regulations and guidelines issued by the FTC will be available at www.ftc.gov/credit when they are issued. Section 623(e).

### GENERAL PROHIBITION ON REPORTING INACCURATE INFORMATION
The FCRA prohibits information furnishers from providing information to a CRA that they know or have reasonable cause to believe is inaccurate. However, the furnisher is not subject to this general prohibition if it clearly and conspicuously specifies an address to which consumers may write to notify the furnisher that certain information is inaccurate. Sections 623(a)(1)(A) and (a)(1)(C).

### DUTY TO CORRECT AND UPDATE INFORMATION
If at any time a person who regularly and in the ordinary course of business furnishes information to one or more CRAs determines that the information provided is not complete or accurate, the furnisher must promptly provide complete and accurate information to the CRA. In addition, the furnisher must notify all CRAs that received the information of any corrections, and must thereafter report only the complete and accurate information. Section 623(a)(2).

### DUTIES AFTER NOTICE OF DISPUTE FROM CONSUMER
If a consumer notifies a furnisher, at an address specified for the furnisher for such notices, that specific information is inaccurate, and the information is, in fact, inaccurate, the furnisher must thereafter report the correct information to CRAs. Section 623(a)(1)(B).

If a consumer notifies a furnisher that the consumer disputes the completeness or accuracy of any information reported by the furnisher, the furnisher may not subsequently report that information to a CRA without providing notice of the dispute. Section 623(a)(3).

The federal banking and credit union regulators and the FTC will issue regulations that will identify when an information furnisher must investigate a dispute made directly to the furnisher by a consumer. Once these regulations are issued, furnishers must comply with them and complete an investigation within 30 days (or 45 days, if the consumer later provides relevant additional information) unless the dispute is frivolous or irrelevant or comes from a "credit repair organization." The FTC regulations will be available at www.ftc.gov/credit. Section 623(a)(8).

### DUTIES AFTER NOTICE OF DISPUTE FROM CONSUMER REPORTING AGENCY
If a CRA notifies a furnisher that a consumer disputes the completeness or accuracy of information provided by the furnisher, the furnisher has a duty to follow certain procedures. The furnisher must:

• Conduct an investigation and review all relevant information provided by the CRA, including information given to the CRA by the consumer. Sections 623(b)(1)(A) and (b)(1)(B).

• Report the results to the CRA that referred the dispute, and, if the investigation establishes that the information was, in fact, incomplete or inaccurate, report the results to all CRAs to which the furnisher provided the information that compile and maintain files on a nationwide basis. Section 623(b)(1)(C) and (b)(1)(D).

PlainApp. 00037

- Complete the above steps within 30 days from the date the CRA receives the dispute (or 45 days, if the consumer later provides relevant additional information to the CRA). Section 623(b)(2).

- Promptly modify or delete the information, or block its reporting. Section 623(b)(1)(E).

## DUTY TO REPORT VOLUNTARY CLOSING OF CREDIT ACCOUNTS

If a consumer voluntarily closes a credit account, any person who regularly and in the ordinary course of business furnishes information to one or more CRAs must report this fact when it provides information to CRAs for the time period in which the account was closed. Section 623(a)(4).

## DUTY TO REPORT DATES OF DELINQUENCIES

If a furnisher reports information concerning a delinquent account placed for collection, charged to profit or loss, or subject to any similar action, the furnisher must, within 90 days after reporting the information, provide the CRA with the month and the year of the *commencement of the delinquency* that immediately preceded the action, so that the agency will know how long to keep the information in the consumer's file. Section 623(a)(5).

Any person, such as a debt collector, that has acquired or is responsible for collecting delinquent accounts and that reports information to CRAs may comply with the requirements of Section 623(a)(5) (until there is a consumer dispute) by reporting the same delinquency date previously reported by the creditor. If the creditor did not report this date, they may comply with the FCRA by establishing reasonable procedures to obtain and report delinquency dates, or, if a delinquency date cannot be reasonably obtained, by following reasonable procedures to ensure that the date reported precedes the date when the account was placed for collection, charged to profit or loss, or subjected to any similar action. Section 623(a)(5).

## DUTIES OF FINANCIAL INSTITUTIONS WHEN REPORTING NEGATIVE INFORMATION

Financial institutions that furnish information to "nationwide" consumer reporting agencies, as defined in Section 603(p), must notify consumers in writing if they may furnish or have furnished negative information to a CRA. Section 623(a)(7). The *Federal Reserve Board* has prescribed model disclosures, 12 CFR Part 222, App. B.

## DUTIES WHEN FURNISHING MEDICAL INFORMATION

A furnisher whose primary business is providing medical services, products, or devices (and such furnisher's agents or assignees) is a medical information furnisher for the purposes of the FCRA and must notify all CRAs to which it reports of this fact. Section 623(a)(9). This notice will enable CRAs to comply with their duties under Section 604(g) when reporting medical information.

## DUTIES WHEN ID THEFT OCCURS

All furnishers must have in place reasonable procedures to respond to notifications from CRAs that information furnished is the result of identity theft, and to prevent refurnishing the information in the future. A furnisher may not furnish information that a *consumer has identified as resulting from identity theft unless the furnisher subsequently knows or is informed by the consumer that* the information is correct. Section 623(a)(6). If a furnisher learns that it has furnished inaccurate information due to identity theft, it must notify each consumer reporting agency of the correct information and must thereafter report only complete and accurate information. Section 623(a)(2). When any furnisher *of information is notified pursuant to the procedures set forth in Section 605B that* a debt has resulted from identity theft, the furnisher may not sell, transfer, or place for collection the debt except in certain limited circumstances. Section 615(f).

The FTC's Web site, www.ftc.gov/credit, has more information about the FCRA, including publications for businesses and the full text of the FCRA.

# PlainApp. 00038

# SAMPLES OF INTERNET POSTS

Below are just a few of the comments from consumers who have been targeted by the
Defendants in this case for fraudulent collection on non-existent T-Mobile debt:

http://www.pissedconsumer.com/reviews-by-company/midland-credit-management/midland-
credit-management-pure-scam-must-read-20100425179719.html

"TOTAL SCAM!!! We received a letter from Midland saying that we owe almost $3,000 to T-
Mobile. We don't even have T-Mobile nor have we ever had T-Mobile. In addition, they send a
letter, but there is no telephone number on the letter to call and tell them that they obviously sent
the letter in error. Beware! Total scam."

"I just received a call from this Lawyer claiming that my wife had an outstanding bill from T-
Mobile for $862.26 back in 2007 and the account was sent to his office to collect a debt. He
claimed that his name was Mark Cruse and his call back number was 1-800-265-8825. This is
where I caught his SCAM, I told him, my wife has never had a contract phone and that the T-
Mobile was prepaid. He immediately tried to change phone companies (lol) and then I said, "this
is a SCAM and you are being recorded. He immediately hung up the phone. If you receive any
information from Midland Credit Management, hang up the phone because this is definitely a
SCAM."

"I called the cops , and they took care of it for me. And yes, there was an Indian sounding guy on
the line. And he asked me personal information as in my SSN , credit card numbers, and seemed
pretty fine when I told him I'll call the cops for harassment. He claimed that my wife had a
"$796" debt with T-Mobile , when she never had a T-Mobile account on her name. Don't be
afraid to go to your local police station for help with this fraud.."

"http://www.creditreportproblems.com/Midland_Credit_Management_Inc.htm
I just received a letter from MCM claiming I owe them $808 for a phone account from T-Mobile
and the account was in my maiden name. I've got married 10 years ago and they said this phone
account is from 2009. Also, it was opened in a city I have not lived in for over 8 years. I believe
this is a scam by MCM because none of this is showing up on my credit report. Not a credit
check from T-Mobile from when the account was supposedly activated, not from when T-Mobile
turned it over to collections, and from when this company took over the debt. So i guess it's good
for me that it's not showing up on my credit, but I'm curious to know if anyone knows how
difficult it is dealing with MCM on this matter and to get them to leave me alone."

"MCM started calling yesterday (Sunday), which is not allowed per federal law, stating that I
have a delinquent account with T-Mobile. I have never had a T-Mobile account, device, etc... I
have no idea what they are talking about and cannot call back due to a "private" number listed."

PlainApp. 00039

"they say that i owe over $600 for a phone that i never owned. i had a phone with suncom not t-mobile. now they have put me on hold and have been here for over 30 min for the fraud dept of this company. do they ever answer the phone. i am glad that i have protect my id. i would say that all people everywhere need this service. now they don't know what i am talking about. go figure. go to protectmyid.com they will help with this company."

"T mobil what is it ? but this company claim we owe them $300. Do not know who is MCM nor T mobil ,we never dealed with them and never will. Talk about Fraud are there persons that really sent them money. Wish this company stop sending me notices and save a tree, cause these letters wind up in the trash. Not to Worry"

http://collectionagencydebt.blogspot.com/2011/04/dealing-with-midland-credit-management.html

"Received a supposed bill from MCM stating a large sum was owed from aT-Mobile account. This was the same thing from a Sunrise Credit out of New York, never had any bills from T-Mobile nor phone requesting payment of said bill. This is an attempt obtain information, DO NOT GIVE THEM ANYTHING. Send a letter registered to them requesting signature, !)Ask why you never received bills etc. from T-Mobile; 2)Do not admit that this bill is yours;mentioned "IDENTITY THEFT"); 3)Ask them to validate outstanding bill;Ask if bill is a "Time Barred Debt"; Then ask them for no further communication until they produce said bill; Then do some research and report them to the FTC, State Attorney General of your state of residence, and the State from which operate, as well as the Better Business Bureau; Good Luck, maybe if there are enough complaints there can be a Class Action Suit against their actions"

"Oh boy... I just got a notice from these folks regarding a T-Mobile account. I have NEVER had an account with them, looks like I'm in for a fun fight."

"Heyyy i also get harrased with that i owe a T mobile bill so it is a scamm its always a young guy with a indian axcent caling and caling and caling even on Sundays"

"I also got the same call that i owe T MOBILE beware its all a scam"

http://creditboards.com/forums/index.php?showtopic=495194

"I never expected this problem to get this far.
I had an account with Suncom Mobile in 2008. I moved to an area without Suncom service. The company acknowledged this and ended my contract early without fee. I received a refund of my deposit and my account was closed in good standing.

PlainApp. 00040

9-12 months later, T-Mobile bought Suncom. I suddenly received a bill for about $100 or so from T-mobile. I have never been a T-mobile customer and ended my contract with Suncom in good standing a year before T-moble bought them.

This is on my credit and I'm pissed off. I hope T-Mobile get's hit by a meteor.

I disputed this account with Experian. Astoundingly, only 48 hours later they had "confirmed the account was mine" (WTF? HOW?). Experian doesn't even have a phone number for this collection agency, just an address.

My mind is about to explode. I could just pay this, but what's to stop the next bogus debt from being $1,000 or $10,000?"

PlainApp. 00041

NOTICE AND DEMAND

TO VALIDATE DEBT CLAIM

MIDLAND CREDIT MANAGEMENT INC.

8875 Aero Dr. Ste. 200

San Diego, CA 92123

Sent by USPS Certified Mail # 7010 0780 0000 2275 9899

RE: Alleged account # 852871****

This letter is not a refusal to pay, but a notice sent pursuant to the Fair Credit Reporting Act **15 U.S.C. §1681**, that your claim is disputed and validation is requested.

******* SILENCE IS ACQUIES

NOTICE TO AGENT IS NOTICE T(

NOTICE TO PRINCIPAL IS NOTIC

APPLICABLE TO ALL SUCCESSORS

NOTICE AND DEMAND TO CEASE AND DESIST COLLECTIOI
PURPORTED DEBT

Pursuant to the truth in lending laws of the United State and the Fair Debt Collection Practices Act laws of the Unite This notice constitutes a timely written response to your notice via communication to Experian Credit Reporting Agency that you are attempting to collect an alleged debt and is not a dishonor of your alleged claim of debt.

This notice is my, required by law, demand to "cease and desist" collection activities of any type prior to validation of purported debt and you must validate the enclosed claim of an alleged debt. Failure to completely answer each and every question, thus constituting partial answers, will be construed to be, no answer. You must provide verification that an actual debt really exists by producing the following:

(1)  The name and address of the organization alleging a claim of a debt;

(2)  The name and address of the person or persons in that organization alleging a claim of a debt;

PlainApp 00042

On the 30th day of October, 2011 Teri Lynn Hinkle of Eastman, GA sent this four page document to:
MIDLAND CREDIT MANAGEMENT INC., 8875 Aero Dr. Ste. 200, San Diego, CA 92123

1

(3)   The name of the actual creditor even if that is myself;

(4)   The origin of the funds used to create this alleged claim of a debt

(5)   The actual records of the organization showing the time and place of the deposit and distribution of the funds used to create this alleged claim of debt.

(6)   The actual records of the organization showing that an actual loan was made from the organization's own funds that resulted in the enclosed alleged claim of a debt.

(7)   The actual records of the organization with a live signature on any and all document/instrument(s) used to allege the existence of a real loan of funds or debt from the organization to myself or anyone else by a similar name.

(8)   BE ADVISED that verification is defined (Black's Law Dictionary, 6th Edition) as follows: "Confirmation of correctness, truth, or authenticity, by affidavit, oath or deposition". Affidavit of truth of matter stated and object of verification is to assure good faith in averments or statements of party.

(9)   The actual records of the organization   showing that an honest disclosure of facts relating to the alleged loan was made by the organization in compliance with the truth in lending laws of the United States Code, Title 15 § 1601 et. seq. and Regulation Z.

(10)  The actual records of the organization showing that any and all document/instrument(s) containing my signature or the likeness of my signature were not negotiated or pledged by the organization against my credit to create the funds used for the appearance of a debt and resulting in this alleged claim of debt.

(11)  The person that prepares and swears to the validation of debt must describe: 1) your job description on a daily basis; 2) if you are the regular keeper of those books and records and are familiar with how they are kept and their contents; 3) how long have you been in your position; 4) when did you first come in contact with the alleged account/debt; 5) how frequently do you work with the files and information they are presenting to verify/validate the alleged debt; 6) are you the person/employee who regularly works with the alleged account/debt; and 7) do you have personal knowledge about the alleged debt and/or any alleged account.

(12)  What are the terms of assignment for this account?   Attach a facsimile of any records relating to such terms.

(13)  Have any insurance claims been made by any creditor or assignee regarding this account?

(14)  Has the purported balanced of this account been used in any tax deduction claim?

TAKE NOTICE: The person that prepares and swears to the validation of debt must also be the same person who will be available to answer interrogatories and be available for depositions.

15 U.S.C. § 1692 (e) states that a "false, deceptive, and misleading representation, in connection with the collection of any debt," includes the false representation of the character or legal

2

On the 27th day of October, 2011 Teri Lynn Hinkle of Eastman, GA sent this four page document to:
MIDLAND CREDIT MANAGEMENT INC., 8875 Aero Dr. Ste. 200, San Diego, CA 92123

status of any debt and further makes a threat to take any action that cannot legally be taken is deceptive practice.

Pursuant to 15 U.S.C. § 1692 (g) (4) <u>Validation of Debts</u>, if you have evidence to validate your claim that the attached presentment does not constitute fraudulent misrepresentation and that one owes this alleged debt, this is a demand that, within 30 days, you provide such verification/validation and supporting evidence signed and certified under penalty of perjury to substantiate your claim. . **Until the requirements of the Fair Debt Collection Practices Act have been complied with and your claim is verified/validated, you have no consent to continue any collection activities.**

This is a constructive notice that, absent the validation of your claim within 30 days, you must "cease and desist" any and all collection activity and are prohibited from contacting me through the mail, by telephone, in person, at my home, or at my work. You are further prohibited from contacting any other third party. Each and every attempted contact, in violation of this act, will constitute harassment and defamation of character and will subject your agency and/or attorney and any and all agents in his/her individual capacities, who take part in such harassment, and defamation, to a liability for actual damages, as well as <u>statutory damages of up to $1,000 for each and every violation</u>, and a further liability for legal fees to be paid to any counsel which I may retain. Further, absent such validation of your claim, you are prohibited from filing any notice of lien and/or levy or judgment and are also barred from reporting any derogatory credit information to any credit reporting agency, regarding this disputed purported debt.

**FURTHERMORE**, pursuant to the <u>Fair Debt Collection Practices Act</u>, 15 U.S.C. § 1692 (g) (8), as you are merely an "agency" acting on someone else's behalf, this is a demand that you provide the name of the original "principal", or "holder in due course", for whom you are attempting to collect this alleged debt.

**PLEASE TAKE NOTICE** that this is a criminal investigation of the business practices of the above named organization, its agents, officers, employees and attorney to determine violations of the United States criminal laws. Your enclosed claim of collection of a purported debt appears to be founded upon a false record in violation of U.S.C. Title 18 § 2071 and 2073 (falsifying records) and further; uttering and possessing false obligations and counterfeit securities based upon the falsified records in violation of U.S.C. Title 18 § 471, 472, 473 and/or 513, and further: using corrupt business practices to make and possess false records and claim of obligation, not substantiated by truthful facts in violation of the Federal Racketeer Influences and Corrupt Organization (RICO), U.S.C. Title 18 § 1961 et. seq. and further: using the U.S. Mail to present such fraud and false instruments amounting to Mail Fraud, criminal conduct falling under Title 18 U.S.C. § 1341 – Frauds and Swindles laws, and further sending mail with false and fictitious names, a criminal conduct falling under Title 18 U.S.C. § 1842 – Fictitious Names.

<u>TAKE NOTICE</u>

Debt Collector's failure in providing Respondent with the requisite verification, validating the above referenced alleged debt within the requirements of law as codified in the Fair Debt Collection Practices Act, Fair Credit Reporting Act and the corresponding laws of each state, signifies that Debt Collector tacitly agrees that:

a.  Debt Collector has no lawful, bona fide, verified claim, re the above-referenced alleged account:

3

PlainApp 00044 On the 20 day of October, 2011 Teri Lynn Hinkle of Eastman, GA sent this four page document to:
MIDLAND CREDIT MANAGEMENT INC., 8875 Aero Dr. Ste. 200, San Diego, CA 92123

b. Debt Collector waives any and all claims against Respondent and

c. Debt Collector tacitly agrees that Debt Collector will compensate Respondent for all costs, fees and expenses incurred in defending against this and any and all continued collection attempts, re the above-referenced alleged account.

d. Failure of Debt Collector to properly and legally verify/validate alleged debt as required in this notice is a self executing irrevocable power of attorney authorizing Respondent/Alleged Debtor named herein to direct the permanent removal, on behalf of the alleged Creditor, of any and all references to said account in any and all credit reporting agency files of any type.

This response will constitute my effort to resolve this on-going debt claim between the parties involved. Until full disclosure is achieved, there can be no case, collection or action. *"No civil or criminal cause of action can arise lest, out of fraud, and there be a valid, honest contract."* See *Eads v. Marks* 249 P. 2d 257, 260.

PlainApp  00045  On the 20 day of October, 2011 Teri Lynn Hinkle of Eastman, GA sent this four page document to:
MIDLAND CREDIT MANAGEMENT INC., 8875 Aero Dr. Ste. 200, San Diego, CA 92123

CERTIFIED MAIL RECEIPT
(Domestic Mail Only; No Insurance Coverage Provided)

For delivery information visit our website at www.usps.com

OFFICIAL USE

| Postage | $ | $0.44 | |
| Certified Fee | | $2.95 | |
| Return Receipt Fee (Endorsement Required) | | $2.30 | |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 | |
| Total Postage & Fees | $ | $5.59 | |

Sent To _Trans Union Consumer Solutions_
Street, Apt. No.; or PO Box No. _P.O. Box 2000_
City, State, ZIP+4 _Chester, PA 19022-2000_

PS Form 3800, August 2006          See Reverse for Instructions

322 Bethel Street, Eastman, GA 31023
August 28, 2011

Trans Union Consumer Solutions
P.O. Box 2000
Chester, PA 19022-2000

Attn: Legal Department

I am disputing the following items:

1. ▮▮▮▮▮▮▮▮▮

2. ▮▮▮▮▮▮▮▮▮▮▮▮

3. ▮▮▮▮▮▮▮▮▮▮

4. MIDLAND CREDIT MGMT INC account #852871****

5. NATIONAL CREDIT SOLUTION account #5039865****

6. ▮▮▮▮▮▮▮▮▮▮

I did not authorize the following inquiries on my credit report. I believe that they were obtained fraudulently. Please remove them.

1. ▮▮▮▮▮▮▮▮▮▮

Please provide me with a description of the reinvestigation procedure for all items. Please provide me with the source of information for all items. Please send me all information in my consumer file. Please send me an updated copy of my credit report. Thank you for your cooperation in advance.

Sincerely,

*Teri Lynn Hinkle*

Teri Lynn Hinkle
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

P.S.  Please find enclosed a copy of my Drivers License and Social Security card to verify identity.

Mailed by USPS Certified Mail #70100780000022759844

PlainApp. 00046

322 Bethel Street, Eastman, GA 31023
August 28, 2011

Equifax Information Services LLC
P.O. Box 105069
Atlanta, GA 30348

Attn: Legal Department

I am disputing the following items:

1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

3. MIDLAND CREDIT MANAGEMENT account #852871****

4. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

5. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

I did not authorize the following inquiries on my credit report. I believe that they were obtained fraudulently. Please remove them.

1. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

2. ▓▓▓▓▓▓▓▓▓▓▓

Please provide me with a description of the reinvestigation procedure for all items. Please provide me with the source of information for all items. Please send me all information in my consumer file. Please send me an updated copy of my credit report. Thank you for your cooperation in advance.

Sincerely,

Teri Lynn Hinkle
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

P.S.  Please find enclosed a copy of my Drivers License and Social Security card to verify identity.

Mailed by USPS Certified Mail #70100780000022759820

PlainApp. 00047

322 Bethel Street, Eastman, GA 31023
August 28, 2011

Experian
P.O. Box 0701
Allen, TX 75013

Attn: Legal Department

I am disputing the following items:

1. ███████████████████████

2. ███████████████████████

3. ███████████████████████

4. MIDLAND CREDIT MANAGEMENT account #852871****

5. ███████████████████████

I did not authorize the following inquiries on my credit report. I believe that they were obtained fraudulently. Please remove them.

1. ███████████████████

2. ███████████████████

3. ███████████████████

Please provide me with a description of the reinvestigation procedure for all items. Please provide me with the source of information for all items. Please send me all information in my consumer file. Please send me an updated copy of my credit report. Thank you for your cooperation in advance.

Sincerely,

*Teri Lynn Hinkle*

Teri Lynn Hinkle
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

P.S. Please find enclosed a copy of my Drivers License and Social Security card to verify identity.

Mailed by USPS Certified Mail #70100780000022759837

PlainApp. 00048



CERTIFIED M
(Domestic Mail Only)

1023

0046 2595 0000 0262 1101

Trans Union Consumer Solutions
P.O. Box 2000
Chester, PA 19022-2000

Attn: Legal Department

I am disputing the following items:

1. ███████████████████████████████████

2. MIDLAND CREDIT MGMT INC account #852871**** I have no contractual obligation
with this company whatsoever and this is false information and a false claim of account.

3. MIDLAND FUNDING LLC account #852871**** I have no contractual obligation with this
company whatsoever and this is false information and a false claim of account.

I did not authorize the following inquiries on my credit report. I believe that they were obtained
without permissible purpose. Please remove them.

1. ███████████████████████████████

Please provide me with a description of the reinvestigation procedure for all items. Please
provide me with the source of information for all items. Please send me all information in my
consumer file. Please send me an updated copy of my credit report. Thank you for your
cooperation in advance.

Sincerely,

*Teri Lynn Hinkle*

Teri Lynn Hinkle
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

P.S.  Please find enclosed a copy of my Drivers License and Social Security card to verify
identity.

Mailed by USPS Certified Mail #70112970000056529400

PlainApp. 00049

31023

Experian
P.O. Box 0701
Allen, TX 75013

Attn: Legal Department

I am disputing the following items:

1. ██████████████████████████████████████

2. MIDLAND FUNDING account #854430**** I have no contractual obligation with this company whatsoever and this is false information and a false claim of account.

I did not authorize the following inquiries on my credit report. I believe that they were obtained without permissible purpose. Please remove them.

1. ████████████████████████

2. ██████████████████████████████████

3. ████████████████████████

4. ██████████████████████

Please provide me with a description of the reinvestigation procedure for all items. Please provide me with the source of information for all items. Please send me all information in my consumer file. Please send me an updated copy of my credit report. Thank you for your cooperation in advance.

Sincerely,

Teri Lynn Hinkle
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

P.S.  Please find enclosed a copy of my Drivers License and Social Security card to verify identity.

Mailed by USPS Certified Mail #70112970000056529394

PlainApp. 00050

31023

47362 2595 0000 0262 1101

Equifax Information Services LLC
P.O. Box 105069
Atlanta, GA 30348

Attn: Legal Department

I am disputing the following items:

1. MIDLAND CREDIT MANAGEMENT account #854430**** I have no contractual obligation with this company whatsoever and this is false information and a false claim of account.

2. MIDLAND FUNDING LLC account ##854430**** I have no contractual obligation with this company whatsoever and this is false information and a false claim of account.


I did not authorize the following inquiries on my credit report. I believe that they were obtained without permissible purpose. Please remove them.

1. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

2. ▇▇▇▇▇▇▇▇▇▇▇

Please provide me with a description of the reinvestigation procedure for all items. Please provide me with the source of information for all items. Please send me all information in my consumer file. Please send me an updated copy of my credit report. Thank you for your cooperation in advance.

Sincerely,

Teri Lynn Hinkle
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

P.S.  Please find enclosed a copy of my Drivers License and Social Security card to verify identity.

Mailed by USPS Certified Mail #70112970000056529387

PlainApp. 00051

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.45 |
| Certified Fee | | $2.95 |
| Return Receipt Fee (Endorsement Required) | | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $3.40 |

Postmark Here
JUL 13 2012
07/13/2012

Sent To *Equifax Information Services LLC*
Street, Apt. No.; or PO Box No. *PO Box 105069*
City, State, ZIP+4 *Atlanta, GA 30348*

PS Form 3800, August 2006    See Reverse for Instructions

7011 2970 0000 5652 9387

---

**U.S. Postal Service**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.45 |
| Certified Fee | | $2.95 |
| Return Receipt Fee (Endorsement Required) | | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $3.40 |

Postmark Here
JUL 13 2012
07/13/2012

Sent To *Experian*
Street, Apt. No.; or PO Box No. *P.O. Box 0701*
City, State, ZIP+4 *Allen, Texas 75013*

PS Form 3800, August 2006    See Reverse for Instructions

7011 2970 0000 5652 9394

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | $0.45 |
| Certified Fee | | $2.95 |
| Return Receipt Fee (Endorsement Required) | | $0.00 |
| Restricted Delivery Fee (Endorsement Required) | | $0.00 |
| Total Postage & Fees | $ | $3.40 |

Postmark Here
3 2012
07/13/2012

Sent To *Trans Union Consumer Solutions*
Street, Apt. No.; or PO Box No. *P.O. Box 2000*
City, State, ZIP+4 *Chester, PA 19022-2000*

PS Form 3800, August 2006    See Reverse for Instructions

7011 2970 0000 5652 9400

PlainApp. 00052

PlainApp. 00053

NASDAQ: ECPG $30.15 -(0.39)

ABOUT ENCORE   CONSUMERS   PARTNERS   CAREERS   NEWSROOM

## Corporate Profile

### NASDAQ - ECPG

| Stock Quote ($) | Change ($) | Change (%) | Volume | Market Value ($M) |
|---|---|---|---|---|
| 30.15 | | (1.28) ↓ | 157,256 | |

As of January 7, 2013. Minimum 20 minute delay.

Welcome
Q3 2012 Encore Capital Group Earnings Conference Call
Thursday, November 01, 2012
7:00 PM ET
Presenters Remarks

Encore Capital Group, Inc. ("Encore"), through its subsidiaries (collectively, the "Company"), is a leading provider of debt management and recovery solutions for consumers and property owners across a broad range of assets. We purchase portfolios of defaulted consumer receivables at deep discounts to face value and use a variety of operational channels to maximize our collections from these portfolios. We manage our receivables by partnering with individuals as they repay their obligations. More

▶ Corporate Information
Corporate Profile
Reasons to Invest
Officers & Directors

ECPG 10-K 12/31/2010

## Section 1: 10-K (FORM 10-K)

Table of Contents

UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

## FORM 10-K

(Mark One)

☒ ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2010 or

☐ TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____ .

COMMISSION FILE NUMBER: 000-26489

# ENCORE CAPITAL GROUP, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| Delaware | 48-1090909 |
| (State or other jurisdiction of incorporation or organization) | (IRS Employer Identification No.) |
| 8875 Aero Drive, Suite 200 San Diego, California | 92123 |
| (Address of principal executive offices) | (Zip code) |

(877) 445-4581
(Registrant's telephone number, including area code)

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $.01 Par Value Per Share | The NASDAQ Stock Market LLC |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☐   No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☐   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐   Accelerated filer ☒   Non-accelerated filer ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

PlainApp. 00054
MIDLAND-HINKLE-000004

Table of Contents

Investors wishing to obtain more information about us may access our internet site (www.encorecapital.com). The site provides access to relevant investor related information such as Securities and Exchange Commission ("SEC") filings, press releases, featured articles, an event calendar, and frequently asked questions. SEC filings are available on the website as soon as reasonably practicable after being filed with, or furnished to, the SEC. The content of the internet site is not incorporated by reference into this Annual Report on Form 10-K. Any materials that the Company filed with the SEC also may be read and copied at the SEC's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an Internet site that contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC (http://www.sec.gov).

## Our Competitive Advantages

*Analytic Strength.* We believe that success in our business depends on the ability to establish and maintain an information advantage. Leveraging an industry-leading distressed consumer database, our in-house team of statisticians, business analysts, and software programmers have developed, and continually enhance, proprietary behavioral and valuation models, custom software applications, and other business tools that guide our portfolio purchases. Moreover, our collection channels are informed by powerful statistical models specific to each collection activity, and each year we deploy significant capital to purchase credit bureau and customized consumer data that describe demographic, account level, and macroeconomic factors related to credit, savings, and payment behavior.

*Consumer Intelligence.* At the core of our analytic approach is a focus on understanding, measuring, and predicting distressed consumer behavior. In this effort, we apply tools and methods borrowed from statistics, psychology, economics, and management science across the full extent of our business. During portfolio valuation, we use an internally-developed and proprietary family of statistical models that determines the likelihood and expected amount of payment for each consumer within a portfolio. Subsequently, the expectations for each account are aggregated to arrive at a portfolio-level liquidation solution and a valuation for the entire portfolio is determined. During collections, we apply our "willingness-capability" framework, which allows us to match our collection approach to an individual consumer's payment behavior.

*Cost Leadership.* Cost efficiency is central to our collection and purchasing strategies. We experience considerable cost advantages, stemming from our operations in India, our enterprise-wide, activity-level cost database, and the development and implementation of operational models that enhance profitability. We believe that we are the only company in our industry with a successful, late-stage collection platform in India. This cost-saving, first-mover advantage helps to reduce our call center variable cost-to-collect.

*Principled Intent.* We strive to treat consumers with respect, compassion and integrity. From discounts and payment plans to hardship solutions, we partner with our consumers as they attempt to return to financial health. We are committed to dialogue that is honorable and constructive, and hope to play an important and positive role in our consumers' lives.

## Our Strategy

We have implemented a business strategy that emphasizes the following elements:

*Extend our knowledge about distressed consumers.* We believe our investments in data, analytic tools, and expertise related to both the general and distressed consumer provide us with a competitive advantage. In addition to rigorous data collection practices that take advantage of our unique relationship with distressed consumers, our consumer intelligence program focuses on segmentation, marketing communications, and original research conducted in partnership with experts from both industry and academia. We believe this work will continue to bolster our operational success while fueling our efforts to understand the actions and motivations of our consumer base.

2

PlainApp. 00055

MIDLAND-HINKLE-000008

Case 3:13-cv-00033-DHB-BKE   Document 97-2   Filed 09/08/14   Page 58 of 87
Case 6:14-cv-00081-GKS-KRS   Document 29   Filed 08/22/14   Page 1 of 5 PageID 188
Case: 15-10388   Date Filed: 07/20/2015   Page: 92 of 251

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

BRIAN FARRELL,

        Plaintiff,

v.                                                      Case No:   6:14-cv-81-Orl-18KRS

FREDERICK J. HANNA &
ASSOCIATES,

        Defendant.

_____

# ORDER

THIS CAUSE comes for consideration on Defendant Frederick J. Hanna & Associates' ("Hanna") Motion for Partial Judgment on the Pleadings (Doc. 25), to which Plaintiff Brian Farrell responded (Doc. 27) and Hanna replied (Doc. 28).   For the reasons that follow, Hanna's motion will be denied.

## I. BACKGROUND

Within two years of commencing this action, Farrell requested his consumer credit report from three major credit reporting agencies, including Equifax and TransUnion.   (Doc. 1 ¶ 9-13.) Upon review of his Equifax consumer credit report, Farrell observed that Hanna obtained Farrell's consumer credit report from Equifax in January 2010.   (*Id.* ¶ 10.)   Farrell also reviewed his TransUnion consumer credit report and observed that Hanna obtained Farrell's consumer credit report from TransUnion in April 2011 and August 2011.   (*Id.* ¶¶ 11-12.)   Farrell never gave Hanna permission to access his consumer credit information from Equifax, TransUnion, or any other credit reporting agency.   (*Id.* ¶¶ 13, 31, 42, 53.)

On or about November 25, 2013, Farrell received a "dunning" letter from Hanna requesting

PlainApp. 00056

payment for a $12,048.90 debt (the "Debt") that Farrell allegedly incurred with FIA CARD

SERVICES, N.A. ("FIA"). (*Id.* ¶ 14.) Hanna included two (2) separate account numbers in the

"dunning" letter and asked Farrell to contact Hanna's office to arrange payment for the Debt. (*Id.*

¶¶ 15, 16.) On or about November 26, 2013, Farrell sent a written request to Hanna requesting

validation of the Debt. (*Id.* ¶ 18.) In Hanna's reply letter to Farrell's Debt validation request,

Hanna stated that Farrell owed a debt to FIA in the amount of $12,048.90. (*Id.* ¶ 19.) Hanna also

attached a court order dated October 12, 2010 to the reply letter. (Doc. 1-1 at 12; Doc. 1 ¶ 19.) As

set forth in the court order, the Eighteenth Judicial Circuit in and for Seminole County, Florida,

entered a default final judgment against Farrell and ordered him to pay $11,906.55 to FIA. (Doc.

1-1 at 12; Doc. 1 ¶ 19.) The aforementioned order includes the statement that the judgment is for

"a total of $11,906.55, for all of which let execution issue. Plaintiff waives future statutory

interest." (Doc. 1-1 at 12; Doc. 1 ¶ 20.)

Farrell avers that Hanna violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681

*et. seq.*, the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et. seq.*, and the Florida

Consumer Collections Practices Act ("FCCPA"), sections 559.55-785, Florida Statutes. In Counts

I, II, and III of the Complaint, Farrell asserts that Hanna violated the FCRA by impermissibly

obtaining Farrell's consumer credit reports. (Doc. 1 ¶¶ 23-55.) Hanna now seeks judgment on the

pleadings in its favor on Farrell's FCRA claims set forth in Counts I, II, and III. (Doc. 25 at 5.)

As grounds therefore, Hanna avers that it had a permissible purpose to obtain Farrell's consumer

credit reports because Hanna was acting as a debt collector on behalf of FIA, and "debt collection is

a permissible purpose for obtaining a consumer's credit report." (*Id.* at 1.)

## II. LEGAL STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure provides that a party may move for judgment on the pleadings, "[a]fter the pleadings are closed—but early enough not to delay trial[.]" Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Andrx Pharms., Inc. v. Elan Corp., PLC*, 421 F.3d 1227, 1232-33 (11th Cir. 2005); *St. Paul Fire & Marine Ins. Co. v. Jablonski*, No. 2:08-cv-386-FtM-29SPC, 2008 WL 1990471, at *1 (M.D. Fla. May 5, 2008). In deciding a Rule 12(c) motion, the court considers the facts alleged in the complaint as true and draws all inferences in favor of the non-movant. *Bankers Ins. Co. v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 137 F.3d 1293, 1295 (11th Cir. 1998); *Szabo v. Fed. Ins. Co.*, No. 8:10-cv-02167-T-33MAP, 2011 WL 3875421, at *2 (M.D. Fla. Aug. 31, 2011). Additionally, "attachments to the pleadings may properly be considered on a motion for judgment on the pleadings if the attachments are central to the plaintiff's claim, and are undisputed in that their authenticity is not challenged." *Nails v. Swisher Int'l, Inc.*, No. 3:12-cv-1147-J-99MMD-PDB, 2013 WL 6768229, at *1 (M.D. Fla. Dec. 19, 2013).[1] A court should dismiss a complaint pursuant to Rule 12(c), "[i]f it is clear that the plaintiff

---

[1] Pursuant to Rule 12(d) of the Federal Rules of Civil Procedure, when matters outside of the pleading are presented to the court on a motion for judgment on the pleadings and not excluded by the court, the motion must be treated as a motion for summary judgment. *See* Fed. R. Civ. P. 12(d). However, a court has broad discretion when deciding whether to treat a motion for judgment on the pleadings as a motion for summary judgment. *Maldonado v. Mattress Firm, Inc.*, No. 8:13-cv-292-T-33AEP, 2013 WL 2407086, at *2 (M.D. Fla. June 3, 2013). A motion for judgment on the pleadings "'should only be treated as one for summary judgment if the record is fully developed and the non-moving party was given adequate notice of the court's decision.'" *Id.* (quoting *Jozwiak v. Stryker Corp.*, No. 6:09-cv-1985-Orl-19GJK, 2010 WL 743834, at *4 (M.D. Fla. Feb. 26, 2010)). At this early stage in the litigation, the Court declines to convert Hanna's motion into a motion for summary judgment. However, the Court will consider the documents attached to the Complaint, collectively labelled as Doc. 1-1, as they are undisputed and central to Farrell's claims. (*See* Doc. 1 ¶¶ 10-12, 16, 18-19; *see also* Doc. 28 at 5-6.)

would not be entitled to relief under any set of facts that could be proved consistent with the allegations" in the Complaint. *Szabo*, 2011 WL 3875421, at *2.

### III. ANALYSIS

Farrell states that Hanna willfully violated the FCRA by accessing Farrell's consumer credit information without his consent and without a permissible purpose under § 1681b. (Doc. 1 ¶¶ 32, 43, 54.) Farrell states that he has never had any previous business dealings with Hanna and that Hanna has not provided him with a justification for obtaining his consumer credit reports from Equifax and Transunion. (*Id.* ¶¶ 29, 33, 40, 44, 51, 55). Farrell argues that, "Hanna has not provided any verified evidence, in any form . . . showing Hanna was 'retained', 'referred', or 'assigned' a debt to collect regarding [Farrell]." (Doc. 27 ¶ 13). Hanna avers that the debt collection letters and the court judgment attached to and referenced in the Complaint, show that Hanna accessed Farrell's consumer credit reports for the permissible purpose of debt collection. (Doc. 28 at 5-6.)

The FCRA provides that a consumer credit report is furnished and used for a permissible purpose where the party requesting the report "intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer . . . ." 15 U.S.C. § 1681b(a)(3)(A). Under the FCRA, a debt collector is permitted to access a consumer's credit report for the purpose of reviewing a creditor's account with the consumer and collecting the debt. *See Flores v. I.C. Sys., Inc.*, No. 13-21352-CIV, 2014 WL 1379046, at *3 (S.D. Fla. Apr. 8, 2014); *Pinson v. United Recovery Sys., LP*, No. 12-80792-Civ, 2013 WL 3717739, at *2 (S.D. Fla. July 15, 2013). A plaintiff alleging a willful misuse or acquisition of a consumer credit report in violation of the FCRA must show that the defendant accessed or used

Case: 15-10398   Date Filed: 07/29/2015   Page: 96 of 251

the consumer credit report without a permissible purpose specified by the statute and without a reasonable belief that a permissible purpose existed.  *See United Recovery Sys.*, 2013 WL 3717739, at *3; *Pinson v. Monarch Recovery Mgmt., Inc.*, No. 12-80480-CIV, 2013 WL 961308, at *3 (S.D. Fla. Mar. 12, 2013).

Judgment on the pleadings as to Farrell's FCRA claims is inappropriate based solely on Hanna's conclusory allegations and self-serving statements that it obtained Farrell's consumer credit reports for the purpose of collecting a debt that Farrell owed FIA.  Upon review of the pleadings and attachments[2] to the Complaint, the Court finds that an issue of material fact lies in whether Hanna was retained, or even had the reasonable belief that it was retained or hired, to act as a debt collector on behalf of FIA or any other creditor to whom Farrell owes or owed a debt. Accordingly, Hanna's motion will be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant Frederick J. Hanna & Associates' Motion for Partial Judgment on the Pleadings (Doc. 25) is **DENIED.**

**DONE and ORDERED** in Orlando, Florida on this ___22___ day of August, 2014.

G. KENDALL SHARP
SENIOR UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

---

[2] *See* Doc. 1-1.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### DUBLIN DIVISION

### Case No 3:13-CV-00033

**Teri Lynn Hinkle**
*Plaintiff,*

**vs**

**MIDLAND CREDIT**
**MANAGEMENT INC.**
**MIDLAND FUNDING LLC.**
**ENCORE CAPITAL GROUP INC.,**
*Defendants.*

## DEFENDANT MIDLAND CREDIT MANAGEMENT INC.'S AMENDED RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Midland Credit Management, Inc. ("MCM"), by its undersigned counsel, serves its amended responses and objections to Plaintiff's First Set of Interrogatories ("Interrogatories") as follows:

### GENERAL OBJECTIONS

A.     MCM objects to Plaintiff's Interrogatories, including the definitions and instructions therein, to the extent they purport to create duties that are not imposed by the Federal Rules of Civil Procedure or by the Local Rules of this Court.

B.     MCM has not concluded its investigation of facts relating to this case or completed formal discovery or preparation for trial. For that reason, there may exist information responsive to the Interrogatories of which MCM does not yet have knowledge or has not yet located, identified, or reviewed. All of the following responses are, therefore, based only on such information and documents that are presently known or available to MCM.

C.     MCM reserves the right to produce evidence of any subsequently discovered fact

PlainApp. 00061

Please provide the following information for each person known to MCM who has knowledge of the facts relevant to this case, including but not limited to all persons interviewed by you, by your counsel or by any person cooperating with you in this action, giving a brief description thereof, for each person you may call as a witness in this case. Include, name, address, telephone number, City of residence; place of employment, business address, phone numbers; relation to MCM; and the subject and substance of the testimony the witness will give and whether or not the witness is to be tendered as an expert witness.

## RESPONSE TO INTERROGATORY NO. 3:

MCM objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing general and specific objections, MCM identifies the following: John Moreno, Process Analyst, Midland Credit Management, Inc. Mr. Moreno may be contacted through counsel for MCM.

MCM has not identified any individual that it intends to call as an expert witness, but will do so in accordance with the applicable scheduling order entered in this case.

## INTERROGATORY NO. 4:

Describe MCM's procedure and policy with respect to the maintenance, preservation, and destruction of documents, stating in your Answer whether any documents or things relating to any information Requested in these interrogatories, or related in any way to this lawsuit, have ever been destroyed or are no longer in your custody. For each such document, please identify the document, how, when and why each document was destroyed or otherwise left your control, the identity of any person who participated in any way in the destruction and/or action for destroying the document or to transfer it out of your control or custody; and if the document still exists, identify the person now having control or custody of the document.

## RESPONSE TO INTERROGATORY NO. 4:

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, not limited in scope, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to the extent that the Interrogatory seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. MCM's "procedure and policy with respect

to the maintenance, preservation, and destruction of documents" is not relevant to any claim or defense asserted in this lawsuit.

## INTERROGATORY NO. 5:

MCM or Attorney: Please Identify each person who has had any contact or communication on your behalf or with you regarding Plaintiff, state where, how, when and with whom said contact or communication occurred and in detail and with particularity the substance thereof.

## RESPONSE TO INTERROGATORY NO. 5:

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing general and specific objections, MCM states that it sent the following communications to Plaintiff. MCM further states that these letters were system generated and no individual person transmitted these letters to Plaintiff.

(1)     December 21, 2011: validation letter regarding T-Mobile account.

(2)     February 5, 2012: request to provide proof letter regarding T-Mobile account.

(3)     April 5, 2012: debt settlement offer/discount letter regarding T-Mobile account.

(4)     June 15, 2012: debt settlement offer/discount letter regarding T-Mobile account.

(5)     July 21, 2012: request to provide proof letter regarding T-Mobile account.

(6)     July 27, 2012: debt settlement offer/discount letter regarding T-Mobile account.

(7)     April 30, 2013: letter requesting proof regarding T-Mobile account.

## INTERROGATORY NO. 6:

Please Identify and describe each exhibit you will use in the trial.

## RESPONSE TO INTERROGATORY NO. 6:

MCM objects to this Interrogatory on the basis that it is premature and subject to the

(14) Fourteenth Defense:  MCM did not violate the FDCPA, FCRA, or any other laws.

(15) Fifteenth Defense:  Plaintiff has withdrawn her TCPA claims.

(16) Sixteenth Defense:  MCM did not willfully violate the FCRA.

(17) Seventeenth Defense:  MCM did not willfully violate the FCRA.

(18) Eighteenth Defense:  MCM did not willfully violate the FCRA.

## INTERROGATORY NO. 8:

Please identify and provide the following information for each person or persons who accessed Plaintiff's credit file on behalf of the Defendant to include; his/her full name, home address, phone number and city of residence; position and/or title within the MCM organization; work address, telephone numbers, employee identifier and dates of employment with MCM.

## RESPONSE TO INTERROGATORY NO. 8:

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving the foregoing general and specific objections, MCM states that it accessed Plaintiff's credit file, however, it is unable to identify the specific individuals who accessed this information.

## INTERROGATORY NO. 9:

Please Identify and provide the following information for each person or persons who reported trade line information on Plaintiff's credit file on behalf of Defendant to include; his/her full name, home address, phone number and city of residence; position and/or title within the MCM organization; work address, telephone numbers, employee identifier and dates of employment with MCM.

## RESPONSE TO INTERROGATORY NO. 9:

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence.  Further, MCM objects to

this Interrogatory to the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that it reported tradeline information on Plaintiff's credit file, however, it is unable to identify the specific individuals who reported this information.

**INTERROGATORY NO. 10:**

Please provide the following information for each person with any involvement in any manner in any efforts on your behalf to collect or attempt to collect any debt(s) purportedly owing by Plaintiff, to include; his/her full name, home address, phone number and city of residence; position and/or title within the MCM organization; work address, telephone numbers, employee identifier and dates of employment with MCM.

**RESPONSE TO INTERROGATORY NO. 10:**

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving the foregoing general and specific objections, MCM states that it will identify individuals who assisted in the efforts to collect unpaid debts from Plaintiff upon entry of a protective order to restrict dissemination of confidential information.

**INTERROGATORY NO. 11:**

If you answered any of the Plaintiff's Requests for Admission with anything other than an unqualified admission, list every individual reason why you did so, describe each factual position and identify all documents which support your answer.

**RESPONSE TO INTERROGATORY NO. 11:**

MCM objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to this Interrogatory to the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. MCM also objects on the basis that this Interrogatory calls for a legal conclusion.

contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that Midland Funding purchased a GE Money Bank/Meijer unpaid debt belonging to Plaintiff from AIS Services LLC on September 24, 2008. Midland Funding purchased a T-Mobile unpaid debt belonging to Plaintiff from Debt Recovery Solutions LLC on December 6, 2011. MCM had serviced Plaintiff's unpaid debt on behalf of Midland Funding.

## INTERROGATORY NO. 14:

Identify the persons who set up and maintained the original accounting of the alleged debts you have reported and/or are continuing to report to the Plaintiff's consumer report and supply the following:

      a.    During what years were they employed with the original creditor and in what capacity

      b.    What specific training did they receive in relation to their position and the daily performance of their employment?

## RESPONSE TO INTERROGATORY NO. 14:

MCM objects to this Interrogatory on the basis that it is vague and ambiguous, overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to this Interrogatory to the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that it obtained the information from the sellers of the unpaid accounts. MCM further states that it is not in possession of further information responsive to this Interrogatory.

## INTERROGATORY NO. 15:

From where did the information you relied upon in your re-investigation process after Plaintiff disputed the alleged account(s), come from?

## RESPONSE TO INTERROGATORY NO. 15:

MCM objects to this Interrogatory on the basis that it is overbroad, unduly burdensome,

PlainApp. 00066          11

and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to this Interrogatory to the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that it obtained the information from the sellers of the unpaid accounts.

**INTERROGATORY NO. 16:**

Identify the person who created the information you relied upon in your re-investigation process after Plaintiff disputed the alleged account(s).

**RESPONSE TO INTERROGATORY NO. 16:**

MCM objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to this Interrogatory to the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that it is not in possession of information responsive to this Interrogatory.

**INTERROGATORY NO. 17:**

If the information you relied upon in your re-investigation was digital or computer generated records;

  a.  Where did it originate from and where is the main data base maintained;

  b.  who created the digital information; and

  c.  what data storage system is being used?

**RESPONSE TO INTERROGATORY NO. 17:**

MCM objects to this Interrogatory on the basis that it is overbroad, unduly burdensome, and seeks information that is neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence. Further, MCM objects to this Interrogatory to

the extent it seeks information that is confidential, proprietary, privileged, and/or contains trade secrets. Subject to and without waiving the foregoing general and specific objections, MCM states that it obtained the information from the sellers of the unpaid accounts. MCM further states that it is not in possession of further information responsive to this Interrogatory.

Date:   January 7, 2014.

KING & SPALDING LLP

Tully T. Blalock
Georgia Bar No. 476098

1180 Peachtree Street, N.E.
Atlanta, Georgia 30309
Telephone: (404) 572-4600
Fax: (404) 572-5100
Email: TBlalock@kslaw.com

**Attorneys for Encore Capital Group, Inc., Midland Funding LLC, and Midland Credit Management, Inc.**

## VERIFICATION

### IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF GEORGIA
### DUBLIN DIVISION

#### Case # 13:13-CV-00033

#### TERI LYNN HINKLE v. MIDLAND CREDIT MANAGEMENT, INC.

I, John Moreno, depose and state that I am authorized to make this verification on behalf of MIDLAND CREDIT MANAGEMENT, INC. I have read the foregoing Defendant Midland Credit Management Inc.'s Responses to Plaintiff's First Set of Interrogatories and know the contents thereof. To the extent that I have personal knowledge of the factual information contained therein, the same are true and correct. Insofar as said facts are based on a composite of information from computerized records, I do not have personal knowledge concerning all of the information contained in said responses, but I am informed and believe that the information set forth therein for which I lack personal knowledge is true and correct.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct. Executed this 7th day of January 2014.

_signature_

John Moreno
Authorized Representative
Midland Credit Management, Inc.

Subscribed and sworn to before me on this 7th day of January, 2014, by John Moreno, proved to me on the basis of satisfactory evidence to be the person who appeared before me.

_signature_

Notary Public

GUIBEL ICKE
COMM. # 1893959
NOTARY PUBLIC - CALIFORNIA
SAN DIEGO COUNTY
COMM. EXPIRES OCT. 14, 2016

PlainApp. 00005

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERI LYNN HINKLE,                    )
                                     )
        PLAINTIFF,                   )
                                     )
V.                                   )
                                     )        CIVIL ACTION NO.
MIDLAND CREDIT                       )        3:13-cv-00033-DHB-BKE
MANAGEMENT, INC. MIDLAND             )
FUNDING, LLC, and ENCORE             )
CAPITAL GROUP, INC.,                 )
                                     )
        DEFENDANTS.                  )

## DEFENDANT MIDLAND CREDIT MANAGEMENT, INC'S FIRST RESPONSE TO PLAINTIFF'S SECOND REQUEST FOR PRODUCTION

Defendant Midland Credit Management, Inc. ("MCM"), by and through its

attorneys of record, hereby responds to Plaintiff's Second Request for Production

to Defendant Midland Credit Management Inc.

## I.    SPECIFIC RESPONSES AND OBJECTIONS TO REQUEST FOR PRODUCTION OF DOCUMENTS

### REQUEST 1:

Produce the "quality analysis" Midland Funding LLC conducted as

referenced in paragraph 2.3.2 of page 4 of the Account Purchase Agreement

**PlainApp. 00070**

196985.2

**RESPONSE:**

MCM objects to Request No. 2 because it is vague and reflects a misunderstanding of the Account Purchase Agreement. Specifically, Account Purchase Agreement § 3.2.2 does not include any reference to an "independent review." To the extent this request is intended to refer to Midland Funding, LLC's "own review" of purchased accounts, Defendant further objects to this request because Plaintiff misconstrues the meaning of § 3.2.2 of the Account Purchase Agreement dated December 6, 2011. This section contains an acknowledgement that the buyer and seller are sophisticated entities capable of making their own determination regarding risks involved in the purchase of accounts contemplated in the agreement. Subject to and without waiving the foregoing objection, no responsive documents exist.

**REQUEST 3:**

Produce independent investigation, verification or validation done in relation to the alleged accounts purchased from Debt Recovery Solutions on December 6, 2011 and AIS Services LLC on September 24, 2008.

**RESPONSE:**

Midland Funding directs Plaintiff to the previously-produced documents bates labeled *MIDLAND-HINKLE*-00001-00002; 000025; 0000031-00000055;

**PlainApp. 00071**

000078; 000105; 000107-0000203.     Responding further with regard to account acquired through the 2008 Account Purchase Agreement, in response to the consumer's dispute letter dated April 5, 2013, and received by Defendants on April 10, 2013, the account was marked paid in full beginning on January 13, 2009 (*see* Midland-Hinkle 000048, 118-120).   No investigation was required due to the dispute being outside the validation period and after payment in full was obtained over four years earlier (*see* Midland-Hinkle000044).

Regarding the account acquired from AIS Services LLC on September 24, 2008, in response to the consumer's verbal dispute of identity theft on December 28, 2011, a letter was sent on February 5, 2012, to Plaintiff requesting verification of the alleged identity theft (*see* Midland-Hinkle 000109).   Plaintiff failed to provide such proof of identity theft, including a police report or Affidavit of identity theft. The account was properly marked as disputed on February 19, 2012, the first date for reporting of this account (*see* Midland-Hinkle 000037).

## REQUEST 4:

Produce the "Chain of Title" described as a "copy of each predecessor bill of sale associated with related Purchased Accounts" provided to Midland Funding LLC on December 6, 2011 by Debt Recovery Solutions which in any way relates to any alleged account purported to belong to the Plaintiff in this case. (paragraph

**PlainApp. 00072**

4.5 of Account Purchase Agreement between Midland Funding LLC and Debt Recovery Solutions.

**RESPONSE:**

MCM directs Plaintiff to the previously-produced documents bates labeled MIDLAND-HINKLE-000025; 0000031-0000043; 000055; 000078; 000105; 000107-000117; 0000125-0000147; 0000182-0000203.

**REQUEST 5:**

Produce the "quality analysis" Midland Funding LLC conducted as is referenced in paragraph 6.1 on page 5 of the Account Purchase Agreement between Midland Funding LLC and AIS Services LLC dated September 24, 2008.

**RESPONSE:**

MCM objects to Request No. 5 because it is vague. Specifically, § 6.1 of the 2008 Agreement does not contain any reference to a "quality analysis." To the extent this request refers to Midland Funding's independent evaluation of the merits and risks of the transaction contemplated by the agreement, Defendants further objects because Plaintiff misconstrues the meaning of § 6.1. This section contains an acknowledgement that the parties are sophisticated entities capable of making their own independent determination regarding the risks of the

**PlainApp. 00073**

contemplated transaction. Subject to and without waiving the foregoing objection, no responsive documents exist.

## REQUEST 6:

Produce all documentation relating to Midland Funding LLC's independent review referenced at the top of page 7 of the Account Purchase Agreement between Midland Funding LLC and AIS Services LLC dated September 24, 2008 in regard to ANY account alleged to belong to the Plaintiff in this case.

## RESPONSE:

Defendants object to this request because it is vague. Specifically, the top of page 7 of the Account Purchase Agreement dated September 24, 2008 does not contain a reference to an "independent review." Defendants refer Plaintiff to the response to Request No. 2 above regarding Plaintiff's misunderstanding of the nature of the "independent review." No responsive documents exist.

Respectfully submitted this 20th day of June, 2014.

Matthew B. Ames
Georgia Bar No. 015898
Joshua Moore ( *pro hac vice*)
Georgia Bar No. 520040
**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

PlainApp. 00074

196985.2                                                    6

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

TERI LYNN HINKLE,                          )
                                           )
        PLAINTIFF,                         )
                                           )
V.                                         )
                                           )      CIVIL ACTION NO.
MIDLAND CREDIT                             )      3:13-cv-00033-DHB-BKE
MANAGEMENT, INC. MIDLAND                   )
FUNDING, LLC, and ENCORE                   )
CAPITAL GROUP, INC.,                       )
                                           )
        DEFENDANTS.                        )

DEFENDANT MIDLAND CREDIT MANAGEMENT, INC'S FIRST
RESPONSE TO PLAINTIFF'S THIRD REQUEST FOR PRODUCTION

Defendant Midland Credit Management, Inc. ("Midland Credit"), by and

through its attorneys of record, hereby responds to Plaintiff's Third Request for

Production to Defendant Midland Credit Management Inc.

I.      SPECIFIC RESPONSES AND OBJECTIONS TO REQUEST FOR
                PRODUCTION OF DOCUMENTS

REQUEST 1:

(Pg. 2, ¶ 1)

        1. Definitions.

        As used herein, the following terms have the following respective meanings:

PlainApp. 00075

"Account Documents" means any application, billing statement, agreement, note or other evidence of indebtedness, which is reasonably necessary to establish the validity of the Accounts, which are the subject of this Agreement. The existence of Account Documents shall not be deemed to imply that the debt evidenced by the Account Documents is enforceable.

Produce originals or copies of any applications, agreements, billing statements, promissory notes or other evidences of indebtedness, notices, correspondence, payment checks, evidences of title and any other documentation related to the Purchased Account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

MCM directs Plaintiff to previously-produced Affidavit of Patrick Minford, and documents bates labeled MIDLAND-HINKLE-000001-00002; 000044-000054; 000118-0000124; 0000148-0000181 regarding the 2008 Account Purchase Agreement. In response to the consumer's dispute letter dated April 5, 2013, and received by Defendants on April 10, 2013, the account was marked paid in full beginning on January 13, 2009 (*see* Midland-Hinkle 000048, 118-120). No investigation was required due to the dispute being outside the validation period and after payment in full was obtained over four years earlier (*see* Midland-Hinkle000044).

**PlainApp. 00076**

**REQUEST 2:**

(Pg. 4, ¶ 3)

### 3. Account Documents.

After the applicable Closing Date, Seller agrees to deliver to Buyer at no charge, copies of all available Account Documents in possession of Seller. Seller shall also, upon receipt of a written request from Buyer, request from the originator of the applicable Account and, to the extent that such documents are reasonably available and provided to Seller, Seller shall provide Buyer with copies of all other Account Documents obtained from the originator.

REDACTED

Produce documents provided to MCM pursuant to this section of the Purchasing Agreement.

**RESPONSE:**

MCM directs Plaintiff to previously-produced Affidavit of Patrick Minford, and documents bates labeled MIDLAND-HINKLE-000001-00002; 000044-000054; 000118-0000124; 0000148-0000181 regarding the 2008 Account Purchase Agreement. In response to the consumer's dispute letter dated April 5, 2013, and received by Defendants on April 10, 2013, the account was marked paid in full beginning on January 13, 2009 (*see* Midland-Hinkle 000048, 118-120). No investigation was required due to the dispute being outside the validation period and after payment in full was obtained over four years earlier (*see* Midland-Hinkle000044).

PlainApp: 00077

**REQUEST 3:**

(Pg. 4, ¶ 3) Produce a copy of the written request sent to the Seller requesting further documentation and original Account Documents subsequent to Plaintiffs dispute with the CRA's in regard to the Purchased account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

MCM directs Plaintiff to previously-produced Affidavit of Patrick Minford, and documents bates labeled MIDLAND-HINKLE-000001-00002; 000044-000054; 000118-0000124; 0000148-0000181 regarding the 2008 Account Purchase Agreement. In response to the consumer's dispute letter dated April 5, 2013, and received by Defendants on April 10, 2013, the account was marked paid in full beginning on January 13, 2009 (*see* Midland-Hinkle 000048, 118-120). No investigation was required due to the dispute being outside the validation period and after payment in full was obtained over four years earlier (*see* Midland-Hinkle000044).

**REQUEST 4:**

(Pg. 4, ¶ 4.2)

4.2. Customer Inquiry. Buyer agrees that after the Closing Date it will handle all Customer inquiries and not refer the Customer to Seller. In the event Buyer requires information from Seller in order to respond to the inquiry, Buyer may request such information pursuant to section 3 of this Agreement.

PlaintApp. 00078

Produce documents containing information provided to MCM pursuant to this section of the Purchasing Agreement in regard to the Purchased Account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

MCM directs Plaintiff to previously-produced Affidavit of Patrick Minford, and documents bates labeled MIDLAND-HINKLE-000001-00002; 000044-000054; 000118-0000124; 0000148-0000181 regarding the 2008 Account Purchase Agreement. In response to the consumer's dispute letter dated April 5, 2013, and received by Defendants on April 10, 2013, the account was marked paid in full beginning on January 13, 2009 (*see* Midland-Hinkle 000048, 118-120). No investigation was required due to the dispute being outside the validation period and after payment in full was obtained over four years earlier (*see* Midland-Hinkle000044).

**REQUEST 5:**

(Pg. 1, ¶ 1.2)

1.2 "Account Documents" means, with respect to each Purchased Account, but only to the extent they exist and are reasonably available to Seller, originals or copies of any applications, agreements, billing statements, promissory notices or other evidences of Indebtedness, notices, correspondence, payment checks, evidences of title and any other documentation related to the Purchased Accounts.

**PlainApp. 00079**

Produce originals or copies of any applications, agreements, billing statements, promissory notes or other evidences of indebtedness, notices, correspondence, payment checks, evidences of title and any other documentation related to the Purchased Account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

MCM directs Plaintiff to the previously-produced Affidavit of Patrick Minford, and documents bates labeled MIDLAND-HINKLE-000025; 0000031-0000043; 000055; 000078; 000105; 000107-000117; 0000125-0000147; 0000182-0000203.

**REQUEST 6:**

(Pg. 8, ¶ 4.4)

4.4  Account Documents. On the Closing Date, Seller shall deliver to Purchaser copies of any Account Documents or billing data where applicable, in the possession of or otherwise reasonably available to Seller, the Original Creditors, or any of their respective representatives or agents.  All Account Documents shall be delivered to Purchaser by means of

REDACTED

Produce copies of all documents delivered to Midland Funding LLC, then given to MCM on the closing date of the sale related to the Purchased Account Midland alleges belongs to the Plaintiff.

**PlainApp. 00080**

**RESPONSE:**

MCM directs Plaintiff to the previously-produced documents bates labeled MIDLAND-HINKLE-000025;   0000031-0000043;   000055;   000078;   000105; 000107-000117; 0000125-0000147; 0000182-0000203.

**REQUEST 7:**

(Pg. 8, ¶ 4.6)

4.6 <u>Terms and Conditions</u>. Upon Purchaser's written request, Seller will use its best efforts to provide Purchaser with a representative copy of the Terms and Conditions historically associated with any of the Purchased Accounts.

Produce MCM's written request to the Seller for the "Terms and Conditions" historically associated with the Purchased Account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

Defendants direct Plaintiff to enclosed documents bates labeled Midland-Hinkle 000204-000218, which are the terms and conditions that were in effect prior to the account charge off date of 12/29/07, and retrieved from the T-Mobile website by Defendants.

**REQUEST 8:**

(Pg. 9, ¶ 4.8)

4.8 <u>Account Inquiries</u>. Seller shall make all reasonable efforts and take all reasonable actions at Seller's sole cost and expense to investigate inquiries from

PlainApp. 00081

and/or issues raised by Purchaser with regard to any Purchased Account ("Purchase Inquiry"). Each Purchaser Inquiry shall be submitted to Seller on a form to be mutually agreed upon by Seller and Purchaser. Seller shall use best efforts to respond to all Purchaser Inquiries in a reasonable and timely fashion.

Produce the Form MCM submitted to the Seller connected with MCM's "investigation" process subsequent to Plaintiff's dispute of the Account MCM alleges belongs to the Plaintiff.

**RESPONSE:**

In response to the consumer's verbal dispute of identity theft on December 28, 2011, a letter was sent on February 5, 2012, to Plaintiff requesting verification of the alleged identity theft (*see* Midland-Hinkle 000109). Plaintiff failed to provide such proof of identity theft, including a police report or Affidavit of identity theft. The account was properly marked as disputed on February 19, 2012, the first date for reporting of this account (*see* Midland-Hinkle 000037).

Respectfully submitted this 20th day of June, 2014.

_____
Matthew B. Ames
Georgia Bar No. 015898
Joshua Moore ( *pro hac vice*)
Georgia Bar No. 520040

**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

PlainApp. 00082

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| TERI LYNN HINKLE, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO. |
| | ) | 3:13-cv-00033-DHB-BKE |
| MIDLAND CREDIT | ) | |
| MANAGEMENT, INC. MIDLAND | ) | |
| FUNDING, LLC, and ENCORE | ) | |
| CAPITAL GROUP, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANT MIDLAND CREDIT MANAGEMENT, INC'S AMENDED FIRST RESPONSE TO PLAINTIFF'S THIRD REQUEST FOR PRODUCTION

Defendant Midland Credit Management, Inc. ("Midland Credit"), by and through its attorneys of record, hereby responds to Plaintiff's Third Request for Production to Defendant Midland Credit Management Inc. Midland Credit amends its response to Plaintiff's Third Request for Production No. 7. All other responses to Plaintiff's Third Request for Production submitted by Midland Credit remain unchanged.

PlainApp. 00083

I.    **SPECIFIC AMENDED RESPONSES AND OBJECTIONS TO REQUEST FOR PRODUCTION OF DOCUMENTS**

**REQUEST 7:**

(Pg. 8, ¶ 4.6)

4.6 Terms and Conditions. Upon Purchaser's written request, Seller will use its best efforts to provide Purchaser with a representative copy of the Terms and Conditions historically associated with any of the Purchased Accounts.

Produce MCM's written request to the Seller for the "Terms and Conditions" historically associated with the Purchased Account MCM alleges belongs to the Plaintiff.

**AMENDED RESPONSE:**

Pursuant to the Court's Order dated July 31, 2014, Midland Credit states it has no documents that are responsive to this Request No. 7. A defendant cannot be compelled to produce records that do not exist. *See Purdee v. Pilot Travel Ctrs., LLC*, 2009 U.S. Dist. LEXIS 13093 (S.D. Ga. Feb. 19, 2009).

PlainApp. 00084                    2

PlainApp. 00085                    3

Respectfully submitted this 5th day of August, 2014.

/s/ Matthew B. Ames
Matthew B. Ames
Georgia Bar No. 015898
Joshua Moore ( *pro hac vice*)
Georgia Bar No. 520040

**BALCH & BINGHAM LLP**
30 Ivan Allen Jr. Blvd. N.W., Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656

Plaintiff's Appendix Document No (97-2)

Exhibits 88- 124 under seal until further order from the Court

Plaintiff's Appendix Document No - 99

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| TERI LYNN HINKLE, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | |
| | ) | CIVIL ACTION NO. |
| MIDLAND CREDIT | ) | 3:13-cv-00033-DHB-BKE |
| MANAGEMENT, INC. , MIDLAND | ) | |
| FUNDING, LLC,  and ENCORE | ) | |
| CAPITAL GROUP, INC., | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO FILE UNDER SEAL

Pursuant to L.R. 79.7(d) and the Court's September 3, 2014 Order, Defendants Midland Credit Management, Inc. and Midland Funding, LLC (collectively, "Midland") submit this supplemental brief in support of Midland's Motion to File Under Seal.   Although Plaintiff does not quote them in her Response to Midland's Motion for Summary Judgment ("Response"), she attaches as exhibits two documents labeled "trade secret" and produced by Midland in

connection with the Confidentiality Agreement and Consent Protective Order[1]: (1) the Assignment of Accounts between Midland and AIS Services, LLC dated September 24, 2008 [bates labeled PlainApp. 00086-PlainApp. 00102]; and (2) the Account Purchase Agreement between Midland and Debt Recovery Solutions, LLC dated December 6, 2011 [bates labeled PlainApp. 00103-PlainApp. 00124] (collectively, the "Account Purchase Agreements").

Midland's Motion to File Under Seal originally requested that Plaintiff's Response and all exhibits be filed under seal.  But because Plaintiff did not quote or otherwise incorporate the confidential terms of the Account Purchase Agreements in her Response, Midland requests only that the Account Purchase Agreements—but not the Response itself—be sealed for a period of one year from the conclusion of this litigation, and any subsequent appeal.

Local Rule 79.7 requires a party seeking to have any matter placed under seal to "rebut the presumption of the openness derived from the First Amendment by showing that closure is essential to preserve some higher interest and is narrowly tailored to serve that interest." The test for whether a judicial record can

---

[1] The parties entered into a Confidentiality Agreement and Consent Protective Order [Doc. 80, ¶ 10] as a precondition to Midland's production of the Account Purchase Agreements.

2

be withheld from the public is a balancing test that weighs the competing interests of the parties to determine whether there is good cause to deny the public the right to access the document.  The Eleventh Circuit uses a balancing test of factors such as whether the records are sought by curious third-parties "for such illegitimate purposes as to promote public scandal or gain unfair commercial advantage," versus "whether access is likely to promote public understanding of historically significant events."[2]

The Account Purchase Agreements contain Midland's trade secrets.[3]  The Confidentiality and Consent Protective Order entered in this case defines trade secret in ¶ 1(g) as:

---

[2] *FTC v. Abbvie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013) (Cits. omitted) (emphasis added).

[3] Where contract terms have economic value and are not generally known in the industry they may qualify as trade secrets. *See Fed. Trade Comm'n v. OSF HealthCare Sys.* (N.D. Ill., 2012); *SmithKline Beecham Corp. v. Pentech Pharm., Inc.*, 261 F. Supp. 2d 1002, 1008 (N.D. Ill. 2003) (information about terms and conditions of contracts "that might give other firms an unearned competitive advantage" is legitimately confidential information that competitors should not have and the public does not need to know to evaluate the judiciary's handling of

legitimate confidential and proprietary business information, or such information or documents not known to the general public, from which the disclosing party derives economic value and a competitive advantage in the marketplace from not being generally known to others, the disclosure of which could cause irreparable injury or damage to the disclosing party.

The Account Purchase Agreements are highly confidential, commercially sensitive, and contain proprietary business information that, if disclosed, would put Midland at a competitive disadvantage with its competitors, if disclosed. Specifically, the terms and conditions under which Midland acquires accounts from third parties reflect an allocation of risk between the parties that is ultimately reflected in the purchase price. Thus, although the purchase price in the Account Purchase Agreements has been redacted, a party knowledgeable of the industry could analyze the overall allocation of risk in the agreements—as reflected in the various warranties made by the buyer and the seller, the indemnification provisions, repurchase obligations, and other provisions—and draw conclusions about Midland's pricing methodology. Midland goes to great lengths to keep this

---

the litigation); *Delta Med. Sys. v. Mid-Am Med. Sys., Inc.*, 331 Ill. App. 3d 777, 794 (2002) (holding that contract terms with economic value that are not generally known in the industry are protectable trade secrets).

4

type of information out of the hands of its competitors, and it is of great economic importance that it do so.

Midland's Account Purchase Agreements were developed over many years after significant time and effort to incorporate customer needs and preferences while promoting Midland's own business strategy.  Midland used the Account Purchase Agreements to acquire many more accounts than just Plaintiff's accounts. Midland sought and obtained a Protective Order prior to disclosing the Account Purchase Agreements.   Allowing Plaintiff to publicly file these trade secret documents—even in redacted form—would undermine the purpose of the Protective Order, which was to keep confidential terms and conditions under which Midland acquires its accounts from getting into the hands of the public.

Here, the balancing test factors weigh in favor of Midland's privacy because in the context of this litigation any public interest in knowing the specific business terms under which Midland acquires its accounts is substantially outweighed by the risk associated with the opportunity for misuse by competitors to their unfair commercial advantage.  It is worth further noting that the Account Purchase Agreements have virtually *no* substantive value to Plaintiff's Response – she attaches the Account Purchase Agreements to her supporting memorandum of law, but she does note quote them or otherwise cite them.

Midland's request is supported by precedent. In *Reyes v. Kenosian & Miele, LLP*, 619 F.Supp.2d 796 (N.D. Cal., 2008), the trial court granted a motion to file an account purchase agreement under seal. In that case, the plaintiff brought FDCPA claims against the law firm representing a debt collection entity. The trial court ruled the defendant's request to file the unredacted account purchase agreement under seal met the required showing "because [the account purchase agreement] contains the confidential information of non-parties."[4] Similarly, the Account Purchase Agreements contain not only Midland's confidential business information, but also confidential information belonging to sellers AIS Services, LLC and Debt Recovery Solutions, LLC.

Midland's request is narrowly tailored because out of the hundreds of pages of discovery materials it has produced to Plaintiff, it seeks to seal just two documents.[5] Accordingly, Midland requests that the Court direct Plaintiff to file

---

[4] *Reyes v. Kenosian & Miele, LLP*, 619 F.Supp.2d 796 (N.D. Cal. 2008).

[5] At Plaintiff's request – and to avoid further discovery related disputes – Midland pared back its initial redactions of the Account Purchase Agreements. Midland did so because it relied upon the Protective Order as a backstop against its trade secrets falling into the hands of the public—or competitors. The redactions enabled Plaintiff to have access to information she claimed she needed, but the

6

under seal (i) the Account Purchase Agreements, and (ii) contents of any pleadings containing quotations, characterizations or summaries of information contained in the Account Purchase Agreements. Midland respectfully requests information filed under seal remain sealed for a period of one year after the later of (i) the entry of final judgment or (ii) conclusion of a direct appeal, if any.

Respectfully submitted this 12th day of September, 2014.

BALCH & BINGHAM LLP

*/s/ Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898
Joshua M. Moore
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia  30308
Telephone:  (404) 261-6020

**Attorneys for Midland Funding LLC, and Midland Credit Management, Inc.**

---

redactions did not remove all manner of sensitive information from the Account Purchase Agreements.  For this reason, just filing redacted copies of the Account Purchase Agreements is not enough protection for Midland.   They should be filed under seal.

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing DEFENDANTS'
SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO FILE UNDER SEAL
has been served upon the following by causing a copy of the same to be
electronically filed with the Clerk of Court using the CM/ECF system and by
United States Mail, properly addressed and postage prepaid, on this 12th day of
September, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

*/s/Joshua M. Moore*
Joshua M. Moore

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | | |
|---|---|---|
| **TERI LYNN HINKLE,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **MIDLAND CREDIT** | ) | **3:13-cv-00033-DHB-BKE** |
| **MANAGEMENT, INC. , MIDLAND** | ) | |
| **FUNDING, LLC,  and ENCORE** | ) | |
| **CAPITAL GROUP, INC.,** | ) | |
| | ) | |
| **DEFENDANTS.** | | |

### ORDER

Defendants' Motion to File Under Seal is hereby GRANTED.  The Clerk is DIRECTED to seal the Account Purchase Agreements, which are attached to Plaintiff's Response to Defendants' Motion for Summary Judgment on the pages bates labeled "PlainApp. 00086 to PlainApp. 00124".  Information filed under seal shall remain sealed for a period of one year after the later of (i) the entry of final judgment or (ii) conclusion of a direct appeal, if any.

So ORDERED this ____ day of September, 2014.

_____

Brian K. Epps
United States Magistrate Judge
Southern District of Georgia

Plaintiff's Appendix Document No - 100

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION

| | | |
|---|---|---|
| TERI LYNN HINKLE, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO. |
| | ) | 3:13-cv-00033-DHB-BKE |
| MIDLAND CREDIT | ) | |
| MANAGEMENT, INC. and | ) | |
| MIDLAND FUNDING, LLC, | ) | |
| | ) | |
| DEFENDANTS. | ) | |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Plaintiff Teri Lynn Hinkle is a frequent filer of lawsuits "in this division against various debt collectors asserting the same cause of action" under the Fair Credit Reporting Act.[1]   Indeed, in one of the "ten consumer credit cases that she ha[d] filed in this district between August 2011 and July 2012," this Court expressly recognized that the law has been explained to her "by this federal court in no uncertain terms time and again,"[2] noting that "[i]n every case, the United States Magistrate Judge issued a Report and Recommendation in which he

---

[1] *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 13 (entered on May 20, 2013).

[2] *Id.* at 14.

1

discusse[d] the ***permissible purpose of debt collection*** and recommend[ed] that the case be dismissed."[3]

Nevertheless, Hinkle persists, most recently in her opposition to the Motion for Summary Judgment (Doc. 85) submitted on behalf of Defendants Midland Credit Management, Inc., Midland Funding, LLC, and Encore Capital Group, Inc. (collectively, "Midland").  As explained below, however, Hinkle's FCRA claims fail as a matter of law for the same reasons that this Court already has explained to her "in no uncertain terms time and again."  Nor does Hinkle's opposition to Midland's motion for summary judgment (Doc. 97) identify any genuine issues of material fact regarding her claims under the Fair Debt Collection Practices Act. Accordingly, and for the reasons explained below, Midland respectfully requests that the Court grant Midland's motion for summary judgment and dismiss all of Hinkle's claims with prejudice.

## I.    The undisputed evidence confirms that Hinkle's FDCPA claim is time-barred insofar as it relates to the GE/Meijer Account.

Hinkle argues that her FDCPA claim is not time-barred to the extent it relates to the GE/Meijer Account because "Defendants **did not** cease reporting the [GE/Meijer] account" in 2009, as Midland explained in support of its motion for summary judgment.  (Doc. 97 at ¶ 18) (emphasis in original).  Instead, Hinkle

---

[3] *Id.* at 13–14 (emphasis added).

insists that Midland "furnished account information to the CRAs continuously from Nov. 17, 2008 to at least the end of Dec. of 2012 as shown on the Plaintiff's credit reports." (*Id.*) (citing Doc. 58, Exs. 10a–q).

However, the credit reports cited by Hinkle as supposed proof of Midland's continuing FDCPA violation actually show that Midland did cease reporting the GE/Meijer Account in 2009:



(Doc. 58, at 4 (Ex. 10-b)).  Thus, the evidence cited by Hinkle belies, rather than supports her claim that Midland continued to report the GE/Meijer Account to the CRAs after 2009.  Because Hinkle did not assert an FDCPA claim against Midland

until well after the expiration of the one-year statute of limitations, Count IV is time-barred to the extent it relates to the GE/Meijer Account.[4]

## II. Midland provided Hinkle with the validation notice required by § 1692g(a).

Hinkle argues that Midland is not entitled to summary judgment on her claim under § 1692g(a) because its December 21, 2011 letter regarding the T-Mobile Account was not "received [until] after the Plaintiff issued her very clear verbal dispute on Dec. 27, 2011." (Doc. 97, at ¶ 43). However, Hinkle's contention is irrelevant. In fact, because Hinkle does not dispute that Midland *sent* the December 21 letter containing the requisite validation notice, Midland would be entitled to judgment as a matter of law even if she had *never* received it.[5]

In any event, Hinkle admits to receiving Midland's initial communication regarding the T-Mobile Account, and she does not dispute that it contained the

---

[4] *See* 15 U.S.C. § 1692k(d) (claims under the FDCPA must be brought "within one year from the date on which the violation occurs."); *Narog v. Certegy Check Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011) ("A plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full, and after the debt collector acknowledged that the debt was paid in full. Under the FDCPA, that conduct is not taken in connection with the collection of a debt.") (citing *Winter v. I.C. System Inc.*, 543 F.Supp.2d 1210, 1213 (S.D. Cal. 2008)).

[5] *Antoine v. J.P. Morgan Chase Bank*, 757 F. Supp. 2d 19, 23 (D.D.C. 2010) ("Plaintiff alleges that he never *received* this notice, but presents no evidence that it was not *sent* or that it does not satisfy the FDCPA disclosure requirements. ... Accordingly, because there is no factual dispute as to whether Defendant Shapiro & Burson mailed compliant notice on November 13, ... [t]he Court therefore grants summary judgment to Defendant on Plaintiff's deficient-disclosure FDCPA claim.").

validation notice required by § 1692g(a).  (*See* Doc. 97, at ¶ 20).  Accordingly, Midland is entitled to judgment as a matter of law on Hinkle's FDCPA claim to the extent it is based on the allegation that Midland violated § 1692g(a) by "fail[ing] . . . to provide the required 'Thirty Day Validation Notice' or disclosures to Plaintiff." (*See* Doc. 8, at ¶ 92).

**III.    Midland was not required under § 1692g(b) to cease collection activities because Hinkle failed to dispute the debt in writing within 30 days.**

Hinkle claims in her response that, in Midland's "zeal to obtain summary judgment" (Doc. 97, at ¶ 45), it has ignored decisions from the Second, Fourth, and Ninth Circuits which "have upheld the clear and plain language of the statute supporting a consumer's right to dispute [a debt] verbally" (Doc. 97, at ¶ 44).  The cases cited by Hinkle are inapposite, however, as none of those decisions addresses whether a debt collector is required under § 1692g(b) to cease collection activities in response to a consumer's *verbal dispute*:

| Cases cited by Hinkle | No writing required under *other* FDCPA sections | Writing required under § 1692g(b) |
|---|---|---|
| *Russell v. Absolute Collection Servs., Inc.*[6] | The court explained that "[n]othing in the text of the FDCPA suggests that a debtor's ability to state a claim under § 1692e is dependent upon the debtor first disputing the validity of the debt in accordance with § 1692g."[7] | The court did not hold, as Hinkle suggests, that a consumer's verbal dispute is sufficient to cause a debt collector to cease collection activities under § 1692g(b). |
| *Clark v. Absolute Collection Serv., Inc.*[8] | The question was "whether section 1692g(a)(3) permits consumers to dispute the validity of a debt orally, or whether it imposes a writing requirement."[9] | The court did not hold that a verbal dispute is sufficient under § 1692g(b); in fact, it noted that "1692g(b) explicitly require[s] written communication."[10] |
| *Hooks v. Forman, Holt, Eliades & Ravin, LLC*[11] | As the court noted, "[t]he language of § 1692g(a)(3) does not incorporate the writing requirement included specifically in other sections of the same statute."[12] | The court went on to explain that it "makes sense to require debtor consumers to take the *extra* step of putting a dispute in writing before claiming the more burdensome set of rights defined in § 1692[(b)]."[13] |

---

[6] No. 12-2357, 2014 WL 3973792 (4th Cir. Aug. 15, 2014).

[7] *Id.* at *5 (emphasis added).

[8] 741 F.3d 487 (4th Cir. 2014).

[9] *Id.* at 490 (emphasis added).

[10] *Id.* (emphasis added).

[11] 717 F.3d 282 (2d Cir. 2013).

[12] *Id.* at 286 (emphasis added).

[13] *Id.* (second emphasis added).

| Cases cited by Hinkle | No writing required under *other* FDCPA sections | Writing required under § 1692g(b) |
|---|---|---|
| *Camacho v. Bridgeport Fin. Inc.*[14] | "[T]here is no writing requirement implicit in § 1692g(a)(3)."[15] | However, "**Section 1692g(b)** . . . provides that if the consumer notifies the collector of a dispute *in writing* within the 30–day period, the collector shall cease collection activities until he obtains the verification."[16] |

Thus, Hinkle ignores the fact that "[a]n oral notice of dispute of a debt's validity has different legal consequences than a written notice." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859, 869–70 (S.D. Tex. 2011). As explained in the cases cited in her response, Hinkle apparently misapprehends the practical import of a verbal dispute versus a dispute in writing:

> As written, section 1692g(a)(3) triggers statutory protections for consumers independent of the later sections 1692g(a)(4), 1692g(a)(5), and 1692g(b). For one, once a consumer disputes a debt orally under section 1692g(a)(3), a debt collector cannot communicate that consumer's credit information to others without disclosing the dispute. 15 U.S.C. § 1692e(8); *see Hooks*, 717 F.3d at 285; *Camacho*, 430 F.3d at 1082. Also, if a consumer owes multiple debts and makes a payment, a debt collector cannot apply that payment to a debt that has been disputed orally. *See* 15 U.S.C. § 1692(h); *Hooks*, 717 F.3d at 285–86; *Camacho*, 430 F.3d at 1082.

---

[14] 430 F.3d 1078 (9th Cir. 2005).

[15] *Id.* at 1082 (emphasis added).

[16] *Id.* at 1080 (first emphasis added).

7

*Clark,* 741 F.3d at 491.  On the other hand, the plain language of § 1692g(b) makes clear that a writing *is* required in order to trigger a debt collector's obligation to cease collection activities until the debt is verified.[17]  However, "if the consumer disputes the debt orally rather than in writing, the consumer loses the protections afforded by § 1692g(b); the debt collector is under no obligation to cease all collection efforts and obtain verification of the debt."  *Osborn,* 821 F. Supp. 2d at 869–70.

Again, Hinkle did orally dispute the T-Mobile Account by telephone on or about December 28, 2011;[18] however, the undisputed evidence shows that she did not dispute the debt in writing until July 26, 2012,[19] well outside the 30-day validation period that began to run in December 2011.

## IV.  Hinkle has failed to raise a triable issue of fact as to whether Midland's collection calls violated § 1692d.

Hinkle insists that "[t]he FDCPA is a strict liability statute to protect consumers and non-consumers who deal with the debt collection industry," and

---

[17] *See* 15 U.S.C. § 1692g(b) ("If the consumer notifies the debt collector **in writing** within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt.") (emphasis added).

[18] (*See* Doc. 8, at, at ¶ 20; Doc. 85-7, Ex. E, at 00035 ("Verbal Dispute within 45 days" recorded on "12/28/2011")).

[19] (*See* Doc. 85-11, Ex. I) ("Response and Notice of Intent to Sue") (dated July 26, 2012).

8

that "[t]o determine [whether] behavior is harassment or abuse ONLY if there are many incidences of it is to say that the FDCPA should be narrowly construed and the debt collection industry should have free reign to abuse the public at will via telecommunications." (Doc. 97, at ¶ 37).  Respectfully, Hinkle is just wrong.

"Summary judgment is routinely granted in favor of debt collectors where the party alleging a violation of the FDCPA does not present evidence of harassing conduct other than a high volume of calls." *Lardner v. Diversified Consultants Inc.*, No. 13-CV-22751, 2014 WL 1778960, at *8 (S.D. Fla. May 1, 2014) (granting summary judgment to defendant).[20]  Here, according to a "Call Log"

---

[20] *See also Valle v. Nat'l Recovery Agency*, No. 10-CV-2775, 2012 WL 1831156 (M.D. Fla. May 18, 2012) (granting summary judgment to defendant debt collector despite evidence showing eighty-two calls to plaintiff over the span of 252 days); *Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301 (M.D. Fla. 2010) (granting summary judgment to defendant debt collector where the debt collector had called the plaintiff fifty-seven times, even as many as seven times per day); *Waite v. Fin. Recovery Servs., Inc.*, No. 09-CV-2336, 2010 WL 5209350 (M.D. Fla. Dec. 16, 2010) (granting summary judgment to defendant debt collector in spite of evidence showing that it had called the plaintiff 132 times over nine months, up to four times per day); *Druschel v. CCB Credit Servs., Inc.*, No. 10-CV-838, 2011 WL 2681637 (M.D. Fla. June 14, 2011) (recommending summary judgment in favor of defendant debt collector even though it called the debtor fourteen times in just two weeks), *adopted by* 2011 WL 2681953 (M.D. Fla. July 11, 2011); *Carman v. CBE Group, Inc.*, 782 F. Supp. 2d 1223 (D. Kan. 2011) (granting summary judgment to defendant debt collector despite evidence of 149 calls over a period of two months); *Pugliese v. Prof. Recovery Serv., Inc.*, No. 09-CV-12262, 2010 WL 2632562 (E.D. Mich. June 29, 2010) (granting summary judgment to defendant debt collector that called plaintiff 350 times over eight months); *Katz v. Capital One*, No. 09-CV-10096, 2009 WL 3190359 (E.D. Mich. Sept. 30, 2009) (granting summary judgment to defendant debt collector that called plaintiff fifteen to seventeen times after receiving her cease and desist letter disputing that she owed the debt).

produced (and apparently prepared) by Hinkle, Midland called her only six (6) times over a period of four (4) months:

| DATE | TIME | COMPANY | CALLER ID | |
|------|------|---------|-----------|---|
| 12/27/2011 | 6:40 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 12/28/2011 | 8:52 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/7/2012 | 6:34 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/8/2012 | 10:36 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/30/2012 | 6:37 PM | MIDLAND | Unknown | 1-800-825-8131 |
| | | | | |
| | | | | |

(PlainApp., at 00036). "Absent evidence of harassing, oppressive, or abusive conduct, the pattern and frequency of [Midland's] calls to [Hinkle] create no triable issue of fact under . . . Section 1692d(5)." *Valle*, 2012 WL 1831156, at *2.[21]

---

[21] In her response, Hinkle cites the Eleventh Circuit's unpublished decision in *Meadows v. Franklin Collection Serv., Inc.*, 414 F. App'x 230 (11th Cir. 2011). (*See* Doc. 97, at ¶ 35 n.4). There, the court reversed the district court's order granting summary judgment to the defendant debt collector on the consumer's § 1692d(5) claim. Unlike Hinkle, however, the plaintiff in *Meadows* had put forth substantial evidence showing that "she received approximately 300 calls over a two and a half year period regarding debts she did not owe and people she did not know"; that the defendant had "used an automated dialer" to make the calls; and that "several times the calls woke her up from sleep and caused her difficulty sleeping." *Id.* at 233. Hinkle, on the other hand, rests her claim upon the six calls listed on her "Call Log," as well as a handful of additional attempts by Midland to reach her on a landline number *she no longer was using*. (*See* Doc. 97, at ¶ 22) ("MCM did not cease calling until after the Plaintiff stopped answering and then it began calling one of the Plaintiffs old land line phone numbers according to its own internal records provided in discovery."). But, as Hinkle intimates, since she no longer used those "old land line phone numbers," she necessarily could not have been "annoy[ed], harass[ed], or abuse[d]" by those calls.

**V.    Hinkle's claim under § 1692e fails because the undisputed evidence shows that Midland properly flagged her account as disputed in its communications with the CRAs.**

Even though Hinkle does not dispute that Midland "appropriately flagged the accounts as 'disputed' in its communications with the CRAS,"[22] she claims that Midland nevertheless violated § 1692e by making allegedly false or misleading statements to the CRAs because "[t]he requirement to 'flag the accounts' as disputed does not afford the Defendants' the ability to furnish information to the CRAs that it knows or should know is false and . . . is further required under the FCRA rather than the FDCPA." (Doc. 97, at ¶ 42).

On this point, Hinkle's argument ignores entirely the overwhelming weight of authority cited in Midland's motion for summary judgment.   Again, "the FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must 'communicate' the disputed nature of the debt" in order to satisfy its obligations to adequately inform credit reporting agencies about the debt. *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 161 (D. Me. 2011) (citing *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 418 (8th Cir. 2008) ("[I]f a debt collector *elects* to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has

---

[22] (Doc. 85, at 7).

disputed a particular debt.")).  In fact, as the Eighth Circuit explained in *Wilhelm,*
"[t]his interpretation is confirmed by the relevant part of the Federal Trade
Commission's December 1988 Staff Commentary on the Fair Debt Collection
Practices Act," which provided that:

> 1.   Disputed debt. If a debt collector knows that a debt is disputed
>      by the consumer . . . *and reports it to a credit bureau,* he must
>      report it as disputed.
>
> 2.   Post-report dispute. *When a debt collector learns of a dispute
>      after reporting the debt to a credit bureau, the dispute need not
>      also be reported.*

*Wilhelm,* 519 F.3d at 418 (emphasis in original) (citing FTC Staff Commentary, 53
Fed. Reg. 50097-02, 50106 (Dec. 13, 1988)).

Because  the undisputed "evidence before the Court firmly establishes that,
in reporting the debt to the credit reporting agencies, [Midland] specifically
flagged the debt as disputed," Midland is entitled to judgment as a matter of law on
Count IV. *Poulin,* 760 F. Supp. 2d at 161.[23]

## VI.   Midland obtained Hinkle's credit report for the permissible purpose of "collection" of her accounts.

"[A]s the assignee of [Hinkle's T-Mobile] account, [Midland] was entitled
under the FCRA to obtain plaintiff's credit report from consumer reporting

---

[23] (*See* Doc. 85-9, Ex. G) ("[W]e have requested that the three major consumer credit
reporting agencies change the status of this account to 'Disputed.'"); (Doc. 85-10, Ex. H) (same).

agencies for the permissible purpose of review or collection of the assigned debt."
*Ostrander v. Unifund Corp.*, No. 07-CV-0086, 2008 WL 850329, at *3 (W.D.N.Y.
Mar. 28, 2008).[24]  Nevertheless, Hinkle claims in her response that "the section of
the FCRA the Defendants claim provides **them** with a permissible purpose does
not in fact pertain to them at all but solely to the CRAs."  (Doc. 97, at ¶ 47)
(emphasis in original).

But Hinkle knows better,[25] because "[a]t the time of filing, [she] had already
filed eight [now **nine**] prior cases in this division against various debt collectors
asserting the same cause of action."  *Hinkle v. ARS National Services, Inc.*, No.
3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at
13.  And "[i]n every case, the United States Magistrate Judge issued a Report and
Recommendation in which he discusse[d] the ***permissible purpose of debt
collection*** and recommend[ed] that the case be dismissed."  *Id.* at 14 (emphasis
added).

---

[24] *See also* 15 U.S.C. § 1681b(a)(3)(A) (stating that a credit report may be provided "in
connection with a credit transaction involving the consumer on whom the information is to be
furnished and involving the review or *collection* of an account of the consumer.") (emphasis
added).

[25] For one, the case Hinkle cites for her above-quoted proposition itself acknowledged
that "the Fourth Circuit explicitly incorporated the 'permissible purposes' under § 1681b into the
civil liability provisions of the FCRA found in [§§] 1681n and 1681o . . . which appl[y] to 'any
. . . user of information' that willfully or negligently fail[s] to comply with the statute's
requirements."  *Cappetta v. GC Servs. Ltd. P'ship*, 654 F. Supp. 2d 453, 460 (E.D. Va. 2009).

Nor may Hinkle's FCRA claim survive summary judgment based on her contention that Midland "most certainly could not have been obtaining Plaintiff's consumer credit report on **behalf of a creditor**," which she claims is required for Midland to have a "permissible purpose" for obtaining her credit report. (Doc. 97, at ¶ 49) (emphasis in original).   "[A]s the Court has repeatedly explained"—*to Hinkle*, in yet *another* case—"it is not necessary for Plaintiff to have had direct dealings with Defendant; for example, one of the 'permissible purposes' for obtaining a consumer report under 15 U.S.C. § 1681b(a)(3)(A) would permit a collection agency retained by a creditor to collect on an account of the consumer." *Hinkle v. CBE Grp.*, No. 11-CV-091, 2012 WL 681468, at *3 (S.D. Ga. Feb. 3, 2012) *report and recommendation adopted*, 2012 WL 676267 (S.D. Ga. Feb. 29, 2012).

And the same goes for debt collectors, as § 1681b "permits a debt collector to request a credit report if it uses the report to review an account." *Pinson v. Monarch Recovery Mgmt., Inc.*, No. 12-CV-80480, 2013 WL 961308, at *2 (S.D. Fla. Mar. 12, 2013) (citation omitted).[26]  Here, Hinkle "acknowledges that [s]he is

---

[26] *See also Huertas v. Galaxy Asset Management*, 641 F.3d 28, 34 (3rd Cir. 2011) ("[T]he statute expressly permits distribution of a consumer report to an entity that intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.").

a 'debtor,' that [Midland] is a 'debt collector,' and that [Midland] was attempting to 'collect a debt.'" *Ekhlas v. NCO Fin. Sys., Inc.*, No. 13-CV-0978, 2013 WL 6190660, at *2 (C.D. Cal. Nov. 25, 2013).[27]   "Therefore, by alleging that [Midland] obtained [her] consumer report and then attempted to collect a debt, [Hinkle] has pled [her]self out of [an] FCRA claim by including details contrary to [her] claim." *Salmas v. Portfolio Recovery Associates, LLC*, 13-CV-0575, 2013 WL 6182614, at *3 (C.D. Cal. Nov. 25, 2013).[28]

Accordingly, as this Court has found "time and again," Hinkle's FCRA claim fails as a matter of law and must be dismissed because Midland obtained her credit report for the permissible purpose of "collection" of her accounts.

## VII. The FCRA does not provide a private right of action for inaccurate reporting.

Hinkle apparently agrees with Midland that she cannot state a claim under the FCRA based upon Midland's alleged furnishing of false or inaccurate information to the CRAs.[29]   Therefore, she necessarily also concedes that Midland

---

[27] (*See, e.g.*, Doc. 8, at ¶¶ 39) ("MCM, and Midland operate as a debt buying and collection enterprise."); (*id.* ¶ 92) ("Midland . . . in connection with the collection of a debt"); (*id.* ¶ 94) ("MCM and Midland . . . are still engaging in collection actions . . .").

[28] (*See* Doc. 97, at ¶ 63) ("The telephone calls placed to the Plaintiff's home were for the purpose of collection . . . .").

[29] (*See* Doc. 97, at ¶ 59) ("Defendants voluminous arguments on § 1681s-2(a) . . . are nothing more than a self-serving diatribe designed to distract and mislead the Court as Plaintiff made no allegations under 15 U.S.C. § 1681s-2(a) in her Complaint.").

is entitled to summary judgment on Counts I through III to the same extent. *See Nawab v. Unifund CCR Partners*, 553 F. App'x 856, 860 (11th Cir. 2013) ("Because Mr. Nawab lacks standing to bring claims under § 1681 s–2(a), the district court properly granted summary judgment as to Counts I and II.").

## VIII. Hinkle has failed to raise a triable issue of fact regarding the reasonableness of Midland's investigation.

Lastly, Hinkle asserts that Midland is not entitled to summary judgment on her FCRA claims because "Defendants have failed to demonstrate exactly what they did to meet the burden of a 'reasonable investigation,' which would be a question of ultimate material fact." (Doc. 97, at ¶ 62). However, "[s]ection 1681s–2(b) generally requires credit information furnishers to conduct a *reasonable* investigation upon receiving notice of a dispute," and "summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Howard v. Pinnacle Credit Servs., LLC*, No. 09-CV-0085, 2010 WL 2600753, at *3 (M.D. Ga. June 24, 2010) (quotation omitted; emphasis in original).

As a matter of law, "[a]bsent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, *the furnisher need not do more than verify that the reported information is consistent with the information in its records*." *Id.* (emphasis added). Here, Hinkle makes no such allegations of fraud

16

or identity theft, nor did she make out a notarized fraud affidavit.[30] "Thus, in order to defeat [Midland's] motion for summary judgment, Plaintiff must establish that upon being notified of Plaintiff's consumer disputes, [Midland] failed to conduct an objectively reasonable investigation to determine whether the disputed information was inaccurate." *Ware v. Bank of Am. Corp.*, No. 13-CV-1647, 2014 WL 1302605, at *8 (N.D. Ga. Jan. 8, 2014). "The burden of showing the investigation was unreasonable is on the plaintiff." *Id.*

Hinkle comes nowhere close to identifying any genuine issue of material fact sufficient to meet her burden and sustain her claim in the face of Midland's motion.   In fact, there is no dispute that Midland conducted a reasonable investigation upon receiving notice from the CRAs of Hinkle's dispute:

> 15.     In July 2012, MCM received notice of a dispute from the credit bureaus.  MCM verified that it was furnishing the information provided by Debt Recovery Solutions, LLC, and continued to report the T-Mobile Account as "disputed."  *See* Ex. E at MIDLAND-HINKLE-000033-34.  In addition, on July 21, 2012, MCM sent Plaintiff a letter requesting additional documentation as part of its investigation.  *See* Exhibit H.  Plaintiff responded that she could not furnish MCM with any documentation because the account was not hers.  *See* Exhibit I.

(Doc. 85-2, at ¶ 15).

---

[30]*See* Exhibit A, Transcript of March 11, 2014 Deposition of Teri L. Hinkle at 107:23 ("Q.   . . . . [Midland's letter requesting information regarding her dispute] did ask if it's fraud to provide a copy of a police report, FTC, affidavit, or notarized fraud affidavit.  And you didn't provide that, right?   A.   Again, why would I? No.").

Nonetheless, Hinkle contends that Midland cannot rely on its own records to show that it conducted a reasonable investigation of her dispute because "[b]oth alleged accounts were purchased not from original creditors but pursuant to 'as is' contracts with 'no warranty' as to accuracy, validity, or authenticity from other Debt Buyers," and because "[t]hose records contain nothing but hearsay information from other buyers without any authenticating evidence from a qualified source as to its truth and validity." (Doc. 97, at ¶¶ 62–63). She is mistaken on both counts.

First, as a matter of law, Midland was entitled to rely on the information it received from the original creditor, and "[t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161.[31]   Indeed, according to the FTC (which Hinkle admits "can certainly be considered an expert authority on the statute"[32]), a debt buyer is justified in relying upon certain information from the original creditor, "such as the name of the original creditor, the original creditor's account number,

---

[31] *See also Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1174 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt."); *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); *In re Cooper*, 253 B.R. 286, 292 (Bankr. N.D. Fla. 2000) ("Attorneys and debt collectors are entitled to rely on the information they receive from the creditor."); *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996).

[32] (Doc. 97, at ¶ 51).

the debtor's social security number, the date of last payment, and the date of charge-off."[33]   And in response to Hinkle's dispute, Midland "verified that it was furnishing the information provided by Debt Recovery Solutions, LLC," including the same information that the FTC deems sufficiently reliable—the name of the original creditor, the original account number, the last four digits of Hinkle's SSN, the date the account was opened, and the date the account was charged off:

| | |
|---|---|
| Name | TERI HINKLE |
| Street-1 | 6080 PARK BV |
| Street-2 | 6080S |
| City | SOUTH ROCKWOO |
| State | MI |
| Zip | 48179 |
| SSN# | *****6359 |
| Home# | 7343790753 |
| Sale Amount | 300.8 |
| Orig Bal$ | 300.8 |
| C/O Date | 2007/12/29 |
| Open Date | 03/04/2006 |
| Creditor | T-MOBILE |
| DOB | 19520526 |

(Doc. 85-4).

Second, Hinkle is wrong to suggest that Midland could not reasonably rely on supposed hearsay contained in the records it obtained from the assignors of her accounts.   Midland's motion for summary judgment need be supported only with "[a]n affidavit or declaration . . . on personal knowledge, [which] set[s] out facts

---

[33] Federal Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* (Jan. 2013), at 36.

that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). Here, Ms. Ross's affidavit is expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's] business either by [her]self or those under a duty to maintain [such] records." (Doc. 85-2, at ¶ 5).[34] And the "documents attached to the Declaration are either non-hearsay or could be reduced to admissible form," which is all that is required for their admissibility in support of Midland's motion for summary judgment. *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112, (11th Cir. 2010).

In sum, "the evidence establishes that [Midland] reviewed all of its information, along with the information provided by the credit reporting agencies." *Howard*, 2010 WL 2600753, at *4. At the same time, "[Hinkle] has failed to raise a genuine issue of material fact that [Midland's] investigation was unreasonable."

---

[34] *See Stroud v. Bank of Am.*, No. 11-CV-22489, Doc. 143 (Order Denying Plaintiff's Motion in Limine), at 4 (overruling plaintiff's objections to affidavit submitted in support of motion for summary judgment where the affiant "state[d] he [was] responsible for obtaining and examining FIA's records with regard to [plaintiff's] account and that he did, in fact, examine those records and has knowledge of their contents") (entered on Aug. 1, 2012); *see also Stroud v. Bank of Am.*, 886 F. Supp. 2d 1308, 1314 (S.D. Fla. 2012) ("In this case, BOA has more than amply demonstrated that it conducted a reasonable investigation, that the result of that investigation provided no reason to reach any conclusion other than that the disputed account belonged to Stroud, and that it accurately reported the results of the investigation. For his part, Stroud has failed to provide any *evidence*, as opposed to merely his own allegations or hunches or theories, that the investigation was unreasonable or that BOA reported any inaccurate information. BOA is therefore entitled to summary judgment.").

*Ware*, 2014 WL 1302605, at *8.[35]   She "has presented no evidence that the procedures employed by [Midland] to investigate the reported disputes were in any respect unreasonable," and she "has neither sought discovery on nor produced any evidence whatsoever about the procedures utilized by [Midland]." *Id.* at *8.

"Put plainly," and just as this Court has found before, "the factual matter offered by Plaintiff in her amended complaint establishes nothing beyond speculation as to the 'mere possibility' of a violation of the FCRA." *Hinkle*, 2012 WL 681468, at *3 (quotations omitted) (affirming dismissal of FCRA claim on the pleadings where the complaint "alleged no facts tending to show that [Defendant] 'willfully' or 'negligently' failed to comply with the FRCA").   Therefore, "[b]ased on the evidence before the Court establishing that [Midland] reviewed all of the information it received regarding [Hinkle's] dispute," the Court should "find[] that [Midland] conducted a reasonable investigation" and is therefore "entitled to summary judgment as to Plaintiff's FCRA claims." *Ware*, 2014 WL 1302605 at *8.[36]

---

[35] "[She] has also failed to show any actual inaccuracies that Defendant could have found through conducting a reasonable investigation. . . .  Plaintiff's failure to demonstrate or establish any actual inaccuracies in the furnished information that a reasonable investigation could have discovered is a separate, sufficient basis for summary judgment." *Id.* at *8, *9.

[36] Furthermore, "[e]ven assuming that [Midland's] conduct was not permitted under the FCRA, Plaintiff's complaint only provides conclusory statements that Defendant[s] violated 15 U.S.C. § 1681b by obtaining Plaintiff's consumer report without a permissible purpose." *Pyle v.*

## RESPONSES TO HINKLE'S OBJECTIONS

The Court should overrule Hinkle's objections to the affidavit of Angelique Ross (Doc. 85-2).   Hinkle objects to Ms. Ross's affidavit as "untrustworthy"[37] because it relies on supposed "hearsay" and because "the information [Ms. Ross] relies on came not from a creditor but the sellers (other [debt] buyers)." (Doc. 97, at ¶ 69). "However, this argument is unavailing as a debt buyer can authenticate a creditor's records in a collection action . . . [u]nder the adoptive business records exception to the hearsay rule." *Clark v. v. Main St. Acquisition Corp.*, No. 12-CV-408, 2013 WL 2295879, at *5 (S.D. Ohio 2013) *aff'd sub nom. Clark v. Main St. Acquisition Corp.*, 553 F. App'x 510 (6th Cir. 2014).

---

*First Nat. Collection Bureau*, No. 12-CV-00288, 2012 WL 1413970, at *3 (E.D. Cal. Apr. 23, 2012).   Without any "factual basis to support [her] claim[,] Plaintiff merely concludes that, because [she] did not owe [Midland] any debt and [Midland] purportedly obtained a copy of [her] credit report, [Midland] was in 'willful violation of the FCRA.'" *Id.* However, Hinkle's "conclusory statements and allegations . . . do not contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* at *4 (quotation omitted). "Merely stating the legal conclusion that Defendant acted willfully but failing to provide any factual basis to support these causes of action is insufficient." *Id.* (quotation omitted).

[37] Hinkle suggests that the Court should strike Ms. Ross's affidavit because she "has proved [*sic*] herself to be an unqualified witness without first-hand knowledge when the Midland Defendants proffered her as an expert witness in an on-going case in the Northern District of California." (Doc. 97, at ¶ 69 n.38) (citing Discovery Order, *Gold v. Midland Credit Management, Inc.*, No. 13-CV-02019, Doc. 65, p. 4 (entered on July 9, 2014)).   There, however, Ms. Ross was not found to lack sufficient "first-hand knowledge" of Midland's business records, nor was she found to be "unqualified" as an expert.   Rather, Ms. Ross simply had indicated at her Rule 30(b)(6) deposition that she did not possess certain "specific information" responsive to the plaintiff's topics of examination.   And in the discovery order (cited by Hinkle), the district court merely ordered Midland to make available an additional witness who could provide testimony on the topics identified by the plaintiff.

As explained above, Ms. Ross's affidavit is expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's] business either by [her]self or those under a duty to maintain [such] records,"[38] and the "documents attached to the Declaration are either non-hearsay or could be reduced to admissible form." *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112, (11th Cir. 2010). "While the [attached documents] are not directly from the original creditor, they are provided by company persons who have knowledge of company processes and relationship with original creditors, and how charged-off receivables are sold and purchased from original creditors." *Hickman*, 2012 WL 4062694, at *7. Thus, "the records . . . were sufficiently authenticated under the business records exception to the hearsay rule," and Ms. Ross's affidavit "fulfills the elements of the business records exception set forth in Federal Rule of Civil Procedure 803." *Id.*[39]

---

[38] (Doc. 85-2, at ¶ 5).

[39] *See also United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984) ("To be admitted under [Rule 803(6)] the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness. Nor is it required that the records be prepared by the business which has custody of them.") (quotations and citations omitted); *Hickman v. Alpine Asset Mgmt. Grp., LLC*, No. 11-CV-1236, 2012 WL 4062694, at *7 (W.D. Mo. Sept. 14, 2012) ("To lay an adequate foundation under the business records exception, the custodian of records need not have personal knowledge of the circumstances in which acquisition, use and filing occurred."); Wright & Miller, 30C Fed. Prac. & Proc. Evid. § 7047.

Second, the Court also should overrule Hinkle's objection and decline her request for "the Court to strike [Midland's] Motion for Summary Judgment in its entirety"[40] based on Midland's failure to identify Ms. Ross as an "individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1). Any failure on Midland's part to disclose Ms. Ross "was substantially justified or is harmless" and therefore unworthy of sanctions under Rule 37(c)(1) because:

1.    Ms. Ross is not an "individual likely to have discoverable information." Rather, Ms. Ross is the "custodian" of the documents attached to her affidavit, or an otherwise "qualified witness" capable of attesting to their authenticity. Fed. R. Evid. 803(6)(D). Thus, "[f]rom the Court's perspective, the affidavit served no purpose other than to authenticate the attached documents." *Graham v. Metro. Life Ins. Co.*, No. 07-CV-164 , 2009 WL 73802, at *6 (S.D. Miss. Jan. 8, 2009) *aff'd,* 349 F. App'x 957 (5th Cir. 2009).[41]

---

[40] (Doc. 97, at ¶ 71).

[41] *See also Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09-CV-02080, 2011 WL 721263, at *4 (D. Colo. Feb. 23, 2011) ("Because the Custodian of Records at Pinnacol Assurance will not give substantive testimony at trial, the Court finds that Defendant's failure to disclose his name and contact information was harmless."); *U.S. Tech. Corp. v. Ramsay*, No. 08-CV-00218, 2011 WL 2516597 (S.D. Miss. June 23, 2011) (finding "that U.S. Technology's failure to disclose Atkinson is harmless" despite "failure to disclose Atkinson as records custodian" because "no prejudice to the defendants will result if Atkinson is permitted to testify as a witness").

2.    In fact, Hinkle made no objection to similar records produced during discovery as attachments to the authenticating affidavit of Patrick Minford, which likewise was based, in part, on "information received in the ordinary course of business while performing [his] duties at Midland, and upon a review of Midland's business records." (Minford Aff., at ¶ 2).

3.    Nor did Hinkle seek to depose Minford or another previously identified Midland representative,[42] precisely because, as she notes in her Response, "no individual person [at Midland] communicated with the Plaintiff." (Doc. 97, at ¶ 10).  Midland did not identify Ms. Ross (or Mr. Minford) as an "individual likely to have discoverable information," because "all written communication [with her] was 'system generated' and not generated by a live person." (Doc. 97, at ¶ 10).

4.    Furthermore, even though each of the documents attached to Ms. Ross's affidavit previously had been produced to her during discovery, Hinkle indicated to Midland's counsel and to the Court that she had neither the need nor inclination to depose a Midland representative concerning those (or any other) documents:

> THE COURT:    . . . But it sounds like right now you are pretty
> reasonably satisfied you have everything, and you

---

[42] (*See* Doc. 97, at ¶ 8) (noting that Midland previously identified a separate corporate representative in response to Hinkle's interrogatory regarding any witnesses Midland may call upon to testify at trial).

|              | have to take some depositions to see whether these other speculations of yours might actually have some substance to them.   Is that a fair characterization of where we sit? |
|:-------------|:---|
| MS. HINKLE:  | I would say on that issue that it is.  I may not need to based on what they did give me and the facts of the case. |

* * *

| THE COURT:  | I think Ms. Hinkle has had enough of this document discovery anyway.  She is ready to get to the deposition and get this over with. |
|:------------|:---|
| MS. HINKLE: | And you are absolutely right.  I really truly do not believe other than the purchasing sale [*sic*] agreements that there is anything they could give me. |

(Doc. 77, at 7:14–21).

5.    Indeed, Hinkle was satisfied with the documents that Midland had produced, and never sought to depose a representative of Midland about their authenticity or their content, even though the Court admonished her to conduct any depositions she thought necessary before the close of discovery:

| THE COURT:  | Now, Ms. Hinkle, I do want to tell you that you do have 45 days but you really need to give some serious consideration to whether there are any other depositions you want to take because you are not going to get another bite at this.  This is the last opportunity to conduct discovery in the case. |
|:------------|:---|

(Doc. 77, at 28:19–24).

Accordingly, the Court should decline to strike Ms. Ross's affidavit or Midland's Motion for Summary Judgment.

## CONCLUSION

The undisputed evidence demonstrates that Hinkle's FDCPA claims fail as a matter of law. Hinkle's FCRA claims do not simply fail as a matter of law; Hinkle knows that they do, as this Court noted in one of the "ten consumer credit cases that she ha[d] filed in this district between August 2011 and July 2012."[43]  There, the Court "easily conclude[d] that the instant lawsuit was filed in bad faith and for the purpose of harassment."[44]  And the same is true here.  Therefore, Midland asks that the Court retain jurisdiction solely for the purpose of awarding attorney's fees to Midland under 15 U.S.C. § 1681n(c), pursuant to a separate motion to follow.

Respectfully submitted this the 19th day of September, 2014.

/s/ Matthew B. Ames
Matthew B. Ames / Ga. Bar No. 015898
Joshua M. Moore / Ga. Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia  30308

---

[43] *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 14 (entered on May 20, 2013).

[44] *Id.* at 15.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the foregoing DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 19th day of September, 2014:

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

/s/ *Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898

# Exhibit A

1                    TERI LYNN HINKLE
2            UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF GEORGIA
3                    DUBLIN DIVISION
                     STATE OF GEORGIA
4

    TERI LYNN HINKLE,              )
5                                  )
          Plaintiff,               )
6                                  )
    vs.                            )
7                                  )   Civil Action File No.
    MIDLAND CREDIT                  )   3:13-CV-00033
8   MANAGEMENT INC.,               )
    MIDLAND FUNDING LLC,           )
9   and ENCORE CAPITAL             )
    GROUP, INC.,                   )
10                                 )
          Defendants.              )
11                                 )
                                   )
12
13                      _ _ _
14

           Deposition of TERI LYNN HINKLE
15

               (Taken by Defendants)
16

               Eastman, Georgia
17             March 11, 2014
18

    Reported by:   Lynne C. Fulwood
19                 Certified Court Reporter
20
21
22   Job No.:      71362
23
24
25

Page 2

```
 1              TERI LYNN HINKLE
 2     ON BEHALF OF THE PLAINTIFF:
 3            (Pro Se)
              Attorney at Law
 4
 5
 6
 7     ON BEHALF OF THE DEFENDANTS:
 8        K. ANN BROUSSARD
          Attorney at Law
          King & Spalding
 9        1180 Peachtree Street, N.E.
10        Atlanta, Georgia 30309
11
12
13
14              - - -
15        Deposition of TERI LYNN HINKLE, taken
16     by the Defendants, at 1646 College Street,
17     Eastman, Georgia, on the 11th day of March
18     2014, at 8:30 a.m., before Lynne C.
19     Fulwood, Certified Court Reporter.
20
21
22
23
24
25
```

Page 3

```
 1              TERI LYNN HINKLE
 2             INDEX TO EXHIBITS
 3     Exhibit 1   Letter to Teri Lynn Hinkle from
                   K. Ann Broussard, dated February
 4                 20, 2014            20
       Exhibit 2   Plaintiff's Responses and
 5                 Objections to Defendant, Midland
                   Credit Management's First Set of
 6                 Interrogatories        34
       Exhibit 3   First Amended Complaint for
 7                 Violations of the FDCPA, FCRA
                   And TCPA            64
 8     Exhibit 4   Response and Notice of Intent
                   To Sue            106
 9     Exhibit 5   Letter to J. Brandon Black from
                   Teri Lynn Hinkle, dated April
10                 5, 2013            106
       Exhibit 6   Letter to Teri Lynn Hinkle from
11                 MCM, dated April 30,
                   2013            106
12     Exhibit 7   Certificate of Service     114
       Exhibit 8   Certificate of Service     114
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              TERI LYNN HINKLE
 2          P R O C E E D I N G S,
 3              - - -
 4           TERI LYNN HINKLE,
 5     having first been duly sworn, was deposed and
 6     examined as follows:
 7           EXAMINATION
 8     BY MS. BROUSSARD:
 9        Q   Good morning, Ms. Hinkle.
10        A   Good morning.
11        Q   My name is Ann Broussard. I'm with King
12     & Spalding in Atlanta and I represent the defendants
13     in this case, Midland Credit Management, Inc.,
14     Midland Funding, LLC, and Encore Capital Group,
15     Incorporated. And this is your deposition in the
16     case Teri Lynn Hinkle versus Midland Credit
17     Management, Inc. and others currently pending in the
18     Southern District of Georgia, Dublin Division, Case
19     No. 3:13-CV-33.
20        A   What others?
21        Q   Midland Credit Management, Inc., Midland
22     Funding, LLC, and Encore Capital Group, Inc.
23        A   Right.
24        Q   Those are the defendants.
25        A   You said "and others."
```

Page 5

```
 1              TERI LYNN HINKLE
 2        Q   That was just a shortened version of the
 3     style instead of --
 4        A   Okay.
 5        Q   -- reading out all the defendants.
 6        A   All right.
 7        Q   That's what that means. And you are here
 8     this morning for your deposition in this lawsuit that
 9     you brought against my clients. Could you state your
10     name for the record?
11        A   Teri Lynn Hinkle.
12        Q   And what is your current address?
13        A   322 Bethel Street, Eastman, Georgia.
14        Q   How long -- go ahead.
15        A   You need the Zip?
16        Q   Sure.
17        A   31023.
18        Q   And how long have you lived at that
19     address, Ms. Hinkle?
20        A   About five years.
21        Q   Do you rent or own it?
22        A   Rent.
23        Q   And prior to that, where did you live?
24        A   At Legacy Road here in Eastman.
25        Q   Do you remember the address?
```

2  (Pages 2 to 5)

Page 6

TERI LYNN HINKLE

1
2    A   No, it was a new house and it didn't have
3  a number yet.
4    Q   Did you own or rent?
5    A   Rent.
6    Q   How long did you live at that residence?
7    A   Till it was sold.  It was about six or
8  eight months.
9    Q   And then prior to that, do you recall
10  where you -- what your address was?
11    A   515 Lawndale, Eastman.
12    Q   Eastman?  How long did you live there?
13    A   It was just a few months.
14    Q   So that covers maybe about five or six
15  years.  Do you recall what your address was prior to
16  Lawndale?
17    A   It was in Michigan.  I don't remember the
18  house number though.  66180.
19    Q   What city, city in Michigan?
20    A   South Rockwood.
21    Q   Do you own or rent that house?
22    A   We owned.
23    Q   Where were you born?
24    A   Montana.
25    Q   City?

Page 7

TERI LYNN HINKLE

1
2    A   Missoula.
3    Q   I actually went to Missoula, Montana a
4  couple of years ago.
5    A   Did you?  I haven't been there since I
6  was very little.
7    Q   What's your date of birth?
8    A   May 26th, 1952.
9    Q   And where did you attend high school?
10    A   Which time?  We moved around so I went to
11  several different high schools.
12    Q   Where did you graduate?
13    A   Paris.
14    Q   Is that Paris, France?
15    A   Paris, California.
16    Q   What year was that that you graduated?
17    A   1970.
18    Q   Did you move around a lot because your
19  family was in the military?
20    A   Uh-huh.
21    Q   And after you graduated high school in
22  1970, did you attend college or any other
23  postsecondary education?
24    A   Yes.  I went to San Jacinto,
25  J-A-C-I-N-T-O.  That's in Hemet, California, and

Page 8

TERI LYNN HINKLE

1
2  Riverside City.
3    Q   Was San Jacinto a college?
4    A   Yeah.
5    Q   Did you obtain a degree?
6    A   No.
7    Q   What did you study?
8    A   First time at San Jacinto was graphic
9  arts.
10    Q   And what about Riverside?
11    A   Theater arts.
12    Q   How long did you attend?
13    A   Three-and-a-half years.
14    Q   Any other postsecondary education?
15    A   No, other than insurance school for
16  insurance license.
17    Q   And let me back up a bit because we
18  launched right into these questions.  Have you ever
19  given your deposition before?
20    A   No.
21    Q   Have you ever testified in court as a
22  witness?
23    A   Yeah, in a traffic case many years ago;
24  and for -- what do you call that, restraining order.
25    Q   Was it a restraining order that you were

Page 9

TERI LYNN HINKLE

1
2  getting against someone else?
3    A   Uh-huh, yes.
4    Q   Okay.  Who were you trying to get it
5  against?
6    A   It was a guy named Robert Manning.
7    Q   When was that?
8    A   I'm sorry?
9    Q   When was that?
10    A   Oh, that was -- let's see, about 2007 or
11  '8.  I don't remember the exact date.
12    Q   So you've never testified in any lawsuit
13  that you personally --
14    A   No.
15    Q   -- brought against a defendant?
16    A   No.
17    Q   Do you understand that your testimony is
18  under oath?
19    A   Yes.
20    Q   And has the same force and effect as if
21  you were testifying in court today?
22    A   Uh-huh.
23    Q   And you understand that if you fail to
24  tell the truth, there could be consequences for lying
25  under oath.  Do you understand that?

3  (Pages 6 to 9)

| Page 10 | Page 11 |
|---|---|

**Page 10**

TERI LYNN HINKLE

1
2  A   Yes.
3  Q   If I ask you a question that you don't
4  understand, please feel free to ask me to rephrase it
5  and I'll try to reword it and ask it so that you
6  understand it.
7        What did you do to prepare for your
8  deposition today?
9  A   Reviewed the rules.
10  Q   What rules?
11  A   There's a Nolo's Deposition Handbook that
12  explains the rules on objections and things like
13  that.
14  Q   Anything else that --
15  A   No.
16  Q   -- you did to prepare?
17  A   Let my daughter know where I was going to
18  be.
19  Q   Are you currently on any medication that
20  would affect your ability to --
21  A   No.
22  Q   -- give your best and truthful testimony
23  today?
24  A   No.
25  Q   And then also if you could please allow

**Page 11**

TERI LYNN HINKLE

1
2  me to finish my question before you answer, even
3  though you may be thinking about the answer and you
4  know it, instead of jumping the gun, just let me
5  finish and I'll try to let you finish your answer
6  before I start the next question.  Do you understand?
7  A   Yep.
8  Q   All right.  Who else lives with you in
9  your home?
10  A   Just my husband.
11  Q   What's his name?
12  A   Pat.
13  Q   Pat Hinkle?
14  A   Uh-huh.
15  Q   Is he from Eastman?
16  A   No.
17  Q   Where is he from?
18  A   I'm sorry?
19  Q   Where was he born?
20  A   Oh, Michigan.
21  Q   Southwood?
22  A   No, I think he was born in Wyandotte.
23  Q   What is -- can you spell that?
24  A   It's W-Y-A-N-D-O-T-T-E, like the Indian
25  tribe.

**Page 12**

TERI LYNN HINKLE

1
2  Q   How old is he?
3  A   64.
4  Q   When did you move to Eastman, Georgia?
5  A   It was -- I'm trying to remember -- it
6  was in the winter of -- it was either the end of 2008
7  or the first of 2009.  I don't remember the exact
8  time.
9  Q   And that's when you moved to Lawndale?
10  A   Uh-huh.
11  Q   And was that a rental or ownership?
12  A   No.  We were staying with my son and his
13  wife while we looked for a house.
14  Q   So you and your husband moved here
15  together in 2008?
16  A   It was either the end of 2008 or the
17  first part of 2009.
18  Q   So why did you move to Eastman?
19  A   To get back down here with my kids.  It
20  had to do with the restraining order.
21  Q   And how many kids do you have?
22  A   Two and one that's missing.
23  Q   For the two, how old are they?
24  A   My son will be 40 in April and my
25  daughter's 25.

**Page 13**

TERI LYNN HINKLE

1
2  Q   Anyone else live in your household with
3  you and your husband?
4  A   No.
5  Q   How long have you and your husband been
6  married?
7  A   26 years.
8  Q   Does he work?
9  A   Off and on.
10  Q   What's his occupation?
11  A   Just assembler.
12  Q   Is he currently working right now?
13  A   Today, yes.
14  Q   Where?
15  A   Husqvarna.
16  Q   Is that H-U-S-K --
17  A   No.  It's H-U-S-Q-V-A-R-N-A.  No U.
18  Q   Do you know what his salary is?
19  A   It's minimum wage, whatever minimum wage
20  is.
21  Q   Do you know approximately what his yearly
22  salary is, just an estimate?
23  A   No, because they -- with Husqvarna they
24  let you work a couple of months and then they lay
25  everybody off and then they call them back and they

Page 14

TERI LYNN HINKLE

1  lay them off.  And it's -- you never know.
2      Q   Do you currently work?
3      A   No.
4      Q   Are you retired from an occupation?
5      A   Uh-huh.
6      Q   What are you retired from?
7      A   Entertainment.
8      Q   Can you describe to me what you did in
9  entertainment?
10     A   Oh, you name it, theater, music.  I was a
11  singer.
12     Q   When's the last time you worked in
13  entertainment?
14     A   Two thousand -- early part of 2008.
15     Q   Where were you employed?
16     A   For myself.
17     Q   So you would contract yourself out to
18  different places?
19     A   Uh-huh.
20     Q   So can you describe for me what kind of
21  work you did?
22     A   I DJ'd for -- well, more than that, but
23  private parties, weddings and receptions, things like
24  that.

Page 15

TERI LYNN HINKLE

1      Q   Was that in Michigan?
2      A   Uh-huh.
3      Q   Did you -- did your company have a name?
4      A   Dynamic Entertainment.
5      Q   Was it incorporated?
6      A   No.
7      Q   Why did you retire from this in 2008?
8      A   Unlike Dinah Shore, I knew when to quit
9  and there's really no market here.
10     Q   Do you know approximately what your
11  yearly income was from Dynamic Entertainment?
12     A   It fluctuated, too, just depended.  Went
13  downhill after about 2005 when the economy started
14  getting bad.
15     Q   So in a good year, how much would you
16  make?
17     A   I don't know.  I don't remember.
18     Q   Was it over like 50,000?
19     A   No, no.  I only worked weekends.
20     Q   Okay.  So how much would you get paid
21  for -- I mean, for lack of a better term, a gig?
22     A   Oh, anywhere between 4- and 600.
23     Q   And you would have a couple of
24  engagements per weekend or one per weekend?

Page 16

TERI LYNN HINKLE

1      A   In the summer sometimes, yeah.  Not so
2  much in the winter.
3      Q   So you were -- you referenced a
4  restraining order.  Did that have anything to do with
5  you moving to Eastman?
6      A   Yes.
7      Q   How did that affect your decision to
8  move?
9      A   Well, I was the first person to seek and
10  cause a person to be prosecuted under the Internet
11  stalking law.  And that gave us the opportunity to
12  get out of his reach.
13     Q   He was stalking you on the Internet in
14  Michigan?
15     A   He was -- well, he was homicidal.  He was
16  after my daughter.  He tried to kill her a couple of
17  times.
18     Q   Was this someone who was dating your
19  daughter?
20     A   Early on, but then not, you know.
21  Obsession.
22     Q   Was your daughter in Michigan at the time
23  or in Eastman?
24     A   Uh-huh.  We moved her down here and then

Page 17

TERI LYNN HINKLE

1  we came later.
2      Q   So why the decision to move from Michigan
3  to Eastman, Georgia?
4      A   Well, my son was already here.
5      Q   Okay.  So what is your son's occupation?
6      A   He's a prison guard.
7      Q   At the Dodge County Eastman jail?
8      A   No, they moved up near where you are.
9  I'm not sure what prison he's at now.
10     Q   Somewhere near Atlanta?
11     A   Uh-huh.
12     Q   Is he married?
13     A   Yes.
14     Q   Any children?
15     A   Well, he has two in California.
16     Q   What about your daughter, is she married?
17     A   No; divorced.
18     Q   Any kids?
19     A   One.
20     Q   All right.  How old?
21     A   Five.
22     Q   What is her occupation?
23     A   Retail sales.
24     Q   Where does she work?

Page 18

TERI LYNN HINKLE

2    A   Aaron's.
3    Q   Do you work part time at all?
4    A   I'm sorry?
5    Q   Do you work part time at all?
6    A   No.
7    Q   So what is your source of income?
8    A   My husband's social security mostly.
9    Q   Do you collect any sort of social
10   security at all?
11   A   No.
12   Q   Do you collect any kind of government
13   benefits?
14   A   No.
15   Q   So what would you estimate is your yearly
16   income based on all sources, your husband's income,
17   social security benefits, for your household?
18   A   Oh, that's really hard to say because his
19   work is so off and on.  Depends on unemployment.
20   What did he make last year?
21   Q   Does he collect unemployment benefits,
22   too?
23   A   In between.  Last time they laid him off,
24   it ran out though, so I'm not really sure.  I don't
25   remember what he made last year.

Page 19

TERI LYNN HINKLE

2    Q   Have you filed any taxes for the 2013 tax
3    year?
4    A   Yeah.  That was like a month ago, but I
5    don't remember what the adjusted gross income was.
6    Q   All right.  Did you get a refund or did
7    you have to pay?
8    A   No.  He got a refund of
9    three-hundred-and-some dollars.  I don't remember
10   exactly.
11   Q   So you can't estimate at all what your
12   2013 household income was?
13   A   I don't remember what it was.
14   Q   Was it over $25,000?
15   A   It was somewhere around that.
16   Q   So would you estimate it to be somewhere
17   between 25- and 30,000?
18   A   I think so.  I'm not positive.
19          (Whereupon, Exhibit No. 1 was marked for
20          identification by the court reporter.)
21   BY MS. BROUSSARD:
22   Q   Ms. Hinkle, I've handed you a document
23   marked as Exhibit 1.  It's the cover letter and the
24   notice of deposition for your deposition this
25   morning.  Do you recall receiving a copy of that by

Page 20

TERI LYNN HINKLE

2    e-mail and by --
3    A   I can't --
4    Q   Let me finish, please -- by e-mail and
5    United States mail?
6    A   If this is the last one you sent me but I
7    can't see it.  These are distance.  If this is the
8    letter that you sent me recently, is it?
9    Q   It's the letter and the notice of
10   deposition that I sent you on February 20th, 2014.
11   A   Then if I could see it, I would recognize
12   it.
13   Q   And, Ms. Hinkle, you understood that you
14   were coming to your deposition this morning.  You
15   didn't tell me that -- you say you can't see?
16   A   I've told you that before that I --
17   Q   So if you take off your glasses, can you
18   see?
19   A   No.
20   Q   So what would you need in order to be
21   able to see?  Because I'm going to be putting several
22   documents in front of you today --
23   A   Reading glasses.  You didn't tell me I
24   would have to read.  You said oral.
25   Q   -- So you're telling me that you can't

Page 21

TERI LYNN HINKLE

2    see that document?
3    A   I can't read it.  I can see the page but
4    I can't read it.  I can see your signature there.
5    Q   All right.  But you do recall getting a
6    copy of the notice of deposition --
7    A   Yes.
8    Q   -- requiring you to appear for your
9    deposition today; is that correct?
10   A   Yes.
11   Q   All right.  I want to talk about other
12   lawsuits that you filed.  Have you filed any cases in
13   state court in the last five years?
14   A   No.
15   Q   But you have filed several lawsuits in
16   federal court in the last five years; is that
17   correct?
18   A   Yes.
19   Q   I want to talk about those.  When was
20   the -- before you sued my clients, when was the last
21   time you filed a lawsuit against a company or an
22   individual?
23   A   I don't remember the dates.
24   Q   Well, what --
25   A   It was back in --

6 (Pages 18 to 21)

Page 22

TERI LYNN HINKLE

1
2    Q    -- companies have you sued?
3    A    It was back in 2011 I believe.
4    Q    And what companies did you sue in 2011?
5    A    It was ARS.
6    Q    Let's talk about the ARS lawsuit.
7    A    That one is still ongoing and appealed,
8    so I object to discussing it.
9    Q    No, it's not subject to the
10   attorney/client privilege, so you're not represented
11   by an attorney so you have to answer my questions
12   today.  And actually I checked Pacer.  The ARS appeal
13   was dismissed for lack of prosecution.
14   A    And they sent me -- it was because of a
15   mixup with the mail.  I did not receive the notice I
16   was supposed to get so they just sent me paperwork to
17   file the brief and appendix so -- for reinstatement.
18   Q    Why did you sue ARS?
19   A    For pulling my credit report without a
20   permissible purpose.  It was an FCRA violation.
21   Q    And did you sue them for a certain dollar
22   amount?
23   A    Just statutory.
24   Q    And ARS won summary judgment; is that
25   correct?

Page 23

TERI LYNN HINKLE

1
2    A    Yes.
3    Q    Any other claims against ARS other than
4    for pulling a credit report without a permissible
5    purpose?
6    A    No.  It was very simple.
7    Q    And in the underlying district court
8    case, they did get a judgment against you; is that
9    right?
10   A    Underlying?
11   Q    In the state court -- in the federal
12   court case?
13   A    Yes.
14   Q    And then prior to ARS, what other
15   companies did you sue?
16   A    There was Pinnacle.
17   Q    And what happened?  What were your claims
18   against Pinnacle?
19   A    They were reporting false information on
20   my credit report and obtaining my credit report
21   without a permissible purpose.
22   Q    What was the outcome of that case?
23   A    They apologized and settled.
24   Q    Was that for a confidential amount?
25   A    I'm sorry?

Page 24

TERI LYNN HINKLE

1
2    Q    Was it for a confidential amount?
3    A    No.
4    Q    How much did you settle for?
5    A    A thousand dollars.
6    Q    A thousand and an apology?
7    A    Well, I didn't ask for the apology.  I
8    just got it.
9    Q    And prior to Pinnacle, who did you sue?
10   A    Plaza.
11   Q    Is that P-L-A-Z-A?
12   A    Uh-huh.
13   Q    What kind of company is that?
14   A    It's Plaza -- wait, let me think because
15   they changed their name.  It was Plaza Associates I
16   think to begin with.  And then they changed it to
17   Plaza Recovery I think.
18   Q    What kind of company is that?
19   A    They're a collection company.
20   Q    What were your claims against Plaza?
21   A    That was impermissible pull.
22   Q    What was the outcome of that case?
23   A    It settled.
24   Q    What was the settlement amount?
25   A    That was before they even put in an

Page 25

TERI LYNN HINKLE

1
2    answer, so I'm trying to remember.  I think it was
3    750.
4    Q    $750?
5    A    Yeah.
6    Q    And prior to Plaza Associates, who did
7    you sue?
8    A    Northland Group and LVNV.  That was in
9    the same suit.
10   Q    And was this just another type of debt
11   collector, a TCPA claim?
12   A    Uh-huh.
13   Q    Did you settle or was it dismissed?
14   A    It was settled.
15   Q    For how much?
16   A    Let's see.  They were separate.  So for
17   which one?
18   Q    How much did you settle with Northland?
19   A    5,000 I believe.
20   Q    And with LVNV?
21   A    I don't remember.  I think it was five.
22   I'm not sure on that.  I'd have to look at that.
23   Q    Prior to Northland and LVNV what other
24   companies have you sued?
25   A    There were some that I filed in the

7  (Pages 22 to 25)

Page 26

TERI LYNN HINKLE

2 beginning when I was first learning how to defend
3 myself and I dismissed them. One of them was Afni I
4 believe.
5    Q  You just dismissed that one?
6    A  No. There were -- I think there were
7 five that I filed all at once before I really
8 understood what I was doing. And I don't remember
9 the names of them. Northland was one of them. I had
10 re-filed it after I had withdrawn it. I think ARS
11 was one of the originals, too. I don't really
12 remember.
13    Q  All right. So how much would you say
14 that you've collected from these various lawsuits
15 that you've filed? Would you say that it's under
16 $10,000?
17    A  No, it would be over.
18    Q  So would it be under 15, about 10- to
19 15,000?
20    A  Yeah.
21    Q  And that's over the course of how many
22 years?
23    A  That was since 2011.
24    Q  So none prior to 2011?
25    A  No.

Page 27

TERI LYNN HINKLE

2    Q  So why do you file these lawsuits?
3    A  Because my rights are violated. I do
4 everything I can to mitigate the situation outside of
5 litigation.
6    Q  Do you have any current credit cards in
7 your name?
8    A  No.
9    Q  Do you have any accounts that are
10 currently in your name such as utility bill --
11 utilities, bank accounts --
12    A  I don't have --
13    Q  -- checking, saving accounts?
14    A  No bank accounts.
15    Q  What about your husband, does he have any
16 credit cards?
17    A  No.
18    Q  Does he have any bank accounts?
19    A  No.
20    Q  So how do you handle your financial
21 transactions?
22    A  Cash.
23    Q  Do you use any other kinds of financial
24 institutions such as short-term loan companies,
25 finance companies?

Page 28

TERI LYNN HINKLE

2    A  No.
3    Q  Title pawn?
4    A  A what?
5    Q  Title pawn?
6    A  No.
7    Q  When's the last time you had a loan in
8 your name?
9    A  I don't even know. I don't remember and
10 I don't think I've ever had a loan.
11    Q  Have you ever had any credit cards in
12 your name?
13    A  Years ago.
14    Q  When's the last time you had a credit
15 card in your name?
16    A  I don't even know. It was a long time
17 ago.
18    Q  Do you have a cell phone in your name?
19    A  No.
20    Q  Have you ever had a cell phone?
21    A  Yes.
22    Q  When's the last time you had a cell
23 phone?
24    A  That was about 2008 before we moved to
25 Georgia.

Page 29

TERI LYNN HINKLE

2    Q  Was it with T-Mobile?
3    A  No.
4    Q  Who was it with?
5    A  Virgin.
6    Q  What's your social security number?
7    A  I don't know it by heart. And I don't
8 give it out except to the IRS.
9    Q  Do you know the last four digits of it?
10    A  No.
11    Q  We'll be moving to compel --
12    A  I always get --
13    Q  -- I will be moving to compel to get your
14 social security number because it is certainly
15 relevant in this lawsuit.
16    A  Well, your clients should already have
17 it. I just don't have my social security card with
18 me.
19    Q  Do you have any utilities in your name?
20    A  The power is in my name I believe.
21    Q  What power company?
22    A  Georgia Power.
23    Q  Any other utilities in your name?
24    A  What else do we have?
25    Q  Do you have any -- is the gas in your

8 (Pages 26 to 29)

Page 30

TERI LYNN HINKLE

1 name or in your husband's name?
2     A   We don't have gas.
3     Q   What about water and sewer?
4     A   The water -- the water and sewer and all
5 that is the same and that's in my name.
6     Q   What about trash pickup?
7     A   That's with the water.
8     Q   Is that included in the water and sewer?
9     A   Yeah.
10    Q   What about cable?
11    A   We don't have cable.  Telephone is in my
12 name.
13    Q   Is it with BellSouth?
14    A   AT&T.
15    Q   Does your husband have a cell phone?
16    A   He has a TracFone.
17    Q   Any other utilities that you can think of
18 that are in your name?
19    A   Dish.
20    Q   That's in your name?
21    A   Uh-huh.
22    Q   And I asked about cable with satellite
23 you have and that's in your name, right?
24    A   Satellite.  We don't have cable.

Page 31

TERI LYNN HINKLE

1     Q   Okay.
2     A   Yeah, satellite's in my name.
3     Q   Any other utilities that you can think of
4 that are in your name?
5     A   Let me think what we have.  We have the
6 phone.  We have the satellite.  We have power.  We
7 don't have gas.  Water.  That would be it.
8     Q   Are you aware of whether any of these
9 utility companies have run credit checks on you in
10 order to give you service?
11    A   Not that I recall.  I don't think so.
12    Q   When's the last time you looked at your
13 credit report?
14    A   I don't remember the exact date, but it
15 was last year.
16    Q   Do you remember when about last year?
17    A   It would have been last summer.
18    Q   Do you recall which report you looked at
19 if it was TransUnion, Experian or Equifax?
20    A   All three.
21    Q   All of them?
22    A   All three.
23    Q   At the time, do you recall seeing any
24 collection accounts on your file?

Page 32

TERI LYNN HINKLE

1     A   Yeah, your clients.
2     Q   Any other collection accounts?
3     A   Not that I recall, no.
4     Q   Any other accounts reporting on your
5 file?
6     A   Paid off accounts.
7     Q   Other than any Midland related accounts,
8 do you recall seeing any that you believe didn't
9 belong to you?
10    A   On my last credit reports?
11    Q   Right.
12    A   I think there was a DVD thing like one of
13 those -- I think it was Columbia.  And I sent them a
14 debt validation and they took it off because it
15 wasn't mine.
16    Q   Do you currently have any outstanding
17 debts?
18    A   No.
19    Q   In the last five years, have you had any
20 debts that you failed to pay?
21    A   I don't believe so.
22    Q   When you say you don't believe so, you
23 believe that it's a possibility that you may have
24 some debts that you failed to pay?

Page 33

TERI LYNN HINKLE

1     A   I really don't remember.  Not that I know
2 of.
3     Q   What about your husband?  Do you know if
4 he has any -- if he's incurred any debts in the last
5 five years that he's failed to pay?
6     A   No.
7     Q   Have you ever had any judgments against
8 you?
9     A   No.
10    Q   Any --
11    A   Again, not that I know of.
12    Q   -- any liens that you know of?
13    A   No.
14        (Whereupon, Exhibit No. 2 was marked for
15        identification by the court reporter.)
16 BY MS. BROUSSARD:
17    Q   Ms. Hinkle, I've handed you a document
18 marked as Exhibit 2.  And those are your Responses
19 and Objections to Midland Credit Management's First
20 Request For Admissions, First Set of Interrogatories
21 and First Requests For Production.
22    A   My answers you said?
23    Q   Your answers.
24    A   Okay.

9  (Pages 30 to 33)

Page 34

TERI LYNN HINKLE

1
2  Q   So if you want to thumb through those --
3  A   It wouldn't do me any good because I
4  can't see it.
5  Q   -- Well, just go ahead and look at them
6  anyway.  Would a magnifying glass help?
7  A   I could see them better --
8  Q   Just tell me if you can recognize those
9  as your answers to Midland Credit Management's
10  discovery requests.
11       THE REPORTER:  I have a magnifying
12  glass if you need it and I also have a
13  spare pair of reading glasses.
14       MS. BROUSSARD:  Ms. Fulwood has an
15  extra pair of readers.
16       THE WITNESS:  Okay.  We'll try that.
17  Thank you.
18       THE REPORTER:  You're welcome.
19  A   It looks like it.  I don't remember every
20  single one of my answers, but it looks like it.
21  BY MS. BROUSSARD:
22  Q   So why are you suing my clients, Midland
23  Funding, Midland Credit Management, Inc. and Encore
24  Capital Group, Inc.?
25  A   For violations of my civil rights.  I

Page 35

TERI LYNN HINKLE

1
2  attempted to mitigate with them and they didn't want
3  to.
4  Q   And when you say mitigate, you sent them
5  demand letters --
6  A   Yes, I did.
7  Q   -- requesting that they remove the
8  accounts and pay you some money?
9  A   No.  First, I sent them debt validation
10  letters, which they ignored, and then they continued
11  putting stuff on my credit report.  I did so again.
12  I disputed with the credit reporting agencies and
13  they refused to stop.
14  Q   Did you ever call any of the Midland
15  defendants?
16  A   No.
17  Q   Did you -- do you recall how many letters
18  you sent?
19  A   At least -- let me see, it's kind of
20  convoluted because they were switching things around.
21  Q   And you have no evidence that anyone was
22  switching anything around; is that correct?
23  A   My credit reports.
24  Q   Have you produced any copies of credit
25  reports in the case?

Page 36

TERI LYNN HINKLE

1
2  A   What do you mean?
3  Q   Have you produced any copies of your
4  credit reports in response to the Midland
5  defendants --
6  A   No.  They already have them.
7  Q   -- request for production?
8  A   They already pulled them.  They already
9  got them.
10  Q   But you would agree that the Midland
11  defendants did ask you to produce copies of your
12  credit reports in this lawsuit and you have failed to
13  do so; is that correct?
14  A   I have said they already have them.
15  Q   That's not responsive to my question.  My
16  question is:  Isn't it correct that the Midland
17  defendants have asked you to produce copies of your
18  credit reports in this lawsuit but you have failed
19  and refused to do so; is that right?
20  A   They asked me for them.  I stated they
21  already had them.
22  Q   That's a yes or no answer.  You have not
23  produced your credit reports in this lawsuit, yes or
24  no, right?
25  A   I have not given them to them, no.

Page 37

TERI LYNN HINKLE

1
2  Q   Thank you.  Did you ever make -- well,
3  did you ever receive any phone calls from the Midland
4  defendants?
5  A   Yes.
6  Q   Did you ever talk to anybody on the phone
7  on behalf of the Midland defendants?
8  A   In what -- what do you mean?
9  Q   Meaning if they called, did you not
10  answer the phone?
11  A   Well, I answered part of the time.  Other
12  times they called and it was just on the caller ID.
13  Q   Do you recall what those conversations
14  were?
15  A   They were calling -- you know, just a
16  debt collection call.  I told them to stop calling
17  me.
18  Q   Do you have any recordings of those
19  calls?
20  A   No.
21  Q   And how do you know it was that you were
22  talking to someone from any of the Midland
23  defendants?
24  A   They identified themselves.
25  Q   As whom?

10  (Pages 34 to 37)

Page 38

TERI LYNN HINKLE

1
2　　A　Midland Credit Management.
3　　Q　Did they identify any specific accounts?
4　　A　No.
5　　Q　Do you have any notes or any other
6　recordings, written recordings from those phone
7　calls?
8　　A　No.  I kept a log of when they called of
9　the calls that I knew for sure were them.
10　　Q　Do you still have that log?
11　　A　Yes.
12　　Q　I just want to make a request on the
13　record that you need to produce the log.
14　　　　Do you recall what the dates were?
15　　A　No.
16　　Q　Are you claiming that you've experienced
17　any economic damages based on the alleged actions of
18　the Midland defendants?
19　　A　In what type -- what do you mean?
20　　Q　Economic damages in terms of any
21　out-of-pocket losses, credit denials, financial
22　monetary loss?
23　　A　Well, I haven't applied for anything
24　other than a bank account, which I couldn't get.
25　　Q　Now, you said you did not have a bank

Page 39

TERI LYNN HINKLE

1
2　account.  When did you try?
3　　A　This was several years ago.
4　　Q　When was that?
5　　A　That was around 2010.
6　　Q　Which bank?
7　　A　Citizens.
8　　Q　Were you just trying to get a checking
9　account?
10　　A　Yes.
11　　Q　You were denied?
12　　A　Yes.
13　　Q　Why?
14　　A　Because of the credit report.  They
15　didn't specifically say what though.
16　　Q　So you have no reason to believe that you
17　were denied based on any information that my --
18　　A　I didn't --
19　　Q　Let me finish, please -- so you can't say
20　that you were denied based on any information that
21　the Midland defendants reported on your credit
22　report, right?
23　　A　What, the checking account --
24　　Q　Yes.
25　　A　-- you mean?  I don't know for sure.

Page 40

TERI LYNN HINKLE

1
2　　Q　All right.  Let's get back to your
3　economic losses.  Any other financial or monetary
4　losses that you were claiming based on the --
5　　A　Just --
6　　Q　-- alleged actions of the Midland
7　defendants?
8　　A　Just what it cost me to file the suit,
9　etcetera, or move it forward.
10　　Q　And you did not pay a filing fee --
11　　A　No.
12　　Q　-- to file this lawsuit?
13　　A　No.
14　　Q　So the $400 filing fee was waived?
15　　A　Yes.
16　　Q　Because you went -- was it IFP?
17　　A　Yeah.
18　　Q　In forma --
19　　A　Yeah.  I had to pay for the service
20　though.
21　　Q　-- How much was service?
22　　A　By -- it was the marshals.  I believe it
23　was 45.
24　　Q　Any other economic losses that you're
25　claiming from having to litigate this lawsuit?

Page 41

TERI LYNN HINKLE

1
2　　A　Well, I wouldn't know the totals.
3　There's a lot of postal, ink, paper, all of that sort
4　of thing.
5　　Q　Could you say that it's under $100?
6　　A　No.
7　　Q　Would you say that it's under $200?
8　　A　No.
9　　Q　But it is your testimony that any
10　financial losses that you are claiming all flow from
11　you having to litigate this case and not anything you
12　incurred prior to filing this lawsuit, right?
13　　A　Other than statutory damages, correct.
14　　Q　How much in statutory damages are you
15　seeking?
16　　A　Between all three or just individually?
17　　Q　Individually?
18　　A　You would have to divide.  I don't know
19　the exact -- how do I explain this?  Under the S2B,
20　the numbers are different between MCM and Midland
21　because they are at different times and different
22　numbers of months.  So I really couldn't say unless I
23　look at my notes, which I don't have.
24　　Q　What notes do you have?
25　　A　That would be privileged under work

Page 42

TERI LYNN HINKLE

1  product.
2     Q   I'm not asking you to produce them right
3  now. I'm just asking you to tell me what kind of
4  notes do you have?
5     A   It was just the notes to make an outline
6  for the complaint so that I knew exactly what
7  happened when.
8
9     Q   Ms. Hinkle, do you file these lawsuits as
10 a supplemental source of income?
11    A   No. If I did, it didn't work very well.
12 No.
13    Q   Any other financial or monetary losses
14 other than the statutory damages that you're
15 claiming?
16    A   No.
17    Q   Are you claiming any noneconomic damages
18 in this case?
19    A   Such as?
20    Q   Such as emotional distress for instance?
21    A   Yes.
22    Q   What is your claim for emotional distress
23 based on?
24    A   Well, it all stems from the issue that
25 brought us here.

Page 43

TERI LYNN HINKLE

1
2     Q   Could you be a little more specific about
3  the issue that you're referring to?
4     A   Well, when we were dealing with the
5  stalker and finally managed to get him locked up, we
6  were able to get my daughter out of the state and
7  somewhere where he couldn't possibly know where she
8  was and then we followed her. Then I discovered that
9  all these people are obtaining my personal
10 information.
11    Q   But this has -- and I'm sorry to
12 interrupt you -- this has nothing to do with the
13 Midland defendants; is that correct?
14    A   I wasn't finished.
15    Q   Okay.
16    A   Okay. And that personal information
17 includes location, etcetera. This person that was
18 stalking my daughter and tried to kill her is now out
19 of jail. That was when I began to do research on the
20 industry your clients are in and that is when I
21 discovered that they routinely hire felons for their
22 call centers, etcetera.
23        That really upset me. I don't know what
24 they're doing with my personal information. I don't
25 know who they share it with. I don't know anything

Page 44

TERI LYNN HINKLE

1  about the people that they give it to. So it is
2  stressful, yes.
3     Q   Specifically as to the two accounts that
4  are at issue in this lawsuit, how have you been
5  emotionally distressed over those specific law --
6  those specific accounts?
7     A   I don't understand the question.
8     Q   There are two accounts at issue in this
9  case; is that correct?
10    A   You mean over the whole time?
11    Q   Right.
12    A   That they were claiming?
13    Q   That you -- that you discuss in your
14 amended complaint.
15    A   Yes, that they were claiming.
16    Q   I'm not asking about the research that
17 you've done on the industry. I'm asking about those
18 two specific accounts. What is the basis for your
19 claim for emotional distress related to those two
20 Midland accounts?
21    A   It has nothing to do with alleged
22 accounts per se. It has to do with the behavior of
23 your clients, not with any account.
24    Q   Ms. Hinkle, you have no evidence that the

Page 45

TERI LYNN HINKLE

1  Midland defendants hired any felons to contact you;
2  is that correct?
3     A   I don't know that. I don't know that
4  because I have no way to know that. And they're not
5  producing what I've asked for.
6     Q   But as we sit here today, you have no
7  evidence to substantiate any kind of claim that
8  Midland hired a felon or --
9     A   I have no --
10    Q   -- or broke the law in researching in
11 order to locate you to collect on any accounts; is
12 that correct?
13    A   No. That's a compound question. Can you
14 ask it separately, please?
15    Q   You have no evidence that Midland hired
16 any felon to assist in collecting on any account you
17 owed; is that correct?
18    A   No, I don't. No.
19    Q   And you have no evidence that Midland
20 broke the law in researching you in order to collect
21 on accounts that you owe; is that correct?
22    A   No, that's incorrect.
23    Q   What's incorrect about it?
24    A   Well, either they did a proper

12  (Pages 42 to 45)

Page 46

TERI LYNN HINKLE

1
2   investigation when I disputed and decided to violate
3   anyway or they didn't and decided to violate anyway.
4   Either way they still violated the law.
5       Q   But you have no evidence that the Midland
6   defendants violated the law; is that correct?
7       A   I have my credit reports.
8       Q   Which you have not produced; is that
9   right?
10      A   Your clients already have them.
11      Q   So you're saying that you think just the
12  very existence of a credit report establishes a
13  violation; is that right?
14      A   The violations are indicated on the
15  credit report.  That is what I disputed.  I answered
16  you.
17      Q   Are you claiming any other financial
18  damages from this?
19      A   I don't understand.
20      Q   I just want to make sure that I'm
21  absolutely clear that you're only claiming statutory
22  damages, no financials?
23      A   I really don't understand what you mean.
24  The statutory damages, I'm not saying that they --
25  reporting on my credit report cost me something.

Page 47

TERI LYNN HINKLE

1
2       Q   Now, you claim that you suffered from
3   emotional distress.  Are you claiming that you
4   suffered any physical harm?
5       A   I don't know if you consider that
6   physical or not, losing sleep or losing weight, being
7   upset, you know.
8       Q   Is the last time --
9       A   Is that physical?
10      Q   -- When is the last time you lost sleep?
11      A   Over this?
12      Q   Are you saying that you lost sleep over
13  this?
14      A   Yes, in the beginning.
15      Q   When's the last time you lost sleep over
16  it?
17      A   It's been a little while.
18      Q   Can you give me an approximate time
19  period?
20      A   Would have been a few months ago.
21      Q   Sometime in the fall?
22      A   I don't remember.
23      Q   You said a few months ago, so that would
24  put it around maybe December?
25      A   I said I don't remember.

Page 48

TERI LYNN HINKLE

1
2       Q   Did anyone witness you losing sleep like
3   your husband?
4       A   No.  I don't think so.
5       Q   Did anyone else, your daughter witness
6   you losing sleep?
7       A   She doesn't live with me.
8       Q   Is it something that you discussed with
9   any family members?
10      A   No.
11      Q   So you're the only person who knows
12  whether or not you lost sleep?
13      A   I'm the only one awake in the middle of
14  the night.
15      Q   Is there any --
16      A   There's no one there.
17      Q   -- Your husband's there, right?
18      A   Yeah, sleeping.
19      Q   Okay.  And you're saying that you never
20  discussed this with him?
21      A   No.
22      Q   How many nights would you say you lost
23  sleep over this?
24      A   I couldn't say.  I don't know.
25      Q   Would you say it was five days?

Page 49

TERI LYNN HINKLE

1
2       A   I don't know.
3       Q   Prior to a few months ago, had you lost
4   sleep?
5       A   Yes.
6       Q   From this issue?
7       A   From -- yes, this issue.
8       Q   So what exactly -- can you describe for
9   me exactly what the Midland defendants did that
10  caused you to lose sleep?
11      A   Obtain my private personal information.
12      Q   And when are you alleging that --
13      A   And --
14      Q   -- Go ahead.
15      A   And furnishing false information to the
16  credit reporting agencies; calling me.
17      Q   Now, you would agree that three months
18  ago the Midland defendants were not calling you; is
19  that correct?
20      A   I haven't answered an unknown call in a
21  long time.
22      Q   But you can't say just because you get a
23  call from an unknown number that it's the Midland
24  defendants, right?
25      A   I don't know.  If I don't answer it and

13  (Pages 46 to 49)

Page 50

TERI LYNN HINKLE

1 it comes up unknown, I don't know what it is.
2    Q   Sitting here today, you have no idea who
3 was calling you from an unknown number a few months
4 ago, right?
5    A   I haven't answered them, so I don't know.
6    Q   Okay.  And when are you alleging that the
7 Midland defendants obtained your personal
8 information?
9    A   2011, 2012, and 2013.
10   Q   Do you have any evidence that the Midland
11 defendants obtained your private -- your personal
12 information in 2011?
13   A   The credit reports, yes, it shows.
14   Q   What about in 2012?
15   A   Yes.
16   Q   2013?
17   A   Yes.
18   Q   And sending information to the credit
19 reporting agencies, you're not contending that your
20 credit file was published to any third parties; is
21 that correct?
22   A   I don't know.
23   Q   Well, you have a copy of your credit
24 report so you know.

Page 51

TERI LYNN HINKLE

1    A   Well, there were other entities pulling
2 the credit that had a right to like my insurance.
3    Q   Who's your insurance company?
4    A   That has changed.  It was GMAC and now
5 it's -- they've changed their name.  It's National
6 something.  I don't remember the name.
7    Q   What kind of insurance?
8    A   Car, automobile.
9    Q   What kind of car do you have?
10   A   A 1995 Buick.
11   Q   And a motorcycle?
12   A   Uh-huh.
13   Q   Those are both insured by --
14   A   No, the motorcycle is Progressive.  Is it
15 Progressive?  Yeah, I think it's Progressive.
16   Q   And the Buick is National --
17   A   National something.  It was GMAC.
18 Recently they changed it to National something.
19   Q   -- Does your husband have a car?
20   A   Yeah.  It doesn't run, but he has one.
21   Q   Is the insurance in your name?
22   A   Uh-huh.
23   Q   All insurance that you have?
24   A   Except his motorcycle.

Page 52

TERI LYNN HINKLE

1    Q   All right.  Any other emotional distress
2 related issues other than losing sleep?
3    A   It was just anxiety.
4    Q   When is the last time you experienced
5 anxiety over this?
6    A   Can't remember.
7    Q   Are you on any medication?
8    A   No.
9    Q   Have you ever seen a doctor about it?
10   A   I don't use doctors.
11   Q   Anyone else witness you experiencing any
12 anxiety?
13   A   I don't know.  I'd have to ask them.
14   Q   Did you ever discuss it with your
15 husband?
16   A   No.
17   Q   I'm asking you this since you live with
18 your husband.  He would be the obvious person who
19 would be a witness to this.
20   A   Not really.
21   Q   Anything else other than anxiety?
22   A   No.  I would just call it anxiety, being
23 stressed out and upset.
24   Q   And the stress and the anxiety, all --

Page 53

TERI LYNN HINKLE

1 and loss of sleep all occurred after you filed a
2 lawsuit, right?
3    A   No, before.
4    Q   Okay.  So --
5    A   What led up to it.
6    Q   -- Well, when did you experience it
7 before the lawsuit?
8    A   I don't remember exactly.  It was back
9 when I found out about all this in 2011.
10   Q   So when you found out about it in 2011,
11 do you recall when you first started losing sleep and
12 experiencing anxiety?
13   A   No, shortly thereafter when I realized
14 the ramifications of my personal information being
15 out there, location specifically.
16   Q   All right.  Did you do anything about
17 these symptoms?
18   A   What do you mean?
19   Q   Did you take any medicine?  Did you talk
20 to anybody?
21   A   No, no.  I told you I don't engage in the
22 American health care system at all.
23   Q   I didn't ask if you went to the doctor.
24 I asked if you took any medicine.

14  (Pages 50 to 53)

Page 54

TERI LYNN HINKLE

1
2      A   No.  I don't take medicines.
3      Q   Can you identify for me names of any
4  people who would have knowledge regarding the
5  underlying facts in your case?
6      A   What do you mean?
7      Q   Meaning any witnesses such as your
8  husband, your children?
9      A   No.
10     Q   Any friends?
11     A   I don't talk to them about those sort of
12  things.
13     Q   So your husband doesn't know anything
14  about the lawsuit?
15     A   No, he can't read.
16     Q   What's his educational level?
17     A   High school, but he was in special Ed.
18     Q   What about your children?  Have you
19  discussed this lawsuit with your children?
20     A   No.  They know that I have it going, but
21  we don't discuss it.
22     Q   Well, because of the things that happened
23  with your daughter, are you saying that you did not
24  discuss I guess what you believe the alleged actions
25  of the Midland defendants were --

Page 55

TERI LYNN HINKLE

1
2      A   No.
3      Q   -- in this matter?
4      A   I don't want her upset again.
5      Q   With respect to your husband you said
6  that he was in special education and he collects
7  social security --
8      A   Uh-huh.
9      Q   -- benefits.  What kind of social
10  security benefits?
11     A   It's just regular social security.  He
12  started collecting at sixty-two-and-a-half.
13     Q   Does he have any kind of mental
14  impairments to your knowledge?
15     A   That would be a matter of opinion.
16     Q   But has he ever been diagnosed with
17  any --
18     A   No.
19     Q   -- kind of mental impairment?
20     A   Other than learning disability, no.
21     Q   Can he not read at all or does he just
22  read at a lower grade level?
23     A   Very low.
24     Q   Do you know what that is, like 9th grade
25  or --

Page 56

TERI LYNN HINKLE

1
2      A   Oh, no.  Way lower than that.
3      Q   -- Grade school reading level?
4      A   Grade school, yeah.
5      Q   Have you discussed this lawsuit or any of
6  the underlying facts with any friends?
7      A   Not specifically, no.
8      Q   When you say not specifically, have you
9  mentioned it to anybody?
10     A   I may have but I -- I don't discuss the
11  details.  My daughter knows that I have these things
12  going on, but she doesn't know the details.
13     Q   Okay.  So if this case goes to trial, who
14  would you call as a witness on the plaintiff's side,
15  meaning -- do you want me to be more specific?
16     A   Yeah.
17     Q   So when we get to the point where we have
18  to produce witness lists and identify who our
19  witnesses are for trial, who would you identify?
20     A   I don't know yet.
21     Q   Has anybody helped you with any of the
22  pleadings or filings in this case?
23     A   No.
24     Q   Other than traffic violations, have you
25  ever been convicted of a crime?

Page 57

TERI LYNN HINKLE

1
2      A   About 40 years ago.  Well, that wasn't a
3  conviction, so no.
4      Q   Have you ever been arrested?
5      A   Yeah.
6      Q   Have you been arrested in Eastman?
7      A   No.
8      Q   When's the last time you were arrested?
9      A   It was about 40 years ago.
10     Q   Was that in Michigan?
11     A   No.
12     Q   Where was it?
13     A   California.
14     Q   How old are you?
15     A   How old am I?
16     Q   How old were you?
17     A   21, 22.
18     Q   What were you arrested for?
19     A   Marijuana.
20     Q   So was that sometime like in 1973?
21     A   Somewhere around there.
22     Q   Was there a trial?  Did you plead guilty?
23     A   No.  The judge threw it out.
24     Q   All right.  Have you -- do you have any
25  blogs or have you posted anything online about this

15  (Pages 54 to 57)

Page 58

TERI LYNN HINKLE

1
2  lawsuit?
3      A   No.
4      Q   Have you used any Internet research?
5      A   I do a lot of Internet research.
6      Q   Are there any particular websites that
7  you use in your research?
8      A   That I research?  No.  Ones that come to
9  mind, I pay attention to ARM, what's going on on
10 there.  There's just dozens of them.
11     Q   Are there any bloggers or anybody,
12 anybody's postings that you follow?
13     A   No, not specifically.
14     Q   Okay.  Regarding the debt collection
15 industry?
16     A   Not -- I don't -- that would be like a
17 guru sort of thing?  Is that what you mean?
18     Q   No, meaning do you follow anybody in
19 particular --
20     A   No.
21     Q   -- on the Internet?
22     A   No.
23     Q   I want to go back to just your financial
24 transactions.  So do you use check cards or debit
25 cards?

Page 59

TERI LYNN HINKLE

1
2      A   I have a prepaid debit.  If I need to use
3  one, I can put money on it.
4      Q   What company is this with?
5      A   It's Walmart.
6      Q   So it's a Walmart specific card?  You can
7  only use it at Walmart?
8      A   No.  It's just one of those prepaid debit
9  cards you buy at Walmart.
10     Q   Okay.  That's why I was asking do you
11 know what company that's sold by?
12     A   No.
13     Q   Do you --
14     A   Well, it says Visa on it.
15     Q   -- Do you have an account with this
16 company?
17     A   No.
18     Q   So do you just go to Walmart and load
19 money onto it?
20     A   Right.  You can just load money on it or
21 you can take money off.  You can use it to -- you
22 know, like my debit card, purchase something or pay a
23 bill on line, something like that.  I don't do that
24 anymore though.
25     Q   You don't use it anymore?

Page 60

TERI LYNN HINKLE

1
2      A   I don't pay bills online.
3      Q   Why don't you have any credit cards?
4      A   Why would I want one?
5      Q   I'm just asking.
6      A   Don't want one.
7      Q   Have you ever applied for a credit card
8  and been denied in the last five years?
9      A   No.
10     Q   Do you know if your husband has applied
11 for a credit card in the last five years?
12     A   I doubt it.  I don't think so.
13     Q   When's the last time you used that debit
14 card?
15     A   Last week I believe.
16     Q   So if you -- you said you don't use bank
17 loans.  If you need any extra money, where did you
18 get that from?
19     A   I don't get it.
20     Q   Can you recall the last time you took out
21 a loan like in the last five years?
22     A   I haven't.
23     Q   So I don't think I've asked this
24 question.  Can you recall in the last five years,
25 other than utility bills, any debts that you've

Page 61

TERI LYNN HINKLE

1
2  incurred?
3      A   No.
4      Q   Have you ever been late paying any of
5  your utility bills?
6      A   Yeah.
7      Q   To the best of your knowledge, do you
8  know if any of the bills that you currently have in
9  your name, are any of them past due?
10     A   No.
11     Q   Do you recall the last time you had a
12 past due bill?
13     A   No, not specifically.
14         MS. BROUSSARD:  Do you want to just
15 take like a five-minute break off the
16 record?
17         (Whereupon, a brief recess was taken.)
18 BY MS. BROUSSARD:
19     Q   We're back on the record from our break.
20 And I assume that you did not discuss your testimony
21 with anyone during the break; is that correct?
22     A   No.  There's nobody around, no.
23     Q   You didn't make any phone calls to anyone
24 during the break?
25     A   I don't have a phone.

16  (Pages 58 to 61)

Page 62

TERI LYNN HINKLE

1
2      Q    And you said you don't have a cell -- you
3  don't have a cell phone?
4      A    No.
5      Q    When's the last time you had a cell
6  phone?
7      A    It was years ago.
8      Q    How many years?
9      A    Back in 2007 or '8.
10      Q    Was it under your name?
11      A    At that Virgin Mobile phone I have.
12      Q    And that was in Michigan, right?
13      A    Uh-huh.
14      Q    Why did you discontinue your service with
15  Virgin?
16      A    Well, I really can't use the cell phone.
17  I can't see the numbers, can't see a text.  So I
18  can't send them because I can't see the letters.
19      Q    Well, what about if you put your readers
20  on?
21      A    What would be the point of that?
22      Q    Just asking the question.
23      A    Well, no, then everywhere you go, you got
24  to carry them.  It's just not necessary.
25      Q    Did you discontinue your service or did

Page 63

TERI LYNN HINKLE

1
2  the phone company discontinue your service?
3      A    I did.  I just didn't see it was
4  necessary.
5      Q    Did you leave any outstanding bills with
6  Virgin?
7      A    No.
8          (Whereupon, Exhibit No. 3 was marked for
9          identification by the court reporter.)
10  BY MS. BROUSSARD:
11      Q    I've got a document marked as Exhibit 3.
12  If you want to put your readers on so you can see
13  that?
14      A    Hers or someone else's?
15      Q    And what's been marked as Exhibit 3 is
16  your First Amended Complaint For Violations of the
17  FDCPA, FCRA and TCPA.  And it was filed June
18  27th, 2013.
19      A    Oh, the amended, okay.
20      Q    Do you recognize this document?
21      A    Yeah.
22      Q    Did anyone assist you in drafting this
23  document?
24      A    No.
25      Q    Do you know approximately how long it

Page 64

TERI LYNN HINKLE

1
2  took you to draft the First Amended Complaint?
3      A    The first one?
4      Q    The one that's in front of you, First
5  Amended Complaint.
6      A    Oh, this one.  I don't remember
7  specifically.  At least two or three days I would
8  imagine.  I don't remember.
9      Q    All right.  And you currently don't have
10  any TCPA claims against the Midland defendants; is
11  that right?
12      A    No.  I dismissed them.
13      Q    Now, you allege that MCM and Encore
14  violated section 1681(b) of the Fair Credit Reporting
15  Act; is that correct?
16      A    Where you at?  What page are you on?
17      Q    Count one.  One, two and three.
18      A    What page is it?
19      Q    These are pages 14, 15, 16.
20      A    I just didn't get that far yet.
21      Q    17 and 18.
22      A    Okay.
23      Q    So you're claiming that they violated
24  that section of the FCRA 1681b; is that right?
25      A    Yes.

Page 65

TERI LYNN HINKLE

1
2      Q    And what is the factual basis for your
3  claim against MCM and Encore that they didn't have a
4  permissible purpose for pulling your credit file?
5      A    Well, they have to have establishment of
6  an account in order to do that or my express
7  permission.  And they had neither.
8      Q    But you have no evidence that MCM and
9  Encore did not have a valid account in your name; is
10  that correct?
11      A    It's they haven't proven to me that they
12  did.  I asked them to.  They didn't.
13      Q    But you have no evidence?  You have no
14  evidence that --
15      A    I can't prove a negative.
16      Q    -- What I'm asking you is do you or do
17  you not have any evidence that the Midland defendants
18  purchased an unpaid -- an account that you failed to
19  pay?
20      A    I don't understand that question at all
21  because I did not say there was an account so --
22      Q    Are you saying you --
23      A    Rephrase that, please.
24      Q    -- Do you have any evidence that the
25  Midland defendants did not have a basis for

Page 66

TERI LYNN HINKLE

1  
2  collecting on an account that you failed to pay?  
3      A   I can't answer that because you are  
4  assuming facts not in evidence that there was an  
5  account that I failed to pay to begin with.  
6      Q   All right. Is your social security  
7  number 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?  
8      A   I don't know. I don't know my social  
9  security number by heart.  
10      Q   Did you ever have an account with GE  
11  Money Bank Meijer, M-E-I-J-E-R?  
12      A   Not that I recall. I mean it's possible.  
13  It depends on how old it was. I don't know.  
14      Q   So you're saying you just don't remember,  
15  that it's possible that you had an account but for  
16  some reason your memory is failing you. Is that what  
17  you're saying?  
18      A   I haven't had any accounts for a very  
19  long time and I don't specifically remember.  
20      Q   Do you recall opening an account with GE  
21  Meijer -- that's GE Money Bank, on or around April  
22  2005?  
23      A   No.  
24      Q   Do you recall being contacted by GE  
25  Meijer regarding an account that you failed to pay in  

Page 67

TERI LYNN HINKLE

1  
2  or around 2005, 2006?  
3      A   No.  
4      Q   Do you know if your husband ever opened  
5  an account with GE Meijer?  
6      A   I wouldn't know.  
7      Q   So if the Midland defendants contacted GE  
8  Meijer, are you saying that they wouldn't have any  
9  documents showing that you opened an account, that  
10  you completed an application, that they sent you  
11  account statements?  
12      A   I do not recall that, so I can't  
13  speculate.  
14      Q   Do you recall paying off an unpaid GE  
15  Meijer account?  
16      A   I don't remember that company.  
17      Q   What about Applied Income Sciences? Have  
18  you ever been contacted by Applied Income Sciences  
19  regarding an unpaid GE Meijer account?  
20      A   I don't think I've ever heard of them.  
21      Q   Have you ever been contacted by anyone  
22  other than -- anyone other than GE Meijer regarding  
23  an unpaid account that you owed to GE Meijer?  
24      A   No, I don't recall anybody calling me  
25  about anything like that.  

Page 68

TERI LYNN HINKLE

1  
2      Q   Are you saying that --  
3      A   When Midland called, they didn't  
4  identify.  
5      Q   -- Okay. So are you saying that you  
6  don't recall or are you saying that you never had an  
7  unpaid account with GE Meijer?  
8      A   I'm saying I don't recall.  
9      Q   So are you saying that it's possible that  
10  you did open an account with GE Meijer and failed to  
11  pay it?  
12      A   I doubt that I failed to pay anything.  
13  The only accounts I do recall ever having I don't  
14  remember specifically who they were with, but I paid  
15  them off.  
16      Q   Well, that's not answering the question.  
17      Can you read my question back, please?  
18      (Whereupon, the Court Reporter read  
19  the record: Question: So are you saying  
20  that it's possible that you did open an  
21  account with GE Meijer and failed to pay  
22  it.)  
23  BY MS. BROUSSARD:  
24      Q   Would you answer, please.  
25      A   I don't recall and I don't think so.  

Page 69

TERI LYNN HINKLE

1  
2      Q   You say you don't think so. Do you know  
3  for a fact?  
4      A   When I say I don't know, obviously I  
5  don't know anything for a fact. I can't say yes. I  
6  can't say no.  
7      Q   So if you're saying you can't say yes and  
8  you can't say no, then it's possible?  
9      A   Anything in the world is possible if I  
10  don't know it.  
11      Q   Did you ever open an account with  
12  T-Mobile?  
13      A   No.  
14      Q   Were you ever contacted by T-Mobile  
15  regarding a cell phone bill that you failed to pay?  
16      A   No.  
17      Q   Were you ever contacted by any entity  
18  other than the Midland defendants regarding an  
19  outstanding bill that you owed to T-Mobile?  
20      A   That was Pinnacle, the lawsuit that I  
21  filed when they settled.  
22      Q   They contacted you regarding a T-Mobile  
23  account?  
24      A   No. They didn't contact me. They were  
25  just on the credit report.  

18   (Pages 66 to 69)

Page 70

TERI LYNN HINKLE

1
2    Q   But if it was on the credit report, was
3    it related to a T-Mobile account?
4    A   That's what it said on the credit report,
5    which is why I disputed and then debt validated them.
6    Q   Was the amount approximately $300?
7    A   I don't remember. I'm not sure if they
8    even had an amount on there.
9    Q   Have you ever been contacted by Debt
10   Recovery Solutions regarding a T-Mobile account?
11   A   No. They were on my credit report as
12   pulling my credit, but it didn't say what for.
13   Q   Are you saying that you don't recall ever
14   having an account with T-Mobile or are you saying for
15   a fact that you never had an account with T-Mobile?
16   A   I did not have an account with T-Mobile.
17   Q   When you opened your account with
18   Virgin -- is it Virgin Mobile?
19   A   Uh-huh.
20   Q   Did you ever receive any statements where
21   T-Mobile was identified as the provider of service?
22   A   No, not that I recall. It was a very
23   long time ago but --
24   Q   Did you ever receive any kind of
25   statements, any communications from T-Mobile?

Page 71

TERI LYNN HINKLE

1
2    A   No.
3    Q   Did you ever contact T-Mobile directly
4    regarding this account?
5    A   No.
6    Q   Why not?
7    A   Why would I?
8    Q   That's what I'm asking you. Why not?
9    A   Well, I don't know why I would.
10   Q   If you're saying that --
11   A   It wasn't mine so why would I contact
12   them about it? And it wasn't them trying to collect
13   it.
14   Q   -- Well, if it wasn't yours, then I would
15   have thought that you -- one would think that you
16   would contact T-Mobile to tell them this is not my
17   account. And that's why I'm asking you why didn't
18   you contact them?
19   A   Because they have had nothing to do with
20   it.
21   Q   Why is that?
22   A   Well, they're not trying to collect it.
23   They're not claiming it exists. It's debt buyer that
24   is saying that. It's your clients that are saying
25   that, not them.

Page 72

TERI LYNN HINKLE

1
2    Q   Any other factual basis that you're
3    claiming for your 1681(b) permissible purpose claim?
4    A   Well, there's only -- 1681(b) is just the
5    permissible purpose, so that's it.
6    Q   And that's what I'm asking. Is there any
7    other factual basis? None?
8    A   There can be none. Either you have it or
9    you don't have it.
10   Q   So the answer is none?
11   A   Right. None.
12   Q   Now, you're claiming that the Midland
13   defendants violated 1681s-2(b)?
14   A   Yes.
15   Q   What's the factual basis for you --
16   A   That strictly has to do with conducting a
17   reasonable investigation after dispute and then
18   continuing to report on the credit report.
19   Q   -- Now, you're not aware of whether or
20   not the credit reporting agencies contacted the
21   Midland defendants regarding your --
22   A   They have to.
23   Q   -- Well, let me finish, please.
24   A   I'm sorry. I thought you were finished.
25   Q   No, I'm not. You're not aware of whether

Page 73

TERI LYNN HINKLE

1
2    or not the credit reporting agencies contacted the
3    Midland defendants regarding your dispute; is that
4    correct?
5    A   Well, according to their report back to
6    me, yes, they did.
7    Q   Okay. When was that?
8    A   It was within 30 days of my dispute. I
9    couldn't tell you the exact date. I would have to
10   look.
11   Q   And you don't know what the Midland
12   defendants did in response to any alleged disputes
13   that might have been received; is that correct?
14   A   All I know is their answers and their
15   interrogatories.
16   Q   But you don't know exactly what steps
17   were taken in conducting any alleged investigation;
18   is that correct?
19   A   They haven't disclosed that as yet, no.
20   I was not there.
21   Q   But you have no documents, you don't have
22   any evidence to show that the credit reporting
23   agencies contacted the Midland defendants regarding
24   your alleged disputes; is that right?
25   A   Just their word that they did.

19  (Pages 70 to 73)

Page 74

TERI LYNN HINKLE

1
2     Q   And that's it, right?
3     A   Well, I don't know why I would doubt
4  that.  That's in the report that they send you within
5  30 days of a dispute.
6     Q   And then you bring an FDCPA 1692d claim
7  against MCM and Encore.  What's the basis of your
8  claims against MCM and Encore under 1692d?
9     A   Not notifying me after taking collection
10  action.
11     Q   I guess I'm not really understanding.
12  What do you mean not contacting you after collection
13  action?
14     A   They didn't send me the -- and I can
15  never remember the name of that form -- the right to
16  dispute notice.  That's not the proper title for it.
17  I never remember.  I have it written down -- when
18  they're supposed to notify you.
19     Q   When are you alleging that they should
20  have notified -- they should have notified you, yes?
21     A   When they started their first collection
22  action, which was reporting on my credit report.
23     Q   And when was the first report on your
24  credit file?
25     A   That I know of, 2011.  I don't remember

Page 75

TERI LYNN HINKLE

1
2  the date specifically.  I think it says in -- in
3  here.
4     Q   Do you know the exact date?
5     A   No, I don't remember unless I put it in
6  the --
7     Q   And you haven't produced any credit
8  reports showing that there's a Midland account on
9  your credit file in 2011; is that right?
10     A   I haven't given them to you.  I have
11  them.
12     Q   All right.  Well, like I said, you have
13  not produced them in discovery; is that correct?
14     A   That's correct.
15     Q   And just so that I'm clear, I am moving
16  to go compel production of any 2011, 2012 and 2013
17  credit reports that you have in your possession
18  because they are responsive to the Midland defendants
19  discovery requests.
20     A   Well, I will object because they already
21  have them.  And that's what this case is all about,
22  people getting hold of my credit reports that
23  shouldn't have them.
24     Q   You brought this lawsuit so those credit
25  reports are at issue in this lawsuit, Ms. Hinkle.

Page 76

TERI LYNN HINKLE

1
2     A   I have no problem giving you the evidence
3  of them having done what they did.
4     Q   So you're claiming that sometime in 2011
5  Midland should have sent you a validation notice.  Is
6  that what you're claiming?
7     A   No, not a validation notice.  They are
8  required to --
9     Q   A notice of dispute notice?
10     A   Yeah.  I can't think of the correct
11  title --
12     Q   Okay.
13     A   -- for that notice, but they are supposed
14  to let you know the first time they take a collection
15  action so that you can dispute it.  It's a notice.
16     Q   Can you recall when in 2011 you should
17  have received that notice?
18     A   It was whenever the first time they
19  reported on my credit report.  And I don't know that
20  because I don't know if they were doing that before I
21  obtained my credit report.
22     Q   Did you receive any communications from
23  Midland in 2011?
24     A   Just a response.  I don't remember the
25  date.  I really have to look back at my case because

Page 77

TERI LYNN HINKLE

1
2  it was convoluted and confusing.  That's why it took
3  me to long to write it.  I sent them a demand for
4  debt validation and they sent me a dunning letter for
5  the wrong thing.  It's not what I was disputing.
6     Q   All right.  But you admit that you did
7  make a dispute even though you claim that you didn't
8  receive some notice of dispute?
9     A   No.  I disputed it with the credit
10  reporting agencies.  Okay.  And it was after that
11  that I sent a demand for debt validation directly to
12  MCM.
13     Q   All right.  Now, you also claim telephone
14  harassment under 1692d(5), but you've testified that
15  you've never called -- you never called the Midland
16  defendants.
17     A   Why would I call them?
18     Q   How many times did you speak with them on
19  the phone?
20     A   I only answered the phone when they
21  called about five or six times.  After that I refused
22  to answer it.
23     Q   And when was that five or six times?
24     A   I don't remember the dates.  I'd have to
25  look at my notes.  Again, I kept a log but I don't

Page 78

TERI LYNN HINKLE

1   remember the dates.
2       Q   Was it in 2011?
3       A   I don't remember, 2011 or '12.  I don't
4   remember.  I'll have to look at the dates.
5       Q   Did they all occur in the same year or
6   did it carry over into the next year?
7       A   No, that was -- to my knowledge, that was
8   the same year because that's when I was answering it.
9   Finally I got fed up and after I had told them to
10  stop calling me, I just stopped answering it.
11      Q   So would that all have occurred in
12  2011 --
13      A   It would have been --
14      Q   -- or in 2012?
15      A   It would have been after the dispute and
16  after -- it was after I sent them the debt
17  validation.  They never contacted me at all until I
18  did that.
19      Q   So are you claiming that just calling you
20  about a debt that you failed to pay is harassment?
21      A   Again, you are assuming facts not in
22  evidence.  This had nothing to with a debt I failed
23  to pay.  They were calling me after I demanded debt
24  validation.  They did not validate it.  That is a
25

Page 79

TERI LYNN HINKLE

1   collection action and it's harassment.
2       Q   Now, you're saying that you don't recall
3   opening these accounts.  Are you claiming that they
4   were the result of identity theft?
5       A   I do not know.  I have no idea where
6   Midland got that information.  I have no way to know.
7       Q   So if it's not identity theft, then --
8       A   I have --
9       Q   -- why -- then why pursue you over an
10  account that you don't owe?
11      A   Well, I tell you what.  In the research
12  that I've done, there are literally hundreds of
13  people out there who get targeted by your client for
14  debts that don't exist.  So I am not unique.  Why not
15  would be --
16      Q   But you have no evidence that the Midland
17  defendants specifically targeted you; is that right?
18      A   That's my word.  I call it targeted when
19  you're being sought after for something wrong.
20      Q   Now, you say that you don't think it was
21  the result of identity theft; is that right?
22      A   No, I did not say that.  I said I do not
23  know.
24      Q   Well, if you're not sure if it's the
25

Page 80

TERI LYNN HINKLE

1   result of identity theft, why did you dispute the
2   accounts as identity theft?
3       A   I didn't.  I did not say identity theft
4   at anytime.
5       Q   So you're saying that you did not contact
6   the credit reporting agencies and tell them it was
7   identity theft?
8       A   I've never used that term, never.
9       Q   Did you contact the credit reporting
10  agencies and tell them that those accounts were the
11  result of fraud?
12      A   I did not use that word either.  I simply
13  said they were not mine.
14      Q   You said they were simply not yours or
15  they were not yours because of identity theft or
16  fraud?
17      A   I said they were not mine.
18      Q   So do you believe the credit reporting
19  agencies misinterpreted your dispute when they
20  said -- when they noted it as identity theft or
21  fraud?
22      A   No.  I believe that has to do with later
23  regulations from the CFPB.
24      Q   But you have no reason -- you have no way
25

Page 81

TERI LYNN HINKLE

1   of knowing if the CFPB even factored into whether the
2   credit reporting agencies noted your dispute as fraud
3   or identity theft, right?
4       A   No.  It's just what they do now.  They
5   automatically do that.
6       Q   But you don't know the credit reporting
7   agencies' policies and procedures, do you?
8       A   I have been reading on the Internet, yes,
9   and it is common practice for them to do that now.
10      Q   So this research is --
11      A   They just automatically do that.
12      Q   -- So this research is based only on your
13  Internet research, right?
14      A   And NCL books and publications, NCLC.
15      Q   You've never worked for a credit
16  reporting agency, have you?
17      A   No.
18      Q   And you don't know anyone who works at a
19  credit reporting agency and you don't know anyone who
20  writes the policies and procedures for --
21      A   No.
22      Q   -- a credit reporting agency, right?
23      A   They do give you some --
24      Q   You've answered the question.
25

21 (Pages 78 to 81)

Page 82

TERI LYNN HINKLE

1  A  I wasn't finished.  They do give you some
2  information on that when they answer or when they
3  respond to your disputes.
4  Q  And I guess just so I'm clear, you're
5  also suing Encore Capital Group, but you've never
6  been contacted by Encore; is that correct?
7  A  Indirectly.
8  Q  You've never been contacted by Encore
9  directly; is that correct?
10  A  Directly identifying themselves as
11  Encore.
12  Q  Right.  So you've never been contacted by
13  an entity identifying itself as Encore Capital Group;
14  is that right?
15  A  Well, yes and no.  When the main company
16  is noted on the communication, then I would say yes,
17  that is a communication.
18  Q  What communication did you receive that
19  said Encore Capital Group?
20  A  I believe in the fine print on the back
21  of their dunning letters it's there.
22  Q  Have you produced any of those letters?
23  A  But I'm not sure.  Your clients already
24  have them.

Page 83

TERI LYNN HINKLE

1  Q  And that's no reason not to produce a
2  document, Ms. Hinkle.  If you want to --
3  A  If you want them --
4  Q  -- file lawsuits, you have to follow the
5  rules, okay?
6  A  Excuse me.  Let me finish.  I will be
7  happy to give you copies of those.
8  Q  So back to my original question, you
9  can't recall ever receiving any document directly
10  authored by Encore Capital Group; is that correct?
11  A  Authored directly from Encore, I don't
12  believe so.
13  Q  And you've never then called -- you never
14  received a call from a company that identified itself
15  as Encore Capital Group; is that correct?
16  A  That's correct.
17  Q  And you've never received any calls from
18  a company that identified itself as Midland Funding;
19  is that correct?
20  A  That's correct.
21  Q  You also are bringing a claim under
22  1692e, parenthesis 2, of the FDCPA against MCM,
23  Midland Funding and Encore.
24  A  Are you on 18?

Page 84

TERI LYNN HINKLE

1  Q  Any of the counts after count four.
2  A  Oh, after four.  Okay.
3  Q  1692e(2).
4  A  Five is TCPA.
5  Q  e(2) is in paragraph 93.
6  A  All right.
7  Q  Do you see that?
8  A  I don't know the numbers by heart.
9  Q  And you allege that the defendants, MCM
10  and Midland, made a false representation to the three
11  consumer reporting agencies regarding the character,
12  amount or legal status of an alleged debt.
13  What is your basis for the claim that the
14  Midland defendants made a false representation to the
15  agencies regarding your debts?
16  A  First of all, you're assuming facts not
17  in evidence.  I did not say they were my debts.  I
18  said they were not, therefore, everything they're
19  reporting is false.  When you go back and you look at
20  the different years, 2011, 2012, '13, they kept
21  changing things.  So that was false on its face every
22  time it was disputed.
23  Q  So you talked about these other lawsuits
24  that you filed against other debt collectors, right?

Page 85

TERI LYNN HINKLE

1  A  Uh-huh.
2  Q  You sued ARS.  Do you recall what account
3  ARS was collecting for?
4  A  I don't remember, no.
5  Q  Do you recall which companies these other
6  debt collectors were collecting for?
7  A  There was -- trying to remember --
8  Q  Well, let me be specific.  Plaza
9  Associates, they're a debt collector.  Who are you
10  claiming they were -- who were they collecting on
11  behalf?
12  A  They never told me.
13  Q  What about Northland Group?
14  A  They didn't identify it either.  They
15  never said.
16  Q  So LVNV?
17  A  It was all the same thing.
18  Q  So you don't recall who LVNV was
19  collecting for?
20  A  I don't remember.  I would have to look
21  back.
22  Q  So you sued these debt collectors.  And
23  it --
24  A  They were --

Page 86

TERI LYNN HINKLE

1
2      Q   -- Well, let me finish.
3      A   Okay.
4      Q   Is it your testimony that these debt
5  collectors were pursuing you and you didn't owe debts
6  to any of these companies?
7      A   I didn't owe those people anything, no.
8      Q   And so at the time you had been paying
9  all of your bills and there weren't any accounts that
10 you failed to pay?
11     A   I didn't have any.
12     Q   And just so that I'm clear going back to
13 the Encore issue again, you're claiming telephone
14 harassment against Encore but you have testified that
15 no one from Encore ever called you, right?
16     A   The allegations with Encore are its
17 liability as the owner of the other two.
18     Q   That's not my question.
19     A   They did not -- they did not call me.
20     Q   My -- okay.  And with respect to
21 harassment, you have no evidence that Encore directly
22 contacted you and as a result they didn't harass you;
23 is that correct?
24     A   They did not contact me.
25     Q   How are you claiming they harassed you if

Page 87

TERI LYNN HINKLE

1
2  they never contacted you?
3      A   They're responsible for the actions of
4  the other two.
5      Q   And you have no evidence of what Encore's
6  level of responsibility is for MCM or Midland
7  Funding; is that right?
8      A   Their own words in their 10K.
9      Q   Permissible purpose, you have no evidence
10 that Encore pulled a copy of your credit file; is
11 that correct?
12     A   I never said they did.
13     Q   Well, you've got a 1681(b) permissible
14 purpose claim against Encore.
15     A   They are responsible for the actions of
16 the other two.
17     Q   But back to --
18     A   Vicarious liability.
19     Q   -- Back to my original question.  Encore
20 never pulled your credit file; is that correct?
21     A   Not directly.
22     Q   Encore never directly itself pulled your
23 credit file; is that correct?
24     A   No, they didn't.  And that wouldn't be
25 s-2(b).

Page 88

TERI LYNN HINKLE

1
2      Q   I didn't say it was s-2(b).
3      A   I'm sorry.  I misheard --
4      Q   I said it's 1681(b).
5      A   Okay.  I misheard you.
6      Q   All right.  And for 1681s-2(b), what is
7  your basis for the allegation that Encore was
8  responsible for -- strike that.
9          What is the basis for your allegation
10 that Encore violated 1681s-2(b) if it did not
11 participate in any disputes?
12     A   Well, that's vicarious liability.
13     Q   But Encore --
14     A   And I understand the way you're asking
15 it.
16     Q   -- And Encore did not directly
17 participate in any alleged disputes that you made to
18 any credit reporting agencies; is that correct?
19     A   I also disputed with -- I sent them a
20 letter directly to Encore.
21     Q   Do you recall when that was?
22     A   No.  I can tell you after today when I
23 look up the dates on it.
24     Q   But you wrote directly to MCM; is that
25 correct?

Page 89

TERI LYNN HINKLE

1
2      A   Them, too.
3      Q   You never wrote to Encore; is that
4  correct?
5      A   Yes, I did.
6      Q   Do you have a copy of that letter?
7      A   Yes, I do.
8      Q   I'm going to need for you to produce
9  that.
10     A   That's fine.
11     Q   And just so you know, all the information
12 that you still need to produce, reserve the right to
13 recall you for further questioning regarding those
14 documents because I should have had those before
15 today.  So I'll have some time remaining on my seven
16 hours.
17         And if I do have to come back to Eastman,
18 Georgia, to continue to depose you, then you will be
19 responsible for attorneys fees, the cost of the
20 deposition, hotel, mileage, whatever's involved with
21 me having to take another trip to Eastman to continue
22 this deposition because you failed to produce
23 documents that should have been produced before this
24 deposition.  You will be responsible for all that
25 and --

Page 90

TERI LYNN HINKLE

1   A   No, I will not.
2   Q   -- Yes, you will.  So --
3   A   I'm not going to have an argument with
4   you.
5   Q   -- Ms. -- Ms. Hinkle, I'm not going to
6   get into an argument with you on the record.  I'm
7   just making a record for myself so that I can attach
8   it to my motion with the court.  Okay.  And I'll
9   leave it at that.  There's nothing else to be said.
10   A   I have a right to say what I'm going to
11   say.  Let it be shown on the record, you did not ask
12   me to bring anything today.  You did not notice me to
13   produce anything today or bring anything with me.
14   Q   Ms. Hinkle, I -- I served discovery
15   requests on you and everything that I'm asking you to
16   produce after this deposition was requested in this
17   deposition -- in those discovery requests.  So
18   everything that I'm asking for is responsive to those
19   questions that I asked you and they should have been
20   produced prior to today.  That's all that I'm saying.
21   A   And you did not let me finish.
22   MS. BROUSSARD:  Okay.  Let's go off
23   the record.
24   (Whereupon, a discussion ensued off

Page 91

TERI LYNN HINKLE

1   the record.)
2   MS. BROUSSARD:  Let's go back on the
3   record.
4   THE WITNESS:  All right.  First of
5   all, not only did you not notice me to
6   bring anything today, after I submitted the
7   answers to the production and
8   interrogatories and admissions to you that
9   your clients propounded on me, you did not
10   object to any of my answers; you did not
11   call and attempt to confer or ask me to
12   amend them.
13   MS. BROUSSARD:  But that doesn't
14   change the fact that the documents that
15   I'm --
16   THE WITNESS:  I'm not finished.
17   MS. BROUSSARD:  -- asking you for are
18   responsive.
19   THE WITNESS:  I'm not finished.  I'm
20   not finished.  I have already said
21   everything you asked for in those -- in
22   that discovery your clients already had.  I
23   said so in my answers.  Now I have said --
24   MS. BROUSSARD:  But you still have to

Page 92

TERI LYNN HINKLE

1   produce them.
2   THE WITNESS:  Now I have said I have
3   no problem giving you what they want even
4   though they already have them, even though
5   I'm sure you've already seen it.  I have no
6   problem with that.
7   MS. BROUSSARD:  Okay.  Well, if you
8   have no problem producing it, I want it
9   five days from today.
10   THE WITNESS:  That's fine.
11   MS. BROUSSARD:  All right.
12   THE WITNESS:  Given mail though,
13   remember I have to deal with the mail.
14   MS. BROUSSARD:  Can you e-mail them?
15   THE WITNESS:  Yeah, sure.
16   MS. BROUSSARD:  Okay.  E-mail them.
17   BY MS. BROUSSARD:
18   Q   All right.  You also are making a claim
19   under 1692e(8), paragraph 91.
20   A   Back.  All right.
21   Q   All right.  And you're making this claim
22   against MCM, Midland Funding and Encore.  And, again,
23   you have no evidence that Encore directly
24   communicated any credit information to any credit

Page 93

TERI LYNN HINKLE

1   reporting agency; is that correct?
2   A   That goes to vicarious liability.
3   Q   Again, to answer my question, you have no
4   evidence that Encore directly communicated any credit
5   information to any agency; is that right?
6   A   I don't know.
7   Q   Which means you don't have any evidence;
8   is that right?
9   A   It means --
10   Q   Either you know you have it or you know
11   you don't.
12   A   It means I don't know because I have to
13   check the rules under vicarious liability.
14   Q   So what evidence do you have that Encore
15   communicated any -- directly communicated any
16   information to any credit reporting agency?
17   A   I just answered you.  You're just trying
18   to ask it in a different way.  I don't know unless I
19   review the rules on vicarious liability as to whether
20   you can consider them directly responsible for what
21   the other two do.
22   Q   So you're saying you have to go and look.
23   So sitting here today, you have no evidence --
24   A   I didn't --

24  (Pages 90 to 93)

Page 94

TERI LYNN HINKLE

1
2    Q   -- that Encore -- you have no evidence
3  that Encore directly communicated any credit
4  information to any consumer reporting agency; is that
5  right?
6    A   I would say yes, they did through
7  vicarious liability.  And yes, I do have that
8  evidence.
9    Q   So now you're changing your answer?
10    A   No.  I'm saying I am not sure if that
11  constitutes directness or not.  I would have to
12  check.
13    Q   So your answer is I don't know?
14    A   I'm not sure.
15    Q   So what's the basis of your claim that
16  MCM knew and Midland Funding knew or should have
17  known that information was false?
18    A   If they actually did a complete
19  investigation, they would have known it was false
20  because it didn't exist.  They didn't even bother to
21  ask me.
22    Q   But they called you, right?  You said you
23  wouldn't answer the phone calls.
24    A   They called demanding me to pay them.
25  They didn't want to hear anything I had to say.

Page 95

TERI LYNN HINKLE

1
2  That's why I finally stopped answering the phone.
3    Q   Did you tell them that the accounts
4  weren't yours?
5    A   Yes.
6    Q   Did you tell them that they were the
7  result of identity theft or fraud?
8    A   I don't know what they were the result
9  of.  I have no idea.
10    Q   But you don't have any evidence that
11  Midland Funding or MCM knew that the accounts were
12  false, right?
13    A   I have no idea.  All I know is one of two
14  things.  Either they did an investigation and
15  continued to violate anyway or they didn't do an
16  investigation and continued to violate anyway.
17  That's all I know.
18    Q   You're also bringing a claim for
19  1692g(a), paren, 1 to 5, against MCM, Midland Funding
20  and Encore.
21    A   What page are you on now?
22    Q   That's paragraph 92 on page 19.  I think
23  it's -- these are sprinkled all throughout but --
24    A   92?
25    Q   Yes.

Page 96

TERI LYNN HINKLE

1
2    A   Okay.
3    Q   All right.  That's regarding the initial
4  communication?
5    A   Right.  That's that 30-day validation
6  notice or dispute notice I believe.
7    Q   Now, Encore never sent you any
8  communications.  That's correct?
9    A   They ignored me.
10    Q   Again, Encore never directly sent you any
11  written communications; is that correct?
12    A   From their office, no, to my knowledge.
13    Q   And you're also bringing a claim under
14  1692g, paren, b?
15    A   Yes.
16    Q   Okay.  And you're bringing this debt
17  verification within 30 days of initial communication
18  claim against all of the defendants.  What's your
19  basis of bringing that claim against the Midland
20  defendants?
21    A   Because they failed to validate the debt
22  after I demanded it and they continued collection
23  actions.  In fact, they never contacted me personally
24  at all ever until after I disputed with the credit
25  reporting agencies and after I sent them a notice of

Page 97

TERI LYNN HINKLE

1
2  debt validation.
3    Q   And Encore did not send you any written
4  communications; is that right?
5    A   No.  I sent it to them and they did not
6  answer me.
7    Q   All right.  But Encore did not directly
8  send you any communications; is that correct?
9    A   Not to my knowledge.  I'm going to have
10  to look at the fine print on the letters that I got
11  as to whether they were identified.
12    Q   And going back to your initial
13  communication claim under 1692g(a) --
14    A   Yeah.
15    Q   -- are you claiming that MCM sent you any
16  communications prior to December 2011?
17    A   I don't understand.
18    Q   Did you receive any communications from
19  any of the -- did you receive any communications from
20  MCM prior to December 2011?
21    A   I do not know what the dates were.  All I
22  know is it was after I disputed with the credit
23  reporting agencies and after I sent a debt validation
24  letter to them.  Before that the only -- well, not
25  the word "vicarious" but indirect communication with

25  (Pages 94 to 97)

Page 98

TERI LYNN HINKLE

1   me was through my credit reports.
2   Q   What is your -- do you have a home phone?
3   A   Uh-huh.
4   Q   What is your home phone number?
5   A   374-4132.
6   Q   What is the area code?
7   A   478.
8   Q   How long have you had that phone number?
9   A   As long as we've been here.
10   Q   Even when you moved around, you kept the
11   same number?
12   A   Yeah.
13   Q   So you say 2008?
14   A   When -- when we first got here, late
15   2008, early 2009. I don't remember the exact date.
16   Q   When you lived in Michigan, what was
17   your -- do you recall your phone number?
18   A   No.
19   Q   Do you recall the area code?
20   A   It changed. 313.
21   Q   313?
22   A   Yeah.
23   Q   Did it change to something else?
24   A   Yeah. It was seven-something. I don't

Page 99

TERI LYNN HINKLE

1   remember.
2   Q   Was it 734?
3   A   It could have been. I don't remember. I
4   don't do well with numbers if you haven't figured
5   that out yet.
6   Q   Have you ever had the phone number
7   734-379-4368?
8   A   I'm not sure. I don't --
9   Q   That doesn't sound familiar?
10   A   I would have to look back. I don't know.
11   Q   Do you recall what your cell phone number
12   was when you were in Michigan?
13   A   It's too long ago. I don't remember.
14   Q   Where were you living in December 2008?
15   A   In Michigan.
16   Q   I thought you --
17   A   I think. I'm not sure. We moved here
18   either at the end of 2008 or the beginning of 2009.
19   Q   -- Do you recall if it was around
20   Christmas time that you moved?
21   A   I don't remember.
22   Q   Was it cold in Michigan when you moved?
23   A   Yes.
24   Q   So do you think you moved sometime in the

Page 100

TERI LYNN HINKLE

1   fall, winter of 2008, 2009?
2   A   Yeah. It was in the winter, I know that,
3   but I don't remember the exact dates. It was a
4   traumatic time.
5   Q   For the GE Meijer account, is there
6   anyone who would have paid that account off on your
7   behalf?
8   A   I don't know that I ever had it. So, no,
9   I don't know.
10   Q   Because you're saying that you never paid
11   it?
12   A   I'm saying I don't know. I already said
13   that. If she wants to go back and read my answers on
14   that so --
15   Q   I'm just making sure because this account
16   was paid off sometime in December 2008. And so I'm
17   just trying to understand why someone would pay off
18   an account that they say doesn't belong to them. So
19   that -- that's just --
20   A   That's not what I said.
21   Q   -- what I'm trying to figure out, Ms.
22   Hinkle.
23   A   That's not what I said. I said I didn't
24   recall. I said it was possible it could have, but I

Page 101

TERI LYNN HINKLE

1   don't know.
2   Q   So it's possible that you could have paid
3   off this account in December 2008; is that right?
4   A   If I had had it, it's possible.
5   Q   Okay. All right. So subject to the
6   penalty of perjury, you're saying that it's possible
7   that this account was yours and you paid it off in
8   December 2008, this account for GE Meijer?
9   A   I'm saying I do not know one way or the
10   other.
11   Q   So you can't say --
12   A   I can't --
13   Q   -- You can't say definitively this is
14   absolutely not my account and I absolutely did not
15   pay off this account?
16   A   No, nor can I say the other way. I'm
17   saying I do not know.
18   Q   And your phone number is 478-374-4132,
19   right?
20   A   4132, yeah.
21   Q   And you live at 322 Bethel Street?
22   A   Yes.
23   Q   Have you ever had any cell phone that
24   you've failed to repay?

26  (Pages 98 to 101)

Page 102

TERI LYNN HINKLE

1
2     A    No, not to my knowledge.  I only had the
3  one.
4     Q    Okay.  And you said that was sometime in
5  2008 that you stopped service?
6     A    It was.  I don't know for sure, 2007 or
7  2008.
8     Q    So it's possible?
9     A    It would have been early around then.
10     Q    So it's possible that you could have
11  discontinued your service in 2007; is that right?
12     A    I don't think so, but I mean if that was
13  the case, it would have been late that year.
14     Q    Late in 2007?
15     A    It's possible.  I don't remember when
16  I -- I didn't have it very long.
17     Q    How long did you have it?
18     A    I don't know.  I just -- I remember I
19  didn't have it very long.  I wasn't happy with even
20  using it.
21     Q    So would you say you had service for less
22  than a year?
23     A    Yeah.
24     Q    Less than a year in 2007?
25     A    Between 2007 and 2008 was around that

Page 103

TERI LYNN HINKLE

1
2  time.  I don't know specifically.  That was a long
3  time ago.
4     Q    And you don't recall ever getting any
5  notices from the cell phone company telling you that
6  your bill was past due and unpaid?
7     A    No.
8     Q    Who was responsible for paying your cell
9  phone bill?  Was it you or did your husband pay it?
10     A    No, it was me.
11     Q    You said Pinnacle was collecting on
12  the -- on the T-Mobile account?
13     A    That's what they had noted on their --
14  the information they furnished on the credit report.
15  I disputed it because I didn't recognize it or them.
16  And then they didn't answer and I filed the suit and
17  then they contacted me.
18     Q    So you're saying that they -- they didn't
19  answer so they were in default?
20     A    No.  They were reporting it on the credit
21  report.  I disputed it.  I sent them a letter of debt
22  validation, which they did not answer.  They're not
23  required by law to do that.  But neither did they
24  remove the information off my credit report.  So I
25  sent them a notice of intent to sue.  They did not

Page 104

TERI LYNN HINKLE

1
2  answer.  Then I filed the suit and immediately after
3  that they contacted me.
4     Q    And you settled the case?
5     A    Yes.
6     Q    So it was never established one way or
7  the other whether or not you actually owed the
8  T-Mobile account?
9     A    They apologized for their error over the
10  telephone and asked to settle.
11     Q    Any other companies ever contact you
12  about this T-Mobile account?
13     A    No.  In fact, I did not know until 2012
14  when I got my credit report that Midland was claiming
15  it.
16     Q    All right.  So that's two companies
17  claiming that you failed to pay a T-Mobile account
18  back in 2007?
19     A    I don't find that surprising because I
20  imagine after Pinnacle got rid of it, it was sold to
21  Midland.  Well, no, actually --
22     Q    But you don't know that, right?
23     A    No, let me finish.  According to the
24  answers in your client's discovery, they bought it
25  from another debt buyer.  So where did they get it?

Page 105

TERI LYNN HINKLE

1
2  I don't know, Pinnacle, wherever.
3          (Whereupon, Exhibits No. 4, 5 and 6 were
4          marked for identification by the court
5          reporter.)
6  BY MS. BROUSSARD:
7     Q    You've been handed three exhibits marked
8  as Exhibits 4, 5 and 6.
9     A    Yeah.
10     Q    All right.  Do you recognize those
11  documents?
12     A    This is all what you're asking me to give
13  you.
14     Q    I'm asking you if you recognize those
15  exhibits.  I'm going to move to strike that response
16  as nonresponsive.  Just answer the question.  Do you
17  recognize the documents?
18     A    Yes, I recognize them.
19     Q    All right.  You've been handed Exhibit 4,
20  which is a letter dated July 26th, 2012, from Teri
21  Lynn Hinkle to MCM, Department 12421, and it's
22  captioned response and notice of intent to sue.
23     A    Uh-huh.
24     Q    Was this a letter that you sent on or
25  around July 26th, 2012?

27 (Pages 102 to 105)

Page 106

TERI LYNN HINKLE

1
2  A  I believe so.
3  Q  And if you want to flip over to page
4  three of that document?
5  A  I only see two.
6  Q  It's a letter, page three.
7  A  This?
8  Q  Yes.
9  A  Okay.
10  Q  And that's a letter from MCM to you dated
11  July 21st, 2012?
12  A  Uh-huh.
13  Q  Do you recall getting this letter?
14  A  Yes, I do.
15  Q  And it reads in part:  The purpose of
16  this letter is to request your assistance so that we
17  may reach a quick resolution to your dispute.  So it
18  looks like they were asking you for documentation
19  regarding your dispute.  Is that what you understood
20  it to be?
21  A  I understood it to be them shifting the
22  burden back on me and I'm not obligated under law to
23  do that for them.
24  Q  On the face of this letter MCM is simply
25  asking you -- well, let's read it so we have it in

Page 107

TERI LYNN HINKLE

1
2  the record.
3  As part of our investigation of your
4  dispute, it would be helpful to have a copy of any
5  documentation you may have that supports your
6  dispute.  In the interim we requested that the three
7  major consumer credit reporting agencies change the
8  status of this dispute to disputed, of this -- I'm
9  sorry, to this account to disputed.
10  And you provided no such documentation;
11  is that correct?
12  A  What documentation could I give them on
13  something that didn't exist?
14  Q  I have no idea.  That's why I'm asking
15  you.  Did you --
16  A  No, I did not --
17  Q  -- provide any?
18  A  -- give them anything.
19  Q  All right.  And it did ask if it's fraud
20  to provide a copy of a police report, FTC, affidavit
21  or notarized fraud affidavit.  And you didn't provide
22  that, right?
23  A  Again, why would I?  No.
24  Q  And if the account was paid in full or
25  account settled, it did ask for proof of payment.

Page 108

TERI LYNN HINKLE

1
2  You didn't have that, right?
3  A  I didn't have anything except my credit
4  reports.
5  Q  Okay.  So you're saying that you didn't
6  have anything and as a result you didn't send any
7  documents; is that right?
8  A  No.  They had whatever they had to get my
9  credit report in the first place.  It wasn't my
10  obligation to validate the debt.  It was theirs.
11  Q  Now, it wasn't -- and MCM wasn't asking
12  you to validate the debt.  They were simply asking
13  you for documents to assist in the resolution of your
14  dispute; is that right?
15  A  This was their response to my demand for
16  debt validation.  Their response apparently appears
17  to be you need to validate it back to me.
18  Q  Can we flip over to the next page?
19  A  Uh-huh.
20  Q  All right.  It's dated July 26th, 2012.
21  Was that part of the whole package that you sent?
22  A  Hold on a second.  It's debt validation
23  letter, envelope, yeah.
24  Q  All right.  What were you hoping to
25  accomplish by sending this on July 26th, 2012?

Page 109

TERI LYNN HINKLE

1
2  A  Send me a debt validation.  I'm looking
3  at something I know is not mine.  They're saying it
4  is.  Okay.  Show me why you believe that.
5  Q  Flip over to Exhibit 5.
6  A  Different document?
7  Q  Yeah.
8  A  Okay.  Are you going to want these back
9  in order?
10  Q  The Court Reporter -- as long as they're
11  just kind of organized.
12  A  Did you hear that?  Kind of organized.
13  Okay.
14  Q  Do you recognize this document?
15  A  Yes, I do.
16  Q  And this is a letter that you sent to the
17  CEO of Midland Credit Management --
18  A  Yes, it is.
19  Q  -- dated April 5th, 2013; is that
20  correct?
21  A  Uh-huh.
22  Q  And this was just a -- you said this is a
23  courtesy to apprise you and your other corporate
24  entities that the attached legal action will be filed
25  in Federal District Court.  So you were just letting

28  (Pages 106 to 109)

Page 110

TERI LYNN HINKLE

1
2  MCM know that you were about to file a lawsuit,
3  right?
4    A   Right.
5    Q   Okay.
6    A   Notice of my intent.
7    Q   Okay.
8    A   Are you done with that one?
9    Q   Yes.  And Exhibit 6, do you recognize
10 this letter?
11   A   Yes.
12   Q   And it is dated April 30th, 2013?
13   A   Uh-huh.
14   Q   Do you recognize this as a letter from
15 MCM addressed to you dated April 30th, 2013 and the
16 letter reads in part:  The purpose of this letter is
17 to advise you that you did not provide sufficient
18 information to investigate your dispute of the
19 crediting reporting of your above-referenced account
20 pursuant to the Fair Credit Reporting Act.
21       And this is for the T-Mobile account --
22   A   I would like to --
23   Q   -- Let me finish.
24   A   Okay.  I have --
25   Q   -- ending in 0953.  Do you recognize this

Page 111

TERI LYNN HINKLE

1
2  letter?
3    A   No.  I thought it was exactly a copy of
4  like the other one.
5    Q   But you live at 322 Bethel Street --
6    A   Doesn't matter where I live.  I --
7    Q   -- I'm just asking you, you do you
8  live --
9    A   Yes.
10   Q   -- at 322 Bethel Street, right?
11   A   Let me finish my answer --
12   Q   Okay.
13   A   -- please.  This letter I do not recall
14 ever seeing.  And if it's not in my records, I did
15 not get it.  I don't throw things like that away.
16   Q   You said you don't throw things away.
17 Did you throw away your Virgin Mobile account
18 statements?
19   A   I don't throw things away when I'm in the
20 middle of a lawsuit or I'm compiling information.  I
21 did not throw any correspondences away from your
22 clients.  I've kept them all organized and in order.
23   Q   Did you make any disputes to the credit
24 reporting agencies --
25   A   Yes.

Page 112

TERI LYNN HINKLE

1
2    Q   -- in or about April 2013?
3    A   I don't remember the dates of the
4  disputes.
5    Q   Did you make any in 2013?
6    A   Yes, I believe so, but I'm not positive.
7  I have to go back and look.
8    Q   Did you get results of investigations
9  from those?
10   A   Each time that I disputed with credit
11 reporting agencies, they responded.
12   Q   Okay.  I'd like to get those in addition
13 to the other documents.
14   A   They responded.
15   Q   But I also want the results of
16 investigation from Experian, TransUnion, Equifax in
17 addition to the other documents we've discussed.  And
18 that's within five days you said you could e-mail
19 them.
20   A   I'll have to scan them because they're
21 not in the computer.
22   Q   All right.  Do you want to take another
23 break and I'm just going to --
24       MS. BROUSSARD:  Let's go off the
25 record.

Page 113

TERI LYNN HINKLE

1
2       (Whereupon, a discussion ensued off the
3  record.)
4       (Whereupon, a brief recess was taken.)
5       (Whereupon, Exhibits No. 7 and 8 were
6  marked for identification by the court
7  reporter.)
8  BY MS. BROUSSARD:
9    Q   Back on the record.  You've been handed
10 documents marked as Exhibit 7 and 8.
11   A   Which are you going to first?
12   Q   7.
13   A   All right.  You were done with this I
14 take it then?
15   Q   You can just put it aside.
16   A   I just didn't want to get it out of order
17 for her.  All right.
18   Q   Do you recognize the document that's
19 marked as Exhibit 7?  I can represent to you that
20 these are your responses to Midland Funding's first
21 discovery requests.
22   A   Yeah, I thought we did that already.
23   Q   We did Midland Credit Management.
24   A   Oh, okay.
25   Q   Three different sets.

29 (Pages 110 to 113)

| Page 114 | Page 115 |
|---|---|

**Page 114**

TERI LYNN HINKLE

2  A   Okay.  Got you.
3  Q   Do you recognize them?
4  A   Yeah.
5  Q   Okay.  Did you -- you never received any
6  letters directly from Midland Funding, did you?
7  A   I am not sure.  I would have to look at
8  the letters that I have in my file.
9  Q   You don't recall just getting letters
10  from MCM?
11  A   I remember MCM's logo, but I would have
12  to look back at the letters themselves.  I don't know
13  for sure.
14  Q   And you never received any letters
15  from -- excuse me.  You never received any phone
16  calls from Midland Funding; is that correct?
17  A   The ones I answered when they identified
18  themselves, they said Midland Credit Management.
19  Q   All right.  So is it --
20  A   There were a couple of those calls they
21  didn't identify themselves.
22  Q   -- But you have no way of knowing if it
23  was Midland Funding?
24  A   No, I don't know.
25  Q   So you never received any communications

**Page 115**

TERI LYNN HINKLE

2  from anyone who identified itself as Midland Funding,
3  LLC, right?
4  A   Not separate communications, no.  Just
5  communication through my credit report.
6  Q   And you never wrote any letters to
7  Midland Funding; is that correct?
8  A   I sent a debt validation letter.
9  Q   But you didn't send it directly to
10  Midland Funding, LLC; is that right?
11  A   I'm sure I did.
12  Q   If you want to look back at Exhibit 5 --
13  A   I'll have to double check, but I believe
14  I did.  This one?
15  Q   -- Exhibit 5.
16  A   Okay.
17  Q   And that's addressed to Midland Credit
18  Management; is that right?
19  A   This is Encore.
20  Q   No.  It says chief executive officer,
21  Midland Credit Management --
22  A   Oh, I see.
23  Q   -- regarding --
24  A   Right, right.  But okay, he's the
25  president of Encore, so yeah.

| Page 116 | Page 117 |
|---|---|

**Page 116**

TERI LYNN HINKLE

2  Q   No.
3  A   That's the distinction.
4  Q   Well --
5  A   And he's also the president of Midland
6  Credit Management.
7  Q   -- But you wrote this letter to Midland
8  Credit Management, correct?
9  A   Directly to J. Brandon Black.
10  Q   And you also insert his title as chief
11  executive officer, Midland Credit Management.
12  Despite what other hats he may wear, you addressed
13  this to the chief executive officer of Midland Credit
14  Management --
15  A   Yes.
16  Q   -- and only him, right?
17  A   This particular letter, yes.
18  Q   Look at Exhibit 4.
19  A   Where did I put it?
20  Q   This is another letter from you, right?
21  A   Uh-huh.
22  Q   And it is addressed to MCM, Department
23  12421.  It's not addressed to --
24  A   Yes.
25  Q   -- Midland Funding, LLC or Encore,

**Page 117**

TERI LYNN HINKLE

2  correct?
3  A   Correct.
4  Q   And you produced no letters in which you
5  sent a letter directly to Midland Funding, LLC; is
6  that right?
7  A   Unless you have them here, I don't think
8  I sent them to you.
9  Q   But you have not produced in this case
10  any letters that you sent directly to Midland
11  Funding, LLC; is that right?
12  A   No.  Any letters I may have sent them
13  they would still have.
14  Q   That's not my question.
15  A   I haven't given it to them.  I haven't
16  given it to you.
17  Q   Did you receive any kind of e-mails,
18  electronic communications from any of the Midland
19  defendants?
20  A   Directly from them?
21  Q   From any of them, e-mails?
22  A   I don't believe so.
23  Q   And you never e-mailed anybody at the
24  Midland defendants; is that right?
25  A   I don't think so, no.

30  (Pages 114 to 117)

Page 118

TERI LYNN HINKLE

1
2    Q   And you never called Midland Funding,
3  LLC; is that right?
4    A   No, I didn't call them.  I would just
5  like to state anything I did, I did in writing
6  because words evaporate.
7    Q   And you've not produced any documents in
8  this lawsuit showing that there was an account on
9  your file being reported by Midland Funding; is that
10 correct?
11   A   I will be giving you that.
12   Q   Okay.  Have you seen any credit
13 reports --
14   A   Yes.
15   Q   -- where you -- let me finish.
16       Have you seen any credit reports where
17 you had any accounts on your file being reported by
18 Midland Funding, LLC?
19   A   Yes.
20   Q   Do you remember what the account -- what
21 the amount of those accounts were?
22   A   No.
23   Q   And if you could look at Exhibit 8, right
24 here?
25   A   (Witness complies with request of

Page 119

TERI LYNN HINKLE

1
2  counsel.)
3    Q   And I'll represent to you that these are
4  Plaintiff's Responses to Encore Capital Group, Inc.'s
5  First Discovery Requests.
6    A   Okay.
7    Q   Do you recognize those?
8    A   Uh-huh.
9    Q   And I think we've already established
10 that you've not contacted directly or been contacted
11 directly by Encore, right?
12   A   I cc'd them into one letter, but that was
13 after the commencement of this suit.
14   Q   Do you remember the date of that?  You
15 said it was a commencement after the lawsuit?
16   A   Yeah.  And I don't remember the date.  I
17 have a copy in the file.
18   Q   All right.  Ms. Hinkle, are you claiming
19 that you've somehow sustained any damage to your
20 reputation as a result of the underlying facts in
21 this case?
22   A   Only in regard to credit worthiness.
23   Q   Now, you testified earlier that you do
24 not use credit, so help me understand how your
25 reputation was damaged regarding your credit

Page 120

TERI LYNN HINKLE

1
2  worthiness if you don't use credit.
3    A   Okay.  Whether or not you apply for a
4  credit account with certain entities, they still use
5  your credit score as a basis for pricing, such as
6  insurance, or rental agreements, something like that.
7  You're not per se applying for credit.
8    Q   Do you know what your credit score is?
9    A   No.  You don't get that with a credit
10 report.  I have no idea what it is right now.
11   Q   No, I'm saying have you purchased or do
12 you belong to some kind of credit monitoring --
13   A   No.
14   Q   -- system where you get copies -- where
15 you get your credit scores?
16   A   No.  I should have brought one.
17   Q   When's the last time you pulled your
18 credit score?
19   A   Last year, but I don't remember what the
20 date was.
21   Q   Was that when you got copies of all three
22 of your credit reports?
23   A   Yeah.  I pull them once a year because
24 you're entitled to it once a year.  So whenever it
25 was due last year, last summer sometime.

Page 121

TERI LYNN HINKLE

1
2    Q   Do you recall what your credit score was
3  at that time?
4    A   They don't give you that.
5    Q   Oh, I thought you said that at the time
6  you pulled your file, that you got -- you bought your
7  score, too?
8    A   No.  No, no, no.
9    Q   When's the last time you pulled your
10 credit score for any of the agencies?
11   A   The score?
12   Q   Yes, a score.
13   A   I don't because you have to pay for it.
14 I don't.
15   Q   Have you applied for insurance or had a
16 rental agency pull your score when they told you what
17 it was?
18   A   They don't tell me, no.
19   Q   Don't they --
20   A   Well, I didn't ask them.
21   Q   -- Don't they give you copies of what
22 they pull?
23   A   No.
24   Q   Have you ever asked for them?
25   A   Huh-uh.  Actually they're not obligated

31  (Pages 118 to 121)

Page 122

TERI LYNN HINKLE

1  by -- in fact I think they're not supposed to.
2      Q   All right. When's -- to your knowledge,
3  when's the last time an insurance agency pulled your
4  credit file?
5      A   That probably would have been when I
6  renewed the auto insurance last time, which would
7  have been -- when was that, last August I believe.
8  Don't quote me on that because I'm not sure of the
9  date. They go six months now --
10     Q   Was that Progressive?
11     A   -- instead of a year. GMAC, the car --
12  motorcycle is due again next month so they will be
13  doing that then.
14     Q   Do you have any reason to believe that
15  GMAC, or whatever the name of that company is, that
16  they gave you a higher rate based on information
17  reporting on your credit file?
18     A   Well, it would have to be because they
19  base -- their actuaries base their prices on people's
20  credit scores. So whatever it was at the time would
21  have determined the price that I pay.
22         Now, when they do it again this last
23  time, it would be different than it was before. But
24  it's hard to tell because across the board for this

Page 123

TERI LYNN HINKLE

1  year all the insurance companies raised their rates.
2      Q   Well, Ms. --
3      A   So it's hard to tell.
4      Q   -- Ms. Hinkle, what I'm asking is do you
5  have any reason to believe that GMAC gave you a
6  higher rate of insurance based on derogatory
7  information reporting on your credit file?
8      A   Originally, yes, they would have had to.
9      Q   Okay. Well, when was that?
10     A   When I first got the -- the policy you
11  mean?
12     Q   Well, when is it that you're claiming
13  that they would have given you a higher rate based on
14  derogatory information?
15     A   As far back as I can go from my own
16  knowledge as to what I know was on the credit report
17  is 2011.
18     Q   All right. Are you trying to attribute
19  that to information from the Midland defendants
20  reported on your credit file?
21     A   Partially, yes. They were there.
22     Q   But have you sought any discovery from
23  GMAC regarding why they -- why they allegedly quoted
24  you a higher rate of insurance?

Page 124

TERI LYNN HINKLE

1      A   I didn't know that it was higher at the
2  time. I didn't know what I know now back then.
3      Q   But in this lawsuit you have no evidence
4  that GMAC quoted you higher insurance rates based on
5  any information on your credit file that came from
6  the Midland defendants; is that right?
7      A   No, I would have to ask them specifically
8  what they -- you know.
9      Q   What about Progressive? Did they pull
10  your credit file last year to --
11     A   Yeah, but they're --
12     Q   -- renew your motorcycle insurance?
13     A   They're just, you know, a flat rate for a
14  year. It's different than car insurance.
15     Q   How much do you pay for GMAC insurance?
16     A   $71 a month.
17     Q   Is it higher than the year before?
18     A   Yes.
19     Q   What was it the year before?
20     A   It was 68. That was a -- I know that
21  when I asked my insurance agent why it went up, she
22  said they had a rate hike across the board.
23     Q   How much do you pay on your motorcycle?
24     A   It's 80 something for the year -- 88 or

Page 125

TERI LYNN HINKLE

1  87, right around there.
2      Q   Per month?
3      A   No. I only pay it once a year.
4      Q   All right. What company -- well, strike
5  that.
6          Is there a management company that I
7  guess manages your rental home?
8      A   No.
9      Q   You rent it from a private party?
10     A   Yes.
11     Q   Who is that?
12     A   Vanessa Hall.
13     Q   Hall, H-A-L-L?
14     A   Uh-huh.
15     Q   Does she live in Eastman?
16     A   Yes.
17     Q   How much rent do you pay?
18     A   600.
19     Q   Did you have to put a security deposit
20  down?
21     A   No.
22     Q   Did she pull your credit in order to rent
23  to you?
24     A   No. At least not to my knowledge. I

32  (Pages 122 to 125)

| Page 126 | Page 127 |
|---|---|

**Page 126**

TERI LYNN HINKLE

1 don't think so.
2    Q   And you've been there five years?
3    A   Uh-huh.
4    Q   So -- all right.  Well, you said she
5 never pulled your credit and she didn't pull it when
6 you moved in?
7    A   No, because she was a friend of my son's.
8    Q   And prior to that, do you know when you
9 were living at Legacy -- in Legacy Road,
10 did they pull your credit in order for you to rent
11 there?
12    A   They wouldn't have because it's kind of a
13 crazy situation.  But the builder -- those are new
14 homes out there and the builder was my son's employer
15 at the time.
16    Q   All right.  So you've referenced
17 companies pulling consumer's files whenever those
18 consumers are trying to rent homes or apartments.
19 But you've not experienced that personally in the
20 last five or six years; is that correct?
21    A   For the rent, no.
22    Q   Any other times that you can think of
23 that your credit file would have been pulled in the
24 last say three to five years?

**Page 127**

TERI LYNN HINKLE

1    A   Well, I believe the utility companies do
2 that and the phone company.
3    Q   Did you have to pay a deposit for Georgia
4 Power?
5    A   Yes, but I don't remember what it was.
6 It was too long ago.  Even for water here they do.
7    Q   So for Georgia Power, do you recall when
8 you -- when you established service with them in
9 Eastman?  Would that have been sometime seven years
10 ago maybe?
11    A   No, it would have been when we moved
12 where we're at now because when we were on Legacy
13 Road, that was not under our name.  It was under the
14 builder's whole block.
15    Q   So sometime in 2009 Georgia Power would
16 have accessed your credit file.  Is that what you're
17 saying?
18    A   Uh-huh.
19    Q   So you can't say --
20    A   And I don't know that they don't do it
21 thereafter.  Many companies do, but I don't know.
22    Q   -- Because you've never seen an inquiry
23 from Georgia Power on your credit file in the last
24 five years; is that right?

| Page 128 | Page 129 |
|---|---|

**Page 128**

TERI LYNN HINKLE

1    A   I don't recall.  I'd have to go back and
2 look.  That's not something that would seem unusual
3 to me or alarm me.
4    Q   So you can't say that Georgia Power took
5 any adverse action with regard to you because of any
6 information that the Midland defendants reported on
7 your credit files; is that correct?
8    A   I don't know.  I'd have to ask them.
9 Actually it did not occur to me to ask them what they
10 base --
11    Q   So sitting here today, you can't --
12    A   -- their inquiries on it.
13    Q   You can't say that the Midland defendants
14 would have caused you to pay a deposit or a higher
15 deposit with Georgia Power; is that correct?
16    A   I can't say that without knowing their
17 policies.
18    Q   And when you say "they", you mean Georgia
19 Power?
20    A   Georgia Power's policies.
21    Q   What about water, is it with the City of
22 Eastman?
23    A   Uh-huh.  I believe that's $100.
24    Q   Did you have to pay a deposit?

**Page 129**

TERI LYNN HINKLE

1    A   Uh-huh.
2    Q   Do you recall how much?
3    A   I believe it's $100.
4    Q   Okay.  I thought you were saying your
5 bill was $100 a month?
6    A   No.
7    Q   And that would have been when you moved
8 into your home five years ago?
9    A   Yeah, on Bethel.
10    Q   And so just like with Georgia Power, you
11 can't say that your utilities with the City of
12 Eastman -- well, strike that.  You can't say that any
13 deposit that you paid with the City of Eastman was
14 the result of information that the Midland defendants
15 reported on your credit file; is that right?
16    A   I don't believe the City of Eastman bases
17 it on that.  I think it's $100 for everybody you
18 know.
19    Q   Oh, okay.
20    A   Policy.
21    Q   What about AT&T, did they pull your
22 credit file?
23    A   Yes.
24    Q   Did you have to pay a deposit?

33  (Pages 126 to 129)

Page 130

TERI LYNN HINKLE

1
2    A  I don't remember.
3    Q  And that would have been in 2009 also?
4    A  Yeah, I believe.
5    Q  So you're not testifying that the Midland
6  defendants caused you to somehow pay a deposit or
7  have some higher rate with AT&T because of any
8  information that the Midland defendants reported on
9  your credit file, right?
10    A  I don't know.  Again, I don't know what
11  their policies are.
12    Q  And when you say they, you mean AT&T?
13    A  I mean AT&T.  I do know that they did
14  pull my credit report and I know that they must do it
15  periodically because I saw them on there more than
16  once or more than one occasion.  So they must be a
17  company that does that periodically with their
18  customers.  But they would have a right to do that.
19    Q  When was the last time you saw that?
20    A  I don't recall the date.  I would have to
21  look.  But I remember seeing them more than once.
22  And I also think if you update your service or change
23  your service in some way, like I don't know, adding
24  call waiting or something like that, that they're
25  going to do it again.

Page 131

TERI LYNN HINKLE

1
2    Q  All right.  What about Dish, did you
3  establish that service in 2009?
4    A  Yeah.  And I know they did pull my credit
5  report, too.
6    Q  Did you have to pay a deposit?
7    A  I'm sure I did, but I don't remember how
8  much.  It's been quite a while.
9    Q  So you're not claiming that any
10  information that the Midland defendants might have
11  reported on your credit file has somehow caused you
12  to have to pay a deposit with Dish; is that correct?
13    A  I don't know because I don't know if
14  Midland were -- excuse me, if the Midland clients
15  were on my credit report in 2009.
16    Q  Okay.
17    A  I never saw it ever in my life until
18  2011.
19    Q  So you don't know what was reported on
20  your credit file in 2009 for anybody?
21    A  No.  I have no way to know.  Can't answer
22  yes or no.
23    Q  In the last five years, have you had any
24  joint accounts with your husband?
25    A  No.

Page 132

TERI LYNN HINKLE

1
2    Q  And you said he doesn't have credit cards
3  either?
4    A  Huh-uh.
5    Q  I know you said you testified that you
6  don't go to doctors, but in the last five years, have
7  you had any unpaid medical bills --
8    A  No.
9    Q  -- in your name?
10    A  No.
11    Q  Has your husband had any unpaid medical
12  bills?
13    A  No, he has the VA.
14    Q  Okay.
15    A  And now he has now -- forgive me because
16  I cannot keep these straight.  It's either Medicare
17  that's social security or Medicaid, whichever one is
18  social security.  I can never keep them straight.
19    Q  Have you ever used Medicaid?
20    A  No, I don't think so.  Is that the other
21  one?
22    Q  Medicaid is low income.
23    A  Oh, no.  I haven't seen a regular doctor
24  in more than 26 years other than a chiropractor.
25    Q  Have you ever cosigned on any loans for

Page 133

TERI LYNN HINKLE

1
2  anyone in the last five years?
3    A  No.
4    Q  Have your kids ever cosigned or have your
5  kids cosigned for any loans for you or your husband
6  in the last five years?
7    A  No.
8    Q  Do you have any other relatives in this
9  area?
10    A  My relatives are all dead except a sister
11  in California.  Oh, and six brothers and a sister I
12  don't know.
13    Q  So your sister in California, how old is
14  she?
15    A  Two-and-a-half years younger than me, so
16  wow, she's going to be 60 this year.  Didn't think
17  about that.
18    Q  Where does she live in California?
19    A  I don't know the town.  We rarely speak.
20    Q  Well, my next question is going to be
21  when's the last time you talked to her?
22    A  Years ago.  Actually spoke to her -- when
23  did I go to California -- 1996 I believe.
24    Q  And I guess I should have asked this
25  early on, any other hobbies or kind of groups that

34  (Pages 130 to 133)

Page 134

TERI LYNN HINKLE

1
2  you belong to, church in town?
3      A   No.
4      Q   Do you belong to any civic organizations?
5      A   No.
6      Q   And you said church, no?
7      A   No.
8      Q   In terms of your social circle outside of
9  your immediate family members, do you have any close
10  friends here?
11      A   Just my neighbors.
12      Q   Do your neighbors know anything about
13  this lawsuit?
14      A   No.
15      Q   Anyone that you talk to on a regular
16  basis who doesn't live here, friends?
17      A   Oh, I have lots of them all over the
18  country.
19      Q   But have you talked with them about this
20  lawsuit?
21      A   No.
22      Q   Have you talked to them about your
23  dealings with the Midland defendants?
24      A   Not specifically, no.
25      Q   And when you say not specifically?

Page 135

TERI LYNN HINKLE

1
2      A   I mean, if we -- I talk to people all the
3  time on the Internet, you know, discussing different
4  issues.  So you know, it could be debt issues in
5  general, it could be political issues in general and
6  so on and so forth.  That's what I mean by not
7  specifically.
8      Q   Have you talked specifically about any of
9  the claims that you have in this case?
10      A   Discussed the nature of claims and the
11  FCRA and the FDCPA in a general way, yes.
12      Q   Do you have a Facebook page?
13      A   No.  I do not participate in social
14  media.
15      Q   So no Twitter I assume?
16      A   I have a Twitter account now for a
17  specific purpose.  And as soon as that specific
18  purpose is over, that will go bye-bye, too.
19      Q   Is it anything related to this lawsuit?
20      A   Absolutely not.
21      Q   Anything related to debt collectors?
22      A   No.
23      Q   Anything related to the financial
24  services industry?
25      A   What do you mean, like banking?

Page 136

TERI LYNN HINKLE

1
2      Q   Banking, credit reporting?
3      A   It's related to currency, foreign
4  currency.
5      Q   Foreign currency?
6      A   Uh-huh.
7      Q   Okay.  Do you have any outstanding loans
8  to -- I know you testified you don't use loans, but
9  do you have any outstanding loans to any nonfinancial
10  institutions such as family members, relatives,
11  friends?
12      A   No.
13      Q   Have you filed all of your lawsuits in
14  the last five years In Forma --
15      A   No.
16      Q   -- Pauperis, IFP?
17      A   No.
18      Q   Why did you file this one IFP?
19      A   Because I didn't have the money to pay
20  for the filing fee.
21      Q   Did you speak with any attorneys
22  regarding your case?
23      A   No.
24      Q   Why not?
25      A   I -- I'll be delicate about this.

Page 137

TERI LYNN HINKLE

1
2      Q   You won't offend me.
3      A   Well --
4      Q   I'm just asking the question.
5      A   -- I don't want to offend you, but I have
6  no reason to believe that they would have my best
7  interests at heart.  I don't know of any at this
8  moment, but I have considered consulting.  But I
9  haven't done so yet.
10      Q   Have you consulted any attorneys
11  regarding any of your other lawsuits?
12      A   No.
13      Q   And you said you're considering
14  consulting one for this case?
15      A   Depending, yeah.
16      Q   Depending on what?
17      A   Well, how it goes forward.
18      Q   So if you thought your cases had merit,
19  is there -- I guess I'm just trying to understand why
20  you wouldn't consult an attorney if you --
21      A   I don't trust them.
22      Q   -- really thought you had a winner?
23      A   I don't trust them to represent me.
24      Q   Have you ever had any attorneys
25  representing you in other cases?

35  (Pages 134 to 137)

Page 138

TERI LYNN HINKLE

1  TERI LYNN HINKLE
2      A   I didn't have other cases.
3      Q   Well --
4      A   Are you talking about my own?
5      Q   -- Other cases other than financial
6  services such as debt collection.
7      A   No.
8      Q   The kind of lawsuits you've brought?
9      A   No, no, no, no, no.  No.  Well, that
10  thing 40 years ago we had one.
11      Q   All right.  Ms. Hinkle, what do you hope
12  to get out of this lawsuit?
13      A   I want them out of my life, off my credit
14  reports, stop targeting me, stop harassing me and
15  make it right with me for the violations that they
16  have committed.
17      Q   When's the last time you looked at your
18  credit report?
19      A   This last summer.
20      Q   Were there Midland accounts still on your
21  file?
22      A   Yes.
23      Q   Do you know which ones or how much?
24      A   I don't remember the particulars.  I have
25  to look again.

Page 139

1  TERI LYNN HINKLE
2      Q   And you said stop harassing you.  But
3  wouldn't you agree that you probably haven't gotten a
4  phone call from Midland in over a year?
5      A   No.  I consider invading my credit
6  reports to be harassment.  I wasn't talking about the
7  telephone calls.
8      Q   And you weren't talking about the letters
9  either because --
10      A   They haven't sent any lately.
11      Q   -- So what do you think you are entitled
12  to, Ms. Hinkle, in terms of a monetary reward --
13  award I should say?
14      A   Just the basic statutory damages for all
15  three defendants.  Now, as I told you a million times
16  before, I'm always willing to discuss any amount
17  but -- well, as long as it's reasonable.
18      Q   And you mentioned, quote/unquote,
19  invading your credit reports.  But you would agree
20  that your credit file isn't even published to any
21  third parties because you don't apply for credit and
22  you haven't applied for utilities in five years.  So
23  who is your credit report being published to?
24      A   Okay.  That doesn't mean I don't shop
25  around for insurance before I renew, and insurance

Page 140

1  TERI LYNN HINKLE
2  companies do use that.  I don't intend to stay in
3  this rental house forever.  There are other
4  situations where that matters.  I don't intend to
5  apply for credit, but that doesn't mean that other
6  entities don't obtain my credit reports with my
7  permission.
8      Q   So when you renewed your insurance this
9  last time in August, who -- which other companies did
10  you shop around with?
11      A   I did that online, so I think GEICO was
12  one of them.
13      Q   Did they pull your report?
14      A   I believe so.  What I did -- you know
15  those websites where you go to compare insurance
16  rates and they automatically compare with different
17  companies, it was one of those.  So sometimes all of
18  the ones they compare with will show up on your
19  credit report or just them, but you never know.
20          It's not something that you can argue
21  with though because by using their website, I'm sure
22  there's very small print that says they're going to
23  do that.
24      Q   Do you know for a fact that they pulled
25  your credit file, meaning did you see inquiries from

Page 141

1  TERI LYNN HINKLE
2  GEICO or other companies on your file?
3      A   I know that I saw insurance companies on
4  there other than my insurance company, but I don't
5  remember specifically who they were.
6      Q   And you have no idea what the
7  underwriting criteria for any of these insurance
8  companies, so you don't know what -- what --
9      A   I don't --
10      Q   -- what the -- what these accounts will
11  account for in terms of what your rates will be; is
12  that correct?
13      A   Well, you don't know that until they give
14  it to you.  And you don't know what they
15  specifically -- well, how do I put this.  I'm sure
16  they have cutoff levels, you know, and you don't know
17  that if you don't ask them.  And I didn't ask them.
18      Q   Right.  And you're saying you're sure
19  they may operate a certain way, but you don't know
20  what the policies and procedures are or the
21  underwriting criteria for any of those insurance
22  companies, right?
23      A   Well, I did used to work in the insurance
24  industry, so I know that they do base it on credit
25  scores partially.

36  (Pages 138 to 141)

Page 142

TERI LYNN HINKLE

1  
2    Q   When did you work in the insurance
3  industry?
4    A   I gave up my license in -- actually I
5  just didn't renew it around 2004, 2005.
6    Q   And I asked you about your employment
7  history and you said that you were --
8    A   I was an independent agent.
9    Q   -- Dynamic Entertainment or something.
10    A   I was still licensed though.  I
11  maintained my license for a long time.
12    Q   Were you actively working in the
13  insurance industry?
14    A   Only all the way back in 1980.
15    Q   And what did you do in the insurance
16  industry?
17    A   Life and health.
18    Q   And when did you cease being actively
19  involved in the insurance industry?
20    A   Had to be around the time my daughter was
21  born because that's why I had to -- so it would have
22  been '80 -- when was she born -- '87 -- no, I take
23  that back.  I got my license in '83 I think, '83.
24  That's a really long time ago.
25    Q   So but you've never worked for GEICO or

Page 143

TERI LYNN HINKLE

1  
2  any --
3    A   Oh, no, no.
4    Q   -- of the companies that you're
5  referencing that you think might have taken some kind
6  of adverse action?
7    A   No.  I just understand how the actuary
8  system in insurance works for insurers in general
9  so --
10    Q   But with regard to --
11    A   A specific company, other than the ones
12  that I wrote policies for, I wouldn't know their
13  exact procedures.
14    Q   -- Other than GEICO, who else pulled your
15  file in August 2013?
16    A   I will have to look at it because I don't
17  remember.  I'm pretty sure Progressive did.  I think
18  I saw them on there.  I didn't really pay attention
19  to those because I -- that was generated by me.
20    Q   All right.  But I just want to make sure
21  that I'm clear that you're not claiming any damages
22  with respect to Midland Reporting for GEICO or
23  Progressive pulling your credit file?
24    A   I didn't buy anything from GEICO.  And as
25  for Progressive, I don't know without having --

Page 144

TERI LYNN HINKLE

1  
2  without asking them if I would have gotten a cheaper
3  rate.
4    Q   All right.
5    A   I can do that but I haven't.
6    Q   And you didn't ask GEICO either; is that
7  right?
8    A   I didn't go with them so I didn't bother
9  them.
10    Q   Any other insurance companies?
11    A   There were others but I don't remember
12  the names of them.
13    Q   Okay.  But with respect to those other
14  unnamed companies?
15    A   The rates were all too high.
16    Q   All right.  But you have no idea if their
17  rates were based on specific information reported on
18  your credit file at the time, right?
19    A   I'm sure that it was a contributing
20  factor.
21    Q   But you don't know that for sure because
22  you did not --
23    A   Not without asking them.
24    Q   -- Right.  Because you've not conducted
25  any discovery of those unnamed companies, right?

Page 145

TERI LYNN HINKLE

1  
2    A   Right.
3    Q   Have you ever added any consumer
4  statements to your credit file?
5    A   I didn't understand that I could do that
6  until this last year.  And no, I haven't.
7    Q   All right.  Other than these insurance
8  companies that you identified, is there anyone else
9  that you think the credit reporting agencies
10  published your credit file to in the last three to
11  five years?
12    A   I'm not sure.  I'd have to go back and
13  look at them.  I don't recall at this moment.
14    Q   All right.  And you said that you may
15  want to move.  You've lived in your current residence
16  for five years.  Are you actively seeking another
17  place to live right now?
18    A   Well, I would like to but not at this
19  time of year certainly.
20    Q   So you have no definite plans --
21    A   No.  No, not yet.
22    Q   -- to move into another rental property?
23    A   I'm sure that we will, but I don't -- I
24  don't know specifically when.
25    Q   All right.  Ms. Hinkle, with respect to

37  (Pages 142 to 145)

Page 146

TERI LYNN HINKLE

1
2  your FCRA claims, do you have any evidence that the
3  Midland defendants willfully or intentionally sought
4  to violate your rights?
5      A   That would be speculatively -- or
6  speculative. I can't know their intention.
7      Q   And you have no evidence that any of the
8  Midland defendants specifically targeted you as a
9  consumer; is that correct?
10     A   Well, yeah, by -- by reporting in my
11 credit report, that's a direct target to me. By
12 calling me is a direct target to me. Sending me
13 dunning letters is a direct target to me. Their
14 intention I can't say.
15     Q   And you have no evidence that the Midland
16 defendants knowingly disregarded your rights; is that
17 correct?
18     A   I'm not sure what you mean by that.
19     Q   Just like intentionally you said no or
20 you have no reason to believe that they
21 intentionally -- what I'm asking you is: Do you
22 believe that the Midland defendants knowingly
23 violated your rights under the FCRA?
24     A   Well, yes, they did.
25     Q   How is that?

Page 147

TERI LYNN HINKLE

1
2      A   When I disputed and they chose to
3  continue the actions they were already doing, that's
4  willful, that's knowing. So I suppose that's
5  intentional. But again, I'm not in their minds, so
6  all I know is the evidence that's in front of my face
7  and the actions that I took.
8      Q   Which is just the credit reports, right?
9      A   And my letters back and forth to them.
10     Q   All right. And just to make sure that
11 I'm clear, you said that you lost sleep. Are you
12 claiming any other physical manifestations flowing
13 from the underlying facts in this case?
14     A   The entire situation, just that whole
15 area of time and the situation of being -- I was in
16 great fear with my information out there not knowing
17 who had it and where it was going.
18     Q   And this is all just from the Midland
19 defendants?
20     A   No, in general others that were on the
21 reports as well.
22     Q   So what others were on the report?
23     A   Those that I sued. And there were some
24 on there that when I -- when I disputed, they removed
25 it. So then I didn't worry so much about that

Page 148

TERI LYNN HINKLE

1
2  although I still don't know where those credit
3  reports went, who got them.
4      Q   Do you have any accounts on your credit
5  file that are not collection accounts, meaning do you
6  have any regular trade lines, maybe some old ones?
7      A   Yeah, there's an old mortgage and --
8      Q   From Michigan?
9      A   Yeah.
10     Q   -- Did it go into foreclosure?
11     A   No, we sold. And really old credit cards
12 that I had that was paid off. And please don't ask
13 me the name of that company. All I know is it starts
14 with a P.
15     Q   I guess I'll see it when I get the credit
16 reports.
17     A   It was Providian or Premiere, one of
18 those.
19     Q   Did you pay it off and close it?
20     A   Yeah.
21     Q   Did the credit card company close it or
22 did you close it?
23     A   I did.
24     Q   Were you delinquent on it?
25     A   No.

Page 149

TERI LYNN HINKLE

1
2      Q   Did your husband just deal in cash
3  transactions only?
4      A   Now, yeah.
5      Q   No credit?
6      A   No.
7      Q   Do you have a savings account?
8      A   No. I told you we don't have a bank
9  account at all.
10     Q   Just wanted to make sure I covered
11 checking and savings.
12     A   Oh, no.
13     Q   Any other kind of retirement accounts?
14     A   No. Social security, that's it.
15     Q   So no 401(k)?
16     A   (Witness shakes head negatively.)
17     Q   IRA?
18     A   No.
19         MS. BROUSSARD: Off the record.
20         (Whereupon, a brief recess was taken.)
21 BY MS. BROUSSARD:
22     Q   Ms. Hinkle, I just have a few more
23 questions for you. Can you put a dollar amount on
24 your emotional distress in this case, how much you
25 think you're entitled to?

38  (Pages 146 to 149)

Page 150

TERI LYNN HINKLE

1
2   A   Did I?
3   Q   I'm asking you, have you?
4   A   No.
5   Q   How much do you think you're entitled to
6   with regard to your alleged emotional distress
7   claims?
8   A   That would be up to a jury or the Court
9   to decide. I don't know. I have no idea.
10  Q   And you've testified there are absolutely
11  no witnesses to any of your emotional distress
12  episodes; is that correct?
13  A   That's my internal.
14  Q   But you've not discussed it with any --
15  A   No.
16  Q   -- any third parties?
17  A   No.
18  Q   So if your husband was called to testify
19  in a deposition, do you know what knowledge he would
20  have --
21  A   Of what?
22  Q   -- regarding the facts in this case?
23  A   None. I've never discussed it with him.
24  And to be quite honest with you, unless it is what's
25  for dinner, something that needs to be fixed or the

Page 151

TERI LYNN HINKLE

1
2   weather, we rarely speak.
3       MS. BROUSSARD: We can go off the
4   record. I am adjourning.
5       (Whereupon, a discussion ensued off the
6   record.)
7       MS. BROUSSARD: Ms. Hinkle, would you
8   like to read and sign the transcript?
9       THE WITNESS: Yes, I would. Thank
10  you.
11      MS. BROUSSARD: Thank you very much,
12  Ms. Hinkle.
13      THE WITNESS: You're welcome.
14          - - -
15  (Deposition adjourned at 12:10 p.m.)
16
17
18
19
20
21          _____
            TERI LYNN HINKLE
22
23
24
25

Page 152

1
2       C E R T I F I C A T E
3   STATE OF GEORGIA:
4   COUNTY OF COBB:
5
6       I hereby certify that the foregoing
7   transcript was taken down as stated in the
8   caption and the questions and answers thereto
9   were reduced to typewriting under my direction,
10  that the foregoing pages 1 through 153 represent
11  a true, complete and correct transcript of the
12  evidence given upon said hearing, and I further
13  certify that I'm not of kin or counsel to the
14  parties in the case; am not in the regular employ
15  of counsel of any of said parties; nor am I in
16  anywise interested in the result of said case.
17      This 24th day of March, 2014.
18
19
20
21          _____
            LYNNE C. FULWOOD,
            Certified Court Reporter
22          State of Georgia
            License No. B-1075
23
24
25

Page 153

1   NAME OF CASE:
2   DATE OF DEPOSITION:
3   NAME OF WITNESS:
4   Reason Codes:
5       1. To clarify the record.
6       2. To conform to the facts.
7       3. To correct transcription errors.
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25          _____

39  (Pages 150 to 153)

**A**

Aaron's (1)
18:2
ability (1)
10:20
able (2)
20:21 43:6
above-referenced (1)
110:19
absolutely (5)
46:21 101:15,15
135:20 150:10
accessed (1)
127:17
accomplish (1)
108:25
account (65)
38:24 39:2,9,23 44:24
45:17 59:15 65:6,9
65:18,21 66:2,5,10
66:15,20,25 67:5,9
67:11,15,19,23 68:7
68:10,21 69:11,23
70:3,10,14,15,16,17
71:4,17 75:8 79:11
85:3 100:6,7,16,19
101:4,8,9,15,16
103:12 104:8,12,17
107:9,24,25 110:19
110:21 111:17
118:8,20 120:4
135:16 141:11
149:7,9
accounts (36)
27:9,11,13,14,18
31:25 32:3,5,7,8
35:8 38:3 44:4,7,9
44:19,21,23 45:12
45:22 66:18 68:13
79:4 80:3,11 86:9
95:3,11 118:17,21
131:24 138:20
141:10 148:4,5
149:13
Act (2)
64:15 110:20
action (9)
1:7 74:10,13,22 76:15
79:2 109:24 128:6
143:6
actions (8)
38:17 40:6 54:24 87:3
87:15 96:23 147:3,7
actively (3)
142:12,18 145:16
actuaries (1)

122:20
actuary (1)
143:7
added (1)
145:3
adding (1)
130:23
addition (2)
112:12,17
address (5)
5:12,19,25 6:10,15
addressed (5)
110:15 115:17 116:12
116:22,23
adjourned (1)
151:15
adjourning (1)
151:4
adjusted (1)
19:5
admissions (2)
33:21 91:9
admit (1)
77:6
adverse (2)
128:6 143:6
advise (1)
110:17
affect (2)
10:20 16:8
affidavit (2)
107:20,21
Afni (1)
26:3
agencies (22)
35:12 49:16 50:20
72:20 73:2,23 77:10
80:7,11,20 81:3,8
84:12,16 88:18
96:25 97:23 107:7
111:24 112:11
121:10 145:9
agency (9)
81:17,20,23 93:2,6,17
94:4 121:16 122:4
agent (2)
124:22 142:8
ago (23)
7:4 8:23 19:4 28:13
28:17 39:3 47:20,23
49:3,18 50:5 57:2,9
62:7 70:23 99:14
103:3 127:7,11
129:9 133:22
138:10 142:24
agree (4)

36:10 49:17 139:3,19
agreements (1)
120:6
ahead (3)
5:14 34:5 49:14
alarm (1)
128:4
allegation (2)
88:7,9
allegations (1)
86:16
allege (2)
64:13 84:10
alleged (10)
38:17 40:6 44:22
54:24 73:12,17,24
84:13 88:17 150:6
allegedly (1)
123:24
alleging (3)
49:12 50:7 74:19
allow (1)
10:25
amend (1)
91:13
amended (6)
3:6 44:15 63:16,19
64:2,5
American (1)
53:23
amount (10)
22:22 23:24 24:2,24
70:6,8 84:13 118:21
139:16 149:23
Ann (3)
2:8 3:3 4:11
answer (25)
11:2,3,5 22:11 25:2
36:22 37:10 49:25
66:3 68:24 72:10
77:22 82:3 93:4
94:9,13,23 97:6
103:16,19,22 104:2
105:16 111:11
131:21
answered (8)
37:11 46:15 49:20
50:6 77:20 81:25
93:18 114:17
answering (4)
68:16 78:9,11 95:2
answers (11)
33:23,24 34:9,20
73:14 91:8,11,24
100:14 104:24
152:8

anxiety (7)
52:4,6,13,22,23,25
53:13
anybody (9)
37:6 53:21 56:9,21
58:11,18 67:24
117:23 131:20
anybody's (1)
58:12
anymore (2)
59:24,25
anytime (1)
80:5
anyway (5)
34:6 46:3,3 95:15,16
anywise (1)
152:16
apartments (1)
126:19
apologized (2)
23:23 104:9
apology (2)
24:6,7
apparently (1)
108:16
appeal (1)
22:12
appealed (1)
22:7
appear (1)
21:8
appears (1)
108:16
appendix (1)
22:17
application (1)
67:10
applied (7)
38:23 60:7,10 67:17
67:18 121:15
139:22
apply (3)
120:3 139:21 140:5
applying (1)
120:7
apprise (1)
109:23
approximate (1)
47:18
approximately (4)
13:21 15:11 63:25
70:6
April (8)
3:9,11 12:24 66:21
109:19 110:12,15
112:2

area (4)
98:7,20 133:9 147:15
argue (1)
140:20
argument (2)
90:4,7
ARM (1)
58:9
arrested (4)
57:4,6,8,18
ARS (12)
22:5,6,12,18,24 23:3
23:14 26:10 85:3,4
arts (2)
8:9,11
aside (1)
113:15
asked (14)
30:23 36:17,20 45:6
53:25 60:23 65:12
90:20 91:22 104:10
121:24 124:22
133:24 142:6
asking (30)
42:3,4 44:17,18 52:18
59:10 60:5 62:22
65:16 71:8,17 72:6
88:14 90:16,19
91:18 105:12,14
106:18,25 107:14
108:11,12 111:7
123:5 137:4 144:2
144:23 146:21
150:3
assembler (1)
13:11
assist (3)
45:17 63:22 108:13
assistance (1)
106:16
Associates (3)
24:15 25:6 85:10
assume (2)
61:20 135:15
assuming (3)
66:4 78:22 84:17
Atlanta (3)
2:10 4:12 17:11
attach (1)
90:8
attached (1)
109:24
attempt (1)
91:12
attempted (1)
35:2

Case 3:13-cv-00033-DHB-BKE   Document 100-1   Filed 09/19/14   Page 42 of 58
Case: 15-10398    Date Filed: 07/20/2015    Page: 203 of 251

Page 2

attend (3)
7:9,22 8:12
attention (2)
58:9 143:18
attorney (4)
2:3,8 22:11 137:20
attorneys (4)
89:19 136:21 137:10
137:24
attorney/client (1)
22:10
attribute (1)
123:19
AT&T (5)
30:15 129:22 130:7
130:12,13
August (3)
122:8 140:9 143:15
authored (2)
83:11,12
auto (1)
122:7
automatically (3)
81:6,12 140:16
automobile (1)
51:9
awake (1)
48:13
award (1)
139:13
aware (3)
31:9 72:19,25
a.m (1)
2:18

_____
B
b (1)
96:14
back (41)
8:17 12:19 13:25
21:25 22:3 40:2
53:9 58:23 61:19
62:9 68:17 73:5
76:25 82:21 83:9
84:20 85:22 86:12
87:17,19 89:17 91:3
92:21 97:12 99:11
100:14 104:18
106:22 108:17
109:8 112:7 113:9
114:12 115:12
123:16 124:3 128:2
142:14,23 145:12
147:9
bad (1)
15:15

bank (10)
27:11,14,18 38:24,25
39:6 60:16 66:11,21
149:8
banking (2)
135:25 136:2
base (4)
122:20,20 128:11
141:24
based (12)
18:16 38:17 39:17,20
40:4 42:23 81:13
122:17 123:7,14
124:5 144:17
bases (1)
129:17
basic (1)
139:14
basis (14)
44:19 65:2,25 72:2,7
72:15 74:7 84:14
88:7,9 94:15 96:19
120:5 134:16
began (1)
43:19
beginning (3)
26:2 47:14 99:19
behalf (5)
2:2,7 37:7 85:12
100:8
behavior (1)
44:23
believe (35)
22:3 25:19 26:4 29:20
32:9,22,23,24 39:16
40:22 54:24 60:15
80:19,23 82:21
83:13 96:6 106:2
109:4 112:6 115:13
117:22 122:8,15
123:6 127:2 128:24
129:4,17 130:4
133:23 137:6
140:14 146:20,22
BellSouth (1)
30:14
belong (5)
32:10 100:19 120:12
134:2,4
benefits (5)
18:13,17,21 55:9,10
best (3)
10:22 61:7 137:6
Bethel (5)
5:13 101:22 111:5,10
129:10

better (2)
15:22 34:7
bill (8)
27:10 59:23 61:12
69:15,19 103:6,9
129:6
bills (8)
60:2,25 61:5,8 63:5
86:9 132:7,12
birth (1)
7:7
bit (1)
8:17
Black (2)
3:9 116:9
block (1)
127:15
bloggers (1)
58:11
blogs (1)
57:25
board (2)
122:25 124:23
books (1)
81:15
born (5)
6:23 11:19,22 142:21
142:22
bother (2)
94:20 144:8
bought (2)
104:24 121:6
Brandon (2)
3:9 116:9
break (5)
61:15,19,21,24
112:23
brief (4)
22:17 61:17 113:4
149:20
bring (4)
74:6 90:13,14 91:7
bringing (5)
83:22 95:18 96:13,16
96:19
broke (2)
45:11,21
brothers (1)
133:11
brought (6)
5:9 9:15 42:25 75:24
120:16 138:8
Broussard (30)
2:8 3:3 4:8,11 19:21
33:17 34:14,21
61:14,18 63:10

68:23 90:23 91:3,14
91:18,25 92:8,12,15
92:17,18 105:6
112:24 113:8
149:19,21 151:3,7
151:11
Buick (2)
51:11,17
builder (2)
126:14,15
builder's (1)
127:15
burden (1)
106:22
buy (2)
59:9 143:24
buyer (2)
71:23 104:25
bye-bye (1)
135:18
B-1075 (1)
152:22

_____
C

C (6)
1:18 2:18 4:2 152:2,2
152:21
cable (4)
30:11,12,23,25
California (8)
7:15,25 17:16 57:13
133:11,13,18,23
call (17)
8:24 13:25 35:14
37:16 43:22 49:20
49:23 52:23 56:14
77:17 79:19 83:15
86:19 91:12 118:4
130:24 139:4
called (13)
37:9,12 38:8 68:3
77:15,15,21 83:14
86:15 94:22,24
118:2 150:18
caller (1)
37:12
calling (10)
37:15,16 49:16,18
50:4 67:24 78:11,20
78:24 146:12
calls (10)
37:3,19 38:7,9 61:23
83:18 94:23 114:16
114:20 139:7
Capital (10)
1:9 4:14,22 34:24

82:6,14,20 83:11,16
119:4
caption (1)
152:8
captioned (1)
105:22
car (5)
51:9,10,20 122:12
124:15
card (8)
28:15 29:17 59:6,22
60:7,11,14 148:21
cards (9)
27:6,16 28:11 58:24
58:25 59:9 60:3
132:2 148:11
care (1)
53:23
carry (2)
62:24 78:7
case (30)
4:13,16,18 8:23 23:8
23:12,22 24:22
35:25 41:11 42:18
44:10 54:5 56:13,22
75:21 76:25 102:13
104:4 117:9 119:21
135:9 136:22
137:14 147:13
149:24 150:22
152:14,16 153:1
cases (5)
21:12 137:18,25
138:2,5
cash (2)
27:22 149:2
cause (1)
16:11
caused (4)
49:10 128:15 130:6
131:11
cc'd (1)
119:12
cease (1)
142:18
cell (13)
28:18,20,22 30:16
62:2,3,5,16 69:15
99:12 101:24 103:5
103:8
centers (1)
43:22
CEO (1)
109:17
certain (3)
22:21 120:4 141:19

certainly (2)
29:14 145:19
Certificate (2)
3:12,12
Certified (3)
1:19 2:19 152:21
certify (2)
152:6,13
CFPB (2)
80:24 81:2
change (4)
91:15 98:24 107:7
130:22
changed (6)
24:15,16 51:5,6,19
98:21
changing (2)
84:22 94:9
character (1)
84:12
cheaper (1)
144:2
check (4)
58:24 93:14 94:12
115:13
checked (1)
22:12
checking (4)
27:13 39:8,23 149:11
checks (1)
31:10
chief (3)
115:20 116:10,13
children (4)
17:15 54:8,18,19
chiropractor (1)
132:24
chose (1)
147:2
Christmas (1)
99:21
church (2)
134:2,6
circle (1)
134:8
Citizens (1)
39:7
city (8)
6:19,19,25 8:2 128:22
129:12,14,17
civic (1)
134:4
civil (2)
1:7 34:25
claim (21)
25:11 42:22 44:20

45:8 47:2 65:3 72:3
74:6 77:7,13 83:22
84:14 87:14 92:19
92:22 94:15 95:18
96:13,18,19 97:13
claiming (30)
38:16 40:4,25 41:10
42:15,17 44:13,16
46:17,21 47:3 64:23
71:23 72:3,12 76:4
76:6 78:20 79:4
85:11 86:13,25
97:15 104:14,17
119:18 123:13
131:9 143:21
147:12
claims (9)
23:3,17 24:20 64:10
74:8 135:9,10 146:2
150:7
clarify (1)
153:5
clear (6)
46:21 75:15 82:5
86:12 143:21
147:11
client (1)
79:14
clients (14)
5:9 21:20 29:16 32:2
34:22 43:20 44:24
46:10 71:24 82:24
91:10,23 111:22
131:14
client's (1)
104:24
close (4)
134:9 148:19,21,22
COBB (1)
152:4
code (2)
98:7,20
Codes (1)
153:4
cold (1)
99:23
collect (7)
18:9,12,21 45:12,21
71:12,22
collected (1)
26:14
collecting (8)
45:17 55:12 66:2 85:4
85:7,11,20 103:11
collection (13)
24:19 31:25 32:3

37:16 58:14 74:9,12
74:21 76:14 79:2
96:22 138:6 148:5
collector (2)
25:11 85:10
collectors (5)
84:25 85:7,23 86:5
135:21
collects (1)
55:6
college (3)
2:16 7:22 8:3
Columbia (1)
32:14
come (2)
58:8 89:17
comes (1)
50:2
coming (1)
20:14
commencement (2)
119:13,15
committed (1)
138:16
common (1)
81:10
communicated (5)
92:25 93:5,16,16 94:3
communication (8)
82:17,18,19 96:4,17
97:13,25 115:5
communications (12)
70:25 76:22 96:8,11
97:4,8,16,18,19
114:25 115:4
117:18
companies (27)
22:2,4 23:15 25:24
27:24,25 31:10 85:6
86:6 104:11,16
123:2 126:18 127:2
127:22 140:2,9,17
141:2,3,8,22 143:4
144:10,14,25 145:8
company (25)
15:4 21:21 24:13,18
24:19 29:21 51:4
59:4,11,16 63:2
67:16 82:16 83:15
83:19 103:5 122:16
125:5,7 127:3
130:17 141:4
143:11 148:13,21
compare (3)
140:15,16,18
compel (3)

29:11,13 75:16
compiling (1)
111:20
complaint (6)
3:6 42:7 44:15 63:16
64:2,5
complete (2)
94:18 152:11
completed (1)
67:10
complies (1)
118:25
compound (1)
45:14
computer (1)
112:21
conducted (1)
144:24
conducting (2)
72:16 73:17
confer (1)
91:12
confidential (2)
23:24 24:2
conform (1)
153:6
confusing (1)
77:2
consequences (1)
9:24
consider (3)
47:5 93:21 139:5
considered (1)
137:8
considering (1)
137:13
constitutes (1)
94:11
consult (1)
137:20
consulted (1)
137:10
consulting (2)
137:8,14
consumer (5)
84:12 94:4 107:7
145:3 146:9
consumers (1)
126:19
consumer's (1)
126:18
contact (10)
45:2 69:24 71:3,11,16
71:18 86:6,10 86:24
104:11
contacted (22)

66:24 67:7,18,21
69:14,17,22 70:9
72:20 73:2,23 78:18
82:7,9,13 86:22
87:2 96:23 103:17
104:3 119:10,10
contacting (1)
74:12
contending (1)
50:20
continue (3)
89:18,21 147:3
continued (4)
35:10 95:15,16 96:22
continuing (1)
72:18
contract (1)
14:18
contributing (1)
144:19
conversations (1)
37:13
convicted (1)
56:25
conviction (1)
57:3
convoluted (2)
35:20 77:2
copies (8)
35:24 36:3,11,17 83:8
120:14,21 121:21
copy (9)
19:25 21:6 50:24
87:10 89:6 107:4,20
111:3 119:17
corporate (1)
109:23
correct (61)
21:9,17 22:25 35:22
36:13,16 41:13
43:13 44:10 45:3,13
45:18,22 46:6 49:19
50:22 61:21 64:15
65:10 73:4,13,18
75:13,14 76:10 82:7
82:10 83:11,16,17
83:20,21 86:23
87:11,20,23 88:18
88:25 89:4 93:2
96:8,11 97:8 107:11
109:20 114:16
115:7 116:8 117:2,3
118:10 126:21
128:8,16 131:12
141:12 146:9,17
150:12 152:11

153:7
**correspondences (1)**
111:21
**cosigned (3)**
132:25 133:4,5
**cost (3)**
40:8 46:25 89:19
**counsel (3)**
119:2 152:13,15
**count (2)**
64:17 84:2
**country (1)**
134:18
**counts (1)**
84:2
**County (2)**
17:8 152:4
**couple (5)**
7:4 13:24 15:24 16:17
114:20
**course (1)**
26:21
**court (21)**
1:2,19 2:19 8:21 9:21
19:20 21:13,16 23:7
23:11,12 33:16 63:9
68:18 90:9 105:4
109:10,25 113:6
150:8 152:21
**courtesy (1)**
109:23
**cover (1)**
19:23
**covered (1)**
149:10
**covers (1)**
6:14
**crazy (1)**
126:14
**credit (172)**
1:7 3:5 4:13,16,21
22:19 23:4,20,20
27:6,16 28:11,14
31:10,14 32:11
33:20 34:9,23 35:11
35:12,23,24 36:4,12
36:18,23 38:2,21
39:14,21 46:7,12,15
46:25 49:16 50:14
50:19,21,24 51:3
60:3,7,11 64:14
65:4 69:25 70:2,4
70:11,12 72:18,20
73:2,22 74:22,24
75:7,9,17,22,24
76:19,21 77:9 80:7

80:10,19 81:3,7,16
81:20,23 87:10,20
87:23 88:18 92:25
92:25 93:5,17 94:3
96:24 97:22 98:2
103:14,20,24
104:14 107:7 108:3
108:9 109:17
110:20 111:23
112:10 113:23
114:18 115:5,17,21
116:6,8,11,13
118:12,16 119:22
119:24,25 120:2,4,5
120:7,8,9,12,15,18
120:22 121:2,10
122:5,18,21 123:8
123:17,21 124:6,11
125:23 126:6,11,24
127:17,24 128:8
129:16,23 130:9,14
131:4,11,15,20
132:2 136:2 138:13
138:18 139:5,19,20
139:21,23 140:5,6
140:19,25 141:24
143:23 144:18
145:4,9,10 146:11
147:8 148:2,4,11,15
148:21 149:5
**crediting (1)**
110:19
**crime (1)**
56:25
**criterias (2)**
141:7,21
**currency (3)**
136:3,4,5
**current (3)**
5:12 27:6 145:15
**currently (8)**
4:17 10:19 13:12 14:3
27:10 32:17 61:8
64:9
**customers (1)**
130:18
**cutoff (1)**
141:16
—————— D ——————
**D (1)**
4:2
**damage (1)**
119:19
**damaged (1)**
119:25

**damages (11)**
38:17,20 41:13,14
42:14,17 46:18,22
46:24 139:14
143:21
**date (14)**
7:7 9:11 31:15 73:9
75:2,4 76:25 98:16
119:14,16 120:20
122:10 130:20
153:2
**dated (9)**
3:3,9,11 105:20
106:10 108:20
109:19 110:12,15
**dates (9)**
21:23 38:14 77:24
78:2,5 88:23 97:21
100:4 112:3
**dating (1)**
16:19
**daughter (11)**
10:17 16:17,20,23
17:17 43:6,18 48:5
54:23 56:11 142:20
**daughter's (1)**
12:25
**day (2)**
2:17 152:17
**days (7)**
48:25 64:7 73:8 74:5
92:10 96:17 112:18
**dead (1)**
133:10
**deal (2)**
92:14 149:2
**dealing (1)**
43:4
**dealings (1)**
134:23
**debit (5)**
58:24 59:2,8,22 60:13
**debt (35)**
25:10 32:15 35:9
37:16 58:14 70:5,9
71:23 77:4,11 78:17
78:21,23,24 84:13
84:25 85:7,10,23
86:4 96:16,21 97:2
97:23 103:21
104:25 108:10,12
108:16,22 109:2
115:8 135:4,21
138:6
**debts (9)**
32:18,21,25 33:5

60:25 79:15 84:16
84:18 86:5
**December (7)**
47:24 97:16,20 99:15
100:17 101:4,9
**decide (1)**
150:9
**decided (2)**
46:2,3
**decision (2)**
16:8 17:3
**default (1)**
103:19
**defend (1)**
26:2
**defendant (2)**
3:5 9:15
**defendants (60)**
1:10,15 2:7,16 4:12
4:24 5:5 35:15 36:5
36:11,17 37:4,7,23
38:18 39:21 40:7
43:13 45:2 46:6
49:9,18,24 50:8,12
54:25 64:10 65:17
65:25 67:7 69:18
72:13,21 73:3,12,23
75:18 77:16 79:18
84:10,15 96:18,20
117:19,24 123:20
124:7 128:7,14
129:15 130:6,8
131:10 134:23
139:15 146:3,8,16
146:22 147:19
**definite (1)**
145:20
**definitively (1)**
101:14
**degree (1)**
8:5
**delicate (1)**
136:25
**delinquent (1)**
148:24
**demand (4)**
35:5 77:3,11 108:15
**demanded (2)**
78:24 96:22
**demanding (1)**
94:24
**denials (1)**
38:21
**denied (4)**
39:11,17,20 60:8
**Department (2)**

105:21 116:22
**depended (1)**
15:13
**Depending (2)**
137:15,16
**depends (2)**
18:19 66:13
**depose (1)**
89:18
**deposed (1)**
4:5
**deposit (10)**
125:20 127:4 128:15
128:16,25 129:14
129:25 130:6 131:6
131:12
**deposition (21)**
1:14 2:15 4:15 5:8
8:19 10:8,11 19:24
19:24 20:10,14 21:6
21:9 89:20,22,24
90:17,18 150:19
151:15 153:2
**derogatory (2)**
123:7,15
**describe (3)**
14:9,21 49:8
**Despite (1)**
116:12
**details (2)**
56:11,12
**determined (1)**
122:22
**diagnosed (1)**
55:16
**different (13)**
7:11 14:19 41:20,21
41:21 84:21 93:19
109:6 113:25
122:24 124:15
135:3 140:16
**digits (1)**
29:9
**Dinah (1)**
15:9
**dinner (1)**
150:25
**direct (3)**
146:11,12,13
**direction (1)**
152:9
**directly (27)**
71:3 77:11 82:10,11
83:10,12 86:21
87:21,22 88:16,20
88:24 92:24 93:5,16

93:21 94:3 96:10
97:7 114:6 115:9
116:9 117:5,10,20
119:10,11
**directness (1)**
94:11
**disability (1)**
55:20
**disclosed (1)**
73:19
**discontinue (3)**
62:14,25 63:2
**discontinued (1)**
102:11
**discovered (2)**
43:8,21
**discovery (11)**
34:10 75:13,19 90:15
90:18 91:23 104:24
113:21 119:5
123:23 144:25
**discuss (7)**
44:14 52:15 54:21,24
56:10 61:20 139:16
**discussed (8)**
48:8,20 54:19 56:5
112:17 135:10
150:14,23
**discussing (2)**
22:8 135:3
**discussion (3)**
90:25 113:2 151:5
**Dish (3)**
30:20 131:2,12
**dismissed (5)**
22:13 25:13 26:3,5
64:12
**dispute (21)**
72:17 73:3,8 74:5,16
76:9,15 77:7,8
78:16 80:2,20 81:3
96:6 106:17,19
107:4,6,8 108:14
110:18
**disputed (16)**
35:12 46:2,15 70:5
77:9 84:23 88:19
96:24 97:22 103:15
103:21 107:8,9
112:10 147:2,24
**disputes (7)**
73:12,24 82:4 88:11
88:17 111:23 112:4
**disputing (1)**
77:5
**disregarded (1)**

146:16
**distance (1)**
20:7
**distinction (1)**
116:3
**distress (8)**
42:20,22 44:20 47:3
52:2 149:24 150:6
150:11
**distressed (1)**
44:6
**district (5)**
1:2,4 4:18 23:7
109:25
**divide (1)**
41:18
**Division (2)**
1:3 4:18
**divorced (1)**
17:18
**DJ'd (1)**
14:23
**doctor (3)**
52:10 53:24 132:23
**doctors (2)**
52:11 132:6
**document (12)**
19:22 21:2 33:18
63:11,20,23 83:3,10
106:4 109:6,14
113:18
**documentation (4)**
106:18 107:5,10,12
**documents (14)**
20:22 67:9 73:21
89:14,23 91:15
105:11,17 108:7,13
112:13,17 113:10
118:7
**Dodge (1)**
17:8
**doing (5)**
26:8 43:24 76:20
122:14 147:3
**dollar (2)**
22:21 149:23
**dollars (2)**
19:9 24:5
**double (1)**
115:13
**doubt (3)**
60:12 68:12 74:3
**downhill (1)**
15:14
**dozens (1)**
58:10

**draft (1)**
64:2
**drafting (1)**
63:22
**Dublin (2)**
1:3 4:18
**due (5)**
61:9,12 103:6 120:25
122:13
**duly (1)**
4:5
**dunning (3)**
77:4 82:22 146:13
**DVD (1)**
32:13
**Dynamic (3)**
15:5,12 142:9

———————— E ————————

**E (4)**
4:2,2 152:2,2
**earlier (1)**
119:23
**early (5)**
14:15 16:21 98:16
102:9 133:25
**Eastman (22)**
1:16 2:17 5:13,24
6:11,12 11:15 12:4
12:18 16:6,24 17:4
17:8 57:6 89:17,21
125:16 127:10
128:23 129:13,14
129:17
**economic (4)**
38:17,20 40:3,24
**economy (1)**
15:14
**Ed (1)**
54:17
**education (3)**
7:23 8:14 55:6
**educational (1)**
54:16
**effect (1)**
9:20
**eight (1)**
6:8
**either (14)**
12:6,16 45:25 46:4
72:8 80:13 85:15
93:11 95:14 99:19
132:3,16 139:9
144:6
**electronic (1)**
117:18

**else's (1)**
63:14
**emotional (8)**
42:20,22 44:20 47:3
52:2 149:24 150:6
150:11
**emotionally (1)**
44:6
**employ (1)**
152:14
**employed (1)**
14:16
**employer (1)**
126:15
**employment (1)**
142:6
**Encore (50)**
1:9 4:14,22 34:23
64:13 65:3,9 74:7,8
82:6,7,9,12,14,20
83:11,12,16,24
86:13,14,15,16,21
87:10,14,19,22 88:7
88:10,13,16,20 89:3
92:23,24 93:5,15
94:2,3 95:20 96:7
96:10 97:3,7 115:19
115:25 116:25
119:4,11
**Encore's (1)**
87:5
**engage (1)**
53:22
**engagements (1)**
15:25
**ensued (3)**
90:25 113:2 151:5
**entertainment (6)**
14:8,10,14 15:5,12
142:9
**entire (1)**
147:14
**entities (4)**
51:2 109:24 120:4
140:6
**entitled (4)**
120:24 139:11 149:25
150:5
**entity (2)**
69:17 82:14
**envelope (1)**
108:23
**episodes (1)**
150:12
**Equifax (2)**
31:20 112:16

**error (1)**
104:9
**errors (1)**
153:7
**establish (1)**
131:3
**established (3)**
104:6 119:9 127:9
**establishes (1)**
46:12
**establishment (1)**
65:5
**estimate (4)**
13:22 18:15 19:11,16
**etcetera (3)**
40:9 43:17,22
**evaporate (1)**
118:6
**everybody (2)**
13:25 129:18
**evidence (35)**
35:21 44:25 45:8,16
45:20 46:5 50:11
65:8,13,14,17,24
66:4 73:22 76:2
78:23 79:17 84:18
86:21 87:5,9 92:24
93:5,8,15,24 94:2,8
95:10 124:4 146:2,7
146:15 147:6
152:12
**exact (9)**
9:11 12:7 31:15 41:19
73:9 75:4 98:16
100:4 143:13
**exactly (7)**
19:10 42:7 49:8,9
53:9 73:16 111:3
**EXAMINATION (1)**
4:7
**examined (1)**
4:6
**excuse (3)**
83:7 114:15 131:14
**executive (3)**
115:20 116:11,13
**Exhibit (24)**
3:3,4,6,8,9,10,12,12
19:19,23 33:15,19
63:8,11,15 105:19
109:5 110:9 113:10
113:19 115:12,15
116:18 118:23
**exhibits (6)**
3:2 105:3,7,8,15
113:5

exist (3)
79:15 94:20 107:13
existence (1)
46:12
exists (1)
71:23
Experian (2)
31:20 112:16
experience (1)
53:7
experienced (3)
38:16 52:5 126:20
experiencing (2)
52:12 53:13
explain (1)
41:19
explains (1)
10:12
express (1)
65:6
extra (2)
34:15 60:17
e(2) (1)
84:6
e-mail (5)
20:2,4 92:15,17
112:18
e-mailed (1)
117:23
e-mails (2)
117:17,21

———————
F
———————
F (1)
152:2
face (3)
84:22 106:24 147:6
Facebook (1)
135:12
fact (8)
69:3,5 70:15 91:15
96:23 104:13 122:2
140:24
factor (1)
144:20
factored (1)
81:2
facts (9)
54:5 56:6 66:4 78:22
84:17 119:20
147:13 150:22
153:6
factual (4)
65:2 72:2,7,15
fail (1)
9:23

failed (20)
32:21,25 33:6 36:12
36:18 65:18 66:2,5
66:25 68:10,12,21
69:15 78:21,23
86:10 89:22 96:21
101:25 104:17
failing (1)
66:16
Fair (2)
64:14 110:20
fall (2)
47:21 100:2
false (9)
23:19 49:15 84:11,15
84:20,22 94:17,19
95:12
familiar (1)
99:10
family (4)
7:19 48:9 134:9
136:10
far (2)
64:20 123:16
FCRA (7)
3:7 22:20 63:17 64:24
135:11 146:2,23
FDCPA (5)
3:7 63:17 74:6 83:23
135:11
fear (1)
147:16
February (2)
3:3 20:10
fed (1)
78:10
federal (3)
21:16 23:11 109:25
fee (3)
40:10,14 136:20
feel (1)
10:4
fees (1)
89:19
felon (2)
45:9,17
felons (2)
43:21 45:2
figure (1)
100:22
figured (1)
99:5
file (47)
1:7 22:17 27:2 31:25
32:6 40:8,12 42:9
50:21 65:4 74:24

75:9 83:5 87:10,20
87:23 110:2 114:8
118:9,17 119:17
121:6 122:5,18
123:8,21 124:6,11
126:24 127:17,24
129:16,23 130:9
131:11,20 136:18
138:21 139:20
140:25 141:2
143:15,23 144:18
145:4,10 148:5
filed (16)
19:2 21:12,12,15,21
25:25 26:7,15 53:2
63:17 69:21 84:25
103:16 104:2
109:24 136:13
files (2)
126:18 128:8
filing (4)
40:10,14 41:12
136:20
filings (1)
56:22
finally (3)
43:5 78:10 95:2
finance (1)
27:25
financial (10)
27:20,23 38:21 40:3
41:10 42:13 46:17
58:23 135:23 138:5
financials (1)
46:22
find (1)
104:19
fine (4)
82:21 89:10 92:11
97:10
finish (13)
11:2,5,5 20:4 39:19
72:23 83:7 86:2
90:22 104:23
110:23 111:11
118:15
finished (6)
43:14 72:24 82:2
91:17,20,21
first (29)
3:5,6 4:5 8:8 12:7,17
16:10 26:2 33:20,21
33:22 35:9 53:12
63:16 64:2,3,4
74:21,23 76:14,18
84:17 91:5 98:15

108:9 113:11,20
119:5 123:11
five (32)
5:20 6:14 17:22 21:13
21:16 25:21 26:7
32:20 33:6 48:25
60:8,11,21,24 77:21
77:23 84:5 92:10
112:18 126:3,21,25
127:25 129:9
131:23 132:6 133:2
133:6 136:14
139:22 145:11,16
five-minute (1)
61:15
fixed (1)
150:25
flat (1)
124:14
flip (3)
106:3 108:18 109:5
flow (1)
41:10
flowing (1)
147:12
fluctuated (1)
15:13
follow (3)
58:12,18 83:5
followed (1)
43:8
follows (1)
4:6
force (1)
9:20
foreclosure (1)
148:10
foregoing (2)
152:6,10
foreign (2)
136:3,5
forever (1)
140:3
forgive (1)
132:15
form (1)
74:15
forma (2)
40:18 136:14
forth (2)
135:6 147:9
forward (2)
40:9 137:17
found (2)
53:10,11
four (3)

29:9 84:2,3
France (1)
7:14
fraud (7)
80:12,17,22 81:3 95:7
107:19,21
free (1)
10:4
friend (1)
126:8
friends (5)
54:10 56:6 134:10,16
136:11
front (3)
20:22 64:4 147:6
FTC (1)
107:20
full (1)
107:24
Fulwood (4)
1:18 2:19 34:14
152:21
Funding (23)
1:8 4:14,22 34:23
83:19,24 87:7 92:23
94:16 95:11,19
114:6,16,23 115:2,7
115:10 116:25
117:5,11 118:2,9,18
Funding's (1)
113:20
furnished (1)
103:14
furnishing (1)
49:15
further (2)
89:13 152:12

———————
G
———————
G (1)
4:2
gas (3)
29:25 30:3 31:8
GE (15)
66:10,20,21,24 67:5,7
67:14,19,22,23 68:7
68:10,21 100:6
101:9
GEICO (7)
140:11 141:2 142:25
143:14,22,24 144:6
general (5)
135:5,5,11 143:8
147:20
generated (1)
143:19

**Georgia (23)**
1:2,3,16 2:10,17 4:18
5:13 12:4 17:4
28:25 29:22 89:18
127:4,8,16,24 128:5
128:16,19,21
129:11 152:3,22
**getting (7)**
9:2 15:15 21:5 75:22
103:4 106:13 114:9
**gig (1)**
15:22
**give (14)**
10:22 29:8 31:11 44:2
47:18 81:24 82:2
83:8 105:12 107:12
107:18 121:4,21
141:13
**given (8)**
8:19 36:25 75:10
92:13 117:15,16
123:14 152:12
**giving (3)**
76:2 92:4 118:11
**glass (2)**
34:6,12
**glasses (3)**
20:17,23 34:13
**GMAC (8)**
51:5,18 122:12,16
123:6,24 124:5,16
**go (25)**
5:14 34:5 49:14 58:23
59:18 62:23 75:16
84:20 90:23 91:3
93:23 100:14 112:7
112:24 122:10
123:16 128:2 132:6
133:23 135:18
140:15 144:8
145:12 148:10
151:3
**goes (3)**
56:13 93:3 137:17
**going (21)**
10:17 20:21 54:20
56:12 58:9 86:12
89:8 90:4,6,11 97:9
97:12 105:15 109:8
112:23 113:11
130:25 133:16,20
140:22 147:17
**good (4)**
4:9,10 15:16 34:3
**gotten (2)**
139:3 144:2

**government (1)**
18:12
**grade (4)**
55:22,24 56:3,4
**graduate (1)**
7:12
**graduated (2)**
7:16,21
**graphic (1)**
8:8
**great (1)**
147:16
**gross (1)**
19:5
**Group (12)**
1:9 4:14,22 25:8
34:24 82:6,14,20
83:11,16 85:14
119:4
**groups (1)**
133:25
**guard (1)**
17:7
**guess (7)**
54:24 74:11 82:5
125:8 133:24
137:19 148:15
**guilty (1)**
57:22
**gun (1)**
11:4
**guru (1)**
58:17
**guy (1)**
9:6

**H**

**Hall (2)**
125:13,14
**Handbook (1)**
10:11
**handed (5)**
19:22 33:18 105:7,19
113:9
**handle (1)**
27:20
**happened (3)**
23:17 42:8 54:22
**happy (2)**
83:8 102:19
**harass (1)**
86:22
**harassed (1)**
86:25
**harassing (2)**
138:14 139:2

**harassment (6)**
77:14 78:21 79:2
86:14,21 139:6
**hard (3)**
18:18 122:25 123:4
**harm (1)**
47:4
**hats (1)**
116:12
**head (1)**
149:16
**health (2)**
53:23 142:17
**hear (2)**
94:25 109:12
**heard (1)**
67:20
**hearing (1)**
152:12
**heart (4)**
29:7 66:9 84:9 137:7
**help (2)**
34:6 119:24
**helped (1)**
56:21
**helpful (1)**
107:4
**Hemet (1)**
7:25
**high (5)**
7:9,11,21 54:17
144:15
**higher (9)**
122:17 123:7,14,25
124:2,5,18 128:15
130:7
**hike (1)**
124:23
**Hinkle (183)**
1:1,4,14 2:1,15 3:1,3
3:9,10 4:1,4,9,16
5:1,11,19 6:1 7:1
8:1 9:1 10:1 11:1,13
12:1 13:1 14:1 15:1
16:1 17:1 18:1 19:1
19:22 20:1,13 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
33:18 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1,9
43:1 44:1,25 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1

58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1,25 76:1
77:1 78:1 79:1 80:1
81:1 82:1 83:1,3
84:1 85:1 86:1 87:1
88:1 89:1 90:1,6,15
91:1 92:1 93:1 94:1
95:1 96:1 97:1 98:1
99:1 100:1,23 101:1
102:1 103:1 104:1
105:1,21 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1,18 120:1
121:1 122:1 123:1,5
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
138:11 139:1,12
140:1 141:1 142:1
143:1 144:1 145:1
145:25 146:1 147:1
148:1 149:1,22
150:1 151:1,7,12,21
**hire (1)**
43:21
**hired (3)**
45:2,9,16
**history (1)**
142:7
**hobbies (1)**
133:25
**hold (2)**
75:22 108:22
**home (5)**
11:9 98:3,5 125:8
129:9
**homes (2)**
126:15,19
**homicidal (1)**
16:16
**honest (1)**
150:24
**hope (1)**
138:11
**hoping (1)**
108:24
**hotel (1)**
89:20

**hours (1)**
89:16
**house (5)**
6:2,18,21 12:13 140:3
**household (3)**
13:2 18:17 19:12
**Hub-uh (2)**
121:25 132:4
**hundreds (1)**
79:13
**husband (22)**
11:10 12:14 13:3,5
27:15 30:16 33:4
48:3 51:20 52:16,19
54:8,13 55:5 60:10
67:4 103:9 131:24
132:11 133:5 149:2
150:18
**husband's (4)**
18:8,16 30:2 48:17
**Husqvarna (2)**
13:15,23
**H-A-L-L (1)**
125:14
**H-U-S-K (1)**
13:16
**H-U-S-Q-V-A-R-N-... (1)**
13:17

**I**

**ID (1)**
37:12
**idea (9)**
50:3 79:6 95:9,13
107:14 120:10
141:6 144:16 150:9
**identification (5)**
19:20 33:16 63:9
105:4 113:6
**identified (5)**
37:24 70:21 83:15,19
97:11 114:17 115:2
145:8
**identify (7)**
38:3 54:3 56:18,19
68:4 85:15 114:21
**identifying (2)**
82:11,14
**identity (11)**
79:5,8,22 80:2,3,4,8
80:16,21 81:4 95:7
**IFP (3)**
40:16 136:16,18
**ignored (2)**
35:10 96:9
**imagine (2)**

Case 3:13-cv-00033-DHB-BKE   Document 100-1   Filed 09/19/14   Page 48 of 58
Case: 15-10398      Date Filed: 07/20/2015      Page: 209 of 251

Page  8

64:8 104:20
**immediate (1)**
134:9
**immediately (1)**
104:2
**impairment (1)**
55:19
**impairments (1)**
55:14
**impermissible (1)**
24:21
**included (1)**
30:9
**includes (1)**
43:17
**income (10)**
15:12 18:7,16,16 19:5
19:12 42:10 67:17
67:18 132:22
**incorporated (2)**
4:15 15:6
**incorrect (2)**
45:23,24
**incurred (2)**
33:5 41:12 61:2
**independent (1)**
142:8
**INDEX (1)**
3:2
**Indian (1)**
11:24
**indicated (1)**
46:14
**indirect (1)**
97:25
**Indirectly (1)**
82:8
**individual (1)**
21:22
**individually (2)**
41:16,17
**industry (9)**
43:20 44:18 58:15
135:24 141:24
142:3,13,16,19
**information (35)**
23:19 39:17,20 43:10
43:16,24 49:11,15
50:9,13,19 53:15
79:7 82:3 89:11
92:25 93:6,17 94:4
94:17 103:14,24
110:18 111:20
122:17 123:8,15,20
124:6 128:7 129:15
130:8 131:10

144:17 147:16
**initial (3)**
96:3,17 97:12
**ink (1)**
41:3
**inquiries (2)**
128:13 140:25
**inquiry (1)**
127:23
**insert (1)**
116:10
**instance (1)**
42:20
**institutions (2)**
27:24 136:10
**insurance (35)**
8:15,16 51:3,4,8,22
51:24 120:6 121:15
122:4,7 123:2,7,25
124:5,13,15,16,22
139:25,25 140:8,15
141:3,4,7,21,23
142:2,13,15,19
143:8 144:10 145:7
**insured (1)**
51:14
**insurers (1)**
143:8
**intend (2)**
140:2,4
**intent (4)**
3:8 103:25 105:22
110:6
**intention (2)**
146:6,14
**intentional (1)**
147:5
**intentionally (3)**
146:3,19,21
**interested (1)**
152:16
**interests (1)**
137:7
**interim (1)**
107:6
**internal (1)**
150:13
**Internet (8)**
16:11,14 58:4,5,21
81:9,14 135:3
**interrogatories (4)**
3:6 33:21 73:15 91:9
**interrupt (1)**
43:12
**invading (2)**
139:5,19

**investigate (1)**
110:18
**investigation (8)**
46:2 72:17 73:17
94:19 95:14,16
107:3 112:16
**investigations (1)**
112:8
**involved (2)**
89:20 142:19
**IRA (1)**
149:17
**IRS (1)**
29:8
**issue (8)**
42:24 43:3 44:5,9
49:6,7 75:25 86:13
**issues (4)**
52:3 135:4,4,5

—————— **J** ——————

**J (2)**
3:9 116:9
**Jacinto (1)**
7:24 8:3,8
**jail (2)**
17:8 43:19
**Job (1)**
1:22
**joint (1)**
131:24
**judge (1)**
57:23
**judgment (2)**
22:24 23:8
**judgments (1)**
33:8
**July (5)**
105:20,25 106:11
108:20,25
**jumping (1)**
11:4
**June (1)**
63:17
**jury (1)**
150:8
**J-A-C-I-N-T-O (1)**
7:25

—————— **K** ——————

**K (2)**
2:8 3:3
**keep (2)**
132:16,18
**kept (5)**
38:8 77:25 84:21

98:11 111:22
**kids (5)**
12:19,21 17:19 133:4
133:5
**kill (2)**
16:17 43:18
**kin (1)**
152:13
**kind (22)**
14:21 18:12 24:13,18
35:19 42:4 45:8
51:8,10 55:9,13,19
70:24 109:11,12
117:17 120:12
126:13 133:25
138:8 143:5 149:13
**kinds (1)**
27:23
**King (2)**
2:9 4:11
**knew (6)**
15:9 38:9 42:7 94:16
94:16 95:11
**know (157)**
10:17 11:4 13:18,21
14:2 15:11,18 16:21
28:9,16 29:7,9 33:2
33:4,12,13 37:15,21
39:25 41:2,18 43:7
43:23,25,25 45:4,4
45:5 47:5,7 48:24
49:2,25 50:2,6,23
50:25 52:14 54:13
54:20 55:24 56:12
56:20 59:11,22
60:10 61:8 63:25
66:8,8,13 67:4,6
69:2,4,5,10 71:9
73:11,14,16 74:3,25
75:4 76:14,19,20
79:6,7,24 81:7,19
81:20 84:9 89:11
93:7,11,11,13,19
94:13 95:8,13,17
97:21,22 99:11
100:3,9,10,13 101:2
101:10,18 102:6,18
103:2 104:13,22
105:2 109:3 110:2
114:12,24 120:8
123:17 124:2,3,3,9
124:14,21 126:9
127:21,22 128:9
129:19 130:10,10
130:13,14,23 131:4
131:13,13,19,21

132:5 133:12,19
134:12 135:3,4
136:8 137:7 138:23
140:14,19,24 141:3
141:8,13,14,16,16
141:19,24 143:12
143:25 144:21
145:24 146:6 147:6
148:2,13 150:9,19
**knowing (5)**
81:2 114:22 128:17
147:4,16
**knowingly (2)**
146:16,22
**knowledge (11)**
54:4 55:14 61:7 78:8
96:12 97:9 102:2
122:3 123:17
125:25 150:19
**known (2)**
94:17,19
**knows (2)**
48:11 56:11

—————— **L** ——————

**lack (2)**
15:22 22:13
**laid (1)**
18:23
**late (4)**
61:4 98:15 102:13,14
**lately (1)**
139:10
**launched (1)**
8:18
**law (10)**
2:3,8 16:12 44:6
45:11,21 46:4,6
103:23 106:22
**Lawndale (3)**
6:11,16 12:9
**lawsuit (30)**
5:8 9:12 21:21 22:6
29:15 36:12,18,23
40:12,25 41:12 44:5
53:3,8 54:14,19
56:5 58:2 69:20
75:24,25 110:2
111:20 118:8
119:15 124:4
134:13,20 135:19
138:12
**lawsuits (10)**
21:12,15 26:14 27:2
42:9 83:5 84:24
136:13 137:11

138:8
lay (2)
  13:24 14:2
learning (2)
  26:2 55:20
leave (2)
  63:5 90:10
led (1)
  53:6
Legacy (5)
  5:24 126:10,10,10
  127:13
legal (2)
  84:13 109:24
letter (32)
  3:3,9,10 19:23 20:8,9
  77:4 88:20 89:6
  97:24 103:21
  105:20,24 106:6,10
  106:13,16,24
  108:23 109:16
  110:10,14,16,16
  111:2,13 115:8
  116:7,17,20 117:5
  119:12
letters (19)
  35:5,10,17 62:18
  82:22,23 97:10
  114:6,8,9,12,14
  115:6 117:4,10,12
  139:8 146:13 147:9
letting (1)
  109:25
let's (8)
  9:10 22:6 25:16 40:2
  90:23 91:3 106:25
  112:24
level (4)
  54:16 55:22 56:3 87:6
levels (1)
  141:16
liability (7)
  86:17 87:18 88:12
  93:3,14,20 94:7
license (5)
  8:16 142:4,11,23
  152:22
licensed (1)
  142:10
liens (1)
  33:13
life (3)
  131:17 138:13 142:17
line (9)
  59:23 153:8,10,12,14
  153:16,18,20,22

lines (1)
  148:6
lists (1)
  56:18
literally (1)
  79:13
litigate (2)
  40:25 41:11
litigation (1)
  27:5
little (3)
  7:6 43:2 47:17
live (14)
  5:23 6:6,12 13:2 48:7
  52:18 101:22 111:5
  111:6,8 125:16
  133:18 134:16
  145:17
lived (3)
  5:18 98:17 145:15
lives (1)
  11:8
living (2)
  99:15 126:10
LLC (10)
  1:8 4:14,22 115:3,10
  116:25 117:5,11
  118:3,18
load (2)
  59:18,20
loan (4)
  27:24 28:7,10 60:21
loans (6)
  60:17 132:25 133:5
  136:7,8,9
locate (1)
  45:12
location (2)
  43:17 53:16
locked (1)
  43:5
log (4)
  38:8,10,13 77:25
logo (1)
  114:11
long (24)
  5:14,18 6:6,12 8:12
  13:5 28:16 49:21
  63:25 66:19 70:23
  77:3 98:9,10 99:14
  102:16,17,19 103:2
  109:10 127:7
  139:17 142:11,24
look (24)
  25:22 34:5 41:23
  73:10 76:25 77:25

78:5 84:20 85:21
  88:23 93:23 97:10
  99:11 112:7 114:7
  114:12 115:12
  116:18 118:23
  128:3 130:21
  138:25 143:16
  145:13
looked (4)
  12:13 31:13,19
  138:17
looking (1)
  109:2
looks (3)
  34:19,20 106:18
lose (1)
  49:10
losing (6)
  47:6,6 48:2,6 52:3
  53:12
loss (2)
  38:22 53:2
losses (6)
  38:21 40:3,4,24 41:10
  42:13
lost (7)
  47:10,12,15 48:12,22
  49:3 147:11
lot (3)
  7:18 41:3 58:5
lots (1)
  134:17
low (2)
  55:23 132:22
lower (2)
  55:22 56:2
LVNV (3)
  25:8,20,23 85:17,19
lying (1)
  9:24
Lynn (162)
  1:1,4,14 2:1,15 3:1,3
  3:9,10 4:1,4,16 5:1
  5:11 6:1 7:1 8:1 9:1
  10:1 11:1 12:1 13:1
  14:1 15:1 16:1 17:1
  18:1 19:1 20:1 21:1
  22:1 23:1 24:1 25:1
  26:1 27:1 28:1 29:1
  30:1 31:1 32:1 33:1
  34:1 35:1 36:1 37:1
  38:1 39:1 40:1 41:1
  42:1 43:1 44:1 45:1
  46:1 47:1 48:1 49:1
  50:1 51:1 52:1 53:1
  54:1 55:1 56:1 57:1

58:1 59:1 60:1 61:1
  62:1 63:1 64:1 65:1
  66:1 67:1 68:1 69:1
  70:1 71:1 72:1 73:1
  74:1 75:1 76:1 77:1
  78:1 79:1 80:1 81:1
  82:1 83:1 84:1 85:1
  86:1 87:1 88:1 89:1
  90:1 91:1 92:1 93:1
  94:1 95:1 96:1 97:1
  98:1 99:1 100:1
  101:1 102:1 103:1
  104:1 105:1,21
  106:1 107:1 108:1
  109:1 110:1 111:1
  112:1 113:1 114:1
  115:1 116:1 117:1
  118:1 119:1 120:1
  121:1 122:1 123:1
  124:1 125:1 126:1
  127:1 128:1 129:1
  130:1 131:1 132:1
  133:1 134:1 135:1
  136:1 137:1 138:1
  139:1 140:1 141:1
  142:1 143:1 144:1
  145:1 146:1 147:1
  148:1 149:1 150:1
  151:1,21
Lynne (3)
  1:18 2:18 152:21

_____ M _____

magnifying (2)
  34:6,11
mail (4)
  20:5 22:15 92:13,14
main (1)
  82:16
maintained (1)
  142:11
major (1)
  107:7
making (4)
  90:8 92:19,22 100:16
managed (1)
  43:5
management (16)
  1:8 4:13,17,21 34:23
  38:2 109:17 113:23
  114:18 115:18,21
  116:6,8,11,14 125:7
Management's (3)
  3:5 33:20 34:9
manages (1)
  125:8

manifestations (1)
  147:12
Manning (1)
  9:6
March (3)
  1:17 2:17 152:17
Marijuana (1)
  57:19
marked (12)
  19:19,23 33:15,19
  63:8,11,15 105:4,7
  113:6,10,19
market (1)
  15:10
married (3)
  13:6 17:13,19
marshals (1)
  40:22
matter (3)
  55:3,15 111:6
matters (1)
  140:4
MCM (26)
  3:11 41:20 64:13 65:3
  65:8 74:7,8 77:12
  83:23 84:10 87:6
  88:24 92:23 94:16
  95:11,19 97:15,20
  105:21 106:10,24
  108:11 110:2,15
  114:10 116:22
MCM's (1)
  114:11
mean (23)
  15:22 36:2 37:8 38:19
  39:25 44:11 46:23
  53:19 54:6 58:17
  66:12 74:12 102:12
  123:12 128:19
  130:12,13 135:2,6
  135:25 139:24
  140:5 146:18
meaning (6)
  37:9 54:7 56:15 58:18
  140:25 148:5
means (4)
  5:7 93:8,10,13
media (1)
  135:14
Medicaid (3)
  132:17,19,22
medical (2)
  132:7,11
Medicare (1)
  132:16
medication (2)

10:19 52:8
medicine (2)
53:20,25
medicines (1)
54:2
Meijer (14)
66:11,21,25 67:5,8,15
67:19,22,23 68:7,10
68:21 100:6 101:9
members (3)
48:9 134:9 136:10
memory (1)
66:16
mental (2)
55:13,19
mentioned (2)
56:9 139:18
merit (1)
137:18
Michigan (14)
6:17,19 11:20 15:2
16:15,23 17:3 57:10
62:12 98:17 99:13
99:16,23 148:8
middle (2)
48:13 111:20
Midland (111)
1:7,8 3:5 4:13,14,16
4:21,21 32:8 33:20
34:9,22,23 35:14
36:4,10,16 37:3,7
37:22 38:2,18 39:21
40:6 41:20 43:1:3
44:21 45:2,9,16,20
46:5 49:9,18,23
50:8,11 54:25 64:10
65:17,25 67:7 68:3
69:18 72:12,21 73:3
73:11,23 75:8,18
76:5,23 77:15 79:7
79:17 83:19,24
84:11,15 87:6 92:23
94:16 95:11,19
96:19 104:14,21
109:17 113:20,23
114:6,16,18,23
115:2,7,10,17,21
116:5,7,11,13,25
117:5,10,18,24
118:2,9,18 123:20
124:7 128:7,14
129:15 130:5,8
131:10,14,14
134:23 138:20
139:4 143:22 146:3
146:8,15,22 147:18

mileage (1)
89:20
military (1)
7:19
million (1)
139:15
mind (1)
58:9
minds (1)
147:5
mine (5)
32:16 71:11 80:14,18
109:3
minimum (2)
13:19,19
misheard (2)
88:3,5
misinterpreted (1)
80:20
missing (1)
12:22
Missoula (2)
7:2,3
mitigate (3)
27:4 35:2,4
mixup (1)
22:15
Mobile (3)
62:11 70:18 111:17
moment (2)
137:8 145:13
monetary (4)
38:22 40:3 42:13
139:12
money (9)
35:8 59:3,19,20,21
60:17 66:11,21
136:19
monitoring (1)
120:12
Montana (2)
6:24 7:3
month (5)
19:4 122:13 124:17
125:3 129:6
months (10)
6:8,13 13:24 41:22
47:20,23 49:3,17
50:4 122:10
morning (5)
4:9,10 5:8 19:25
20:14
mortgage (1)
148:7
motion (1)
90:9

motorcycle (6)
51:12,15,25 122:13
124:13,24
move (9)
7:18 12:4,18 16:9
17:3 40:9 105:15
145:15,22
moved (14)
7:10 12:9,14 16:25
17:9 28:24 98:11
99:18,21,23,25
126:7 127:12 129:8
moving (4)
16:6 29:11,13 75:15
music (1)
14:11
M-E-I-J-E-R (1)
66:11

————————  N  ————————

N (1)
4:2
name (37)
4:11 5:10 11:11 14:11
15:4 24:15 27:7,10
28:8,12,15,18 29:19
29:20,23 30:2,2,6
30:13,19,21,24 31:3
31:5 51:6,7,22 61:9
62:10 65:9 74:15
122:16 127:14
132:9 148:13 153:1
153:3
named (1)
9:6
names (3)
26:9 54:3 144:12
National (4)
51:6,17,18,19
nature (1)
135:10
NCL (1)
81:15
NCLC (1)
81:15
near (2)
17:9,11
necessary (2)
62:24 63:4
need (9)
5:15 20:20 34:12
38:13 59:2 60:17
89:8,12 108:17
needs (1)
150:25
negative (1)

65:15
negatively (1)
149:16
neighbors (2)
134:11,12
neither (2)
65:7 103:23
never (45)
9:12 14:2 48:19 68:6
70:15 74:15,17
77:15,15 78:18 80:9
80:9 81:16 82:6,9
82:13 83:14,14,18
85:13,16 87:2,12,20
87:22 89:3 96:7,10
96:23 100:11 104:6
114:5,14,15,25
115:6 117:23 118:2
126:6 127:23
131:17 132:18
140:19 142:25
150:23
new (2)
6:2 126:14
night (1)
48:14
nights (1)
48:22
Nolo's (1)
10:11
noneconomic (1)
42:17
nonfinancial (1)
136:9
nonresponsive (1)
105:16
Northland (5)
25:8,18,23 26:9 85:14
notarized (1)
107:21
noted (4)
80:21 81:3 82:17
103:13
notes (6)
38:5 41:23,24 42:5,6
77:25
notice (22)
3:8 19:24 20:9 21:6
22:15 74:16 76:5,7
76:9,9,13,15,17
77:8 90:13 91:6
96:6,6,25 103:25
105:22 110:6
notices (1)
103:5
notified (2)

74:20,20
notify (1)
74:18
notifying (1)
74:9
number (15)
6:3,18 29:6,14 49:23
50:4 66:7,9 98:5,9
98:12,18 99:7,12
101:19
numbers (5)
41:20,22 62:17 84:9
99:5
N.E (1)
2:9

————————  O  ————————

O (1)
4:2
oath (2)
9:18,25
object (3)
22:8 75:20 91:11
objections (3)
3:5 10:12 33:20
obligated (2)
106:22 121:25
obligation (1)
108:10
Obsession (1)
16:22
obtain (3)
8:5 49:11 140:6
obtained (3)
50:8,12 76:21
obtaining (2)
23:20 43:9
obvious (1)
52:19
obviously (1)
69:4
occasion (1)
130:16
occupation (4)
13:10 14:5 17:6,23
occur (2)
78:6 128:10
occurred (2)
53:2 78:12
offend (2)
137:2,5
office (1)
96:12
officer (3)
115:20 116:11,13
Oh (18)

9:10 11:20 14:11
15:23 18:18 56:2
63:19 64:6 84:3
113:24 115:22
121:5 129:20
132:23 133:11
134:17 143:3
149:12
**okay (60)**
5:4 9:4 15:21 17:6
31:2 33:25 34:16
43:15,16 48:19 50:7
53:5 56:13 58:14
59:10 63:19 64:22
68:5 73:7 76:12
77:10 83:6 84:3
86:3,20 88:5 90:9
90:23 92:8,17 96:2
96:16 101:6 102:4
106:9 108:5 109:4,8
109:13 110:5,7,24
111:12 112:12
113:24 114:2,5
115:16,24 118:12
119:6 120:3 123:10
129:5,20 131:16
132:14 136:7
139:24 144:13
**old (11)**
12:2,23 17:21 57:14
57:15,16 66:13
133:13 148:6,7,11
**once (6)**
26:7 120:23,24 125:4
130:16,21
**ones (6)**
58:8 114:17 138:23
140:18 143:11
148:6
**ongoing (1)**
22:7
**online (3)**
57:25 60:2 140:11
**open (3)**
68:10,20 69:11
**opened (3)**
67:4,9 70:17
**opening (2)**
66:20 79:4
**operate (1)**
141:19
**opinion (1)**
55:15
**opportunity (1)**
16:12
**oral (1)**

**20:24**
**order (14)**
8:24,25 12:20 16:5
20:20 31:11 45:12
45:21 65:6 109:9
111:22 113:16
125:23 126:11
**organizations (1)**
134:4
**organized (3)**
109:11,12 111:22
**original (2)**
83:9 87:19
**Originally (1)**
123:9
**originals (1)**
26:11
**outcome (2)**
23:22 24:22
**outline (1)**
42:6
**outside (2)**
27:4 134:8
**outstanding (5)**
32:17 63:5 69:19
136:7,9
**out-of-pocket (1)**
38:21
**owe (4)**
45:22 79:11 86:5,7
**owed (4)**
45:18 67:23 69:19
104:7
**owned (1)**
6:22
**owner (1)**
86:17
**ownership (1)**
12:11

———— **P** ————
**P (2)**
4:2 148:14
**Pacer (1)**
22:12
**package (1)**
108:21
**page (17)**
21:3 64:16,18 95:21
95:22 106:3,6
108:18 135:12
153:8,10,12,14,16
153:18,20,22
**pages (2)**
64:19 152:10
**paid (11)**

15:21 32:7 68:14
100:7,11,17 101:3,8
107:24 129:14
148:12
**pair (2)**
34:13,15
**paper (1)**
41:3
**paperwork (1)**
22:16
**paragraph (3)**
84:6 92:20 95:22
**paren (2)**
95:19 96:14
**parenthesis (1)**
83:23
**Paris (3)**
7:13,14,15
**part (9)**
12:17 14:15 18:3,5
37:11 106:15 107:3
108:21 110:16
**partially (2)**
123:22 141:25
**participate (3)**
88:11,17 135:13
**particular (3)**
58:6,19 116:17
**particulars (1)**
138:24
**parties (6)**
14:24 50:21 139:21
150:16 152:14,15
**party (1)**
125:10
**Pat (2)**
11:12,13
**Pauperis (1)**
136:16
**pawn (2)**
28:3,5
**pay (42)**
19:7 32:21,25 33:6
35:8 40:10,19 58:9
59:22 60:2 65:19
66:2,5,25 68:11,12
68:21 69:15 78:21
78:24 86:10 94:24
100:18 101:16
103:9 104:17
121:13 122:22
124:16,24 125:4,18
127:4 128:15,25
129:25 130:6 131:6
131:12 136:19
143:18 148:19

**paying (4)**
61:4 67:14 86:8 103:8
**payment (1)**
107:25
**Peachtree (1)**
2:9
**penalty (1)**
101:7
**pending (1)**
4:17
**people (7)**
43:9 44:2 54:4 75:22
79:14 86:7 135:2
**people's (1)**
122:20
**period (1)**
47:19
**periodically (2)**
130:15,17
**perjury (1)**
101:7
**permissible (8)**
22:20 23:4,21 65:4
72:3,5 87:9,13
**permission (2)**
65:7 140:7
**person (5)**
16:10,11 43:17 48:11
52:19
**personal (7)**
43:9,16,24 49:11 50:8
50:12 53:15
**personally (3)**
9:13 96:23 126:20
**phone (34)**
28:18,20,23 30:16
31:7 37:3,6,10 38:6
61:23,25 62:3,6,11
62:16 63:2 69:15
77:19,20 94:23 95:2
98:3,5,9,18 99:7,12
101:19,24 103:5,9
114:15 127:3 139:4
**physical (4)**
47:4,6,9 147:12
**pickup (1)**
30:7
**Pinnacle (7)**
23:16,18 24:9 69:20
103:11 104:20
105:2
**place (2)**
108:9 145:17
**places (1)**
14:19
**Plaintiff (2)**

**1:5 2:2**
**plaintiff's (3)**
3:4 56:14 119:4
**plans (1)**
145:20
**Plaza (7)**
24:10,14,15,17,20
25:6 85:9
**plead (1)**
57:22
**pleadings (1)**
56:22
**please (11)**
10:4,25 20:4 39:19
45:15 65:23 68:17
68:24 72:23 111:13
148:12
**point (2)**
56:17 62:21
**police (1)**
107:20
**policies (7)**
81:8,21 128:18,21
130:11 141:20
143:12
**policy (2)**
123:11 129:21
**political (1)**
135:5
**positive (2)**
19:18 112:6
**possession (1)**
75:17
**possibility (1)**
32:24
**possible (13)**
66:12,15 68:9,20 69:8
69:9 100:25 101:3,5
101:7 102:8,10,15
**possibly (1)**
43:7
**postal (1)**
41:3
**posted (1)**
57:25
**postings (1)**
58:12
**postsecondary (2)**
7:23 8:14
**power (12)**
29:20,21,22 31:7
127:5,8,16,24 128:5
128:16,20 129:11
**Power's (1)**
128:21
**practice (1)**

81:10
Premiere (1)
148:17
prepaid (2)
59:2,8
prepare (2)
10:7,16
president (2)
115:25 116:5
pretty (1)
143:17
price (1)
122:22
prices (1)
122:20
pricing (1)
120:5
print (3)
82:21 97:10 140:22
prior (14)
5:23 6:9,15 23:14
24:9 25:6,23 26:24
41:12 49:3 90:21
97:16,20 126:9
prison (2)
17:7,10
private (4)
14:24 49:11 50:12
125:10
privilege (1)
22:10
privileged (1)
41:25
Pro (1)
2:3
probably (2)
122:6 139:3
problem (4)
76:2 92:4,7,9
procedures (2)
81:8,21 141:20
143:13
produce (12)
36:11,17 38:13 42:3
56:18 83:2 89:8,12
89:22 90:14,17 92:2
produced (12)
35:24 36:3,23 46:8
75:7,13 82:23 89:23
90:21 117:4,9 118:7
producing (2)
45:6 92:9
product (1)
42:2
production (4)
33:22 36:7 75:16 91:8

Progressive (8)
51:15,16,16 122:11
124:10 143:17,23
143:25
proof (1)
107:25
proper (2)
45:25 74:16
property (1)
145:22
propounded (1)
91:10
prosecuted (1)
16:11
prosecution (1)
22:13
prove (1)
65:15
proven (1)
65:11
provide (4)
107:17,20,21 110:17
provided (1)
107:10
provider (1)
70:21
Providian (1)
148:17
publications (1)
81:15
published (4)
50:21 139:20,23
145:10
pull (12)
24:21 120:23 121:16
121:22 124:10
125:23 126:6,11
129:22 130:14
131:4 140:13
pulled (12)
36:8 87:10,20,22
120:17 121:6,9
122:4 126:6,24
140:24 143:14
pulling (7)
22:19 23:4 51:2 65:4
70:12 126:18
143:23
purchase (1)
59:22
purchased (1)
65:18 120:11
purpose (12)
22:20 23:5,21 65:4
72:3,5 87:9,14
106:15 110:16

135:17,18
pursuant (1)
110:20
pursue (1)
79:10
pursuing (1)
86:5
put (11)
24:25 47:24 59:3
62:19 63:12 75:5
113:15 116:19
125:20 141:15
149:23
putting (2)
20:21 35:11
P-L-A-Z-A (1)
24:11
p.m (1)
151:15

_____
Q
_____
question (22)
10:3 11:2,6 36:15,16
44:8 45:14 60:24
62:22 65:20 68:16
68:17,19 81:25 83:9
86:18 87:19 93:4
105:16 117:14
133:20 137:4
questioning (1)
89:13
questions (5)
8:18 22:11 90:20
149:23 152:8
quick (1)
106:17
quit (1)
15:9
quite (2)
131:8 150:24
quote (1)
122:9
quoted (2)
123:24 124:5
quote/unquote (1)
139:18

_____
R
_____
R (2)
4:2 152:2
raised (1)
123:2
ramifications (1)
53:15
ran (1)
18:24

rarely (2)
133:19 151:2
rate (8)
122:17 123:7,14,25
124:14,23 130:7
144:3
rates (6)
123:2 124:5 140:16
141:11 144:15,17
reach (2)
16:13 106:17
read (11)
20:24 21:3,4 54:15
55:21,22 68:17,18
100:14 106:25
151:8
readers (3)
34:15 62:19 63:12
reading (5)
5:5 20:23 34:13 56:3
81:9
reads (2)
106:15 110:16
realized (1)
53:14
really (17)
15:10 18:18,24 26:7
26:11 33:2 41:22
43:23 46:23 52:21
62:16 74:11 76:25
137:22 142:24
143:18 148:11
reason (17)
39:16 66:16 80:25
83:2 122:15 123:6
137:6 146:20 153:4
153:8,10,12,14,16
153:18,20,22
reasonable (2)
72:17 139:17
recall (51)
6:9,15 19:25 21:5
31:12,19,24 32:4,9
35:17 37:13 38:14
53:12 60:20,24
61:11 66:12,20,24
67:12,14,24 68:6,8
68:13,25 70:13,22
76:16 79:3 83:10
85:3,6,19 88:21
89:13 98:18,20
99:12,20 100:25
103:4 106:13
111:13 149:7 121:2
127:8 128:2 129:3
130:20 145:13

receive (10)
22:15 37:3 70:20,24
76:22 77:8 82:19
97:18,19 117:17
received (8)
73:13 76:17 83:15,18
114:5,14,15,25
receiving (2)
19:25 83:10
receptions (1)
14:24
recess (3)
61:17 113:4 149:20
recognize (15)
20:11 34:8 63:20
103:15 105:10,14
105:17,18 109:14
110:9,14,25 113:18
114:3 119:7
record (19)
5:10 38:13 61:16,19
68:19 90:7,8,12,24
91:2,4 107:2 112:25
113:3,9 149:19
151:4,6 153:5
recordings (3)
37:18 38:6,6
records (1)
111:14
Recovery (2)
24:17 70:10
reduced (1)
152:9
referenced (2)
16:4 126:17
referencing (1)
143:5
referring (1)
43:3
refund (2)
19:6,8
refused (3)
35:13 36:19 77:21
regard (4)
119:22 128:6 143:10
150:6
regarding (24)
54:4 58:14 66:25
67:19,22 69:15,18
69:22 70:10 71:4
72:21 73:3,23 84:12
84:16 89:13 96:3
106:19 115:23
119:25 123:24
136:22 137:11
150:22

regular (5)
55:11 132:23 134:15
148:6 152:14
regulations (1)
80:24
reinstatement (1)
22:17
related (8)
32:8 44:20 52:3 70:3
135:19,21,23 136:3
relatives (3)
133:8,10 136:10
relevant (1)
29:15
remaining (1)
89:15
remember (67)
5:25 6:17 9:11 12:5,7
15:18 18:25 19:5,9
19:13 21:23 25:2,21
26:8,12 28:9 31:15
31:17 33:2 34:19
47:22,25 51:7 52:7
53:9 64:6,8 66:14
66:19 67:16 68:14
70:7 74:15,17,25
75:5 76:24 77:24
78:2,4,5 85:5,8,21
92:14 98:16 99:2,4
99:14,22 100:4
102:15,18 112:3
114:11 118:20
119:14,16 120:19
127:6 130:2,21
131:7 138:24 141:5
143:17 144:11
remove (2)
35:7 103:24
removed (1)
147:24
renew (3)
124:13 139:25 142:5
renewed (2)
122:7 140:8
rent (11)
5:21,22 6:4,5,21
125:10,18,23
126:11,19,22
rental (6)
12:11 120:6 121:16
125:8 140:3 145:22
repay (1)
101:25
rephrase (2)
10:4 65:23
report (43)

22:19 23:4,20,20
31:14,19 35:11
39:14,22 46:12,15
46:25 50:25 69:25
70:2,4,11 72:18,18
73:5 74:4,22,23
76:19,21 103:14,21
103:24 104:14
107:20 108:9 115:5
120:10 123:17
130:14 131:5,15
138:18 139:23
140:13,19 146:11
147:22
reported (12)
1:18 39:21 76:19
118:9,17 123:21
128:7 129:16 130:8
131:11,19 144:17
reporter (12)
1:19 2:19 19:20 33:16
34:11,18 63:9 68:18
105:5 109:10 113:7
152:21
reporting (40)
23:19 32:5 35:12
46:25 49:16 50:20
64:14 72:20 73:2,22
74:22 77:10 80:7,10
80:19 81:3,7,17,20
81:23 84:12,20
88:18 93:2,17 94:4
96:25 97:23 103:20
107:7 110:19,20
111:24 112:11
122:18 123:8 136:2
143:22 145:9
146:10
reports (26)
32:11 35:23,25 36:4
36:12,18,23 46:7
50:14 75:8,17,22,25
98:2 108:4 118:13
118:16 120:22
138:14 139:6,19
140:6 147:8,21
148:3,16
represent (5)
4:12 113:19 119:3
137:23 152:10
representation (2)
84:11,15
represented (1)
22:10
representing (1)
137:25

reputation (2)
119:20,25
request (5)
33:21 36:7 38:12
106:16 118:25
requested (2)
90:17 107:6
requesting (1)
35:7
requests (7)
33:22 34:10 75:19
90:16,18 113:21
119:5
required (2)
76:8 103:23
requiring (1)
21:8
research (10)
43:19 44:17 58:4,5,7
58:8 79:12 81:11,13
81:14
researching (2)
45:11,21
reserve (1)
89:12
residence (2)
6:6 145:15
resolution (2)
106:17 108:13
respect (5)
55:5 86:20 143:22
144:13 145:25
respond (1)
82:4
responded (2)
112:11,14
response (8)
3:8 36:4 73:12 76:24
105:15,22 108:15
108:16
responses (4)
3:4 33:19 113:20
119:4
responsibility (1)
87:6
responsible (7)
87:3,15 88:8 89:19,24
93:21 103:8
responsive (4)
36:15 75:18 90:19
91:19
restraining (4)
8:24,25 12:20 16:5
result (11)
79:5,22 80:2,12 86:22
95:7,8 108:6 119:20

129:15 152:16
results (2)
112:8,15
Retail (1)
17:24
retire (1)
15:8
retired (2)
14:5,7
retirement (1)
149:13
review (1)
93:20
Reviewed (1)
10:9
reward (1)
139:12
reword (1)
10:5
re-filed (1)
26:10
rid (1)
104:20
right (139)
4:23 5:6 8:18 11:8
13:12 17:21 19:6
21:5,11 23:9 26:13
30:24 32:12 36:19
36:24 39:22 40:2
41:12 42:3 44:12
46:9,13 48:17 49:24
50:5 51:3 52:2 53:3
53:17 57:24 59:20
62:12 64:9,11,24
66:6 72:11 73:24
74:2,15 75:9,12
77:6,13 79:18,22
81:4,14,23 82:13,15
84:7,25 86:15 87:7
88:6 89:12 90:11
91:5 92:12,19,21,22
93:6,9 94:5,22
95:12 96:3,5 97:4,7
101:4,6,20 102:11
104:16,22 105:10
105:19 107:19,22
108:2,7,14,20,24
110:3,4 111:10
112:22 113:13,17
114:19 115:3,10,18
115:24,24 116:16
116:20 117:6,11,24
118:3,23 119:11,18
120:10 122:3
123:19 124:7 125:2
125:5 126:5,17

127:25 129:16
130:9,18 131:2
138:11,15 141:18
141:22 143:20
144:4,7,16,18,24,25
145:2,7,14,17,25
147:8,10
rights (5)
27:3 34:25 146:4,16
146:23
Riverside (2)
8:2,10
Road (3)
5:24 126:10 127:14
Robert (1)
9:6
Rockwood (1)
6:20
routinely (1)
43:21
rules (6)
10:9,10,12 83:6 93:14
93:20
run (2)
31:10 51:21

_____
S
_____

s (2)
4:2 119:4
salary (2)
13:18,22
sales (1)
17:24
San (3)
7:24 8:3,8
satellite (3)
30:23,25 31:7
satellite's (1)
31:3
saving (1)
27:13
savings (2)
149:7,11
saw (5)
130:15,19 131:17
141:3 143:18
saying (38)
46:11,24 47:12 48:19
54:23 65:22 66:14
66:17 67:8 68:2,5,6
68:8,9,19 69:7
70:13,14 71:10,24
71:24 79:3 80:6
90:21 93:23 94:10
100:11,13 101:7,10
101:18 103:18

108:5 109:3 120:11
127:18 129:5
141:18
says (4)
59:14 75:2 115:20
140:22
scan (1)
112:20
school (6)
7:9,21 8:15 54:17
56:3,4
schools (1)
7:11
Sciences (2)
67:17,18
score (9)
120:5,8,18 121:2,7,10
121:11,12,16
scores (3)
120:15 122:21 141:25
se (3)
2:3 44:23 120:7
second (1)
108:22
section (2)
64:14,24
security (15)
18:8,10,17 29:6,14,17
55:7,10,11 66:6,9
125:20 132:17,18
149:14
see (23)
9:10 20:7,11,15,18,21
21:2,3,4 25:16 34:4
34:7 35:19 62:17,17
62:18 63:3,12 84:8
106:5 115:22
140:25 148:15
seeing (4)
31:24 32:9 111:14
130:21
seek (1)
16:10
seeking (2)
41:15 145:16
seen (6)
52:10 92:6 118:12,16
127:23 132:23
send (8)
62:18 74:4,14 97:3,8
108:6 109:2 115:9
sending (3)
50:19 108:25 146:12
sent (33)
20:6,8,10 22:14,16
32:14 35:4,9,18

67:10 76:5 77:3,4
77:11 78:17 88:19
96:7,10,25 97:5,15
97:23 103:21,25
105:24 108:21
109:16 115:8 117:5
117:8,10,12 139:10
separate (2)
25:16 115:4
separately (1)
45:15
served (1)
90:15
service (16)
3:12,12 31:11 40:19
40:21 62:14,25 63:2
70:21 102:5,11,21
127:9 130:22,23
131:3
services (2)
135:24 138:6
Set (2)
3:5 33:21
sets (1)
113:25
settle (4)
24:4 25:13,18 104:10
settled (6)
23:23 24:23 25:14
69:21 104:4 107:25
settlement (1)
24:24
seven (2)
89:15 127:10
seven-something (1)
98:25
sewer (3)
30:4,5,9
shakes (1)
149:16
share (1)
43:25
shifting (1)
106:21
shop (2)
139:24 140:10
Shore (1)
15:9
shortened (1)
5:2
shortly (1)
53:14
short-term (1)
27:24
show (3)
73:22 109:4 140:18

showing (3)
67:9 75:8 118:8
shown (1)
90:12
shows (1)
50:14
side (1)
56:14
sign (1)
151:8
signature (1)
21:4
simple (1)
23:6
simply (4)
80:13,15 106:24
108:12
singer (1)
14:12
single (1)
34:20
sister (3)
133:10,11,13
sit (1)
45:7
sitting (3)
50:3 93:24 128:12
situation (4)
27:4 126:14 147:14
147:15
situations (1)
140:4
six (7)
6:7,14 77:21,23
122:10 126:21
133:11
sixty-two-and-a-hal...
55:12
sleep (14)
47:6,10,12,15 48:2,6
48:12,23 49:4,10
52:3 53:2,12 147:11
sleeping (1)
48:18
small (1)
140:22
social (16)
18:8,9,17 29:6,14,17
55:7,9,11 66:6,8
132:17,18 134:8
135:13 149:14
sold (4)
6:7 59:11 104:20
148:11
Solutions (1)
70:10

son (3)
12:12,24 17:5
son's (3)
17:6 126:8,15
soon (1)
135:17
sorry (8)
9:8 11:18 18:4 23:25
43:11 72:24 88:3
107:9
sort (4)
18:9 41:3 54:11 58:17
sought (3)
79:20 123:23 146:3
sound (1)
99:10
source (2)
18:7 42:10
sources (1)
18:16
South (1)
6:20
Southern (2)
1:2 4:18
Southwood (1)
11:21
Spalding (2)
2:9 4:12
spare (1)
34:13
speak (4)
77:18 133:19 136:21
151:2
special (2)
54:17 55:6
specific (12)
38:3 43:2 44:6,7,19
56:15 59:6 85:9
135:17,17 143:11
144:17
specifically (22)
39:15 44:4 53:16 56:7
56:8 58:13 61:13
64:7 66:19 68:14
75:2 79:18 103:2
124:8 134:24,25
135:7,8 141:5,15
145:24 146:8
speculate (1)
67:13
speculative (1)
146:6
speculatively (1)
146:5
spell (1)
11:23

spoke (1)
133:22
sprinkled (1)
95:23
stalker (1)
43:5
stalking (3)
16:12,14 43:18
start (1)
11:6
started (4)
15:14 53:12 55:12
74:21
starts (1)
148:13
state (8)
1:3 5:9 21:13 23:11
43:6 118:5 152:3,22
stated (2)
36:20 152:7
statements (5)
67:11 70:20,25
111:18 145:4
States (2)
1:2 20:5
status (2)
84:13 107:8
statutory (7)
22:23 41:13,14 42:14
46:21,24 139:14
stay (1)
140:2
staying (1)
12:12
stems (1)
42:24
steps (1)
73:16
stop (6)
35:13 37:16 78:11
138:14,14 139:2
stopped (3)
78:11 95:2 102:5
straight (1)
132:16,18
Street (6)
2:9,16 5:13 101:22
111:5,10
stress (1)
52:25
stressed (1)
52:24
stressful (1)
44:3
strictly (1)
72:16

strike (4)
88:8 105:15 125:5
129:13
study (1)
8:7
stuff (1)
35:11
style (1)
5:3
subject (2)
22:9 101:6
submitted (1)
91:7
substantiate (1)
45:8
sue (9)
3:8 22:4,18,21 23:15
24:9 25:7 103:25
105:22
sued (6)
21:20 22:2 25:24 85:3
85:23 147:23
suffered (2)
47:2,4
sufficient (1)
110:17
suing (2)
34:22 82:6
suit (5)
25:9 40:8 103:16
104:2 119:13
summary (1)
22:24
summer (4)
16:2 31:18 120:25
138:19
supplemental (1)
42:10
supports (1)
107:5
suppose (1)
147:4
supposed (4)
22:16 74:18 76:13
122:2
sure (35)
5:16 17:10 18:24
25:22 38:9 39:25
46:20 70:7 79:25
82:24 92:6,16 94:10
94:14 99:9,18
100:16 102:6 114:7
114:13 115:11
122:9 131:7 140:21
141:15,18 143:17
143:20 144:19,21

145:12,23 146:18
147:10 149:10
surprising (1)
104:19
sustained (1)
119:19
switching (2)
35:20,22
sworn (1)
4:5
symptoms (1)
53:18
system (3)
53:23 120:14 143:8
s-2(b) (2)
87:25 88:2
S2B (1)
41:19

_____ T _____

T (2)
152:2,2
take (10)
20:17 53:20 54:2
59:21 61:15 76:14
89:21 112:22
113:14 142:22
taken (8)
1:15 2:15 61:17 73:17
113:4 143:5 149:20
152:7
talk (8)
21:11,19 22:6 37:6
53:20 54:11 134:15
135:2
talked (5)
84:24 133:21 134:19
134:22 135:8
talking (4)
37:22 138:4 139:6,8
target (3)
146:11,12,13
targeted (4)
79:14,18,19 146:8
targeting (1)
138:14
tax (1)
19:2
taxes (1)
19:2
TCPA (5)
3:7 25:11 63:17 64:10
84:5
telephone (5)
30:12 77:13 86:13
104:10 139:7

tell (16)
9:24 20:15,23 34:8
42:4 71:16 73:9
79:12 80:7,11 88:22
95:3,6 121:18
122:25 123:4
telling (2)
20:25 103:5
Teri (162)
1:1,4,14 2:1,15 3:1,3
3:9,10 4:1,4,16 5:1
5:11 6:1 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1 52:1 53:1
54:1 55:1 56:1 57:1
58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1,20
106:1 107:1 108:1
109:1 110:1 111:1
112:1 113:1 114:1
115:1 116:1 117:1
118:1 119:1 120:1
121:1 122:1 123:1
124:1 125:1 126:1
127:1 128:1 129:1
130:1 131:1 132:1
133:1 134:1 135:1
136:1 137:1 138:1
139:1 140:1 141:1
142:1 143:1 144:1
145:1 146:1 147:1
148:1 149:1 150:1
151:1,21
term (2)
15:22 80:9
terms (4)

38:20 134:8 139:12
141:11
testified (8)
8:21 9:12 77:14 86:14
119:23 132:5 136:8
150:10
testify (1)
150:18
testifying (2)
9:21 130:5
testimony (5)
9:17 10:22 41:9 61:20
86:4
text (1)
62:17
Thank (4)
34:17 37:2 151:9,11
theater (2)
8:11 14:11
theft (11)
79:5,8,22 80:2,3,4,8
80:16,21 81:4 95:7
theirs (1)
108:10
thereto (1)
152:8
thing (6)
32:13 41:4 58:17 77:5
85:18 138:10
things (11)
10:12 14:24 35:20
54:12,22 56:11
84:22 95:14 111:15
111:16,19
think (50)
11:22 19:18 24:14,16
24:17 25:2,21 26:6
26:10 28:10 30:18
31:4,6,12 32:13,14
46:11 48:4 51:16
60:12,23 67:20
68:25 69:2 71:15
75:2 76:10 79:21
95:22 99:18,25
102:12 117:7,25
119:9 122:2 126:2
126:23 129:18
130:22 132:20
133:16 139:11
140:11 142:23
143:5,17 145:9
149:25 150:5
thinking (1)
11:3
third (3)
50:21 139:21 150:16

thought (9)
71:15 72:24 99:17
111:3 113:22 121:5
129:5 137:18,22
thousand (3)
14:15 24:5,6
three (16)
31:21,23 41:16 49:17
64:7,17 84:11 105:7
106:4,6 107:6
113:25 120:21
126:25 139:15
145:10
Three-and-a-half (1)
8:13
three-hundred-and...
19:9
threw (1)
57:23
throw (5)
111:15,16,17,19,21
thumb (1)
34:2
Till (1)
6:7
time (61)
7:10 8:18 12:8 14:13
16:23 18:3,5,23
21:21 28:7,14,16,22
31:13,24 37:11
44:11 47:8,10,15,18
49:21 52:5 57:8
60:13,20 61:11 62:5
66:19 70:23 76:14
76:18 84:23 86:8
89:15 99:21 100:5
103:2,3 112:10
120:17 121:3,5,9
122:4,7,21,24 124:3
126:16 130:19
133:21 135:3
138:17 140:9
142:11,20,24
144:18 145:19
147:15
times (8)
16:18 37:12 41:21
77:18,21,23 126:23
139:15
title (5)
28:3,5 74:16 76:11
116:10
today (18)
9:21 10:8,23 13:13
20:22 21:9 22:12
45:7 50:3 88:22

89:15 90:13,14,21
91:7 92:10 93:24
128:12
**told (8)**
20:16 37:16 53:22
78:10 85:13 121:16
139:15 149:8
**totals (1)**
41:2
**town (2)**
133:19 134:2
**TracFone (1)**
30:17
**trade (1)**
148:6
**traffic (2)**
8:23 56:24
**transactions (3)**
27:21 58:24 149:3
**transcript (3)**
151:8 152:7,11
**transcription (1)**
153:7
**TransUnion (2)**
31:20 112:16
**trash (1)**
30:7
**traumatic (1)**
100:5
**trial (3)**
56:13,19 57:22
**tribe (1)**
11:25
**tried (2)**
16:17 43:18
**trip (1)**
89:21
**true (1)**
152:11
**trust (2)**
137:21,23
**truth (1)**
9:24
**truthful (1)**
10:22
**try (4)**
10:5 11:5 34:16 39:2
**trying (13)**
9:4 12:5 25:2 39:8
71:12,22 85:8 93:18
100:18,22 123:19
126:19 137:19
**Twitter (2)**
135:15,16
**two (17)**
12:22,23 14:15 17:16

44:4,9,19,20 64:7
64:17 86:17 87:4,16
93:22 95:13 104:16
106:5
**Two-and-a-half (1)**
133:15
**type (2)**
25:10 38:19
**typewriting (1)**
152:9
**T-Mobile (19)**
29:2 69:12,14,19,22
70:3,10,14,15,16,21
70:25 71:3,16
103:12 104:8,12,17
110:21

——————— U ———————

**U (1)**
13:17
**Uh-huh (33)**
7:20 9:3,22 11:14
12:10 14:6,20 15:3
16:25 17:12 24:12
25:12 30:22 51:13
51:23 55:8 62:13
70:19 85:2 98:4
105:23 106:12
108:19 109:21
110:13 116:21
119:8 125:15 126:4
127:19 128:24
129:2 136:6
**underlying (6)**
23:7,10 54:5 56:6
119:20 147:13
**understand (17)**
9:17,23,25 10:4,6
11:6 44:8 46:19,23
65:20 88:14 97:17
100:18 119:24
137:19 143:7 145:5
**understanding (1)**
74:11
**understood (4)**
20:13 26:8 106:19,21
**underwriting (2)**
141:7,21
**unemployment (2)**
18:19,21
**unique (1)**
79:15
**United (2)**
1:2 20:5
**unknown (4)**
49:20,23 50:2,4

**unnamed (2)**
144:14,25
**unpaid (8)**
65:18 67:14,19,23
68:7 103:6 132:7,11
**unusual (1)**
128:3
**update (1)**
130:22
**upset (4)**
43:23 47:7 52:24 55:4
**use (16)**
27:23 52:11 58:7,24
59:2,7,21,25 60:16
62:16 80:13 119:24
120:2,4 136:8 140:2
**utilities (7)**
27:11 29:19,23 30:18
31:4 129:12 139:22
**utility (5)**
27:10 31:10 60:25
61:5 127:2

——————— V ———————

**VA (1)**
132:13
**valid (1)**
65:9
**validate (5)**
78:25 96:21 108:10
108:12,17
**validated (1)**
70:5
**validation (16)**
32:15 35:9 76:5,7
77:4,11 78:18,25
96:5 97:2,23 103:22
108:16,22 109:2
115:8
**Vanessa (1)**
125:13
**various (1)**
26:14
**verification (1)**
96:17
**version (1)**
5:2
**versus (1)**
4:16
**vicarious (7)**
87:18 88:12 93:3,14
93:20 94:7 97:25
**violate (5)**
46:2,3 95:15,16 146:4
**violated (8)**
27:3 46:4,6 64:14,23

72:13 88:10 146:23
**violation (2)**
22:20 46:13
**violations (6)**
3:7 34:25 46:14 56:24
63:16 138:15
**Virgin (7)**
29:5 62:11,15 63:6
70:18,18 111:17
**Visa (1)**
59:14
**vs (1)**
1:6

——————— W ———————

**wage (2)**
13:19,19
**wait (1)**
24:14
**waiting (1)**
130:24
**waived (1)**
40:14
**Walmart (5)**
59:5,6,7,9,18
**want (28)**
21:11,19 34:2 35:2
38:12 46:20 55:4
56:15 58:23 60:4,6
61:14 63:12 83:3,4
92:4,9 94:25 106:3
109:8 112:15,22
113:16 115:12
137:5 138:13
143:20 145:15
**wanted (1)**
149:10
**wants (1)**
100:14
**wasn't (12)**
32:16 43:14 57:2
71:11,12,14 82:2
102:19 108:9,11,11
139:6
**water (8)**
30:4,5,5,8,9 31:8
127:7 128:22
**way (16)**
45:5 46:4 56:2 79:7
80:25 88:14 93:19
101:10,17 104:6
114:22 130:23
131:21 135:11
141:19 142:14
**wear (1)**
116:12

**weather (1)**
151:2
**website (1)**
140:21
**websites (2)**
58:6 140:15
**weddings (1)**
14:24
**week (1)**
60:15
**weekend (2)**
15:25,25
**weekends (1)**
15:20
**weight (1)**
47:6
**welcome (2)**
34:18 151:13
**went (8)**
7:3,10,24 15:13 40:16
53:24 124:22 148:3
**weren't (3)**
86:9 95:4 139:8
**We'll (2)**
29:11 34:16
**we're (2)**
61:19 127:13
**we've (3)**
98:10 112:17 119:9
**whatever's (1)**
89:20
**when's (15)**
14:13 28:7,14,22
31:13 47:15 57:8
60:13 62:5 120:17
121:9 122:3,4
133:21 138:17
**whichever (1)**
132:17
**wife (1)**
12:13
**willful (1)**
147:4
**willfully (1)**
146:3
**willing (1)**
139:16
**winner (1)**
137:22
**winter (4)**
12:6 16:3 100:2,3
**withdrawn (1)**
26:10
**witness (20)**
8:22 34:16 48:2,5
52:12,20 56:14,18

91:5,17,20 92:3,11
92:13,16 118:25
149:16 151:9,13
153:3
**witnesses (3)**
54:7 56:19 150:11
**won (1)**
22:24
**word (4)**
73:25 79:19 80:13
97:25
**words (2)**
87:8 118:6
**work (12)**
13:8,24 14:3,22 17:25
18:3,5,19 41:25
42:11 141:23 142:2
**worked (4)**
14:13 15:20 81:16
142:25
**working (2)**
13:12 142:12
**works (2)**
81:19 143:8
**world (1)**
69:9
**worry (1)**
147:25
**worthiness (2)**
119:22 120:2
**wouldn't (10)**
34:3 41:2 67:6,8
87:24 94:23 126:13
137:20 139:3
143:12
**wow (1)**
133:16
**write (1)**
77:3
**writes (1)**
81:21
**writing (1)**
118:5
**written (4)**
38:6 74:17 96:11 97:3
**wrong (2)**
77:5 79:20
**wrote (5)**
88:24 89:3 115:6
116:7 143:12
**Wyandotte (1)**
11:22
**W-Y-A-N-D-O-T-T...**
11:24

———————— **Y** ————————

**yeah (46)**
8:4,23 16:2 19:4 25:5
26:20 30:10 31:3
32:2 40:17,19 48:18
51:16,21 56:4,16
57:5 61:6 63:21
76:10 92:16 97:14
98:13,23,25 100:3
101:21 102:23
105:9 108:23 109:7
113:22 114:4
115:25 119:16
120:23 124:12
129:10 130:4 131:4
137:15 146:10
148:7,9,20 149:4
**year (29)**
7:16 15:16 18:20,25
19:3 31:16,17 78:6
78:7,9 102:13,22,24
120:19,23,24,25
122:12 123:2
124:11,15,18,20,25
125:4 133:16 139:4
145:6,19
**yearly (3)**
13:21 15:12 18:15
**years (40)**
5:20 6:15 7:4 8:13,23
13:7 21:13,16 26:22
28:13 32:20 33:6
39:3 57:2,9 60:8,11
60:21,24 62:7,8
84:21 126:3,21,25
127:10,25 129:9
131:23 132:6,24
133:2,6,15,22
136:14 138:10
139:22 145:11,16
**Yep (1)**
11:7
**younger (1)**
133:15

———————— **Z** ————————

**Zip (1)**
5:15

———————— **$** ————————

**$10,000 (1)**
26:16
**$100 (5)**
41:5 128:24 129:4,6
129:18
**$200 (1)**
41:7

**$25,000 (1)**
19:14
**$300 (1)**
70:6
**$400 (1)**
40:14
**$71 (1)**
124:17
**$750 (1)**
25:4

———————— **0** ————————

**0953 (1)**
110:25

———————— **1** ————————

**1 (6)**
3:3 19:19,23 95:19
152:10 153:5
**10 (1)**
26:18
**10K (1)**
87:8
**106 (3)**
3:8,10,11
**11 (1)**
1:17
**11th (1)**
2:17
**114 (2)**
3:12,12
**1180 (1)**
2:9
**12 (1)**
78:4
**12:10 (1)**
151:15
**12421 (2)**
105:21 116:23
**13 (1)**
84:21
**14 (1)**
64:19
**15 (2)**
26:18 64:19
**15,000 (1)**
26:19
**153 (1)**
152:10
**16 (1)**
64:19
**1646 (1)**
2:16
**1681b (1)**
64:24
**1681s-2(b) (3)**

72:13 88:6,10
**1681(b) (5)**
64:14 72:3,4 87:13
88:4
**1692d (2)**
74:6,8
**1692d(5) (1)**
77:14
**1692e (1)**
83:23
**1692e(2) (1)**
84:4
**1692e(8) (1)**
92:20
**1692g (1)**
96:14
**1692g(a) (2)**
95:19 97:13
**17 (1)**
64:21
**18 (2)**
64:21 83:25
**19 (1)**
95:22
**1952 (1)**
7:8
**1970 (2)**
7:17,22
**1973 (1)**
57:20
**1980 (1)**
142:14
**1995 (1)**
51:11
**1996 (1)**
133:23

———————— **2** ————————

**2 (5)**
3:4 33:15,19 83:23
153:6
**20 (2)**
3:4,4
**20th (1)**
20:10
**2004 (1)**
142:5
**2005 (4)**
15:14 66:22 67:2
142:5
**2006 (1)**
67:2
**2007 (8)**
9:10 62:9 102:6,11,14
102:24,25 104:18
**2008 (17)**

12:6,15,16 14:15 15:8
28:24 98:14,16
99:15,19 100:2,17
101:4,9 102:5,7,25
**2009 (10)**
12:7,17 98:16 99:19
100:2 127:16 130:3
131:3,15,20
**2010 (1)**
39:5
**2011 (22)**
22:3,4 26:23,24 50:10
50:13 53:10,11
74:25 75:9,16 76:4
76:16,23 78:3,4,13
84:21 97:16,20
123:18 131:18
**2012 (11)**
50:10,15 75:16 78:15
84:21 104:13
105:20,25 106:11
108:20,25
**2013 (14)**
3:10,11 19:2,12 50:10
50:17 63:18 75:16
109:19 110:12,15
112:2,5 143:15
**2014 (5)**
1:17 2:18 3:4 20:10
152:17
**21 (1)**
57:17
**21st (1)**
106:11
**22 (1)**
57:17
**24th (1)**
152:17
**25 (2)**
12:25 19:17
**26 (2)**
13:7 132:24
**26th (5)**
7:8 105:20,25 108:20
108:25
**27th (1)**
63:18

———————— **3** ————————

**3 (5)**
3:6 63:8,11,15 153:7
**3:13-CV-00033 (1)**
1:7
**3:13-CV-33 (1)**
4:19
**30 (4)**

```
    3:11 73:8 74:5          60 (1)
    96:17                    133:16
30th (2)                600 (2)
    110:12,15               15:23 125:19
30,000 (1)              64 (2)
    19:17                   3:7 12:3
30-day (1)              66180 (1)
    96:5                    6:18
30309 (1)               68 (1)
    2:10                    124:21
31023 (1)
    5:17                    ――――― 7 ―――――
313 (2)
    98:21,22             7 (5)
322 (4)                     3:12 113:5,10,12,19
    5:13 101:22 111:5,10  71362 (1)
34 (1)                      1:22
    3:6                  734 (1)
374-4132 (1)                99:3
    98:6                 734-379-4368 (1)
                            99:8
    ――――― 4 ―――――        750 (1)
                            25:3
4 (6)
    3:8 15:23 105:3,8,19  ――――― 8 ―――――
    116:18
40 (4)                  8 (6)
    12:24 57:2,9 138:10     3:12 9:11 62:9 113:5
401(k) (1)                  113:10 118:23
    149:15              8:30 (1)
4132 (1)                    2:18
    101:21              80 (2)
45 (1)                      124:25 142:22
    40:23               83 (2)
478 (1)                     142:23,23
    98:8                87 (2)
478-374-4132 (1)            125:2 142:22
    101:19              88 (1)
                            124:25
    ――――― 5 ―――――
                        ――――― 9 ―――――
5 (8)
    3:9,10 95:19 105:3,8  9th (1)
    109:5 115:12,15         55:24
5th (1)                 91 (1)
    109:19                  92:20
5,000 (1)               92 (2)
    25:19                   95:22,24
50,000 (1)              93 (1)
    15:19                   84:6
515 (1)
    6:11
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 (1)
    66:7

    ――――― 6 ―――――
6 (4)
    3:10 105:3,8 110:9
```

Plaintiff's Appendix Document No - 101

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### DUBLIN DIVISION

|                               |       |                              |
| ----------------------------- | ----- | ---------------------------- |
| TERI LYNN HINKLE,             | )     |                              |
|                               | )     |                              |
|    PLAINTIFF,                 | )     |                              |
|                               | )     |                              |
| V.                            | )     | CIVIL ACTION NO.             |
|                               | )     | 3:13-cv-00033-DHB-BKE        |
| MIDLAND CREDIT                | )     |                              |
| MANAGEMENT, INC. and          | )     |                              |
| MIDLAND FUNDING, LLC,         | )     |                              |
|                               | )     |                              |
|    DEFENDANTS.                | )     |                              |

## DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Teri Lynn Hinkle is a frequent filer of lawsuits "in this division against various debt collectors asserting the same cause of action" under the Fair Credit Reporting Act.[1]  Indeed, in one of the "ten consumer credit cases that she ha[d] filed in this district between August 2011 and July 2012," this Court expressly recognized that the law has been explained to her "by this federal court in no uncertain terms time and again,"[2] noting that "[i]n every case, the United States Magistrate Judge issued a Report and Recommendation in which he

---

[1] *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 13 (entered on May 20, 2013).

[2] *Id.* at 14.

1

discusse[d] the *permissible purpose of debt collection* and recommend[ed] that the case be dismissed."[3]

Nevertheless, Hinkle persists, most recently in her opposition to the Motion for Summary Judgment (Doc. 85) submitted on behalf of Defendants Midland Credit Management, Inc., Midland Funding, LLC, and Encore Capital Group, Inc. (collectively, "Midland").  As explained below, however, Hinkle's FCRA claims fail as a matter of law for the same reasons that this Court already has explained to her "in no uncertain terms time and again."  Nor does Hinkle's opposition to Midland's motion for summary judgment (Doc. 97) identify any genuine issues of material fact regarding her claims under the Fair Debt Collection Practices Act. Accordingly, and for the reasons explained below, Midland respectfully requests that the Court grant Midland's motion for summary judgment and dismiss all of Hinkle's claims with prejudice.

## I.    The undisputed evidence confirms that Hinkle's FDCPA claim is time-barred insofar as it relates to the GE/Meijer Account.

Hinkle argues that her FDCPA claim is not time-barred to the extent it relates to the GE/Meijer Account because "Defendants **did not** cease reporting the [GE/Meijer] account" in 2009, as Midland explained in support of its motion for summary judgment.  (Doc. 97 at ¶ 18) (emphasis in original).  Instead, Hinkle insists that Midland "furnished account information to the CRAs continuously

---

[3] *Id.* at 13–14 (emphasis added).

2

from Nov. 17, 2008 to at least the end of Dec. of 2012 as shown on the Plaintiff's credit reports." (*Id.*) (citing Doc. 58, Exs. 10a–q).

However, the credit reports cited by Hinkle as supposed proof of Midland's continuing FDCPA violation actually show that Midland did cease reporting the GE/Meijer Account in 2009:



(Doc. 58, at 4 (Ex. 10-b)).  Thus, the evidence cited by Hinkle belies, rather than supports her claim that Midland continued to report the GE/Meijer Account to the CRAs after 2009.  Because Hinkle did not assert an FDCPA claim against Midland until well after the expiration of the one-year statute of limitations, Count IV is time-barred to the extent it relates to the GE/Meijer Account.[4]

---

[4] *See* 15 U.S.C. § 1692k(d) (claims under the FDCPA must be brought "within one year from the date on which the violation occurs."); *Narog v. Certegy Check Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011) ("A plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full, and after the debt collector

## II. Midland provided Hinkle with the validation notice required by § 1692g(a).

Hinkle argues that Midland is not entitled to summary judgment on her claim under § 1692g(a) because its December 21, 2011 letter regarding the T-Mobile Account was not "received [until] after the Plaintiff issued her very clear verbal dispute on Dec. 27, 2011." (Doc. 97, at ¶ 43). However, Hinkle's contention is irrelevant. In fact, because Hinkle does not dispute that Midland *sent* the December 21 letter containing the requisite validation notice, Midland would be entitled to judgment as a matter of law even if she had *never* received it.[5]

In any event, Hinkle admits to receiving Midland's initial communication regarding the T-Mobile Account, and she does not dispute that it contained the validation notice required by § 1692g(a). (*See* Doc. 97, at ¶ 20). Accordingly, Midland is entitled to judgment as a matter of law on Hinkle's FDCPA claim to the extent it is based on the allegation that Midland violated § 1692g(a) by "fail[ing] . . . to provide the required 'Thirty Day Validation Notice' or disclosures to Plaintiff." (*See* Doc. 8, at ¶ 92).

---

acknowledged that the debt was paid in full. Under the FDCPA, that conduct is not taken in connection with the collection of a debt.") (citing *Winter v. I.C. System Inc.*, 543 F.Supp.2d 1210, 1213 (S.D. Cal. 2008)).

[5] *Antoine v. J.P. Morgan Chase Bank*, 757 F. Supp. 2d 19, 23 (D.D.C. 2010) ("Plaintiff alleges that he never *received* this notice, but presents no evidence that it was not *sent* or that it does not satisfy the FDCPA disclosure requirements. . . . Accordingly, because there is no factual dispute as to whether Defendant Shapiro & Burson mailed compliant notice on November 13, . . . [t]he Court therefore grants summary judgment to Defendant on Plaintiff's deficient-disclosure FDCPA claim.").

4

**III.   Midland was not required under § 1692g(b) to cease collection activities because Hinkle failed to dispute the debt in writing within 30 days.**

Hinkle claims in her response that, in Midland's "zeal to obtain summary judgment" (Doc. 97, at ¶ 45), it has ignored decisions from the Second, Fourth, and Ninth Circuits which "have upheld the clear and plain language of the statute supporting a consumer's right to dispute [a debt] verbally" (Doc. 97, at ¶ 44).   The cases cited by Hinkle are inapposite, however, as none of those decisions addresses whether a debt collector is required under § 1692g(b) to cease collection activities in response to a consumer's *verbal dispute*:

| Cases cited by Hinkle | No writing required under *other* FDCPA sections | Writing required under § 1692g(b) |
|---|---|---|
| ***Russell v. Absolute Collection Servs., Inc.***[6] | The court explained that "[n]othing in the text of the FDCPA suggests that a debtor's ability to state a claim under **§ 1692e** is dependent upon the debtor first disputing the validity of the debt in accordance with § 1692g."[7] | The court did not hold, as Hinkle suggests, that a consumer's verbal dispute is sufficient to cause a debt collector to cease collection activities under § 1692g(b). |
| ***Clark v. Absolute Collection Serv., Inc.***[8] | The question was "whether section **1692g(a)(3)** permits consumers to dispute the validity of a debt orally, or whether it imposes a writing requirement."[9] | The court did not hold that a verbal dispute is sufficient under § 1692g(b); in fact, it noted that "1692g(b) **explicitly require[s]** written communication."[10] |

---

[6] No. 12-2357, 2014 WL 3973792 (4th Cir. Aug. 15, 2014).

[7] *Id.* at *5 (emphasis added).

[8] 741 F.3d 487 (4th Cir. 2014).

| Cases cited by Hinkle | No writing required under *other* FDCPA sections | Writing required under § 1692g(b) |
|---|---|---|
| *Hooks v. Forman, Holt, Eliades & Ravin, LLC*[11] | As the court noted, "[t]he language of § 1692g(a)(3) does not incorporate the writing requirement included specifically in **other sections** of the same statute."[12] | The court went on to explain that it "makes sense to require debtor consumers to take the *extra* step of putting a dispute in writing before claiming the more burdensome set of rights defined in § 1692g[(b)]."[13] |
| *Camacho v. Bridgeport Fin. Inc.*[14] | "[T]here is no writing requirement implicit in § 1692g(a)(3)."[15] | However, "**Section 1692g(b)** . . . provides that if the consumer notifies the collector of a dispute *in writing* within the 30–day period, the collector shall cease collection activities until he obtains the verification."[16] |

Thus, Hinkle ignores the fact that "[a]n oral notice of dispute of a debt's validity has different legal consequences than a written notice." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859, 869–70 (S.D. Tex. 2011). As explained in the cases cited in her response, Hinkle apparently misapprehends the practical import of a verbal dispute versus a dispute in writing:

---

[9] *Id.* at 490 (emphasis added).

[10] *Id.* (emphasis added).

[11] 717 F.3d 282 (2d Cir. 2013).

[12] *Id.* at 286 (emphasis added).

[13] *Id.* (second emphasis added).

[14] 430 F.3d 1078 (9th Cir. 2005).

[15] *Id.* at 1082 (emphasis added).

[16] *Id.* at 1080 (first emphasis added).

> As written, section 1692g(a)(3) triggers statutory protections for consumers independent of the later sections 1692g(a)(4), 1692g(a)(5), and 1692g(b). For one, once a consumer disputes a debt orally under section 1692g(a)(3), a debt collector cannot communicate that consumer's credit information to others without disclosing the dispute. 15 U.S.C. § 1692e(8); *see Hooks,* 717 F.3d at 285; *Camacho,* 430 F.3d at 1082. Also, if a consumer owes multiple debts and makes a payment, a debt collector cannot apply that payment to a debt that has been disputed orally. *See* 15 U.S.C. § 1692(h); *Hooks,* 717 F.3d at 285–86; *Camacho,* 430 F.3d at 1082.

*Clark,* 741 F.3d at 491. On the other hand, the plain language of § 1692g(b) makes clear that a writing *is* required in order to trigger a debt collector's obligation to cease collection activities until the debt is verified.[17] However, "if the consumer disputes the debt orally rather than in writing, the consumer loses the protections afforded by § 1692g(b); the debt collector is under no obligation to cease all collection efforts and obtain verification of the debt." *Osborn,* 821 F. Supp. 2d at 869–70.

Again, Hinkle did orally dispute the T-Mobile Account by telephone on or about December 28, 2011;[18] however, the undisputed evidence shows that she did

---

[17] *See* 15 U.S.C. § 1692g(b) ("If the consumer notifies the debt collector **in writing** within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt.") (emphasis added).

[18] (*See* Doc. 8, at, at ¶ 20; Doc. 85-7, Ex. E, at 00035 ("Verbal Dispute within 45 days" recorded on "12/28/2011")).

not dispute the debt in writing until July 26, 2012,[19] well outside the 30-day validation period that began to run in December 2011.

## IV.   Hinkle has failed to raise a triable issue of fact as to whether Midland's collection calls violated § 1692d.

Hinkle insists that "[t]he FDCPA is a strict liability statute to protect consumers and non-consumers who deal with the debt collection industry," and that "[t]o determine [whether] behavior is harassment or abuse ONLY if there are many incidences of it is to say that the FDCPA should be narrowly construed and the debt collection industry should have free reign to abuse the public at will via telecommunications." (Doc. 97, at ¶ 37). Respectfully, Hinkle is just wrong.

"Summary judgment is routinely granted in favor of debt collectors where the party alleging a violation of the FDCPA does not present evidence of harassing conduct other than a high volume of calls." *Lardner v. Diversified Consultants Inc.*, No. 13-CV-22751, 2014 WL 1778960, at *8 (S.D. Fla. May 1, 2014) (granting summary judgment to defendant).[20]   Here, according to a "Call Log"

---

[19] (*See* Doc. 85-11, Ex. I) ("Response and Notice of Intent to Sue") (dated July 26, 2012).

[20] *See also Valle v. Nat'l Recovery Agency*, No. 10-CV-2775, 2012 WL 1831156 (M.D. Fla. May 18, 2012) (granting summary judgment to defendant debt collector despite evidence showing eighty-two calls to plaintiff over the span of 252 days); *Tucker v. CBE Group, Inc.*, 710 F. Supp. 2d 1301 (M.D. Fla. 2010) (granting summary judgment to defendant debt collector where the debt collector had called the plaintiff fifty-seven times, even as many as seven times per day); *Waite v. Fin. Recovery Servs., Inc.*, No. 09-CV-2336, 2010 WL 5209350 (M.D. Fla. Dec. 16, 2010) (granting summary judgment to defendant debt collector in spite of evidence showing that it had called the plaintiff 132 times over nine months, up to four times per day); *Druschel v. CCB Credit Servs., Inc.*, No. 10-CV-838, 2011 WL 2681637 (M.D. Fla. June 14, 2011) (recommending summary judgment in favor of defendant debt collector even though it

produced (and apparently prepared) by Hinkle, Midland called her only six (6)
times over a period of four (4) months:

| DATE | TIME | COMPANY | CALLER ID | |
|------|------|---------|-----------|---|
| 12/27/2011 | 6:40 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 12/28/2011 | 8:52 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/7/2012 | 6:34 PM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/8/2012 | 10:36 AM | MIDLAND | Unknown | 1-800-825-8131 |
| 4/30/2012 | 6:37 PM | MIDLAND | Unknown | 1-800-825-8131 |
| | | | | |
| | | | | |

(PlainApp., at 00036). "Absent evidence of harassing, oppressive, or abusive
conduct, the pattern and frequency of [Midland's] calls to [Hinkle] create no triable
issue of fact under . . . Section 1692d(5)." *Valle*, 2012 WL 1831156, at *2.[21]

---

called the debtor fourteen times in just two weeks), *adopted by* 2011 WL 2681953 (M.D. Fla.
July 11, 2011); *Carman v. CBE Group, Inc.*, 782 F. Supp. 2d 1223 (D. Kan. 2011) (granting
summary judgment to defendant debt collector despite evidence of 149 calls over a period of two
months); *Pugliese v. Prof. Recovery Serv., Inc.*, No. 09-CV-12262, 2010 WL 2632562 (E.D.
Mich. June 29, 2010) (granting summary judgment to defendant debt collector that called
plaintiff 350 times over eight months; *Katz v. Capital One*, No. 09-CV-10096, 2009 WL
3190359 (E.D. Mich. Sept. 30, 2009) (granting summary judgment to defendant debt collector
that called plaintiff fifteen to seventeen times after receiving her cease and desist letter disputing
that she owed the debt).

[21] In her response, Hinkle cites the Eleventh Circuit's unpublished decision in *Meadows
v. Franklin Collection Serv., Inc.*, 414 F. App'x 230 (11th Cir. 2011). (*See* Doc. 97, at ¶ 35 n.4).
There, the court reversed the district court's order granting summary judgment to the defendant
debt collector on the consumer's § 1692d(5) claim. Unlike Hinkle, however, the plaintiff in
*Meadows* had put forth substantial evidence showing that "she received approximately 300 calls
over a two and a half year period regarding debts she did not owe and people she did not know";
that the defendant had "used an automated dialer" to make the calls; and that "several times the
calls woke her up from sleep and caused her difficulty sleeping." *Id.* at 233. Hinkle, on the
other hand, rests her claim upon the six calls listed on her "Call Log," as well as a handful of
additional attempts by Midland to reach her on a landline number *she no longer was using*. (*See*
Doc. 97, at ¶ 22) ("MCM did not cease calling until after the Plaintiff stopped answering and
then it began calling one of the Plaintiffs old land line phone numbers according to its own

9

V.   **Hinkle's claim under § 1692e fails because the undisputed evidence shows that Midland properly flagged her account as disputed in its communications with the CRAs.**

Even though Hinkle does not dispute that Midland "appropriately flagged the accounts as 'disputed' in its communications with the CRAS,"[22] she claims that Midland nevertheless violated § 1692e by making allegedly false or misleading statements to the CRAs because "[t]he requirement to 'flag the accounts' as disputed does not afford the Defendants' the ability to furnish information to the CRAs that it knows or should know is false and . . . is further required under the FCRA rather than the FDCPA." (Doc. 97, at ¶ 42).

On this point, Hinkle's argument ignores entirely the overwhelming weight of authority cited in Midland's motion for summary judgment.   Again, "the FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must 'communicate' the disputed nature of the debt" in order to satisfy its obligations to adequately inform credit reporting agencies about the debt. *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 161 (D. Me. 2011) (citing *Wilhelm v. Credico, Inc.*, 519 F.3d 416, 418 (8th Cir. 2008) ("[I]f a debt collector *elects* to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has

---

internal records provided in discovery."). But, as Hinkle intimates, since she no longer used those "old land line phone numbers," she necessarily could not have been "annoy[ed], harass[ed], or abuse[d]" by those calls.

[22] (Doc. 85, at 7).

disputed a particular debt.")).  In fact, as the Eighth Circuit explained in *Wilhelm*, "[t]his interpretation is confirmed by the relevant part of the Federal Trade Commission's December 1988 Staff Commentary on the Fair Debt Collection Practices Act," which provided that:

> 1.   Disputed debt. If a debt collector knows that a debt is disputed by the consumer . . . *and reports it to a credit bureau,* he must report it as disputed.
>
> 2.   Post-report dispute. *When a debt collector learns of a dispute after reporting the debt to a credit bureau, the dispute need not also be reported.*

*Wilhelm*, 519 F.3d at 418 (emphasis in original) (citing FTC Staff Commentary, 53 Fed. Reg. 50097-02, 50106 (Dec. 13, 1988)).

Because  the undisputed "evidence before the Court firmly establishes that, in reporting the debt to the credit reporting agencies, [Midland] specifically flagged the debt as disputed," Midland is entitled to judgment as a matter of law on Count IV. *Poulin*, 760 F. Supp. 2d at 161.[23]

## VI.   Midland obtained Hinkle's credit report for the permissible purpose of "collection" of her accounts.

"[A]s the assignee of [Hinkle's T-Mobile] account, [Midland] was entitled under the FCRA to obtain plaintiff's credit report from consumer reporting agencies for the permissible purpose of review or collection of the assigned debt." *Ostrander v. Unifund Corp.*, No. 07-CV-0086, 2008 WL 850329, at *3 (W.D.N.Y.

---

[23] (*See* Doc. 85-9, Ex. G) ("[W]e have requested that the three major consumer credit reporting agencies change the status of this account to 'Disputed.'"); (Doc. 85-10, Ex. H) (same).

Mar. 28, 2008).[24] Nevertheless, Hinkle claims in her response that "the section of the FCRA the Defendants claim provides **them** with a permissible purpose does not in fact pertain to them at all but solely to the CRAs." (Doc. 97, at ¶ 47) (emphasis in original).

But Hinkle knows better,[25] because "[a]t the time of filing, [she] had already filed eight [now *nine*] prior cases in this division against various debt collectors asserting the same cause of action." *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 13. And "[i]n every case, the United States Magistrate Judge issued a Report and Recommendation in which he discusse[d] the **permissible purpose of debt collection** and recommend[ed] that the case be dismissed." *Id.* at 14 (emphasis added).

Nor may Hinkle's FCRA claim survive summary judgment based on her contention that Midland "most certainly could not have been obtaining Plaintiff's consumer credit report on **behalf of a creditor**," which she claims is required for

---

[24] *See also* 15 U.S.C. § 1681b(a)(3)(A) (stating that a credit report may be provided "in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the review or *collection* of an account of the consumer.") (emphasis added).

[25] For one, the case Hinkle cites for her above-quoted proposition itself acknowledged that "the Fourth Circuit explicitly incorporated the 'permissible purposes' under § 1681b into the civil liability provisions of the FCRA found in [§§] 1681n and 1681o . . . which appl[y] to 'any . . . user of information' that willfully or negligently fail[s] to comply with the statute's requirements." *Cappetta v. GC Servs. Ltd. P'ship*, 654 F. Supp. 2d 453, 460 (E.D. Va. 2009).

Midland to have a "permissible purpose" for obtaining her credit report. (Doc. 97, at ¶ 49) (emphasis in original). "[A]s the Court has repeatedly explained"—*to Hinkle*, in yet *another* case—"it is not necessary for Plaintiff to have had direct dealings with Defendant; for example, one of the 'permissible purposes' for obtaining a consumer report under 15 U.S.C. § 1681b(a)(3)(A) would permit a collection agency retained by a creditor to collect on an account of the consumer." *Hinkle v. CBE Grp.*, No. 11-CV-091, 2012 WL 681468, at *3 (S.D. Ga. Feb. 3, 2012) *report and recommendation adopted*, 2012 WL 676267 (S.D. Ga. Feb. 29, 2012).

And the same goes for debt collectors, as § 1681b "permits a debt collector to request a credit report if it uses the report to review an account." *Pinson v. Monarch Recovery Mgmt., Inc.*, No. 12-CV-80480, 2013 WL 961308, at *2 (S.D. Fla. Mar. 12, 2013) (citation omitted).[26] Here, Hinkle "acknowledges that [s]he is a 'debtor,' that [Midland] is a 'debt collector,' and that [Midland] was attempting to 'collect a debt.'" *Ekhlas v. NCO Fin. Sys., Inc.*, No. 13-CV-0978, 2013 WL 6190660, at *2 (C.D. Cal. Nov. 25, 2013).[27] "Therefore, by alleging that

---

[26] *See also Huertas v. Galaxy Asset Management*, 641 F.3d 28, 34 (3rd Cir. 2011) ("[T]he statute expressly permits distribution of a consumer report to an entity that intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to, or review or collection of an account of, the consumer.").

[27] (*See, e.g.*, Doc. 8, at ¶¶ 39) ("MCM, and Midland operate as a debt buying and collection enterprise."); (*id.* ¶ 92) ("Midland . . . in connection with the collection of a debt"); (*id.* ¶ 94) ("MCM and Midland . . . are still engaging in collection actions . . .").

[Midland] obtained [her] consumer report and then attempted to collect a debt, [Hinkle] has pled [her]self out of [an] FCRA claim by including details contrary to [her] claim." *Salmas v. Portfolio Recovery Associates, LLC*, 13-CV-0575, 2013 WL 6182614, at *3 (C.D. Cal. Nov. 25, 2013).[28]

Accordingly, as this Court has found "time and again," Hinkle's FCRA claim fails as a matter of law and must be dismissed because Midland obtained her credit report for the permissible purpose of "collection" of her accounts.

## VII. The FCRA does not provide a private right of action for inaccurate reporting.

Hinkle apparently agrees with Midland that she cannot state a claim under the FCRA based upon Midland's alleged furnishing of false or inaccurate information to the CRAs.[29] Therefore, she necessarily also concedes that Midland is entitled to summary judgment on Counts I through III to the same extent. *See Nawab v. Unifund CCR Partners*, 553 F. App'x 856, 860 (11th Cir. 2013) ("Because Mr. Nawab lacks standing to bring claims under § 1681 s–2(a), the district court properly granted summary judgment as to Counts I and II.").

---

[28] (*See* Doc. 97, at ¶ 63) ("The telephone calls placed to the Plaintiff's home were for the purpose of collection . . . .").

[29] (*See* Doc. 97, at ¶ 59) ("Defendants voluminous arguments on § 1681s-2(a) . . . are nothing more than a self-serving diatribe designed to distract and mislead the Court as Plaintiff made no allegations under 15 U.S.C. § 1681s-2(a) in her Complaint.").

## VIII. Hinkle has failed to raise a triable issue of fact regarding the reasonableness of Midland's investigation.

Lastly, Hinkle asserts that Midland is not entitled to summary judgment on her FCRA claims because "Defendants have failed to demonstrate exactly what they did to meet the burden of a 'reasonable investigation,' which would be a question of ultimate material fact." (Doc. 97, at ¶ 62). However, "[s]ection 1681s–2(b) generally requires credit information furnishers to conduct a *reasonable* investigation upon receiving notice of a dispute," and "summary judgment is proper if the reasonableness of the defendant's procedures is beyond question." *Howard v. Pinnacle Credit Servs., LLC*, No. 09-CV-0085, 2010 WL 2600753, at *3 (M.D. Ga. June 24, 2010) (quotation omitted; emphasis in original).

As a matter of law, "[a]bsent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, *the furnisher need not do more than verify that the reported information is consistent with the information in its records.*" *Id.* (emphasis added). Here, Hinkle makes no such allegations of fraud or identity theft, nor did she make out a notarized fraud affidavit.[30] "Thus, in order to defeat [Midland's] motion for summary judgment, Plaintiff must establish that upon being notified of Plaintiff's consumer disputes, [Midland] failed to conduct

---

[30]*See* **Exhibit A**, Transcript of March 11, 2014 Deposition of Teri L. Hinkle at 107:23 ("Q.  . . . . [Midland's letter requesting information regarding her dispute] did ask if it's fraud to provide a copy of a police report, FTC, affidavit, or notarized fraud affidavit. And you didn't provide that, right?   A.    Again, why would I? No.").

an objectively reasonable investigation to determine whether the disputed information was inaccurate." *Ware v. Bank of Am. Corp.*, No. 13-CV-1647, 2014 WL 1302605, at *8 (N.D. Ga. Jan. 8, 2014). "The burden of showing the investigation was unreasonable is on the plaintiff." *Id.*

Hinkle comes nowhere close to identifying any genuine issue of material fact sufficient to meet her burden and sustain her claim in the face of Midland's motion. In fact, there is no dispute that Midland conducted a reasonable investigation upon receiving notice from the CRAs of Hinkle's dispute:

> 15. In July 2012, MCM received notice of a dispute from the credit bureaus. MCM verified that it was furnishing the information provided by Debt Recovery Solutions, LLC, and continued to report the T-Mobile Account as "disputed." *See* Ex. E at MIDLAND-HINKLE-000033-34. In addition, on July 21, 2012, MCM sent Plaintiff a letter requesting additional documentation as part of its investigation. *See* **Exhibit H.** Plaintiff responded that she could not furnish MCM with any documentation because the account was not hers. *See* **Exhibit I.**

(Doc. 85-2, at ¶ 15).

Nonetheless, Hinkle contends that Midland cannot rely on its own records to show that it conducted a reasonable investigation of her dispute because "[b]oth alleged accounts were purchased not from original creditors but pursuant to 'as is' contracts with 'no warranty' as to accuracy, validity, or authenticity from other Debt Buyers," and because "[t]hose records contain nothing but hearsay information from other buyers without any authenticating evidence from a

qualified source as to its truth and validity." (Doc. 97, at ¶¶ 62–63). She is mistaken on both counts.

First, as a matter of law, Midland was entitled to rely on the information it received from the original creditor, and "[t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161.[31] Indeed, according to the FTC (which Hinkle admits "can certainly be considered an expert authority on the statute"[32]), a debt buyer is justified in relying upon certain information from the original creditor, "such as the name of the original creditor, the original creditor's account number, the debtor's social security number, the date of last payment, and the date of charge-off."[33] And in response to Hinkle's dispute, Midland "verified that it was furnishing the information provided by Debt Recovery Solutions, LLC," including the same information that the FTC deems sufficiently reliable—the name of the original creditor, the original account number, the last four digits of Hinkle's SSN, the date the account was opened, and the date the account was charged off:

---

[31] *See also Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1174 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt."); *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); *In re Cooper*, 253 B.R. 286, 292 (Bankr. N.D. Fla. 2000) ("Attorneys and debt collectors are entitled to rely on the information they receive from the creditor."); *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996).

[32] (Doc. 97, at ¶ 51).

[33] Federal Trade Comm'n, *The Structure and Practices of the Debt Buying Industry* (Jan. 2013), at 36.

| | |
|---|---|
| Name | TERI HINKLE |
| Street-1 | 6080 PARK BV |
| Street-2 | 6080S |
| City | SOUTH ROCKWOO |
| State | MI |
| Zip | 48179 |
| SSN# | *****6359 |
| Home# | 7343790753 |
| Sale Amount | 300.8 |
| Orig Bal$ | 300.8 |
| C/O Date | 2007/12/29 |
| Open Date | 03/04/2006 |
| Creditor | T-MOBILE |
| DOB | 19520526 |

(Doc. 85-4).

Second, Hinkle is wrong to suggest that Midland could not reasonably rely on supposed hearsay contained in the records it obtained from the assignors of her accounts. Midland's motion for summary judgment need be supported only with "[a]n affidavit or declaration . . . on personal knowledge, [which] set[s] out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). Here, Ms. Ross's affidavit is expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's] business either by [her]self or those under a duty to maintain [such] records." (Doc. 85-2, at ¶ 5).[34] And the

---

[34] *See Stroud v. Bank of Am.*, No. 11-CV-22489, Doc. 143 (Order Denying Plaintiff's Motion in Limine), at 4 (overruling plaintiff's objections to affidavit submitted in support of motion for summary judgment where the affiant "state[d] he [was] responsible for obtaining and examining FIA's records with regard to [plaintiff's] account and that he did, in fact, examine those records and has knowledge of their contents") (entered on Aug. 1, 2012); *see also Stroud v. Bank of Am.*, 886 F. Supp. 2d 1308, 1314 (S.D. Fla. 2012) ("In this case, BOA has more than

"documents attached to the Declaration are either non-hearsay or could be reduced to admissible form," which is all that is required for their admissibility in support of Midland's motion for summary judgment. *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112, (11th Cir. 2010).

In sum, "the evidence establishes that [Midland] reviewed all of its information, along with the information provided by the credit reporting agencies." *Howard*, 2010 WL 2600753, at *4. At the same time, "[Hinkle] has failed to raise a genuine issue of material fact that [Midland's] investigation was unreasonable." *Ware*, 2014 WL 1302605, at *8.[35] She "has presented no evidence that the procedures employed by [Midland] to investigate the reported disputes were in any respect unreasonable," and she "has neither sought discovery on nor produced any evidence whatsoever about the procedures utilized by [Midland]." *Id.* at *8.

"Put plainly," and just as this Court has found before, "the factual matter offered by Plaintiff in her amended complaint establishes nothing beyond speculation as to the 'mere possibility' of a violation of the FCRA." *Hinkle*, 2012

---

amply demonstrated that it conducted a reasonable investigation, that the result of that investigation provided no reason to reach any conclusion other than that the disputed account belonged to Stroud, and that it accurately reported the results of the investigation. For his part, Stroud has failed to provide any *evidence,* as opposed to merely his own allegations or hunches or theories, that the investigation was unreasonable or that BOA reported any inaccurate information. BOA is therefore entitled to summary judgment.").

[35] "[She] has also failed to show any actual inaccuracies that Defendant could have found through conducting a reasonable investigation. ... Plaintiff's failure to demonstrate or establish any actual inaccuracies in the furnished information that a reasonable investigation could have discovered is a separate, sufficient basis for summary judgment." *Id.* at *8, *9.

WL 681468, at *3 (quotations omitted) (affirming dismissal of FCRA claim on the pleadings where the complaint "alleged no facts tending to show that [Defendant] 'willfully' or 'negligently' failed to comply with the FRCA"). Therefore, "[b]ased on the evidence before the Court establishing that [Midland] reviewed all of the information it received regarding [Hinkle's] dispute," the Court should "find[] that [Midland] conducted a reasonable investigation" and is therefore "entitled to summary judgment as to Plaintiff's FCRA claims." *Ware*, 2014 WL 1302605 at *8.[36]

## RESPONSES TO HINKLE'S OBJECTIONS

The Court should overrule Hinkle's objections to the affidavit of Angelique Ross (Doc. 85-2). Hinkle objects to Ms. Ross's affidavit as "untrustworthy"[37]

---

[36] Furthermore, "[e]ven assuming that [Midland's] conduct was not permitted under the FCRA, Plaintiff's complaint only provides conclusory statements that Defendant[s] violated 15 U.S.C. § 1681b by obtaining Plaintiff's consumer report without a permissible purpose." *Pyle v. First Nat. Collection Bureau*, No. 12-CV-00288, 2012 WL 1413970, at *3 (E.D. Cal. Apr. 23, 2012). Without any "factual basis to support [her] claim[,] Plaintiff merely concludes that, because [she] did not owe [Midland] any debt and [Midland] purportedly obtained a copy of [her] credit report, [Midland] was in 'willful violation of the FCRA.'" *Id.* However, Hinkle's "conclusory statements and allegations . . . do not contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* at *4 (quotation omitted). "Merely stating the legal conclusion that Defendant acted willfully but failing to provide any factual basis to support these causes of action is insufficient." *Id.* (quotation omitted).

[37] Hinkle suggests that the Court should strike Ms. Ross's affidavit because she "has proved [*sic*] herself to be an unqualified witness without first-hand knowledge when the Midland Defendants proffered her as an expert witness in an on-going case in the Northern District of California." (Doc. 97, at ¶ 69 n.38) (citing Discovery Order, *Gold v. Midland Credit Management, Inc.*, No. 13-CV-02019, Doc. 65, p. 4 (entered on July 9, 2014)). There, however, Ms. Ross was not found to lack sufficient "first-hand knowledge" of Midland's business records, nor was she found to be "unqualified" as an expert. Rather, Ms. Ross simply had indicated at her Rule 30(b)(6) deposition that she did not possess certain "specific information" responsive to the

because it relies on supposed "hearsay" and because "the information [Ms. Ross] relies on came not from a creditor but the sellers (other [debt] buyers)." (Doc. 97, at ¶ 69). "However, this argument is unavailing as a debt buyer can authenticate a creditor's records in a collection action . . . [u]nder the adoptive business records exception to the hearsay rule." *Clark v. v. Main St. Acquisition Corp.*, No. 12-CV-408, 2013 WL 2295879, at *5 (S.D. Ohio 2013) *aff'd sub nom. Clark v. Main St. Acquisition Corp.*, 553 F. App'x 510 (6th Cir. 2014).

As explained above, Ms. Ross's affidavit is expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's] business either by [her]self or those under a duty to maintain [such] records,"[38] and the "documents attached to the Declaration are either non-hearsay or could be reduced to admissible form." *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112, (11th Cir. 2010). "While the [attached documents] are not directly from the original creditor, they are provided by company persons who have knowledge of company processes and relationship with original creditors, and how charged-off receivables are sold and purchased from original creditors." *Hickman*, 2012 WL 4062694, at *7. Thus, "the records . . . were sufficiently authenticated under the business records exception to the hearsay rule," and Ms.

---

plaintiff's topics of examination. And in the discovery order (cited by Hinkle), the district court merely ordered Midland to make available an additional witness who could provide testimony on the topics identified by the plaintiff.

[38] (Doc. 85-2, at ¶ 5).

Case: 13-15398   Date Filed: 07/10/2015   Page: 242 of 251

Ross's affidavit "fulfills the elements of the business records exception set forth in Federal Rule of Civil Procedure 803." *Id.*[39]

Second, the Court also should overrule Hinkle's objection and decline her request for "the Court to strike [Midland's] Motion for Summary Judgment in its entirety"[40] based on Midland's failure to identify Ms. Ross as an "individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1). Any failure on Midland's part to disclose Ms. Ross "was substantially justified or is harmless" and therefore unworthy of sanctions under Rule 37(c)(1) because:

1.    Ms. Ross is not an "individual likely to have discoverable information." Rather, Ms. Ross is the "custodian" of the documents attached to her affidavit, or an otherwise "qualified witness" capable of attesting to their authenticity. Fed. R. Evid. 803(6)(D). Thus, "[f]rom the Court's perspective, the affidavit served no purpose other than to authenticate the attached documents."

---

[39] *See also United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984) ("To be admitted under [Rule 803(6)] the person who actually prepared the documents need not have testified so long as other circumstantial evidence and testimony suggest their trustworthiness. Nor is it required that the records be prepared by the business which has custody of them.") (quotations and citations omitted); *Hickman v. Alpine Asset Mgmt. Grp., LLC*, No. 11-CV-1236, 2012 WL 4062694, at *7 (W.D. Mo. Sept. 14, 2012) ("To lay an adequate foundation under the business records exception, the custodian of records need not have personal knowledge of the circumstances in which acquisition, use and filing occurred."); Wright & Miller, 30C Fed. Prac. & Proc. Evid. § 7047.

[40] (Doc. 97, at ¶ 71).

*Graham v. Metro. Life Ins. Co.*, No. 07-CV-164 , 2009 WL 73802, at \*6 (S.D.
Miss. Jan. 8, 2009) *aff'd*, 349 F. App'x 957 (5th Cir. 2009).[41]

 2. In fact, Hinkle made no objection to similar records produced during
discovery as attachments to the authenticating affidavit of Patrick Minford, which
likewise was based, in part, on "information received in the ordinary course of
business while performing [his] duties at Midland, and upon a review of Midland's
business records." (Minford Aff., at ¶ 2).

 3. Nor did Hinkle seek to depose Minford or another previously
identified Midland representative,[42] precisely because, as she notes in her Response,
"no individual person [at Midland] communicated with the Plaintiff." (Doc. 97, at
¶ 10). Midland did not identify Ms. Ross (or Mr. Minford) as an "individual likely
to have discoverable information," because "all written communication [with her]
was 'system generated' and not generated by a live person." (Doc. 97, at ¶ 10).

 4. Furthermore, even though each of the documents attached to Ms.
Ross's affidavit previously had been produced to her during discovery, Hinkle

---

[41] *See also Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09-CV-02080, 2011
WL 721263, at \*4 (D. Colo. Feb. 23, 2011) ("Because the Custodian of Records at Pinnacol
Assurance will not give substantive testimony at trial, the Court finds that Defendant's failure to
disclose his name and contact information was harmless."); *U.S. Tech. Corp. v. Ramsay*, No. 08-
CV-00218, 2011 WL 2516597 (S.D. Miss. June 23, 2011) (finding "that U.S. Technology's
failure to disclose Atkinson is harmless" despite "failure to disclose Atkinson as records
custodian" because "no prejudice to the defendants will result if Atkinson is permitted to testify
as a witness").

[42] (*See* Doc. 97, at ¶ 8) (noting that Midland previously identified a separate corporate
representative in response to Hinkle's interrogatory regarding any witnesses Midland may call
upon to testify at trial).

indicated to Midland's counsel and to the Court that she had neither the need nor inclination to depose a Midland representative concerning those (or any other) documents:

> THE COURT: . . . But it sounds like right now you are pretty reasonably satisfied you have everything, and you have to take some depositions to see whether these other speculations of yours might actually have some substance to them.   Is that a fair characterization of where we sit?
>
> MS. HINKLE: I would say on that issue that it is.  I may not need to based on what they did give me and the facts of the case.
>
> \* \* \*
>
> THE COURT: I think Ms. Hinkle has had enough of this document discovery anyway.  She is ready to get to the deposition and get this over with.
>
> MS. HINKLE: And you are absolutely right.  I really truly do not believe other than the purchasing sale [*sic*] agreements that there is anything they could give me.

(Doc. 77, at 7:14–21).

     5.     Indeed, Hinkle was satisfied with the documents that Midland had produced, and never sought to depose a representative of Midland about their authenticity or their content, even though the Court admonished her to conduct any depositions she thought necessary before the close of discovery:

> THE COURT: Now, Ms. Hinkle, I do want to tell you that you do have 45 days but you really need to give some

> serious consideration to whether there are any
> other depositions you want to take because you are
> not going to get another bite at this. This is the last
> opportunity to conduct discovery in the case.

(Doc. 77, at 28:19–24).

Accordingly, the Court should decline to strike Ms. Ross's affidavit or Midland's Motion for Summary Judgment.

## CONCLUSION

The undisputed evidence demonstrates that Hinkle's FDCPA claims fail as a matter of law. Hinkle's FCRA claims do not simply fail as a matter of law; Hinkle knows that they do, as this Court noted in one of the "ten consumer credit cases that she ha[d] filed in this district between August 2011 and July 2012."[43] There, the Court "easily conclude[d] that the instant lawsuit was filed in bad faith and for the purpose of harassment."[44] And the same is true here. Therefore, Midland asks that the Court retain jurisdiction solely for the purpose of awarding attorney's fees to Midland under 15 U.S.C. § 1681n(c), pursuant to a separate motion to follow.

Respectfully submitted this the 19th day of September, 2014.

/s/ Matthew B. Ames
Matthew B. Ames / Ga. Bar No. 015898
Joshua M. Moore / Ga. Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia 30308

---

[43] *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 14 (entered on May 20, 2013).

[44] *Id.* at 15.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 19th day of September, 2014:

> Teri Lynn Hinkle
> 322 Bethel Street
> Eastman, Georgia 31023

> /s/ Matthew B. Ames
> Matthew B. Ames
> Georgia Bar No. 015898

Plaintiff's Appendix Document No - 102

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

| | | |
|---|---|---|
| TERI LYNN HINKLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV 313-033 |
| | ) | |
| MIDLAND CREDIT MANAGEMENT, | ) | |
| INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

———————

**O R D E R**

———————

Before the Court is Defendants' Motion to File Under Seal, which requests an order from the Court directing Plaintiff to file under seal certain confidential and trade secret information belonging to Defendants.  (Doc. no. 93.)   Defendants made their request for a sealing order because, in accordance with a previously entered Confidentiality Agreement and Consent Protective Order (see doc. no. 82), Plaintiff notified Defendants of her intent to include information about two Account Purchasing Agreements in her response to Defendants' motion for summary judgment.  By Order dated September 3, 2014, the Court directed Plaintiff to file the entirety of her response to Defendants' motion for summary judgment under seal and also directed Defendants to file a brief, in accordance with the provisions of Loc. R. 79.7, explaining why information in Plaintiff's responsive brief and/or accompanying exhibits should be sealed rather than, for example, appropriately redacted.

In their supplemental briefing, Defendants alter their original request for a sealing order as to the entirety of Plaintiff's response to the motion for summary judgment.  (See doc. no. 99.)  Having reviewed Plaintiff's response, Defendants state, "But because Plaintiff did not quote or otherwise

incorporate the confidential terms of the Account Purchase Agreements in her Response, [Defendants] request only that the Account Purchase Agreements – but not the Response itself – be sealed for a period of one year from the conclusion of this litigation, and any subsequent appeal." (Id. at 2.)  The Account Purchase Agreements are specifically identified as (1) the Assignment of Accounts between Midland and AIS Services, LLC dated September 24, 2008 (bates labeled PlainApp. 00086-PlainApp. 00102); and (2) the Account Purchase Agreement between Midland and Debt Recovery Solutions, LLC dated December 6, 2011 (bates labeled PlainApp. 00103-PlainApp. 00124).  (Id.)  Plaintiff complied with the Court's directive to file the entirety of her response to the motion for summary judgment under seal, but she does not voice any opposition to the unsealing of all but the Account Purchase Agreements identified by Defendants in their supplemental briefing.

Under Local Rule 79.7(d), "part[ies] seeking to have any matter placed under seal must rebut the presumption of the openness derived from the First Amendment by showing that closure is essential to preserve some higher interest and is narrowly tailored to serve that interest."  As the Local Rules reflect, the filing of documents under seal is generally disfavored, because "[t]he operations of the courts and the judicial conduct of judges are matters of utmost public concern, and the common-law right of access to judicial proceedings, an essential component of our system of justice, is instrumental in securing the integrity of the process." Romero v. Drummond Co., 480 F.3d 1234, 1245 (11th Cir. 2007) (internal quotations and citations omitted).  "The common law right of access may be overcome by a showing of good cause, which requires balancing the asserted right of access against the other party's interest in keeping the information confidential." Id. (citing Chicago Tribune Co. v. Bridgestone/Firestone, Inc., 263 F.3d 1304, 1309 (11th Cir. 2001) (per curiam)).  When balancing these interests,

2

courts consider, among other factors, whether allowing access would impair court functions or harm legitimate privacy interests, the degree of and likelihood of injury if made public, the reliability of the information, whether there will be an opportunity to respond to the information, whether the information concerns public officials or public concerns, and the availability of a less onerous alternative to sealing the documents.

Id. at 1246.

"[A] party's privacy or proprietary interest in information sometimes overcomes the interest of the public in accessing the information," id., such as when the information could serve as "sources of business information that might harm a litigant's competitive standing." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 598 (1978)). Courts have found that parties' interests in the terms of confidential agreements can outweigh the public right of access. See, e.g., Graphic Packaging Int'l, Inc. v. C.W. Zumbiel Co., No. 3:10-cv-891, 2010 WL 6790538, at *2 (M.D. Fla. Oct. 28, 2010); Mars, Inc. v. JCM Am. Corp., No. 05-3165, 2007 WL 496816, at *2-3 (D.N.J. Feb. 13, 2007) (finding that public disclosure of confidential business agreements would result in injury to the plaintiff because it would sacrifice the plaintiff's competitive negotiating position).

The parties' desire to seal court documents "is immaterial to the public right of access." Brown v. Advantage Eng'g, Inc., 960 F.2d 1013, 1016 (11th Cir. 1992). In the absence of a third party challenging the protection of information, the Court serves as "the primary representative of the public interest in the judicial process," and must "review any request to seal the record (or part of it) [and] may not rubber stamp a stipulation to seal the record." Estate of Martin Luther King, Jr., Inc. v. CBS, Inc., 184 F. Supp. 2d 1353, 1363 (N.D. Ga. 2002).

Upon consideration, the Court finds the information provided in the supplemental briefing about the content of the Account Purchase Agreements satisfies Defendants' burden of showing good cause for sealing these two exhibits because of the potential harm to their

3

competitive standing if the information were made public.  Accordingly, the Court **GRANTS IN PART** the motion to seal (doc. no. 93), as set forth herein.

Accordingly, the Court hereby **DIRECTS** the Clerk to unseal Plaintiff's response to the motion for summary judgment except for the Account Purchase Agreements attached as exhibits on the pages bates labeled PlainApp. 00086 - PlainApp. 00124.  Said agreements shall remain sealed for a period of one year after the later of (i) entry of final judgment or (ii) conclusion of a direct appeal, if any.

SO ORDERED this 25th day of September, 2014, at Augusta, Georgia.

_____
BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA

4