CASE NO. 15-10398-F

---

UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

TERI LYNN HINKLE,

Plaintiff—Appellant

v.

MIDLAND CREDIT MANAGEMENT, INC.;

MIDLAND FUNDING LLC; AND

ENCORE CAPITAL GROUP INC.

Defendants—Appellees,

BRIEF OF PLAINTIFF – APPELLANT TERI LYNN HINKLE

*Appeal from the United States District Court, Southern District of Georgia, Dublin Division*

Craig K. Perry
Attorney at Law
Nevada Bar No. 3786
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
(702) 228-4777
*Attorney for Plaintiff-Appellant Teri Hinkle*

## CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT

The following is a list of the trial judge(s) and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case on appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

| Name: | Role in case |
|---|---|
| -Craig K. Perry, Esq. | as attorney for Appellant; |
| -Craig K. Perry & Associates, | as attorneys for Appellant; |
| -Teri Hinkle, | as named Appellant; |
| -Matthew B. Ames, Esq., | as attorney for Appellees/Defendants; |
| -Jason Brent Tompkins, Esq., | as attorney for Appellees/Defendants; |
| -Balch & Bingham, LLC, | as attorneys for Defendant/Defendants; |
| -Encore Credit Group, Inc. | as Appellee/Defendant; |
| -Midland Credit Management, Inc. | as Appellee/Defendant; |
| -Midland Funding, LLC, | as Appellee/Defendant; |
| -H. Dudley Bowen, Jr., | as District Court Judge; |

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Teri Lynn Hinkle ("Hinkle") does not believe that oral argument will be required in order to render a ruling; nonetheless, counsel for Appellant is willing to appear for any oral argument that this Court deems necessary or helpful in adjudicating the issues.

## CERTIFICATE OF SIZE AND STYLE

This brief is written in 14 point Times New Roman using Microsoft Word, converted to Adobe PDF.

# TABLE OF CONTENTS

Page

CERTIFICATE OF INTERESTED PARTIES……………………....…………… i

STATEMENT REGARDING ORAL ARGUMENT…………………………... ii

CERTIFICATE OF SIZE AND STYLE…………………………………………… ii

TABLE OF CONTENTS…………………………………………………………. iii

TABLE OF AUTHORITIES……………………………………………….... v

STATEMENT OF JURISDICTION……………………………………….. 1

STATEMENT OF THE ISSUES………………………………………... 2

STATEMENT OF THE CASE………………………………………….. 3

I. FACTUAL AND PROCEDURAL OVERVIEW OF THE CASE………..… 4

   A. Statement of Relevant Facts………………………………………..... 4

   B. Statement of Relevant Case Procedure…………………………… 6

II. STANDARD OF REVIEW……………………………………….. 7

III. SUMMARY OF THE ARGUMENT……………………………........... 8

III. ARGUMENT/CITATIONS OF AUTHORITIES………………....……… 13

  I. Midland's Motion for Summary Judgment should have been denied for
    not disclosing a key witness and for defects in the affidavit of
    Angelique Ross in violation of FCRP 6(e)……………………………… 13

   A. Midland prejudiced Hinkle's ability to engage in meaningful
     discovery by refusing to disclose their main witness, Angelique
     Ross, prior to the close of discovery………………………………….. 13

B.  Angelique Ross did not possess the requisite knowledge to support
    Midland's motion for summary judgment as required by Rule 56(e)... 17

II.  Hinkle (1) Has proven by a preponderance of the evidence or
     alternatively, (2) can present genuine issues of material fact
     against Midland for violations of federal law as set forth in
     her amended complaint…………………………………………………… 22

     A.  Midland negligently or willfully failed to conduct a reasonable
         investigation based upon the nature of Hinkle's dispute letters as
         required by 15 U.S.C § 1691s-2(b)…………………………………….. 22

     B.  Midland did not have a permissible purpose to obtain Hinkle's credit
         report…………………………………………………………………….. 29

III.   Midland violated the FDCPA; Hinkle's oral dispute was valid………....  32

CONCLUSION………………………………………………………………….. 34

CERTIFICATE OF COMPLIANCE…………………………………………… 37

CERTIFICATE OF FILING AND SERVICE………………………………….. 37

# TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

*Bersaw v. Northland Group Inc.*, Civil No. 14-cv-128-JL
   Opinion No. 2015 DNH 050, District……………………………….. 30, 31

*Brim v. Midland Credit Management, Inc.*,
   795 F. Supp.2d 1255 (2011)…………………………………………  17

*Cahlin v. Gen. Motors Acceptance Corp.*,
   936 F.2d 1151 (11th Cir. 1991)……………………………………  24

*Cambridge Electronics Corp. v. MGA Electronics*,
   227 F.R.D. 313 (C.D. Cal. 2004)…………………………………  14

*Camacho v. Bridgeport Fin., Inc.*,
   430 F.3d 1078 (9th Cir. 2005)……………………………………  33

*Gold v. Midland Credit Management, Inc., et al* ,
   No. 13-cv-02019-BLF, Dist. Ct., N.Ca., (2014)…………………………  17

*Green v. RBS Nat. Bank*,
   228 F. App'x 691 (11th Cir. 2008)………………………………..  23

*Harrison v. Culliver*,
   746 F.3d 1288 (11th Cir. 2014)……………………………………   8

*Itel Capital Corp. v. Cups Coal, Co.*,
   707 F.2d 1253 (11th Cir. 1983)……………………………………  19

*Johnson v. MBNA Am. Bank, NA*,
   357 F.3d 426 (4th Cir. 2004)………………………………… 25, 26

*Nieves v. Univ. of P.R.*,
   7 F. App'x, 384 (11th Cir. 1993)……………………….………………  31

*Orozco v. Midland Credit Management Inc.*,
   No. 2:12-cv-02585-KJM-CKD, Fed. Dist. Ct., E. Ca., (2013)…..………...  17

v

*Peart v. Shippie,*
  345 F. App'x 384 (11th Cir. 2009)…………………………………………… 23

*Sampson v. Washington Bank,*
  453 F. App'x 863 (11th Cir. 2011)…………………………………………… 23

*Williams v.Bellsouth Telecommunications, Inc.,*
  373 F.3d 1132 (11th Cir. 2004)……………………………………………  7

*United States v. Bueno Sierra,*
  99 F.3d 375 (11th Cir. 1996)………………………………………………… 19

*United States v. Petrie,*
  302 F.3d 1280 (11th Cir. 2002)……………………………………………… 19

*Urquilla-Diaz v. Kaplan Univ.,*
  780 F.3d 1039 (11th Cir. 2015)……………………………………………  7

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.,*
  259 F.3d 1101 (9th Cir. 2001)……………………………………………….. 14

