No. 15-10398

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

◆

### TERI LYNN HINKLE,

**Appellant,**

v.

### MIDLAND CREDIT MANAGEMENT, INC., et al.,

**Appellees.**

◆

On Appeal from the United States District Court
for the Southern District of Georgia
Dublin Division
3:13-cv-00033-DHB-BKE

---

### BRIEF OF APPELLEES
### MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC,
### AND ENCORE CAPITAL GROUP, INC.

---

Attorneys for Appellees:

Matthew B. Ames
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd., N.W.
Suite 700
Atlanta, GA 30308
Telephone: (404) 261-6020
Facsimile:  (404) 261-3656

October 8, 2015

Jason B. Tompkins
Chase T. Espy
Balch & Bingham LLP
1901 Sixth Avenue North
Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Appellees certify to the best of the undersigned's knowledge that, in addition to the list of persons and entities disclosed by counsel for Plaintiff-Appellant, the following entities have an interest in the outcome of this case:

**I.    Trial Judges:**

1)  **Epps, Brian K.** (U.S. Magistrate Judge).

**II.    Attorneys/Law Firms:**

1)  **Balch & Bingham LLP** (Attorneys for Appellees);

2)  **Espy, Chase T.** (Attorney for Appellees).

**III.    Related Entities:**

1)  **Midland Portfolio Services, Inc.** owns 100% of the interests in Defendant-Appellee Midland Funding, LLC;

2)  **Midland Credit Management, Inc.** owns 100% of the interests in Midland Portfolio Services, Inc.

3)  **Encore Capital Group, Inc.** (a publicly held corporation which trades under NASDAQ symbol ECPG) owns 100% of the interests in Midland Credit Management, Inc.

Dated this 8th day of October, 2015.

*/s/ Jason B. Tompkins*
One of the Attorneys for Appellees

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

The district court correctly found that the material facts of this case are not in dispute and that the Defendants-Appellees are entitled to judgment as a matter of law. Appellant's arguments involve straightforward application of the law to the undisputed facts. Thus, oral argument would not significantly aid this Court's decisional process or the resolution of this appeal.

# <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT.....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CITATIONS ...........................................................................iv

STATEMENT OF THE ISSUES..................................................................1

STATEMENT OF THE CASE......................................................................1

ARGUMENT AND CITATIONS OF AUTHORITY ...........................................24

I.    Hinkle has abandoned most of the claims she raised before the district
      court and waived several of the arguments in her opening brief by
      raising them for the first time on appeal..........................................24

      A.    Hinkle has abandoned the majority of arguments she made below
            in support of her FDCPA claim, as well as any argument that
            Midland willfully violated the FCRA. ..................................24

      B.    Hinkle waived both of the arguments she raises in support of her
            FCRA claims. ...........................................................26

II.   Midland was entitled to judgment as a matter of law on Hinkle's FDCPA
      claim because it was not required to cease credit reporting on the T-
      Mobile Account by virtue of her oral dispute. .............................28

III.  The undisputed evidence shows that Midland obtained Hinkle's credit
      report for the permissible purpose of "collection" of the T-Mobile
      Account.....................................................................31

IV.   Hinkle failed to raise a triable issue of fact regarding the reasonableness
      of Midland's investigation following her dispute of the T-Mobile
      Account with the CRAs. .................................................36

V.    The district court did not abuse its discretion by refusing to strike
      Angelique Ross's affidavit. .............................................43

      A.    Midland was not required to disclose Angelique Ross because she
            was not an individual likely to have discoverable information. .........44

B.    Even if Ross should have been disclosed as a potential witness, the trial court did not abuse its discretion in finding that Midland's failure to do so was substantially justified or harmless. .....................45

CONCLUSION .....................................................................................51

CERTIFICATE OF COMPLIANCE .......................................................53

CERTIFICATE OF SERVICE ................................................................54

# <u>TABLE OF CITATIONS</u>

## <u>CASES</u>

*Adams v. LexisNexis Risk & Information Analytics Group, Inc.*,
    No. 08-CV-4708, 2010 WL 1931135 (D.N.J. May 12, 2010) .........................34

*Barfield v. Brierton*,
    883 F.2d 923 (11th Cir. 1989) .................................................... 18, 19

*Bersaw v. Northland Grp. Inc.*,
    No. 14-CV-128, 2015 WL 1097402 (D.N.H. Mar. 11, 2015).................... 34, 35

*Cavero v. One W. Bank FSB*,
    No. 14-14369, -- F. App'x --, 2015 WL 3540388 (11th Cir. June 8, 2015) 20, 28

*Chiang v. Verizon New England, Inc.*,
    595 F.3d 26 (1st Cir. 2010)......................................... 36, 40, 41, 42

*Citizens Bank of Batesville, Ark. v. Ford Motor Co.*,
    16 F.3d 965 (8th Cir. 1994) ................................................................45

*Clark v. Absolute Collection Serv., Inc.*,
    741 F.3d 487 (4th Cir. 2014) .............................................................30

*Clark v. v. Main St. Acquisition Corp.*,
    No. 12-CV-408, 2013 WL 2295879 (S.D. Ohio May 24, 2013)......................47

*Davis v. Coca-Cola Bottling Co. Consol.*,
    516 F.3d 955 (11th Cir. 2008) ..........................................................20

*Demaestri v. Asset Acceptance Capital Corp.*,
    No. 11-CV-01671, 2012 WL 1229907 (D. Colo. Mar. 14, 2012).............. 33, 34

*Edeh v. Midland Credit Mgm't*, No. 09-CV-01706.................................................39

*Edeh v. Midland Credit Mgmt., Inc.*,
    413 F. App'x 925 (8th Cir. 2011) ........................................ 23, 39, 40

*Ekhlas v. NCO Fin. Sys., Inc.*,
    No. 13-CV-0978, 2013 WL 6190660 (C.D. Cal. Nov. 25, 2013) .....................35

*Flores v. I.C. Sys., Inc.*,
    No. 13-CV-21352, 2014 WL 1379046 (S.D. Fla. Apr. 8, 2014)................ 18, 31

*Fritz v. Capital Mgmt. Servs., LP*,
    No. 12–CV-4725, 2013 WL 4648370 (W.D. Pa. Aug. 29, 2013).....................34

*Gorman v. Wolpoff & Abramson, LLP*,
    584 F.3d 1147 (9th Cir. 2009) .................................................. 36, 41

*Graham v. Metro. Life Ins. Co.*,
  No. 07-CV-164, 2009 WL 73802 (S.D. Miss. Jan. 8, 2009) .............................44

*Harris v. NCO Fin. Sys.*,
  No. 13-CV-0259, 2013 WL 6858852 (D. Md. Dec. 23, 2013) .........................33

*Hawthorne v. Mac Adjustment, Inc.*,
  140 F.3d 1367 (11th Cir. 1998) .........................................................................35

*Hearn v. McKay*,
  603 F.3d 897 (11th Cir. 2010) ..................................................................... 19, 45

*Hickman v. Alpine Asset Mgmt. Grp., LLC*,
  No. 11-CV-1236, 2012 WL 4062694 (W.D. Mo. Sept. 14, 2012)............. 46, 47

*Hinkle v. ARS National Services, Inc.*,
  No. 3:12-CV-0052-DHB .....................................................................................22

*Holloman v. Smith Debnam Narron Drake Saintssing & Myers, LLP*,
  No. 14-CV-0031, 2014 WL 1225330 (M.D.N.C. Mar. 25, 2014) ....................35

*Howard v. Pinnacle Credit Servs., LLC*,
  No. 09-CV-0085, 2010 WL 2600753 (M.D. Ga. June 24, 2010)......................15

*Huertas v. Galaxy Asset Mgmt.*,
  641 F.3d 28 (3d Cir. 2011) ................................................................................34

*Johnson v. MBNA Am. Bank, NA*,
  357 F.3d 426 (4th Cir. 2004) .............................................................................36

*Jones v. UPS Ground Freight*,
  683 F.3d 1283 (11th Cir. 2012) .........................................................................46

*King v. Asset Acceptance, LLC*,
  452 F. Supp. 2d 1272 (N.D. Ga. 2006).............................................................26

*Levine v. World Fin. Network Nat. Bank*,
  437 F.3d 1118 (11th Cir. 2006) .........................................................................26

*Miller v. Wolpoff & Abramson, LLP*,
  309 F. App'x 40 (7th Cir. 2009).........................................................................34

*Narog v. Certegy Check Servs., Inc.*,
  759 F. Supp. 2d 1189 (N.D. Cal. 2011).............................................................25

*Norman v. Northland Grp. Inc.*,
  495 F. App'x 425 (5th Cir. 2012).......................................................................34

*Osborn v. Ekpsz, LLC*,
  821 F. Supp. 2d 859 (S.D. Tex. 2011)...............................................................29

*Ostrander v. Unifund Corp.*,
No. 07-CV-86, 2008 WL 850329 (W.D.N.Y. Mar. 28, 2008) ...........................35

*Pinson v. Monarch Recovery Mgmt., Inc.*,
No. 12-CV-80480, 2013 WL 961308 (S.D. Fla. Mar. 12, 2013) ......................34

*Poulin v. The Thomas Agency*,
760 F. Supp. 2d 151 (D. Me. 2011) ............................................................. 21, 30

*Pyle v. First Nat. Collection Bureau*,
No. 12-CV-00288, 2012 WL 1413970 (E.D. Cal. Apr. 23, 2012) ....................26

*Robinson v. Greystone Alliance, LLC*,
No. 10-CV-3658, 2011 WL 2601573 (D. Md. June 29, 2011) ..........................34

*Salmas v. Portfolio Recovery Associates, LLC*,
No. 13-CV-0575, 2013 WL 6182614 (C.D. Cal. Nov. 25, 2013) ......................35

*Sapuppo v. Allstate Floridian Ins. Co.*,
739 F.3d 678 (11th Cir. 2014) ..........................................................................24

*Saunders v. Emory Healthcare, Inc.*,
360 F. App'x 110 (11th Cir. 2010) .............................................................. 16, 46

*Searle v. Convergent Outsourcing, Inc.*,
No. 13-11914, 2014 WL 4471522 (D. Mass. June 12, 2014) .................... 22, 35

*Serra Chevrolet, Inc. v. Gen. Motors Corp.*,
446 F.3d 1137 (11th Cir. 2006) ........................................................................20

*Sheridan v. United Recovery Sys., LP*,
No. 14-CV-01250, 2015 WL 1462909 (M.D. Tenn. Mar. 30, 2015)................36

*Smith v. John P. Frye, P.C.*,
No. 10-CV-3366, 2011 WL 748363 (N.D. Ill. Feb.24, 2011)...........................34

*Spacecon Specialty Contractors, LLC v. Bensinger*,
No. 09-CV-02080, 2011 WL 721263 (D. Colo. Feb. 23, 2011) .......................44

*Tannenbaum v. United States*,
148 F.3d 1262 (11th Cir. 1998) ........................................................................20

*Thomas v. Gulf Coast Credit Servs., Inc.*,
214 F. Supp. 2d 1228 (M.D. Ala. 2002)....................................................... 26, 34

*U.S. Tech. Corp. v. Ramsay*,
No. 08-CV-00218, 2011 WL 2516597 (S.D. Miss. June 23, 2011)...................44

*United States v. Godwin*,
765 F.3d 1306 (11th Cir. 2014) ........................................................................24

*United States v. Parker*,
　749 F.2d 628 (11th Cir. 1984) .......................................................46

*United States v. Whitley,*
　529 F.3d 150 (2d Cir. 2008) ..........................................................34

*Valle v. RJM Acquisitions, LLC*,
　No. 12-CV-00957, 2015 WL 739855 (D. Conn. Feb. 19, 2015)..... 22, 32, 33, 34

*Ware v. Bank of Am. Corp.*,
　9 F. Supp. 3d 1329  (N.D. Ga. 2014).............................................42

*Westra v. Credit Control of Pinellas*,
　409 F.3d 825 (7th Cir. 2005) .................................................... 37, 38

*Wilhelm v. Credico, Inc.,*
　519 F.3d 416 (8th Cir. 2008) .........................................................30

*Winter v. I.C. System Inc.,*
　543 F. Supp. 2d 1210 (S.D. Cal. 2008) ..........................................25

## STATUTES

15 U.S.C. § 1681(b) ........................................................................33

15 U.S.C. § 1681a ..................................................................... 32, 33

15 U.S.C. § 1681b.................................................................... passim

15 U.S.C. § 1681n.................................................................... 25, 26

15 U.S.C. § 1681o.................................................................... 25, 26

15 U.S.C. § 1681s ...........................................................................41

15 U.S.C. § 1692a...........................................................................35

15 U.S.C. § 1692g.................................................................... passim

15 U.S.C. § 1692k...........................................................................25

15 U.S.C. § 1693a .................................................................... 32, 35

## RULES

Rule 26, Fed. R. Civ. P. ............................................................ 16, 44

Rule 37, Fed. R. Civ. P. ............................................................ 19, 45

Rule 56, Fed. R. Civ. P. ............................................................ 46, 47

Rule 803, Fed. R. Evid................................................................ 44, 46

## **OTHER AUTHORITIES**

Wright & Miller, 30C Fed. Prac. & Proc. Evid. § 7047 ..........................................47

## STATEMENT OF THE ISSUES

**I.     Did Midland comply with the FDCPA by reporting the T-Mobile Account to the credit reporting agencies (CRAs) as "disputed" following Hinkle's oral dispute?**

Yes. Midland was not required to cease reporting the T-Mobile Account to the CRAs following Hinkle's oral dispute, and discharged its obligation under the FDCPA by specifically flagging the debt as disputed.

