CASE NO. 15-10398-F

---

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

TERI LYNN HINKLE,

Appellant,

v.

MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING LLC,
AND ENCORE CAPITAL GROUP INC.

Appellees,

---

On Appeal from the United States District Court
For the Southern District of Georgia
Dublin Division
3:13-cv-00033-DHB-BKE

---

REPLY BRIEF OF APPELLANT
TERI LYNN HINKLE

---

**Attorney for Appellant**

Craig K. Perry
Craig K. Perry & Associates
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
Telephone: (702) 228-4777
Facsimile: (702) 943-7520

## CERTIFICATE OF INTERESTED PARTIES AND
## CORPORATE DISCLOSURE STATEMENT

The following is a list of the trial judge(s) and all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case on appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party.

| Name: | Role in case |
| --- | --- |
| -Craig K. Perry, Esq. | as attorney for Appellant; |
| -Craig K. Perry & Associates, | as attorneys for Appellant; |
| -Teri Hinkle, | as named Appellant; |
| -Matthew B. Ames, Esq., | as attorney for Appellees/Defendants; |
| -Jason Brent Tompkins, Esq., | as attorney for Appellees/Defendants; |
| -Balch & Bingham, LLC, | as attorneys for Defendant/Defendants; |
| -Encore Credit Group, Inc. | as Appellee/Defendant; |
| -Midland Credit Management, Inc. | as Appellee/Defendant; |
| -Midland Funding, LLC, | as Appellee/Defendant; |
| -H. Dudley Bowen, Jr., | as District Court Judge |

i

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES...........................................................i

TABLE OF CONTENTS ...........................................................................ii

TABLE OF CITATIONS ..........................................................................iii

REPLY ARGUMENT AND CITATIONS OF AUTHORITY ...............................1

I.    The Courts should take judicial notice of the CFPB's CO against Appellees....4

    A. Midland has waived its rights of appeal on issues in the CO ..................8

    B. Issues not addressed by the CO are subject to limited review provided for in *Chevron*................................................................8

II.    Midland did not conduct a reasonable investigation into Hinkle's dispute letters sent to the CRA's ...............................................................9

    A. Midland did not conduct a reasonable investigation as to the T-Mobile Account ................................................................9

    B. Midland did not conduct a reasonable investigation as to the GE/Meijer Account ................................................................22

III.    Midland did not have a permissible purpose for obtaining Hinkle's credit report because debt buyers are neither creditors nor acting on behalf of a creditor....23

IV.    The CFPB found that Midland violated multiple counts of FDCPA................25

V.    The lower court improperly relied upon the inadmissible affidavit of Angelique Ross in granting Midland summary judgment on all issues raised by Hinkle ................................................................26

VI.    Midland did not comply with the FDCPA when it reported the T-Mobile Account to the CRAs................................................................27

VII.    As to the FCRA, the CFPB found evidence of willful misconduct.................28

VIII.    Hinkle has not intentionally abandoned any issues on appeal.........................28

CONCLUSION .................................................................................... 29

## IX.    TABLE OF CITATIONS

*Allen v. School Board for Santa Rosa County, Florida, et al.*, No.
3:10cv142/MCR/CJK, 787 F.Supp.2d 1293 (N.D. Fla. 2011)................................ 2

*Bryant v. Carleson,* 444 F.2d 353, 357 (9th Cir. 1971) ........................................... 6

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct.
2778, 2793 (1984) .................................................................................................... 9

*Daker v. Warren*, No. 1:10-CV-03815-RWS-ECS, 2011 WL 4553141 (Ga. App.
May 9, 2011) ............................................................................................................ 1

*Denius v. Dunlap.* 330 F.3d 919, 926 (7th Cir. 2003)............................................... 6

*Greene v. American Cast Iron Pipe Company,* 871 F.Supp. 1427, 1428 (N.D. Ala.
1994)......................................................................................................................... 7

*Harris, et al. v. The City of Philadelphia, et al.*, No. 97-1144, 137 F.3d 209 (3rd
Cir. February 1998) ................................................................................................. 2

*Helman v. Udren Law Offices, P.C., .__F.Supp.3d__, 2014 WL 7781199, \*10, fn.1
(S.D. Fla., 2014) ...................................................................................................... 6

*Moore v. Verizon Commc'ns, Inc.,* 2010 WL 3619877 \*3, (N.D.Cal. 2010) ......... 6

*National Cable and Telecommunications Assn v. Brand X Internet Services*, 545
U.S. 967, 125 S. Ct. 2688, 2700 (2005) .................................................................. 9

*Tovar v. Midland Credit Management,* 2011 WL 1431988 (S.D. Cal. 2011)........ 6

*United States v. Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460,
76 L.Ed. 999 (1932)................................................................................................. 7

*Williams v. Bellsouth Telecommunications, Inc.*, No. 03-14386, 373 F.3d 1132
(11th Cir. 2004) ....................................................................................................... 1

## STATUTES

5 U.S.C. § 701(b)(1) .................................................................................. 5

5 U.S.C. § 706 ........................................................................................... 5

12 U.S.C. § 5491 ....................................................................................... 5

12 U.S.C. § 5492(a) .................................................................................... 4

12 U.S.C. § 5563(a) .................................................................................... 5

12 U.S.C. § 5563, or 12 CFR Part 108 ......................................................... 3

15 U.S.C. § 1681(a)(4) ................................................................................ 3

15 U.S.C. §§ 1681n and 1681o .................................................................. 28

15 U.S.C. §§ 1681s-2(a)(8)(E) and (b) (CO, ¶ 126-127) .............................. 22

15 U.S.C. § 1681s-2(b)) and IV (multiple violations of the FDCPA (692d, 1692e, and 1692g) of Hinkle's FAC ........................................................................ 2

