CASE NO. 15-10398-FF

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

TERI LYNN HINKLE,

Appellant,

v.

MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING LLC,
AND ENCORE CAPITAL GROUP INC.

Appellees,

On Appeal from the United States District Court
For the Southern District of Georgia
Dublin Division
3:13-cv-00033-DHB-BKE

REPLY BRIEF OF APPELLANT
TERI LYNN HINKLE

<u>Attorney for Appellant</u>

Craig K. Perry
Craig K. Perry & Associates
8010 West Sahara Avenue, Suite 260
Las Vegas, Nevada 89117
Telephone: (702) 228-4777
Facsimile: (702) 943-7520

Case No. 15-10398-FF
Teri Lynn Hinkle v. Midland Credit Management, Inc., et al.

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

PLEASE TAKE NOTICE that Appellant Teri Hinkle through her undersigned counsel of record submits the following Certificate as to the Interested Persons:

Interested entities or persons required to be listed under Rule 26.1-1, are as follows:

1. Ames, Matthew B., Member of Balch & Bingham, LLC Law Firm (Attorney for Appellees and Defendants)

2. Balch & Bingham, LLC (Law Firm for Appellees and Defendants)

3. Bowen, H. Dudley, Jr. (Senior District Judge United States District Court of Southern District of Georgia)

4. Craig K. Perry & Associates (Attorneys for Appellant and Plaintiff)

5. Encore Credit Group, Inc., ECPG (Appellees and Defendant)

6. Epsy, Chase T., Member of Balch & Bingham, LLC Law Firm (Attorney for Appellees and Defendants)

7. Hinkle, Teri (Appellant and Plaintiff)

8. Midland Credit Management, Inc. (Appellees and Defendant)

9. Midland Funding, LLC (Appellees and Defendant)

10. Perry, Craig K. (Attorney for Appellant and Plaintiff, Owner of Craig K. Perry & Associates)

Case No. 15-10398-FF
Teri Lynn Hinkle v. Midland Credit Management, Inc., et al.

11. Tompkins, Jason Brent (Attorney for Appellees and Defendants, Member at

Balch & Bingham, LLC Law Firm)

Respectfully submitted this 23rd day of December, 2015.

/s/Craig K. Perry, Esq._____
Craig K. Perry, Esq.
Nevada Bar No. 3786
8010 W. Sahara Ave., Ste. 260
Las Vegas, Nevada 89117
(702) 228-4777
*Counsel for Appellant*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES AND CORPORATE DISCLOSURE STATEMENT .................................................................... C-1, C-2

TABLE OF CONTENTS ........................................................................... i

TABLE OF CITATIONS ........................................................................... ii

REPLY ARGUMENT AND CITATIONS OF AUTHORITY ............................... 1

I. Opening Statement ....................................................................... 1

II. The Granting of Appellees' Motion for Summary Judgment Constituted a "De Novo Wrong" That Should Be Reversed ........................................... 5

III. Appellees' Failure to Disclose Affiant Angelique Ross Was Prejudicial and Harmful to Appellant Hinkle's Case, and Deprived Hinkle of a Meaningful Opportunity to Conduct Discovery She Could Use to Rebut Their Assertions ........................................................................ 11

IV. Appellees Could Not Conduct a Reasonable Investigation Under these Circumstances Solely by Expecting Hinkle to Prove a Negative ............ 18

V. Midland Is a Debt Buyer, They Are Not A Creditor Nor Do They Act on Behalf of Creditors; Therefore, They Do Not Have A Permissible Purpose for Accessing Appellant's Credit Files .................................................. 27

VI. The FDCPA Claims Should Not Be Dismissed Because a Trier of Fact Could Infer From the Facts That Appellees Violated Various Sections of the FDCPA, 15 U.S.C. § 1692 ................................................................. 29

A. Midland did not comply with the FDCPA when it reported the T-Mobile account to the CRAs .................................................................. 29

B. The issue of "willful" is a question of fact for the jury. ..................... 29

VII. Hinkle Has Not Abandoned Any Issues on Appeal ............................... 30

CONCLUSION ................................................................................................ 31

## VIII.  **TABLE OF CITATIONS**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d
202 (1986) ..................................................................................................... 11

*Berryman–Dages v. City of Gainesville Fla.,* No. 1:10cv177–MP–GRJ, 2012 WL
1130074, at *2 (N.D.Fla. Apr. 4, 2012) ................................................................ 15

*Bowe v. Public Storage*, --- F. Supp. 3d ---, 2015 WL 3440418
(S.D. Flor. 2015).................................................................... 10, 14, 15, 20

*Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330, 1333 (11th Cir.
2015) ...................................................................................................... 4

*Consumer Financial Protection Bureau vs. Morgan Drexen, Inc., 60 F. Supp.3rd
1082, 1091 (C.D. Col.2014)* ..................................................................... 19

*Daker, Warren*, 2011 WL4553141 (N.D. Georgia 2011) ....................................... 5

*Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981) ............................................... 10

*Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 669 F.2d
1026, 1031 (5th Cir.1982) ..................................................................... 11

*Kincade v. Gen. Tire & Rubber Co.,* 635 F.2d 501, 504 (5th Cir.1981) .............. 31

*Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505 .......................................... 11

*Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.,* 420 F.2d 1211, 1213 (5th
Cir.1969)............................................................................................. 11

*Lips v. City of Hollywood,* 350 Fed.Appx. 328, 340 (11th Cir.2009)................... 15

*McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th Cir.1996)................................. 14

*Miller v. Johnson & Johnson, Janssen Pharmaceuticals*, Inc., 80 F.Supp.3d 1284 (M.D. Fl. 2015)..........................................................................................................30

*Mitchell v. Ford Motor Co.,* 318 Fed.Appx. 821, 824 (11th Cir.2009) .................15

*Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 52, 127 S.Ct. 2201, 2205 (2007)......4