**Statutes**

Fair Debt Collection Practices Act

  15 U.S.C. § 1692 et. seq………………………………………............  3

  15 U.S.C. § 1693a(a)………………………………………………....... 31

  15 U.S.C. § 1692e……………………………………………….............  2

  15 U.S.C. § 1692g(a)…………………………………………………… 2, 33

Fair Credit Reporting Act

  15 U.S.C. § 1681 et. seq…………………………………………............... 3

  15 U.S.C. § 1681b(a)……………………………………………………….12, 30

  15 U.S.C. § 1681(b)(a)(3)(A)…………………………………..1, 2, 3, 11, 12, 30

15 U.S.C. § 1681s-2(a)……………………………………………….... 22

15 U.S.C. § 1681s-2(b)…………………………………………1, 2, 10, 22, 23, 24

15 U.S.C. § 1681s-2(b)(1)(E)(ii)…………………………………………. 28

15 U.S.C. § 1681i(a)(1)(A)…………………………………….…… 27

**Rules**

Fed. R. Civ. P. 26(a)(1)………………………………………… 2, 9, 14

Fed. R. Civ. P. 26(e)(2)………………………………………….…. 10, 14

Fed. R. Civ. P. 33…………………………………………….….  14

Fed. R. Civ. P. 37(c)(1)………………………………………...…. 2, 9, 14, 36

Fed. R. Civ. P. 56(e)………………………………………….…….. 2, 13, 17

Fed. R. Evid. 803(6)(d)…………………………………………….. 18

## STATEMENT OF JURISDICTION

A. Jurisdiction of the District Court. The District Court has subject matter jurisdiction over this matter. The action was brought under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681b(a)(3)(A) and 1681s-2(b) and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692g, 1692d and 1692e.

B. Jurisdiction of this Court. This Court has jurisdiction over this appeal. The appeal is from a final order entered by the District Court granting the Motion for Summary Judgment of Defendants/Appellees Midland Credit Management Inc., Midland Funding LLC, and Encore Capital Group Inc.'s (hereafter referred to collectively as "Midland").

C. Filing Dates of This Appeal. This appeal was timely filed. On January 6, 2015 judgment was entered in favor of Midland, pursuant to the District Court's order granting the Motion for Summary Judgment, also filed on January 6, 2015. Plaintiff/Appellant's ("Hinkle") Notice of Appeal was filed on January 30, 2015, and receipt of fees was filed on February 12, 2015.

D. This case is an appeal from a final order, which was the Order granting Summary Judgment in favor of Midland, on the dates set forth in the preceding paragraph. The granting of this motion disposed all of the parties' claims.

1

## STATEMENT OF THE ISSUES

1.      Whether Midland's failure to comply with Fed. R. Civ. P. 26(a)(1) precludes the testimony of Angelique Ross pursuant to Fed R. Civ. P. 37(c)(1).

2.      Whether the affidavit of Angelique Ross met the standards for reliability for an affidavit in support of Midland's motion for summary judgment as required by Fed R. Civ. P. 56(e) and the Federal Rules of Evidence.

3.      Whether genuine issues of material fact remain for trial—as raised by Hinkle—that render the lower court's granting of summary judgment improper.

4.      Whether, given the issues raised in Hinkle's dispute letters to the consumer reporting agencies, Midland conducted an investigation that was reasonable under the circumstances, as required by 15 U.S.C § 1681s-2(b) of the Fair Credit Reporting Act.

5.      Whether Midland failed to establish that these alleged debts emanated from alleged "accounts" of the type covered by 15 U.S.C. § 1681b(a)(3)(A).

6.      Whether (a) Hinkle's oral dispute of the debt 15 U.S.C. § 1692g(a) was proper, and (b) Hinkle adequately presented a prima facie case for violations of the provisions of 15 U.S.C. §§ 1692g(a), 1692d and 1692e of the Fair Debt Collection Practices Act.

## STATEMENT OF THE CASE

Appellant, Teri Lynn Hinkle ("Hinkle") sued Appellees, Midland Credit Management Inc., Midland Funding LLC, and Encore Capital Group Inc. (collectively referred to hereafter as "Midland") for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C § 1681 et seq., and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq. (Doc. 8), as follows:

**FCRA violations**. Hinkle alleges that Midland violated two provisions of the FCRA: (1) 15 U.S.C § 1681s-2(b), for failure to conduct a reasonable investigation in response to her dispute letters sent to Equifax, Experian and TransUnion and 15 U.S.C § 1681b(a)(3)(A), for failing to have a permissible purpose in obtaining her credit report.

**FDCPA violations**. Hinkle orally and timely disputed that the alleged debts on these alleged accounts that Midland claims they had, did not belong to her; Midland not only reported false information about her in violation of 15 U.S.C. § 1692e but also continued to report the GE-Meijer debt, which was paid by an unidentified payer *prior* to Midland's first reporting.

Hinkle contends that the lower court erred in granting summary judgment due to (1) misapplication of the law, the rules of court & applicable case law, and (2) because genuine issues of material fact exist for the trier of fact.

3

# I.
## FACTUAL AND PROCEDURAL OVERVIEW OF THE CASE

**A.**     <u>Statement of relevant facts</u>

Hinkle ordered credit reports in May of 2011 and discovered that each one contained false and erroneous information concerning an alleged debt with GE-Meijer. (Doc. 58, Ex. 10a-e.)  Months later, she ordered them again and found another error—this time an alleged debt with T-Mobile.  (Doc. 58, Ex. 10f-q.) Both alleged debts were being reported by the same junk debt buyer entities, Midland. (Doc. 58, Ex. 10a-q). Further, Midland mischaracterized these alleged debts differently to the credit reporting agencies (hereafter "CRAs") as summarized in this chart (Doc. 58, Ex. 10a-q):

| Table 1: Summary of Midland's Reporting to the CRAs | | | |
|---|---|---|---|
| Alleged Debt | Experian | Equifax | Transunion |
| GE/Meijer | "open" and "open" (two entries) | "paid and closed" | "open" |
| T-Mobile | "open" | "open" | "open" |

On September 6, 2011 Hinkle sent a dispute letter to each CRA, informing them that these alleged debts did not belong to her. (Doc. 97-2, Ex. PA00046-48.) Responses to her dispute letters varied, as summarized in this table (Doc. 58 Ex. 10a-q):

4

| Table 2: Results of Hinkle's Dispute Letters of Sept. 6, 2011 | | | |
|---|---|---|---|
| | Experian | Equifax | Transunion |
| GE/Meijer Account | Account updated; reporting continues | "Deleted" No longer reporting | Account verified; reporting continues |

On December 27, 2011, Midland called Hinkle, and she orally and unambiguously *disputed* any alleged debts. (Doc. 97-2, Ex. PA 00001-5, 36.)[1] Days later, Hinkle received a dunning letter from Midland for the alleged T-Mobile account, reported to each CRA as "open" (*See* Table 1).

On February 5, 2012, Midland wrote Hinkle a letter requesting that she **prove the non-existence** of the alleged T-Mobile debt.  (Doc. 85-9, Ex. G.)  On May 7, 2012, Midland had obtained her TransUnion credit report without her permission.  (Doc. 58, Ex. 10L.) On July 13, 2012 Hinkle again filed a dispute as to both accounts (Doc. 97-2, Ex. PA 00049-51.) with the following results summarized in Table 3 below:

| Table 3: Results of Hinkle's Dispute Letters of July 13, 2012 | | | |
|---|---|---|---|
| | **Experian** | **Equifax** | **Transunion** |
| GE/Meijer Account | No longer reporting as of July 13, 2012 | No longer reporting | Account deleted |
| T-Mobile Account | Continued reporting | Continued reporting | Deleted |

On April 30, 2013, after nearly two years of unsuccessful attempts to correct the errors, Hinkle filed suit, and thereafter filed an Amended Complaint against

---

[1] Midland's notes confirm Hinkle disputed it, but with a call date of December 28th. (Doc.97-2, Ex.00027, 28)

Midland on June 27, 2013, alleging violations of the FDCPA and FCRA (Doc. 8).