**II.    Did Midland have a permissible purpose under the FCRA for obtaining Hinkle's credit report?**

Yes. The undisputed evidence shows that Midland obtained Hinkle's credit report solely for the permissible purpose of collecting the T-Mobile Account.

**III.   Did Hinkle fail to raise a triable issue of fact as to the reasonableness of Midland's investigation of her dispute of the T-Mobile Account?**

Yes. There is no genuine issue of material fact as to the reasonableness of Midland's investigation in light of the generalized information it received from the CRAs regarding Hinkle's dispute of the T-Mobile Account.

## STATEMENT OF THE CASE

### A.     Nature of the Case

Plaintiff-Appellant Teri Lynn Hinkle—a professional *pro se* plaintiff[1]—appeals from the district court's summary judgment in favor of Defendants-Appellees Midland Credit Management, Inc., Midland Funding, LLC, and their parent company Encore Capital Group, Inc. (collectively, "Midland"). Hinkle

---

[1] Since June 2011 Hinkle has filed twelve cases, including this one, in the Southern District of Georgia, in which she has asserted many of the same claims she asserted in this case. Though she proceeded *pro se* before the district court, she is represented by counsel on appeal.

asserted several claims against Midland under the Fair Debt Collection Practices Act (FDCPA) and the Fair Credit Reporting Act (FCRA), all of which arose from Midland's attempts to collect on two accounts: (1) a debt originally owed to GE/Meijer (the "GE/Meijer Account"); and (2) a debt originally owed to T-Mobile (the "T-Mobile Account").

The district court found that there were no genuine issues of material fact and that Midland was entitled to judgment as a matter of law on all of Hinkle's claims, many of which she now has abandoned on appeal. Meanwhile, Hinkle waived several of the arguments she makes for the first time on appeal by failing to raise them before the district court. Regardless, the district court's summary judgment should be affirmed as to all of Hinkle's claims.

### B.    Statement of the Facts

The GE/Meijer Account

On September 24, 2008, Midland acquired the GE/Meijer Account from AIS Services, LLC.[2] A week later, on October 1, 2008, Midland sent an initial collection letter to Hinkle regarding the GE/Meijer Account, which included a settlement offer promising that Midland would notify the three major CRAs that the debt was paid in full if it received payment of $237.49 by November 15, 2008.[3] On October 13, 2008, Midland received a check in that exact amount at the

---

[2] (Doc. 85-2, at ¶ 6).

[3] (Doc. 85-6).

2

remittance address identified on the settlement letter.[4] Thereafter, the account was reported as "paid in full"[5] until March 16, 2009, when Midland ceased reporting it entirely.

Over two years later, on September 6, 2011, Hinkle filed a dispute with the three major credit bureaus, claiming that the GE/Meijer Account was not hers.[6] Before Hinkle even filed her dispute with the CRAs, however, Experian had last reported the status of the GE/Meijer Account as "Paid, Closed,"[7] and TransUnion had last reported that the Account was "PAID IN FULL."[8] Thus, in response to Hinkle's dispute, Experian simply noted that its information for the GE/Meijer

---

[4] (Doc. 85-5, at Midland-Hinkle 000049).

[5] (Doc. 85-5, at Midland-Hinkle 000048). As Hinkle notes (Appellant's Br., at 21–22), Midland's records show that it twice reported the GE/Meijer Account to the CRAs as having been "[a]ssigned to internal or external collections" before it began reporting that the account had been "paid in full." (*Id.*). That was because the payment that Midland received on October 13 was in the exact amount of Midland's discounted settlement offer, whereas the remaining balance was not zeroed out until December 22, 2008. *See* (Doc. 85-5, at Midland-Hinkle 000049). This also accounts for what Hinkle refers to as a mysterious "second payment" in December 2008, "two months after payment in full was supposedly received in October." (Appellant's Br., at 21).

[6] (Doc. 8, at ¶ 16). Hinkle implies that as of September 6, 2011, Midland was reporting both the GE/Meijer and T-Mobile Accounts to the CRAs, and that her dispute pertained to both Accounts. *See* (Appellant's Br., at 4) ("On September 6, 2011 Hinkle sent a dispute letter to each CRA, informing them that these alleged debts did not belong to her."). However, (1) Midland could not have been reporting the T-Mobile Account at that time because it did not acquire the account until December 6, 2011; (2) Hinkle's own documents show that the T-Mobile Account was "First Reported" in "Mar 2012" (Doc. 58, at 8); and (3) Hinkle herself made clear in an e-mail to Midland's counsel that she "did not discover [Midland] [was] even reporting the alleged T-Mobile acct to the CRAs until June of 2012." (Doc. 83, at 11 [Ex. 16, at 2]); *see also* (Doc. 97, at ¶ 25; Doc. 97-2, at PlainApp. 00002, ¶ 10).

[7] (Doc. 58, at 4).

[8] (Doc. 58, at 6).

Account had been "Updated,"[9] and TransUnion responded that the information it was reporting was "VERIFIED" and that there was "NO CHANGE"[10]—that is, TransUnion verified that the debt had been "PAID IN FULL," as previously reported. Meanwhile, Equifax responded to Hinkle's dispute by informing her that "[t]his item has been deleted from the credit file."[11]

| | Experian | Equifax | TransUnion |
|---|---|---|---|
| **Report Before Dispute** | "Status: Paid, Closed" | N/A | "PAID IN FULL" |
| **Response To Dispute** | "Updated" | "This item has been deleted from the credit file." | "VERIFIED, NO CHANGE" |
| **Report After Dispute** | "Paid, Closed" | Deleted | "Paid in Full" |

On October 20, 2011—over three years after Midland had sent its initial communication to Hinkle regarding the GE/Meijer Account—Hinkle sent a "Demand for Validation of Debt" to Midland, claiming that she did not, and never had, owed any money on the GE/Meijer Account.[12] As noted above, however, the

---

[9] (Doc. 58, at 3).

[10] (Doc. 58, at 5). A later report from TransUnion shows that the GE/Meijer Account was subsequently "DELETED." *See* (Doc. 58, at 15).

[11] (Doc. 58, at 7).

[12] (Doc. 8, at ¶ 17).

GE/Meijer Account was paid in full on November 15, 2008,[13] and Midland had ceased reporting the Account to the CRAs as of March 16, 2009.[14]

The T-Mobile Account

Separately, on December 6, 2011, Midland acquired the T-Mobile Account from Debt Recovery Solutions, LLC.[15] Midland sent an initial collection letter to Hinkle regarding the T-Mobile Account on December 21, 2011, advising her (consistent with the statute)[16] that Midland would "assume the debt to be valid" if she did not "notify [Midland] within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof."[17] On or about December 28, Midland called Hinkle in an attempt to reach a settlement of the T-Mobile Account. During that conversation, however, Hinkle verbally disputed that she owed any money on the T-Mobile Account.[18]

Following her oral dispute of the T-Mobile Account, Midland sent a letter to Hinkle dated February 5, 2012, informing her that it had flagged the debt as disputed in its credit reporting to the CRAs, and seeking her assistance "so that we

---

[13] (Doc. 85-6).

[14] (Doc. 85-5, at Midland-Hinkle 000048).

[15] (Doc. 85-2, at ¶ 7); *see also* (Doc. 85-4).

[16] *See* 15 U.S.C. § 1692g(a)(3) ("[U]nless the consumer, within thirty days after receipt of the [validation] notice, disputes the validity of the debt, or any portion thereof, the debt will be assumed to be valid by the debt collector.").

[17] (Doc. 8, at ¶ 19); *see also* (Doc. 85-8).

[18] (Doc. 8, at ¶ 20); *see also* (Doc. 85-7, at Midland-Hinkle 00035).

may reach a quick resolution of your dispute."[19] Hinkle claims that Midland's letter "request[ed] that she **prove the non-existence** of the alleged T-Mobile debt."[20] To the contrary, Midland stated in the letter that as part of its "investigation of your dispute, it would be helpful to have a copy of any documentation you may have that supports your dispute," and provided four examples of supporting documentation.[21]

Hinkle never provided any documentation to substantiate her dispute of the T-Mobile Account.[22] Instead, Hinkle intentionally refused to respond to Midland's request for assistance in investigating her dispute, later testifying that she "understood [the letters] to be [Midland] shifting the burden back on me and I'm not obligated under law to do that [investigation] for them."[23]

On May 7, 2012, having received no response to its February 5 letter requesting Hinkle's assistance, Midland obtained a copy of her credit report as part of its investigation of her dispute of the T-Mobile Account.[24] In "June of 2012," Hinkle also "obtained her consumer credit reports from all three credit reporting

---

[19] (Doc. 85-9).

[20] (Appellant's Br., at 5) (emphasis in original).

[21] (Doc. 85-9).

[22] (Doc. 85-7).

[23] *See* (Doc. 100-1, at 106:15–23).

[24] (Doc. 8, at ¶ 25); *see also* (Doc. 58, at 14).

agencies."[25] Hinkle disputed the T-Mobile Account with all three CRAs on July 13, 2012.[26] Even prior to her July 13 dispute, Experian reported "NO STATUS" for the T-Mobile Account,[27] whereas TransUnion was reporting the T-Mobile Account as "In Collection."[28] However, both Experian and TransUnion noted that the T-Mobile Account already had been flagged as disputed.[29]

In response to Hinkle's July 13 dispute of the T-Mobile Account, Experian updated its report to reflect that the "Account information is disputed by consumer,"[30] but continued to report "NO STATUS" for the Account.[31] Equifax, on the other hand, responded to Hinkle's dispute by informing her that it had "verified that this item belongs to you" based on "[a]dditional information [it] ha[d] been provided from the original source regarding this item."[32] Nonetheless, Equifax still reported the T-Mobile Account as disputed.[33] Likewise, TransUnion

---

[25] (Doc. 8, at ¶ 27).

[26] (Doc. 8, at ¶ 29).

[27] (Doc. 58, at 10).

[28] (Doc. 58, at 13). Meanwhile, the same TransUnion Report continued to reflect that the GE/Meijer Account was "Paid in Full," which it had verified in "09/2011." (*Id.*).

[29] (Doc. 58, at 10, 13).

[30] (Doc. 58, at 8).

[31] (Doc. 58, at 16).

[32] (Doc. 58, at 11).