15 U.S.C. § 1692k ...................................................................................... 3

15 U.S.C. § 1681b ..................................................................................... 23

15 U.S.C. § 1681b(a)(3) ............................................................................. 23

15 U.S.C. § 1681s-2(b) ................................................................................ 2

15 U.S.C. §§ 1692d, 1692d(5). (CO, ¶ 118-119) ........................................ 25

15 U.S.C. § 1692d, 1692e, and 1692g) ........................................................ 2

15 U.S.C. §§ 1692e, 1692e(8)." (CO, ¶ 118-119) ....................................... 25

15 U.S.C. §1692(e) ...................................................................................... 3

15 U.S.C. §§ 1692e, 1692e(10)." (CO, ¶ 105) ..................................................... 25

15 U.S.C. §§ 1692e, 1692e(10)." (CO, ¶ 111) ..................................................... 25

15 U.S.C. § 1692g(a) .......................................................................................... 27

15 U.S.C. § 1692l(b), (d) ..................................................................................... 4

## RULES

Fed. R. Evid. 201(b), 28 § U.S.C. ...................................................................... 5

Fed. R. Evid. 201(b) ............................................................................................ 8

Fed. R. Evid. 201(f) ............................................................................................. 6

Fed. R. Evid. 803(8)(C) ....................................................................................... 8

## OTHER AUTHORITIES

*A.G. Schneiderman Obtains Settlement From Major Debt Buyer Who Filed
Thousands Of Time-Barred Debt Collection Actions*, http://www.ag.ny.gov/press-
release/ag-schneiderman-obtains-settlement-major-debt-buyer-who-filed-
thousands-time-barred ........................................................................................... 4

Appellees' Consent Order with the Consumer Financial Protection Bureau ......... 4
*CFPB Takes Action Against the Two Largest Debt Buyers for Using Deceptive
Tactics to Collect Bad Debts*; http://www.consumerfinance.gov/newsroom/cfpb-
takes-action-against-the-two-largest-debt-buyers-for-using-deceptive-tactics-to-
collect-bad-debts/FDCPA, Id. § 1089 ..................................................................... 4

Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ............ 4

OAA Administrative Proceeding, File No. 2015-CFPB-0022, before the United
States Of America Consumer Financial Protection Bureau, entitled: *In the Matter
of: Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit
Management, Inc. and Asset Acceptance Capital Corp* ......................................... 5

## REPLY ARGUMENT AND CITATIONS OF AUTHORITY

This Court will determine whether the Motion for Summary Judgment was proper or improper: "The undersigned will conduct a *de novo* review of Daker's claims. Under that standard, a 'court's task is to determine whether the … decision [at issue] is wrong—that is, whether the court disagrees with it." *Daker, Warren*, 2011 WL4553141 (N.D. Georgia 2011), *citing* in part to *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-1138 (11th Cir. 2004) (in *Williams,* this Court uses the phrase "*de novo* wrong." *Williams* at p. 1138.)

On 9/9/15, the Consumer Financial Protection Bureau (CFPB) took action against Appellees. Appellees signed "The Stipulation and Consent to the Issuance of a Consent Order" (Stipulation) and the "Consent Order"[1] (CO). The impact of the CO upon this case will be discussed. In addition, this brief addresses the issues that Appellees concede survive on appeal;[2] finally it discusses the abandonment issues.

Although Hinkle is not a party to the CFPB's CO, principals of res judicata apply to consent decrees. "Principles of res judicata dictate that parties to a prior proceeding that resulted in a judgment or consent decree, 'or those with sufficient identity of interests with such parties that their interests are deemed to have been

---

[1] For convenience, these were obtained directly from the CFPB website, and are attached hereto as Addendums Doc. 1 and Doc. 2. *See* Declaration of Craig K. Perry, Esq. at the end of this Reply at ¶ 2.

[2] Appellee's Brief, p. 1.

litigated in those proceedings," are precluded from attacking the prior judgment. *Allen v. School Bd. For Santa Rosa County, Florida*, 787 F.Sup.2d 1293, 1296 (N.D. Florida 2011) [citations omitted]. By consenting to a decree, a defendant waives the right under the Due Process Clause to litigate the issues raised by the plaintiff's complaint. *Harris v. The City of Philadelphia,* 137 F.3d 209, 212 (Fed. Cir. 1998) [citations omitted].

**Effect of the Consent Order**. The CFPB's CO is important to this case. First, it was issued against Appellees with their consent. Second, its findings parallel many of the findings in Hinkle's case, further substantiating her case. Third, the CFPB's conclusions of law directly impact Hinkle's case.

The CO's findings of fact and conclusions of law directly address important aspects of Counts II & III (failure to conduct a reasonable investigation, alleging willful noncompliance, § 1681s-2(b)) and IV (multiple violations of the FDCPA (1692d, 1692e, and 1692g) of Hinkle's First Amended Complaint (FAC). [3]

**Effect of the Stipulation**. By voluntarily signing the Stipulation, Appellees waived all rights of judicial review as to the findings and conclusions made by the CFPB.[4] Appellees' waiver narrows the scope of judicial review in this case, and

---

[3] Doc. 8.

[4] "Respondents, by consenting to this Stipulation, **waive**: ... (c) The rights to all hearings under the statutory provisions under which the proceeding is to be or has been instituted; the filing of proposed findings of fact and conclusions of law; proceedings before, and a recommended decision by, a hearing officer; all post-hearing procedures; and any other

sets forth the application of law on many of the relevant arguments bearing on this case.