*Snover v. City of Starke, Fla., 398 Fed. Appx. 445, 449 (11th Cir.2010)*.............14

*United States v. Smith*, 402 F.2d 1303, 1313 (11th Cir. 2005) ...............................31

*Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1137-1138 (11th Cir. 2004) ............................................................................................................5

## STATUTES

15 U.S.C. § 1681b(a)(3) ..........................................................................................27

15 U.S.C. § 1681s-2(b)............................................................................................19

15 U.S.C. § 1692g(a)...............................................................................................29

15 U.S.C.§1692(e); 15 U.S.C. § 1681(a)(4) ............................................................3

15 U.S.C. §1692k, §§1681n and 1681o .................................................................4

## RULES

Fed. Rule 37(c) ................................................................................ 15

Fed R. Civ. P. 56(c)(4) ................................................................. 14,17

## OTHER AUTHORITIES

Annual Report, Encore Capital Group, Inc., p. 35, third to last paragraph
http://www.sec.gov/Archives/edgar/data/1084961/000110496115000011/ecpg-
20141231x10k.htm ................................................................................ 1

Appellee's Brief.............................................................. 3,6,8,14,21,31

CFPB Bulletin 2014-01 ....................................................... 19

*Consumer Financial Protection Bureau vs. Morgan Drexen, Inc., 60 F. Supp.3rd
1082, 1091 (C.D. Col.2014)* ................................................. 19

Dodd-Frank Wall Street Reform and Consumer Protection
Act of 2010………… ........................................................... 3,19

Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff
Report and Summary of Interpretations, Page 44, Section 3(B).......................... 28

http://www.ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-major-
debt-buyer-who-filed-thousands-time-barred ........................................ 5

http://www.consumerfinance.gov/newsroom/cfpb-takes-action-against-thetwo-
largest-debt-buyers-for-using-deceptive-tacts-to-collect-bad-debts/ ...................... 1

http://www.consumerfinance.gov/newsroom/prepared-remarks-of-cfpb-director-
richard-cordray-on-call-about-encore-and-portfolio-recovery-associates-
enforcement-action/ ............................................................... 2

Semi-Annual Report of the CFPB, Fall 2015,
http://www.consumerfinance.gov/reports/semi-annual-report-fall-2015/ .............. 3

# I.
## OPENING STATEMENT

Defendants-Appellees, Midland Credit Management, Inc., Midland Funding, LLC, and their parent company Encore Capital Group, Inc. (collectively, "Midland") are one of this nation's two largest junk debt buyers.[1] Midland routinely purchases "zombie debt" or debt without any original account-level documentation or proof, often purchased from other predecessor debt collectors or debt buyers, who pass along undocumented debt in a daisy chain from one holder to another for pennies on the dollar. According to information gleaned from Encore's 2014 annual report to shareholders, 2012-2014, Midland spent, on average, 2.6 cents for every dollar of debt it purchased.[2]

Midland also made the following telling statements in its 2014 annual report, "At the core of our analytic approach is a focus on characterizing *our consumers' willingness and ability to repay their financial obligations*. In this effort, we apply tools and methods from statistics, *psychology*, economics, and management science across the full extent of our business."[3]

….Our failure…to comply with existing or new laws, rules, or regulations

---

[1] http://www.consumerfinance.gov/newsroom/cfpb-takes-action-against-the-two-largest-debt-buyers-for-using-deceptive-tactics-to-collect-bad-debts/

[2]. Annual Report, Encore Capital Group, Inc., p. 35, third to last paragraph http://www.sec.gov/Archives/edgar/data/1084961/000108496115000011/ecpg-20141231x10k.htm

[3] Id. at p. 3.

could limit our ability to recover on receivables…cause us to pay damages to consumers or result in fines or penalties….We have seen a trend in laws, rules and regulations *requiring increased availability of historic information* about receivables in order to collect. If credit originators or portfolio resellers are *unable or unwilling to meet these evolving requirements*, we may be unable to collect on certain accounts….Additional consumer protection or privacy laws, rules and regulations may be enacted, or existing laws, *rules or regulations may be reinterpreted or enforced in a different manner*, imposing additional restrictions or requirements on the collection of receivables[.]"[4] [Bold italics added for emphasis.]

The CFPB has publicly stated that they investigated Appellees and "found that Encore and PRA [Portfolio Recovery Associates] bought debts that they knew or should have known were inaccurate or could not be legally enforced," and, "The companies consciously bought debt that they know was suspect because the seller expressly represented that documents were not available to validate some or all of the accounts."[5]

The CFPB also publicly stated, "The CFPB took action against Encore Capital Group, one of the nation's two largest debt buyers. The Bureau found violations of the Fair Debt Collection Practices Act and the

---

[4] Id. at p. 16.
[5] http://www.consumerfinance.gov/newsroom/prepared-remarks-of-cfpb-director-richard-cordray-on-call-about-encore-and-portfolio-recovery-associates-enforcement-action/

2

Dodd-Frank Wall Street Reform and Consumer Protection Act related to Encore's collection of bad debts, litigation practices, and other collection activities. Specifically, the Bureau found that Encore threatened and deceived consumers to collect on debts the company should have known were inaccurate or had other problems. The Bureau ordered Encore to cease reselling debts, stop collections on $125 million worth of judgments, and halt collection of future debts that cannot be verified. Encore is required to pay up to $42 million in consumer relief and $10 million in civil monetary penalties."[6]

The opening line of Appellees' brief begins with a non-substantive, and *ad hominem* attack against the Appellant Teri Hinkle by labeling her as a "professional *pro se* plaintiff" for having filed a handful of lawsuits (all but one was satisfactorily resolved), (Appellee's Brief, p. 1). Midland's tone is sanctimonious when considering its own well-documented, *unlawful* actions.