B.    **Statement of relevant procedural facts**

Hinkle filed an individual Discovery Plan (Doc. 30) after repeated, failed attempts to file jointly with Midland (*See* Doc. 30, Ex.2).[2] Thereafter, Midland never provided the required Rule 26(a)(1) disclosures due by November 11, 2013 (Doc. 29, p. 1 ¶4).  Hinkle tried (a) phone calls, (b) a letter to Tully T. Blalock, (defense counsel of record) (Doc. 55, Ex. 9), (c) raising the issue in her motions to compel (Doc. 39, 40 and 41 ¶s 24) in Doc. 50- ¶ 9, and (d) pointing out that the disclosures were over 100 days late (Doc. 55). No disclosures were ever made.

Hinkle's discovery requests for the identity of witnesses who may be called to testify, as well as those with knowledge concerning the case (Doc. 97-2 PA00061-68), were ignored; she objected to the Affidavit of Patrick Minford,[3] who was used as a "Declarant," and later, Angelique Ross the undisclosed affiant proffered in support of their motion for summary judgment. Hinkle's objections to testimony from these witnesses were again raised in her Opposition to Defendants' Motion for Summary Judgment. (Doc. 97-28). The lower court did not sustain Hinkle's objections.

---

[2] Initially, there were concerns about disclosure of trade secrets, however the parties signed a **Protective Order Agreement** (Doc. 82), and thereafter, Midland continued to refuse to comply with the disclosure requirements.

[3] Patrick Minford, in his affidavit continually referred to the Plaintiff, Teri Hinkle, as the "Defendant," raising the issue of whether his affidavit was merely boilerplate and whether he actually reviewed it before he signed it.

During the course of litigation, Hinkle had to file a total of four motions to compel answers to discovery (Docs. 32, 34, 36, 50).[4]

On July 28, 2014, Midland filed their motion for summary judgment (Doc. 85). Their "Statement of Undisputed Material Facts" (Doc. 85-1) was formulated entirely on the testimony of Angelique Ross, the undisclosed witness who proceeded to attempt to lay the foundation for the admissibility of hearsay records as an "other qualified witness." On September 8, 2014, Hinkle filed her Opposition to Midland's motion for summary judgment (Doc. 97). On September 19, 2014, Midland filed their Reply in support of their motion (Doc. 101).

On January 6, 2015, U.S. District Court Judge Bowen granted Midland's motion for summary judgment, dismissing the entire case. (Doc. 105.) On Jan. 30, 2015, Hinkle filed her Notice of Appeal (Doc. 107).

## II.
## STANDARD FOR REVIEW

Summary judgment determinations of the lower district court receive *de novo* review on appeal, and the same legal standards that governed the district court's disposition apply. *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004). "(W)e review the district court's grant of summary judgment de novo, construing the evidence and all reasonable inferences therefrom in favor of the nonmoving party." *Urquilla-Diaz v. Kaplan Univ.*, 780

---

[4] Hinkle's third motion, a motion for reconsideration (Doc. 50), was treated as a motion to compel by the District Court.

7

F.3d 1039, 1050 (11th Cir. 2015). "Summary judgment is appropriate where the

pleadings, affidavits, depositions, admissions, and the like 'show that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law.'" *Id* at p. 1050.

"An issue of fact is 'material' if, under the applicable substantive law, it

might affect the outcome of the case. (A)n issue of fact is 'genuine' if the record

taken as a whole could lead a rational trier of fact to find for the nonmoving party."

*Id* at p. 1050, *citing to Harrison v. Culliver,* 746 F.3d 1288, 1298 (11th Cir.2014)

(quoting *Hickson Corp. v. N. Crossarm Co.,* 357 F.3d 1256, 1259–60 (11th

Cir.2004) (internal citations and quotation marks omitted).

## III.
## SUMMARY OF THE ARGUMENT

In her First Amended Complaint, Plaintiff Teri Hinkle sued Midland Credit

Management, Inc., Midland Funding LLC and Encore Capital Group Inc. (referred

to collectively as "Midland") for violations of the FCRA and the FDCPA

concerning two alleged debts that Midland had acquired in a daisy chain of

purchases between it and other predecessor debt buyers—Midland never had any

contact with these original creditors (GE-Meijer or T-Mobile). Hinkle properly

notified Midland that she never maintained an account with either alleged creditor.

She also sent dispute letters to each of the credit reporting agencies Equifax,

Experian and Transunion, and achieved marginal, mixed results with corrections or

8

deletions. Midland admitted it did not conduct any meaningful re-investigation, arguing it was not required in this case.

Hinkle's claims of FCRA and FDCPA violations were dismissed when the lower court accepted all of Midland's arguments and granted the companies' motion for summary judgment.

In granting Midland's motion for summary judgment, the lower court committed four reversible errors. First, the lower court failed to exclude the affidavit of a previously undisclosed witness, Angelique Ross, who provided the foundation of Midland's list of undisputed facts, as well as their argument in favor of summary judgment. Next, the lower court erred on two aspects of the FCRA. The court should not have adopted Midland's argument that Midland did not need to perform a more meaningful investigation. Also, the court should not have found that Midland had proven it had a statutorily permissible purpose to access Hinkle's credit file. Finally, the lower court erred when it dismissed Hinkle's FDCPA claim, since Hinkle had properly (orally) disputed the alleged T-Mobile debt, which triggered a duty to verify the accuracy of the information they were reporting. Each of these errors is summarized below.

**Error No. 1. Permitting Midland to benefit from its obstructive discovery tactics, in violation of Fed. R. Civ. P. 37(c)(1).** Hinkle never received 26(a)(1) disclosures from Midland and had to compel discovery responses on four

occasions. After the close of discovery, and in sole support of its motion for summary judgment, Midland produced an affidavit from one Angelique Ross, who had never been disclosed. This deliberate tactic eliminated Hinkle's opportunity to voir dire Ross, cross examine Ross, and test Ross's ability to meet the burden of proof required of Fed R. Civ. P. 56(c)(4) affiants in support of a motion for summary judgment.

Pursuant to Fed R. Civ. P. 37(c)(1), "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), **the party is not allowed to use that** information or **witness** to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (Bold added for emphasis.) The failure to disclose Ross in this case was neither substantially justified nor harmless.

**Error No. 2. Concluding that Midland conducted a proper investigation in this case (15 U.S.C. § 1681s-2(b)).** Hinkle properly sent dispute letters to each of the credit reporting agencies ("CRAs"), which triggered a duty of re-investigation on both the CRAs and the furnishers (Midland). The court accepted Midland's argument that the Plaintiff had a duty to participate in the investigation. However, this fails on two counts. First, Plaintiff, under the circumstances of this case, did not have anything to offer in an investigation, since these accounts did not belong to her. Therefore, her involvement was irrelevant. In some cases, such a

request might be appropriate; for example, a consumer says an account is paid in full, and is asked to provide proof of payment so further collection efforts can cease.