[33] (Doc. 58, at 12).

reported the T-Mobile Account as "In Collection," while also noting that it was disputed.[34]

|  | Experian | Equifax | TransUnion |
|---|---|---|---|
| **Report Before Dispute** | "NO STATUS" | N/A | "In Collection" |
| **Response To Dispute** | "Account information is disputed by consumer" | "We verified that this item belongs to you." | "ACCT INFO DISPUTED BY CONSUMER" |
| **Report After Dispute** | "NO STATUS" | "Consumer Disputes This Account Information; Collection Account" | "In Collection" |

On July 20, 2012, Midland received notice of Hinkle's July 13 dispute with the CRAs.[35] However, Midland was provided with no information regarding the nature of Hinkle's dispute aside from the fact that she claimed that the T-Mobile Account was "not his/hers":[36]

Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 1-Not his/hers. V erify Name, address, SSN, Dates and Balance. Control# 99992201016681057    COMM  A8  ***    0.00 07/20/2012 09:27:54

Thus, in response to Hinkle's dispute, Midland sent her a second letter on July 21, 2012, again seeking her assistance with its "investigation of [her] dispute," and again stating that "it would be helpful to have a copy of any documentation

---

[34] (Doc. 58, at 19).

[35] (Doc. 85-7, at 4).

[36] (Doc. 87-5, at 5).

you may have that supports your dispute."[37] And, once again, Midland's letter provided four examples of supporting documentation that could be of assistance in its investigation of her dispute.[38]

On July 26, 2012, in response to Midland's second letter requesting documentation regarding her dispute, Hinkle sent Midland a "Demand for Validation of Debt" regarding the T-Mobile Account and a "Notice of Intent to Sue."[39] Although Hinkle claimed that she previously had requested validation of the T-Mobile Account in October 2011, she mistakenly referred to her "Demand for Validation" of the GE/Meijer Account which, as noted above, had been paid in full three years earlier.[40]

Hinkle filed suit on April 30, 2013, after Midland failed to pay the $18,000 that she demanded in her July 26 "Notice of Intent to Sue" as a settlement of her purported FDCPA and FCRA claims.[41]

---

[37] (Doc. 85-10).

[38] (*Id.*).

[39] *See* (Doc. 8, at ¶¶ 31–32); (Doc. 85-11, at Midland-Hinkle 000028).

[40] *See* (Doc. 8, at ¶ 17); *see also* (Doc. 97, at ¶ 20) ("Plaintiff sent a demand for validation of the first alleged account [the GE/Meijer Account] on Oct. 20, 2011 and never received a response regarding that account being disputed. Instead Plaintiff received a letter from the Defendants . . . that was dated Dec. 21, 2011, regarding a different account [the T-Mobile Account] the Plaintiff had no knowledge of.").

[41] (Doc. 85-11, at Midland-Hinkle 000023).

**C.    Statement of the Course of Proceedings and Disposition in the Court Below**

<u>Hinkle's Claims against Midland</u>

In Counts I through III of her original complaint, Hinkle asserted the same FCRA claims against Midland Credit Management, Inc., Midland Funding, LLC, and Encore Capital Group, Inc., respectively.[42] In Count IV, Hinkle asserted a single FDCPA claim against all three defendants.[43] Hinkle amended her complaint to add a claim against all three defendants for violation of the Telephone Consumer Protection Act (TCPA)[44] but later voluntarily dismissed it, leaving only the four claims she had asserted in her original complaint.[45]

In support of her FCRA claims, Hinkle alleged that Midland had: (1) obtained her credit report without a permissible purpose;[46] (2) reported false information to the CRAs;[47] and (3) failed to conduct a reasonable investigation after receiving notice from the CRAs that she disputed the two accounts.[48] As for her FDCPA claim, Hinkle alleged that Midland had: (1) failed to provide her with

---

[42] *See generally* (Doc. 1, at ¶¶ 47–72).

[43] (*Id.* at ¶¶ 73–86).

[44] (Doc. 8, at ¶¶ 105–110).

[45] (Doc. 23).

[46] (Doc. 8, at ¶¶ 74, 88).

[47] (*Id.* at ¶¶ 75, 81).

[48] (*Id.*).

the statutorily-required validation notices concerning both accounts;[49] (2) failed to cease collection activities after she disputed the accounts;[50] (3) harassed her with telephone calls after she disputed the accounts;[51] and (4) made false representations regarding the accounts to the CRAs.[52]

Discovery

While Hinkle claims that she "had to file a total of four motions to compel answers to discovery" (Appellant's Br., at 7), the record reveals that the first three motions (Docs. 32, 34, and 36) were denied as moot in light of her amended motions to compel (Docs. 39, 40, and 41),[53] which the district court simply denied outright.[54] Moreover, Hinkle's "three" original and amended motions to compel were, in reality, a single motion directed separately to each defendant.[55] Her "fourth" motion to compel (Doc. 55) was a motion to reconsider the Court's order denying the previous "three," which the district court construed as a new motion to compel.[56]

---

[49] (Doc. 8, at ¶ 92).

[50] (*Id.* at ¶ 94).

[51] (*Id.* at ¶ 95).

[52] (*Id.* at ¶¶ 91, 93).

[53] *See* (Doc. 54, at 1) ("Because she filed amended motions, Plaintiffs original motions to compel and motion for a hearing are MOOT.").

[54] (*Id.*)

[55] (*Id.*) ("Plaintiff filed separate motions against each of the three defendants, but they are based on the same interactions with defense counsel and raise the same arguments.").

[56] *See* (Doc. 59).

At a hearing on her "fourth" motion to compel, the district court engaged in a colloquy with Hinkle, in which the court ultimately concluded that she did not actually seek to compel Midland to produce any additional documents or interrogatory responses:[57]

| THE COURT: | . . . [I]t sounds like right now you are pretty reasonably satisfied you have everything, and you have to take some depositions to see whether these other speculations of yours might actually have some substance to them. Is that a fair characterization of where we sit? |
|---|---|
| MS. HINKLE: | I would say on that issue that it is. I may not need to based on what they did give me and the facts of the case. |

Accordingly, the district court denied Hinkle's motion to the extent she requested more fulsome responses to her discovery requests, noting that "[Hinkle] concedes that Defendants have now produced all documents responsive to requests for production."[58] Moreover, the district court admonished Hinkle once again that she should strongly consider whether to seek the deposition of a Midland representative:[59]

| THE COURT: | Now, Ms. Hinkle, I do want to tell you that you do have 45 days but you really need to give some serious consideration to whether there are any |
|---|---|

---

[57] (Doc. 77, at 7:14–21).

[58] (Doc. 76, at 2). Hinkle's motion was granted only to the extent she requested copies of the Purchase Agreements between Midland and the sellers of both accounts. (Doc. 76, at 2–3). Midland later produced the Purchase Agreements under the parties' agreed confidentiality order (Doc. 82).

[59] (Doc. 77, at 28:19–24).

> other depositions you want to take because you are
> not going to get another bite at this.  This is the last
> opportunity to conduct discovery in the case.

Nonetheless, Hinkle elected not to serve Midland with a deposition notice at any time prior to the close of discovery on June 27, 2014.

Midland's Motion for Summary Judgment

After the close of discovery, Midland filed its Motion for Summary Judgment (Doc. 85), arguing that it was entitled to judgment as a matter of law on all three grounds that Hinkle asserted as the basis for her FCRA claims, because: (1) the undisputed evidence showed that Midland obtained Hinkle's credit report only for the permissible purpose of attempting to collect on her two accounts; (2) the FCRA provides no private right of action for the alleged furnishing of false information to the CRAs; and (3) Hinkle had failed to raise a triable issue of fact regarding the reasonableness of Midland's investigations of Hinkle's disputes to the CRAs.

Midland contended that it was entitled to summary judgment on Hinkle's FDCPA claim, because: (1) the undisputed evidence showed that Midland in fact had included the requisite validation notices in its initial communications concerning both accounts; (2) Midland was not obligated to cease its collection activities in response to Hinkle's oral dispute of the T-Mobile Account; (3) as a matter of law, Midland's five telephone calls to Hinkle over a period of several

13

months did not amount to harassment; and (4) there was no genuine issue of material fact as to whether Midland made any false representations to the CRAs in connection with the accounts, because it was undisputed that Midland had appropriately flagged the accounts as "disputed." Furthermore, Midland argued, Hinkle's claims were time-barred under the FDCPA's one-year statute of limitations to the extent they related to the GE/Meijer Account, which had been paid in full over four years before she filed suit.

In opposition, Hinkle argued that Midland was not entitled to summary judgment on the claims that she has not abandoned on appeal[60] because: (1) her oral dispute was sufficient under the FDCPA to require Midland to cease attempting to collect on the T-Mobile Account;[61] (2) Midland lacked a permissible purpose under the FCRA for pulling her credit report in connection with its investigation of her dispute of the T-Mobile Account, because § 1681b(a)(3)(A) applies only to the CRAs, not to debt collectors, and because Midland could not have obtained her credit report for the purpose of collection since she had no direct relationship with Midland;[62] and (3) Midland "ha[d] failed to demonstrate exactly

---

[60] *See infra*, at 26–28.

[61] (Doc. 97, at ¶ 44).

[62] (Doc. 97, at ¶ 47).

14

what [it] did to meet the burden of a 'reasonable investigation,' which would be a question of ultimate material fact."[63]

In its reply, Midland pointed out that: (1) it was not required to cease all collection activities regarding the T-Mobile account because Hinkle did not dispute the debt in writing until July 26, 2012, well outside the 30-day validation period that began to run upon Midland's initial communication in December 2011; (2) Hinkle was simply wrong as a matter of law that a debt collector may not obtain a consumer's credit report for the permissible purpose of collection; and (3) its investigation of Hinkle's dispute of the T-Mobile Account was reasonable as a matter of law, because "[a]bsent allegations of fraud, identity theft, or other issues not identifiable from the face of its records, the furnisher need not do more than verify that the reported information is consistent with the information in its records."[64]

Hinkle's Motion to Strike Angelique Ross's Affidavit

In her response to Midland's motion for summary judgment, Hinkle also objected to the Affidavit of Angelique Ross, which Midland had attached to

---

[63] (Doc. 97, at ¶ 62). Despite previously insisting that Midland had violated the FCRA by allegedly reporting false or inaccurate information to the CRAs, Hinkle agreed in her response to Midland's motion that the FCRA provides no private right of action against furnishers based on the information they provide to the CRAs. (Doc. 97, at ¶ 59).

[64] *Howard v. Pinnacle Credit Servs., LLC*, No. 09-CV-0085, 2010 WL 2600753, at *3 (M.D. Ga. June 24, 2010) (quotation omitted).

authenticate documents in support of its motion.[65] Hinkle argued that the court should strike Ross's Affidavit because it was based on "information . . . [which] came not from a creditor but the sellers (other [debt] buyers),"[66] and because Midland had failed to identify Ross in its Rule 26 initial disclosures as a person likely to have discoverable information.[67]

In its reply, Midland urged the court to overrule Hinkle's objections, because Ross's affidavit was expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's] business either by [her]self or those under a duty to maintain [such] records,"[68] and the "documents attached to the Declaration are either non-hearsay or could be reduced to admissible form."[69] Midland further argued that it was not required to identify Ross in its initial disclosures because she was not an "individual likely to have discoverable information," Fed. R. Civ. P. 26(a)(1), and even if she were, Ross's Affidavit should not be stricken because Midland's failure to disclose her as a potential witness was either substantially justified or harmless.

---

[65] *See* (Doc. 85-2).

[66] (Doc. 97, at ¶ 69).

[67] (Doc. 97, at ¶ 71).

[68] (Doc. 85-2, at ¶ 5).

[69] *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 112 (11th Cir. 2010).

District Court's Order Granting Midland's Motion for Summary Judgment

The district court rejected out of hand Hinkle's objections to Ross's affidavit, finding that "[t]he record [did] not support [Hinkle's] assertion that Ross is unqualified to serve as records custodian or that the business records attached to the Ross Affidavit are inadmissible."[70]

As to the merits, the district court granted summary judgment to Midland on all of Hinkle's claims. First, the district court agreed that Hinkle's FDCPA claims were time-barred to the extent they related to the GE/Meijer Account.[71] The district court also concluded that Midland was entitled to judgment as a matter of law on her FDCPA claim "to the extent it is based on [Midland's] failure to cease collection activities prior to [her] submission of a written dispute of the T–Mobile account," because Hinkle's "oral notice of dispute did not trigger a statutory obligation for [Midland] to cease [its] collection efforts."[72]

The district court also found that Midland was entitled to summary judgment on Hinkle's FCRA claim for allegedly obtaining her credit report without a permissible purpose. As the court explained, Hinkle had "offer[ed] no evidence

---

[70] (Doc. 105, at 5).