Appellees begin their brief with an *ad hominem* attack against the Appellant Teri Hinkle, labeling her as a "professional *pro se* plaintiff" for having filed a handful of lawsuits (all but one was resolved to the satisfaction of both parties), (Appellee's Brief, p. 1). Midland's inference is sanctimonious when considering its own actions. Consumer protection laws were enacted to insure that consumers' rights are not trampled;[5] Congress created private rights of civil action for both the FDCPA and FCRA, which provide for putative damages, actual damages, punitive damages, attorney's fees and costs, depending upon the circumstances.[6]

Ironically, Midland has used and abused the judicial system, repeatedly, against tens of thousands of consumers, in violation of state and federal laws. Midland has a notorious history of complaints about illegally filing thousands of lawsuits on time-barred debt and against wrong persons, as well as other high-profile misconduct. For example, in January 2015, New York State reached a settlement with Midland for filing lawsuits and obtaining judgments on time-

---

procedural right available under section 1053 of the CFPA, 12 U.S.C. § 5563, or 12 CFR Part 108; ...[and] (d) The **right to seek any** administrative or **judicial review of the Consent Order** [.]" See Addendum 1, paragraph 9, (bold added for emphasis).

[5] *See* 15 U.S.C. §1692(e); 15 U.S.C. § 1681a(4).

[6] *See Id.* § 1692k and *Id.* §§ 1681n and 1681o.

barred debt. Midland was required to pay a fine of $675,000 and dismiss 4,500 judgments ($18 million worth) because the debts were time-barred.[7]

Likewise, the current CO, discussed throughout this brief, requires Midland to disgorge $42 million to repay consumers for FDCPA and FCRA violations, pay a $10 million fine, and "stop collection on over $125 million worth of debts."[8]

## I.    The Courts should take judicial notice of the CFPB's CO against Appellees

Congress vested the CFPB with authority to enforce federal consumer protection laws and prescribe rules implementing the FDCPA, Id. § 1089 (amending 15 U.S.C. § 1692l(b), (d)) and the FCRA, (amending 15 U.S.C. § 1681s-2(b), (d)).

The Bureau is the first agency ever to have general rulemaking authority over either the FDCPA or FCRA.[9] Congress granted the CFPB power to conduct adjudication proceedings as to any person to ensure enforcement of the Dodd-Frank Act, and "any other Federal law that the Bureau is authorized to enforce,

---

[7] http://www.ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-major-debt-buyer-who-filed-thousands-time-barred

[8] *CFPB Takes Action Against the Two Largest Debt Buyers for Using Deceptive Tactics to Collect Bad Debts*; http://www.consumerfinance.gov/newsroom/cfpb-takes-action-against-the-two-largest-debt-buyers-for-using-deceptive-tactics-to-collect-bad-debts/. *See also* Addendum 2 (the CO), ¶¶ 143 to 168. The CFPB also cited Appellees for numerous violations of the Consumer Financial Protection Act or CFPA.

[9] 12 U.S.C. § 5492(a) "**Powers of the Bureau.** The Bureau is authorized to establish the general policies of the Bureau with respect to all executive and administrative functions, including—… **(10)** implementing the Federal consumer financial laws through rules, orders, guidance, interpretations, statements of policy, examinations, and enforcement actions[.]" [July 21, 2010]

including an enumerated consumer law, and any regulations or order prescribed thereunder," with limited exceptions. 12 U.S.C. § 5563(a).

The CFPB is an Executive agency[10] as defined by 5 U.S.C. § 701(b)(1) that is subject to the scope of review set forth in *Id* § 706, which states in relevant part that "the reviewing court shall…(2) hold unlawful and set aside agency action, findings, and conclusions found to be—(a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]"

On 9/9/2015, the Office of Administration Adjudication ("OAA) within the CFPB issued and published as a matter of judicial action and public record, a 63-page CO ("CO") and incorporated Stipulation, between the CFPB and Appellees.

This CO arises from the OAA Administrative Proceeding, File No. 2015-CFPB-0022, before the CFPB, entitled: *In the Matter of: Encore Capital Group, Inc., Midland Funding, LLC, Midland Credit Management, Inc. and Asset Acceptance Capital Corp.*

Hinkle requests that the Court take Judicial Notice of this historically significant CO and Stipulation under Fed. R. Evid. 201(b), 28 § U.S.C. § 201. The CO and Stipulation may also be considered by the Court as a Public Record investigation of the CFPB, under Fed. R. Evid. 803(8)(C).

---

[10] *Id* § 5491(a), "The Bureau [of Consumer Financial Protection] shall be considered an Executive agency as defined in section 105 of Title 5."

Judicial Notice may be taken of facts "not subject to reasonable dispute" because they are either "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b) and (d). Moreover, judicial notice may be taken at "any stage of the proceeding," including "on appeal." See *Denius v. Dunlap.* 330 F.3d 919, 926 (7th Cir. 2003); Fed. R. Evid. 201(f).

Judicial notice has been granted for judicial records such as the CO and Stipulation herein because they represent "**judicial developments** (that) affect [the court's] consideration of the various issues presented." *Bryant v. Carleson,* 444 F.2d 353, 357 (9th Cir. 1971), (emphasis added). Judicial notice may also be utilized by a court for "background" information purposes. See *Helman v. Udren Law Offices, P.C., .__F.Supp.3d__,* 2014 WL 7781199, *10, fn.1 (S.D. Fla., 2014). Judicial notice is also appropriate for published decisions, orders and policy statements of Federal administrative agencies, such as the CFPB. See *Tovar v. Midland Credit Management [MCM],* 2011 WL 1431988 (S.D. Cal. 2011) (MCM, of the Appellees on appeal, was granted judicial notice for (17) documents, including documents from Federal administrative agencies, citing to *Moore v. Verizon Commc'ns, Inc.,* 2010 WL 3619877 *3, (N.D.Cal. 2010)).

Judicial notice has also been granted for Federal agency websites, such as the website of the CFPB herein, which is Hinkle's source of the CO and Stipulation. See *Denius v. Dunlap,* 330 F.3d 919, 926 (7th Cir. 2003) (*Denius* provides a string of citations to cases involving similar Federal agencies on p. 926).  As the CFPB website explains:

"The Office of Administration (OAA) is an independent judicial office within the Consumer Financial Protective Bureau.  Administrative Law Judges in the OAA hold hearings and decide on formal charges and actions initiated by the Bureau. The charges and actions initiated by the Bureau are based on alleged violations of federal statutes and the regulations that carry out the statutes' mandates. The OAA Docket Clerk compiles and maintains the official record of individual administrative cases."