Consumer protection laws were enacted to insure that consumers' rights are not trampled.[7] Congress purposely created private rights of civil action for both the FDCPA and FCRA, which provide for putative damages, actual damages, punitive damages, attorney's fees and costs, depending

---

[6] Semi-Annual Report of the CFPB, Fall 2015, http://www.consumerfinance.gov/reports/semi-annual-report-fall-2015/
[7] *See* 15 U.S.C. §1692(e); 15 U.S.C. § 1681(a)(4)

upon the circumstances.[8] "Congress enacted FCRA in 1970 to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Collins v. Experian Information Solutions, Inc.*, 775 F.3d 1330, 1333 (11th Cir. 2015), *citing to* <u>Safeco Ins. Co. of Am. v. Burr,</u> 551 U.S. 47, 52, 127 S. Ct. 2201, 2205 (2007). And yet, Appellees use this disparaging language to cast aspersions, even though these statutes are designed for private enforcement of unlawful conduct. The only way these statutes protect consumers is if they exercise their private rights of action to enforce them, as Congress intended.

While straining at a gnat and swallowing a camel, Midland has a well-documented history of violating these laws, using and abusing the judicial system, repeatedly, against thousands of consumers, in violation of state and federal consumer protection laws.

Midland has repeatedly been found to have blatantly violated consumer protection laws. Recently, in January 2015, New York State reached a settlement with Midland for filing lawsuits and obtaining judgments on time-barred debt. In that instance, Midland was required to pay a fine of $675,000 and dismiss 4,500 judgments ($18 million worth)

---

[8] *See* Id. § 1692k and Id. §§ 1681n and 1681o.

because Midland filed on time-barred debt.[9]  Nevertheless, Midland begins

its brief by misdirecting attention to Hinkle's *legal* actions. This is a pattern

noted throughout this case, including blaming Hinkle for failing to assist

them in the impossible task of proving a negative, rather than simply turn to

the original creditors to obtain original account-level documentation.

## II.
## THE GRANTING OF APPELLEES' MOTION FOR SUMMARY JUDGMENT CONSTITUTED A "DE NOVO WRONG" THAT SHOULD BE REVERSED

This Court will decide whether the lower court's granting of

Appellee's Motion for Summary Judgment on all issues was proper: "[T]he

undersigned will conduct a *de novo* review of Daker's claims. Under that

standard, a 'court's task is to determine whether the … decision [at issue] is

wrong—that is, whether the court disagrees with it.'" *Daker, Warren*, 2011

WL4553141 (N.D. Georgia 2011), *citing* in part to *Williams v. BellSouth*

*Telecomms., Inc.*, 373 F.3d 1132, 1137-1138 (11th Cir. 2004) (in *Williams,*

this Court uses the phrase "*de novo* wrong." *Williams* at p. 1138.)

Appellees' arguments in their motion for summary judgment were

based upon "Defendants' Statement of Undisputed Material Facts" Doc. 85-

---

[9] http://www.ag.ny.gov/press-release/ag-schneiderman-obtains-settlement-major-debt-buyer-who-filed-thousands-time-barred

Some of the "facts" are in dispute. Some are not. But even facts not in

dispute go to a jury if reasonable minds can differ as to their inferences.

## STATEMENT OF UNDISPUTED FACTS ALLEGED BY APPELLEES, DOC 85-1, pp. 1-5

| Fact | Description | Disputed? | Discussion |
|---|---|---|---|
| 1 | 9/24/2008, Midland Acquired GE/Meijer account from another debt buyer, AIS Services LLC | Yes in part, no in part | Do not dispute the purchase; she disputes that by virtue of the purchase, the information was inherently accurate, a notion that is implied by the affidavit of Ross and arguments of counsel |
| 2 | 10/1/2008, Midland sent initial collection letter to Hinkle, and the debt was paid in full. | Yes | Hinkle received nothing from Midland in the mail; Hinkle did not pay the debt, and Appellees never produce any records as to who paid it (why not?) Midland insinuates Hinkle paid it |
| 3 | Midland received a check for $237.49 | Yes | No proof it was paid; Midland infers it was Hinkle who paid it. They provide no proof it was her |
| 4 | Midland ceased reporting the account to the CRAs; account reported as paid in full | Yes | Account gets re-reported every month, so reporting was ongoing |
| 5 | 12/6/2011, Midland acquires T-Mobile account | Yes | Disputes the allegation it was "a debt originally owed to T-Mobile" by Hinkle or anyone else due to lack of proof or foundation |
| 6 | Midland sent a letter to Hinkle on 12/21/2011 | No | Hinkle agrees Midland sent a letter |

| 7 | 10/20/2011. Hinkle sent demand for validation of debt | No | Hinkle agrees that she sent the letter, but denies Midland's statement that there was any "initial" communication sent to her three years prior |
|---|---|---|---|
| 8 | 12/21/2011, Hinkle receives first letter regarding T-Mobile account | No | Hinkle agrees she received this letter |
| 9 | 12/28/2011 Midland called Hinkle at her home to reach a settlement of the T-Mobile account | No in part, yes in part | Hinkle agrees there was a call, but states that the call was made the day before, on 12/27/2011 |
| 10 | Hinkle verbally [sic, should "orally"] disputed the debt | No in part, yes in part | Acknowledges she orally disputed she owed any money, but caller did not make it clear whether he was calling about the T-Mobile or GE-Meijer accounts |
| 11 | Midland sent Hinkle two letters, one on 2/5/2012, the other on 7/21/2012, seeking her assistance | No | Hinkle agrees that she received these letters, the suggestion they were truly "seeking her assistance" in this form letter is disputed |
| 12 | Letter asked for documentation and gave four examples of supporting documentation | No | Hinkle agrees the letter asked for documentation, but the inference she could assist in the matter is entirely misplaced. This is nothing more than a stock form letter that is irrelevant to her specific dispute. Example one: Proof of payment (consumer would provide this if an already-paid bill was in collection. Hinkle had nothing to offer); Example two: Fraud. Hinkle had no |