Second, any request for assistance by Midland to Hinkle was made after the 30-day investigation window; therefore, even assuming Hinkle was required to assist, a timely request was not received.

Third, Midland could have performed a reasonable investigation as to T-Mobile, since the purchase agreement afforded full cooperation by the predecessor debt buyer to validate the debt at no charge, and as to the GE-Meijer account, since their purchase agreement with the predecessor debt buyer indicates they would not assist in the validation process, Midland could not properly re-investigate and should have notified the CRAs that it could not verify, resulting in deletions.

Finally, the inconsistency of responses from each CRA's investigation, resulting in some but not all deletions, creates an issue for the trier of fact as to what was done with each request by each CRA to Midland that resulted in those inconsistent results, and whether any re-investigation as to each request by CRAs was reasonably conducted.

**Error No. 3. Concluding from the evidence that Midland had a permissible purpose to access Hinkle's credit file and obtain a credit report (15 U.S.C. § 1681b(a)(3)(A)).** Midland had insufficient information to conclude

that Hinkle had an "account" that would permit Midland to obtain a report of her credit. Specifically, Section 1681b(a)(3)(A) states that qualified persons can obtain a credit report if it relates to an account as defined by these statutes. The term "account" is defined by reference in this statute "and no other" type of account can provide a basis to obtain a credit report. The word "debt" is conspicuously absent from (b)(a)(3)(A), and the court erred by failing to look beyond the allegations that the information was going to be used to attempt to collect an alleged "debt." "Debt" is not synonymous with "account;" the word "account" as used in 1681b(a) has specific statutory limits (15 U.S.C. § 1693a(2), which refers to 15 U.S.C. § 1602(j)). Every debt is not an account, nor is every account a debt.

In discovery, Midland did not produce any evidence that these debts comported with the definition of "accounts" as defined above—for example— whether these alleged to be "open" accounts (which is one type of account for which a permissible purpose may exist). In the absence of any evidence as to what type of accounts Midland believed these to be, the lower court could not have concluded at this time that access to Hinkle's credit file was permissible; first, an investigation as to the type of account that is in question should have been demonstrated, and the evidence in support thereof. Alternatively, at the very least, it is a question of fact for the trier of fact.

12

**Error No. 4. Holding that a written dispute as required by the FDCPA (15 U.S.C. § 1692g(b) is the only proper type of dispute that triggers a duty to verify a debt.** The lower court adopted Midland's misdirected argument that all disputes of an alleged debt must be in writing. While that may be true for purposes of Section 1692g(b), it is not the case for purposes of the preceding subsection, Section 1692g(a), under which the courts have held oral disputes are valid. Hinkle orally disputed the alleged T-Mobile debt in compliance with 1692g(a), and Midland acknowledged the oral dispute from their records.

Once an oral dispute has been made, Midland should verify the information before reporting it; in this case, they could not say whether the accounts were valid because they did not verify them; in addition, they continued to report the GE-Meijer account as unpaid to the CRAs, even after their own records reflected that it had been paid.

### IV.
### ARGUMENT/CITATIONS OF AUTHORITIES

I. MIDLAND'S MOTION FOR SUMMARY JUDGMENT SHOULD HAVE BEEN DENIED FOR NOT DISCLOSING A KEY WITNESS AND FOR DEFECTS IN THE AFFIDAVIT OF ANGELIQUE ROSS IN VIOLATION OF FCRP 56(e)

**A. Midland prejudiced Hinkle's ability to engage in meaningful discovery by refusing to disclose their main witness, Angelique Ross, prior to the close of discovery.**

Midland refused to participate fully in the discovery process. Midland never provided an initial document and witness disclosure—as required by Rule 26(a)(1), and subsequently never supplemented with any disclosures as required by Rule 26(e)(2). Midland also ignored its ongoing and far-reaching duty to "seasonably" supplement interrogatory responses under Rule 33 where the responses are incomplete or incorrect. *Cambridge Electronics Corp. v. MGA Electronics,* 227 F.R.D. 313, 332 (C.D. Cal. 2004).

Unless Midland demonstrates that its violation of Rule 26 was either harmless or substantially justified, prejudice to Hinkle has occurred. Further, Fed. R. Civ. P. 37(c)(1) requires the lower court to impose the sanction of as precluding that party from introducing the evidence not disclosed pursuant to Rule 26(e). Fed. R. Civ. P. 37(c)(1) provides that the evidence is not allowable. Therefore, Ross's affidavit should not have been allowed: "the party [Midland] **is not allowed to use that information or witness to supply evidence** on a motion, at a hearing," if it is not produced under 26(a). *See* Fed. R. Civ. P. 37(c)(1). (Bold added for emphasis.) *See also, Yeti by Molly, Ltd. v. Deckers Outdoor Corp.,* 259 F.3d 1101, 1106 (9th Cir. 2001). However, this remedy was not adhered to by the lower court, and this was improper.

Next, Midland waited until after the close of discovery before producing its sole, surprise witness in support of its motion for summary judgment. At that time,

Midland produced the name and affidavit of affiant Angelique Ross. Using Ross's affidavit, Midland unabashedly laid foundation for a litany of what they allege to be undisputed facts that Ross states she was "familiar with," including prior owners of the alleged debts and accounts without any authorization from prior owners to speak on behalf of "their records." (Doc. 85-2-1).

We know that Angelique Ross ("Ross") did not possess any personal knowledge of either alleged debt or accounts, and Midland admitted this: "Midland did not identify Ms. Ross (or Mr. Minford) as an 'individual likely to have discoverable information,' because all '**written communication [with her] was 'system generated' and not generated by a live person.**'" (Doc. 101, p. 23, ¶ 3; bold added for emphasis).

Ross's name, and the nature of her testimony, should have been disclosed prior to the close of discovery. It amounted to argument by ambush, or worse yet, summary trial without the opportunity to cross-examine. At the beginning of a trial, a party can voir dire witnesses. In this case, by virtue of the stratagem used by Midland, Plaintiff was precluded from the opportunity to vet Ross or challenge her factual claims as an "other qualified witness."

Hinkle was a cypher in her own case; her repeated pleas for disclosure and adequate discovery responses were met by silence, avoidance, and obstruction. Her diligence was rewarded with a surprise, ambush attack. This was neither

"harmless" nor "substantially justified." Midland's tactic worked perfectly; by ignoring the rules of discovery, Midland presented evidence that Hinkle could not adequately have had the opportunity to rebut, which seriously prejudiced her case.

Hinkle should have been permitted to investigate, depose and voir dire Ross as to her knowledge or competency and qualifications as to these supposed accounts of hers. Also, Ross was Hinkle's opportunity to cross-examine a representative of Midland as to the permissible purpose in accessing her credit file concerning these alleged "accounts."