[71] (*Id.* at 9).

[72] (*Id.* at 13).

that [Midland] obtained her credit reports for any purpose other than collection," which is a permissible purpose under the FCRA.[73]

Lastly, the district court found that Hinkle had failed to raise a triable issue of fact regarding the reasonableness of Midland's investigation of her dispute with the CRAs. While Hinkle had argued that "it was unreasonable for [Midland] to rely on the information [it] received from the original creditors," the district court "note[d] that [Midland] did more than merely rely on [its] internal records—[it] requested information and assistance from [Hinkle], but [she] did not respond."[74] "In the absence of [her] cooperation," the district court found that there was no genuine issue of material fact as to whether "it was reasonable for [Midland] to limit the scope of [its] investigation to an examination of its own electronic systems."[75]

### D.    Standards of Review

<u>Summary Judgment</u>

"Consideration of the district court's grant of summary judgment requires plenary review and application of the same legal standards that bound the district court." *Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989) (citation omitted).

---

[73] (*Id.*, at 18). ("Section 1681b(3)(A) of the FCRA permits a debt collector to request a credit report if it uses the report to review an account.") (citing *Flores v. I.C. Sys., Inc.*, No. 13-CV-21352, 2014 WL 1379046, *3 (S.D. Fla. Apr. 8, 2014)).

[74] (Doc. 105, at 21).

[75] (*Id.*).

Under Rule 56(c), "summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quotation omitted). "The moving party is entitled to judgment as a matter of law if the nonmoving party cannot sufficiently show an essential element of the case to which the nonmoving party has the burden of proof." *Id.* (citation omitted).

Rule 56(e), on the other hand, "requires that when a motion for summary judgment is made and supported according to the rule, the nonmoving party's response must set forth specific facts showing a genuine issue for trial." *Barfield*, 883 F.2d at 933. "If the party's response consists of nothing more than a repetition of his conclusory allegations, the district court must enter summary judgment in the moving party's favor." *Id.* (citations omitted).

Hinkle's Motion to Strike Angelique Ross's Affidavit

"[U]ndisclosed witnesses may still be [allowed to testify] if the disclosure failure was substantially justified or if it was harmless." *Hearn v. McKay*, 603 F.3d 897, 903 (11th Cir. 2010) (citing Fed. R. Civ. P. 37(c)(1)). This Court's review of a district court's decision whether to impose sanctions under Rule 37 "is sharply limited to a search for an abuse of discretion and a determination that the findings

of the trial court are fully supported by the record." *Serra Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1146–47 (11th Cir. 2006).

## SUMMARY OF THE ARGUMENT

"It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 972 (11th Cir. 2008) (citation omitted). By failing to raise any argument in her opening brief that Midland's alleged FCRA violations were willful, Hinkle has abandoned any such argument on appeal. Likewise, aside from her claim that Midland violated the FDCPA by continuing to report the T-Mobile Account to the CRAs following her oral dispute, Hinkle also has abandoned any arguments regarding the other FDCPA violations she asserted in the district court, including *all* of her FDCPA claims as to the GE/Meijer Account.  Furthermore, even as to the claims she has not abandoned, Hinkle waived the two arguments that she actually does raise in her opening brief in support of her FCRA claims by failing to first raise them before the district court.[1]

In sum, only the following claims and arguments are at issue on appeal:

(1)    Whether Midland was obligated to cease reporting the T-Mobile Account to the CRAs following Hinkle's oral dispute;

---

[1] Hinkle's former *pro se* status does not excuse her waiver of arguments raised for the first time on appeal. "Although *pro se* pleadings are liberally construed, issues not raised before the district court are deemed waived." *Cavero v. One W. Bank FSB*, No. 14-14369, -- F. App'x -- , 2015 WL 3540388, at *1 (11th Cir. June 8, 2015) (holding that *pro see* appellants waived arguments in support of their FDCPA claims by failing to raise them before the district court) (citing *Tannenbaum v. United States,* 148 F.3d 1262, 1263 (11th Cir. 1998)).

(2)     Whether Midland obtained Hinkle's credit report for the permissible purpose of collecting the T-Mobile Account; and

(3)     Whether Midland's investigation was reasonable in light of the information it received from the CRAs about the nature of Hinkle's dispute of the T-Mobile Account.

The district court correctly concluded that Midland was entitled to judgment as a matter of law on all of Hinkle's claims:

### (1)     Midland did not violate the FDCPA by continuing to report the T-Mobile Account to the CRAs following Hinkle's oral dispute.

"[T]he FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must 'communicate' the disputed nature of the debt" following either a consumer's oral dispute or a written dispute outside the 30-day validation period. *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 161 (D. Me. 2011). And here, it is undisputed that Midland "specifically flagged the debt as disputed." *Id.*[2]

### (2)     Midland obtained Hinkle's credit report for the permissible purpose of collecting the T-Mobile Account.

As Midland noted before the district court, Hinkle knew better than to argue that Midland could not obtain her credit report for the permissible purpose of collection. Indeed, she previously had filed nine other cases in the same division, of the same court, asserting the same claim. And "[i]n every case, the United States Magistrate Judge issued a Report and Recommendation in which he discusse[d] the

---

[2] (*See* Doc. 85-9) ("[W]e have requested that the three major consumer credit reporting agencies change the status of this account to 'Disputed.'"); (Doc. 85-10) (same).

***permissible purpose of debt collection*** and recommend[ed] that the case be dismissed."[3] To her credit, Hinkle does not renew her argument on appeal that the permissible purposes set forth in § 1681b(a)(3)(A) apply only to the CRAs, and not debt collectors. Instead, she raises a new argument for the first time — that the statute applies only to "accounts," not "debts.".

But even if it were not waived, Hinkle's purported distinction between "accounts" and "debts" is, at best, without a difference. In fact, her "argument 'has been universally rejected by every court that has directly addressed it.'" *Valle v. RJM Acquisitions, LLC*, No. 12-CV-00957, 2015 WL 739855, at *3 (D. Conn. Feb. 19, 2015). "Relying on the 'collection of an account' language in § 1681b(a)(3)(A), courts appear to be uniform in their agreement that a debt collector is permitted to obtain a consumer credit report for the purpose of collecting an outstanding **debt**." *Id.* (emphasis added).

"In the instant case, . . . [Hinkle] has acknowledged that [Midland] was seeking to collect a (disputed) consumer debt that she allegedly owed T–Mobile." *Searle v. Convergent Outsourcing, Inc.*, No. 13-11914, 2014 WL 4471522, at *4 (D. Mass. June 12, 2014). On the other hand, Hinkle has offered no evidence whatsoever that Midland obtained her credit report for any purpose other than

---

[3] *Hinkle v. ARS National Services, Inc.*, No. 3:12-CV-0052-DHB, Doc. 45 (Order Granting Motion for Summary Judgment), at 13–14 (emphasis added).

collection of the T-Mobile account. "This is sufficient to establish that [Midland] had authority to request the credit report." *Id.*

**(3)     Hinkle failed to raise a triable issue of fact as to the reasonableness of Midland's investigation in light of the information it received from the CRAs regarding the nature of her dispute of the T-Mobile Account.**

The district court correctly concluded that Hinkle failed to raise a triable issue of fact as to the reasonableness of Midland's investigation. The reasonableness of a furnisher's investigation is judged by an objective standard, based on the nature of the consumer's dispute. Here, Hinkle's dispute was generic—that she simply did not owe the T-Mobile Account. Because "[t]he notices the CRAs provided to Midland provided little, if any, detail as to the basis for [Hinkle's] dispute," in this case, "[i]t was . . . enough for Midland to check the information it received from the seller of the debt to verify that [Hinkle] was the one who owed it." *Edeh v. Midland Credit Mgmt., Inc.*, 413 F. App'x 925, 926–27 (8th Cir. 2011).

Accordingly, and for the reasons explained below, this Court should affirm the district court's summary judgment.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.    **Hinkle has abandoned most of the claims she raised before the district court and waived several of the arguments in her opening brief by raising them for the first time on appeal.**

Hinkle has abandoned the majority of the FDCPA claims she raised in the district court, as well as any argument that Midland willfully violated the FCRA. On the other hand, Hinkle makes several arguments in her opening brief that she failed to raise before the district court. Thus, the following claims and/or arguments should not be considered on appeal.

A.    **Hinkle has abandoned the majority of arguments she made below in support of her FDCPA claim, as well as any argument that Midland willfully violated the FCRA.**

Though she mentions them in passing as part of her Statement of the Issues,[4] Hinkle makes no argument in her opening brief in support of her FDCPA claims under §§ 1692g(a)(4),[5] 1692g(b),[6] and 1692d.[7] Therefore, those claims have been abandoned and are not at issue on appeal.[8] Furthermore, while Hinkle also makes a

---

[4] *See* (Appellant's Br., at 2, ¶ 6).

[5] (Doc. 8, at ¶ 19).

[6] (*Id.* at ¶ 94).

[7] (*Id.* at ¶ 95).

[8] "Because those claims are not designated as discrete issues in [her] brief to this Court and are not supported by legal authority and substantive analysis, they are not properly before [this Court]." *United States v. Godwin*, 765 F.3d 1306, 1319 (11th Cir. 2014) (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681–82 (11th Cir. 2014) (explaining that an appellant abandons a claim by failing to list it in his statement of the issues, failing to "devot[e] a discrete section of his argument" to it, raising it "in a perfunctory manner without supporting arguments and authority," or burying it within a larger argument)).

passing attempt to resurrect an FDCPA claim based on the GE/Meijer account,[9] her

opening brief makes no mention of the fact that the district court concluded that

any such claim was time-barred.[10] By failing to raise any argument to the contrary,

Hinkle likewise has abandoned *all* of her FDCPA claims as to the GE/Meijer

account.[11]

As for her FCRA claims, Hinkle's only mention of "willfulness" in her

opening brief is her conclusory assertion that Midland "willfully ignored the

opportunity to prove [its] claim" by failing to request that DRS, the seller of the T-

Mobile Account, obtain additional information from the original creditor.

(Appellant's Br., at 32).[12] Yet, "[m]erely stating the legal conclusion that

---

[9] *See* (Appellant's Br., at 33–35).

[10] *See* (Doc. 105, at 9) ("An action to enforce any liability created by the FDCPA may be brought within one year from the date on which the violation occurs. 15 U.S .C. § 1692k(d). In this case, the GE/Meijer account was paid in full in December 2008. Defendants last reported information regarding this account to the CRAs on March 16, 2009. Plaintiff commenced this action on April 4, 2013. Therefore, any FDCPA claim based on the GE/Meijer account is time-barred.").

[11] Any purported FDCPA claims based on the GE/Meijer Account also fail as a matter of law because "[a] plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full, and after the debt collector acknowledged that the debt was paid in full." *Narog v. Certegy Check Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011) (citing *Winter v. I.C. System Inc.*, 543 F. Supp. 2d 1210, 1213 (S.D. Cal. 2008)). "Under the FDCPA, that conduct is not taken in connection with the collection of a debt." *Id.*

[12] As this Court has stated:

[The] FCRA provides for civil liability both for willful and negligent noncompliance. With regard to willful noncompliance, 15 U.S.C. § 1681n(a) provides, in relevant part, that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer [for actual damages, statutory damages, and possibly punitive damages.] In contrast, § 1681o(a), which governs negligent

Defendant acted willfully but failing to provide any factual basis to support these causes of action is insufficient." *Pyle v. First Nat'l Collection Bureau*, No. 12-CV-00288, 2012 WL 1413970, at *3 (E.D. Cal. Apr. 23, 2012).[13] Hinkle could direct the district court to no such evidence of willfulness on Midland's part, and on appeal, she has abandoned the endeavor altogether. Therefore, this Court should affirm the district court's summary judgment in favor of Midland on her FCRA claims.

### B.    Hinkle waived both of the arguments she raises in support of her FCRA claims.

Hinkle contends for the first time on appeal that even if there were no dispute that Midland obtained her credit report solely for the purpose of collecting on the T-Mobile Account, the permissible purposes described in § 1681b(a)(3)(A) apply only to *accounts*, not *debts*. Thus, Hinkle argues, Midland was not entitled to

---

noncompliance, allows for actual damages but not statutory damages or punitive damages.