Consent Orders or Decrees have been granted judicial notice by the 11th Cir., involving one of the parties to the decree.  See *Greene v. American Cast Iron Pipe Company,* 871 F.Supp. 1427, 1428 (N.D. Ala. 1994) (District Court in discrimination action, took judicial notice of all pleadings and orders in previous discrimination action against the same employer, including a consent decree).

The CO and Stipulation between CFPB and Midland, is a fully adversarial litigation and intervening historical judicial development that touches and concerns numerous issues in this appeal and national public policy.  See *United States v.*

*Swift & Co.,* 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (A consent decree has the same effect as a judgment entered after full adversarial litigation. 286 U.S. at 114).

Accordingly, Hinkle requests that judicial notice be granted because CFPB's legal conclusion and valid reasoning are based upon the same or similar facts against the same action. Fed. R. Evid. 201(b); Fed. R. Evid. 803(8)(C).

The CO also contains considerable and reliable background information about Midland's business practices, its financial structure, national scope and breadth of operations and litigation practices, policies and procedures (or lack thereof) and its control and manipulation of the litigation process. The CO exposes Midland's misconduct on a national, unprecedented scale.

### A.  Midland has waived its rights of appeal on issues in the CO

By way of Stipulation, Appellees "agree to the issuance of the CO without admitting or denying any of the findings of fact or conclusions of law[.]" Moreover, Appellees, "by consenting to this Stipulation, waive…the rights to all hearings[,] …the right to seek any administrative or judicial review of the CO [, and]…any other right to challenge or contest the validity of the CO[.]"[11]

### B.  Issues not addressed by the CO are subject to limited review provided for in *Chevron*

As to any remaining issues not addressed by the CO, the standard for review

---

[11] See Stipulation, attached as Addendum Doc. No. 1.

is set forth by the U.S. Supreme Court in *Chevron U.S.A., Inc. v. Natural Res. Def.*

*Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2793 (1984), which is, to give

deference to government agencies in the absence of an unreasonable construction

of the statute or in the absence of any ambiguity.

In 2005, the U.S. Supreme Court reversed the Ninth Circuit by supplanting

the FCC's views with its own, stating as follows.[12]

> (a) *Chevron*[13] requires a federal court to defer to an agency's construction, even if it differs from what the court believes to be the best interpretation, if the particular statute is within the agency's jurisdiction to administer, the statute is ambiguous on the point at issue, and the agency's construction is reasonable….

> (b) The Ninth Circuit should have applied *Chevron's* framework, instead of following the contrary construction it adopted in *Portland.* …Because *Portland* held only that the best reading of § 153(46) was that cable modem service was a "telecommunications service," not that this was the only permissible reading or that the Communications Act unambiguously required it, the Ninth Circuit erred in refusing to apply *Chevron.*

Likewise, the CFPB has the power to execute and enforce both the FDCPA

and the FCRA by the same standards set forth in *Chevron.*

**II.    Midland did not conduct a reasonable investigation into Hinkle's dispute letters sent to the CRAs.**

**A. Midland did not conduct a reasonable investigation as to the T-Mobile Account**

---

[12] *National Cable and Telecommunications Assn v. Brand X Internet Services*, 545 U.S. 967, 125 S. Ct. 2688, 2691 (2005).
[13] 467 U.S. 837, 104 S. Ct. 2778 (1984)

On July 13, 2012, Hinkle sent certified letters to Equifax, Experian and Transunion regarding the T-Mobile Account.[14] Midland acknowledges receiving these letters.[15] In response, Affiant Ross states "MCM received notice of a dispute from the credit bureaus. MCM verified that it was showing the information provided by Debt Recovery Solutions, LLC, (DRS) and continues to report the T-Mobile Account as 'disputed.'"[16] Ross goes on to say that "In addition, on July 21, 2012, MCM sent Plaintiff a letter requesting additional documentation as part of its investigation, Plaintiff responded that she could not furnish MCM with any documentation because the account was not hers."[17] Midland took no further action to correct or delete the information, which they say was proper.[18]

However, Midland's arguments are completely at odds with the recently issued CO. The CFPB makes it clear that debt collectors engaging in such conduct violate 1681s-2(b).

The CFPB made several significant findings of fact and conclusions of law against Midland. In the CO, the CFPB affirmed that an investigation must be "reasonable." "Section 623 (b)(1)(A) of the FCRA makes it unlawful for a

---

[14] Doc. 97-2, pp. 51-54.
[15] Doc. 85-2, ¶¶ 15.
[16] *Id*, paragraph 15.
[17] *Id*, paragraph 15.
[18] Appellees' Brief, pp. 36

furnisher of information to a Consumer reporting agency, upon receiving notice of a Consumer dispute from the Consumer reporting agency, not to conduct a reasonable investigation of the disputed information.  15 U.S.C. § 1681s-2(b)."[19]

Appellee argues that what constitutes a reasonable investigation depends upon the circumstances.[20] Hinkle agrees.  As to what constitutes a reasonable investigation in Hinkle's case, the parties disagree.

Midland argues that their investigation was reasonable, based upon what Hinkle said in her letter to the CRAs. However in support of their position, Midland wrongly referred to Hinkle's GE/Meijer dispute letter, not T-Mobile.[21] The T-Mobile letter explains why she disputed it.

Nonetheless Midland downplays the wording of the 7/13/2011 letter regarding the T-Mobile Account, which states clearly, "I have no contractual obligation with this company whatsoever and this is false information and a false claim of account."[22] Midland minimizes the wording, arguing the information Hinkle provided to the CRAs is irrelevant as to Midland. But the letter is clear,

---

[19] CO, ¶ 124.

[20] Appellees' Brief, pp. 36.