| | | | evidence of fraud was ever committed, had never reported any fraud to the authorities, so had nothing to provide. Further, filing such a report would not assist Midland with their investigation. Example three: balance discrepancy, so provide copy of contract for time of disputed service; copy of bill. Hinkle never had an account with T-Mobile, so had nothing to provide. Example 4: Death certificate. Not applicable to Hinkle, who is alive. |
|---|---|---|---|
| | | | Midland's argument on this point is that the inference that they conducted a reasonable investigation and Hinkle refused to cooperate so it's her fault they did not do more is misplaced. This burden shifting is unreasonable. Midland needed to go back to the creditor for documentation of the debt but never did. This burden-shifting/blame-shifting and whether this was reasonable should either be held to be unreasonable, or it should go to the trier of fact |
| 13 | Hinkle never provided documentation to substantiate her dispute with T-Mobile | No | True because she had no documentation to provide, they infer lack of cooperation from this, but fail to suggest what she could have provided that would have assisted them in the investigation |

| 14 | Hinkle "intentionally refused" Midland's request for assistance | Yes | She could not assist them with their investigation because she had nothing to give them, they infer "lack of cooperation" but she could have done nothing to assist them that would help. It clearly was an attempt to shift the burden, and she had neither the obligation nor the ability to assist. She can't prove a negative |
| 15 | Midland obtained a copy of her credit report on 5/7/2012 | No | Do not dispute when they obtained a copy, but dispute the inference/statement that it was pulled because she failed to respond or that pulling her credit was for a lawful purpose or that it would facilitate their investigation |
| 16 | In July, 2012, Midland received a notice of dispute from the credit bureaus | No | |
| 17 | Hinkle sent notice of intent to sue on July 26, 2012 | No | |
| 18 | Midland failed to pay the $18,000 demanded by Hinkle as settlement | Yes in part; no in part | Hinkle did not demand a settlement of $18,000 in her 7/26/2012 letter; but she did file suit when Midland failed to compensate her in any way for their violations nor did they cease to violate her. |

Appellant only agrees that 6, 7, 8, 11, 12, 15, 16 and 17 are not in

dispute. Appellant also asserts that 2, 3, 4, 5, and 14 are facts in dispute, and

9

that 1, 9, 10 and 18 are partly in dispute, partly not in dispute. However, even though certain facts or aspects of those facts are not in dispute, Appellant draws very different, material inferences from the same facts, as mentioned in column three, the discussion section, as to 6, 7, 8, 10, 11, 12, 13, 15, 16, 17 and 18.

Disputes of fact as well as reasonable disagreements about the inferences that can be drawn from the same facts are supposed to go to the jury, and are not to be decided upon by the District Court judge. The recent case of *Bowe v. Public Storage*, --- F. Supp. 3d ---, 2015 WL 3440418 (S.D. Fl. 2015) is instructive as pertaining to when a district court should *not* grant summary judgment. As to the facts on which the parties *disagree,* the court stated:

> "If the record presents factual issues, the District Court must not decide them on a motion for summary judgment; it must deny the motion and proceed to trial;"[10]

As to facts on which the parties *agree*, since the inferences of those facts can be viewed differently by the trier of fact, these cases still go to the trier of fact:

---

[10] *Bowe, citing to Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981)

1. "The parties may agree on the facts but if they disagree about the inferences that should be drawn from these facts, the case should go to trial;"[11] and

2. "If reasonable minds might differ on the inferences arising from undisputed facts then the District Court should deny the motion for summary judgment;"[12]

Finally, we should remind ourselves that "On a motion for summary judgment, *all reasonable inferences arising from undisputed facts should be made in favor of the nonmovant*, but an inference based on speculation or conjecture is not reasonable."[13] [italics added for emphasis.]

In this case, the District Court has committed a "*de novo* wrong," to use a phrase of this Court, and this case should be remanded so the case can proceed to trial.

## III.
### APPELLEES' FAILURE TO DISCLOSE AFFIANT ANGELIQUE ROSS WAS PREJUDCIAL AND HARMFUL TO APPELLANT HINKLE'S CASE, AND DEPRIVED HINKLE OF A MEANINGFUL OPPORTUNITY TO CONDUCT DISCOVERY SHE COULD USE TO REBUT THEIR ASSERTIONS

Looking at the list of so-called undisputed facts, it's true that among that list of 18, many of them are admissible without the affidavit of Angelique Ross, specifically the items numbered 6-18 do not involve Ross's

---

[11] *Id., citing to Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.,* 420 F.2d 1211, 1213 (5th Cir.1969)
[12] *Id., citing to Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.,* 669 F.2d 1026, 1031 (5th Cir.1982); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)
[13] *Id.,* citing *Liberty Lobby, Inc.,* 477 U.S. at 255, 106 S.Ct. 2505

testimony because these items, or their inferences, are acknowledged by the Plaintiff-Appellant in her deposition, in discovery and in her motions. However, as to items 1-5 there are evidentiary problems, because Ross goes well beyond personal knowledge and does not know how the data acquired from other parties was obtained, or the accuracy thereof.

In particular, she makes the following declarations in her affidavit:

"According to information received from AIS Services, LLC [who is not even the original creditor], the debt involved credit extended to Plaintiff by GE Money/Meijer,"[14] and "According to information received from Debt Recovery Solutions, LLC [who also is not even the original creditor], the debt involved credit extended to Plaintiff T-Mobile."[15]

Allowing Ross to testify about facts she is asserting is analogous to someone coming into court to give eyewitness testimony in a traffic accident case—even though they didn't actually see the crash—but allowing them to testify, just because they read about it. It's analogous: Appellees don't know anything about the debt, only what they read. Without original account-level documentation to act as a check and a balance, it's hearsay built on hearsay, and not meeting the exception of a business record.

Accordingly, the problem with Ross's testimony is she is relying upon

---

[14] Doc 85-2, paragraph 6.
[15] Id at paragraph 7

documents, the accuracy of which she cannot explain, vouch for, or verify. We have already explained it's triple hearsay (in Ross's words, "according to" the predecessor debt buyer, if they were asked, they, too, would say it is "according to" the creditor or other predecessor debt buyer).