Midland insinuates that because Hinkle did not claim she needed *anything* else in the case, it somehow follows that this statement waived Midland's responsibility to disclose its key witness, Angelique Ross. (Doc. 101, p. 24-25). First, Hinkle's statement was based on what she had been provided up to that point in time. Second, Hinkle qualified her statement by saying, "I may not need to *based on what they did give me* and the facts of the case." (Doc. 101, p. 24, italics added for emphasis). Finally, Midland's duty of disclosure is immutable, and had Midland disclosed Ross's name and anticipated testimony, Hinkle would have learned the importance of Ross's testimony and would have had the opportunity to question her.

Midland's use of Ms. Ross's testimony after the close of discovery—without disclosing her—was neither accidental nor unintentional; it had to be a calculated

16

strategy by design in order to prejudice Hinkle's ability to prosecute her case or raise any legitimate defenses. All of the so-called undisputed facts (Doc. 85-1) that laid the foundation of their motion for summary judgment came directly from the affidavit of Ross.

It now appears that Ross is a routine, professional witness for Midland-- someone regularly presented in the capacity of a corporate representative affiant and witness against various Plaintiffs in similar cases. *See, for example, Brim v. Midland Credit Management, Inc.,* 795 F. Supp.2d 1255 (2011), *Gold v. Midland Credit Management, Inc., et al*, No. 13-cv-02019-BLF, Dist. Ct., N. Cal., (2014), *and Orozco v. Midland Credit Management Inc*., No. 2:12-cv-02585-KJM-CKD, Fed. Dist. Ct., E. Ca., (2013).

Ross is well aware of the fact, as she has both seen and been privy to in prior cases, that Midland buys "junk" or "zombie" debt from a daisy chain of predecessor debt buyers who use "quitclaim" language such as "without recourse or warranty" in their Purchase Agreements because they know that the purchased information is unreliable and therefore NOT trustworthy. Both Ross and her boss are well aware of this practice, as Midland signs off on these agreements--the same as other junk debt buyers nationwide. (Doc. 97-2 PA00009, 10, 86-124).

**B.     Angelique Ross did not possess the requisite knowledge to support Midland's motion for summary judgment as required by 56(e)**

Even assuming Ms. Ross had been properly and timely disclosed, her affidavit fails to meet the requirements of Rule 56(e) for three reasons. First, she did not have the requisite personal knowledge. Second, she is neither a custodian nor qualifies as an "other qualified witness" as required by the hearsay exclusion set forth in Fed R. Evid. 803(6)(d), and cannot attest reliably concerning the records of the original creditors or intermediary debt buyers in support of her illusory conclusions. Third, Ross either failed to address genuine issues of material fact in dispute or she contradicted material facts asserted by Midland.[5]

Midland argued that Ross had personal knowledge of "records kept in the course of [Midland's] business either by [her]self or those under a duty to maintain [such] records," (Doc. 101, p. 21), but it is not Midland's records that are in question—the records of alleged original creditors are in question. As to those records, Ross is neither custodian of records nor an "other qualified person," as she does not establish that she ever worked for any of those entities. Ross relies on hearsay from the prior debt buyers, and they are relying upon hearsay allegedly from the original creditor. Taking such hearsay as true without laying a proper

---

[5] DRS—the seller of the TM account—claimed to have obtained this alleged account from one of eight T-Mobile *companies*, and did not identify which company; however, five months prior to selling the account to Midland, the alleged account was in the hands of yet another debt buyer who is Pinnacle; Hinkle also sued Pinnacle for FCRA violations on this same bogus account. That case was settled within days of filing and Pinnacle apologized and stated that they no longer had the account. In this case, Ross is testifying as to the trustworthiness of a daisy chain of alleged records generated by other intermediary buyers (at least four entities) without knowledge or authority to do so. (Doc. 101, p. 8).

18

foundation is, by analogy, a Trojan-horse approach to introducing evidence: superficially, the evidence may look legitimate, but on the inside it is fakery—hearsay (Midland's records) built upon hearsay (the records of AIS and DRS) built upon hearsay (alleged records of intermediary buyers and sellers) built upon hearsay (the alleged records of original creditors).

This Court held that "The touchstone of admissibility under the business records exception to the hearsay rule is reliability." *United States v. Bueno-Sierra*, 99 F.3d 375, 378 (11th Cir. 1996). Midland admits Ross is not the custodian of records. This Court has held that, "The custodian, however, must be able to testify about the 'origination and compilation of the documents' or 'about the initial link in the chain producing the record.'" *United States v. Petrie*, 302 F.3d 1280, 1288 (11th Cir. 2002). Ross does not have to be a custodian of records, but she must be able to provide reliable testimony as an "other qualified witness." Here, she cannot qualify as such because she lacks factual knowledge about the links in the chain of the records she is authenticating. Knowledge is essential, even though a custodian (or qualified witness) has not prepared the record that is at issue. *Itel Capital Corp. v. Cups Coal Co.*, 707 F.2d 1253, 1259 (11th Cir. 1983).

Midland has failed to produce anything but a computerized printout from their own electronic system that Hinkle had an account with either GE or T-Mobile: no contracts, no billing statements, not even what *type* of account (*e.g.,* business or

personal, joint or single, open or closed, etc.) from T-Mobile—nothing. There is no

evidence except Ross's self-serving, unreliable testimony that avoided probing

cross-examination or inquiry due to her non-disclosure.

As discussed below, as to one of the alleged accounts, the seller of the debt

provided a pathway to Midland to obtain a proper, legal foundation as to their

alleged account, of which Midland did not take advantage, and as to the second

alleged account, Midland and the seller mutually agreed that Midland would not

receive any cooperation to prove up validity.

Going further, indicators are present in Ross's affidavit demonstrating her

testimony is unreliable. For example, Ross makes the following statements in her

Affidavit:

> 6. …(A)ccording to the information received from AIS Services the
> debt involved credit extended to Plaintiff (Hinkle) by GE Money/Meijer
> …(Doc. 85-2, p. 2, bold added for emphasis).

> 7. …(A)ccording to the information received from Debt Recovery
> Solutions, LLC, the debt involved credit extended to Plaintiff (Hinkle)
> by T-Mobile…(Doc. 85-2. p. 2, bold added for emphasis).

These statements expose the unreliability of Ross's testimony. Midland

bought the rights to collect on two alleged debts on alleged accounts from the

predecessor debt collectors AIS (GE) and Debt Recovery Solutions (T-Mobile).

Ross made these statements without any substantiating or supporting documents

that would allow such statements to be validated.

**Insufficiency of Facts**. In support of another incident of defects in Ross's affidavit, in paragraph 8 she states in the last sentence as follows:

> (I)n response to that letter (initial letter from Midland to Hinkle regarding the GE/Meijer account) MCM received a payment in full of the discounted settlement amount. (Doc. 85-2-3)

Not only does this paragraph fail for lack of personal knowledge but also it fails to identify any supporting *specific* facts, such as *who* made the payment. There is no evidence that established who made the alleged payment, what bank account this payment came from or whose name was on the checking account. Midland provides no explanation from its alleged "records" of the source or method of payment for the second payment made in December of 2008—which was made two months after payment in full was supposedly received in October. (Doc. 97-2, PlainApp. 00020.)