*Levine v. World Fin. Network Nat. Bank*, 437 F.3d 1118, 1123 (11th Cir. 2006). All of Hinkle's FCRA claims arise under § 1681n, not § 1681o. *See supra*, at 22 & n.**Error! Bookmark not defined.**.

[13] "[A]s used in the FCRA, 'willfully' entails a 'conscious disregard' of the law, which means 'either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the FCRA or in reckless disregard of whether the policy [or action] contravened those rights.'" *King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1279 (N.D. Ga. 2006) (granting summary judgment on plaintiff's claim for willful violation of the FCRA) (citation omitted). Thus, to prevail on a claim for a defendant's alleged willful violation of the FCRA, the evidence must show an "intention to thwart consciously [plaintiff's] right to have inaccurate information removed promptly from his report." *Id.* at 1280; *see also Thomas v. Gulf Coast Credit Servs., Inc.*, 214 F. Supp. 2d 1228, 1238 (M.D. Ala. 2002) (granting summary judgment on willfulness claim because "fail[ure] to produce immediate eradication of inaccurate information" is not a knowing and conscious disregard for the plaintiff's rights).

judgment as a matter of law, because it failed to direct the district court to any evidence that her T-Mobile Account qualified as an "account" under § 1681b(a)(3)(A). In addition to being wrong as a matter of law, as explained more fully below,[14] Hinkle waived this argument by failing to raise it before the district court. *See Cavero*, 2015 WL 3540388, at *1.

Hinkle also has waived any argument that Midland's investigation of her dispute was unreasonable because it failed to request additional information from the original creditor. In the district court, Hinkle did state that Midland's investigation was unreasonable, in part, because it did not "attempt to verify the information contained in the spread sheets purchased," or "seek any supporting documentation or information beyond the bare and contradictory information received in spreadsheets at the times [it purchased the accounts]." (Doc. 97, at ¶¶ 62, 64). She *did not*, however, make the argument that she makes for the first time in her opening brief—that is, that Midland's investigation was unreasonable because "[t]he reasonable thing Midland should have done is simply contact the Seller to investigate the account information," since "DRS—the seller of the alleged T-Mobile account—was contractually obligated to provide free assistance and communication with the original creditor through them." (Appellant's Br., at 29). By failing to raise it before the district court in opposition to Midland's motion

---

[14] *See infra*, at III.

for summary judgment, Hinkle waived her new argument based on the Purchase

Agreement between Midland and DRS. *See Cavero*, 2015 WL 3540388, at *1.

## II.    Midland was entitled to judgment as a matter of law on Hinkle's FDCPA claim because it was not required to cease credit reporting on the T-Mobile Account by virtue of her oral dispute.

As noted above, Hinkle argued before the district court that Midland

violated § 1692g**(b)** by failing to cease collection activities in response to her oral

dispute of the T-Mobile Account.[15] On appeal, Hinkle ostensibly claims not that

Midland was required to cease all collection activities, but rather that her oral

dispute under § 1692g**(a)(3)** obligated Midland to cease reporting the debt to the

CRAs.[16] In that sense, Hinkle's argument on appeal appears to be, in reality, a re-

tread of her argument before the district court in support of her claim under a

different subsection: that is, that Midland violated § 1692e(8) "by reporting an

'alleged' debt' . . . to a consumer reporting agency . . . in connection with the

collection of a debt which they knew was incorrect."[17] As the district court

explained with respect to that claim, "[t]he FDCPA does not require debt collectors

---

[15] *See* (Doc. 8, at ¶ 94).

[16] *See* (Appellant's Br., at 9) ("[T]he lower court erred when it dismissed Hinkle's FDCPA claim, since Hinkle properly (orally) disputed the alleged T-Mobile debt, which triggered a duty to verify the accuracy of the information [Midland] [was] reporting."); *see also* (*Id.* at 32–35).

[17] (Doc. 8, at ¶ 91). Hinkle comes closest to acknowledging as much in her Statement of the Case. *See* (Appellant's Br., at 3) ("Hinkle orally and timely disputed that the alleged debts on these alleged accounts that Midland claims they had, did not belong to her; Midland not only reported false information about her in violation of 15 U.S.C. § l692e but also continued to report the GE-Meijer debt, which was paid by an unidentified payer prior to Midland's first reporting.").

to cease reporting a debt to the CRAs simply because a consumer disputes that the debt was ever owed."[18]

Nevertheless, Hinkle still apparently misapprehends that "[a]n oral notice of dispute of a debt's validity has different legal consequences than a written notice." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859, 869–70 (S.D. Tex. 2011). As the district court rightfully concluded, the plain language of § 1692g**(b)** makes clear that a writing is required in order to trigger a debt collector's obligation to cease collection activities until the debt is verified.[19]

On the other hand, a consumer's oral dispute of a debt has <u>other</u> consequences. For example, "once a consumer disputes a debt **orally** under section 1692g**(a)(3)**, a debt collector cannot communicate that consumer's credit information to others **without disclosing the dispute**." *Clark v. Absolute*

---

[18] (Doc. 105, at 17). In any event, the undisputed evidence shows that Midland stopped reporting the GE/Meijer Account in March 2009, long before Hinkle filed either of her disputes with the CRAs. *See* (Doc. 85-5, at Midland-Hinkle 000048). While Hinkle insinuates that Midland may have fabricated such evidence (Appellant's Br., at 34), the truth is that she misapprehends the difference between a furnisher's "reporting" of credit information to the CRAs and the appearance of an account on her credit "report." *See* (Doc. 97 at ¶¶ 18–19, 25; Doc. 97-2, at PlainApp. 00006, ¶ 3). The appearance of the GE/Meijer Account on Hinkle's credit report does not contradict Midland's records, which show that it stopped reporting the Account in 2009. Indeed, one of the credit reports cited by Hinkle as supposed proof that Midland continued credit reporting on the GE/Meijer Account shows that the account was, in fact, "Last Reported: 03/2009." (Doc. 58, at 4 (Ex. 10b)). Thus, the district court rightly concluded that her FDCPA claims were time-barred as to the GE/Meijer Account, a determination which Hinkle does not challenge on appeal.

[19] *See* 15 U.S.C. § 1692g(b) ("If the consumer notifies the debt collector **in writing** within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt.") (emphasis added).

*Collection Serv., Inc.*, 741 F.3d 487, 491 (4th Cir. 2014) (citing 15 U.S.C. §
1692**e(8)**) (emphases added). Thus, for purposes of Hinkle's FDCPA claim (at
least insofar as that claim is characterized on appeal), the salient distinction is that,
in the face of an oral dispute, the FDCPA requires only that "if a debt collector
*elects* to communicate 'credit information' about a consumer, it must not omit a
piece of information that is always material, namely, that the consumer has
disputed a particular debt." *Wilhelm v. Credico, Inc.,* 519 F.3d 416, 418 (8th Cir.
2008) (emphasis in original).[20]

In essence, Hinkle "insists that because [Midland] was informed that the
debt . . . was invalid, its decision to 'credit report' this debt amounted to a violation
of" the FDCPA. *Poulin*, 760 F. Supp. 2d at 161. "While [she] may wish this to be a
true statement of the law, [s]he unfortunately can cite to no legal authority to
support [t]his argument." *Id.* To the contrary, "the FDCPA specifically
contemplates the circumstances presented here, and obligates only that a debt
collector must 'communicate' the disputed nature of the debt" in order to satisfy its
obligations to adequately inform credit reporting agencies about the debt following
a consumer's oral dispute under § 1692g(a)(3). *Poulin*, 760 F. Supp. 2d at 161.

---

[20] Indeed, § 1692g(a)(3) simply states one of the notices that a debt collector must
provide in its initial communication with a consumer. Thus, other than a claim alleging that a
debt collector failed to provide the requisite validation notice (a claim which Hinkle initially
asserted but has now abandoned), it is difficult to conceive how a debt collector could "violate"
§ 1692g(a)(3) merely by continuing to report a disputed debt to the CRAs.

Here, not only did "[t]he evidence before the [district court] firmly establish[] that, in reporting the debt to the credit reporting agencies, [Midland] specifically flagged the debt as disputed,"[21] *id.*, Hinkle herself even recognizes as much.[22] Therefore, the district court correctly concluded that Midland was entitled to judgment as a matter of law on Hinkle's FDCPA claim to the extent she argues that her oral dispute of the T-Mobile Account obligated Midland to cease reporting the account to the CRAs.

## III. The undisputed evidence shows that Midland obtained Hinkle's credit report for the permissible purpose of "collection" of the T-Mobile Account.

While Hinkle "insists that [Midland] had no permissible purpose to request her credit report, [she] offer[ed] no evidence that [Midland] obtained her credit reports for any purpose other than collection," which, as the district court noted, is a permissible purpose under the FCRA.[23] Likewise, Hinkle still has failed to cite any evidence that Midland harbored an ulterior motive for pulling her credit report aside from its efforts to collect on the T-Mobile Account. Instead, Hinkle argues (for the first time on appeal), that Midland lacked a permissible purpose for

---

[21] (*See* Doc. 85-9) ("[W]e have requested that the three major consumer credit reporting agencies change the status of this account to 'Disputed.'"); (Doc. 85-10) (same).

[22] *See* (Appellant's Br., at 34) (acknowledging that "Midland inserted the dispute flag, 'disputed by consumer,' in response to both disputes on both alleged accounts").

[23] (Doc. 105, at 19) ("Section 1681b(3)(A) of the FCRA permits a debt collector to request a credit report if it uses the report to review an account.") (citing *Flores v. I.C. Sys., Inc.*, 2014 WL 1379046, *3 (S.D. Fla. Apr. 8, 2014)).

obtaining her credit report because the FCRA only "permits a CRA to grant access to those it 'has reason to believe' are involved in 'the review or collection of an **account**,'" as opposed to "the review or collection of a '**debt**.'" (Appellant's Br. at 30) (emphases added) (quoting 15 U.S.C. § 1681b(a)(3)(A)).

In other words, Hinkle "contends that n[o] defendant was collecting an 'account' of [hers] as permitted by the statute," because "[t]he definitions section of FCRA states that 'the term 'account' has the same meaning as in section 1693a of this title." *Valle*, 2015 WL 739855, at *3 (quoting 15 U.S.C. § 1681a) (alterations omitted). "Section 1693a, in turn, defines 'account' as 'a demand deposit, savings deposit, or other asset account (other than an occasional or incidental credit balance in an open end credit plan as defined in section 1602(f) of this title) established primarily for personal, family, or household purposes.'" *Id.* (quoting 15 U.S.C. § 1693a(2)) (alterations omitted). Because "Midland has not produced any evidence as to what type of accounts these are," or "that either of the alleged debts were 'established primarily for personal, family, or household purposes,'" Hinkle contends that Midland was not entitled to summary judgment on her FCRA claim. *See* (Appellant's Br. at 32) (quoting 15 U.S.C. § 1693a(2)).

Hinkle's purported distinction between "accounts" and "debts" is, at best, without a difference. In fact, her "argument 'has been universally rejected by every court that has directly addressed it.'" *Valle*, 2015 WL 739855, at *3 (quoting

*Harris v. NCO Fin. Sys.*, No. 13-CV-0259, 2013 WL 6858852, at \*3 (D. Md. Dec. 23, 2013)). "[R]ead literally, the cross-reference in § 1681a(r)(4) may suggest that only deposit accounts are included in FCRA's definition of an 'account.'" *Id.* "Read correctly, § 1681b(a)(3)(A) permits [Midland] to obtain [Hinkle's] consumer reports." *Demaestri v. Asset Acceptance Capital Corp.*, No. 11-CV-01671, 2012 WL 1229907, at \*5 (D. Colo. Mar. 14, 2012), *report and recommendation adopted*, 2012 WL 1229940 (D. Colo. Apr. 12, 2012).