[21] In their "Unopposed Motion of Appellees to Correct/Amend Appellee's Brief," they only stated, "It has come to the attention of the undersigned counsel that Midland's brief erroneously refers to Hinkle's August 28, 2011 dispute of a separate account…not the one of her July 13, 2012 disputes of the T-Mobile." See Appellee's 10/8/2015 Motion, p. 2, paragraph 3. It was corrected only after it was brought to their attention by the CFPB in regard to a letter that Hinkle recently wrote.

[22] Doc. 97-2, pp. 51-53.

and Midland knows their files contain inaccurate information and they had no intention of obtaining original account-level documentation (see the CO).

If that wasn't enough, Hinkle wrote a *second letter* regarding the T-Mobile Account. Even affiant Ross asserted, "Plaintiff responded that she could not furnish MCM with any documentation **because the account was not hers.**"[bold added for emphasis][23]  Hinkle could not provide any additional information about the account because *she never had the account.* Midland cannot make the issue between her and the CRAs. They have the information they needed from Hinkle, and in any event, the CFPB found that typically, Midland does not review any original account-level documentation. The duty of investigation, under these circumstances, is wholly Midland's not Hinkle's.[24]

**CFPB's Findings of Fact, Applied to Hinkle's Case.** The findings of fact and conclusions of law by the CFPB against Midland provide the guidance needed to reverse and remand this case:

1. CFPB's findings cover Appellees' behavior from July 21, 2011 to September 9, 2015.[25] Hinkle's complaints fit within that period (2012).

2. Appellees are by definition debt collectors and furnishers, and are therefore subject to the FCRA and FDCPA.[26]

---

[23] Doc. 85-2
[24] CO ¶ 129.
[25] CO, ¶ 16.

3. Typically, the only documentation that Appellees get from debt sellers is data files, not original account-level documentation.[27] Appellees admit in their briefing there is no account-level documentation.[28] The Purchase Agreement ("PA") states that by the Closing Date, debt Seller (who is not the creditor but DRS), would provide any account documentation in its possession. Since Midland neither received any nor made any additional requests for account-level documentation, it could not have conducted a reasonable investigation as required by the CFPB.[29]

4. The CO defines original account level-documentation as follows:

> Original Account-Level Documentation" means
> a.    any documentation that a Creditor or that Creditor's agent (such as a servicer) provided to a Consumer about a Debt;
> b.    a complete transactional history of a Debt, created by a Creditor or that Creditor's agent (such as a servicer); or
> c.    a copy of a judgment, awarded to a Creditor or entered on or before the Effective Date.[30]

5. The CFPB stated that when Midland "purchases Debt portfolios, it has typically received an electronic spreadsheet, sometimes referred to as a "data file," from the seller that includes information about the Consumer, such as

---

[26] CO, ¶ 20.
[27] CO, ¶ 23.
[28] "[S]he did not possess any personal knowledge of either alleged debt or account…because all "written communication was 'system generated' and not generated by a 'live person.'" Appellees' Brief, p. 44.
[29] Doc. 97-2 PlainApp. 00110, p. 8, section 4.4 of the PA states that the debt Seller would deliver copies o whatever it had by the closing date.
[30] CO, ¶12.

name, address, social security number, and information about the Debt, including

the purported amount of the Debt, contract interest rate, and dates of origination

and default.

Information obtained in Hinkle's case revealed the same thing. Appellees

did not possess any account-level documents; they did not have any (1)

documents creditors give consumers, (2) the transactional history of the debt or

(3) a copy of any creditor-awarded judgment; all they had were data files

provided by predecessor debt buyers. Angelique Ross testified she reviewed "a

printout of the electronic document containing information about the T-Mobile

Account sold to Midland Funding, LLC. The footnote of that document states

'Data printed by Midland Credit Management, Inc. from electronic records

provided by AIS Services, LLC pursuant to the Bill of Sale/Assignment of

Accounts transferred on or about 12/6/2011 in connection with sale of accounts

from DRS to Midland Funding, LLC.'"[31]

6. CFPB found that "Encore's purchase agreements with Debt sellers have

typically limited accuracy, in varying degrees, the seller's responsibility for the

accuracy and validity of the accounts in question."[32] In Hinkle's case, Affiant

Ross attested that the T-Mobile Account was purchased from a predecessor debt

---

[31] Doc. 85-2, ¶¶ 6, 7
[32] CO ¶ 24.

buyer DRS. The PA between and Midland stated, among other things, the following:

> This Bill of Sale is executed without recourse or warranties except as stated and provided for in the agreement." And ... "all of the information contained in Seller's Accounts Information (a) constitutes Seller's own business records regarding the Purchased Accounts; and (b) accurately reflects in all material respects the information about the Purchased Accounts in Seller's possession.

7. Midland is aware that the data on these accounts contains errors, and although the purchase agreements state that Midland has reviewed them before buying them, they normally only "review the data file for facial anomalies such as default date preceding an account open date or a social security number that is obviously a placeholder (e.g., made up of all the same numbers)."[33]

Remember, these are debt sellers' own records, not the creditors' original account-level documentation.  They are merely the debt sellers' data files.[34]

8. In numerous instances, Debt sellers have provided data files to Encore containing inaccurate information as to the identity of the Consumer obligated to pay the Debt, the age of the Debt, the amount of the Debt, the interest rate, and

---

[33] CO, ¶ 29

[34] Page 5 of the PA with DRS… Doc. 97-2 PlainApp. 000107, states that their own records are true and correct "to the best of their knowledge," which doesn't mean much, because it says nothing about the accuracy of the records they obtained from the creditor, and there is nothing from the creditor attesting to their accuracy.

other material information about the Debt. Nevertheless, Midland has continued purchasing Consumer Debt from these sellers.[35]

Hinkle has consistently stated that she is the wrong person, and she is not alone; many people claim they were improperly being chased by Midland for a batch of bogus T-Mobile debt.[36] Therefore, Midland obviously knew the T-Mobile debts were problematic.