Midland knows what they have in their files, and they know what they don't have. They admittedly have no original account-level documentation: *no contract* for services, *no signature* of the appellant agreeing to such, no proof she received any goods or services of the original creditor, *no proof* of prior payments made by her—*nothing but a data sheet* of scant information from the predecessor debt buyer.

By the same token, Hinkle has no documentation either, because she never had an account with either alleged creditor. On this point, isn't it the height of what is reasonable to expect Midland to go back to the original creditor and obtain that same original documentation, and is it not unreasonable to expect that Hinkle can somehow assist to prove a negative? At the very least, this is why this case needs to go to a jury or get a ruling that such an expectation (or excuse) is unreasonable.

The lower court did not give Hinkle the benefit of the doubt, the facts were clearly interpreted in light most favorable to the moving party.

Had Ross been deposed, as she has in other cases that we were

13

permitted to go to trial, Appellant could have demonstrated to the court her

inability to qualify as an "other qualified witness" for admitting these

documents.

> Rule 56(c) provides that a party opposing a summary judgment
> motion may object to materials cited to support a fact that cannot be
> presented in a form that would be admissible in evidence. "On
> motions for summary judgment, a court may consider only that
> evidence which can be reduced to an admissible form." *Snover v. City
> of Starke, Fla.,* 398 Fed.Appx. 445, 449 (11th Cir.2010) (internal
> quotations and citations omitted). "Authentication is a condition
> precedent to admissibility." *Id.* (internal quotations omitted).
> Otherwise admissible evidence can be submitted in inadmissible form
> at the summary judgment stage, though at trial it must be submitted in
> admissible form. *McMillian v. Johnson,* 88 F.3d 1573, 1584 (11th
> Cir.1996)[16]

Appellees gloss over this essential point: that authentication *precedes*

admissibility. Midland readily admits they did not disclose Angelique Ross

as a witness.[17] They claim that she is "merely a 'custodian' of the documents

attached to her affidavit, or an otherwise 'qualified witness' capable of

attesting to their authenticity."[18]

Appellees' use of the word "merely" signals their attempt to downplay

the necessary requirement of authentication. Ross is neither a custodian of

records nor an "other qualified witness" to have records admitted into the

---

[16] *Bowes* at p. 9.
[17] Appellees' Brief at p. 44.
[18] Appellee's Brief at p. 44.

record as a foundational basis for a motion for summary judgment, let alone

the evidentiary requirements required at trial.

> Rule 37(c) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party." *Mitchell v. Ford Motor Co.,* 318 Fed.Appx. 821, 824 (11th Cir.2009). "In determining whether the failure to disclose was justified or harmless, we consider the non-disclosing party's explanation for its failure to disclose, the importance of the information, and any prejudice to the opposing party if the information had been admitted." *Lips v. City of Hollywood,* 350 Fed.Appx. 328, 340 (11th Cir.2009). "Prejudice generally occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question." *Berryman–Dages v. City of Gainesville Fla.,* No. 1:10cv177–MP–GRJ, 2012 WL 1130074, at *2 (N.D.Fla. Apr. 4, 2012).[19]

In *Bowe*, this Court held that although failure to disclose a certain

witness during discovery did not require striking her [Defendant, the moving

party's witness] as a witness, but in determining whether the failure to

disclose a witness was justified or harmless, such that the testimony will be

admitted, a court considers (a) the non-disclosing party's explanation for its

failure to disclose, (b) the importance of any information, and (c) any

prejudice to the opposing party if the information had been admitted.[20]

---

[19] *Bowes* at p. 9.
[20] *Id.* at p. 9

As to (a) Appelles admit she has no knowledge, she's merely an "other qualified person."  But that argument is circular; a person is qualified *because* they know something about how the records were originated—how they were created.  As to (b), reliability is always the objective, and why we don't allow hearsay, and any exceptions must also be reliable.  As to part (c), the Court stated that prejudice usually occurs when late disclosure deprives the opposing party of a meaningful opportunity to perform discovery and depositions related to the documents or witnesses in question.

Again, Ross did not have access to any original account-level documentation, nor could she say or is qualified to say what either AIS or DRS looked at, either. Second, Ross only reviewed a summary of data that was compiled by another debt collector or buyer, who compiled the data *after* it was purchased by either the creditor or yet another predecessor debt collector/buyer. Third, Appellant admits that Ross was not disclosed because "she was not an 'individual likely to have discoverable information.'"[21]

Appellees have stated that Appellant has not shown what questions she might have asked if given the opportunity to question Ross. By now, the types of questions should be obvious; she would have been asked about her ability to act as a qualified witness to these records, whether the records

---

[21] Appellant's Brief at p. 44.

were accurate, how they know that these accounts belonged to her, what if any investigation was effected when she wrote her letters, whether she could testify as to why they continued to expect her cooperation after receiving her letters, whether she could testify as to why they could not understand the plain language of her letters that she never had accounts with GE/Meijer or T-Mobile, cross examine her as to the verification process when her dispute letters were received from the CRA, why did they not request original account level documentation when they knew she had no evidence of indebtedness, etc.

An affidavit in support of a motion for summary judgment requires personal knowledge. Fed R. Civ. P. 56(c)(4) expressly states, "An affidavit or declaration used to support or oppose a motion must be made on *personal knowledge*, set out *facts that would be admissible in evidence*, and show that the affiant or declarant is *competent to testify* on the matters stated." This rule requires (1) personal knowledge, (2) trial-admissible facts, and (3) competency. When it comes to alleged consumer debts purchased second-or-third-hand from creditors, Ross does not qualify.