**Material Misstatements of Fact**. Ross's affidavit is also defective because she contradicts Midland's own assertions:

> For the first two months, MCM reported that the account was assigned to collections, commencing after receiving the payment in full. MCM reported that the account was paid in full later. (Doc. 85-2, p. 3, ¶9).

This statement concerns the alleged GE/Meijer account that Hinkle discovered on her credit report that was reported as "paid in full." (Doc. 58, Ex. 10a-q.) Ross states that Midland reported to credit reporting agencies that the GE/Meijer account was paid in full "after receiving the payment." (Doc. 85-2, p 3,

¶9.) Ross's statement contradicts Midland's prior admission that someone paid this debt *before* Midland ever reported it—not after.  (Doc. 97-2, PlainApp. 00020.) In other words, for the first two months, Midland reported nonpayment falsely, and Ross tried to cover it up with her false testimony.

Under these circumstances, allowing Ross's affidavit to stand as a reliable foundation of the so-called "undisputed facts" (Doc. 85-1) of the case, unchallenged, and not subjected to the tools of discovery, deposition and cross-examination, has created a miscarriage of justice that should not be allowed to prevail.

## II. HINKLE  (1) HAS PROVEN BY A PREPONDERANCE OF THE EVIDENCE, OR ALTERNATIVELY, (2) CAN PRESENT GENUINE ISSUES OF MATERIAL FACT AGAINST MIDLAND FOR VIOLATIONS OF FEDERAL LAW AS SET FORTH IN HER AMENDED COMPLAINT

**A.     Midland negligently or willfully failed to conduct a reasonable investigation based upon the nature of Hinkle's dispute letters as required by 15 U.S.C. § 1681s-2(b).**

In its motion for summary judgment, Midland prejudiced the mind of the lower court when it argued that Hinkle could not maintain a private right of action under 15 U.S.C. § 1681s-2(a). (Doc. 85.) Hinkle does not disagree, but this argument is intentionally misleading; Hinkle never made a claim under s-2(a), therefore, there was no legitimate reason for raising the issue. One must examine Midland's motives for raising a non-issue, and whether it was an attempt to place Hinkle in a false, negative light to the lower court. Hinkle properly alleged

violations of 15 U.S.C. § 1681s-2(b), for which a private right of action exists, as this court has repeatedly held. In fact this Court has visited issues relating to 15 U.S.C. § 1681s-2(b) in six prior cases. Some important precedents have arisen from these cases. This Court has recognized a private right of action exists under s-2(b): "The FCRA provides consumers (such as Sampson) with a private right of action against the furnisher if the furnisher fails to fulfill its requirements under § 1681s–2(b)." *Sampson v. Washington Mut. Bank*, 453 F. App'x 863, 867 (11th Cir. 2011). Next, this Court has recognized that this private right of action is only triggered if a dispute letter has been received: "The FCRA does provide a private right of action for a violation of § 1681s–2(b), but only if the furnisher received notice of the consumer's dispute from a consumer reporting agency." *Green v. RBS Nat. Bank, 288 F. App'x,* 641, 642 (11th Cir. 2008). Finally, this Court has recognized that if a dispute letter is sent to a CRA, a duty of investigation is triggered: "The FCRA also requires furnishers of credit information to investigate the accuracy of said information upon receiving notice of a dispute." *Peart v. Shippie*, 345 F. App'x 384, 386 (11th Cir. 2009).

To date, this Court has not reviewed a case that gave it the opportunity to evaluate standard of investigation required by a furnisher after receiving proper notice of a dispute. This Court came close to addressing the issue in *Green v. RBS National Bank*, 288 Fed. Appx 641 (11th Cir. 2008), when it stated the following:

Green [the consumer] initiated only three disputes with CRAs, one with Experian and two with Trans Union. Citizens [the furnisher] investigated the Experian dispute and accurately reported its findings to Experian the next day. Citizens investigated the Trans Union disputes and accurately reported its findings to Trans Union within no more than eight days. In short, Citizens timely complied with the letter of the law in all three instances." *Id* at p. 643.

In *Green*, the Court held the furnisher had conducted a timely investigation, but did not explain whether an investigation must be reasonable. However, on another occasion, this Court did analyze the meaning of the word "investigation" in the context of 1681s-2*(a)*, where it held that an investigation must be "reasonable:"

> After a credit report has been prepared on a consumer, **a credit reporting agency retains a duty** under section 611(a) [i.e., 15 U.S.C. § 1681s-2(a)] of FCRA **to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer**. When a consumer brings a claim for violation of this duty, a court is generally called upon to determine whether the credit reporting agency could have discovered an error in a particular report through a reasonable investigation. [citation omitted.] Thus, a section 611(a) claim is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts that provide a more accurate representation about a particular entry.

*Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).

(Bold added for emphasis.). Taking its queue from this Court's opinion in *Cahlin*, the Fourth Circuit analyzed a 1681s-2*(b)* action within its jurisdiction as to what constitutes a reasonable investigation as it applies to furnishers:

> The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." *Am. Heritage Dictionary* 920 (4th ed.2000); *see Webster's Third New Int'l Dictionary* 1189 (1981) (defining "investigation" as "a searching inquiry"). Thus, the plain meaning of "investigation" clearly requires some degree of careful inquiry by creditors.

Further, § 1681s–2(b)(1)(A) uses the term "investigation" in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. **It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit reports, Congress used the term "investigation" to include superficial, *un* reasonable inquiries by creditors. *Cf. Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1160 (11th Cir.1991) (interpreting analogous statute governing reinvestigations of consumer disputes by credit reporting agencies to require reasonable investigations);** *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (same). We therefore hold that § 1681s–2(b)(1) requires creditors, after receiving notice of a consumer dispute from a credit reporting agency, to conduct a reasonable investigation of their records to determine whether the disputed information can be verified.

*Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 430-31 (4th Cir. 2004). (Bold added for emphasis).

In *Johnson*, MBNA appealed from a judgment against them by a jury in favor of the Plaintiff, Linda Johnson, who had alleged violations of 1681s-2(b). MBNA had contacted Johnson and informed her she owed a $17,000 balance on the account. Johnson sent a dispute letter to all three CRAs, which triggered the duty of MBNA to investigate. Thereafter, the only thing MBNA did was respond to the three "automated consumer dispute verification" ("ACDV") forms sent by the CRAs. This amounted to MBNA agents reviewing "account information contained in MBNA's Computerized Information System ('CIS') and, based on the results of that review, notified the credit reporting agencies that MBNA had verified that the disputed information was correct." *Id*. at p. 429. The jury deemed the investigation insufficient (due to the nature of Johnson's dispute), which was,

25

that the debt was not her responsibility, since the debt arose from a credit card that belonged to her former husband, and she was only an authorized user—not the obligor—of the account.