"The definition of 'account' in § 1681a(r)(4) provided by [Hinkle] . . . is under a heading concerning 'Credit and debit related terms.'" *Id.* However, Hinkle "has made no showing that such usage of the term is applicable to the word 'account' as used in section 1681b(a)(3)(A), which does not deal with credits and debits." *Id.* On the other hand, "[g]iven that one of the purposes of the statute is to require consumer reporting agencies to 'adopt reasonable procedures for meeting the needs of consumer credit,' 15 U.S.C. § 1681(b), it would make little sense for the statute to apply only to deposit accounts." *Valle*, 2015 WL 739855, at \*3. Nor is it at all "clear what the 'collection of' a deposit account would mean in practical terms." *Id.*

Therefore, this Court should reject Hinkle's reliance on the FCRA's cross-reference to the Electronic Fund Transfer Act's definition of "account" to suggest that Midland lacked a permissible purpose for obtaining her credit report for

purposes of collecting on her T-Mobile Account.[24] Indeed, "'[r]elying on the 'collection of an account' language in § 1681b(a)(3)(A), courts appear to be uniform in their agreement that a debt collector is permitted to obtain a consumer credit report for the purpose of collecting an outstanding debt." *Valle*, 2015 WL 739855, at *3 (quoting *Fritz v. Capital Mgmt. Servs., LP*, No. 12–CV-4725, 2013 WL 4648370, at *3 (W.D. Pa. Aug. 29, 2013) (collecting cases)) (alterations omitted);[25] *see also Demaestri*, 2012 WL 1229907, at *4;[26] *Pinson v. Monarch Recovery Mgmt., Inc.,* No. 12-CV-80480, 2013 WL 961308, at *2 (S.D. Fla. Mar. 12, 2013) (agreeing that § 1681b "permits a debt collector to request a credit report if it uses the report to review an account") (citation omitted).[27]

---

[24] *See Valle*, 2015 WL 739855, at *3 (rejecting the same proffered interpretation based on the principle that "where the literal meaning of a statute yields an illogical result or one manifestly not intended by the legislature, departure from strict adherence to statutory text may be warranted") (quoting *United States v. Whitley*, 529 F.3d 150, 156 (2d Cir. 2008)).

[25] *Id.* (citing *Norman v. Northland Grp. Inc.*, 495 F. App'x 425, 427 (5th Cir. 2012); *Huertas v. Galaxy Asset Mgmt.*, 641 F.3d 28, 34 (3d Cir. 2011); *Miller v. Wolpoff & Abramson, LLP*, 309 F. App'x 40, 43 (7th Cir. 2009); *Thomas v. U.S. Bank, N.A.*, 325 F. App'x 592, 593 (9th Cir. 2009)).

[26] *Id.* (citing *Robinson v. Greystone Alliance, LLC*, No. 10-CV-3658, 2011 WL 2601573, at *3 (D. Md. June 29, 2011) ("Debt collection is a permissible purpose for obtaining a credit report under the FCRA. As long as the debt collector has 'reason to believe' that the consumer owes the debt, the debt collector may permissibly obtain the consumer's credit report without violating the FCRA.") (alteration omitted); *Smith v. John P. Frye, P.C.*, No. 10-CV-3366, 2011 WL 748363, at *3 (N.D. Ill. Feb. 24, 2011) (providing that "obtaining a credit report in connection with collection of a debt is permissible under the FCRA"); *Adams v. LexisNexis Risk & Info. Analytics Grp, Inc.*, No. 08-CV-4708, 2010 WL 1931135, at *8 (D.N.J. May 12, 2010) ("Courts recognize that collection is a permissible purpose for obtaining a consumer report under the FCRA.")).

[27] A recent district court case that Hinkle cites, *Bersaw v. Northland Grp. Inc.*, is not to the contrary. *See* No. 14-CV-128, 2015 WL 1097402, at *3 (D.N.H. Mar. 11, 2015). Rather than hold the consumer plaintiff to her burden of identifying substantial evidence that the defendant

"In the instant case, . . . [Hinkle] has acknowledged that [Midland] was seeking to collect a (disputed) consumer debt that she allegedly owed T–Mobile." *Searle*, 2014 WL 4471522, at *4.[28] Meanwhile, Hinkle has offered no evidence whatsoever that Midland obtained her credit report for any purpose other than collection. "This is sufficient to establish that [Midland] had authority to request the credit report." *Id.*[29] "Because reviewing or collecting on the account of the

---

did *not* have a permissible purpose, the *Bersaw* court apparently based its decision on the defendant's failure to adduce evidence that it *did* have a permissible purpose to review the plaintiff's credit report. *See id.* ("Northland has not claimed—let alone presented evidence establishing—that those debts were 'established primarily for personal, family, or household purposes' (as opposed to, say, business purposes), as required for them to qualify as 'accounts' under 15 U.S.C. § 1693a(2). So, on the current record, there is a genuine issue of material fact as to whether Northland had a 'permissible purpose; for obtaining Bersaw's consumer report.").

That is not the case here. In fact, Hinkle "acknowledges that [s]he is a 'debtor,' that [Midland] is a 'debt collector,' and that [Midland] was attempting to 'collect a debt.'" *Ekhlas v. NCO Fin. Sys., Inc.*, No. 13-CV-0978, 2013 WL 6190660, at *2 (C.D. Cal. Nov. 25, 2013). "It is also undisputed that, as the assignee of that account, [Midland] was entitled under the FCRA to obtain plaintiff's credit report from consumer reporting agencies for the permissible purpose of review or collection of the assigned debt." *Ostrander v. Unifund Corp.*, No. 07-CV-86, 2008 WL 850329, at *3 (W.D.N.Y. Mar. 28, 2008). "Therefore, by alleging that [Midland] obtained [her] consumer report and then attempted to collect a debt, [Hinkle] has pled [her]self out of [an] FCRA claim by including details contrary to [her] claim." *Salmas v. Portfolio Recovery Assoc., LLC*, No. 13-CV-0575, 2013 WL 6182614, at *3 (C.D. Cal. Nov. 25, 2013); *see* (Doc. 8, at ¶ 35). On the other hand, if this Court were to credit Hinkle's new argument on appeal (that there is no evidence that her T-Mobile Account was "established primarily for personal, family, or household purposes") then she would have pleaded herself out of an FDCPA claim. *See Hawthorne v. Mac Adjustment, Inc.*, 140 F.3d 1367, 1371 (11th Cir. 1998) ("[T]he statutory language . . . limits application of the FDCPA to debts arising from *consumer* transactions . . . [and] provides that a 'debt' is 'any obligation or alleged obligation *of a consumer* to pay money arising out of a transaction . . . primarily for personal, family, or household purposes . . . .'") (quoting 15 U.S.C. § 1692a(5)) (emphases in original; citations omitted).

[28] *See, e.g.*, (Doc. 8, at ¶ 39) ("MCM, and Midland operate as a debt buying and collection enterprise."); (*id.* at ¶ 92) ("Midland . . . in connection with the collection of a debt"); (*id.* at ¶ 94) ("MCM and Midland . . . are still engaging in collection actions . . .").

[29] *See Holloman v. Smith Debnam Narron Drake Saintssing & Myers, LLP*, No. 14-CV-0031, 2014 WL 1225330, at *2 (M.D.N.C. Mar. 25, 2014) ("The fact that Plaintiff disputes [her]

consumer is a permissible purpose for requesting and obtaining a person's credit report under the FCRA, and because it is undisputed that [Midland] requested and obtained one copy of [Hinkle's] credit report solely to assist in its collection of [her] T–Mobile USA, Inc. account debt and not for any other purpose, [Midland] is entitled to a judgment as a matter of law." *Sheridan v. United Recovery Sys., LP*, No. 14-CV-01250, 2015 WL 1462909, at *4 (M.D. Tenn. Mar. 30, 2015), *report and recommendation adopted*, 2015 WL 1810125 (M.D. Tenn. Apr. 17, 2015).

## IV. Hinkle failed to raise a triable issue of fact regarding the reasonableness of Midland's investigation following her dispute of the T-Mobile Account with the CRAs.

Hinkle failed to raise a triable issue of fact as to the reasonableness of Midland's investigation of her generic dispute that she simply did not owe the T-Mobile Account. The reasonableness of a furnisher's investigation is judged by the nature of the consumer's dispute.[30] For example, as Hinkle notes, the consumer's dispute in *Johnson* was very specific,[31] and the furnisher's investigation could be

---

current obligation to pay . . . does not provide a basis for concluding that Defendant[s] lacked a permissible purpose in obtaining Plaintiff's credit report."), *report and recommendation adopted*, 2014 WL 1339976 (M.D.N.C. Apr. 3, 2014).

[30] *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 38 (1st Cir. 2010) (more limited investigation may be appropriate when CRAs provide furnisher with vague or cursory information about consumer's dispute); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1155 (9th Cir. 2009).

[31] *See Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004) ("MBNA was notified of the specific nature of Johnson's dispute—namely, her assertion that she was not a co-obligor on the account.").

deemed unreasonable only in light of the specificity of her dispute.[32] Here, on the other hand, Midland's "investigation in this case was reasonable given the scant information it received regarding the nature of [Hinkle's] dispute." *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005).

While Hinkle asserts that "Midland was notified of the specific nature of [her] dispute" (Appellant's Br., at 21), the documents she actually cites for that proposition show that her dispute was anything but "specific." According to its records, the CRAs indicated to Midland only that Hinkle claimed that the T-Mobile Account was "Not hers/his."[33] And even though Midland's investigation is evaluated based only on the information it received, the information Hinkle actually submitted to the CRAs was equally unspecific:[34†]

---

[32] *See id.* ("MBNA's agents testified that their investigation was primarily limited to (1) confirming that the name and address listed on the ACDVs were the same as the name and address contained in the CIS, and (2) noting that the CIS contained a code indicating that Johnson was the sole responsible party on the account. The MBNA agents also testified that, in investigating consumer disputes generally, they do not look beyond the information contained in the CIS and never consult underlying documents such as account applications. Based on this evidence, a jury could reasonably conclude that MBNA acted unreasonably in failing to verify the accuracy of the information contained in the CIS.").

[33] (Doc. 97-2, at PlainApp. 00023, and 27–28).

[34] (Doc. 97-2, at PlainApp. 00051); *see also* (*id.* at PlainApp. 00049–00050).

[†] Midland's Appellee's Brief previously referred to Hinkle's August 28, 2011 dispute of the GE/Meijer Account, rather than her July 13, 2012 dispute of the T-Mobile Account, noting that her dispute with the CRAs was "even less descriptive" than the notice of her dispute that Midland received from the CRAs. Although Hinkle's July 2012 dispute did include more information than her August 2011 dispute—namely, the assertion that she had "no contractual obligation" with Midland and her belief that its reporting of the T-Mobile Account was "a false claim of account"—the fact remains that the information Hinkle provided **to the CRAs** is irrelevant to her claim against Midland. Rather, as described more fully below, "[t]he [FCRA] is

37

Attn: Legal Department

I am disputing the following items:

1. MIDLAND CREDIT MANAGEMENT account #854430**** I have no contractual obligation with this company whatsoever and this is false information and a false claim of account.

2. MIDLAND FUNDING LLC account ##854430**** I have no contractual obligation with this company whatsoever and this is false information and a false claim of account.

In other words, just like the furnisher in *Westra*, Midland "received a [dispute] from [the CRAs] indicating that [Hinkle] was disputing the charge on the basis that the account did not belong to [her]." *Westra*, 409 F.3d at 827.[35] In response, Midland "verified [Hinkle's] name, address, and date of birth and sent the [dispute] back to [the CRAs]." *Id.* Without more, as was the case in *Westra*,

---

clear that the investigation is directed to the information ***provided by the CRA***." *Chiang*, 595 F.3d at 38 (emphasis added).

Thus, regardless of what information Hinkle provided in her dispute **to the CRAs**, the district court correctly concluded that Midland's investigation was reasonable in light of the "scant information" it received **from the CRAs**. *See Westra*, 409 F.3d at 827; *see also Stroud v. Bank of Am.,* 886 F. Supp. 2d 1308, 1316 (S.D. Fla. 2012) ("Instead, the rule is that if a credit reporting agency relays an insufficient dispute description to an information furnisher, then an individual may instead simply have a cause of action against the credit reporting agency.") (citation omitted); *Arianas v. LVNV Funding LLC*, No. 8:14-CV-01531, 2015 WL 5038269, at *7 n.3 (M.D. Fla. Aug. 25, 2015) ("To the extent Arianas's claim is based on the insufficiency of the dispute description, that claim is properly directed at the credit reporting agency, not the furnisher.").