9. The CFPB found that "Sellers typically have not provided Encore with any consumer-level documentation about most individual Debts, such as account statements, records of payments, and the underlying contracts signed by the Consumers."[37] This is also true in Hinkle's case.[38]

10. CFPB found that "Some purchase agreements state that the seller will not provide any account level documents for certain portfolios."[39] Similarly, Midland's PA with DRS says that Midland cannot obtain such documentation, making it impossible for Midland to access account-level documentation:

> Without express written authorization from Seller, Purchaser shall not make direct contact with any of all of Seller's predecessor(s)-in interest for any reason with regard to any of the Accounts [including Hinkle's alleged account] sold hereunder. This includes but is not limited to: Account Inquiries, Obligor Information, or Account Documents (including

---

[35] CO ¶ 30
[36] Doc. 97-2, PlainApp. 00039-41
[37] CO ¶ 32.
[38] Doc. 97-2 PlainApp. 000107
[39] CO ¶ 33.

the issuance of any Subpoena Duces Tecum) with regard to any of the Accounts sold hereunder."[40]

11. CFPB found that "Consumer disputes have come to Encore in a typical month through e-OSCAR, the web-based communications system used by the nationwide Consumer reporting agencies to communicate with data furnishers regarding Consumer disputes" and that "Encore has generally relied on Consumers to inform Encore when it was attempting to collect Debt based on inaccurate or erroneous information."[41] In Hinkle's case, this is all that they could do, since they were not allowed, per the PA, to obtain any of the account-level documentation from the creditors. It only says they *could* have requested any "Terms and Conditions" doc., *if it exists* by written request. Midland did not make the request, admitting they only downloaded a generic version from T-Mobile's web site.[42]

12. CFPB found that "Before Encore has investigated 'untimely' claims that Encore is collecting from the wrong person, Encore has required the Consumer to produce a notarized affidavit swearing that the Consumer is a victim of identity theft, a police report, or a letter from the credit issuer determining that there was a fraud on the account,"[43] and that "In numerous

---

[40] Doc. 97, p. 19, ¶ i.
[41] CO ¶ 37.
[42] Doc 83, p. 3, ¶ 7(b), Doc 97, p. 20, ¶g, Doc 87 (Judge's order).
[43] CO ¶ 41

instances, Encore has told Consumers submitting "untimely" disputes that under the FDCPA, the Consumer has the burden of proving that he or she does not owe a Debt."[44] In a similar pattern in Hinkle's case, the dispute letters were sent to the CRAs, and they notified Midland via e-Oscar that she had a disputed claim. Midland admits all they did was look at the data files by automated computer process[45] and then they immediately placed the burden on Hinkle to assist in the investigation.

This raises two critical questions. If Hinkle never had the account, what information *could* she provide to assist in Midland's investigation? Second, if she did go and file a police report that her identity had been stolen, presumably years after the alleged crime of identity theft had occurred, how would this have assisted Midland in their investigation? The answer to both questions is clear; in situations where a debt collector is attempting to collect from the wrong person, it is not reasonable to ask the consumer to participate in the investigation process. It's up to Midland to go and get the account-level documentation to prove their accusations. On these points, Midland fails to show in their brief how their requirements would assist in their investigation.

13. The CFPB found that Midland attempts to collect debts without a reasonable basis—even in cases where they had account level documentation.

---

[44] CO ¶ 42
[45] Doc. 85-2.

"Despite the indicators described above regarding the inaccuracy of information produced by Debt sellers, Midland has generally relied upon the summary data files as the sole basis for its collection efforts and has only attempted to obtain account-level documentation evidencing the Debt in certain limited circumstances. Even when Encore has already been in possession of account-level documentation regarding the Debts it has collected, Encore generally did not review the documentation to ensure it was consistent with information in the data file."[46] In Hinkle's case, they had no account-level documentation, and therefore had no reasonable basis to believe she owed the debt.

14. The CFPB found that Midland made "claims to Consumers regarding Debt that [Midland] knew or had reason to believe cannot be supported by account-level documentation available to [Midland] as it did regarding Debt that can be supported by such documentation."[47] In other words, the CFPB found that Midland did not make known to Consumers when an account was or was not supported by account-level documentation. In Hinkle's case, Midland attempted to make Hinkle believe that they had documentation supporting the claim that she was not the wrong person owing the debt.

15. The CFPB found that "Consumers being contacted by [Midland] regarding these Debts did not know that Encore knew or had reason to believe

---

[46] CO ¶ 45.
[47] CO ¶ 46.

19

the information forming the basis for the claim may be inaccurate or unsupportable by underlying documentation,"[48] and that "Consumers contacted by Encore regarding these Debts did not know when Encore knew or had reason to believe it lacked access to account-level documentation to support the claim."[49] In Hinkle's case, she knew that that the T-Mobile Account did not belong to her, but Midland continued to act as if they had a reasonable basis for assuming the debt was hers, and they willfully and wrongfully shifted the burden to her to prove otherwise, which was impossible—for she could not provide documentation about something that she never had.