## IV.
## APPELLEES COULD NOT CONDUCT A REASONABLE INVESTIGATION UNDER THESE CIRCUMSTANCES SOLELY BY EXPECTING HINKLE TO PROVE A NEGATIVE

On July 13, 2012, Hinkle sent certified letters to Equifax, Experian and Transunion regarding the T-Mobile Account.[22] In response, Affiant Ross states "MCM received notice of a dispute from the credit bureaus. MCM verified that it was showing the information provided by Debt Recovery Solutions, LLC, (DRS) and continues to report the T-Mobile Account as 'disputed.'"[23] Ross goes on to say, "In addition, on July 21, 2012, MCM sent Plaintiff a letter requesting additional documentation as part of its investigation, Plaintiff responded that she could not furnish MCM with any documentation because the account was not hers."[24] Midland took no further action to correct or delete the information, which they say was proper.[25]

Midland does not disagree that investigations should be reasonable under the circumstances. However, at the lower court, they argued once Appellant "refused" to cooperate, their duty ended. Based on what they

---

[22] Doc. 97-2, pp. 51-54.
[23] *Id*, paragraph 15.
[24] *Id*, paragraph 15.
[25] Appellees' Brief, pp. 36

received from the CRAs, Appellees claim their investigation was
reasonable. Appellees' Brief at p. 40.

However, Midland's arguments are completely at odds with CFPB
interpretations, guidelines and requirements of compliance with federal
Consumer financial laws. In fact, the Dodd-Frank Act that created the
CFPB, requires "that CFPB interpretations of federal consumer financial
laws be granted defenses as if the CFPB was the only agency authorized to
interpret these laws. See Consumer *Financial Protection Bureau vs.
Morgan Drexen, Inc., 60 F. Supp.3rd 1082, 1091 (C.D. Col.2014)*; the
CFPB makes it clear that debt collectors engaging in such conduct violate
1681s-2(b).

The CFPB requires that an investigation by a furnisher of
information like Midland, should be "reasonable." See CFPB Bulletin
2014-01.[i] "Section 623 (b)(1)(A) of the FCRA makes it unlawful for a
furnisher of information to a Consumer reporting agency, upon receiving
notice of a Consumer dispute from the Consumer reporting agency, not to
conduct a reasonable investigation of the disputed information.  15 U.S.C.
§ 1681s-2(b)."[26]

---

[26] CFPB Bulletin 2014-01.  The FCRA's requires that furnishers conduct investigations
of disputed information.  ..the investigations of disputes are important because they
provide critical check on accuracy of furnished items.  The investigation can also help

19

Appellees argue that what constitutes a reasonable investigation depends upon the circumstances.[27] Hinkle agrees.  But as to what constitutes a reasonable investigation in Hinkle's case, the parties disagree.

In a light most favorable to the nonmovant, it cannot be said that the *only inference to be drawn from Appellees' actions was that they conducted a reasonable investigation.* Given the facts that (a) Hinkle had no documentation of non-existent accounts, (b) Hinkle was specific in her dispute letter that these accounts did not belong to her, and (c) Appellees did nothing other than electronically "ping" back information to the CRAs without any human intervention or investigation, is evidence enough to draw an inference that Appellees did not conduct a reasonable investigation. Again, at the very least, these facts should defeat a motion for summary judgment, as the court did in *Bowe*, because either (1) The parties may agree on the facts, but if they disagree about the inferences that should be drawn from these facts, the case should go to trial, (2) If reasonable minds might differ on the inferences arising from undisputed facts then the District Court should deny the motion for summary

---

furnisher identify problems with respect to the general accuracy of the information that is furnishes to CRAs. ..the furnisher should investigate the dispute, and if appropriate, direct the CRA to correct to delete the disputed information... whether an investigation is reasonable depends on the circumstances, but the furnisher should not assume that simply deleting that item will generally constitute a reasonable investigation.

[27] Appellees' Brief, pp. 36.

judgment, and (3) all reasonable inferences arising from undisputed facts should be made in favor of the nonmovant.

Midland downplays the wording of the 7/13/2011 letter regarding the T-Mobile Account, which states clearly, "I have no contractual obligation with this company whatsoever and this is false information and a false claim of account."[28] Midland argues the information Hinkle provided to the CRAs is insufficient to know what her complaints were. But the CRA advised them that Hinkle was claiming that the debt was not hers.[29] But the letter is clear, and Midland knows their files contain inaccurate information and they had no intention of obtaining original account-level documentation.

If that wasn't enough, Hinkle wrote a *second letter* regarding the T-Mobile Account. Even affiant Ross asserted, "Plaintiff responded that she could not furnish MCM with any documentation **because the account was not hers.**"[bold added for emphasis][30] Hinkle could not provide any additional information about the account because *she never had the account.* Midland cannot make the issue between her and the CRAs. They

---

[28] Doc. 97-2, pp. 51-53.
[29] Doc. 97-2, PlainApp. 00027; Appellee's Brief, page 8. Type 1-Not his/hers.
[30] Doc. 85-2

21

have the information they needed from Hinkle. The duty of investigation, under these circumstances, is wholly Midland's not Hinkle's.

Appellees admit in their brief they had no account-level documentation.[31] The Purchase Agreement ("PA") states that by the Closing Date, debt Seller (who is not the creditor but DRS), would provide any account documentation in its possession. Since Midland neither received any nor made any additional requests for account-level documentation, it is arguable that they could not have conducted a reasonable investigation.[32]

When Midland purchases debt portfolios, they typically receive an electronic spreadsheet, sometimes referred to as a "data file," from the seller that includes information about the Consumer, such as name, address, social security number, and information about the Debt, including the purported amount of the Debt, contract interest rate, and dates of origination and default.  Appellees only compared name, address and date of birth.  They say Hinkle should have done more; but it is the Appellees

---

[31] "[S]he did not possess any personal knowledge of either alleged debt or account…because all "written communication was 'system generated' and not generated by a 'live person.'" Appellees' Brief, p. 44.