Without going in to all of MBNA's arguments on appeal, one of them in relevant part was this: "MBNA contends that this provision does not contain any qualitative component that would allow courts or juries to assess whether the creditor's investigation was reasonable." *Id.* at p. 430. In other words, MBNA argued on appeal it was not up to a jury to determine whether an investigation was reasonable. However, the court held in *Johnson* that the question of reasonableness was a fact question for the jury, and that there was sufficient evidence for the jury to conclude as it did:

> As explained above, MBNA was notified of the specific nature of Johnson's dispute—namely, her assertion that she was not a co-obligor on the account. Yet MBNA's agents testified that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the CIS, [citation omitted] and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account. The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. **Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS**.

*Id.* at p. 431. (Bold added for emphasis.)

In the case at hand, Midland was notified of the specific nature of Hinkle's dispute, (Doc. 97-2, PlainApp 00023, 27-28), and her assertion that both alleged

accounts were false and did not belong to her. According to Midland's answers to discovery, its computer simply responded to the ACDV by comparing its internal records to information that they had previously sent to the CRAs and "verifying" that it still matched computerized records. (Doc. 97-2, PA00023, 27, 66-68),(Doc. 58 Ex.10a-q).

While Hinkle cannot state, and she is not asking this Court to hold, that in every case, only using the ACDV system set up between CRAs and furnishers for purposes of conducting an investigation is *never* acceptable, she does contend that the lack of effort taken by Midland as to her particular dispute was not reasonable. Alternatively, sufficient evidence exists for a jury to conclude that Midland did not conduct a reasonable investigation; therefore, the granting of summary judgment was not proper and should be reversed.

Hinkle disputed the legitimacy of both alleged accounts as not belonging to her. Her dispute letters put the CRAs on notice, and upon receipt, Midland had a duty to conduct an investigation that was reasonable under the circumstances.

The FCRA gives the CRAs and the furnishers 30 days to respond to a consumer dispute letter. 15 U.S.C. § 1681i(a)(1)(A). During *that* window of time, no one contacted Hinkle to assist with the investigation—not that she could be of

27

any help—for Hinkle could not prove nonexistence of an account she did not have.[6]

It was not reasonable, even if timely requested, for Midland to ask Hinkle to prove the non-existence of these accounts. Nor was it reasonable for Midland to insist that she report her identity as stolen without the requisite proof.

If Midland could not conduct a reasonable investigation, (Doc. 97-2, Ex. PA00026)—in this case—they should have advised the CRAs to delete it. *See* 15 U.S.C. § 1681s-2(b)(1)(E)(ii). Nonetheless, Midland decided to continue reporting the information as set forth in Table 3, month after month.

Documents produced in discovery demonstrate that Midland possessed the means and the ability, at no extra cost to them, to contact the original creditor through the debt seller and perform a reasonable investigation. Specifically, when Midland purchased these accounts, they entered into a Bill of Sale (Doc. 85-2, p. 2), which incorporates by reference the Purchase Agreement. The language of these purchase agreements makes it quite clear that the sales of these accounts were made "without recourse or warranty," in other words, "as is," and no guarantee of accuracy.

---

[6] Such a request by Midland could have made sense in a different context; if, for example, Hinkle had alleged she already paid off a debt from an account that belonged to her, or if the amount on her account had the wrong balance, it might have made sense to get her involved in the investigation process. But given the nature of her disputes—that she never had either account—makes their request nonsensical and irrelevant to the investigation; such a request is likely the result of perfunctory processing of such disputes. At the very least, that is a question of fact to be determined by the trier of fact.

In the Purchase Agreement between Midland (Buyer) and DRS (predecessor debt buyer/Seller), DRS agreed (a) to be the intermediary with the original creditor, (b) to obtain any information on the accounts sold, and (c) to do so at no extra cost to the Buyer (Midland). (Doc. 97-2, PA00103-123, filed under seal). The reasonable thing Midland should have done is simply contact the Seller to investigate the account information. They chose not to avail themselves of this option, thereby missing their opportunity to conduct a reasonable, free investigation by communicating with the original creditor through the seller (DRS), which may have satisfied the investigation mandate of s-2(b) by confirming that Hinkle had no such account. (Doc. 97).

DRS—the seller of the alleged T-Mobile account—was contractually obligated to provide free assistance and communication with the original creditor through them. Midland failed to avail themselves of this opportunity.

In fact, Midland notes in its own records it was "not able to investigate" Hinkle's disputes. (Doc. 97-2 PlainApp. 00026). This contradicts the Purchase Agreement, which states that they could investigate through the seller, at no charge.

**B.    Midland did not have a permissible purpose to obtain Hinkle's credit report**

On May 7, 2012, Midland accessed Hinkle's credit files (Doc. 97-15, ¶2), a full five months after Hinkle's first unanswered dispute. (Doc. 58, Ex.10a-q.) Yet, in their motion for summary judgment, they argued they had a permissible purpose

29

pursuant to 15 U.S.C. § 1681b(a)(3)(A) because her report was obtained in connection with the collection of a debt. (Doc. 85, p. 16.) However, not every alleged debt presents an opportunity for a collector or debt buyer to access someone's credit report. It hinges on the type of "account" and the purpose for which the review is sought.

Section 1681b(a)(3)(A) permits a CRA to grant access to those it "has reason to believe" are involved in "the review or collection of an account of, a consumer." The statute does not state it is for the review or collection of a "debt." The distinction is important because access to a consumer's credit file is limited to a narrow set of circumstances "and no other." 1681b(a). Therefore, the threshold question is whether Midland, at this late stage, was seeking the report for a review or collection of the type of account contemplated with this statute. This very issue was recently analyzed in the case of *Bersaw v. Northland Group Inc.*, 2015 WL 1097402 (not reported in the F. Supp.), Case No. 14-CV-128-JL,  Doc. 16, (D. New Hampshire Mar. 11, 2015). In that case, Bersaw was a pro se litigant who sued Northland Group Inc., who had been hired by a debt buyer to collect on an account purchased from the original creditor—Chase Bank.  Bersaw effectively argued the statute permitted Northland's access to his credit file—only if Northland was reviewing an "account" in the manner defined by the FCRA.  The Bersaw Court stated as follows:

…the FCRA provides a specific, narrow definition of that term [account], which encompasses only… "a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in [15 U.S.C. 15 U.S.C. § 1602(j)]), as described in regulations of the Bureau [of Consumer Financial Protection ], established primarily for personal, family, or household purposes." 15 U.S.C. § 1693a(2); see id. § 1681a(r)(4) (incorporating definition of "account" set forth in Electronic Funds Transfer Act). For the court to grant summary judgment to Northland, then, it is not sufficient that Northland sought Bersaw's credit report in connection with the collection of a debt. The evidence must also show that the debt in question satisfied the definition of "account."

*Id.* at p. 6. In *Bersaw*, the court refused to grant summary judgment and did not dismiss Plaintiff's case that alleged Northland pulled his report for an impermissible purpose. Northland argued that they were collecting on open-type account, but produced no evidence as to the nature of the alleged account. "[T]he court cannot simply rely on Northland's say-so as to the nature of the debts—there must be some evidence substantiating Northland's position." *See 1 v. Univ. of P.R.*, 7 F. 3d 270, 280 (1st Cir. 1993) ('unsubstantiated allegations in memoranda are insufficient on summary judgment.')" *Id.* at p. 8.