[35] According to her own affidavit, Hinkle "did not use the terms 'fraud' or 'identity theft' in her communication with the Midland representative." *See* (Doc. 97-2, at PlainApp. 00002, ¶ 7); *see also id.* at PlainApp. 00008, ¶¶ 9-10) ("Record 000035 … [contains] an entry which states that the Plaintiff claimed fraud which is untrue. . . . Plaintiff made NO CLAIMS of fraud or identity theft . . . .").

Midland's "verification of [Hinkle's] information was a reasonable procedure." *Id.*[36]

The same is true here. Indeed, in a case nearly identical to this one, the Eighth Circuit affirmed the district court's summary judgment based on the reasonableness of Midland's investigation, which, as here, consisted solely of verifying that the information it was reporting to the CRAs was accurate based on the information it received from the original creditor. In *Edeh v. Midland Credit Mgmt., Inc.*, the court held that "[i]t was . . . enough for Midland to check the information it received from the seller of the debt to verify that Edeh was the one who owed it and how much he owed," particularly since "[t]he notices the CRAs provided to Midland provided little, if any, detail as to the basis for Edeh's

---

[36] In fact, unlike Hinkle, the consumer in *Westra* actually provided TransUnion with documentation to support her fraud claim. However, when notifying the furnisher of the dispute, TransUnion "did not provide any information about possible fraud or identity theft or include any of the documentation provided to TransUnion." *Westra*, 409 F.3d at 827. The court nonetheless concluded that there was no genuine issue of material fact whether it was reasonable for the furnisher to rely on its own records in light of the nature of the dispute and the information it received from the CRAs. *Id.*; *see also Ware v. Bank of Am. Corp.*, 9 F. Supp. 3d 1329, 1339 (N.D. Ga. 2014) (granting summary judgment to furnisher on plaintiff's FCRA claims where the defendant "provided evidence showing that the Bank investigated Plaintiff's 'not his' disputes by comparing the personal identifiers in each dispute with the personal identifiers associated with the Account," which "revealed that the person who submitted the disputes and the person who owned the Account had the same name . . ., the same date of birth, the same Social Security number, and the same home address"); *Howard*, 2010 WL 2600753, at *4 (granting furnisher's motion for summary judgment where it was "undisputed that the only information provided to Defendant about Plaintiff's dispute was: 'Consumer states inaccurate information. Provide or confirm complete ID and account information'" and that the information provided by the CRAs "did not explain that the debt did not belong to Plaintiff, that Plaintiff was the victim of her own daughter's unauthorized use of her name and credit, or that the account belonged to Plaintiff's daughter and not to Plaintiff").

page

dispute." *Edeh*, 413 F. App'x at 926–27. Likewise, Midland was provided with equally scant information regarding Hinkle's dispute:

| Midland's Notice of Edeh's Dispute[37] | Midland's Notice of Hinkle's Dispute[38] |
|---|---|
| Account dispute modified in E-OSCAR. Bureau: EXP. Dispute Type 1-Not his/hers. Verify Name, address, SSN, Dates and Balance. Control# 3975110687001 | Account dispute modified in E-OSCAR. Bureau: EFX. Dispute Type 1-Not his/hers. Verify Name, address, SSN, Dates and Balance. Control# 99992201016681057 |

Therefore, it was reasonable for Midland to rely on the information it received from the seller to verify Hinkle's "name, address, and date of birth," to ensure that the T-Mobile Account was not apparently owed by some *other* "Teri Lynn Hinkle." *Id.*; *see also Chiang*, 595 F.3d at 40 ("The fact that Chiang put on evidence that he told Verizon NE he disputed various bills does not itself raise a reasonable inference that [it] conducted an unreasonable investigation or that the furnished information was not accurate. That evidence is not enough.").

"Further, contrary to [Hinkle's] assertions on appeal as to what constitutes a reasonable investigation whenever a debt is disputed, ***a furnisher of information need investigate only what is contained in the CRA's dispute notice*** as to the nature of the dispute." *Edeh*, 413 F. App'x at 926 (emphasis added). Thus, while the district court was right to conclude that "[i]n the absence of Plaintiff's

_____

[37] *Edeh v. Midland Credit Mgm't*, No. 09-CV-01706, Doc. 41-10, at 4 (filed on Jan. 4, 2010).

[38] (Doc. 85-7, at 3).

cooperation, . . . it was reasonable for [Midland] to limit the scope of their investigation to an examination of its own electronic systems" (Doc. 105, at 21), the converse is not necessarily true. In other words, even if Hinkle *had* responded to Midland's repeated requests for assistance with its investigation of her dispute,[39] the reasonableness of Midland's investigation still must be assessed only in light of the barebones notice of Hinkle's dispute that Midland received from the CRAs.

The same goes for Hinkle's new argument on appeal: that Midland's investigation of her dispute was unreasonable because it could have requested that the seller obtain additional information from T-Mobile, the original creditor.[40] Again, under the FCRA, "the reasonableness of the investigation is to be

_____

[39] As Hinkle notes, "[t]he FCRA gives the CRAs and the furnishers 30 days to respond to a consumer dispute letter." (Appellant's Br. at 27) (citing 15 U.S.C. § 1681i(a)(l)(A)). She claims that "[d]uring *that* window of time, no one contacted Hinkle to assist with the investigation." (*Id.*). As noted above, however, the undisputed evidence shows that Hinkle disputed the T-Mobile Account with the CRAs on July 13, 2012 (Doc. 8, at ¶ 29), and that Midland sent a letter on July 21, 2012, requesting her assistance with its investigation of her dispute. Hinkle obviously was aware of the July 21 letter, because she attached it to her July 26 "Demand for Validation of Debt" and "Notice of Intent to Sue" (Doc. 85-11, at Midland-Hinkle 000028), and alleged in her original complaint that Midland sent the letter on July 21, 2012. (Doc. 1, at ¶ 26; Doc. 8, at ¶¶ 30–32).

[40] Importantly, Hinkle is mistaken regarding the entire basis for her suggestion that Midland could (and should) have requested that DRS obtain additional information from the original creditor. According to the Purchase Agreement, upon which Hinkle relies, DRS obligated itself to obtain additional information only in response to inquiries prior to Midland's purchase of the accounts, and only in response to inquiries from Midland (not in response to a consumer's dispute with the CRAs). *See* (Doc. 97-2, at PlainApp. 00111, ¶ 4.8) (filed under seal). On the other hand, DRS expressly disclaimed any obligation to provide information "[f]rom and after" the date Midland purchased the accounts. (*Id.* at PlainApp. 00112, ¶ 5.5) (filed under seal) (emphasis added). In fact, the Purchase Agreement goes so far as to state that Midland "shall not refer, for any reason, any Obligor or Original Creditor or any other person to [DRS]." (*Id.*) (filed under seal) (emphases added).

determined by ***an objective standard***," and "[t]he statute is clear that the investigation is directed to the information ***provided by the CRA***." *Chiang*, 595 F.3d at 37, 38 (emphases added); *see also* 15 U.S.C. § 1681s–2(b)(1)(B) (requiring a furnisher to review "all relevant information" provided to it by a CRA). "Accordingly, the central inquiry when assessing a consumer's claim under § 1681s-2(b) is 'whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute.'" *Id.* at 38 (quoting *Gorman*, 584 F.3d at 1157).

For the reasons explained above, in light of the information it received from the CRAs regarding Hinkle's dispute, it was reasonable for Midland to rely on its own records, which included the account information it received from the seller and the original creditor.[41] From those records, Midland verified that the account belonged to Hinkle, and that the information it had reported to the CRAs was accurate.[42] Hinkle's "behavior in refusing to engage in discovery or provide any

---

[41] In addition to being waived and wrong as a matter of law, Hinkle's new argument also fails because she cannot show that the result would have been any different had Midland actually asked DRS for more information from T-Mobile. While Hinkle makes much of the fact that the Bill of Sale indicates that the accounts Midland purchased from DRS were "without warranty," she fails to mention that DRS also represented in the Purchase Agreement that the accounts were all valid and overdue and that the information it provided to Midland was accurate. *See* (Doc. 97-2, at PlainApp. 000108, ¶¶ 3.1.3–3.1.4) (filed under seal); *see also* (Doc. 73-5, 9) ("To the best of Seller's knowledge and belief, all of the infotmation contained in the Accounts Schedule and Seller's Accounts Information, is and shall be true, complete [and] accurate.").

[42] In fact, aside from her repeated protestations to the contrary, Hinkle has made no effort, either before the district court or on appeal, to demonstrate that the information Midland reported to the CRAs *actually was inaccurate*. However, "absent a showing of actual inaccuracy

information about the reasonableness of [Midland's] investigation procedures cannot be a shortcut to trial on the merits." *Chiang*, 595 F.3d at 38. Accordingly, this Court should affirm the district court's summary judgment on Hinkle's FCRA claim.

## V.    The district court did not abuse its discretion by refusing to strike Angelique Ross's affidavit.

Hinkle devotes over half of her opening brief to her argument that the district court erred by refusing to strike the affidavit of Angelique Ross, which Midland submitted to authenticate documents in support of its motion for summary judgment. Hinkle contends that this Court should reverse the district court's summary judgment because, as she repeatedly insists, "[a]ll of the so-called undisputed facts that laid the foundation of [Midland's] motion for summary judgment came directly from the affidavit of Ross." (Appellant's Br., at 17) (internal citation omitted).

---

on a reinvestigation, a plaintiff's claim . . . fails as a matter of law," because "to carry his burden, the plaintiff ha[s] to demonstrate some causal relationship between the . . . allegedly unreasonable reinvestigation and the failure to discover inaccuracies in his account." *Chiang*, 595 F.3d at 37. Because Hinkle has failed to raise any issue of material fact regarding the accuracies of Midland's credit reporting, this Court may affirm the district court's summary judgment on that basis, as well. *See Ware*, 9 F. Supp. 3d at 1339 ("Plaintiff has also failed to show any actual inaccuracies that Defendant could have found through conducting a reasonable investigation. . . . Plaintiff's failure to demonstrate or establish any actual inaccuracies in the furnished information that a reasonable investigation could have discovered is a separate, sufficient basis for summary judgment.").

The truth is that the "undisputed facts" of this case may be gleaned solely from the documents attached to Ross's affidavit—documents which also were already in Hinkle's possession or previously produced to her in discovery. Because Ross's affidavit merely authenticated those documents, the district court did not abuse its discretion by concluding that Midland either was not required to identify Ross in its initial disclosures, or that its failure to do so was substantially justified or harmless. Either way, the district court did not err in considering Ross's affidavit and the documents that were attached to it.

### A.   Midland was not required to disclose Angelique Ross because she was not an individual likely to have discoverable information.

Ross was not previously disclosed as a potential witness because she was not an "individual likely to have discoverable information." Fed. R. Civ. P. 26(a)(1). Rather, Ross was merely a "custodian" of the documents attached to her affidavit, or an otherwise "qualified witness" capable of attesting to their authenticity. Fed. R. Evid. 803(6)(D). "From the Court's perspective, [her] affidavit served no purpose other than to authenticate the attached documents." *Graham v. Metro. Life Ins. Co.*, No. 07-CV-164, 2009 WL 73802, at *6 (S.D. Miss. Jan. 8, 2009), *aff'd*, 349 F. App'x 957 (5th Cir. 2009).[43]

---

[43] *See also Spacecon Specialty Contractors, LLC v. Bensinger*, No. 09-CV-02080, 2011 WL 721263, at *4 (D. Colo. Feb. 23, 2011) ("Because the Custodian of Records at Pinnacol Assurance will not give substantive testimony at trial, the Court finds that Defendant's failure to disclose his name and contact information was harmless."); *U.S. Tech. Corp. v. Ramsay*, No. 08-CV-00218, 2011 WL 2516597, at *1 (S.D. Miss. June 23, 2011) (finding "that U.S.