16. The CFPB found that Midland was obtaining judgments in court "based solely on an affidavit referencing the Consumer 's failure to dispute the Debt,"[50] and that "Encore has routinely submitted affidavits without attaching supporting documentation, in which the affiant swears that he or she has reviewed account-level business records concerning the Consumer's account when that is not the case,"[51] yet "in most instances, these representations have been made when affiants have merely reviewed a computer screen containing the scant information  produced by sellers in data files and not after a review of any account level documents such as account applications, terms and conditions of

---

[48] CO ¶ 47.
[49] CO ¶ 47.
[50] CO ¶ 57.
[51] CO ¶ 58.

contracts, payment histories, monthly credit card statements, charge slips, or bills of sale reflecting Encore's ownership of the account."[52]

Similarly, in Hinkle's case, an affidavit was used as the sole support of Midland's list of undisputed facts that it attached to its motion for summary judgment.[53] It was also used to obtain a judgment, in this case, summary judgment. All that Ross did is review scant information from a computer screen from the seller—without reviewing any account-level documentation. Although the CFPB's findings were about obtaining judgments when Midland sued consumers and obtained verdicts, Midland obtained dismissal of Hinkle's case using the same tactic the CFPB condemns. The CFPB further found that "in numerous instances from at least 2009 to 2011, Encore submitted affidavits in which affiants misrepresented that they had personal knowledge of facts contained in affidavits, including that the Consumer owed a Debt."[54] Affiant Ross also stated having personal knowledge about Midland's operations, but this cannot extend into the knowledge of how DRS obtained its information. Midland

---

[52] CO ¶ 59.
[53] Midland argues that Ross's affidavit is but one piece of admissible evidence: "Midland's alleged failure to identify Ross in its initial disclosure was harmless because summary judgment was not dependent upon the admissibility of the documents attached to her affidavit." Appellees' Brief, p. 45. However, the documents do not come in under the business records exception rule to hearsay unless there is a custodian of records or "other qualified witness" to introduce them. Hinkle argued in her brief that Ross was not so qualified. F. Rules of Evid. § 803
[54] CO ¶ 64.

creates the illusion that Ross is a person who can get this information properly admitted into court.

CFPB concluded as a matter of law that Midland violated § 1681s-2(b), stating as follows:

> ### Violation of the Fair Credit Reporting Act
>
> Section 623 (b)(1)(A) of the FCRA makes it unlawful for a furnisher of information to a Consumer reporting agency, upon receiving notice of a Consumer dispute from the Consumer reporting agency, not to conduct a reasonable investigation of the disputed information. 15 U.S.C. § 1681s-2(b).[55]....In numerous instances, Encore failed to conduct reasonable investigations of Consumer disputes under the FCRA for accounts that had not been disputed within 45 days of Encore sending the Consumer a Notice of Debt under Section 809 of the FDCPA. The acts or practices alleged in Paragraph 126 constitute violations of Sections 623(a)(8)(E) and (b)(1)(A) of the FCRA, 15 U.S.C. §§ 1681s-2(a)(8)(E) and (b). (Bold added for emphasis)

### B. Midland did not conduct a reasonable investigation as to the GE/Meijer Account

Hinkle does not need to repeat the facts the CFPB relied upon for the alleged T-Mobile Account as for GE/Meijer Account. The same findings of facts and analysis of the CFPB would apply to the GE/Meijer Account. However, Hinkle's dispute letter to the CRA's for this alleged account differs only slightly: Hinkle wrote a letter to the CRAs on September 6, 2011 (to GE/Meijer); the CRA's sent her dispute letter to Midland. In her letter, Hinkle specifically asked them to "provide me with a description of the reinvestigation procedure for all

---

[55] CO ¶ 124.

items."[56] Midland changed the account status to "paid." However, it left the

account "open," which was improper, since they did not have any account-level

documentation that she ever had an account with GE/Meijer.

### III. Midland did not have a permissible purpose for obtaining Hinkle's credit report because debt buyers are neither creditors nor acting on behalf of a creditor

Appellant previously pointed out that Midland is a debt collector and was

trying to collect on an account that was closed, which does not fit the definition of

"account" per § 1681b(a)(3).  In addition to that argument, the FTC and the CFPB

have held that ***debt buyers do not have a permissible purpose for obtaining a***

***credit report for consumers like Hinkle***. When the CFPB took action against

Midland on 9/9/15, the CO didn't address the issue of permissible purpose (15

U.S.C. § 1681b), but the FTC has addressed the matter in prior situations; their

interpretations of the law on "permissible purpose" are clear and unmistakable,

backed by 40 years of experience.

In the CO, the CFPB repeated the definition of who is a "creditor" and who

is not. Midland is not a creditor, the Bureau said:

> **"Creditor"** "means any person who offers or extends credit creating a Debt or to whom a Debt is owed, but **such term does not include any person to the extent that that person receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such Debt for another."** [Bold added for emphasis.][57]

---

[56] CO ¶¶ 124, 126, 127
[57] CO ¶ 8.

The FTC also stated creditors can have a permissible purpose to access a consumer's credit file. However, debt buyers, such as Midland, are *not* creditors since (1) they have *never extended credit* to the Consumer, (2) they are *assigned or transferred* the debt through *purchase*, and (3) they are collecting *on their own behalf* rather than the creditor.

Some debt collectors are permitted to access a consumer's credit file. For example, a collection agency, detective agency, private investigator, or attorney can have a permissible "collection" purpose under this section to obtain a consumer report on a consumer for use in obtaining payment of that consumer's account when working on the collection of an account ***on behalf of a creditor***.[58] That does not fit Midland, by admission of Midland and by finding of the CFPB.[59]

In summary, debt buyers are not creditors; additionally, all debt buyers are debt collectors, not all debt collectors are debt buyers. Debt collectors who are not debt buyers consist of two types: those who work on behalf of a creditor, and those who collect on their own behalf. Because Midland is not a creditor, and because they do not collect on behalf of a creditor, they did not have a permissible purpose for accessing Hinkle's credit files, according to the FTC and CFPB.

---

[58] Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report and Summary of Interpretations, Page 44, Section 3(B).
[59] Midland spent $4 billion to own 60 million consumer accounts and $128 billion worth of debt. CO, ¶ 22

**IV.    The CFPB found that Midland violated multiple counts of FDCPA**

The following relevant violations of the FDCPA also apply to Hinkle's case:

1.  These representations "are false or misleading and constitute a deceptive act or practice in violation of Sections 807, and 807(10) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(10)." (CO, ¶ 111);

2.  "In numerous instances, in connection with collecting or attempting to collect Debt, Encore communicated disputed credit information to third-party collection agencies, including law firms, without communicating that the Debt is disputed. The representations set forth in Paragraph 118 are false or misleading and constitute violations of Sections 807 and 807(8) of the FDCPA, 15 U.S.C. §§ 1692e, 1692e(8)." (CO, ¶ 118-119);

3.  "In numerous instances, in connection with collecting or attempting to collect Debt, [Asset Acceptance, a fully owned Encore subsidiary] made an excessive number of telephone calls and engaged in conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a Debt. The acts or practices set forth in Paragraph 120 are harassing or abusive and constitute violations of Sections 806 and 806(5) of the FDCPA, 15 U.S.C. §§ 1692d, 1692d(5). (CO, ¶ 118-119).