[32] Doc. 97-2 PlainApp. 00110, p. 8, section 4.4 of the PA states that the debt Seller would deliver copies of whatever it had by the closing date.

who could do more.  They knew from her oral dispute <u>and</u> her letters that she did not have accounts with their alleged creditors.

Information obtained in Hinkle's case revealed the same thing. Appellees did not possess any account-level documents; they did not have any (1) documents creditors give consumers, (2) the transactional history of the debt or (3) a copy of any creditor-awarded judgment; all they had were data files provided by predecessor debt buyers. Angelique Ross testified she reviewed "a printout of the electronic document containing information about the T-Mobile Account sold to Midland Funding, LLC. The footnote of that document states 'Data printed by Midland Credit Management, Inc. from electronic records provided by AIS Services, LLC pursuant to the Bill of Sale/Assignment of Accounts transferred on or about 12/6/2011 in connection with sale of accounts from DRS to Midland Funding, LLC.'"[33]

Affiant Ross attested that the T-Mobile Account was purchased from a predecessor debt buyer DRS. The PA between and Midland stated, among other things, the following:

> This Bill of Sale is executed without recourse or warranties except as stated and provided for in the agreement." And … "all of the information contained in Seller's Accounts Information (a) constitutes Seller's own business records regarding the Purchased

---

[33] Doc. 85-2, ¶¶ 6, 7

23

Accounts; and (b) accurately reflects in all material respects the information about the Purchased Accounts in Seller's possession.

Remember, these are debt sellers' own records, not the creditors' original account-level documentation. They are merely the debt sellers' data files.[34]

Hinkle has consistently stated that she is the wrong person, and she is not alone; many people claim they were improperly being chased by Midland for a batch of bogus T-Mobile debt.[35] Therefore, Midland knew the T-Mobile debts were problematic.

Sellers typically have not provided Appellees with any consumer-level documentation about most individual debts, such as account statements, records of payments, and the underlying contracts signed by the Consumers." This is also true in Hinkle's case.[36]

Midland's PA with DRS says that Midland cannot obtain account-level documentation, making it impossible for Midland to access account-level documentation:

> Without express written authorization from Seller, Purchaser shall not make direct contact with any of all of Seller's

---

[34] Page 5 of the PA with DRS… Doc. 97-2 PlainApp. 000107, states that their own records are true and correct "to the best of their knowledge," which doesn't mean much, because it says nothing about the accuracy of the records they obtained from the creditor, and there is nothing from the creditor attesting to their accuracy.

[35] Doc. 97-2, PlainApp. 00039-41

[36] Doc. 97-2 PlainApp. 000107

predecessor(s)-in interest for any reason with regard to any of the Accounts [including Hinkle's alleged account] sold hereunder. This includes but is not limited to: Account Inquiries, Obligor Information, or Account Documents (including the issuance of any Subpoena Duces Tecum) with regard to any of the Accounts sold hereunder."[37]

Consumer disputes come to Appellees in a typical month through e-OSCAR, the web-based communications system used by the nationwide CRAs to communicate with data furnishers regarding Consumer disputes Encore has generally relied on consumers to inform Encore when it was attempting to collect Debt based on inaccurate or erroneous information." In Hinkle's case, this is all that they could do, since they were not allowed, per the PA, to obtain any of the account-level documentation from the creditors. It only says they *could* have requested any "Terms and Conditions" doc., *if it exists* by written request. Midland did not make the request, admitting they only downloaded a generic version from T-Mobile's web site.[38]

In this case, the dispute letters were sent to the CRAs, and they notified Midland via e-Oscar that she had a disputed claim. Midland admits all they did was look at the data files by automated computer

---

[37] Doc. 97, p. 19.
[38] Doc 83, p. 3, ¶ 7(b), Doc 97, p. 20, ¶g, Doc 87 (Judge's order).

process[39] and then they immediately placed the burden on Hinkle to assist in the investigation.

This raises two critical questions. If Hinkle never had the account, what information *could* she provide to assist in Midland's investigation? Second, if she did go and file a police report that her identity had been stolen, presumably years after the alleged crime of identity theft had occurred, how would this have assisted Midland in their investigation? The answer to both questions is clear or alternatively, raises a different inference; in situations where a debt collector is attempting to collect from the wrong person, it is not reasonable to ask the consumer to participate in the investigation process. Isn't it up to Midland to go and get the account-level documentation to prove their accusations once she disputes it? On these points, Midland fails to show in their brief how their requirements would assist in their investigation.

Midland did not make known to Hinkle whether her account was or was not supported by account-level documentation. Midland acted like they had documentation by making her disprove it. That is a valid inference from the way they treated her and the letters they wrote. They are, in essence, saying to her, "our documents show that you owe this

---

[39] Doc. 85-2.

money.  Prove you don't."  But they admit they have no account documentation.  But when a consumer says, "I never had accounts with them," Appellees cannot continue to say, "prove it."  Now it's up to them to either back off and fix what they are reporting or go get the proof. If they can't get the proof, the only logical inference is to delete it.  At the very least, that is a reasonable inference from their facts.

Hinkle knew that that the T-Mobile Account did not belong to her, but Midland continued to act as if they had a reasonable basis for assuming the debt was hers, knowing they had no original account-level documentation, wrongfully attempting to shift the burden to her to prove otherwise, which was impossible—for she could not provide documentation about something that she never had.

## V.

### MIDLAND IS A DEBT BUYER, THEY ARE NOT A CREDITOR NOR DO THEY ACT ON BEHALF OF CREDITORS; THEREFORE, THEY DO NOT HAVE A PERMISSIBLE PURPOSE FOR ACCESSING APPELLANT'S CREDIT FILES

Appellant previously pointed out that Midland is a debt collector and was trying to collect on an account that was closed, which does not fit the definition of "account" per § 1681b(a)(3).  The FTC has addressed the matter in prior situations; their interpretations of the law on "permissible purpose" are clear and unmistakable, backed by 40 years of experience.