The court in *Bersaw* also held that even if it indulged the notion that it was a credit card debt, "Northland has not claimed—let alone presented evidence establishing—that those debts were 'established primarily for personal, family, or household purposes' (as opposed to, say, business purposes), as required for them to qualify as "accounts" under 15 U.S.C. § 1693a(a)." The *Bersaw* court

31

concluded, "there is a genuine issue of material fact as to whether Northland had a 'permissible purpose' for obtaining Bersaw's consumer report." Id at p. 8.

The facts and analysis of *Bersaw* apply to the case at hand. First, Midland has not produced any evidence as to what types of accounts these are. As to the alleged T-Mobile account, they could have obtained further information, according to their purchase agreement, but instead they willfully ignored the opportunity to prove their claim. As to the alleged GE account, they could not have obtained any information, and therefore could not meet the burden of proof. Second, even assuming Midland could produce information as to whether these accounts were "a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan)," they have not produced any evidence that either of the alleged debts were "established primarily for personal, family, or household purposes.'" Therefore, as in *Bersaw*, material issues of fact remain in Hinkle's case.

## III. MIDLAND VIOLATED THE FDCPA; ORAL DISPUTES ARE VALID

On December 27, 2011, Midland telephoned Hinkle regarding an outstanding debt. Hinkle unambiguously told Midland she had no such account. (Doc. 97-2, PA 00027, 28, 36).  Midland's own records documented the dispute. (Doc. 97-2, PA 00027, 28). In response to the dispute, some 40 days later, Midland tried to impose a duty to *disprove* the debt on Hinkle. (Doc. 97-2, PA 00028, 29).

Midland apparently determined, then argued, that an oral dispute can be ignored, allowing them to continue to look the other way in terms of compliance with the statute and erase their misdeeds.

On summary judgment, the lower court held that as per 15 U.S.C. § 1692g(b), disputes must be made in writing, and therefore, no request for verification was timely made, no verification of the debt was required, and further efforts to collect on the debt did not violate 15 U.S.C. § 1692g. However, disputes made pursuant to 15 U.S.C. § 1692g(a)(3) can be made orally, which is precisely what Hinkle did.[7]   Ross claims that Midland stopped reporting in 2009. (Doc. 85-2, 97-2 PA00019, 20). Her testimony contradicts the evidence. As Table 4 summarizes, Midland continued reporting both alleged accounts after Hinkle's dispute.

| Table 4 | | | | | | | |
|---------|------|-------------------|---------------------------|-------------------------|----------------------------------|---------------------|-----------------------------------------|
| **Event** | **Date** | **Proof of Dispute** | **Verified to CRAs** | **Flagged as Disputed** | **Credit Reporting Continued** | **Ross Affidavit** | **Account Removed from CRAs** |
| CRA dispute GE acct | 9/2011 7/2012 | Doc. 97-2, 00023,0004 6,47,48,49 | Doc.58 Ex. 10a,c, | Doc. 58 Ex. 10d, | Doc. 58 Ex. 10a,d,k | **Completely Omitted** | Removed from CRAs by expiration of Statute of Limitations |

---

[7] In *Camacho v. Bridgeport Fin. Inc.,* 430 F.3d 1078 (9th Cir. 2005). the Ninth Circuit held that a consumer's oral notification is sufficient to overcome the debt collector's section 1692g(a)(3) assumption that the debt is valid, even though a written request is required to obtain verification of the debt or a response to the dispute. Instead, the consumer can dispute the debt's validity in writing *or* orally. In reaching this conclusion, the Ninth Circuit pointed out that at least three other FDCPA provisions, in addition to section 1692g(a)(3) that require *only* oral notice by the consumer: Sections 1692e(8), 1692h and 1692c(a)(1).

| CRA dispute TM acct | 7/2012 | Doc. 97-2, 00027,0004 9,50,51 | Doc. 58 Ex. 10f,g,i, | Doc. 58 Ex. 10h, j,k,n,q | Doc. 58 Ex. 10h, j,k,n,q | **Addressed and Admitted** | Removed from CRAs by expiration of Statute of Limitations |

The Ross affidavit fails to mention Hinkle's dispute regarding the alleged GE account altogether, yet at the same time, she states that the dispute of the alleged T-Mobile account was "verified" and that Midland continued to report it. In reality, Midland claimed both had supposedly been "verified" in response to Hinkle's disputes and continued reporting each of them. Whether Midland has engaged in shoddy record keeping or deliberate subterfuge in the alteration of records, the evidence is clear; both alleged accounts were disputed the same way, "verified" to the CRAs and continued to be reported by the CRAs.

While it may be true that Midland did not "furnish" further information from 2009 to 2011 on the alleged GE account; that simply means they did not update or change the information they had furnished. To avoid the act of "reporting" Midland would have had to request the "furnished" information connected to the account be deleted which they did not do. In addition, Midland inserted the dispute flag, "disputed by consumer," in response to both disputes on both alleged accounts which would certainly constitute "furnishing information" for the purpose of "reporting" when the consumer's credit report is requested by third parties. A

failure to insert that action in Midland's electronic records connected with the alleged GE account does not erase it.

Midland's behavior in regard to these alleged accounts is of the type of troublesome conduct the CFPB has been addressing since its inception in 2010.

## CONCLUSION

Ample evidence in the record demonstrates that the Defendants did not conduct a reasonable investigation given the nature of Hinkle's disputes. She wrote her dispute letters, advising them that she did not have accounts with either GE or T-Mobile. Defendants did nothing to investigate her disputes. They argued that they did not have to do anything because the Plaintiff did nothing to help them. However, Hinkle had nothing to offer because she did not possess any evidence of their nonexistence. Midland did not conduct a reasonable investigation; at the very least, it is a question properly left open for the trier of fact.

Second, Midland did not make a prima facie case that they were entitled to obtain Hinkle's credit report. Due to lack of evidence, they cannot answer the question as to what kind of account they were trying to pursue, therefore, they cannot demonstrate that they had a permissible purpose. Again, whether Midland had a permissible purpose is a question of fact for the trier of fact—a genuine issue of material fact.

As to Hinkle's FDCPA claim, Hinkle's oral dispute triggered a duty on the part of Midland to either remove or validate the alleged debt. They began falsely reporting on an account that should never have been reported to the CRAs in the first place (GE-Meijer). Whether Midland falsely reported this information after failing to validate it, at the very least, is a genuine issue of material fact.

Finally, the granting of summary judgment should be reversed because it was neither substantially justified nor harmless for Midland's failure to disclose Angelique Ross as an alleged person with knowledge of the facts, and the remedy for doing so under Fed. R. Civ. P. 37(c)(1) is clear, in that "it may not be used." In addition, multiple layers of hearsay underscore her testimony, making it impossible for her to provide reliable testimony.

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 8,145 words in the foregoing Brief, exclusion of the portions excluded by Rule 32(a)(7)(B)(iii).

_____
Craig K. Perry, Esq., Nevada Bar No. 3786

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of July, 2015, a true and correct copy of the foregoing BRIEF OF PLAINTIFF—APPELLANT TERI HINKLE was electronically filed.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the court's electronic filing system.

_____
Craig K. Perry, Esq., Nevada Bar No. 3786