In fact, as Hinkle acknowledged below and admits again on appeal, Ross was not disclosed as a potential witness because "[w]e know that she did not possess any personal knowledge of either alleged debt or account . . . because all 'written communication [with Hinkle] was 'system generated' and not generated by a live person." (Appellant's Br., at 15). Accordingly, Midland was not required to disclose Ross as a potential witness, and for that reason alone, this Court should reject Hinkle's attempt to reverse the district court's summary judgment based on an inapposite technicality.

**B.    Even if Ross should have been disclosed as a potential witness, the trial court did not abuse its discretion in finding that Midland's failure to do so was substantially justified or harmless.**

Assuming for the sake of argument that Midland should have disclosed Ross as a potential witness or affiant before it filed its motion for summary judgment, the district court did not abuse its discretion by considering her affidavit and the documents attached to it. For one, despite the fact that Hinkle objected to the admissibility of Ross's affidavit based on Midland's alleged failure to disclose her as a potential witness, the district court did not even find that objection worthy of

---

Technology's failure to disclose Atkinson is harmless" despite "failure to disclose Atkinson as records custodian" because "no prejudice to the defendants will result if Atkinson is permitted to testify as a witness").

mention. Regardless, to the extent Ross should have been disclosed earlier, Midland's failure to do so was substantially justified or harmless.[44]

First, Midland's alleged failure to identify Ross in its initial disclosures was harmless because summary judgment was not dependent upon the admissibility of the documents attached to her affidavit. Hinkle complains at length that Ross's authentication of the attached documents does not meet the requirements for Rule 56, even going so far as to suggest that it contains "triple hearsay." *See* (Appellant's Br. at 16). As this Court has explained, however, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (quotation omitted); *see also* Fed. R. Civ. P. 56(c)(2).

Here, the "documents attached to [Ross's] Declaration are either non-hearsay or could be reduced to admissible form." *Saunders*, 360 F. App'x at 112. As Ross herself attested, her affidavit is expressly based upon her "position, personal knowledge," and on "records kept in the regular course of [Midland's]

---

[44] *See* Fed. R. Civ. P. 37(c)(1); *see also Hearn*, 603 F.3d at 903 (affirming district court's decision to allow undisclosed witness to testify at trial "for the limited purpose of establishing that Defendants made prior inconsistent statements") (citing *Citizens Bank of Batesville, Ark. v. Ford Motor Co.*, 16 F.3d 965, 967 (8th Cir. 1994) (declining to second-guess district court's exercise of discretion to allow witness testimony when, among other reasons, counsel failed to request a continuance or recess)).

business either by [her]self or those under a duty to maintain [such] records."[45]
And "[w]hile the [attached documents] are not directly from the original creditor,
they are provided by company persons who have knowledge of company processes
and relationship with original creditors, and how charged-off receivables are sold
and purchased from original creditors." *Hickman v. Alpine Asset Mgmt. Grp., LLC*,
No. 11-CV-1236, 2012 WL 4062694, at *7 (W.D. Mo. Sept. 14, 2012). Thus, "the
records . . . were sufficiently authenticated under the business records exception to
the hearsay rule," and Ross's affidavit "fulfills the elements of the business records
exception set forth in Federal Rule of Civil Procedure 803." *Id.*[46]

In short, Hinkle's "argument is unavailing, as a debt buyer can authenticate a
creditor's records in a collection action . . . [u]nder the adoptive business records
exception to the hearsay rule." *Clark v. v. Main St. Acquisition Corp.*, No. 12-CV-
408, 2013 WL 2295879, at *5 (S.D. Ohio May 24, 2013), *aff'd sub nom. Clark v.
Main St. Acquisition Corp.*, 553 F. App'x 510 (6th Cir. 2014). Thus, as the district
court concluded, "[t]he record does not support [Hinkle's] assertion that Ross is

---

[45] (Doc. 85-2, at ¶ 5).

[46] *See also United States v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984) ("To be admitted
under [Rule 803(6)] the person who actually prepared the documents need not have testified so
long as other circumstantial evidence and testimony suggest their trustworthiness. Nor is it
required that the records be prepared by the business which has custody of them.") (quotations
and citations omitted); *Hickman*, 2012 WL 4062694, at *7 ("To lay an adequate foundation
under the business records exception, the custodian of records need not have personal knowledge
of the circumstances in which acquisition, use and filing occurred."); Wright & Miller, 30C Fed.
Prac. & Proc. Evid. § 7047.

unqualified to serve as records custodian or that the business records attached to the Ross Affidavit are inadmissible." (Doc. 105, at 5). Hinkle has failed to show that the district court's conclusion was an abuse of discretion.

Lastly, other than her unadorned cries of "prejudice,"[47] Hinkle fails to identify a single question she would have asked Ross or what she might have done to rebut the authenticity of the documents attached to her affidavit. Indeed, the record belies Hinkle's complaint that "Midland presented evidence that Hinkle could not adequately have had the opportunity to rebut, which seriously prejudiced her case." (Appellant's Br. at 16). All of the documents attached to Ross's affidavit either were previously produced to Hinkle during discovery, admittedly were already in her possession, or were attached to the affidavit of Patrick Minford, another Midland representative, to which Hinkle never objected and whom she never sought to depose:[48]

---

[47] *See, e.g.*, (Appellant's Br., at 10) (claiming that Midland's failure to disclose Ross deprived Hinkle of her opportunity to "voir dire [*sic*] Ross, cross examine Ross, and test Ross's ability to meet the burden of proof required of Fed R. Civ. P. 56(c)(4)").

[48] "On May 6, 2014, Defendants provided Plaintiff with the Affidavit of Patrick Minford, . . . [which] incorporate[d] previously-produced documents . . . ." (Doc. 73, at 4). Hinkle claims in her Statement of Facts that "she objected to the Affidavit of Patrick Minford." (Appellant's Br., at 6). While Hinkle did tell the district court that she would like to depose Minford by written questions, she never followed through with her stated intention. *See* (Doc. 77, at 20:14–19, 21:5–19). Meanwhile, Hinkle's assertion that she objected to Minford's affidavit is unaccompanied by any citation to the record, and the undersigned counsel has failed to identify any place in the record where such objection(s) might be found. *See* 11th Cir. R. 28-1(i) ("In the statement of the case, as in all other sections of the brief, every assertion regarding matter in the record shall be supported by a reference to the volume number (if available), document number, and page number of the original record where the matter relied upon is to be found.").

| Document | Description | Previously Available to Hinkle |
|---|---|---|
| Doc. 85-3 | GE/Meijer Account data from original creditor (Midland-Hinkle 000124) | Attached to Minford Affidavit[49] |
| Doc. 85-4 | T-Mobile Account data from original creditor (Midland-Hinkle 000125) | Attached to Minford Affidavit[50] |
| Doc. 85-5 | GE/Meijer Account notes from Midland's internal records (Midland-Hinkle 000044–54) | Produced in discovery[51] |
| Doc. 85-6 | Midland's Initial Communication with Hinkle regarding the GE/Meijer Account (Midland-Hinkle 000219–20) | Produced in discovery[52] |
| Doc. 85-7 | T-Mobile Account notes from Midland's internal records (Midland-Hinkle 000031–43) | Produced in discovery[53] |
| Doc. 85-8 | Midland's Initial Communication with Hinkle regarding the T-Mobile Account (Midland-Hinkle 000107–08) | Already in Hinkle's possession[54] |

[49] (Doc. 73-5, Minford Aff., Ex. B, at Midland-Hinkle 000124).

[50] (Doc. 73-5, Minford Aff., Ex. C, at Midland-Hinkle 000125).

[51] *See* (Doc. 97-2, at PlainApp. 00076) ("[Midland] directs Plaintiff to previously-produced . . . documents bates labeled MIDLAND-HINKLE . . . 000044–54[.]").

[52] *See* (Doc. 97-2, at PlainApp. 00006) ("Final amended response [by Defendants] . . . are labeled [Midland-Hinkle] 000219–224.").

[53] *See* (Doc. 97-2, at PlainApp. 00080) ("[Midland] directs Plaintiff to previously-produced . . . documents bates labeled MIDLAND-HINKLE . . . 000031–43[.]").

[54] (Doc. 97-2, at PlainApp 00007, ¶ 4) ("Records 000107, 000109, and 000110 were produced after Plaintiff's first Motion to Compel . . . . These are letters Plaintiff already possessed . . . .").

| **Document** | **Description** | **Previously Available to Hinkle** |
|---|---|---|
| Doc. 85-9 | February 5, 2012 Letter from Midland to Hinkle regarding its investigation of her dispute of the T-Mobile Account (Midland-Hinkle 000109) | Already in Hinkle's possession[55] |
| Doc. 85-10 | July 21, 2012 Letter from Midland to Hinkle regarding its investigation of her dispute of the T-Mobile Account (Midland-Hinkle 000025 & 000078) | Produced in discovery;[56] included as factual allegation in Hinkle's original and amended complaints;[57] and attached to letter <u>from Hinkle</u> to Midland[58] |
| Doc. 85-11 | July 26, 2012 "Response and Notice of Intent to Sue" from Hinkle to Midland (Midland-Hinkle 000023–24) | Letter <u>from Hinkle</u> to Midland[59] |

Hinkle also declined the district court's express invitation for her to take the deposition of a Midland representative, even though she was given the chance to do so over two months before Midland filed its motion for summary judgment. In fact, despite the district court's admonition that Hinkle should "give some serious consideration to whether there are any other depositions you want to take," she failed to avail herself of the opportunity, and even though the court warned that she

---

[55] (*Id.*) (same).

[56] *See* (Doc. 97-2, at PlainApp. 00080) ("[Midland] directs Plaintiff to previously-produced . . . documents bates labeled MIDLAND-HINKLE . . . 000078[.]").

[57] *See* (Doc. 1, ¶ 26; Doc. 8, at ¶ 30). Hinkle also was asked about the July 21 letter at her deposition. *See* (Doc. 100-1, at 106:10–14).

[58] *See* (Doc. 97-2, at PlainApp. 00080) ("[Midland] directs Plaintiff to previously-produced . . . documents bates labeled MIDLAND-HINKLE-000025[.]").

[59] *See* (Doc. 8, at, at ¶ 31–32).

was "not going to get another bite at this," and that it was her "last opportunity to conduct discovery in this case." (Doc. 77, at 28:19–24). Accordingly, the district court did not abuse its discretion in refusing to strike Ross's affidavit.

## **CONCLUSION**

For the reasons stated above, Midland respectfully requests that the Court affirm the district court's summary judgment.

/s/ Jason B. Tompkins
One of the Attorneys for Appellees

**Of Counsel:**

Matthew B. Ames
(mames@balch.com)
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd., N.W.
Suite 700
Atlanta, GA 30308
Telephone:   (404) 261-6020
Facsimile:    (404) 261-3656

Jason B. Tompkins
(jtompkins@balch.com)
Chase T. Espy
(cespy@balch.com)
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. App. P. 32(a)(7)(C), Appellees hereby certify that this brief, in Times New Roman 14-point typeface, complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,987 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*/s/ Jason B. Tompkins*
One of the Attorneys for Appellees

**<u>Of Counsel</u>:**

Matthew B. Ames
(mames@balch.com)
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd., N.W.
Suite 700
Atlanta, GA 30308
Telephone:   (404) 261-6020
Facsimile:    (404) 261-3656

Jason B. Tompkins
(jtompkins@balch.com)
Chase T. Espy
(cespy@balch.com)
Balch & Bingham LLP
1901 Sixth Avenue North, Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 251-8100
Facsimile: (205) 226-8798

## <u>CERTIFICATE OF SERVICE</u>

In accordance with Federal Rule of Appellate Procedure 25(c)(2) and 11th

Cir. R. 25-3, I hereby certify that I have filed the foregoing brief using the Court's

ECF system, which will electronically serve the following counsel of record on this

8th day of October, 2015:

Craig K. Perry
Attorney at Law
Nevada Bar No. 3786
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
Tel: (702) 228-4777

On this same date, the original and additional copies of the brief were filed

by Federal Express overnight delivery, addressed as follows:

Clerk's Office – Appeal No. 15-10398
U.S. Court of Appeals – Eleventh Circuit
56 Forsyth Street NW
Atlanta, GA 30303.

Respectfully submitted,

*/s/ Jason B. Tompkins*
Of Counsel