**V.    The lower court improperly relied upon the inadmissible affidavit of Angelique Ross in granting Midland summary judgment on all issues raised by Hinkle**

25

Hinkle has two problems with Ross's affidavit. First, Ross was not a disclosed witness, and could not be cross-examined as to any of her testimony. In its brief, Appellees argued that Hinkle stated she was done with discovery (as we pointed out in our opening brief, she stated this without knowing about Ross), and she did not put forth in her opening brief any questions she might ask. By now, it should be clear that Hinkle would have asked about what original account-level documentation was in the file, why Midland didn't have it or ask for such documentation, how was Ross a qualified witness to attest to the accuracy of the debt sellers' records that these alleged accounts were owned by Hinkle. Second, the entire motion for summary judgment was based on affiant's affidavit, and her affidavit alone. Ross, they argue, was "merely" authenticating the documents. But that is precisely the problem. She is not qualified to authenticate these records. Without original account-level documentation reviewed by a qualified witness, authentication is not possible and the requirements of F. Rule Evid. 803(6)(d) cannot be met. Her testimony is hearsay; Midland's records are built on hearsay; and DRS and AIS records are hearsay: triple hearsay.

Because Midland has admitted that no original account-level documentation was obtained on either account, and two, such documentation was no longer available;[60] because Ross's affidavit clearly states she only reviewed electronic

---

[60] Appellees' Brief, p. 44.

26

data files obtained from the debt sellers;[61] and finally, the CFPB has held that Appellees' have a pattern of not obtaining account-level documentation in their collection efforts, reporting or re-investigations, Midland is in violation of the FCRA and FDCPA.

Therefore, assuming this Court agrees that the matter is settled by the recent findings and conclusions of law by the CFPB as to what is required, to that degree, this issue does not need to be revisited if this case is reversed, and the lower court should make findings consistent with the findings of the CFPB.

## VI. Midland did not comply with the FDCPA when it reported the T-Mobile account to the CRAs

When Hinkle orally disputed the debt, which is permissible under 1692g(a). This should have given pause to Midland to ascertain whether the alleged T-Mobile Account actually belonged to her. Because they lacked documentation, it was improper to report it to others when Midland knew the information could be inaccurate for lack of review of the account-level documentation, and reliance only upon the data files of the debt Seller, DRS. This is exactly what the CFPB found and cited them for, and then placed restrictions on Appellees from doing it in the future.

## VII. As to the FCRA, the CFPB found evidence of willful misconduct

---

[61] Doc. 85-2.

The CFPB's produced a lengthy list of intentional misconduct and misrepresentation by Midland in its CO. This court should hold the conduct willful, and the lower court should follow suit.

Hinkle did not need to argue on appeal whether the violations of the FCRA were willful misconduct. Appellees state because she did not argue it, she waived it. She has not. Hinkle can obtain civil damages under either § 1681o (negligence) or § 1681n (willful misconduct). Whether the conduct of Midland was willful or negligent is a question for the jury. In *Miller v. Johnson & Johnson, Janssen Pharmaceuticals*, Inc., 80 F.Supp.3d 1284 (M.D. Fl. 2015), the court held (analogous to the instant case) as follows:

> "Miller provides ample evidence that he incurred actual damages as a result of J&J's violation of the FCRA…. Accordingly, Miller has demonstrated a genuine dispute of material fact and the parties will proceed to trial on the issue of damages….The question of whether an employer acted willfully or negligently is "understood to be a question of fact for the jury….Therefore, genuine dispute exists as to whether J&J acted negligently or willfully when it violated the FCRA, an issue on which the parties will also proceed to trial." *Miller* at p. 1296.

## VIII.    Hinkle has not intentionally abandoned any issues on appeal.

All of the arguments set forth above are issues on appeal that Appellees agree were properly raised.  Appellee claims that Hinkle has abandoned issues on appeal.  Even assuming arguments of Hinkle were raised but adequately argued in her opening brief, this court can still amplify upon the issue explained in this reply brief. *United States v. Smith*, 402 F.2d 1303, 1313 (11th Cir. 2005) ("[W]e have

'liberally read' that brief and also considered "counsel's amplification of his position in the reply brief and at oral argument" in order to identify the issues presented. *Id.* And in *Kincade, supra,* we reason that even a few abbreviated descriptions of an argument are ordinarily sufficient to raise it on appeal, at least where other parts of the brief do not contain 'express indications that the appellant does not intend to advance that argument.'")  In addition, to the extent that a Consent Order (i.e., decree) can be taken notice of at any time during a proceeding, all of these issues are valid.

## CONCLUSION

For the reasons stated above, Midland respectfully requests that the Court deny the district court's summary judgment.

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted 6895

words in the foregoing Brief, exclusion of the portions excluded by Rule

32(a)(7)(B)(iii)

_____

Craig K. Perry, Esq., Nevada Bar No. 3786

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of October, 2015, a true and correct copy

of the foregoing REPLY BRIEF OF PLAINTIFF—APPELLANT TERI HINKLE

was electronically filed.  Notice of this filing will be sent by operation of the

Court's electronic filing system to all parties indicated on the electronic filing

receipt.  Parties may access this filing through the court's electronic filing system.

_____

Craig K. Perry, Esq., Nevada Bar No. 3786