27

Further, Midland is not a creditor:

"**Creditor**" "means any person who offers or extends credit creating a Debt or to whom a Debt is owed, but **such term does not include any person to the extent that that person receives an assignment or transfer of a debt in default solely for the purpose of facilitating collection of such Debt for another [i.e., a debt buyer].**"

According to the FTC, creditors can have a permissible purpose to access a consumer's credit file. However, debt buyers, such as Midland, are *not* creditors since (1) they have *never extended credit* to the Consumer, (2) they are *assigned or transferred* the debt through *purchase*, and (3) they are collecting *on their own behalf* rather than the creditor.

Some debt collectors (not debt buyers) are permitted to access a consumer's credit file. For example, a collection agency, detective agency, private investigator, or attorney can have a permissible "collection" purpose under this section to obtain a consumer report on a consumer for use in obtaining payment of that consumer's account when working on the collection of an account *on behalf of a creditor*.[40]  The FTC has interpreted the statute to afford debt buyers a permissible purpose to obtain credit files,

---

[40] Forty Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report and Summary of Interpretations, Page 44, Section 3(B). https://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations

if doing so in anticipation of a purchase but not after the completion date on the bill of sale.[41]

Because Midland is not a creditor, and because they do not collect on behalf of a creditor, they did not have a permissible purpose for accessing Hinkle's credit files.

## VI.
## THE FDCPA CLAIMS SHOULD NOT BE DISMISSED BECAUSE A TRIER OF FACT COULD INFER FROM THE FACTS THAT APPELLEES VIOLATED VARIOUS SECTIONS OF THE FDCPA, 15 U.S.C. § 1692

### A.     Midland did not comply with the FDCPA when it reported the T-Mobile account to the CRAs

When Hinkle orally disputed the debt, which is permissible under 1692g(a); this should have given Appellees a reason to ascertain whether the alleged T-Mobile Account actually belonged to her. Because they lacked documentation, it was improper to report it to others when Midland knew the information could be inaccurate for lack of review of the account-level documentation, and reliance only upon the data files of the predecessor debt buyer, DRS. This is exactly what the CFPB found and cited them for, and then placed restrictions on Appellees from doing it in the future.

### B.     The issue of "willful" is a question of fact for the jury.

---

[41] *Id.* at p. 47.

Hinkle did not need to argue on appeal whether the violations of the FCRA constituted willful misconduct. Appellees state because she did not argue it, she waived it. She has not. Hinkle can obtain civil damages under either § 1681o (negligence) or § 1681n (willful misconduct). Whether the conduct of Midland was willful or negligent is a question for the jury. Appellee believes that either willful or negligent misconduct would be inferred from the facts as they stand.  In *Miller v. Johnson & Johnson, Janssen Pharmaceuticals*, Inc., 80 F.Supp.3d 1284 (M.D. Fl. 2015), the court held (analogous to the instant case) as follows:

"Miller provides ample evidence that he incurred actual damages as a result of J&J's violation of the FCRA.... Accordingly, Miller has demonstrated a genuine dispute of material fact and the parties will proceed to trial on the issue of damages....The question of whether an employer acted willfully or negligently is "understood to be a question of fact for the jury....Therefore, genuine dispute exists as to whether J&J acted negligently or willfully when it violated the FCRA, an issue on which the parties will also proceed to trial." *Miller* at p. 1296.

## VII.
## HINKLE HAS NOT ABANDONED ANY ISSUES ON APPEAL

All of the arguments set forth above are issues on appeal that Appellees agree were properly raised.  Appellee claims that Hinkle has abandoned some of her issues on appeal.  Even assuming arguments of Hinkle were raised but adequately argued in her opening brief, this court can

still amplify upon the issue explained in this reply brief. *United States v. Smith*, 402 F.3d 1303, 1313 (11th Cir. 2005).[42]

Appellees argue that Appellant did not raise the issue of "account" before the district.[43]  This is not true, as the record clearly shows, it was raised.  *See* Doc. 97, p. 14, paragraphs 48-49.  Therefore the issue has not been waived.

Even if this Court should find certain issues have been abandoned, Appellees stipulated that three issues survive, (1) the obligation of Midland to cease reporting the T-Mobile Account following Hinkle's oral dispute; (2) whether Midland had a permissible purpose to pull the credit report "for the purpose of collecting the T-Mobile account;" and (3) whether Midland's investigation was reasonable under the circumstances.[44]

## CONCLUSION

For the reasons stated above, Appellant Hinkle respectfully requests that the Court deny the district court's summary judgment and remand the case back to the District Court for trial on the merits, with appropriate

---

[42] "[W]e have 'liberally read' that brief and also considered 'counsel's amplification of his position in the reply brief and at oral argument' in order to identify the issues presented. *Id.* And in *Kincade [Kincade v. Gen. Tire & Rubber Co., 635 F.2d 501, 504 (5th Cir.1981)]*, *supra,* we reason that even a few abbreviated descriptions of an argument are ordinarily sufficient to raise it on appeal, at least where other parts of the brief do not contain 'express indications that the appellant does not intend to advance that argument.'"

[43] Appellee's Brief, p. 26.

[44] Appellees' Brief, pp. 20-21.

31

guidance as to the proper application of law with respect to the FCRA and FCPA.

///

## CERTIFICATE OF COMPLIANCE

I hereby certify that my word processing program, Microsoft Word, counted

6965 words in the foregoing Brief, exclusion of the portions excluded by

Rule 32(a)(7)(B)(iii)

_____
Craig K. Perry, Esq., Nevada Bar No. 3786

## CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2015, a true and

correct copy of the foregoing REPLY BRIEF OF APPELLANT TERI LYNN

HINKLE was electronically filed.  Notice of this filing will be sent by

operation of the Court's electronic filing system to all parties indicated on

the electronic filing receipt.  Parties may access this filing through the

court's electronic filing system.

_____
Craig K. Perry, Esq., Nevada Bar No. 3786